**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC.; BEULAH MISSIONARY BAPTIST CHURCH; E.D. NIXON APARTMENTS, INC.; MCRAE PROSTATE CANCER AWARENESS FOUNDATION; MILSTEAD COMMUNITY CENTER, INC.; NCO NILE CLUB; NEW ELAM MISSIONARY BAPTIST CHURCH; NOTASULGA HIGH SCHOOL PTSA; SHORTER COMMUNITY DEVELOPMENT, INC.; SHORTER LODGE # 533; SHORTER VOLUNTEER FIRE DEPARTMENT; SOJOURNER TRUTH CHAPTER #265 OES; SWEET GUM AME ZION CHURCH; TABERNACLE BAPTIST CHURCH; TUBMAN GARDENS, INC.; TUSKEGEE MACON COUNTY COMMUNITY FOUNDATION, INC.; TUSKEGEE NATIONAL ALUMNI ASSOCIATION; LUCKY PALACE, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 3:06-cv-01113-WKW-csc |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY; MILTON MCGREGOR; MACON COUNTY GREYHOUND PARK, INC., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## THIRD AMENDED COMPLAINT

1.      This is an action by seventeen Macon County, Alabama, non-profit organizations ("The Charities") and Lucky Palace, LLC, against David Warren in his official capacity as the Sheriff of Macon County, Alabama; Milton McGregor; and Macon County Greyhound Park, Inc.

("VictoryLand").  This Complaint includes claims: (1) against Defendant Warren, pursuant to 42 U.S.C. § 1983, for violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; (2) against all Defendants, pursuant to 42 U.S.C. § 1983, for a conspiracy to deprive the Charities of the equal protection of the laws; (3) against all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (4) against all defendants for a conspiracy to violate RICO, (5) against Defendants McGregor and VictoryLand for tortious interference with contractual or business relations, and (6) against Defendants McGregor and VictoryLand for tortious interference with prospective business relationships.

2.    At least since the fall of 2003, Defendants—who, with others, constitute an Enterprise directed by VictoryLand and McGregor, a shareholder and employee of VictoryLand—have engaged in the improper influence of a public servant in connection with the promulgation and amendment of the rules and regulation governing electronic bingo in Macon County.  Said Enterprise is more fully described herein.

3.    Throughout the applicable time period, Defendants VictoryLand and McGregor, through unlawful influence, caused Defendant Warren to arbitrarily promulgate unreasonable rules and regulations for the operation of bingo in Macon County that allowed only one entity— VictoryLand—to operate electronic bingo games.  Not only were the original rules and regulations a product of the influence and designed to favor only VictoryLand, but, through the continued influence of the Enterprise, the rules and regulations were amended twice to ensure that attempts of competitors to enter the market would be thwarted.  These improper activities furthered the Enterprise by allowing it to exist and flourish without competition, to the detriment of the Plaintiffs.

2

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically 42 U.S.C. § 1983 and 18 U.S.C. § 1962. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965(a) because all Defendants reside in this district, all Defendants are subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

## PARTIES

6.      Plaintiff Hope for Families & Community Services, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to prevent abuse and neglect of families and children.

7.      Plaintiff Beulah Missionary Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

8.      Plaintiff E.D. Nixon Apartments, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to provide elderly and handicapped persons with housing facilities and services specially designed to meet their physical, social, and psychological needs, and to promote their health, security, happiness, and usefulness.

9.      Plaintiff McRae Prostate Cancer Awareness Foundation is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to promote prostate health and awareness, prostate cancer support groups for patients

and their families, and research into life-enhancing treatment and an eventual cure for prostate cancer.

10.    Plaintiff Milstead Community Center, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama. Its mission is to improve the economic, civic, and social conditions of the community of Milstead, Alabama.

11.    Plaintiff NCO Nile Club is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama. It is an organization of non-commissioned officers of the Reserve and National Guard units in and around Tuskegee, Alabama. Its mission is to maintain liaison between officers and enlisted men; to obtain a higher degree of readiness; to discuss, solve, and eliminate problems in the units, in order to further the common good, general welfare, and relations of their community; to bring about civil betterment through grants, donations, guidance, and support; and to aid charitable, educational, and recreational projects through youth groups.

12.    Plaintiff New Elam Missionary Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

13.    Plaintiff Notasulga High School PTSA is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

14.    Plaintiff Shorter Community Development, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama. Its mission is to establish structured support services for homeless and economically disadvantaged individuals, families, and juveniles so that they may lead lives of self-sufficiency.

15.    Plaintiff Shorter Lodge # 533 is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

16.    Plaintiff Shorter Volunteer Fire Department is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

17.    Plaintiff Sojourner Truth Chapter #265 OES is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

18.    Plaintiff Sweet Gum AME Zion Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

19.    Plaintiff Tabernacle Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

20.    Plaintiff Tubman Gardens, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to provide elderly and handicapped persons with housing and services designed to meet their physical, social, and psychological needs and to promote their health, security, happiness, and usefulness.

21.    Plaintiff Tuskegee Macon County Community Foundation, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to bring together human and financial resources to address and solve community problems.

22.    Plaintiff Tuskegee National Alumni Association is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to foster the ideals of Tuskegee Institute and its founder, Booker T. Washington; to encourage and assist students, graduates, and former students toward the highest development of character and service to mankind; to encourage liberal financial and moral support of Tuskegee Institute and its policies; and to assume and maintain an active national leadership in the promotion and furtherance of Tuskegee Institute.

23.    Plaintiff Lucky Palace, LLC, is a limited liability company formed under the laws of the State of Delaware, and its principal place of business is in the State of Alabama.

24.    Defendant David Warren is a citizen and resident of Macon County in the State of Alabama.  Defendant Warren is also the Sheriff of Macon County.

25.    Defendant Milton McGregor is a citizen and resident of Montgomery County in the State of Alabama.  Defendant McGregor is also the President and majority shareholder of Macon County Greyhound Park, Inc.

26.    Defendant Macon County Greyhound Park, Inc., is a corporation formed under the laws of the State of Alabama, and its principal place of business is in the State of Alabama. Macon County Greyhound Park, Inc., does business as VictoryLand.

## RELEVANT NON-PARTIES

27.    Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C., (hereinafter the "Gray Law Firm") is a professional corporation formed under the laws of the State of Alabama, and its principal place of business is in the State of Alabama.

28.    Fred D. Gray Jr. is a citizen and resident of Macon County in the State of Alabama.  Gray is a shareholder the Gray Law Firm.

29.    Fred D. Gray is a citizen and resident of Macon County in the State of Alabama. Fred Gray is the father of Fred Gray Jr. and is a shareholder in the Gray Law Firm.  Fred Gray is also a shareholder in Defendant VictoryLand.

## FACTUAL BASIS

30.    Since at least 1992, Fred Gray, Fred Gray Jr., and the Gray Law Firm have represented Defendants VictoryLand and McGregor.  From 1992 to the present, Defendants McGregor and VictoryLand have bestowed at least the following benefits on the Grays and the

Gray Law Firm: (1) legal fees; (2) free travel on aircraft owned or chartered by Defendants McGregor and VictoryLand; and (3) substantial dividend payments to Fred Gray in his capacity as a shareholder in VictoryLand.

31.     Amendment 555 of the Constitution of the State of Alabama provides for "local" constitutional amendments.    Pursuant to Amendment 555, any proposed constitutional amendment that affects only one county can be adopted as a valid part of the Constitution by a majority vote of the affected county.   Through this type of amendment, the operation of bingo gaming facilities has been authorized in various counties throughout the State.

32.     On or about November 4, 2003, the voters of Macon County approved Amendment 744 to the Constitution, which governs the operation of bingo gaming in Macon County, Alabama.   Amendment 744 provides that "the operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in Macon County." *See* Ala. Const. (1901) Amend. 744.   Further, the Amendment provides that the non-profit organization may enter into an agreement with an individual, firm, or a corporation to operate the facility.   Pursuant to Amendment No. 744, the Alabama Legislature delegated the authority to promulgate rules and regulations for the licensing and conduct of bingo games to the Sheriff of Macon County.

33.     Amendment 744 did not limit the number of bingo licenses that could be issued by the Sheriff of Macon County, nor did it restrict the operation of bingo gaming in Macon County to one facility or operator.

34.     When Amendment 744 was approved in November 2003, Lucky Palace embarked on an endeavor to build, own and operate a bingo parlor in Macon County, Alabama.   Lucky Palace hired an experienced management team and licensed a highly visible brand—Planet

Hollywood—for its bingo parlor. To finance the construction of its bingo parlor, Lucky Palace secured $54 million in financial commitments. As part of its construction, Lucky Palace plans significant improvements to the local infrastructure, including sewer and water service upgrades, at no cost to Macon County. Lucky Palace's bingo parlor will create 630 new jobs in Macon County.

35.   Lucky Palace was not the only entity interested in operating a bingo parlor in Macon County. VictoryLand was similarly interested, and, on or about November 11, 2003, Defendant McGregor had a conversation with Defendant Warren, the Sheriff of Macon County, about VictoryLand's interest in conducting electronic bingo. That conversation was conducted in the presence of attorney Fred Gray Jr.

36.   Upon information and belief, Fred Gray Jr., Defendant Warren, and Defendant McGregor agreed to formulate rules and regulations for the licensing and conduct of bingo games that would allow only non-profit organizations affiliated with VictoryLand to conduct electronic bingo games.[1] Such rules would grant VictoryLand a monopoly on electronic bingo

---

[1] "Where pleadings concern matters 'peculiarly within the knowledge of the defendants,' conclusory pleading on 'information and belief' should be liberally viewed." *Tankersley v. Albright*, 514 F.2d 956, 965 n.16 (7th Cir. 1975) (quoting *Carroll v. Morrison Hotel Corp.*, 149 F.2d 404, 406 (7th Cir. 1945)). The alleged agreement and its contents are peculiarly within the knowledge of Defendants Warren and McGregor and their attorney, Fred Gray Jr. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of attorney Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray., is an investor in VictoryLand, (4) that Fred Gray Jr. currently represents Defendant McGregor and VictoryLand and has represented Defendants McGregor and VictoryLand since at least 1992, (5) that Defendant Warren, despite some knowledge of this past representation, retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, (6) that Sheriff Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a monopoly on the conduct of electronic bingo games in Macon County, and (8) that Defendant Warren issued the one-sided rules and regulations.

gaming in Macon County, allowing it to reap profits of hundreds of millions of dollars, without the threat of competing electronic bingo facilities in the County.

37.    After forming their agreement, Defendants Warren and McGregor had an identical or virtually identical interest in promulgating rules and regulations that favored nonprofit organizations affiliated with Defendant VictoryLand.

38.    In pursuit of their common goal, Defendants Warren, McGregor, and VictoryLand retained the same attorney, Fred Gray Jr., to represent them with regard to the formulation of the rules and regulations for the licensing and conduct of bingo games.

39.    On or about December 5, 2003, Defendant Warren, the Sheriff of Macon County, promulgated "Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("Original Rules"), a true and correct copy of which are attached hereto as Exhibit A.  The Original Rules were primarily drafted by Fred Gray Jr., on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in drafting the Original Rules.

40.    The Original Rules stated that any Macon County non-profit organization could apply for a Class B Bingo License.  They further provided that "[a] Class B Bingo License shall be issued to an applicant who desires to operate any and all games of bingo . . . at a qualified location for the holder of a Class B License."  The Original Rules defined a "qualified location for the holder of a Class B Bingo License" as a location that, among other things, had a value of $5 million, including the land, building and improvements.  Furthermore, to be a qualified location, the location had to be inspected and approved by the Sheriff.  The Original Rules only required one charity to contract with an operator of a qualified location to host bingo, and there was no maximum number of licenses that could be issued.

41.     At the time the Original Rules were promulgated, the only location in Macon County that had a value of $5 million was VictoryLand.  On December 17, 2003—twelve days after the Original Rules were issued—Defendant Warren issued the first Class B Bingo License to the Tuskegee Human and Civil Rights Multicultural Center for the conduct of bingo games at VictoryLand.  Fred Gray is the President of the Tuskegee Human and Civil Rights Multicultural Center.  Defendant McGregor is also an officer of the Tuskegee Human and Civil Rights Multicultural Center.  Defendant Warren—prior to issuing the Class B Bingo License—did not conduct an investigation into, among other things, the value of VictoryLand or the identity of its owners, as required by the Original Rules.  Instead, Defendant Warren relied solely on representations made by Defendant McGregor.

42.     Defendant Warren's interpretation of the Original Rules ensured that VictoryLand would remain the only "qualified location" for the conduct of electronic bingo.  The Original Rules required a "qualified location" to be inspected and approved by the Sheriff.  Defendant Warren interpreted this rule to require that a facility be constructed and visually inspected by him before receiving approval or disapproval.  Furthermore, the Original Rules contained no specifications that, if met, would guarantee approval.  Businesses other than VictoryLand were thus ensnared in a Catch-22: No rational investor would be willing to invest $5 million in a location without a license, and no one could get a license until they invested $5 million in a location.

43.     To escape from this Catch-22, Lucky Palace sought a reasonable accommodation with Defendant Warren.  In or around January 2004, Paul Bracy Jr., President of Lucky Palace, was assured by Defendant Sheriff that anyone who met the requirements set forth in the Original Rules would have no problem obtaining a license to operate bingo games in Macon County.

Based on those assurances, Lucky Palace continued its efforts to establish a "qualified location for the holder of a Class B Bingo License" in Macon County by securing capital investments in excess of $5 million and by ensuring that all other requirements in the Original Rules would be met.

44.    Before Lucky Palace could meet those requirements, however, Defendant Warren, with the assistance of Fred Gray Jr., changed the rules.  On or about June 2, 2004, Defendant Warren promulgated an amended set of rules entitled "First Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("First Amended Rules"), a true and correct copy of which are attached hereto as Exhibit B.  The First Amended Rules were primarily drafted by Fred Gray Jr.—the attorney for Defendants Warren, McGregor, and VictoryLand—on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in the promulgation of the First Amended Rules.  The First Amended Rules were not publicly disclosed by Defendant Warren at the time of their promulgation, and there was no opportunity for public comment on the amendments prior to their promulgation.

45.    On June 2, 2004, Fred Gray Jr. faxed a copy of the First Amended Rules to Defendant McGregor and John Bolton, one of Defendant McGregor's attorneys.

46.    On June 10, 2004, the Tuskegee News disclosed the existence of the First Amended Rules to the public for the first time.  The First Amended Rules defined a "qualified location for the holder of a Class B Bingo License" as a location that, among other things, had a value of $15 million, including the land, building and improvements.  The First Amended Rules also provided that "[n]o Class B Licensee shall be authorized to operate bingo at any qualified

location . . . unless a minimum of fifteen (15) applicants shall first obtain a Class B License for such location." This provision will be referred to hereinafter as the "Fifteen License Minimum."

47.     On or about June 11, 2004—following the disclosure of the First Amended Rules by the Tuskegee News—Lucky Palace again notified Defendant Warren by letter of its intention to build, own, and operate a "qualified location for the holder of a Class B Bingo License" in compliance with the Original Rules. Lucky Palace asked for confirmation that a Class B Bingo License would be issued to a qualified nonprofit organization that desired to operate bingo games at the location if such a location were built. Defendant Warren did not respond to the letter.

48.     On or about June 15, 2004, Lucky Palace contacted Defendant Warren by letter to notify him that it was continuing to operate under the Original Rules. Stressing to Defendant Warren that the process of land purchases, site development, environmental assessments, associated legal and consulting fees and architectural renderings were all based on the Original Rules, Lucky Palace inquired as to the impact of the First Amended Rules on Lucky Palace's planned development. Defendant Warren did not respond.

49.     On or about July 21, 2004, Bracy and Defendant Warren met in Defendant Warren's office to discuss the concerns of the Lucky Palace lenders and investors over the First Amended Rules and any additional changes that may be forthcoming.

50.     On or about July 30, 2004, Bracy sent, for Defendant Warren's signature, a statement that the First Amended Rules would not be further amended and that, if Lucky Palace complied with the First Amended Rules, there will be no delays or problems in obtaining his approval of its "qualified location for the holder of a Class B Bingo License." Defendant Warren did not sign the statement.

51.     On or about August 5, 2004, Defendant Warren replied by letter to Bracy and stated that he reserved the right to amend the regulations as necessary but did not see any amendments in the foreseeable future.  He further stated that the First Amended Rules governed any bingo operations that were currently in existence or that were to be constructed and completed in the following several months.

52.     On or about November 10, 2004—after securing contracts with over fifteen nonprofit organizations—Lucky Palace submitted an Application for Bingo Operator's License. The application was denied because, according to Defendant Warren, Lucky Palace's proposed location did not qualify as it was not completed.

53.     On or about November 23, 2004, Lucky Palace sought clarification on what constituted "capital improvements" under the First Amended Rules.  This clarification was to ensure that Lucky Palace could come into compliance with the $15 million requirement for locations in the First Amended Rules.  This also placed Defendant Warren on notice that the requirements in place at that time would soon be met by Lucky Palace.

54.     On or about January 6, 2005, Defendant Warren amended his rules again.  The amended set of rules was entitled "Second Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("Second Amended Rules"), a true and correct copy of which are attached hereto as Exhibit C.  The Second Amended Rules were primarily drafted by Fred Gray Jr.—the attorney for Defendants Warren, McGregor, and VictoryLand—on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in the promulgation of the Second Amended Rules.

55.    The Second Amended Rules stated that "[a]t no time shall there be issued and outstanding more than sixty (60) Class B Licenses for the operation of bingo in Macon County." This provision will be referred to hereinafter as the "Sixty License Maximum."

56.    Defendant Warren promulgated the Second Amended Rules with knowledge that forty-six Class B Bingo Licenses had been, or soon would be, issued to non-profit organizations with contractual ties to Defendant VictoryLand.  Accordingly, the Sixty License Maximum—combined with Fifteen License Minimum—foreclosed the operation of bingo games in Macon County at any location other than VictoryLand.

57.    On March 8, 2005, Pebblin W. Warren, the wife of Defendant Warren, was elected to the Alabama House of Representatives in a special election.  On or about July 18, 2005, Representative Warren submitted HB 17, a bill which sought to amend Amendment 744 to incorporate the Second Amended Rules.  That amendment would have further insulated VictoryLand from competing bingo parlors in Macon County.  HB 17 was not enacted into law.

58.    On or about July 25, 2005, the Charities submitted Charity Application Packages for Class B Bingo Licenses (hereinafter "Applications") to Defendant Warren.  The Applications indicated that the Charities intended to conduct bingo at a location owned by Lucky Palace.  Pursuant to their contracts with Lucky Palace, the Charities were each guaranteed semi-annual payments of $21,000 for operating bingo games at Lucky Palace's location.  To this day, Defendant Warren has failed to issue Class B Bingo Licenses to the Charities.

59.    On or about August 17, 2005, Lucky Palace sent a letter to Defendant Warren in which it expressed its concerns over Defendant Warren's repeated dismissals of efforts to acquire bingo licenses to operate in Macon County.  Pre-approval was again requested by Lucky Palace so that it could begin construction on its location and move towards the operation of a

"qualified location for the holder of a Class B Bingo License" in Macon County. Defendant Warren did not respond.

60.     By the end of 2005, fifty-eight Class B Bingo Licenses had been issued to non-profit organizations affiliated with VictoryLand. As of today, all sixty Class B Bingo Licenses have been issued to non-profit organizations affiliated with VictoryLand.

61.     As a direct result of Defendant Warren's actions—which, upon information and belief, were conducted at the behest of Defendants McGregor and VictoryLand and with the advice, consent, and influence of Fred Gray Jr.[2]—Lucky Palace has been unable to open and operate its bingo facility and has suffered damages in the form of lost profits.

62.     On several occasions, during meetings between representatives of Lucky Palace and Defendant Warren, Defendant Warren told the representatives that, if Lucky Palace or the Charities wanted Class B Bingo Licenses, then they would have to sue him.

63.     On December 18, 2006, the Charities filed the instant suit against Sheriff Warren and, on March 2, 2006, moved for leave to add McGregor and VictoryLand as Defendants. On March 6, 2007, Alabama State Senator Myron Penn submitted SB 92, a bill that—like HB 17 submitted by Representative Warren—sought to amend Amendment 744 to incorporate the

---

[2] The reasons for Defendant Warren's conduct are peculiarly within the knowledge of Defendant Warren. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of attorney Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray., is an investor in VictoryLand, (4) that Fred Gray Jr. currently represents Defendant McGregor and VictoryLand and has represented Defendants McGregor and VictoryLand since at least 1992, (5) that Defendant Warren, despite some knowledge of this past representation, retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, (6) that Sheriff Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations, (7) that the rules and regulations drafted by Fred Gray Jr. gave Defendant VictoryLand a monopoly on the conduct of electronic bingo games in Macon County, and (8) that Defendant Warren issued the one-sided rules and regulations.

Second Amended Rules. Defendant McGregor has contributed at least $10,000 to Senator Penn's campaigns.

## PATTERN OF RACKETEERING ACTIVITY

64.     As described more fully herein, the Defendants are engaged in an ongoing pattern of racketeering as defined by 18 U.S.C. § 1961(5).

65.     The pattern of racketeering activity engaged in by the Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

66.     Under 18 U.S.C. § 1961(1), "racketeering activity" includes any act or threat involving bribery that is chargeable under state law and punishable by imprisonment for more than one year.

67.     The racketeering activity in this case includes an ongoing pattern of violations of Alabama's bribery statutes.

68.     Ala. Code § 13A-10-60, *et seq.*, is entitled "Bribery and Corrupt Influence." Ala. Code § 13A-10-60 incorporates the definition of "public servant" set forth in Ala. Code § 13A-10-1. Ala. Code § 13A-10-1(7) defines a "public servant," in pertinent part, as "[a]ny officer or employee of government, including . . . any person . . . participating as an adviser, consultant, or otherwise in performing a governmental function."

69.     After Fred Gray Jr. was retained by Defendant Warren for the purpose of advising him with respect to the formulation of rules and regulations for the licensing and conduct of bingo games, Fred Gray Jr. became a "public servant," as that term is defined by Ala. Code § 13A-10-1(7). *Cf. Vaughn v. State*, 880 So. 2d 1178 (Ala. Crim. App. 2003) (holding that the president of an architectural, engineering, and urban planning firm, who was retained as a

consultant by the state, was a "public servant" as defined by Ala. Code § 13A-10-1(7)); *Vaughan v. Marshall*, 2006 WL 1476043, \*8 (M.D. Ala. 2006) ("The evidence was undisputed that Vaughn was hired as a consultant to conduct a comparative site analysis for the State of Alabama; thus, he clearly fell within the definition of a 'public servant.'").

70.     Ala. Code § 13A-10-61(a) states that "[a] person commits the crime of bribery if:

(1)     He offers, confers or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced; or

(2)     While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

Ala. Code § 13A-10-61(a).  Ala. Code § 13A-10-61(c) states that "[b]ribery is a Class C felony." Pursuant to Ala. Code § 13A-5-6, a Class C felony is punishable by imprisonment for a term not more than 10 years or less than 1 year and 1 day.

71.     Defendants McGregor and VictoryLand have violated and continue to violate Ala. Code § 13A-10-61(a)(1).   As described more fully herein, Defendants McGregor and VictoryLand, on multiple occasions since January 1, 2003, have offered, conferred, and/or agreed to confer things of value upon Fred Gray, Fred Gray Jr., and the Gray Law Firm, with the intent that Fred Gray Jr.'s opinion, judgment, exercise of discretion, or other actions in advising and consulting with Defendant Warren in the promulgation of, and subsequent amendments to, the rules and regulations for the operation of bingo in Macon County would be corruptly influenced.

72.     Fred Gray Jr. has violated and continue to violate Ala. Code § 13A-10-61(a)(2). As described more fully herein, Fred Gray Jr., on multiple occasions since January 1, 2003, has

solicited, accepted, and/or agreed to accept pecuniary benefits from Defendants McGregor and VictoryLand upon an agreement or understanding that Fred Gray Jr.'s opinion, judgment, exercise of discretion, or other actions in promulgating and amending rules and regulations for the operation of bingo in Macon County would be corruptly influenced.

73.    Each such violation of Ala. Code § 13A-10-61 constitutes an act of "racketeering activity" under 18 U.S.C. § 1961(1)(A).

74.    A "thing of value" "does not necessarily mean a substance . . . . [I]t includes an act, or action." *Caruthers v. State*, 74 Ala. 406 (Ala. 1883). "'Value . . . is determined by the application of a subjective, rather than an objective, test, and the requirement of value is satisfied if the thing has sufficient value in the mind of the person concerned so that his actions are influenced.'" *McDonald v. State*, 329 So. 2d 583, 587 (Ala. Cr. App. 1975) (quoting 12 Am. Jur. 2d Bribery § 7).

75.    On numerous occasions since January 1, 2003, Defendants McGregor and VictoryLand have bestowed the following things of value on Fred Gray, Fred Gray Jr. and the Gray Law Firm: (1) legal fees and the promise of future legal fees; (2) free travel on aircraft owned or chartered by Defendants McGregor and VictoryLand and the promise of future free travel; and (3) substantial dividend payments to Fred Gray in his capacity as a shareholder in VictoryLand and the promise of substantial payments in the future. All of these things had value in the mind of Fred Gray Jr.

76.    In a bribery case, intent may be established by circumstantial evidence. *See United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996). The circumstances surrounding the promulgation and amendment of the rules and regulations for electronic bingo establish that

(1) Defendants McGregor and VictoryLand intended to corruptly influence Fred Gray Jr. and (2) Fred Gray Jr. agreed or understood that his actions would be corruptly influenced.

77.    Defendant McGregor met with Fred Gray Jr. and Defendant Warren within a week after Amendment 744 was ratified.  Defendant McGregor, at that meeting, did not disclose to Defendant Warren the full extent of the benefits that he had bestowed or planned to bestow on Fred Gray Jr.  Defendant Warren, following the meeting, retained Fred Gray Jr. to draft the rules and regulations and planned to rely on Fred Gray Jr.'s opinion, judgment, and exercise of discretion when Fred Gray Jr. advised and consulted Defendant Warren on the content of those rules and regulations.

78.    Following the meeting, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to aid in the creation rules and regulations that favored Defendant VictoryLand.[3] Upon information and belief, Fred Gray Jr. agreed and understood that, if he created rules and

---

[3] The alleged intent is peculiarly within the knowledge of Defendant McGregor.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of Fred Gray Jr., (3) that, from at least 1992 until the time of the meeting, Defendants McGregor and VictoryLand had bestowed things of value on Fred Gray Jr., (4) that, at the time of the meeting, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (5) that, following the meeting, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (6) that, following the meeting, Fred Gray Jr. continued to represent Defendants McGregor and VictoryLand, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (8) that such a monopoly was not in the best interests of the people of Macon County, (9) that, following the issuance of the rules and regulations, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the rules and regulation, Fred Gray Jr. continued representing Defendants McGregor and VictoryLand.

regulations that favored VictoryLand, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[4]

79.    Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in drafting the rules and regulations.[5]    Neither Defendant McGregor nor Fred Gray Jr. disclosed the full extent of this assistance to Defendant Warren.

80.    As a result of Defendant McGregor's influence, the Original Rules were drafted in such a way that Defendant VictoryLand was the only location in Macon County that could qualify for the conduct of electronic bingo, and its qualification was immediate.    The Original Rules also imposed no requirements on the amount of compensation that a location would have

---

[4] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of Fred Gray Jr., (3) that, from at least 1992 until the time of the meeting, Defendants McGregor and VictoryLand had bestowed things of value on Fred Gray Jr., (4) that, at the time of the meeting, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (5) that, following the meeting, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (6) that, following the meeting, Fred Gray Jr. continued to represent Defendants McGregor and VictoryLand, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (8) that such a monopoly was not in the best interests of the people of Macon County, (9) that, following the issuance of the rules and regulations, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the rules and regulation, Fred Gray Jr. continued representing Defendants McGregor and VictoryLand.

[5] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and his attorney, Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that a meeting was conducted in the presence of Fred Gray Jr., (2) that, following the meeting, Fred Gray Jr. continued to represent Defendants McGregor and VictoryLand, (3) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (4) that such a monopoly was not in the best interests of the people of Macon County, (5) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (6) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

to give to a non-profit organization in exchange for the location's right to conduct electronic bingo on the organization's behalf. Accordingly, the Original Rules allowed Defendant VictoryLand to be the primary beneficiary of electronic bingo—with its affiliated non-profit organizations receiving little money in return.

81.    Because the Original Rules heavily favored Defendant VictoryLand, they did not serve the interests of the people of Macon County—interests that Defendant Warren, and Fred Gray Jr., as his adviser, were bound to protect and serve. The Original Rules, among other things, deterred additional investment in Macon County and prevented the creation of additional jobs. The Original Rules also prevented the establishment of Macon County as a gaming destination. In addition, the virtual monopoly granted to Defendant VictoryLand obviated any need for VictoryLand to invest in capital improvements to it facilities, to compensate fairly the nonprofit organizations affiliated with it, or to compensate its employees with competitive wages or other benefits.

82.    Fred Gray Jr. presented the Original Rules to Defendant Warren. Defendant Warren made few, if any, changes to the Original Rules before adopting and promulgating them as the rules and regulation governing electronic bingo. Instead, Defendant Warren relied on Fred Gray Jr.'s opinion, judgment, and exercise of discretion regarding the content of the Original Rules.

83.    Shortly after the Original Rules were promulgated, Defendant VictoryLand contracted with the Tuskegee Human and Civil Rights Multicultural Center, a nonprofit organization, for the conduct of electronic bingo at VictoryLand. The Tuskegee Human and Civil Rights Multicultural Center was controlled by Fred Gray and Defendant McGregor. Under the terms of their contract, the Tuskegee Human and Civil Rights Multicultural Center agreed to

accept a flat fee of $10,500 per year from VictoryLand. In return, VictoryLand would receive all of the proceeds from the conduct of electronic bingo.

84. The Tuskegee Human and Civil Rights Multicultural Center applied for a license for the conduct of electronic bingo, and Defendant Warren issued that license on December 17, 2003. Defendant Warren, relying on the advice of Fred Gray Jr., made no inquiry into the contractual arrangement between the Tuskegee Human and Civil Rights Multicultural Center and VictoryLand.

85. After Defendant Warren issued a license to the Tuskegee Human and Civil Rights Multicultural Center, Defendant VictoryLand immediately began operating electronic bingo games. The one-sided terms of Defendant VictoryLand's contract with the Tuskegee Human and Civil Rights Multicultural Center allowed Defendant VictoryLand to offer the opportunity to conduct electronic bingo at its location to other nonprofit organizations on a take-it-or-leave-it basis.

86. From December 17 to June 2004, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr.

87. In early 2004, Plaintiff Lucky Palace was developing firm plans for the construction of an electronic bingo parlor to compete with Defendant VictoryLand. In April 2004, Plaintiff Lucky Palace contracted with Plaintiffs McRae Prostate Awareness Foundation and Shorter Community Development, Inc., for the conduct of electronic bingo. In May 2004, Plaintiff Lucky Palace closed a purchase of land adjacent to Defendant VictoryLand's bingo parlor.

88. In May 2004, Defendant Warren authorized Fred Gray Jr. to revise the Original Rules using his opinion, judgment, and exercise of discretion. After Fred Gray Jr. received this

authorization, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to develop more onerous rules and regulations for competing facilities.[6]  Upon information and belief, Fred Gray Jr. agreed and understood that, if he developed more onerous rules and regulations for competing facilities, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[7]

---

[6] The alleged intent is peculiarly within the knowledge of Defendant McGregor.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Original Rules until May 2004, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2004, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray Jr. continued to represent Defendants McGregor and VictoryLand, (5) that the First Amended Rules drafted by Fred Gray Jr. imposed rules and regulations for the conduct of electronic bingo games in Macon County that were even more onerous than the Original Rules, (6) that the monopoly thereby sustained was not in the best interests of the people of Macon County, (7) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, (8) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News, (9) that, following the issuance of the First Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the First Amended Rules, Fred Gray Jr. continued representing Defendants McGregor and VictoryLand.

[7] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Original Rules until May 2004, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2004, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray Jr. continued to represent Defendants McGregor and VictoryLand, (5) that the First Amended Rules drafted by Fred Gray Jr. imposed rules and regulations for the conduct of electronic bingo games in Macon County that were even more onerous than the Original Rules, (6) that the monopoly thereby sustained was not in the best interests of the people of Macon County, (7) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor

89.    Fred Gray Jr. revised the rules and regulations to impose more onerous requirements on facilities competing with VictoryLand.  Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in revising the rules and regulations.[8]  Fred Gray Jr., without fully disclosing the assistance received from Defendants McGregor and VictoryLand, advised Defendant Warren to issue the First Amended Rules. Defendant Warren then issued the First Amended Rules with few, if any, changes in June 2004.

90.    From June 2004 to December 2004, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr.

91.    Despite the onerousness of the First Amended Rules, Lucky Palace took steps to meet their requirements after learning about their issuance.  Throughout the fall of 2004, Lucky Palace provided frequent updates to Defendant Warren regarding the status of their venture.  In September 2004, Lucky Palace contracted with seventeen additional non-profit organizations for the conduct of electronic bingo at Lucky Palace's planned facility, bringing the total to nineteen and easily satisfying the 15 License Minimum.  Lucky Palace contracted with additional non-

---

and John Bolton, one of his attorneys, (8) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News, (9) that, following the issuance of the First Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the First Amended Rules, Fred Gray Jr. continued representing Defendants McGregor and VictoryLand.

[8] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and his attorney, Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the First Amended Rules through January 2004, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (2) that the First Amended Rules imposed onerous requirements on bingo parlors that intended to compete with VictoryLand, thus shoring up VictoryLand's virtual monopoly on the conduct of electronic bingo games in Macon County, (3) that such a monopoly was not in the best interests of the people of Macon County, (4) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (5) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

profit organizations in October and December 2004. In December 2004, Lucky Palace purchased a 5.49 acre tract of land directly across the street from Defendant VictoryLand's bingo parlor.

92.    In December 2004, Defendant Warren authorized Fred Gray Jr. to revise the First Amended Rules using his opinion, judgment, and exercise of discretion. After Fred Gray Jr. received this authorization, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to develop rules and regulations that would prevent the opening of a competing bingo parlor.[9] Upon information and belief, Fred Gray Jr. agreed and understood that, if he developed more such rules and regulations, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[10]

---

[9] The alleged intent is peculiarly within the knowledge of Defendant McGregor. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Second Amended Rules until June 2005, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in June 2005, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray Jr. continued to represent Defendants McGregor and VictoryLand, (5) that the Second Amended Rules drafted by Fred Gray Jr. granted a monopoly on electronic bingo to Defendant VictoryLand, (6) that the monopoly thereby granted was not in the best interests of the people of Macon County, (7) that, following the issuance of the Second Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (8) that, following the issuance of the Second Amended Rules, Fred Gray Jr. continued representing Defendants McGregor and VictoryLand.

[10] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Second Amended Rules until May 2005, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2005, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants

93.    Fred Gray Jr. revised the rules and regulations to prevent the opening of a bingo parlor that could compete with Defendant VictoryLand.  Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in revising the rules and regulations.[11]  Fred Gray Jr., without fully disclosing the assistance received from Defendants McGregor and VictoryLand, advised Defendant Warren to issue the Second Amended Rules. Defendant Warren then issued the Second Amended Rules with few, if any, changes on January 6, 2005.

94.    The Second Amended Rules capped the maximum number of Class B Bingo Licenses at 60.  That cap, combined with the requirement that a bingo parlor contract with a minimum of 15 non-profit organizations before conducting electronic bingo, has foreclosed competition for electronic bingo in Macon County.

95.    From January 6, 2005, until the present, Defendants McGregor and VictoryLand have continued to bestow things of value on Fred Gray Jr.

---

McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray Jr. continued to represent Defendants McGregor and VictoryLand, (5) that the Second Amended Rules drafted by Fred Gray Jr. granted a monopoly on electronic bingo to Defendant VictoryLand, (6) that the monopoly thereby granted was not in the best interests of the people of Macon County, (7) that, following the issuance of the Second Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (8) that, following the issuance of the Second Amended Rules, Fred Gray Jr. continued representing Defendants McGregor and VictoryLand.

[11] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and his attorney, Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the First Amended Rules through June 2005, Fred Gray Jr. represented Defendants McGregor and VictoryLand, (2) that the Second Amended Rules established an actual monopoly on the conduct of electronic bingo games in Macon County, (3) that such a monopoly was not in the best interests of the people of Macon County, (4) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (5) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

96.    The alleged acts of racketeering activity involve a distinct threat of long-term racketeering activity.

97.    The above-described bribery of Fred Gray Jr. by Defendants McGregor and VictoryLand—which has resulted in the promulgation and maintenance of rules and regulations that deprive the Plaintiffs of the ability to open a business that competes with VictoryLand—has continued for almost four years, is ongoing at the present time, and will continue into the future unless halted by judicial intervention.  This bribery has corruptly influenced Fred Gray Jr.'s opinion, judgment, and exercise of discretion by motivating him to act in his personal interest and in the interest of Defendants McGregor and VictoryLand rather than in the public interest. The bribery continues to corruptly influence Fred Gray Jr.'s opinion, judgment, and exercise of discretion, preventing him from fulfilling his duties as a public servant.

98.    The above-described bribery—which insulates VictoryLand and its profits from any threat of competition—is part of McGregor and VictoryLand's regular way of doing business.  Indeed, the bribery has allowed VictoryLand to (1) avoid investing in capital improvements to its facilities, (2) decline to compensate fairly the nonprofit organizations affiliated with it, (3) refuse to bestow adequate benefits on its employees, whose employment prospects are diminished by VictoryLand's monopoly, and (4) impose unreasonable working conditions on its employees.  The bribery has thus greatly benefited VictoryLand at the expense not only of the Plaintiffs but of the people of Macon County.

### THE ENTERPRISE

99.    Defendants, as well as Fred Gray Jr., Fred Gray, and the Gray Law Firm, were associated in fact as an "Enterprise," as that term is defined by 18 U.S.C. § 1961(4).  Defendant McGregor was an employee and shareholder of Defendant VictoryLand.  Fred Gray was a

shareholder of Defendant VictoryLand. Fred Gray, Fred Gray Jr., and the Gray Law Firm served as attorneys for Defendants McGregor and VictoryLand. Fred Gray Jr. and the Gray Law Firm also served as attorneys for Defendant Warren.

100.    That Enterprise was formed for the common purpose of enriching certain of its members through a pattern of bribery that allowed VictoryLand to operate as the sole Class B bingo parlor in Macon County.

101.    Each associate of the Enterprise conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Defendant Warren retained Fred Gray Jr. as his adviser. Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr. by providing benefits to Fred Gray, Fred Gray Jr., and the Gray Law Firm. Fred Gray Jr. drafted rules and regulations to establish and maintain Defendant VictoryLand's monopoly. Defendant Warren promulgated those rules and regulations.

102.    The Enterprise is engaged in and affects interstate commerce in a variety of ways.

103.    The Enterprise is engaged in and affects interstate commerce in that the individuals who participate in Defendant VictoryLand's electronic bingo games travel in interstate commerce to reach Defendant VictoryLand's facility. In fact, Defendant VictoryLand's facility is located immediately next to an interstate highway.

104.    The Enterprise is engaged in and affects interstate commerce by advertising its bingo parlor in interstate commerce. Defendant VictoryLand advertises its bingo parlor in publications that circulate outside of Alabama and in television and radio advertisements that reach beyond Alabama. Defendant VictoryLand also maintains an internet website that can be and is accessed by persons outside of Alabama.

105.    The Enterprise affects interstate commerce by limiting the number and variety of bingo transactions and the ability of interstate travelers to choose among competing bingo parlors in Macon County.

### INJURY

106.    Under 18 U.S.C. § 1964(c), "any person injured in his business or property" by racketeering activities may sue for those injuries and recover treble damages.  A plaintiff may recover any damages proximately caused by the racketeering activity, including lost profits.  *See, e.g., Maiz v. Virani*, 253 F.3d 641, 662-663 (11th Cir. 2001).

107.    Lucky Palace has secured all of the necessary prerequisites to opening and operating a bingo parlor in Macon County.  It has secured real property on which to build its facility.  It has hired an architect who produced plans for the facility.  It has contracted with an engineer to assist with construction of the facility.  It has contracted with a company to manage its bingo parlor.  It has licensed a brand name for its facility.  It has arranged financing for its facility.  It has contracted with nonprofit organizations who are interested in conducting electronic bingo at its facilities.  It has located an insurance company that is ready and willing to provide the required insurance.  To begin constructing and operating the facility, Lucky Palace needs only a license from Defendant Warren.

108.    Because of the racketeering activity, which has resulted in the creation and maintenance of VictoryLand's monopoly, Lucky Palace is unable to obtain the necessary license and conduct its business for profit.  Accordingly, the racketeering activity has been and continues to be the direct and proximate cause of an injury to Lucky Palace's business.  As a result of that injury, Lucky Palace has suffered damages in the form of lost profits and the diminished value of their investments.

109. The Charities have contracted with Lucky Palace to conduct electronic bingo on their behalves. Under those contracts, each of the Charities is entitled to fixed semi-annual payments of $21,000. The Charities cannot receive those payments unless they receive licenses from Defendant Warren. The pattern of racketeering activity has prevented the Charities from obtaining those licenses. Accordingly, the Charities have been injured in their business and property as a direct and proximate result of the racketeering activity.

110. The directness of the injuries to the Plaintiffs distinguishes this case from *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006). The *Anza* court recognized that, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 1998. In *Anza*, the plaintiff's theory was that the defendants "harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers." *Id.* at 1996-97. The Court determined that the requirement of proximate causation was not met because "[t]he cause of [the plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 1997.

111. In this case, the cause of the Plaintiffs' asserted harm is a set of actions (Defendant Warren's promulgation of one-sided rules) that is directly related to the alleged RICO violation (the bribery of Fred Gray Jr.). Accordingly, *Anza* does not control this case.

112. In addition, the Eleventh Circuit, in a case following *Anza*, reaffirmed that "'proximate cause is not . . . the same thing as a sole cause,' and it is enough for the plaintiff to plead and prove that the defendant's tortious or injurious conduct was a 'substantial factor in the sequence of responsible causation.'" *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1288 n.5 (11th Cir. 2006) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399, *modified*

*on other grounds by* 30 F.3d 1347 (11th Cir. 1994). The pattern of racketeering activity in this case was certainly a substantial factor, if not the sole factor, in the sequence of causation that led to the Plaintiffs' injuries.

## COUNT I
### (RICO 18 U.S.C. § 1962(c))

113. The Plaintiffs reallege the facts and allegations set forth in paragraphs 1 through 112 above.

114. Lucky Palace is a "person," as that term is defined in 18 U.S.C. § 1961(3), which has been injured in its business or property by the conduct of the Defendants in violation of RICO.

115. The Charities are each, individually, a "person", as that term is defined in 18 U.S.C. § 1961(3), which has been injured in its business or property by the conduct of the Defendants in violation of RICO.

116. Each Defendant, as well as Fred Gray Jr. and the Gray Law Firm, is a "person," as that term is defined in 18 U.S.C. § 1961(3), culpable for his or its conduct in violation of RICO.

117. The Defendants have conducted and participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

118. As a direct and proximate result of the Defendants' violations of 18 U.S.C. § 1962(c), the Plaintiffs have been injured in their business and/or property through lost profits for Lucky Palace and lost licensing fees for the Charities in an amount to be proven at trial. Under 18 U.S.C. § 1964, the Plaintiffs are entitled to bring this action and to recover herein treble damages and the costs of bringing this lawsuit, including attorneys' fees.

## COUNT II
### (RICO 18 U.S.C. § 1962(d))

119.    Plaintiffs reallege the facts and allegations set forth in paragraphs 1 through 118 above.

120.    Defendants, being persons employed by or associated with the Enterprise described above, unlawfully and willfully combined, conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

121.    As part of the conspiracy, each Defendant agreed to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above.

122.    The racketeering acts which Defendants committed and caused to be committed were overt acts taken in furtherance of the conspiracy.

123.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property through lost profits for Lucky Palace and lost licensing fees for the Charities in an amount to be proven at trial.  Under 18 U.S.C. § 1964, Plaintiffs are entitled to bring this action and to recover herein treble damages and the costs of bringing this lawsuit, including attorneys' fees.

## COUNT III
### (Violation of the Equal Protection Clause)

124.    The Plaintiffs fully incorporate Paragraphs 1-123 by reference as if fully set forth herein.

125.    Defendant Warren, under the color of state law and his authority as Sheriff of Macon County, has intentionally treated the Plaintiffs differently from other similarly-situated organizations, and there is no rational basis for the difference in treatment.  Accordingly, the Plaintiffs have been denied their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

126.    The Charities are Macon County non-profit organizations.  They have submitted completed applications for Class B Bingo Licenses to Defendant Warren.  Those applications fulfill all of the requirements of the Original Rules, the First Amended Rules, and the Second Amended Rules.  Accordingly, the Charities are similarly situated to those fifty-nine Macon County non-profit organizations that have been granted Class B Bingo Licenses.

127.    Lucky Palace is an Alabama limited liability company.  It has submitted to Defendant Warren a completed application for a Class B Bingo Operator's License.  That application fulfills those requirements of the Original Rules, the First Amended Rules, and the Second Amended Rules that have a rational basis.  Accordingly, Lucky Palace is similarly situated to VictoryLand, which is the only organization that has received a Class B Bingo Operator's License.

128.    Defendant Warren has intentionally treated the Plaintiffs differently from their similarly-situated counterparts by failing to issue appropriate licenses to the Plaintiffs in a timely fashion.  That different treatment constitutes intentional and arbitrary discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  There is no rational basis for that different treatment.

129.    There is no rational basis for the Fifteen License Minimum.  There is no rational basis for the Sixty License Maximum.  There is no rational basis for issuing fifty-nine of the

sixty Class B Bingo Licenses available under the Second Amended Rules to nonprofit organizations who desired to operate bingo games at VictoryLand.  There is no rational basis for requiring interested organizations to construct or lease a multi-million dollar facility prior to obtaining a Class B Bingo License.

130.     In addition to lacking a rational basis, the requirements stated in Paragraph 129 are arbitrary, capricious, and intended to discriminate against all nonprofit organizations, including the Charities, that desire to operate bingo at locations other than VictoryLand.

**COUNT IV**
**(Conspiracy to Deprive the Plaintiffs of the Equal Protection of the Laws)**

131.     The Plaintiffs fully incorporate Paragraphs 1-130 by reference as if fully set forth herein.

132.     Defendant Warren and Defendant McGregor, in his personal capacity and as an agent for VictoryLand, agreed or had an understanding—reached by, through, and with the assistance and influence of Fred Gray, Fred Gray Jr., and the Gray Law Firm—that Defendant Warren would issue rules and regulations for the licensing and operation of bingo in Macon County that would (1) deprive any nonprofit organization, other than a nonprofit organization associated with VictoryLand, of the ability to obtain a license for the conduct of electronic bingo in Macon County and (2) deprive any organization, other than VictoryLand, of the ability to obtain an operator's license for the conduct of bingo in Macon County.  Accordingly, Defendants McGregor and VictoryLand were jointly engaged with Defendant Warren, a state official, in the deprivation of the Plaintiffs' equal protection rights

133.     By issuing rules and regulations in accordance with that agreement or understanding, Defendant Warren deprived the Plaintiffs of the equal protection of the laws. Defendant Warren perpetuated that deprivation by issuing the First Amended Rules and the

Second Amended Rules.  Defendant Warren further perpetuated the deprivation by refusing to consider the Plaintiffs' applications for Class B Bingo Licenses based on his interpretation of the Original Rules, the First Amended Rules, and the Second Amended Rules.

134.     In addition, upon information and belief, Defendant McGregor has taken steps to perpetuate the deprivation by encouraging Representative Warren and Senator Penn, personally or through his agents, to submit legislation seeking to amend Amendment 744 to incorporate the Second Amended Rules.[12]

135.     As a result of the deprivation and its perpetuation, the Plaintiffs have been injured in an amount to be proven at trial.

**COUNT V**
**(Tortious Interference with Contractual and Business Relations)**

136.     The Plaintiffs fully incorporate Paragraphs 1-135 by reference as if fully set forth herein.

137.     Amendment 744 allowed non-profit organizations to enter into contractual agreements with an individual, firm, or a corporation to operate Class B Bingo facilities within Macon County.

138.     In accordance with Amendment 744, each of the Charities individually contracted with Lucky Palace to operate a Class B Bingo facility in Macon County.

---

[12]  The alleged encouragement is peculiarly within the knowledge of Defendant McGregor.  This allegation is based, in part, on the following facts and circumstances: (1) that Defendant McGregor has close ties with Defendant Warren, who is the husband of Representative Warren, (2) that Defendant McGregor contributed $10,000 to Senator Penn's campaign, (3) that the Second Amended Rules create a monopoly for VictoryLand, (4) that Senator Penn introduced SB 92 on March 6, 2007, four days after the Charities moved to add McGregor and VictoryLand as Defendants, (5)  that Senator Penn stated publicly that his goal in submitting SB 92 was "to etch [the Second Amended Rules] into stone," (6) that SB 92 and HB 17 are substantially similar, and (7) the Defendant McGregor publicly acknowledged discussing SB 92 with various people prior to its submission.

139.    Upon information and belief, Defendants McGregor and VictoryLand had knowledge of those contractual relationships.[13]

140.    With knowledge of those contractual relationships between Lucky Palace and the Charities, Defendants McGregor and VictoryLand intentionally interfered with those contractual and business relationships by influencing, aiding and/or directing Defendant Warren[14] to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County. That interference was unjustified.

141.    Because of the promulgation, amendment, and maintenance of those arbitrary, capricious, and irrational rules and regulations, the performance of the contractual relationships between Lucky Palace and the Charities has been rendered impossible.

142.    The Plaintiffs have been damaged—and continue to be damaged—by the intentional interference with their contractual relationships by the actions of Defendants McGregor and VictoryLand.

## COUNT VI
### (Tortious Interference with Prospective Business Relationships)

143.    The Plaintiffs fully incorporate Paragraphs 1-142 by reference as if fully set forth herein.

---

[13] The existence of the alleged knowledge is peculiarly within the knowledge of Defendant McGregor. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant Warren had knowledge of those relationships, (2) that Defendants Warren, McGregor, and VictoryLand were represented by the same attorney, and (3) that Defendant Warren depended on Fred Gray Jr. for advice regarding electronic bingo.

[14] The Plaintiffs make no claim against Defendant Warren in this Count.

144.    The Plaintiffs reasonably expected that, if allowed to conduct electronic bingo in Macon County, they would be able to enter into contractual and business relationships with numerous patrons and customers.

145.    Upon information and belief, Defendants McGregor and VictoryLand had knowledge of the Plaintiffs' expected contractual and business relationships.[15]

146.    With knowledge of the Plaintiffs' expected contractual and business relationships, Defendants McGregor and VictoryLand intentionally interfered with the Plaintiffs' ability to consummate their expected contractual and business relationships by influencing, aiding and/or directing Defendant Warren[16] to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County.  That interference was unjustified.

147.    Because of the promulgation, amendment, and maintenance of those arbitrary, capricious, and irrational rules and regulations, the Plaintiffs have been unable to consummate their expected contractual and business relationships with numerous patrons and customers.

148.    The Plaintiffs have been damaged—and continue to be damaged—by the intentional interference with their prospective business relationships by the actions of Defendants McGregor and VictoryLand.

WHEREFORE, the Charities pray that this Court enter judgment against the Defendants as follows:

---

[15] The existence of the alleged knowledge is peculiarly within the knowledge of Defendant McGregor.  This allegation is based, in part, on the following facts and circumstances: (1) that Defendant Warren had knowledge of those relationships, (2) that Defendants Warren, McGregor, and VictoryLand were represented by the same attorney, (3) that Defendant Warren depended on Fred Gray Jr. for advice regarding electronic bingo, and (4) that Defendants McGregor and VictoryLand were aware of the popularity of electronic bingo in Macon County.

[16] The Plaintiffs make no claim against Defendant Warren in this Count.

a.    With regard to Sheriff David Warren, for appropriate injunctive relief requiring Sheriff David Warren to, *inter alia*, (1) issue Class B Bingo Licenses to each of the Charities, (2) issue a Class B Bingo Operator's License to Lucky Palace, LLC, (3) suspend the Fifteen License Minimum and the Sixty License Maximum, and (4) allow the Charities to operate any and all games of bingo at the Lucky Palace location;

b.    With regard to Milton McGregor and Macon County Greyhound Park, Inc., for damages in an amount to be proven at trial, treble damages, and punitive damages;[17]

c.    For costs, including attorney's fees; and

d.    For such further and additional relief as the Court deems just and appropriate.

DATED:  June 29, 2007.

Respectfully submitted,

s/ Robert K. Spotswood
s/ Michael T. Sansbury
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, AL 35203-3329
Telephone:  (205) 986-3620
Fax:  (205) 986-3639
E-mail: rks@spotswoodllc.com
         msansbury@spotswoodllc.com

*Attorneys for the Plaintiffs*

---

[17] The Plaintiffs do not seek any damages from Defendant Warren.

## CERTIFICATE OF SERVICE

I hereby certify that, on June 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Fred David Gray, Esq.
Fred David Gray Jr., Esq.
Gray, Langford, Sapp, McGowan, Gray & Nathanson
P.O. Box 830239
Tuskegee, AL  36083-0239
E-mail:          fgray@glsmgn.com
                 jbibb@glsmgn.com
                 fgrayjr@glsmgn.com
                 thalia@glsmgn.com

William M. Slaughter, Esq.
Patricia C. Diak, Esq.
Peter John Tepley, Esq.
Khristi Doss Driver, Esq.
Haskell, Slaughter, Young & Rediker, LLC
1400 Park Place Tower
2001 Park Place North
Birmingham, AL  35203
E-mail:          wms@hsy.com
                 pcd@hsy.com
                 pt@hsy.com
                 kdd@hsy.com

John Mark White, Esq.
Augusta S. Dowd, Esq.
Rebecca G. DePalma, Esq.
White, Arnold, Andrews & Dowd
2025 Third Avenue, North
Suite 600
Birmingham, AL  35203
E-mail:          mwhite@waadlaw.com
                 adowd@waadlaw.com

John M. Bolton III, Esq.
Charlanna White Spencer, Esq.
Sasser, Bolton & Sefton PC
PO Box 242127
Montgomery, AL 36124-2127
E-mail:          jbolton@sasserlawfirm.com
                 cspencer@sasserlawfirm.com

James H. Anderson, Esq.
Ryan Wesley Shaw, Esq.
Beers, Anderson, Jackson, Patty, Van Heest & Fawal PC
P.O. Box 1988
Montgomery, AL  36102
E-mail:          janderson@beersanderson.com
                 wshaw@beersanderson.com

s/ Michael T. Sansbury
OF COUNSEL

39

# RULES AND REGULATIONS FOR THE LICENSING AND OPERATION OF
## BINGO GAMES IN MACON COUNTY, ALABAMA

Section 1: Definitions ....................................................................................1

Section 2: Operation of Bingo Games in Macon County...........................3

Section 3: Bingo Permit Required ............................................................3

Section 4: Application for Permit; Submission; Form; Contents ...............3

Section 5: Issuance of Permit...................................................................5

Section 6: Amendments; Applications; Permits ........................................5

Section 7: Contents and Display of Permits.............................................5

Section 8: Fee Proceeds ..........................................................................6

Section 9: General Regulations; Prizes ...................................................6

Section 10: Records and Accounting ........................................................7

Section 11: Enforcement and Supervision; Rules; Bonds.........................8

Section 12: Revocation of Permits; Appeal...............................................8

Section 13: Effect of Revocation ...............................................................9

Section 14: Appeal of Denial of Permit .....................................................9

Section 15: Severability..............................................................................9

Section 16: Amendments ............................................................................9



EXHIBIT

A

<u>MACON COUNTY BINGO REGULATIONS</u>

The following Rules and Regulations For the Licensing and Operation of Bingo Games in Macon County (hereinafter sometimes referred to as "Rules", "Regulations" or "Rules and Regulations") are hereby promulgated by David M. Warren, Sheriff of Macon County, to regulate the issuance of permits or licenses for and the operation of bingo games by certain nonprofit organizations in Macon County, Alabama pursuant to Act. No. 2003-124, Regular Session, 2003, authorizing a referendum on an amendment of the Constitution of Alabama which said referendum was approved by the voters on November 4, 2003.

**Section 1: Definitions**

As used herein the following words shall have the following meanings as described herein, unless the context clearly indicates otherwise:

(a)     "Bingo" or "Bingo games" shall mean any game of chance known as bingo, including any bingo game permitted by federal law, (whether or not electronic, computer, or other technologic aids are used in connection therewith) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations, and which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards. Nothing herein is intended to prohibit the award of interim or consolation prizes. Electronic, computer or other technologic aids include any machine or device that assists a player or the playing of a bingo game; broadens the participation levels in a common game; facilitates communication between and among bingo locations; or allows players to play a game with or against other players rather than with or against a machine. Examples of electronic, computer or other technologic aids include, but are not limited to, dispensers, readers, telephones, cables, televisions, screens, satellites, bingo blowers, electronic player stations, electronic cards for participants in bingo games, player terminals, central servers containing random number generators for remote player terminals and video displays providing game results in different display modes.

(b)     "Person" shall mean any human being, corporation, partnership, association or other legal entity of any kind whatsoever.

(c)     "Sheriff" shall mean the Sheriff of Macon County, Alabama. Under the Rules and Regulations herein, the Sheriff may designate or otherwise

1

authorize persons of the Macon County Sheriff's Office to perform various duties of the Sheriff set forth herein.

(d)   "Nonprofit organization" shall mean a bona fide organization for charitable, educational, or other lawful purposes which operates without profit to its members and/or which has been classified by the Internal Revenue Service as a tax exempt organization.

(e)   "License holder" shall mean any nonprofit organization that has been issued a bingo license by the Sheriff pursuant to these Regulations.

(f)   "Location" shall mean a building, hall, enclosure, room, or outdoor area that complies with all federal, state and local laws and applicable building and fire codes.

(g)   "Class A Bingo License" shall mean a license issued to an applicant who desires to operate paper card bingo only at a qualified location.

(h)   "Class B Bingo License" shall mean a license issued to an applicant who desires to operate any and all games of bingo as defined hereinabove, at a qualified location.

(i)   "Qualified location" for the holder of a Class A Bingo License shall mean a location, as defined above, which has been inspected and approved by the Sheriff for the conduct of bingo games.

(j)   "Qualified location" for the holder of a Class B Bingo License shall mean a location, as defined above, which has been inspected and approved by the Sheriff for the conduct of bingo games and other lawful activities and for which the license applicant shall submit satisfactory evidence that the location has in place the following at all times that any bingo games are being conducted or operated: (i) public liability insurance in an amount not less than $5,000,000; (ii) if liquor is served, liquor liability insurance in the amount of not less than $1,000,000; (iii) adequate parking for patrons and employees; (iv) onsite security as prescribed by the Sheriff; (v) onsite first aid personnel as prescribed by the Sheriff; (vi) cash or surety bond in an amount not less than $1,000,000; (vii) such accounting procedures, controls and security monitoring as necessary to preserve and promote the integrity of the operation of bingo games and to ensure the protection of the charitable license holder and its patrons; (viii) satisfactory evidence that the owner or owners of the location paid at least $5,000,000 for the land, building and other capital improvements (before depreciation) comprising said location or the value of said land, building and other /

2

capital improvements (before depreciation) must be at least $5,000,000; (ix) satisfactory evidence that the location is fully compliant with the Americans with Disabilities Act ("ADA"); and (x) satisfactory evidence that the owner or owners of such location have been residents of the State of Alabama for at least three (3) years or, if the owner is a partnership, association, corporation, limited liability company, or other business entity, satisfactory evidence that those partners, members, or stockholders of such entity that own collectively at least two-thirds (2/3) of the voting rights and equity interests of such entity, are individuals that have been residents of the State of Alabama for at least three (3) years.

(k)    "Bingo session" shall mean a consecutive period of time up to 24 consecutive hours during which bingo is played on as many as seven (7) days in a given week. A license holder shall not be limited in the number of bingo sessions it operates during any 24-hour period.

## Section 2:    Operation of Bingo Games in Macon County

The operation of bingo games for prizes or money by nonprofit organizations, as defined herein, shall be allowed in Macon County, pursuant to Amendment No. 744 to the Constitution of Alabama and Act No. 2003-124, provided that the nonprofit organization shall first obtain a bingo license (Class A or B) as set out herein, and abide by all of the Regulations duly promulgated by the Sheriff.

## Section 3:    Bingo License Required

No nonprofit organization, as defined herein, shall be allowed to operate a bingo game unless the Sheriff first issues a license to said organization authorizing it to do so. In the event of any controversy as to whether or not a game of chance or activity constitutes a bingo game, as defined herein, for which a license may be issued, the decision of the Sheriff shall control, subject to the rights of appeal as set out herein. The license described herein shall be in a form designated by the Sheriff and shall be in addition to and not in lieu of any other permits or licenses which may be required by law, and no bingo game shall be operated until such time as all required licenses or permits have been obtained. A license holder may hold only one license and that license shall be valid for only one location in Macon County, Alabama. A license is not assignable or transferable and shall become automatically void upon the change of name, dissolution, loss of charter, or, if the license holder is a tax exempt organization under the federal income tax laws, the loss of exemption from taxation under the Internal Revenue Code.

3

**Section 4:    Application for License; Submission; Form; Contents**

(a)    Any nonprofit organization, as defined herein, desiring to obtain a license to operate bingo games hereunder shall make application to the Sheriff on forms prescribed by the Sheriff and shall pay an annual fee of $250.00 for Class A Bingo Licenses and $1,000.00 for Class B Bingo Licenses.  Such license shall expire and become automatically void on December 31 of the calendar year for which it is issued, except that any licenses issued during 2003 shall not expire until December 31, 2004. Renewal applications shall be filed with the Sheriff at least forty-five (45) days prior to January 1 of each calendar year and shall be on forms prescribed by the Sheriff. Renewal applications shall be subject to the same application fee as provided for an original application and shall contain the same information as required in an original application.  Should one or more Class B Bingo License holders contract in a given calendar year with the owner of a Class B qualified location, the owner of said Class B qualified location shall pay a business license fee ("Operator's License Fee") of $40,000 at the time the Class B Bingo License is issued or renewed. In no event shall more than one Operator's License Fee be paid by the owner of a Class B qualified location in any given year.

(b)    The Sheriff shall refuse to grant a bingo license or renewal to any applicant qualified hereunder unless and until the applicant fully provides the information required hereunder, such being provided in a form and in sufficient detail to satisfy the Sheriff of its validity and sufficiency.   The Sheriff shall have complete discretion to require any reasonable confirming documentation as to any information required hereunder and shall have a reasonable time to check or confirm by any method available to him the accuracy or validity of any information provided hereunder.

(c)     Each application for a bingo license or renewal thereof shall contain the following information and exhibits:

(1)    The date of incorporation or other evidence of inception showing existence by the organization for the prescribed period of time.

(2)    A certified copy of the charter, certificate of incorporation, by-laws, or other evidence of legal existence of the organization.

(3)    When applicable, a copy of the letter ruling or tax exempt determination letter from the Internal Revenue Service or other proof deemed acceptable by the Sheriff verifying the tax exempt status of the organization named in the application or the parent organization of which the same is a qualified branch, chapter, lodge or post.

(4)    The names and residence addresses of each of the officers and directors of the organization, as well as the names and addresses of any members

4

or persons who shall be in charge of or have control over the operation or promotion of bingo games.

(5)    The names and addresses of any persons, organizations, or other entities which shall act as sureties for the applicant or to which the applicant is financially indebted in regard to the operation of bingo games.

(6)    The exact physical location at which the applicant will conduct the bingo games and if the premises on which the games are to be conducted are not owned by the applicant, the names and addresses of the owners thereof and a copy of all rental, lease, consulting or other agreements with the said owners regarding the use of the premises for the operation of the bingo games.

(7)    A statement listing all convictions, if any, for criminal offenses, other than minor traffic offenses, of each of the persons for whom names are required in subsections (4), (5), and (6) above.

## Section 5:    Issuance of License

Upon receipt of a fully completed and documented application for a license meeting all of the requirements set out herein, the Sheriff shall make such investigation as he may deem necessary or proper of the qualifications of each applicant as required herein and the truth and veracity of the information contained or attached to the application and after making such investigation and after being first satisfied that all qualifications and requirements as set out herein the Sheriff shall issue such license to said applicant upon the terms and conditions herein set forth.    As part of said investigation, any person named in paragraphs 4,5, 6 of Section 4(c) herein may be required to furnish a consent for background and criminal history check.

A Class A Bingo License shall be issued to an applicant who desires to operate paper card bingo only at a qualified location for the holder of a Class A License.  A Class B Bingo License shall be issued to an applicant who desires to operate any and all games of bingo, as defined hereinabove, at a qualified location for the holder of a Class B License.

## Section 6:    Amendments; Applications; Licenses

(a)    An applicant may amend an application filed hereunder to correct or complete the information contained therein or to change said information to comply with a change in circumstances at any time prior to the denial thereof by the Sheriff or the issuance of a license thereon, provided that said amendment be made in or on a form satisfactory to the Sheriff and the applicant pays a substitution or amendment fee of $50.00 per amendment.

(b)    A license, once issued, may be amended only upon resubmission of a new, completed application satisfactory to the Sheriff, surrender of the license being amended, and payment of a new annual fee. The Sheriff may deny amendments for any reason for which an original application may be denied.

## Section 7:    Contents and Display of Licenses

(a)    Each bingo license shall contain the name and address of the license holder, the location at which the license holder is permitted to conduct bingo games, the days of the week on which the license holder is permitted to conduct bingo games, the date on which the license was issued and upon which it expires.

(b)    The license holder shall display the license conspicuously at the location where bingo is being conducted at all times during the conduct of a bingo game.

## Section 8:    Fee Proceeds

All monies collected by the Sheriff hereunder shall be paid to the County and placed in a separate bingo account, and deposited in a designated bank located in Macon County within three business days of the collection of said fees.  All expenses incurred by the Sheriff in the administration and enforcement hereof shall be paid from this account, with the balance, if any, in said account to be used by the Sheriff for general law enforcement purposes.  To the extent allowed by law, in the public interest, the said account shall be subject to audit by the State of Alabama Examiners of Public Accounts.

## Section 9:    General Regulations; Prizes

(a)    No person under the age of 19 years shall be permitted to play any game or games of bingo, nor shall any person under the age of 19 years be permitted to conduct or assist in the operation of any game of bingo.

(b)    No bingo license shall be issued to any nonprofit organization, unless the organization shall have been in existence for at least three (3) years in the county immediately prior to the issuance of the permit or license.

(c)    Bingo games may be operated on the premises owned or leased by the nonprofit organization operating the bingo games.

(d)    A nonprofit organization may enter into a contract with any individual, firm, association or corporation to have the individual or entity operate bingo

6

games or concessions on behalf of the nonprofit organization.  A nonprofit organization may pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game.

(e)    A nonprofit organization may lend its name or allow its identity to be used by another person or entity in the operating or advertising of a bingo game in which the nonprofit organization is not directly and solely operating the bingo game.

(f)    Prizes given by any nonprofit organization for the playing of bingo games shall not exceed the cash amount or gifts of equivalent value set by these Rules and Regulations for any bingo session.  For the purposes of these Rules and Regulations, no single prize given by any nonprofit organization, or on its behalf, for the playing of bingo games shall exceed $1,000,000 in cash or equivalent value during any bingo session.

(g)    No person who has been convicted of a felony offense, and whose civil rights have not been restored by law, shall conduct or in any way participate in the operation of any bingo game permitted hereunder, nor shall any person who has been convicted of any gambling offense be permitted to conduct or in any way participate in the operation of any bingo game permitted hereunder within 12 months of the conviction.

## Section 10:  Records and Accounting

Each license holder shall keep and maintain the following records and accounts pertaining to each bingo session conducted by it for at least three (3) years from the date of such session:

(a)    An itemized list of all gross receipts for each bingo session, which shall include all receipts derived from the sale of bingo cards, entrance fees, donations, or from any other source whatsoever pertaining to the operation of such session. Notwithstanding the foregoing, the holder of a Class B License who has contracted with an individual, firm, association or corporation for the operation of bingo games shall only report the Class B License holder's gross receipts under such contract and provide a copy of such contract to the Sheriff.

(b)    An itemized list of all expenses, costs and disbursements, other than prizes, paid or given as a result of the operation of any bingo session, together with the name and address of each person to whom said expenses, disbursements or consideration was paid or given; a receipt or invoice for all items purchased and for all services rendered; and such other records as will adequately reflect the amount and nature of such expenses, costs and disbursements. Notwithstanding the foregoing, the holder of a Class B Bingo License who has contracted with an individual, firm,

7

association or corporation for the operation of bingo games which permits the holder to receive reasonable compensation for the operation of a bingo session net of the costs associated with the operation of the bingo games, including without limitation, building rent, insurance, equipment rental, consulting or management fees, employee expense, utilities, janitorial services, bingo prizes or gifts and the like, shall only be required to maintain a copy of such contract and provide a copy of same to the Sheriff upon request.

(c)     All records, receipts, accounts and/or lists required to be kept and maintained hereunder shall be open to inspection by the Sheriff, or his authorized agents or representatives, during reasonable business hours.

(d)     All locations at which bingo games are being held by a license holder, or at which a license holder intends to conduct bingo games, shall be open to the Sheriff, or his authorized representatives, during all times at which bingo games are being conducted and during all other reasonable business hours.

(e)     On or before April 15, 2005, and on or before April 15th of each calendar year thereafter, each license holder who held a license for all or any part of the preceding calendar year shall file with the Sheriff a verified copy of all records, receipts, accounts and/or lists required to be kept or maintained hereunder relating to the operation of bingo games for said previous calendar year.

## Section 11: Enforcement and Supervision; Rules; Bonds

(a)     The Sheriff shall be charged with the duty to and shall enforce and supervise the administration and enforcement of all of the rules, regulations and reporting required hereunder.  In addition to these Regulations, the Sheriff shall enforce all applicable criminal and civil laws of the State of Alabama to prevent and discourage any illegal activity.

(b)     The Sheriff may require such acceptable sureties and/or bonds that he deems reasonable or necessary to insure proper compliance with these Rules and Regulations and the submission of such acceptable sureties or bonds shall be a condition precedent to the issuance of any license hereunder.  The operator and surety or sureties shall be jointly and severally responsible for payment of prizes to winners, said payment to occur no later than the end of the session during which the prize was won.

## Section 12: Revocation of Licenses; Appeal

The Sheriff, for good cause shown, may revoke any license issued pursuant hereto if the license holder or any officer, director, agent, employee or member of the

8

license holder, or any person acting in concert with such persons, violates any of the Regulations herein promulgated. Such revocation by the Sheriff shall become effective ten (10) days after written notice of such revocation has been delivered by the Sheriff, or his authorized representative, to any person named in the license application pursuant to Section 4, subsections (c)(4) and (c)(5) hereunder, or such other person as may be involved in the operation of bingo pursuant hereto, unless the license holder shall make a written request for a hearing as to such revocation to the Macon County Commission within said ten (10) day period. Upon such request for hearing, the Commission shall hold a hearing upon such revocation, subject to rules and regulations for the conduct of meetings and hearings before such Commission, at its next regularly scheduled meeting, or specially called meeting for the purpose of such hearing. Upon such hearing the rendering of a decision adverse to the license holder shall result in the immediate revocation of the subject license. Following a hearing and rendition of an opinion by the Commission upon revocation of a license issued hereunder, either party to said hearing may appeal the same to the Circuit Court of Macon County, Alabama and may request a trial by jury. Pending appeal to the Circuit Court hereunder, the revoked license shall remain revoked until and unless the Circuit Court shall order the same reinstated and shall set a reasonable bond to assure complete compliance with all Rules and Regulations promulgated hereunder pending such appeal.

## Section 13:  Effect of Revocation

The holder of any license issued pursuant hereto which shall be revoked as herein set out shall return such license to the Sheriff on or before the effective date of such revocation and whether returned or not such license shall be void and not valid beyond the effective date of revocation thereof unless such revocation shall be extended by appeal as provided hereunder. A license holder whose license is revoked in consequence of a violation of any rule or regulation promulgated herein, or other rule or regulation promulgated hereunder, shall be ineligible to apply for or have issued to it another license hereunder for a period of one (1) year after the effective date of such revocation. Nor shall any license be issued to any organization which is directed or controlled by persons listed in the application for license filed pursuant to Section 4, subsections (c)(4) and (c)(5) hereof in regard to the revoked license or to any organization of which the membership is substantially the same as any organization whose license has been revoked hereunder, for a period of one (1) year after the effective date of such revocation.

## Section 14:  Appeal of Denial of License

Any nonprofit organization whose application for a license hereunder shall he denied by the Sheriff pursuant to these Regulations shall have the right to appeal such denial to the Macon County Commission and to the Circuit Court of Macon County in the same manner as an appeal of a revocation of a license issued hereunder may be

appealed pursuant hereto provided, however, that such organization shall not operate any bingo game until such application shall have been granted, and a license issued, pursuant to any order of the said Commission or Court.

## Section 15: Severability

The provisions hereto and the Regulations promulgated hereunder are severable. If any part hereof shall be declared invalid or unconstitutional, such declaration shall not affect any parts hereof which shall remain.

## Section 16: Amendments

The Sheriff reserves the right to amend these Regulations from time to time as necessary, but no amendments shall be effective unless in writing and signed by the Sheriff.

Issued this the ___5___<sup></sup> day of December, 2003.

David M. Warren
Sheriff of Macon County, Alabama

# FIRST AMENDED AND RESTATED RULES AND REGULATIONS
## FOR THE LICENSING AND OPERATION
## OF
## BINGO GAMES IN MACON COUNTY, ALABAMA

Section 1: Definitions ..................................................................... 1

Section 2: Operation of Bingo Games in Macon County ........................... 3

Section 3: Bingo License Required .................................................... 3

Section 4: Application for License; Submission; Form; Contents .................. 4

Section 5: Issuance of License ......................................................... 5

Section 6: Amendments; Applications; Licenses .................................... 5

Section 7: Contents and Display of Licenses ........................................ 6

Section 8: Fee Proceeds ................................................................ 6

Section 9: General Regulations; Prizes ............................................... 6

Section 10: Records and Accounting ................................................. 7

Section 11: Enforcement and Supervision; Rules; Bonds .......................... 8

Section 12: Revocation of Licenses; Appeal ......................................... 8

Section 13: Effect of Revocation ...................................................... 9

Section 14: Appeal of Denial of License ............................................. 9

Section 15: Compliance with Federal Law ........................................... 9

Section 16: Severability ................................................................ 10

Section 17: Amendments ............................................................... 10

Section 18:  Effective Date ............................................................ 10

**EXHIBIT**

B

## MACON COUNTY BINGO REGULATIONS

The following First Amended and Restated Rules and Regulations For the Licensing and Operation of Bingo Games in Macon County (hereinafter sometimes referred to as "Rules," "Regulations" or "Rules and Regulations") are hereby promulgated by David M. Warren, Sheriff of Macon County, to regulate the issuance of permits or licenses for and the operation of bingo games by certain nonprofit organizations in Macon County, Alabama pursuant to Act. No. 2003-124, Regular Session, 2003, authorizing a referendum on an amendment of the Constitution of Alabama which said referendum was approved by the voters on November 4, 2003. It is the purpose of these First Amended and Restated Rules and Regulations to fund and provide for appropriate oversight and regulation of bingo in Macon County, to preserve and promote the integrity of the operation of bingo games and to protect the nonprofit organizations that are or may become licensed under these Regulations and whose valuable services are supported and funded in part by the conduct of bingo in this county.

### Section 1: Definitions

As used herein the following words shall have the following meanings as described herein, unless the context clearly indicates otherwise:

(a)    "Bingo" or "Bingo games" shall mean any game of chance known as bingo, including any bingo game permitted by federal law, (whether or not electronic, computer, or other technologic aids are used in connection therewith) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations, and which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards. Nothing herein is intended to prohibit the award of interim or consolation prizes. Electronic, computer or other technologic aids include any machine or device that assists a player or the playing of a bingo game; broadens the participation levels in a common game; facilitates communication between and among bingo locations; or allows players to play a game with or against other players rather than with or against a machine. Examples of electronic, computer or other technologic aids include, but are not limited to, dispensers, readers, telephones, cables, televisions, screens, satellites, bingo blowers, electronic player stations, electronic cards for participants in bingo games, player terminals, central servers containing random number generators for remote player terminals and video displays providing game results in different display modes.

(b)  "Person" shall mean any human being, corporation, partnership, association or other legal entity of any kind whatsoever.

(c)  "Sheriff" shall mean the Sheriff of Macon County, Alabama. Under the Rules and Regulations herein, the Sheriff may designate or otherwise authorize persons of the Macon County Sheriff's Office to perform various duties of the Sheriff set forth herein.

(d)  "Nonprofit organization" shall mean a bona fide organization that is active and in good standing for charitable, educational, or other lawful purposes which operates without profit to its members and/or which has been classified by the Internal Revenue Service as a tax exempt organization.

(e)  "License holder" shall mean any nonprofit organization that has been issued a bingo license by the Sheriff pursuant to these Regulations.

(f)  "Location" shall mean a building, hall, enclosure, room, or outdoor area that complies with all federal, state and local laws and applicable building and fire codes.

(g)  "Class A Bingo License" shall mean a license issued to an applicant who desires to operate paper card bingo only at a qualified location.

(h)  "Class B Bingo License" shall mean a license issued to an applicant who desires to operate any and all games of bingo as defined hereinabove, at a qualified location.

(i)  "Qualified location" for the holder of a Class A Bingo License shall mean a location, as defined above, which has been inspected and approved by the Sheriff for the conduct of bingo games.

(j)  "Qualified location" for the holder of a Class B Bingo License shall mean a location, as defined above, which has been inspected and approved by the Sheriff for the conduct of bingo games and other lawful activities and for which the license applicant shall submit satisfactory evidence that the location has in place the following at all times that any bingo games are being conducted or operated: (i) public liability insurance in an amount not less than $5,000,000; (ii) if liquor is served, liquor liability insurance in the amount of not less than $1,000,000; (iii) adequate parking for patrons and employees; (iv) onsite security as prescribed by the Sheriff; (v) onsite first aid personnel as prescribed by the Sheriff; (vi) cash or surety bond in an amount not

less than $1,000,000; (vii) such accounting procedures, controls and security monitoring as necessary to preserve and promote the integrity of the operation of bingo games and to ensure the protection of the charitable license holder and its patrons; (viii) satisfactory evidence that the owner or owners of the location paid at least $15,000,000 for the land, building and other capital improvements (before depreciation) comprising said location; (ix) satisfactory evidence that the location is fully compliant with the Americans with Disabilities Act ("ADA"); and (x) satisfactory evidence that the owner or owners of such location have been residents of the State of Alabama for at least three (3) years or, if the owner is a partnership, association, corporation, limited liability company, or other business entity, satisfactory evidence that those partners, members, or stockholders of such entity that own collectively at least two-thirds (2/3) of the voting rights and equity interests of such entity, are individuals that have been residents of the State of Alabama for at least three (3) years.

(k)     "Bingo session" shall mean a consecutive period of time up to 24 consecutive hours during which bingo is played on as many as seven (7) days in a given week. A license holder shall not be limited in the number of bingo sessions it operates during any 24 hour period.

## Section 2:     Operation of Bingo Games in Macon County

The operation of bingo games for prizes or money by nonprofit organizations, as defined herein, shall be allowed in Macon County, pursuant to Amendment No. 744 to the Constitution of Alabama and Act No. 2003-124, provided that the nonprofit organization shall first obtain a bingo license (Class A or B) as set out herein, and abide by all of the Regulations duly promulgated by the Sheriff. No Class B Licensee shall be authorized to operate bingo at any qualified location, as defined herein, unless a minimum of fifteen (15) applicants shall first obtain Class B Licenses for such location. This restriction shall be noted on any Class B License issued effective as of the date of issuance of these First Amended and Restated Rules and Regulations.

## Section 3:     Bingo License Required

No nonprofit organization, as defined herein, shall be allowed to operate a bingo game unless the Sheriff first issues a license to said organization authorizing it to do so. In the event of any controversy as to whether or not a game of chance or activity constitutes a bingo game, as defined herein, for which a license may be issued, the decision of the Sheriff shall control, subject to the rights of appeal as set

4

out herein. The license described herein shall be in a form designated by the Sheriff and shall be in addition to, and not in lieu of any other permits or licenses which may be required by law, and no bingo game shall be operated until such time as all required licenses or permits have been obtained. A license holder may hold only one license and that license shall be valid for only one location in Macon County, Alabama. A license is not assignable or transferable and shall become automatically void upon the change of name, dissolution, loss of charter, or, if the license holder is a tax exempt organization under the federal income tax laws, the loss of exemption from taxation under the Internal Revenue Code.

**Section 4:    Application for License; Submission; Form; Contents**

(a)    Any nonprofit organization, as defined herein, desiring to obtain a license to operate bingo games hereunder shall make application to the Sheriff on forms prescribed by the Sheriff and shall pay an annual fee of $250.00 for Class A Bingo Licenses and $1,000.00 for Class B Bingo Licenses. Such license shall expire and become automatically void on December 31 of the calendar year for which it is issued, except that any licenses issued during 2003 shall not expire until December 31, 2004. Renewal applications shall be filed with the Sheriff at least forty-five (45) days prior to January 1 of each calendar year and shall be on forms prescribed by the Sheriff. Renewal applications shall be subject to the same application fee as provided for an original application and shall contain the same information as required in an original application. Should fifteen (15) or more Class B Bingo License holders contract in a given calendar year with the owner of a Class B qualified location, the owner of said Class B qualified location shall pay a business license fee ("Operator's License Fee") of $250,000 at the time the Class B Bingo License is issued or renewed. In no event shall more than one Operator's License Fee be paid by the owner of a Class B qualified location in any given year.

(b)    The Sheriff shall refuse to grant a bingo license or renewal to any applicant qualified hereunder unless and until the applicant fully provides the information required hereunder, such being provided in a form and in sufficient detail to satisfy the Sheriff of its validity and sufficiency. The Sheriff shall have complete discretion to require any reasonable confirming documentation as to any information required hereunder and shall have a reasonable time to check or confirm by any method available to him the accuracy or validity of any information provided hereunder.

(c)    Each application for a bingo license or renewal thereof shall

5

contain the following information and exhibits:

(1)     The date of incorporation or other evidence of inception showing existence by the organization for the prescribed period of time.

(2)     A copy of the charter, certificate of incorporation, by-laws, or other evidence of legal existence of the organization.

(3)     When applicable, a copy of the letter ruling or tax exempt determination letter from the Internal Revenue Service or other proof deemed acceptable by the Sheriff verifying the tax exempt status of the organization named in the application or the parent organization of which the same is a qualified branch, chapter, lodge or post.

(4)     The names and residence addresses of each of the officers and directors of the organization, as well as the names and addresses of any members or persons who shall be in charge of or have control over the operation or promotion of bingo games.

(5)     The names and addresses of any persons, organizations, or other entities which shall act as sureties for the applicant or to which the applicant is financially indebted in regard to the operation of bingo games.

(6)     The exact physical location at which the applicant will conduct the bingo games and if the premises on which the games are to be conducted are not owned by the applicant, the names and addresses of the owners thereof and a copy of all rental, lease, consulting or other agreements with the said owners regarding the use of the premises for the operation of the bingo games.

(7)     A statement listing all convictions, if any, for criminal offenses, other than minor traffic offenses, of each of the persons for whom names are required in subsections (4), (5), and (6) above.

**Section 5:   Issuance of License**

Upon receipt of a fully completed and documented application for a license meeting all of the requirements set out herein, the Sheriff shall make such investigation as he may deem necessary or proper of the qualifications of each applicant as required herein and the truth and veracity of the information contained or attached to the application and after making such investigation and after being first satisfied that all qualifications and requirements as set out herein the

Sheriff shall issue such license to said applicant upon the terms and conditions herein set forth. As part of said investigation, any person named in paragraphs 4, 5, 6 of Section 4(c) herein may be required to furnish a consent for background and criminal history check.

A Class A Bingo License shall be issued to an applicant who desires to operate paper card bingo only at a qualified location for the holder of a Class A License. A Class B Bingo License shall be issued to an applicant who desires to operate any and all games of bingo, as defined hereinabove, at a qualified location for the holder of a Class B License.

## Section 6:   Amendments; Applications; Licenses

(a)   An applicant may amend an application filed hereunder to correct or complete the information contained therein or to change said information to comply with a change in circumstances at any time prior to the denial thereof by the Sheriff or the issuance of a license thereon, provided that said amendment be made in or on a form satisfactory to the Sheriff and the applicant pays a substitution or amendment fee of $50.00 per amendment.

(b)   A license, once issued, may be amended only upon resubmission of a new, completed application satisfactory to the Sheriff, surrender of the license being amended, and payment of a new annual fee. The Sheriff may deny amendments for any reason for which an original application may be denied.

## Section 7:   Contents and Display of Licenses

(a)   Each bingo license shall contain the name and address of the license holder, the location at which the license holder is permitted to conduct bingo games, the days of the week on which the license holder is permitted to conduct bingo games, the date on which the license was issued and upon which it expires.

(b)   The license holder shall display the license conspicuously at the location where bingo is being conducted at all times during the conduct of a bingo game.

## Section 8:   Fee Proceeds

All monies collected by the Sheriff hereunder shall be paid to the County and placed in a separate bingo account, and deposited in a designated bank located

7

in Macon County within three business days of the collection of said fees.  All expenses incurred by the Sheriff in the administration and enforcement hereof shall be paid from this account, with the balance, if any, in said account to be used by the Sheriff for general law enforcement purposes. To the extent allowed by law, in the public interest, the said account shall be subject to audit by the State of Alabama Examiners of Public Accounts.

**Section 9:    General Regulations; Prizes**

(a)    No person under the age of 19 years shall be permitted to play any game or games of bingo, nor shall any person under the age of 19 years be permitted to conduct or assist in the operation of any game of bingo.

(b)    No bingo license shall be issued to any nonprofit organization, unless the organization shall have been in existence for at least three (3) years in the county immediately prior to the issuance of the permit or license.

(c)    Bingo games may be operated on the premises owned or leased by the nonprofit organization operating the bingo games.

(d)    A nonprofit organization may enter into a contract with any individual, firm, association or corporation to have the individual or entity operate bingo games or concessions on behalf of the nonprofit organization. A nonprofit organization may pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game.

(e)    A nonprofit organization may lend its name or allow its identity to be used by another person or entity in the operating or advertising of a bingo game in which the nonprofit organization is not directly and solely operating the bingo game.

(f)    Prizes given by any nonprofit organization for the playing of bingo games shall not exceed the cash amount or gifts of equivalent value set by these Rules and Regulations for any bingo session. For the purposes of these Rules and Regulations, no single prize given by any nonprofit organization, or on its behalf, for the playing of bingo games shall exceed $20,000,000 in cash or equivalent value during any bingo session.

(g)    No person who has been convicted of a felony offense, and whose civil rights have not been restored by law, shall conduct. or in any way participate in the operation of any bingo game permitted hereunder, nor shall any

8

person who has been convicted of any gambling offense be permitted to conduct or in any way participate in the operation of any bingo game permitted hereunder within 12 months of the conviction.

## Section 10: Records and Accounting

Each license holder shall keep and maintain the following records and accounts pertaining to each bingo session conducted by it for at least three (3) years from the date of such session:

(a)    An itemized list of all gross receipts for each bingo session, which shall include all receipts derived from the sale of bingo cards, entrance fees, donations, or from any other source whatsoever pertaining to the operation of such session. Notwithstanding the foregoing, the holder of a Class B License who has contracted with an individual, firm, association or corporation for the operation of bingo games shall only report the Class B License holder's gross receipts under such contract and provide a copy of such contract to the Sheriff.

(b)    An itemized list of all expenses, costs and disbursements, other than prizes, paid or given as a result of the operation of any bingo session, together with the name and address of each person to whom said expenses, disbursements or consideration was paid or given; a receipt or invoice for all items purchased and for all services rendered; and such other records as will adequately reflect the amount and nature of such expenses, costs and disbursements. Notwithstanding the foregoing, the holder of a Class B Bingo License who has contracted with an individual, firm, association or corporation for the operation of bingo games which permits the holder to receive reasonable compensation for the operation of a bingo session net of the costs associated with the operation of the bingo games, including without limitation, building rent, insurance, equipment rental, consulting or management fees, employee expense, utilities, janitorial services, bingo prizes or gifts and the like, shall only be required to maintain a copy of such contract and provide a copy of same to the Sheriff upon request.

(c)    All records, receipts, accounts and/or lists required to be kept and maintained hereunder shall be open to inspection by the Sheriff, or his authorized agents or representatives, during reasonable business hours.

(d)    All locations at which bingo games are being held by a license holder, or at which a license holder intends to conduct bingo games, shall be open to the Sheriff, or his authorized representatives, during all times at which bingo games are being conducted and during all other reasonable business hours.

9

(e)    On or before April 15, 2005, and on or before April 15th of each calendar year thereafter, each license holder who held a license for all or any part of the preceding calendar year shall file with the Sheriff a verified copy of all records, receipts, accounts and/or lists required to be kept or maintained hereunder relating to the operation of bingo games for said previous calendar year.

## Section 11:  Enforcement and Supervision; Rules; Bonds

(a)    The Sheriff shall be charged with the duty to and shall enforce and supervise the administration and enforcement of all of the rules, regulations and reporting required hereunder. In addition to these Regulations, the Sheriff shall enforce all applicable criminal and civil laws of the State of Alabama to prevent and discourage any illegal activity.

(b)    The Sheriff may require such acceptable sureties and/or bonds which he deems reasonable or necessary to insure proper compliance with these Rules and Regulations and the submission of such acceptable sureties or bonds shall be a condition precedent to the issuance of any license hereunder. The operator and surety or sureties shall be jointly and severally responsible for payment of prizes to winners, said payment to occur no later than the end of the session during which the prize was won.

## Section 12:  Revocation of Licenses; Appeal

The Sheriff, for good cause shown, may revoke any license issued pursuant hereto if the license holder or any officer, director, agent, employee or member of the license holder, or any person acting in concert with such persons, violates any of the Regulations herein promulgated. Such revocation by the Sheriff shall become effective ten (10) days after written notice of such revocation has been delivered by the Sheriff, or his authorized representative, to any person named in the license application pursuant to Section 4, subsections (c)(4) and (c)(5) hereunder, or such other person as may be involved in the operation of bingo pursuant hereto, unless the license holder shall make a written request for a hearing as to such revocation to the Macon County Commission within said ten (10) day period. Upon such request for hearing, the Commission shall hold a hearing upon such revocation, subject to rules and regulations for the conduct of meetings and hearings before such Commission, at its next regularly scheduled meeting, or specially called meeting for the purpose of such hearing. Upon such hearing the rendering of a decision adverse to the license holder shall result in the immediate revocation of the subject license. Following a hearing and rendition of an opinion

10

by the Commission upon revocation of a license issued hereunder, either party to said hearing may appeal the same to the Circuit Court of Macon County, Alabama and may request a trial by jury. Pending appeal to the Circuit Court hereunder, the revoked license shall remain revoked until and unless the Circuit Court shall order the same reinstated and shall set a reasonable bond to assure complete compliance with all Rules and Regulations promulgated hereunder pending such appeal.

## Section 13:  Effect of Revocation

The holder of any license issued pursuant hereto which shall be revoked as herein set out shall return such license to the Sheriff on or before the effective date of such revocation and whether returned or not such license shall be void and not valid beyond the effective date of revocation thereof unless such revocation shall be extended by appeal as provided hereunder. A license holder whose license is revoked in consequence of a violation of any rule or regulation promulgated herein, or other rule or regulation promulgated hereunder, shall be ineligible to apply for or have issued to it another license hereunder for a period of one (1) year after the effective date of such revocation. Nor shall any license be issued to any organization which is directed or controlled by persons listed in the application for license filed pursuant to Section 4, subsections (c)(4) and (c)(5) hereof in regard to the revoked license or to any organization of which the membership is substantially the same as any organization whose license has been revoked hereunder, for a period of one (1) year after the effective date of such revocation. .

## Section 14:  Appeal of Denial of License

Any nonprofit organization whose application for a license hereunder shall be denied by the Sheriff pursuant to these Regulations shall have the right to appeal such denial to the Macon County Commission and to the Circuit Court of Macon County in the same manner as an appeal of a revocation of a license issued hereunder may be appealed pursuant hereto provided, however, that such organization shall not operate any bingo game until such application shall have been granted, and a license issued, pursuant to any order of the said Commission or Court.

## Section 15:  Compliance With Federal Law

All electronic, computer, technologic aids and other devices used in connection with the operation of licensed bingo games conducted in Macon County under the authority of Amendment No. 744 to the Constitution of Alabama and permitted under the Rules and Regulations for the Licensing and Operating of

11

Bingo Games promulgated by the Sheriff of Macon County are expressly enumerated as lawful and exempted from the provisions of 15 U.S.C. § 1172.

### Section 16: Severability

The provisions hereto and the Regulations promulgated hereunder are severable. If any part hereof shall be declared invalid or unconstitutional, such declaration shall not affect any parts hereof which shall remain.

### Section 17: Amendments

The Sheriff reserves the right to amend these Regulations from time to time as necessary, but no amendments shall be effective unless in writing and signed by the Sheriff.

### Section 18: Effective Date.

The effective date of these First Amended and Restated Rules and Regulations is June 2, 2004, except, however, the effective date for the increased business license fee for the owner of a Class B qualified location as set forth in Section 4(a) shall be January 1, 2005, and thereafter, and the effective date for the provisions of new Section 15 is the date the Rules and Regulations For the Licensing and Operation of Bingo Games in Macon County were originally enacted by the Sheriff.

Issued this the 2nd day of June, 2004.

David M. Warren
Sheriff of Macon County, Alabama

12

# COMMENTARY TO
## AMENDED AND RESTATED BINGO REGULATIONS

Having had the opportunity to evaluate and regulate the licensing and operation of bingo games in Macon County, Alabama, pursuant to Amendment No. 774 of the Constitution of Alabama, the Macon County Bingo Regulations are hereby amended and restated in their entirety in order to maintain, protect and enhance the integrity of, the viability of and the economic benefits derived from, bingo games for the eligible nonprofit organizations in Macon County that offer material charitable and educational purposes in Macon County, Alabama. The following changes have been made to the Macon County Bingo Regulations:

**Section 1(d):** The definition "Nonprofit organization" is hereby amended to add the phrase "that is active and in good standing" in order to protect the truly viable charities in Macon County, Alabama, from a nonprofit organization that does not provide material charitable or educational benefits to Macon County and/or is an otherwise dormant, inactive nonprofit organization used primarily as a subterfuge to obtain a bingo license to operate games of bingo either directly or by contract with a third party individual or business entity.

**Section 1(j):** The capital investment amount required for a "qualified location" for the holder of a Class B License is hereby increased to $15,000,000 and limited to actual cost in order to require any qualified location to prove a significant investment and financial commitment to Macon County prior to becoming a "qualified location". Further, the capital investment requirement is restricted to actual cost, not based on any valuation, in order to avoid any potential dispute or abuse based on any real estate appraisal submitted with an application.

**Section 2:** In order to maximize economic benefits to numerous nonprofit organizations in Macon County and to further avoid the potential abuse of a third party individual or business entity from using one nonprofit organization (or a minimal number) as a "front" to operate bingo games under a Class B License, the last two (2) sentences have been added to Section 2 of the Regulations. By requiring at least fifteen (15) nonprofit organizations to obtain Class B Licenses prior to authorizing such a bingo operation at a qualified location, assurance is provided that a large representative group of charities is afforded the opportunity to obtain the economic benefits associated with a Class B License.

**Section 4(a):** The license for a Class B qualified location is hereby increased to $250,000, effective as of January 1, 2005. The license fee increase should provide additional funding for the Sheriff's Department to support, as well as retain, existing and increased law enforcement personnel to regulate and supervise the operation of bingo games in Macon County to preserve and protect the integrity of the bingo games for customers and for the nonprofit organizations.

**Section 9(f):** The single prize limitation has been increased to provide greater attraction and marketing of the bingo games in order to enhance economic benefits to the charities in Macon County, Alabama.

**Section 15:**    A new Section 15 is hereby added (with existing Sections 15 and 16 being renumbered Section 16 and 17, respectively) to incorporate into the existing Regulations the federal protection of transportation of gaming equipment from one state to another where such gaming activity is legalized in the state of final destination for such gaming equipment.

**Section 18:**    The new Section 18 provides that the First Amended and Restated Rules and Regulations are effective as of June 2, 2004, except the increased business license fee for the owner of a Class B qualified location shall be effective as of January 1, 2005, and thereafter, and the provisions of new Section 15 are effective as of the date the Rules and Regulations were originally enacted by the Sheriff.

# SECOND AMENDED AND RESTATED RULES AND REGULATIONS
## FOR THE LICENSING AND OPERATION
## OF
## BINGO GAMES IN MACON COUNTY, ALABAMA

Section 1: Definitions ............................................................................2

Section 2: Operation of Bingo Games in Macon County...........................4

Section 3: Bingo License Required ............................................................5

Section 4: Application for License; Submission; Form; Contents .............5

Section 5: Issuance of License ..................................................................7

Section 6: Amendments; Applications; Licenses .....................................7

Section 7: Contents and Display of Licenses ...........................................7

Section 8: Fee Proceeds ...........................................................................8

Section 9: General Regulations; Prizes ....................................................8

Section 10: Records and Accounting........................................................9

Section 11: Enforcement and Supervision; Rules; Bonds .......................10

Section 12: Revocation of Licenses; Appeal ..........................................10

Section 13: Effect of Revocation ...........................................................11

Section 14: Appeal of Denial of License .................................................11

Section 15: Compliance with Federal Law ..............................................12

Section 16: Severability...........................................................................12

Section 17: Amendments .........................................................................12

Section 18: Effective Date .......................................................................12

EXHIBIT

tabbies'

G

## MACON COUNTY BINGO REGULATIONS

The following Second Amended and Restated Rules and Regulations For the Licensing and Operation of Bingo Games in Macon County (hereinafter sometimes referred to as "Rules", "Regulations" or "Rules and Regulations") are hereby promulgated by David M. Warren, Sheriff of Macon County, to regulate the issuance of permits or licenses for and the operation of bingo games by certain nonprofit organizations in Macon County, Alabama pursuant to Act No. 2003-124, Regular Session, 2003, authorizing a referendum on an amendment to the Constitution of Alabama, which said referendum was approved by the voters on November 4, 2003. The primary purpose of this Second Amendment is to encompass the definition of "bingo games" as pronounced by the Attorney General for the State of Alabama and to further adopt the policy of the Attorney General in limiting the conduct of Class B bingo gaming in Macon County thereby allowing the Sheriff to more effectively regulate and enforce the proper conduct of bingo games.

## Section 1: Definitions

As used herein the following words shall have the following meanings as described herein, unless the context clearly indicates otherwise:

(a)   "Bingo" or "Bingo games" shall mean any game of chance known as bingo, including any bingo game permitted by federal law, (whether or not electronic, computer, or other technologic aids are used in connection therewith) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations, and which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards. The bingo game must incorporate the typical features of traditional bingo, including, but not limited to, a grid of five horizontal and five vertical squares, numbers randomly selected, and a preordained winning pattern. Alternative entertaining displays such as spinning reels and other video or mechanical graphics are permitted but must not affect game play. Just as in traditional bingo halls, players on electronic bingo machines must compete against one another. Consequently, the electronic machines must be linked so that players are competing against each other. Nothing herein is intended to prohibit the award of interim or consolation prizes. Electronic, computer or other technologic aids include any machine or device that assists a player or the playing of a bingo game;

2

broadens the participation levels in a common game; facilitates communication between and among bingo locations; or allows players to play a game with or against other players rather than with or against a machine. Examples of electronic, computer or other technologic aids include, but are not limited to, dispensers, readers, telephones, cables, televisions, screens, satellites, bingo blowers, electronic player stations, electronic cards for participants in bingo games, player terminals, central servers containing random number generators for remote player terminals and video displays providing game results in different display modes.

(b)   "Person" shall mean any human being, corporation, partnership, association or other legal entity of any kind whatsoever.

(c)   "Sheriff" shall mean the Sheriff of Macon County, Alabama. Under the Rules and Regulations herein, the Sheriff may designate or otherwise authorize persons of the Macon County Sheriff's Office to perform various duties of the Sheriff set forth herein.

(d)   "Nonprofit organization" shall mean a bona fide organization that is active and in good standing for charitable, educational, or other lawful purposes which operates without profit to its members and/or which has been classified by the Internal Revenue Service as a tax exempt organization.

(e)   "License holder" shall mean any nonprofit organization that has been issued a bingo license by the Sheriff pursuant to these Regulations.

(f)   "Location" shall mean a building, hall, enclosure, room, or outdoor area that complies with all federal, state and local laws and applicable building and fire codes.

(g)   "Class A Bingo License" shall mean a license issued to an applicant who desires to operate paper card bingo only at a qualified location.

(h)   "Class B Bingo License" shall mean a license issued to an applicant who desires to operate any and all games of bingo as defined hereinabove, at a qualified location.

(i)   "Qualified location" for the holder of a Class A Bingo License shall mean a location, as defined above, which has been inspected and approved by the Sheriff for the conduct of bingo games.

3

(j)   "Qualified location" for the holder of a Class B Bingo License shall mean a location, as defined above, which has been inspected and approved by the Sheriff for the conduct of bingo games and other lawful activities and for which the license applicant shall submit satisfactory evidence that the location has in place the following at all times that any bingo games are being conducted or operated: (i) public liability insurance in an amount not less than $5,000,000; (ii) if liquor is served, liquor liability insurance in the amount of not less than $1,000,000; (iii) adequate parking for patrons and employees; (iv) onsite security as prescribed by the Sheriff; (v) onsite first aid personnel as prescribed by the Sheriff; (vi) cash or surety bond in an amount not less than $1,000,000; (vii) such accounting procedures, controls and security monitoring as necessary to preserve and promote the integrity of the operation of bingo games and to ensure the protection of the charitable license holder and its patrons; (viii) satisfactory evidence that the owner or owners of the location paid at least $15,000,000 for the land, building and other capital improvements (before depreciation) comprising said location; (ix) satisfactory evidence that the location is fully compliant with the Americans with Disabilities Act ("ADA"); and (x) satisfactory evidence that the owner or owners of such location have been residents of the State of Alabama for at least three (3) years or, if the owner is a partnership, association, corporation, limited liability company, or other business entity, satisfactory evidence that those partners, members, or stockholders of such entity that own collectively at least two-thirds (2/3) of the voting rights and equity interests of such entity, are individuals that have been residents of the State of Alabama for at least three (3) years.

(k)   "Bingo session" shall mean a consecutive period of time up to 24 consecutive hours during which bingo is played on as many as seven (7) days in a given week. A license holder shall not be limited in the number of bingo sessions it operates during any 24 hour period.

## Section 2:   Operation of Bingo Games in Macon County

The operation of bingo games for prizes or money by nonprofit organizations, as defined herein, shall be allowed in Macon County, pursuant to Amendment No. 744 to the Constitution of Alabama and Act No. 2003-124, provided that the nonprofit organization shall first obtain a bingo license (Class A or B) as set out herein, and abide by all of the Regulations duly promulgated by the Sheriff. No Class B Licensee shall be authorized to operate bingo at any qualified location, as defined herein, unless a minimum of fifteen (15) applicants shall first obtain Class B

4

Licenses for such location. This restriction shall be noted on any Class B License issued hereafter. At no time shall there be issued and outstanding more than sixty (60) Class B Licenses for the operation of bingo in Macon County.

## Section 3:    Bingo License Required

No nonprofit organization, as defined herein, shall be allowed to operate a bingo game unless the Sheriff first issues a license to said organization authorizing it to do so. In the event of any controversy as to whether or not a game of chance or activity constitutes a bingo game, as defined herein, for which a license may be issued, the decision of the Sheriff shall control, subject to the rights of appeal as set out herein. The license described herein shall be in a form designated by the Sheriff and shall be in addition to and not in lieu of any other permits or licenses which may be required by law, and no bingo game shall be operated until such time as all required licenses or permits have been obtained. A license holder may hold only one license and that license shall be valid for only one location in Macon County, Alabama. A license is not assignable or transferable and shall become automatically void upon the change of name, dissolution, loss of charter, or, if the license holder is a tax exempt organization under the federal income tax laws, the loss of exemption from taxation under the Internal Revenue Code.

## Section 4:    Application for License; Submission; Form; Contents

(a)    Any nonprofit organization, as defined herein, desiring to obtain a license to operate bingo games hereunder shall make application to the Sheriff on forms prescribed by the Sheriff and shall pay an annual fee of $250.00 for Class A Bingo Licenses and $1,000.00 for Class B Bingo Licenses. Such license shall expire and become automatically void on December 31 of the fifth year following its issuance. Renewal applications shall be filed with the Sheriff at least forty-five (45) days prior to January 1 of each calendar year and shall be on forms prescribed by the Sheriff. Renewal applications shall be subject to the same application fee as provided for an original application and shall contain the same information as required in an original application. Should fifteen (15) or more Class B Bingo License holders contract in a given calendar year with the owner of a Class B qualified location, the owner of said Class B qualified location shall pay a business license fee ("Operator's License Fee") of $250,000 at the time the Class B Bingo License is issued or renewed. In no event shall more than one Operator's License Fee be paid by the owner of a Class B qualified location in any given year.

(b)    The Sheriff shall refuse to grant a bingo license or renewal to any applicant qualified hereunder unless and until the applicant fully provides the information required hereunder, such being provided in a form and in sufficient

5

detail to satisfy the Sheriff of its validity and sufficiency. The Sheriff shall have complete discretion to require any reasonable confirming documentation as to any information required hereunder and shall have a reasonable time to check or confirm by any method available to him the accuracy or validity of any information provided hereunder.

(c)  Each application for a bingo license or renewal thereof shall contain the following information and exhibits:

(1)  The date of incorporation or other evidence of inception showing existence by the organization for the prescribed period of time.

(2)  A copy of the charter, certificate of incorporation, by-laws, or other evidence of legal existence of the organization.

(3)  When applicable, a copy of the letter ruling or tax exempt determination letter from the Internal Revenue Service or other proof deemed acceptable by the Sheriff verifying the tax exempt status of the organization named in the application or the parent organization of which the same is a qualified branch, chapter, lodge or post.

(4)  The names and residence addresses of each of the officers and directors of the organization, as well as the names and addresses of any members or persons who shall be in charge of or have control over the operation or promotion of bingo games.

(5)  The names and addresses of any persons, organizations, or other entities which shall act as sureties for the applicant or to which the applicant is financially indebted in regard to the operation of bingo games.

(6)  The exact physical location at which the applicant will conduct the bingo games and if the premises on which the games are to be conducted are not owned by the applicant, the names and addresses of the owners thereof and a copy of all rental, lease, consulting or other agreements with the said owners regarding the use of the premises for the operation of the bingo games.

(7)  A statement listing all convictions, if any, for criminal offenses, other than minor traffic offenses, of each of the persons for whom names are required in subsections (4), (5), and (6) above.

## Section 5:   Issuance of License

Upon receipt of a fully completed and documented application for a license meeting all of the requirements set out herein, the Sheriff shall make such investigation as he may deem necessary or proper of the qualifications of each applicant as required herein and the truth and veracity of the information contained or attached to the application and after making such investigation and after being first satisfied that all qualifications and requirements as set out herein the Sheriff shall issue such license to said applicant upon the terms and conditions herein set forth.  As part of said investigation, any person named in paragraphs 4, 5, 6 of Section 4(c) herein may be required to furnish a consent for background and criminal history check.

A Class A Bingo License shall be issued to an applicant who desires to operate paper card bingo only at a qualified location for the holder of a Class A License.  A Class B Bingo License shall be issued to an applicant who desires to operate any and all games of bingo, as defined hereinabove, at a qualified location for the holder of a Class B License.

## Section 6:   Amendments; Applications; Licenses

(a)   An applicant may amend an application filed hereunder to correct or complete the information contained therein or to change said information to comply with a change in circumstances at any time prior to the denial thereof by the Sheriff or the issuance of a license thereon, provided that said amendment be made in or on a form satisfactory to the Sheriff and the applicant pays a substitution or amendment fee of $50.00 per amendment.

(b)   A license, once issued, may be amended only upon resubmission of a new, completed application satisfactory to the Sheriff, surrender of the license being amended, and payment of a new annual fee.   The Sheriff may deny amendments for any reason for which an original application may be denied.

## Section 7:   Contents and Display of Licenses

(a)   Each bingo license shall contain the name and address of the license holder, the location at which the license holder is permitted to conduct bingo games, the days of the week on which the license holder is permitted to conduct bingo games, the date on which the license was issued and upon which it expires.

7

(b)    The license holder shall display the license conspicuously at the location where bingo is being conducted at all times during the conduct of a bingo game.

## Section 8:    Fee Proceeds

All monies collected by the Sheriff hereunder shall be paid to the County and placed in a separate bingo account, and deposited in a designated bank located in Macon County within three business days of the collection of said fees.  All expenses incurred by the Sheriff in the administration and enforcement hereof shall be paid from this account, with the balance, if any, in said account to be used by the Sheriff for general law enforcement purposes. To the extent allowed by law, in the public interest, the said account shall be subject to audit by the State of Alabama Examiners of Public Accounts.

## Section 9:    General Regulations; Prizes

(a)    No person under the age of 19 years shall be permitted to play any game or games of bingo, nor shall any person under the age of 19 years be permitted to conduct or assist in the operation of any game of bingo.

(b)    No bingo license shall be issued to any nonprofit organization, unless the organization shall have been in existence for at least three (3) years in the county immediately prior to the issuance of the permit or license.

(c)    Bingo games may be operated on the premises owned or leased by the nonprofit organization operating the bingo games.

(d)    A nonprofit organization may enter into a contract with any individual, firm, association or corporation to have the individual or entity operate bingo games or concessions on behalf of the nonprofit organization.  A nonprofit organization may pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game.

(e)    A nonprofit organization may lend its name or allow its identity to be used by another person or entity in the operating or advertising of a bingo game in which the nonprofit organization is not directly and solely operating the bingo game.

(f)    Prizes given by any nonprofit organization for the playing of bingo games shall not exceed the cash amount or gifts of equivalent value set by these Rules and Regulations for any bingo session.  For the purposes of these Rules

and Regulations, no single prize given by any nonprofit organization, or on its behalf, for the playing of bingo games shall exceed $20,000,000 in cash or equivalent value during any bingo session.

(g)    No person who has been convicted of a felony offense, and whose civil rights have not been restored by law, shall conduct or in any way participate in the operation of any bingo game permitted hereunder, nor shall any person who has been convicted of any gambling offense be permitted to conduct or in any way participate in the operation of any bingo game permitted hereunder within 12 months of the conviction.

## Section 10:   Records and Accounting

Each license holder shall keep and maintain the following records and accounts pertaining to each bingo session conducted by it for at least three (3) years from the date of such session:

(a)    An itemized list of all gross receipts for each bingo session, which shall include all receipts derived from the sale of bingo cards, entrance fees, donations, or from any other source whatsoever pertaining to the operation of such session.  Notwithstanding the foregoing, the holder of a Class B License who has contracted with an individual, firm, association or corporation for the operation of bingo games shall only report the Class B License holder's gross receipts under such contract and provide a copy of such contract to the Sheriff.

(b)    An itemized list of all expenses, costs and disbursements, other than prizes, paid or given as a result of the operation of any bingo session, together with the name and address of each person to whom said expenses, disbursements or consideration was paid or given; a receipt or invoice for all items purchased and for all services rendered; and such other records as will adequately reflect the amount and nature of such expenses, costs and disbursements.  Notwithstanding the foregoing, the holder of a Class B Bingo License who has contracted with an individual, firm, association or corporation for the operation of bingo games which permits the holder to receive reasonable compensation for the operation of a bingo session net of the costs associated with the operation of the bingo games, including without limitation, building rent, insurance, equipment rental, consulting or management fees, employee expense, utilities, janitorial services, bingo prizes or gifts and the like, shall only be required to maintain a copy of such contract and provide a copy of same to the Sheriff upon request.

(c)    All records, receipts, accounts and/or lists required to be kept and maintained hereunder shall be open to inspection by the Sheriff, or his

9

authorized agents or representatives, during reasonable business hours.

(d)     All locations at which bingo games are being held by a license holder, or at which a license holder intends to conduct bingo games, shall be open to the Sheriff, or his authorized representatives, during all times at which bingo games are being conducted and during all other reasonable business hours.

(e)     On or before April 15, 2005, and on or before April 15th of each calendar year thereafter, each license holder who held a license for all or any part of the preceding calendar year shall file with the Sheriff a verified copy of all records, receipts, accounts and/or lists required to be kept or maintained hereunder relating to the operation of bingo games for said previous calendar year.

## Section 11:   Enforcement and Supervision; Rules; Bonds

(a)     The Sheriff shall be charged with the duty to and shall enforce and supervise the administration and enforcement of all of the rules, regulations and reporting required hereunder.  In addition to these Regulations, the Sheriff shall enforce all applicable criminal and civil laws of the State of Alabama to prevent and discourage any illegal activity.

(b)     The Sheriff may require such acceptable sureties and/or bonds which he deems reasonable or necessary to insure proper compliance with these Rules and Regulations and the submission of such acceptable sureties or bonds shall be a condition precedent to the issuance of any license hereunder.  The operator and surety or sureties shall be jointly and severally responsible for payment of prizes to winners, said payment to occur no later than the end of the session during which the prize was won.

## Section 12:   Revocation of Licenses; Appeal

The Sheriff, for good cause shown, may revoke any license issued pursuant hereto if the license holder or any officer, director, agent, employee or member of the license holder, or any person acting in concert with such persons, violates any of the Regulations herein promulgated. Such revocation by the Sheriff shall become effective ten (10) days after written notice of such revocation has been delivered by the Sheriff, or his authorized representative, to any person named in the license application pursuant to Section 4, subsections (c)(4) and (c)(5) hereunder, or such other person as may be involved in the operation of bingo pursuant hereto, unless the license holder shall make a written request for a hearing as to such revocation to the Macon County Commission within said ten (10) day

10

period. Upon such request for hearing, the Commission shall hold a hearing upon such revocation, subject to rules and regulations for the conduct of meetings and hearings before such Commission, at its next regularly scheduled meeting, or specially called meeting for the purpose of such hearing. Upon such hearing the rendering of a decision adverse to the license holder shall result in the immediate revocation of the subject license. Following a hearing and rendition of an opinion by the Commission upon revocation of a license issued hereunder, either party to said hearing may appeal the same to the Circuit Court of Macon County, Alabama and may request a trial by jury. Pending appeal to the Circuit Court hereunder, the revoked license shall remain revoked until and unless the Circuit Court shall order the same reinstated and shall set a reasonable bond to assure complete compliance with all Rules and Regulations promulgated hereunder pending such appeal.

## Section 13:  Effect of Revocation

The holder of any license issued pursuant hereto which shall be revoked as herein set out shall return such license to the Sheriff on or before the effective date of such revocation and whether returned or not such license shall be void and not valid beyond the effective date of revocation thereof unless such revocation shall be extended by appeal as provided hereunder. A license holder whose license is revoked in consequence of a violation of any rule or regulation promulgated herein, or other rule or regulation promulgated hereunder, shall be ineligible to apply for or have issued to it another license hereunder for a period of one (1) year after the effective date of such revocation. Nor shall any license be issued to any organization which is directed or controlled by persons listed in the application for license filed pursuant to Section 4, subsections (c)(4) and (c)(5) hereof in regard to the revoked license or to any organization of which the membership is substantially the same as any organization whose license has been revoked hereunder, for a period of one (1) year after the effective date of such revocation.

## Section 14:  Appeal of Denial of License

Any nonprofit organization whose application for a license hereunder shall be denied by the Sheriff pursuant to these Regulations shall have the right to appeal such denial to the Macon County Commission and to the Circuit Court of Macon County in the same manner as an appeal of a revocation of a license issued hereunder may be appealed pursuant hereto provided, however, that such organization shall not operate any bingo game until such application shall have been granted, and a license issued, pursuant to any order of the said Commission or Court.

11

## Section 15:  Compliance With Federal Law

All electronic, computer, technologic aids and other devices used in connection with the operation of licensed bingo games conducted in Macon County under the authority of Amendment No. 744 to the Constitution of Alabama and permitted under the Rules and Regulations for the Licensing and Operating of Bingo Games promulgated by the Sheriff of Macon County are expressly enumerated as lawful and exempted from the provisions of 15 U.S.C. § 1172.

## Section 16:  Severability

The provisions hereto and the Regulations promulgated hereunder are severable. If any part hereof shall be declared invalid or unconstitutional, such declaration shall not affect any parts hereof which shall remain.

## Section 17:  Amendments

The Sheriff reserves the right to amend these Regulations from time to time as necessary, but no amendments shall be effective unless in writing and signed by the Sheriff.

## Section 18:  Effective Date.

The effective date of these Second Amended and Restated Rules and Regulations is January 1, 2005.

Issued this the __6__ day of __January__, 200_5_.

David M. Warren
Sheriff of Macon County, Alabama

# COMMENTARY TO SECOND AMENDED AND RESTATED BINGO REGULATIONS

The Attorney General for the State of Alabama has recently conducted an exhaustive investigation and review of gaming activities in the State of Alabama, including but not limited to, bingo games conducted in Macon County, Alabama, pursuant to Amendment No. 744 of the Constitution of Alabama. In response to the Attorney General's recent findings and pronouncements, the First Amended and Restated Rules and Regulations For the Licensing and Operation of Bingo Games in Macon County (the "Macon County Bingo Regulations") are hereby amended and restated to comport and comply with the Attorney General's definition of bingo games and policy to limit Class B bingo gaming activities in Macon County, Alabama, at a reasonable level whereby the Sheriff can more adequately and effectively regulate and enforce the proper conduct of such bingo games. Accordingly, the following changes have been made to the Macon County Bingo Regulations:

**Section 1(a):**   The definition "Bingo" or "Bingo games" is hereby amended to add four new sentences to be inserted after the first sentence and before the second sentence of the current definition in order to adopt the Attorney General's pronouncement of bingo games that are lawful in the State of Alabama.

**Section 2:**   A new sentence has been added to the end of Section 2 to limit the number of Class B Licenses that may be issued in order to follow the policy of the Attorney General to limit Class B bingo gaming activities in Macon County, Alabama, and to allow the Sheriff to more effectively regulate and enforce the proper conduct of such bingo games.

**Section 4:**   The second sentence has been revised to allow licenses to be issued for five (5) years, rather than one (1) year. This revision will reduce and avoid additional administrative costs of review and processing of renewal applications for the Sheriff, although the annual license fee will still be required.

13