**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 3:06-cv-01113-WKW-WC |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY, et al., | ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
<u>JOINT MOTION TO DISMISS</u>**

Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, Alabama  35213
TEL:   (205) 986-3620
FAX:   (205) 986-3639
E-mail:        rks@spotswoodllc.com
               msansbury@spotswoodllc.com

*Attorneys for the Plaintiff Charities*

Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
Heninger Garrison Davis, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:        steve@hgdlawfirm.com
               lewis@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

I.    STANDARD FOR DECISION ................................................................................. 1

II.   THE PLAINTIFFS HAVE ALLEGED SUFFICIENT GROUNDS FOR ALL OF
      THE CLAIMS IN THEIR COMPLAINT ................................................................ 1

      A.    Based on the allegations of the Third Amended Complaint, Fred Gray Jr.
            is a public servant ........................................................................................ 2

            1.    Fred Gray Jr. is a public servant under Ala. Code § 13A-10-1 ................. 3

            2.    The fact that Fred Gray Jr. is a lawyer does not exempt Defendants
                  McGregor and VictoryLand from RICO liability ...................................... 6

      B.    The Plaintiffs have stated a valid RICO claim ....................................................... 9

            1.    Rule 8, not Rule 9, provides the applicable pleading standard .................. 9

            2.    The Complaint would satisfy Rule 9 if it were applicable ....................... 11

                  a.    The Plaintiffs' allegations "upon information and belief"
                        satisfy Rule 9's requirements ...................................................... 12

                  b.    The Defendants' unsupported criticisms of the Complaint
                        do not justify dismissal .............................................................. 13

                  c.    Requiring a response to a RICO Standing Order
                        is both improper and unnecessary here ......................................... 13

      C.    Plaintiffs' Section 1983 conspiracy claim is sufficient ....................................... 15

            1.    There is no rational basis for requiring interested organizations
                  to construct or lease a multi-million dollar facility prior to
                  obtaining a Class B Bingo License .......................................................... 15

            2.    There is no rational basis for the Fifteen License Minimum,
                  the Sixty License Maximum, and the granting of all licenses to
                  organizations affiliated with VictoryLand .............................................. 17

      D.    The Plaintiffs have sufficiently alleged claims for tortious interference .............. 19

            1.    Tortious interference with contractual and business relations ................. 19

            2.      Tortious interference with prospective contractual and business
                    relations ............................................................................................. 21

III.    THE PLAINTIFFS' CLAIMS FOR TORTIOUS INTERFERENCE AND
        FOR VIOLATIONS OF SECTION 1983 ARE NOT BARRED BY STATUTES
        OF LIMITATIONS ................................................................................................ 24

        A.      The Defendants' tortious interference is continuous ............................................ 24

        B.      The Defendants' violation of Section 1983 is both a continuous tort
                and a continuing violation ................................................................................. 25

IV.     CONCLUSION ................................................................................................................ 27

        CERTIFICATE OF SERVICE ................................................................................................ 28

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abiff v. Slaton*,
    806 F. Supp. 993 (N.D. Ga. 1992) ................................................................ 26

*Alan Neuman Prods., Inc. v. Albright*,
    862 F.2d 1388 (9th Cir. 1988) ................................................................ 10

*Ambrosia Coal & Const. Co. v. Pages Morales*,
    482 F.3d 1309 (11th Cir. 2007) ................................................................ 9, 10

*American Mutual Liability Insurance Co. v. Phillips*,
    491 So. 2d 904 (Ala. 1986) ................................................................ 25

*Ancata v. Prison Health Servs., Inc.*,
    769 F.2d 700 (11th Cir. 1985) ................................................................ 2

*Atlanta Market Ctr. Management Co. v. McLane*,
    503 S.E.2d 278 (Ga. 1998) ................................................................ 23

*Bashir v. National R.R. Passenger Corp.*,
    929 F. Supp. 404 (S.D. Fla. 1996) ................................................................ 9

*Beavers v. American Cast Iron Pipe Co.*,
    975 F.2d 792 (11th Cir. 1992) ................................................................ 27

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ................................................................ 1, 2

*BellSouth Mobility, Inc. v. Cellulink, Inc.*,
    814 So. 2d 203 (Ala. 2001) ................................................................ 23

*Bennett v. Berg*,
    685 F.2d 1053 (8th Cir. 1982) ................................................................ 10

*Blue Cross & Blue Shield v. Nielsen*,
    714 So. 2d 293 (Ala. 1998) ................................................................ 3

*Board of Trustees of University of Alabama v. Garrett*,
    531 U.S. 356, 121 S. Ct. 955, 964 (2001) ................................................................ 15

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ................................................................ 9, 10

*Calloway v. Partners Nat'l Health Plans*,
    986 F.2d 446 (11th Cir. 1993) ..................................................................... 27

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*,
    139 F.3d 1396 (11th Cir. 1998) ................................................................... 23

*Carver v. Bunch*,
    946 F.2d 451 (6th Cir. 1991) ...................................................................... 13

*Cayman Exploration Corp. v. United Gas Pipe Line Co.*.
    873 F.2d 1357 (10th Cir. 1989) ............................................................... 9-10

*Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*,
    271 F.3d 374 (2d Cir. 2001) ....................................................................... 14

*Conley v. Gibson*,
    355 U.S. 41, 78 S. Ct. 99 (1957) ................................................................... 1

*Denny v. Barber*,
    576 F.2d 465, 469 (2d Cir. 1978) ................................................................ 12

*Directv, Inc. v. Treesh*,
    487 F.3d 471 (6th Cir. 2007) ...................................................................... 13

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987) ..................................................................... 12

*Donaldson v. O'Connor*,
    493 F.2d 507 (5th Cir. 1974),
    *vacated on other grounds by O'Connor v. Donaldson*,
    422 U.S. 563, 95 S. Ct. 2486 (1975) ........................................................... 26

*Durham v. Business Management Assocs.*,
    847 F.2d 1505 (11th Cir. 1988) ..................................................................... 9

*Erickson v. Pardus*,
    127 S. Ct. 2197 (2007) ................................................................................. 1

*Ex parte Alabama Dept. of Transp.*,
    764 So. 2d 1263 (Ala. 2000)........................................................ 21, 22, 23, 24

*Ex parte Pfizer, Inc.*,
    746 So. 2d 960 (Ala. 1999) ........................................................................... 3

*Foster v. Board of School Com'rs of Mobile County*,
    872 F.2d 1563 (11th Cir. 1989) ................................................................... 26

*Garren v. Commercial Union Insurance Co.*,
340 So. 2d 764 (Ala. 1976) ...................................................................................... 25

*Garrett v. Raytheon Co.*,
368 So. 2d 516 (Ala. 1979) ...................................................................................... 25

*Gary v. City of Warner Robins*,
311 F.3d 1334 (11th Cir. 2002) ............................................................................... 15

*Georgetown Manor, Inc. v. Ethan Allen, LLC*,
47 F.3d 1099 (11th Cir. 1995) ................................................................................. 23

*Hammond v. State*,
354 So. 2d 280 (Ala. Crim. App. 1977) ...................................................................... 5

*Handeen v. Lemaire*,
112 F.3d 1339 (8th Cir. 1997) ............................................................................... 6, 7

*Hartz v. Friedman*,
919 F.2d 469, 471 (7th Cir. 1990) ........................................................................... 11

*Hillis v. Rentokil, Inc.*,
596 So. 2d 888 (Ala. 1992) ...................................................................................... 25

*IMED Corp. v. Systems Eng'g Assocs. Corp.*,
602 So. 2d 344 (Ala. 1992) ........................................................................................ 3

*In re Craftmatic Secs. Litig.*,
890 F.2d 628 (3d Cir. 1989) ..................................................................................... 12

*Jennings v. Emry*,
910 F.2d 1434 (7th Cir. 1990) ................................................................................. 11

*Knight v. Columbus, Ga.*,
19 F.3d 579 (11th Cir. 1994) ............................................................................... 26-27

*Lehigh Portland Cement Co. v. Donaldson*,
231 Ala. 242, 164 So. 97 (1935) ............................................................................. 24

*Lovett v. Ray*,
327 F.3d 1181 (11th Cir. 2003) ............................................................................... 26

*McLaughlin v. Anderson*,
962 F.2d 187 (2d Cir. 1992) .................................................................................... 10

*Michaels Bldg. Co. v. Ameritrust Co.*,
   848 F.2d 674 (6th Cir. 1988) ................................................................. 9, 10

*Moon v. Harco Drugs, Inc.*,
   435 So. 2d 218 (Ala. 1983) ..................................................................... 24

*Neitzke v. Williams*,
   490 U.S. 319, 109 S. Ct. 1827 (1989) .......................................................... 1

*New England Data Servs. v. Becher*,
   829 F.2d 286 (1st Cir. 1987) ................................................................... 10

*Ouaknine v. MacFarlane*,
   897 F.2d 75 (2d Cir. 1990) ..................................................................... 12

*Owens v. Okure*,
   488 U.S. 235, 109 S. Ct. 573 (1989) ..................................................... 25-26

*People v. Hoskins*,
   2006 WL 933004, *1 (Mich. Ct. App. Apr 11, 2006) ...................................... 5

*People v. McGarry*,
   99 N.W. 147 (Mich. 1904) ....................................................................... 5

*People v. Salsbury*,
   96 N.W. 936 (Mich. 1903) ....................................................................... 5

*Perlman v. Zell*,
   938 F. Supp. 1327 (N.D. Ill. 1996) .......................................................... 10

*Pullen v. Cincinnati Ins. Co.*,
   400 So. 2d 393 (Ala. 1981) ...................................................................... 5

*Rose v. Bartle*,
   871 F.2d 331 (3rd Cir. 1989) .................................................................. 10

*Ross v. Buckeye Cellulose Corp.*,
   980 F.2d 648 (11th Cir. 1993) ................................................................ 27

*Santiago v. Lykes Bros. S.S. Co.*,
   986 F.2d 423 (11th Cir. 1993) ................................................................ 26

*Saporito v. Combustion Eng'g, Inc.*,
   843 F.2d 666 (3d Cir. 1988) ................................................................... 10

*Scheuer v. Rhodes,*
 416 U.S. 232, 94 S. Ct. 1683 (1974) ........................................................... 1

*State v. Perez,*
 883 A.2d 367 (N.J. 2005) ............................................................................ 4

*Stern v. Leucadia Nat'l Corp.,*
 844 F.2d 997 (2d Cir. 1988) ....................................................................... 12

*Swierkiewicz v. Sorema N. A.,*
 534 U.S. 506, 122 S. Ct. 992 (2002) ............................................................ 1

*Thornton v. Evans,*
 692 F.2d 1064 (7th Cir. 1982) ................................................................... 11

*Tom's Food, Inc. v. Carn,*
 896 So. 2d 443 (Ala. 2004) ................................................................... 22-23

*Town of Loxley v. Rosinton Water, Sewer & Fire Protection Auth., Inc.,*
 376 So. 2d 705 (Ala. 1979) ......................................................................... 3

*Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County,*
 589 So. 2d 687 (Ala. 1991) ......................................................................... 3

*United States v. Massey,*
 89 F.3d 1433 (11th Cir. 1996) ................................................................... 13

*United States v. Whitney,*
 229 F.3d 1296 (10th Cir. 2000) ................................................................. 13

*Vaughan v. Marshall,*
 2006 WL 1476043, *8 (M.D. Ala. 2006) .................................................... 6

*Vaughn v. State,*
 880 So. 2d 1178 (Ala. Crim. App. 2003) ............................................... 3, 5-6

*Vicom, Inc. v. Harbridge Merchant Servs., Inc.,*
 20 F.3d 771 (7th Cir. 1994) ................................................................. 10, 11

*Wagh v. Metris Direct, Inc.,*
 363 F.3d 821 (9th Cir. 2003) ..................................................................... 14

*Wexner v. First Manhattan Co.,*
 902 F.2d 169 (2d Cir. 1990) ..................................................................... 12

*Wilson v. Garcia*,
   471 U.S. 261, 105 S. Ct. 1938 (1985) .......................................................... 25

## CONSTITUTIONS

Alabama Constitution, Amendment 744 .................................................. 4

## STATUTES AND RULES

Ala. Code § 6-2-38(*l*)........................................................................... 26

Ala. Code § 13A-10-1........................................................................... 2, 3, 5

Ala. Code § 13A-10-1 (commentary)................................................... 5

Ala. Code § 13A-10-1(3)..................................................................... 3

Ala. Code § 13A-10-1(7)..................................................................... 3, 4, 5, 6

Ala. Code § 13A-10-60(b)(3)............................................................... 3

Alabama Rules of Professional Conduct, Rule 1.7(b) ...................... 8

Alabama Rules of Professional Conduct, Rule 1.7(b)(2) .................. 8

Alabama Rules of Professional Conduct, Rule 1.10 .......................... 20

Alabama Rules of Professional Conduct, Rule 1.10(a) ..................... 8

Fed. R. Civ. P. 8 .................................................................................... 13

Fed. R. Civ. P. 8(a) ............................................................................... 10

Fed. R. Civ. P. 8(a)(2) .......................................................................... 1, 11

Fed. R. Civ. P. 8(e)(1) .......................................................................... 11

Fed. R. Civ. P. 9(b) ............................................................................... 9, 10, 11, 12

Fed. R. Civ. P. 11(b)(3) ........................................................................ 12, 13, 20

Fed. R. Civ. P. 12(b)(6) ........................................................................ 1

18 U.S.C. § 1962(c) .............................................................................. 6

18 U.S.C. § 1962(d) .......................................................................................................... 7

42 U.S.C. § 1983 ............................................................................................. 15, 19, 24, 25-26

**OTHER AUTHORITIES**

Mich. Comp. Laws Ann. § 750.118 ................................................................................. 5

Moore's Federal Practice § 8.13 ...................................................................................... 11

Restatement (Second) of Torts § 766B cmt. b (1979) ................................................... 22

Restatement (Second) of Torts § 768 (1979) ................................................................ 23

5 Wright & Miller, Federal Practice & Procedure Civ. 3d § 1224 (2007) ............................ 12, 20

5 Wright & Miller, Federal Practice and Procedure § 1281 (1969) ............................................ 11

The Plaintiff Charities and Plaintiff Lucky Palace, LLC, hereby respond to the Joint Motion to Dismiss filed by Defendants Milton McGregor and Macon County Greyhound Park, Inc. ("VictoryLand") (collectively "Defendants"), as follows:

## I.    STANDARD FOR DECISION

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specific facts are not necessary; the statement needs only to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957)). In addition, when ruling on a defendant's motion to dismiss pursuant to Rule 12(b)(6), a judge must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (citing *Twombly*, 127 S. Ct. at 1965 (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827 (1989); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683 (1974))).

## II.    THE PLAINTIFFS HAVE ALLEGED SUFFICIENT GROUNDS FOR ALL OF THE CLAIMS IN THEIR COMPLAINT.

The Third Amended Complaint ("Complaint") is thirty-eight pages long and contains 148 numbered paragraphs and seventeen footnotes. It lays out, in detail, an alleged conspiracy between Defendants McGregor, VictoryLand, and Warren—involving Fred Gray Jr. and the Gray Law Firm—to promulgate, amend, and maintain rules and regulations that, to this very day, deprive the Plaintiffs of an opportunity to open and operate an electronic bingo parlor in Macon County. It lays out, in detail, the means and methods used to create, further, and maintain that conspiracy. And it lays out, in detail, the harm that the conspiracy has caused and continues to cause, not only to the Plaintiffs, but to the citizens of Macon County. In short, the Complaint

provides more than "labels and conclusions" or "a formulaic recitation of the elements." *Twombly*, 127 S. Ct. at 1965.   Rather, it states "a claim to relief that is plausible on its face," *id.* at 1974, and "raise[s] a right to relief above the speculative level," *id.* at 1965.  The Complaint thus satisfies the "exceedingly low" threshold for surviving a motion to dismiss.  *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

In addition, the Defendants have not articulated a single legal basis upon which to dismiss any of the claims in the Complaint.  They have not shown that Fred Gray Jr. is exempt from the broad statutory language defining a "public servant" for the purposes of the Alabama bribery statute.  They have not articulated a rational basis for the rules and regulations governing electronic bingo.   They have not demonstrated that a claim for tortious interference is inconsistent with the allegations of the Complaint.  Finally, they have not shown that the statute of limitations has begun to run, much less expired.

**A.      Based on the allegations of the Third Amended Complaint, Fred Gray Jr. is a public <u>servant.</u>**

Under the plain language of Ala. Code § 13A-10-1, the facts alleged in the Complaint establish that Fred Gray Jr. is a public servant because he participated as an adviser and consultant in the performance of a governmental function.  The Defendants seek to avoid this plain language by introducing a statutory test that has not been adopted by any court, much less any Alabama court.  The introduction of that test would eviscerate the statutory language and should be rejected by this court.

Furthermore, the fact that Fred Gray Jr. is a lawyer does not exempt him from legal consequences if he violates the law, and it certainly does not exempt Defendants McGregor and VictoryLand.  The Complaint sufficiently alleges such a violation.

1.    **Fred Gray Jr. is a public servant under Ala. Code § 13A-10-1.**

"The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute." *IMED Corp. v. Systems Eng'g Assocs. Corp.*, 602 So. 2d 344, 346 (Ala. 1992). In interpreting a statute, "words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." *Id.*; *see also Ex parte Pfizer, Inc.*, 746 So. 2d 960, 964 (Ala. 1999); *Blue Cross & Blue Shield v. Nielsen*, 714 So. 2d 293, 296 (Ala. 1998); *Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County*, 589 So. 2d 687, 689 (Ala. 1991); *Town of Loxley v. Rosinton Water, Sewer & Fire Protection Auth., Inc.*, 376 So. 2d 705, 708 (Ala. 1979). "If the language of [a] statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect." *IMED Corp.*, 602 So. 2d at 346.

Ala. Code § 13A-10-60(b)(3) incorporates the definition of "public servant" set forth in Ala. Code § 13A-10-1. Ala. Code § 13A-10-1(7) defines a "public servant," in pertinent part, as "[a]ny officer or employee of government, including . . . any person . . . participating as an adviser, consultant, or otherwise in performing a governmental function." Ala. Code § 13A-10-1(7). "Sections . . . 13A-10-60(b)(3), and 13A-10-1(7) are clear and unambiguous; therefore, no judicial construction is necessary." *Vaughn v. State*, 880 So. 2d 1178, 1192 (Ala. Crim. App. 2003).

The clear and unambiguous language of Ala. Code § 13A-10-1(7) states that any person who participates as an adviser in performing a governmental function is a public servant. A "governmental function" is "[a]ny activity which a public servant is legally authorized to undertake on behalf of a government." Ala. Code § 13A-10-1(3). Defendant Warren was

authorized, by Amendment 744 of the Alabama Constitution, to promulgate rules and regulations for the conduct of electronic bingo. (Complaint at ¶ 32.) The promulgation of those rules and regulations was a "governmental function." The Third Amended Complaint alleges that Defendant Warren retained Fred Gray Jr. for the purpose of advising him with regard to the content of those rules and regulations (Complaint at ¶ 69) and that Defendant Warren relied on Fred Gray Jr.'s opinion, judgment, and exercise of discretion regarding the content of those rules and regulations (Complaint at ¶ 82). Those allegations, when taken as true, establish that Fred Gray Jr. "participated" as an "adviser" in the performance of a "governmental function." Accordingly, Fred Gray Jr. was a "public servant" under the clear and unambiguous language of Ala. Code § 13A-10-1(7).

Defendants McGregor and VictoryLand attempt to introduce ambiguity into Ala. Code § 13A-10-1(7) by arguing that a "public servant" must have a "contractual delegation of responsibility." (Brief at 3.)[1] But no court has ever held that such a "contractual delegation of responsibility" is necessary. In *State v. Perez*, 883 A.2d 367 (N.J. 2005), the Supreme Court of New Jersey held that, when individuals are empowered to exercise public authority through a contractual delegation of responsibility, those individuals are clearly public servants. *See id.* at 369. That narrow holding was appropriate to the facts of *Perez*, which involved the issuance of false documents by a privatized Department of Motor Vehicles. The *Perez* Court did not hold— and did not have occasion to hold—that a "public servant" must, in all circumstances, have contractual delegation of responsibility.[2]

---

[1] Defendants' Brief in Support of Joint Motion to Dismiss Plaintiffs' Third Amended Complaint will be referenced herein as "(Brief at X)."

[2] Even if the *Perez* court had so held—and such a holding were binding on this Court— the allegations of the Third Amended Complaint, when taken as true and construed in the light most favorable to the Plaintiffs, establish that Fred Gray Jr. received a sufficient contractual

Indeed, requiring the existence of a "contractual delegation of responsibility" would eviscerate the plain language of Ala. Code § 13A-10-1(7). Ala. Code § 13A-10-1(7) specifically states that an "adviser" or a "consultant" may be a "public servant." Advisers and consultants generally do not exercise responsibility; instead, they advise and consult with those who exercise responsibility.

Concluding that such advisers are public servants is far from novel. In the cases of *People v. McGarry*, 99 N.W. 147 (Mich. 1904), and *People v. Salsbury*, 96 N.W. 936 (Mich. 1903), the Michigan Supreme Court held that a city attorney, who agreed in exchange for money to advise the city council to approve a contract, could be held guilty of bribery. *McGarry*, 99 N.W. at 148-49; *Salsbury*, 96 N.W. at 948. While these cases are admittedly dated, *Salsbury* has been cited by the Michigan Court of Appeals as recently as 2006, *see People v. Hoskins*, 2006 WL 933004, *1 (Mich. Ct. App. Apr 11, 2006). Furthermore, *Salsbury* has been cited by the Alabama Supreme Court, *see Pullen v. Cincinnati Ins. Co.*, 400 So. 2d 393, 400 (Ala. 1981), and by the Alabama Court of Criminal Appeals in a bribery case, *see Hammond v. State*, 354 So. 2d 280, 290 (Ala. Crim. App. 1977). Finally, it should be noted that the definitions in Ala. Code § 13A-10-1 "are taken primarily from the Michigan Revised Criminal Code and from Alabama provisions," Ala. Code § 13A-10-1 (commentary), and that the current Mich. Comp. Laws Ann. § 750.118 is virtually identical to the statute that was at issue in *Salsbury*.

Therefore, this Court should follow the clear and unambiguous language of Ala. Code § 13A-10-1(7) and deny the Motion with regard to this argument. *Cf. Vaughn v. State*, 880 So. 2d 1178 (Ala. Crim. App. 2003) (holding that the president of an architectural, engineering, and urban planning firm, who was retained as a consultant by the state, was a "public servant" as

---

delegation of responsibility. (*See, e.g.*, Complaint at ¶ 39 (Defendant Warren relied on Fred Gray Jr. "for his opinion, judgment, and exercise of discretion in drafting the Original Rules").)

defined by Ala. Code § 13A-10-1(7)); *Vaughan v. Marshall*, 2006 WL 1476043, *8 (M.D. Ala. 2006) ("The evidence was undisputed that Vaughn was hired as a consultant to conduct a comparative site analysis for the State of Alabama; thus, he clearly fell within the definition of a 'public servant.'").[3]

## 2.    The fact that Fred Gray Jr. is a lawyer does not exempt Defendants McGregor and VictoryLand from RICO liability.

As stated by the U.S Court of Appeals for the Eighth Circuit—and as quoted by Defendants McGregor and VictoryLand (Brief at 6)—"[b]ehavior prohibited by [18 U.S.C.] § 1962(c) will violate RICO regardless of the person to whom it may be attributed . . . ." *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997). The behavior prohibited by 18 U.S.C. § 1962(c) is "conduct[ing] or participat[ing], directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). In this case, the Plaintiffs have alleged that Defendants McGregor and VictoryLand engaged in behavior that violates 18 U.S.C. § 1962(c).

Each of the cases cited by Defendants McGregor and VictoryLand in Part I.A.2. of their Brief holds that an attorney in a particular factual circumstance did not violate 18 U.S.C. § 1962(c) because he did not "participate in the conduct" of the enterprise. Those cases do not apply to Defendants McGregor and VictoryLand, however, because they are not attorneys and their participation in the conduct of the alleged Enterprise did not consist of providing legal

---

[3] While the Defendants seek to distinguish the Vaughan cases on the basis that Vaughan did not dispute that he was a "public servant" (Brief at 4-5), that distinction is unpersuasive given the holding, in *Vaughn v. State*, that Ala. Code § 13A-10-1(7) is 'clear and unambiguous," 880 So. 2d at 1192, and the holding, in *Vaughan v. Marshall*, that Vaughan "clearly fell within the definition of a 'public servant,'" 2006 WL 1476043 at *8. Based on that language, there is no reason for this Court to predict that the Alabama Supreme Court would adopt the novel "contractual delegation of responsibility" theory of "public servant" put forth by the Defendants, even if directly confronted with the issue.

services. (Complaint at ¶¶ 99-105.) Thus, those cases do not even begin to exempt Defendants McGregor and VictoryLand from liability under 18 U.S.C. § 1962(c).

Even if those cases could be more broadly construed—to hold, for instance, that an attorney in a particular factual circumstance did not engage in a RICO predicate act or participate in a conspiracy under 18 U.S.C. § 1962(d)—this Court should still focus its attention, not on the status of the individual, but on the individual's behavior: "The polestar is the activity in question, not the defendant's status." *Handeen*, 112 F.3d at 1349. While the *Handeen* court indicated that "offering conventional advice to a client or performing ordinary legal tasks" does not typically violate RICO, the allegations of the Complaint show that the advice offered by Fred Gray Jr. was not conventional and that the legal tasks performed were not ordinary.

The Complaint alleges that Defendant Warren relied on Fred Gray Jr.'s opinion, judgment, and exercise of discretion regarding the content of the rules and regulations governing electronic bingo. (Complaint at ¶ 39.) The Complaint further alleges that Defendants McGregor and VictoryLand bribed Fred Gray Jr.—and that Fred Gray Jr. accepted those bribes—with the intent that Fred Gray Jr.'s opinion, judgment, and exercise of discretion would result in rules and regulations that favored VictoryLand. (Complaint at ¶ 78.) Those bribes were not fully disclosed to Defendant Warren. (Complaint at ¶ 77.)[4] Furthermore, the Complaint alleges that McGregor, personally and through his agents, assisted with the drafting of the rules and regulations and that the assistance was not disclosed to Defendant Warren. (Complaint at ¶ 79.)[5]

---

[4] While technically irrelevant to this Motion to Dismiss, the Plaintiffs note that, in response to their interrogatories, Defendant Warren has indicated that he had no knowledge of Fred Gray's financial interest in VictoryLand during the time the rules and regulations were being drafted. (*See* David Warren's Answers to Plaintiffs' First Interrogatories, attached hereto as Exhibit A, at ¶¶ 3, 7.)

[5] While technically irrelevant to this Motion to Dismiss, the Plaintiffs note that, in response to their interrogatories, Defendant Warren has indicated that he had no knowledge that

Accordingly, the actions of Fred Gray Jr., as alleged in the Complaint, were neither conventional nor ordinary.[6]

Fred Gray Jr.'s status as an attorney does not exempt those associated with him from liability under RICO—especially under the circumstances alleged in this case. Accordingly, the Complaint should not be dismissed on that basis.

---

anyone except Fred Gray Jr. participated in the drafting of the rules and regulations. (*See* Exhibit A at ¶ 9.)

[6] Indeed, the extraordinariness of Fred Gray Jr.'s alleged actions are demonstrated by contrasting those actions with the Alabama Rules of Professional Conduct. Under Rule 1.10(a), "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.1, 1.8(c), 1.9 or 2.2." Fred Gray Jr. and Fred Gray were associated in a firm. (Complaint at ¶¶ 27-29.) Under Rule 1.7(b),

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client . . . or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation.

As alleged in the Complaint, Fred Gray has represented VictoryLand since 1992 (Complaint at ¶ 30) and is a shareholder in VictoryLand (Complaint at ¶ 29). Fred Gray's ability to represent Defendant Warren with regard to electronic bingo would have been materially limited by both his representation and ownership of VictoryLand once VictoryLand expressed an interest in electronic bingo. VictoryLand expressed such an interest around November 11, 2003. (Complaint at ¶ 35.)

Even if Fred Gray believed that his representation of Defendant Warren would not be "adversely affected" by his responsibilities to VictoryLand and his own interests—a belief that could not possibly be deemed "reasonable"—Defendant Warren would still have to consent to such representation "after consultation." Rule 1.7(b)(2). As alleged in the Complaint, Fred Gray's interests were not fully disclosed to Defendant Warren. (Complaint at ¶ 77.) Accordingly, Fred Gray did not obtain the necessary consent after consultation and was prohibited from representing Defendant Warren. Fred Gray Jr. was similarly prohibited by the imputed disqualification rule in Rule 1.10(a).

**B.    The Plaintiffs have stated a valid RICO claim.**

In arguing that the Plaintiffs have failed to state a valid RICO claim, Defendants McGregor and VictoryLand provide many case citations but little analysis of the Complaint. In the absence of that analysis, it is difficult for the Plaintiffs to determine on what basis the Defendants are arguing that the Complaint has failed to state a claim.[7] In any event, the Plaintiffs have thoroughly pleaded all of the elements of a RICO claim.

**1.    Rule 8, not Rule 9, provides the applicable pleading standard.**

The Defendants assert that the specificity requirements of Rule 9(b)—which requires the circumstances of an alleged fraud to be stated "with particularity," Fed. R. Civ. P. 9(b)—apply to civil RICO actions. (Brief at 10.) The Plaintiffs disagree with this assertion. Both *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309 (11th Cir. 2007), and *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)—the case cited by *Ambrosia Coal* in support of the specificity requirement—deal with civil RICO claims whose predicate acts consist of mail and wire fraud.[8] Plaintiffs do not contest that a heightened pleading requirement is appropriate when a civil RICO claim is based on mail and wire fraud. *See, e.g., Durham v. Business Management Assocs.*, 847 F.2d 1505, 1511-12 (11th Cir. 1988); *see also Cayman Exploration Corp. v. United Gas Pipe Line Co.*. 873 F.2d 1357, 1362 (10th Cir.

---

[7] Because the Defendants provide little analysis of the actual allegations of the Complaint, it is difficult to know exactly which aspects of the Complaint the Defendants feel to be inadequate. To the extent the Defendants level such specific criticisms on reply, this Court should deem those criticisms waived or, at the very least, allow the Plaintiffs to file a surreply. *Cf. Bashir v. National R.R. Passenger Corp.*, 929 F. Supp. 404, 413 (S.D. Fla. 1996) ("[B]ecause Defendants raised this argument in their reply in support of their motion, rather than in the motion itself, it is not properly before the Court. It would be improper for the Court to entertain this argument without first allowing Plaintiff an opportunity to respond.").

[8] While the predicate acts at issue in *Ambrosia Coal* are not clear from the opinion, they are clear from the complaint in that case, which is attached hereto as Exhibit B.

1989); *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988); *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674 (6th Cir. 1988); *Saporito v. Combustion Eng'g, Inc.*, 843 F.2d 666, 675 (3d Cir. 1988); *New England Data Servs. v. Becher*, 829 F.2d 286, 289-90 (1st Cir. 1987); *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982). When a civil RICO claim is not based on mail and wire fraud, however, a heightened pleading standard is not appropriate.[9] *See, e.g., McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (holding that stringent pleading requirements for fraud or mistake did not apply to civil RICO extortion allegation); *Rose v. Bartle*, 871 F.2d 331, 356 n. 33 (3rd Cir. 1989) ("It should be noted that the plaintiffs allege no mail, wire or other fraud by the defendants, and therefore are not required to adhere to the higher pleading standard of 'particularity' mandated by Fed. R. Civ. P. 9(b)."); *Perlman v. Zell*, 938 F. Supp. 1327, 1337 (N.D. Ill. 1996) ("A RICO claim generally must conform only to the standards set out in Fed. R. Civ. P. 8(a), which require 'a short and plain statement of the claim showing that the pleader is entitled to relief.'") (citing *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 776 (7th Cir. 1994)). The Defendants do not seem to challenge the sufficiency of the Complaint under Rule 8(a), and the Motion can be denied on that basis alone.

---

[9] This rule is not foreclosed by *Ambrosia Coal*. While the Plaintiffs understand that the Court's language is ambiguous, they believe that the Court intended to say that "Civil RICO claims that are essentially a certain breed of fraud claims must be pleaded with an increased level of specificity." That reading would be consistent with the holdings of other U.S. Circuit Courts of Appeal. Furthermore, that reading is supported by the next sentence of the *Ambrosia Coal* opinion, which states that, "[t]o satisfy the Rule 9(b) standard, RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Ambrosia Coal*, 482 F.3d at 1316-17 (citing *Brooks*, 116 F.3d at 1380-81). Obviously, such allegations cannot be made in RICO complaints that do not allege mail and wire fraud.

**2.    The Complaint would satisfy Rule 9 if it were applicable.**

Even if Rule 9(b), rather than Rule 8(a), provided the appropriate standard for evaluating the sufficiency of the Complaint, the Complaint alleges the elements of a civil RICO claim with the particularity required by Fed. R. Civ. P. 9(b).  It specifically alleges the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity in fifty-nine paragraphs (Complaint at ¶¶ 64-112), which are preceded by thirty-four paragraphs that set out additional facts underlying the RICO claim (Complaint at ¶¶ 30-63).  It is hard to imagine how the Complaint could allege the RICO claim with any more particularity without also running afoul of Rule 8(a)(2), which requires "a short and plain statement of the claim," and Rule 8(e)(1), which requires "[e]ach averment of a pleading" to be "simple, concise, and direct:"

> [T]he caselaw is clear that, although RICO complaints often might need to be somewhat longer than many complaints, RICO complaints must meet the requirements of Rule 8(a)(2) and Rule 8(e)(1).  *See, e.g., Hartz v. Friedman*, 919 F.2d 469, 471 (7th Cir. 1990) (stating that trial court could have dismissed 125-page RICO complaint pursuant to Rule 8(a)(1)); *Jennings* [*v. Emry*], 910 F.2d [1434,] 1434 [(7th Cir. 1990)] (stating that the fact that RICO is being pled does not make Rule 8(e)(1) any less applicable).  Moreover, the particularity demands of pleading fraud under Rule 9(b) in no way negate the commands of Rule 8.  *See, e.g., Thornton v. Evans*, 692 F.2d 1064, 1082 n.41 (7th Cir. 1982) (stating that "detailed allegations required by Rule 9(b) must 'be [made] consistently with the general philosophy of Rule 8(e)(1)'") (quoting 5 Wright & Miller, Federal Practice and Procedure § 1281, at 364 (1969)); *see also* Moore's Federal Practice § 8.13, at 8-57, 8-58.

*Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 776 (7th Cir. 1994).  The Defendants nevertheless appear to level three charges against the inadequacy of the Complaint, each of which is discussed below.

*a.    The Plaintiffs' allegations "upon information and belief" satisfy Rule 9's requirements.*

First, the Defendants seem to criticize the Plaintiffs for basing certain allegations on "information and belief."  (Brief at 10.)  But the Defendants cite no authority prohibiting such

allegations.  In fact, such pleading is permitted by the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 11(b)(3); *see also* 5 Wright & Miller, Federal Practice & Procedure Civ. 3d § 1224 (2007) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.").

In cases alleging fraud, "[t]o pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir. 1978)).  "Thus, fraud pleadings generally cannot be based on information and belief." *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988).  Because this case does not involve fraud, the Plaintiff could not allege "the time, place, speaker, and sometimes even the content of the alleged misrepresentation," upon information or belief or otherwise.

But, even if Rule 9(b) were applicable to this case, Rule 9(b)'s requirements are relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control.  *E.g., Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *In re Craftmatic Secs. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989).  But, "even under a nonrestrictive application of the rule, pleaders must allege that the necessary information lies within the defendant's control, and then allegations must be accompanied by a statement of facts upon which the allegations are based." *Craftmatic*, 890 F.2d at 645 (citations omitted).

The 148 paragraphs of the Complaint contain only fourteen allegations "upon information and belief."  (Complaint at ¶¶ 36, 61, 78, 79, 88, 89, 92, 93, 134, 139, 145.)  Each such allegation is accompanied by an allegation that the necessary information lies within the

control of a defendant or a relevant non-party. (*Id.*)  Each such allegation is also accompanied by a statement of the facts upon which the allegations are based. (*Id.*)  Accordingly, the Plaintiffs' allegations "upon information and belief" satisfy the requirements of Rule 9(b).[10]

b.     *The Defendants' unsupported criticisms of the Complaint do not justify dismissal.*

Second, the Defendants seem to level a series of criticisms against the complaint, stating that "bald assertions" are "present throughout" the Complaint (Brief at 12), that the Complaint "fails to allege basic facts" (Brief at 12), and that the Complaint is "an improper shotgun complaint" (Brief at 13).  Again, the Defendants provide no citations to the Complaint and do not identify specific problems with the Complaint.  It is the Defendants' burden to show that the Plaintiffs have failed to state a claim.  *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) ("The defendant has the burden of showing that the plaintiff has failed to state a claim for relief.") (citing *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991)).  The Defendants' arguments, which are unsupported by any analysis of the Complaint, fail to satisfy that burden.

c.     *Requiring a response to a RICO Standing Order is both improper and unnecessary here.*

Finally, the Defendants ask this Court to order the Plaintiffs to respond to a "RICO Standing Order" regarding their RICO claim. (Brief at 14-17.)  This Court should not enter such an order for two reasons.  First, the Middle District of Alabama has no such order or any local rule requiring the Plaintiffs to provide the information sometimes required by such orders.  Second, such orders require far more detail than is required by Rule 8 of the Federal Rules of

---

[10] Because most of the allegations "upon information and belief" involve either intent (Complaint at ¶¶ 78, 88, 92) or an agreement (Complaint at ¶¶ 36, 61, 78, 88, 92), the allegations "upon information and belief"—which indicate that the allegations "are likely to have evidentiary support," Fed. R. Civ. P. 11(b)(3)—were probably not even necessary.  After all, both intent and agreement can be established by circumstantial evidence, *see United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996) (intent); *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000) (agreement), and the circumstances alleged provide sufficient evidentiary support for the allegations of intent and agreement.

Civil Procedure.  *See Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 828 (9th Cir. 2003) ("The use of RICO Standing Orders to compel plaintiffs to produce detailed RICO Case Statements, which are then treated by the district court as part of that party's pleadings, can in certain circumstances require far more information from plaintiffs than is required under either Rule 8(a) or 9(b) of the Federal Rules."); *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374, 385-86 (2d Cir. 2001) ("The Standing Order calls for information far in excess of the essential elements of a RICO claim. . . .  To the extent the Standing Order called for presentation of information going beyond what a plaintiff needs to present to establish a legally sufficient case, plaintiff's inability to produce it could not justify the grant of judgment to defendant.");  *id.* at 386 ("[T]he district judge construed the Standing Order to justify dismissal of the action by reason of the plaintiff's failure to possess every fact needed to prove the essential elements of the claim (and more) at the time of the complaint without any opportunity for discovery.  We do not think the Standing Order can possibly be intended to impose such an obligation.").

Furthermore, given the detailed factual allegations in the Complaint, there is no reason to require the Plaintiffs to respond to a (nonexistent) RICO Standing Order.  As demonstrated in Exhibit C to this response, the allegations of the Complaint answer every inquiry posed by the suggested RICO Standing Order save three.  (Exhibit C at 5.d., 5.e., and 17.)  The three inquiries that are not answered by the Complaint are neither essential elements of a RICO claim nor particularly difficult to answer, and the Plaintiffs have undertaken to answer them.   (*Id.*)  Accordingly, the Plaintiffs do not need to respond to the RICO Standing Order, nor should this Court rely on the RICO Standing Order in evaluating the sufficiency of the Complaint's allegations.

C.    **Plaintiffs' Section 1983 conspiracy claim is sufficient.**

With regard to the Section 1983 conspiracy claim, the Defendants are again long on case citations and short on substantive analysis. The Plaintiffs agree that the rules and regulations and their issuance by Sheriff Warren should be subjected only to rational basis review. Rational basis review, however, requires that a statute be "rationally related to the achievement of a legitimate government purpose." *Gary v. City of Warner Robins*, 311 F.3d 1334, 1338-39 (11th Cir. 2002) (quotation marks and citation omitted). The allegations of the Complaint establish that the rules and regulations lack a rational basis, and Defendants McGregor and VictoryLand have not shown otherwise.

1.    **There is no rational basis for requiring interested organizations to construct or lease a multi-million dollar facility prior to obtaining a Class B Bingo License.**

As alleged in the Complaint, the Original Rules required electronic bingo games to be conducted at a facility that had a value of $5 million. (Complaint at ¶ 40.) At the time the Original Rules were promulgated, VictoryLand owned the only facility in Macon County with a value of $5 million. (Complaint at ¶ 41.) Furthermore, because Defendant Warren interpreted the Original Rules to require that a facility be constructed and physically inspected by him before it was approved, businesses other than VictoryLand were ensnared in a Catch-22: No rational investor would build a facility without a license, and no license would be issued until a facility was built. (Complaint at ¶ 42.)[11] Defendant Warren exacerbated this Catch-22 with the First Amended Rules, which raised the required value from $5 million to $15 million. (Complaint at ¶ 46.)

---

[11] While technically irrelevant to the Motion to Dismiss, Defendant Warren himself testified, in his deposition in the *Macon County Investments* case, that he would not invest in such a facility under these circumstances. (Excerpts from Deposition of David M. Warren, attached hereto as Exhibit D, at 262:13-16.)

The Plaintiffs recognize that "the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 367, 121 S. Ct. 955, 964 (2001). The Plaintiffs contend, however, that this burden is not difficult because there is no reasonably conceivable state of facts that could support this requirement and, thus, nothing for them to negative.

The absence of a reasonably conceivable state of facts is demonstrated by the Defendants' own inability to articulate a rational basis for this requirement almost four years after it was first imposed. The Defendants contend that the requirement is rationally related to the legitimate governmental interest of economic development. (Brief at 32.) While the Plaintiffs accept that economic development is a legitimate governmental interest, the allegations of the Complaint demonstrate that the requirement is not rationally related to economic development.

As alleged in the Complaint, Lucky Palace is ready and willing to invest $54 million in the construction of a bingo parlor in Macon County. (Complaint at ¶ 34.) That investment will create 630 new jobs in Macon County. (*Id.*) It will also provide upgrades to Macon County's local infrastructure free of charge. (*Id.*) Rather than encouraging and promoting such economic development, however, Defendant Warren's requirement—and its attendant Catch-22—has, in fact, prevented that development. (Complaint at ¶¶ 42-43.)

Furthermore, by allowing Victoryland to operate as a monopoly, Defendant Warren has, in fact, suppressed to economic opportunities of the citizens of Macon County. As a monopolist, VictoryLand can (1) avoid investing in capital improvements to its facilities, (2) decline to compensate fairly the nonprofit organizations affiliated with it, (3) refuse to bestow adequate

16

benefits on its employees, whose employment prospects are diminished by VictoryLand's monopoly, and (4) impose unreasonable working conditions on its employees. (Complaint at ¶ 98.) Therefore, Defendant Warren's requirement actually discourages economic development.

Accordingly, there is no rational basis for requiring interested organizations to construct or lease a multi-million dollar facility prior to obtaining a Class B Bingo License, and the Defendants have not articulated one.

2.    **There is no rational basis for the Fifteen License Minimum, the Sixty License Maximum, and the granting of all licenses to organizations affiliated with VictoryLand.**

If economic development is, in fact, the legitimate state interest to which the rules and regulations are rationally related, that interest is undermined by the combination of the Fifteen License Maximum, the Sixty License Minimum, and the granting of all licenses to organizations affiliated with VictoryLand. That combination of actions effectively chokes off any further development of economic opportunities in Macon County by creating a monopoly on electronic bingo for VictoryLand.

Instead of relying on economic development, then, the Defendants seek to justify this combination of actions by articulating four different—and diametrically opposed—governmental interests: (1) preventing the operation of a "front" (Brief at 27), (2) providing economic benefits to a large group of charities (Brief at 28), (3) allowing Defendant Warren to more effectively regulate the conduct of bingo games (Brief at 29), and (4) controlling the growth of gambling (Brief at 30). Because these interests are diametrically opposed, it is hard to conceive of a regulation—or a combination of actions—that would be rationally related to all four governmental interests. The Defendants, unsurprisingly, have not come up with one.

17

The rules and regulations do not prevent the operation of a front. Instead, as alleged in the Complaint, the rules and regulations allow VictoryLand to operate a front. Because the combination of actions by Defendant Warren has granted VictoryLand a monopoly on electronic bingo, Victoryland is able to negotiate its contracts with charities on a take-it-or-leave-it basis. (Complaint at ¶ 85.) Therefore, VictoryLand is allowed to pay its affiliated charities a paltry sum while it retains the lion's share of the proceeds. (Complaint at ¶¶ 36, 81, 83, 98.) The rules and regulations, then, are not rationally related to the interest in preventing the operation of a "front."

While the Fifteen License Minimum would, indeed, allow a larger group of charities to benefit from electronic bingo, the Sixty License Minimum, in fact, eliminates that opportunity. Furthermore, because VictoryLand has all sixty licenses, the opportunity for charities to benefit from electronic bingo is very small, and the charities have no opportunity to seek a better deal elsewhere.[12] (Complaint at ¶¶ 36, 81, 83, 85, 98.) This combination of regulations, therefore, is not rationally related to the legitimate state interest in providing opportunities to a large group of charities.

The Sixty License Maximum is not at all related to the Defendant Warren's interest in regulating the conduct of electronic bingo games. VictoryLand conducts the electronic bingo games, not the affiliated nonprofit organizations, and regulating Victoryland's conduct of those games requires the same effort whether VictoryLand is affiliated with sixty nonprofit organizations or a hundred. (Complaint at ¶¶ 3, 83, 85.)

---

[12] While technically irrelevant to the motion to dismiss, the Bingo Operations and Lease Agreement between VictoryLand and Tuskegee Human and Civil Rights Multicultural Center, which is attached hereto as Exhibit E, also reflects a twenty-year term. (Exhibit E at 1.) During that term, only Victoryland can terminate the Agreement. (*Id.* at 6.) If the Agreement is terminated, the Center is forbidden from contracting with any other entity for the conduct of electronic bingo. (*Id.*)

While the Sixty License Maximum and the granting of all sixty licenses to VictoryLand has the effect of limiting electronic bingo to a single establishment, it is not rationally related to controlling to growth of gambling. The rules and regulations contain no limitations on the volume of electronic bingo that can be conducted at a particular establishment—whether the establishment has fifteen licenses or sixty. (Complaint at Ex. C.) Therefore, VictoryLand can conduct as much electronic bingo as it desires—whether it has fifteen licenses or sixty.[13] The combination of actions thus does not control the growth of gambling—it merely channels the proceeds of gambling to a single operator.

At the end of the day, then, Defendant Warren's rules and regulations are rationally related to only a single interest—VictoryLand's interest in maintaining a highly profitable monopoly on electronic bingo. There is no legitimate state interest in providing such a monopoly to VictoryLand—especially where VictoryLand is allowed to conduct as much electronic bingo as it desires. Accordingly, the Plaintiffs have stated a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause.

**D.    The Plaintiffs have sufficiently alleged claims for tortious interference.**

**1.    Tortious interference with contractual and business relations.**

Defendants argue that Plaintiffs have failed to allege facts to support two elements of their claim for tortious interference with contractual and business relations. First, the Defendants argue that Plaintiffs have failed to allege that the Defendants had knowledge of the contracts between Lucky Palace and the Plaintiffs. (Brief at 35.) Second, the Defendants argue that the Plaintiffs have failed to allege that the Defendants interfered with those contracts. (Brief at 35-

---

[13]    While technically irrelevant to the motion to dismiss, Defendant Warren acknowledged, in his *Macon County Investments* deposition, that allowing VictoryLand to add additional electronic bingo machines "could be interpreted as inconsistent" with a policy against the expansion of gambling. (Exhibit D at 323:4-15.)

36.)  Because the Plaintiffs have alleged both elements, the Motion to Dismiss this claim should be denied.

In paragraph 139 of the Complaint, the Plaintiffs allege that Defendants McGregor and VictoryLand had knowledge of the contractual relationships between Lucky Palace and the Charities.  (Complaint at ¶ 139.)  Because a claim for tortious interference does not sound in fraud, that allegation of knowledge is sufficient to state a claim, especially where the existence of that knowledge is peculiarly within the knowledge of the Defendants.  *See* Fed. R. Civ. P. 11(b)(3); *see also* 5 Wright & Miller, Federal Practice & Procedure Civ. 3d § 1224 (2007) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.").  Furthermore, the Plaintiffs were not required to state the basis of their information and belief, but they did so anyway.  (Complaint at ¶ 139 n.13.)[14]  The Plaintiffs, therefore, have alleged sufficient knowledge to survive a motion to dismiss.  If the Defendants lacked knowledge of the contractual relationships, that fact will be revealed soon enough through discovery.

With regard to interference, the Defendants argue that Lucky Palace, not the Defendants, caused the contracts not to be performed.  The Defendants' argument on this issue is reminiscent

---

[14] In footnote 2 of their Brief, the Defendants misstate the occurrences at the July 2 status conference.  (Brief at 35 n.2.)  Counsel for the Plaintiffs stated that the joint representation allegation was based on an online docket report indicating that Fred Gray Jr. represents Defendant VictoryLand in a currently pending case involving electronic bingo.  Counsel for the Defendants indicated that the online docket report was incorrect and that other members of the Gray Law Firm represent Defendant VictoryLand in that case.  That factual issue is a red herring, however, given Rule 1.10 of the Rules of Professional Conduct.  Furthermore, it is certainly reasonable to infer, for the purposes of a motion to dismiss, that Fred Gray Jr.'s knowledge of the contractual relationships was passed along to other members of his firm and to Defendants McGregor and VictoryLand.  Ultimately, however, the Plaintiffs are not required to plead a basis for their information and belief as to their allegation regarding the Defendants' knowledge, and this Court must simply accept it as true at this time.

of an argument to the jury and appropriately so: Causation is an issue of fact, and the Defendants can certainly argue that Lucky Palace, in fact, caused the non-performance of the contracts. However, the Plaintiffs have alleged sufficient facts to support their claim that the Defendants caused the non-performance. The Plaintiffs have alleged that no rational investor—including Lucky Palace—would build a facility before receiving assurance of a license. (Complaint at ¶ 42.) The Plaintiffs have alleged that, under Defendant Warren's interpretation of the rules and regulations, no license would be issued until a facility was built. (Complaint at ¶ 42.) The Plaintiffs further allege that Defendants McGregor and VictoryLand were involved in the issuance of those rules and regulations. (Complaint at ¶¶ 79-80.) Accordingly, the plaintiffs have alleged sufficient facts to survive a motion to dismiss on this element.

**2.    Tortious interference with prospective contractual and business relations.**

The Defendants' sole argument with regard to this claim is apparently that, in pleading the claim, the Plaintiffs did not satisfy a standard of pleading—which they call "the required threshold for identity of the parties" (Brief at 38)—that simply does not exist.

A cause of action for tortious interference "allows a plaintiff a remedy in the situation where a defendant has intentionally interfered with a prospective contract as well when he has interfered with an existing contract." *Ex parte Alabama Dept. of Transp.*, 764 So. 2d 1263, 1270 (Ala. 2000) (citing Restatement (Second) of Torts § 766B cmt. b (1979)). To assert a cause of action for tortious interference with prospective business relations, a plaintiff does not need an existing contract, just a reasonable expectancy of commercial relations: "This rule has always been justified by the policy that 'protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking.'" *Ex*

*parte Alabama Dept. of Transp.*, 764 So. 2d 1263, 1270 (quoting Restatement (Second) of Torts § 766 cmt. c (1979)).

The Plaintiffs have alleged such a reasonable expectancy here. The Plaintiffs reasonably expected that, but for the improper influence of Defendants McGregor and Victoryland, they would be able to open and operate an electronic bingo parlor. (Complaint at ¶ 144.) That operation would have allowed the Plaintiffs to enter into contractual and business relationships with numerous patrons and customers. (Complaint at ¶ 144.) The reasonableness of that expectation is based on the extensive planning done by the Plaintiffs and the financial success of VictoryLand's electronic bingo operation. (Complaint at ¶¶ 98, 107.)

The Defendants argue that these allegations have "fail[ed] to meet the required threshold for identity of the parties." (Brief at 38.) But the Defendants have not cited a single case in support of this supposed "required threshold." Furthermore, none of the cases cited by the Defendants support the granting of a motion to dismiss in these circumstances.

In *Ex parte Alabama Dep't of Transp.*, the plaintiffs sued ALDOT, claiming that ALDOT interfered with its prospective business relations when it amended its specifications to preclude the use of "chert gravel," which the plaintiffs manufactured, in asphalt. 764 So. 2d at 1265-66. The Court determined that summary judgment in the defendants' favor was appropriate because the "undisputed evidence" showed that the plaintiff had been unable to sell any "chert gravel" to a state asphalt contractor even before the specifications were amended, *id.* at 1270, thus establishing the absence of a market for it. In this case, the allegations of the Complaint establish that there is a market for electronic bingo, rendering a motion to dismiss inappropriate.

Similarly, the Court in *Tom's Food* did not find that dismissal was appropriate for the type of tortious interference claim presented here. Instead, the Court, after trial, was faced with

the question of whether the plaintiff, Duke, had established "a viable claim of tortious interference with any business relationship _existing_ between Duke, on the one hand, and Dixie's vending-account customers, on the other."  896 So. 2d at 456 (emphasis added).  The Court resolved this question in two ways.  First, it found that the plaintiff and defendant were part of "'interwoven contractual arrangements'" _id._ at 456, and, accordingly, the defendant was not a "stranger" to the relationship with which it allegedly interfered, _id._ at 455.  Second, the Court found that the "'competitor's privilege'" would bar an action for tortious interference between the plaintiff and defendant, who were competitors.[15]  _Id._ at 457.  Thus, _Tom's Food_ does not require—as the Defendants misleadingly suggest—that the Plaintiffs allege their prospective relationships with more specificity than is already present in the Complaint.

Likewise, the _Georgetown Manor_ case is inapplicable because it arises under Florida law. _See Georgetown Manor, Inc. v. Ethan Allen, LLC_, 47 F.3d 1099, 1101 (11th Cir. 1995).  While Florida may have a restrictive view of the tort of prospective business relations, other states, such as Alabama and Georgia, do not.  _See, e.g., Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp._, 139 F.3d 1396, 1409 (11th Cir. 1998) (applying Georgia law) ("[A] plaintiff claiming tortious interference with prospective business relationships need not identify particular disrupted contracts to recover . . . .").  The Alabama Supreme Court has frequently relied on Georgia law in its development of the contours of the tortious interference tort.  _See, e.g., BellSouth Mobility, Inc. v. Cellulink, Inc._, 814 So. 2d 203, 212 (Ala. 2001) (adopting, from _Atlanta Market Ctr. Management Co. v. McLane_, 503 S.E.2d 278, 282 (Ga. 1998), the concept that a non-party to a contract is not necessarily a "stranger" to it).  Furthermore, the Alabama

---

[15] The "competitor's privilege" is, of course, inapplicable here because, as alleged in the Complaint, Defendants McGregor and VictoryLand employed "wrongful means" to influence the rules and regulations.  _See Tom's Food_, 896 So. 2d. at 457 (citing Restatement (Second) of Torts § 768 (1979)).

Supreme Court has already framed the nature of this Court's inquiry by focusing, not on the identity of the party, but on the reasonableness of the expectation. *Ex parte Alabama Dept. of Transp.*, 764 So. 2d at 1270. Accordingly, this Court should not dismiss this claim based on the Plaintiffs' failure to identify specific patrons and customers.

## III.    THE PLAINTIFFS' CLAIMS FOR TORTIOUS INTERFERENCE AND FOR VIOLATIONS OF SECTION 1983 ARE NOT BARRED BY STATUTES OF LIMITATIONS

### A.    The Defendants' tortious interference is continuous.

The Plaintiffs' tortious interference claims arise from the Defendants' participation, not only in the promulgation and amendment of the rules and regulations, but also in their maintenance. (Complaint at ¶ 140 ("Defendants McGregor and VictoryLand intentionally interfered with those contractual and business relationships by influencing, aiding and/or directing Defendant Warren to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County.") (footnote omitted); (*id.* at 146 ("Defendants McGregor and VictoryLand intentionally interfered with the Plaintiffs' ability to consummate their expected contractual and business relationships by influencing, aiding and/or directing Defendant Warren to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County.") (footnote omitted).)  Under Alabama law, "a defendant's repeated wrongs to the plaintiff can constitute a 'continuous tort'" in a number of circumstances, including "when there is a 'single sustained method pursued in executing one general scheme.'" *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983) (quoting *Lehigh Portland Cement Co. v. Donaldson*, 231 Ala. 242, 246, 164 So. 97 (1935)).  In this case, the allegations of the Complaint establish that the Defendants pursued a "single sustained method"—the promulgation, amendment, and maintenance of the rules and

regulations—in "executing one general scheme"—creating and sustaining Victoryland's monopoly on electronic bingo. Accordingly, the Defendants' actions constitute a "continuous tort" under Alabama law.

"[T]he statutory period of limitations for a continuous tort begins to run from the 'date of injury." *Hillis v. Rentokil, Inc.*, 596 So. 2d 888, 890 (Ala. 1992) (citing *Garrett v. Raytheon Co.*, 368 So. 2d 516 (Ala. 1979); *American Mutual Liability Insurance Co. v. Phillips*, 491 So. 2d 904 (Ala. 1986). "The 'date of injury' for statute of limitations purposes is 'the day on which the plaintiff was last exposed to the damages [which injured her].'" *Hillis*, 596 So. 2d at 890 (quoting *Garrett*, 368 So. 2d at 520 (citing *Garren v. Commercial Union Insurance Co.*, 340 So. 2d 764 (Ala. 1976))). In this case, the injury to the Plaintiffs from the Defendants' participation in the promulgation, amendment, and maintenance of the rules and regulations is ongoing.[16] Accordingly, the statute of limitations has not even begun to run, much less expired.

**B.    The Defendants' violation of Section 1983 is both a continuous tort and a continuing violation.**

Similarly, the statute of limitations has not expired on any of the Plaintiffs' Section 1983 claims for two reasons. First, Section 1983 borrows its statute of limitations from state law, and, as discussed above, the statute has not yet begun to run pursuant to the continuous tort doctrine. Second, the federal courts have long recognized the "continuing violation doctrine" in the context of Section 1983, and that doctrine also serves to toll the statute of limitations.

In *Wilson v. Garcia*, 471 U.S. 261, 105 S. Ct. 1938 (1985), the Court held that the state limitations period for personal injury actions applies to all actions arising under section 1983 within a particular state. *Id.* at 276, 105 S. Ct. at 1947. In *Owens v. Okure*, 488 U.S. 235, 109 S.

---

[16] Indeed, it is for this very reason that the Plaintiffs seek, not only damages for the delayed opening of their competing bingo parlor, but also an injunction.

Ct. 573 (1989), the Court held that, in states like Alabama, which have multiple statutes of limitations for personal injury actions, the residual personal injury limitations period applies. *Id.* at 249-50, 109 S. Ct. at 582. In Alabama, that period is the two-year period provided in Ala. Code § 6-2-38(*l*). *Foster v. Board of School Com'rs of Mobile County*, 872 F.2d 1563, 1566 (11th Cir. 1989).

Because Ala. Code § 6-2-38(*l*) is an Alabama statute of limitations, it is subject to the continuous tort doctrine discussed above. As alleged in the Complaint, the Plaintiffs' injury from the Section 1983 conspiracy arises out of, not only the deprivation of their Equal Protection rights, but the perpetuation of that deprivation through the maintenance of the rules and regulations.[17] (Complaint at ¶ 135.) That deprivation continues today, and the statute of limitations for that continuous injury has not even begun to run.

Furthermore, the Eleventh Circuit has long recognized the "continuing violation doctrine" in the context of Section 1983. *See Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003). Under the "continuing violation doctrine," when the violation alleged involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases. *See Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir. 1974), *vacated on other grounds by O'Connor v. Donaldson*, 422 U.S. 563, 95 S. Ct. 2486 (1975); *Santiago v. Lykes Bros. S.S. Co.*, 986 F.2d 423, 426 (11th Cir. 1993); *Abiff v. Slaton*, 806 F. Supp. 993, 996 (N.D. Ga. 1992). "The critical distinction in the continuing violation analysis . . . is whether the plaintiffs complain of '"the present consequence of a one time violation, which does not extend the limitations period, [or] the continuation of that violation into the present,

---

[17] As alleged in the complaint, the Defendants have taken actions in furtherance of the alleged conspiracy as recently as March 6, 2007, when Senator Myron Penn introduced, with the Defendants' encouragement, legislation that sought to insulate the rules and regulations from attack in lawsuits such as this one. (Complaint at ¶ 63.)

which does."'"  *Knight v. Columbus, Ga.*, 19 F.3d 579, 580-81 (11th Cir. 1994) (quoting *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993) (quoting *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir. 1992)); citing *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 658 (11th Cir. 1993)).  In this case, as alleged in the Complaint and as discussed above, the maintenance of the rules and regulations is a violation of the Plaintiffs' rights.  That violation continues into the present.  Accordingly, the statute of limitations period has not yet expired.

**IV.     CONCLUSION**

The Plaintiffs have sufficiently alleged all of the claims in their Complaint, and there is no legal basis for dismissing any of those claims.  Accordingly, this Court should deny the Defendants' Joint Motion to Dismiss in its entirety.


Respectfully submitted this 3rd day of August 2007,


s/ Robert K. Spotswood_____
s/ Michael T. Sansbury_____
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
SPOTSWOOD SANSOM & SANSBURY
    LLC
940 Concord Center
2100 Third Avenue North
Birmingham, Alabama  35213
TEL:   (205) 986-3620
FAX:  (205) 986-3639
E-mail:        rks@spotswoodllc.com
               msansbury@spotswoodllc.com

*Attorneys for the Plaintiff Charities*

s/ Stephen D. Heninger_____
s/ W. Lewis Garrison Jr._____
Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:        (205) 326-3336
FAX:        (205) 326-3332
E-mail:        steve@hgdlawfirm.com
               lewis@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Fred David Gray, Esq.
Fred David Gray Jr., Esq.
Gray, Langford, Sapp, McGowan, Gray,
    Gray & Nathanson PC
P.O. Box 830239
Tuskegee, AL  36083-0239
E-mail:    fgray@glsmgn.com
    jbibb@glsmgn.com
    fgrayjr@glsmgn.com
    thalia@glsmgn.com

James H. Anderson, Esq.
Ryan Wesley Shaw, Esq.
Beers, Anderson, Jackson, Patty, Van Heest &
    Fawal PC
P.O. Box 1988
Montgomery, AL  36102
E-mail:    janderson@beersanderson.com
    wshaw@beersanderson.com

John Mark White, Esq.
Augusta S. Dowd, Esq.
Rebecca DePalma, Esq.
White, Arnold, Andrews & Dowd
2025 Third Avenue, North
Suite 600
Birmingham, AL  35203
E-mail:    mwhite@waadlaw.com
    adowd@waadlaw.com
    rdepalma@waadlaw.com

William M. Slaughter, Esq.
Patricia C. Diak, Esq.
Peter John Tepley, Esq.
Khristi Doss Driver, Esq.
Haskell, Slaughter, Young & Rediker, LLC
1400 Park Place Tower
2001 Park Place North
Birmingham, AL  35203
E-mail:    wms@hsy.com
    pcd@hsy.com
    pt@hsy.com
    kdd@hsy.com

John M. Bolton III, Esq.
Charlanna White Spencer, Esq.
Sasser, Bolton & Sefton PC
PO Box 242127
Montgomery, AL 36124-2127
E-mail:    jbolton@sasserlawfirm.com
    cspencer@sasserlawfirm.com

George L. Beck, Jr.
Capell Howard PC
PO Box 2069
Montgomery, AL 36102-2069
E-mail:    glb@chlaw.com

s/ Michael T. Sansbury
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

HOPE FOR FAMILIES & COMMUNITY )
SERVICES, INC., et al.,                         )
                                                          )
                                                          )
                    Plaintiffs,                      )
                                                          )
                                                          )
vs.                                                      )          CASE  NO.:  3:06-cv-01113-WKW
                                                          )
DAVID WARREN, In his Official          )
Capacity as the SHERIFF OF              )
MACON COUNTY, ALABAMA,          )
et al.,                                                    )
                    Defendants.                    )

### DAVID WARREN'S ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES

COMES NOW Defendant David Warren and hereby answers the following interrogatories propounded upon him by the Plaintiffs in this cause as follows:

### Answers to Interrogatories

1.      Please describe in detail any and all knowledge you possessed of Fred Gray's interest in VictoryLand.


RESPONSE:  From general observation over the years, I know that Fred Gray has been interested in Macon County community development.  VictoryLand is a business that promised to do much toward community development, employing Macon County residents and providing a place of entertainment for thousands of people. At some point in time many years before January 2003, VictoryLand became one of Fred Gray's clients.

2.    Relating to your answer to the above interrogatory, please identify and describe in detail the basis of your knowledge.

RESPONSE: See answer to Interrogatory 1.

3.    Please describe in detail any and all knowledge you possessed of the relationship Fred Gray, Fred Gray, Jr., and/or the Gray Law Firm had with VictoryLand and describe in detail any such relationship.

RESPONSE:  From January, 2003 to the present, I have generally understood that VictoryLand is one of Fred Gray's clients.

4.    Relating to your answer to the above interrogatory, please identify and describe in detail the basis of your knowledge.

RESPONSE:  See answer to Interrogatory 3.

5.    Please describe in detail any and all knowledge you possessed of a relationship Fred Gray, Fred Gray, Jr., and/or the Gray Law Firm had with Milton McGregor and describe in detail any such relationship.

RESPONSE:  I know that Milton McGregor is the President of VictoryLand and VictoryLand is a client of Attorney Fred Gray.

6.    Relating to your answer to the above interrogatory, please identify and describe in detail the basis of your knowledge.

RESPONSE:  This is knowledge I gained being in the community over the years.

7.    Please describe in detail any and all knowledge you possessed of any type of benefit bestowed on Fred Gray, Fred Gray, Jr., and/or the Gray Law Firm by Milton McGregor and/or VictoryLand.

**RESPONSE:  I possess no knowledge of any type of benefit bestowed on Fred Gray, Fred Gray, Jr. and/or the Gray Law Firm by Milton McGregor and/or VictoryLand.**

8.    Relating to your answer to the above interrogatory, please identify and describe in detail the basis of your knowledge.

**RESPONSE:  See answer to Interrogatory 7.**

9.    Please identify each and every individual who assisted in any way, including consulting or advising, with formulating and drafting rules and regulations for the licensing and conduct of bingo games in Macon County, Alabama, including all amendments thereto.

**RESPONSE:  Fred D. Gray, Jr.**

10.    Relating to your answer to the above interrogatory, for each such person identified, please describe in detail his or her role in and contribution to formulating and drafting rules and regulations for the licensing and conduct of bingo games in Macon County, Alabama, including all amendments thereto.

**RESPONSE:  He served as my attorney, assisting by providing legal advice in connection with  formulating and drafting of the documents.**

11.    Please identify the person(s) who answered these interrogatories, and all persons who assisted you or were consulted in answering these interrogatories.

**RESPONSE:  David M. Warren.**

Dated this __6th__ day of July, 2007.

_____ (L.S.)
David M. Warren

STATE OF ALABAMA          )

MACON COUNTY              )


I __Vanessa G. Taylor_____, a Notary Public in and for said County in said State, do hereby certify that David M. Warren, whose name is signed to the foregoing and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal, this __6th__ day of July, 2007.

_____
NOTARY PUBLIC
My commission expires: __3/20/09__

SEAL

_____
Fred D. Gray, Jr. (GRA044)
Attorney for Defendant David Warren

OF COUNSEL:

**GRAY, LANGFORD, SAPP, MCGOWAN,
   GRAY & NATHANSON**
P.O. Box 830239
Tuskegee, Alabama 36083
(334)727-4830 Telephone
(334)727-5877 Facsimile
fgrayjr@glsmgn.com

OF COUNSEL:

**Beers, Anderson, Jackson, Patty, Van Heest
   and Fawal, P.C.**
P.O. Box 1988
Montgomery, Alabama 36102
janderson@beersanderson.com
wshaw@beersanderson.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the following via United States mail, postage pre-paid and properly affixed, on this the ̲2̲0̲t̲h̲ day of July, 2007:

Robert K. Spotswood, Esq.
Michael T. Sansbury, Esq.
Spotswood, Sansom & Sansbury, LLC
940 Concord Center
2100 Third Avenue North
Birmingham, AL 35213
rks@spotswoodllc.com
msansbury@spotswoodllc.com

John M.Bolton, III, Esq.
Charlanna W. Spencer, Esq.
Sasser, Bolton, Stidham & Sefton, P.C.
100 Colonial Bank Boulevard
Suite B201
Montgomery, AL 36117
jbolton@sasserlawfirm.com
cspencer@sasserlawfirm.com

Augusta S. Dowd, Esq.
J. Mark White, Esq.
White Arnold Andrews & Dowd P.C.
2025 Third Avenue North
Suite 600
Birmingham, AL 35203
jmarkwhite@waadlaw.com
adowd@waadlaw.com

William M. Slaughter, Esq.
Peter J. Tepley, Esq.
Patricia C. Diak, Esq.
Haskell Slaughter Young & Rediker, LLC
1400 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
wms@hsy.com
pt@hsy.com

George L. Beck, Jr., Esq.
Capell & Howard, P.C.
P.O. Box 2069
Montgomery, Alabama 36102-2069
glb@chlaw.com

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 99-7677-Civ-Hurley/Lynch



AMBROSIA COAL & CONSTRUCTION
COMPANY, a Pennsylvania Corporation,

    Plaintiff,

v.

HECTOR CARLOS PAGÉS MORALES,
ISLA VERDE BEACH HOTEL &
CASINO, S.E., ISLA VERDE BEACH
HOTEL & CASINO, INC., ANA CELIA
PAGÉS, GREEN ISLE PARTNERS LTD,
S.E., GREEN ISLE-GP LTD, S.E., GREEN
ISLE JV, S.E., ACES GREEN ISLE GP, INC.,
ACES PR, INC., RAHN GREEN ISLE GP,
INC., RAHN PR LTD. S.E., RAHN GREEN
ISLE LP, INC., GREEN ISLE INVESTORS
GP, ACES GREEN ISLE INVESTORS, INC.,
SMALL CORPORATE SERVICES, INC.,
LENINE STROLLO, PASQUALE FERRUCCIO,
GEORGE MALIZIA and JOSEPH SEGUELLION

    Defendants.

_____/

## FOURTH AMENDED COMPLAINT

    Plaintiff, Ambrosia Coal and Construction Company ("Ambrosia") sues the

above-mentioned Defendants, and alleges:

# THE PARTIES

A.    Plaintiff

1.        Plaintiff is a Pennsylvania corporation with its principal place of business located at 2859 Benjamin Franklin Parkway, Edinburg, Pennsylvania.

B.    The Isla Verde Defendants

2.        Upon information and belief, Defendant Hector Carlos Pagés Morales ("Pagés") was, at the time the original Complaint was filed, a resident of the Commonwealth of Puerto Rico and is now a resident of the state of Florida.

3.        Defendant Isla Verde Beach Hotel & Casino, S.E. is a Puerto Rican partnership controlled by Pagés, the partners of which were believed to be residents of the Commonwealth of Puerto Rico at the time the original Complaint was filed.

4.        Defendant Isla Verde Beach Hotel & Casino, Inc. is a Puerto Rican corporation whose majority shareholder and director is Defendant Pagés.

5.        Defendant Ana Celia Pagés is, upon information and belief, a resident of the Commonwealth of Puerto Rico. Further, it is believed that she is the president of Defendant Isla Verde Beach Hotel & Casino, Inc. and a partner in Defendant Isla Verde Beach Hotel & Casino, S.E.

6.        The Isla Verde Defendants (collectively the Defendants identified in paragraphs 2 through 5 above) have participated in, used and operated a business venture in Florida through a Florida limited partnership and/or a Florida corporation with an office in the State of Florida, to injure or cause damage to Plaintiff, and they have otherwise regularly conducted business in Florida. Alternatively, the use by such Defendants of a Florida limited

-2-

partnership and/or a Florida corporation and other entities constitutes substantial, and not isolated, activity within the State of Florida, subjecting them to jurisdiction in this State.

C.    The Green Isle Defendants

7.    Defendant Green Isle Partners Ltd, S.E. ("Green Isle Partners") is a Florida limited partnership existing as early as mid-September, 1994, and in no event later than October 10, 1994. Its partners are residents of a state other than Pennsylvania. On information and belief, its general partners at various times relevant hereto included Defendants Aces PR, Inc., Rahn PR, Ltd., S.E., and Green Isle-GP Ltd., S.E.

8.    On or about June 25, 2001, and subsequent to the filing of the original Complaint in this action, Green Isle Partners filed a voluntary Chapter 11 Petition with the United States Bankruptcy Court for the Southern District of Florida. On May 5, 2003, the Bankruptcy Court entered an Order confirming a Modified Second Amended Chapter 11 Plan in connection with the Green Isle Partners bankruptcy that, inter alia, estimated Ambrosia's claim for money damages against Green Isle Partners at $4,250,000.00. The claim proceeding against Green Isle Partners is currently on appeal. That proceeding was without prejudice to Ambrosia's right to prove additional damages against Green Isle Partners at trial and to seek additional amounts from any other party, including any other defendant named herein.

9.    Defendant Aces PR, Inc. is a Florida Corporation which was originally a general partner of Defendant Green Isle Partners. It is believed and therefore averred that Aces PR, Inc. has received substantial distributions out of the Green Isle Partners bankruptcy.

10.    Defendant Rahn PR Ltd., S.E. is a Florida limited partnership. Its partners are residents of a state other than Pennsylvania. Rahn PR Ltd., S.E. was originally a general partner of Defendant Green Isle Partners.

11.    Defendant Green Isle-GP Ltd., S.E. is a Florida limited partnership. Its partners are residents of a state other than Pennsylvania. On information it was formed on or about December 14, 1995 and shortly thereafter became a successor or additional general partner of Defendant Green Isle Partners.

12.    On information, Defendant Green Isle JV, S.E. is a Florida partnership, and its partners are residents of a state other than Pennsylvania. Defendant Green Isle JV, S.E. is believed to be the general partner of Defendant Green Isle GP Ltd., S.E. and may have (since the filing of the original Complaint), merged into one or more of the Green Isle Defendants (as hereafter defined).

13.    Defendant Aces Green Isle GP, Inc. is a Delaware corporation with its principal place of business located at 1050 Lee Wagner Boulevard, Fort Lauderdale, Florida 33315. Aces Green Isle GP, Inc. is believed to be a general partner of Defendant Green Isle JV, S.E., a limited partner of Defendant Green Isle-GP Ltd., S.E., and a joint venturer in Defendant Green Isle JV, S.E.

14.    Defendant Rahn Green Isle GP, Inc. is a Florida corporation that on information was formed on or about December 12, 1995. Its principal place of business is located at 1512 East Broward Boulevard, Fort Lauderdale, Florida 33301. It is believed that Rahn Green Isle GP, Inc. is, or at relevant times was, a general partner of Defendant Green Isle JV, S.E., a limited partner of Defendant Green Isle-GP Ltd., S.E., and a joint venturer in

-4-

Defendant Green Isle JV, S.E.  Upon further information, it is also believed that this entity merged into the Defendant Aces Green Isle GP, Inc. on or about December 28, 1999.

15.    Defendant Rahn Green Isle LP, Inc. is a Florida corporation which, on information, was formed on or about December 12, 1995.  Its principal place of business is located at 1050 Lee Wagner Boulevard, Suite 301, Fort Lauderdale, Florida 33315.  Upon further information, it is believed that Defendant Rahn Green Isle LP, Inc. was merged into Defendant Aces PR, Inc. on or about December 28, 1999.

16.    Reference to the "Green Isle Defendants" in this Complaint shall be deemed to include the entities identified in paragraphs 7 through 15 above.  The mergers identified above have resulted in the liability arising from the events or transactions hereinafter averred, devolving upon the surviving entity.  Further, to the extent any of the above Green Isle Defendants are or were general partners of a defendant to whom liability will attach, those general partners are thereby jointly and severally liable to Ambrosia for all losses suffered.

D.    The Strollo Defendants

17.    Defendant Small Corporate Services, Inc. is a corporation believed to exist or have existed under the laws of Puerto Rico with its principal place of business in Puerto Rico. It is further believed that Defendant Lenine Strollo and/or Defendant George Malizia control Small Corporate Services, Inc.

18.    Defendant Lenine Strollo is believed to be a resident of the state of Arizona.

19.    Defendant Pasquale Ferruccio is believed to be a resident of the state of Ohio.

-5-

20. Defendant George Malizia is believed to be a resident of the state of Florida.

21. Defendant Joseph Seguellion is believed to be a resident of the state of Ohio.

## SUBJECT MATTER JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this controversy pursuant to 28 U.S.C. §1332 (diversity of citizenship with amount in controversy exceeding $75,000) and 18 U.S.C.§§ 1964 and 1965 ("RICO").

23. Venue in this Court is proper pursuant to 28 U.S.C. §1391 and 18 U.S.C. §1965(a) and (b), in that a substantial part of the events and transactions giving rise to the claim occurred in this district, and the Defendants are subject to personal jurisdiction in this district.

## BACKGROUND

24. In November 1985, Ambrosia, through Carmen D. Ambrosia (now deceased), provided four million dollars ($4,000,000.00) to enable Garita Hotel Limited Partnership, an Ohio limited partnership, to buy a 99-year leasehold interest in certain beachfront property in Isla Verde, Puerto Rico (the "Puerto Rico Property"). Upon information and belief, the request to provide funds was made to Carmen D. Ambrosia by Defendant Malizia. Ambrosia did not know who else, if anyone, was involved at the time it provided the funds to Garita.

25. The Puerto Rico Property was to be used to develop a luxury hotel and casino.

26. In exchange for the delivery of such funds, Ambrosia received, among other things, a 100% ownership interest in a corporation named Garita Hotel Corporation.

27.    Garita Hotel Corporation was the majority owner and sole general partner of Garita Hotel Limited Partnership.

28.    In August of 1991, Defendants George Malizia and Lenine Strollo, improperly purporting to act on behalf of Garita Hotel Limited Partnership, attempted to sell Garita's interest in the Puerto Rico Property to Defendant Isle Verde Beach Hotel & Casino, S.E. and/or Defendant Pagés without Ambrosia's knowledge, even though all parties knew of Ambrosia's interest.

29.    These Defendants utilized the United States mail and wire services in an attempt to consummate the purported sale of Garita's interest.

30.    In furtherance of this scheme to defraud Ambrosia of its rights in the Puerto Rico Property, these Defendants made false representations designed to conceal the wrongful sale of the property without Ambrosia's consent or knowledge.

31.    The recited consideration for the sale was $12,500,000.00.

32.    On discovering the attempted sale, the new management of Ambrosia Coal (who were not involved in the 1985 transaction and took over management when it became clear that Carmen D. Ambrosia, who was elderly and had been ill and suffering for years, was incapable of managing Ambrosia) asserted that the sale was unauthorized, without the authority or knowledge of the owner and without delivery of any money or funds to Ambrosia.

33.    Ambrosia demanded an accounting for the proceeds of the sale from Malizia and, upon learning of Strollo's alleged relationship with Malizia, from Strollo.

34.    When Defendants Strollo and Malizia refused to provide an accounting, Ambrosia filed various actions in the State Courts of Pennsylvania against Defendants Malizia,

Strollo and Small Corporate Services, Inc., who apparently were claiming the right to act for

Garita Hotel Limited Partnership in the unauthorized sale because, they contended, Ambrosia

sold the stock of Garita to Small Corporate Services, Inc.

35. During the course of that litigation, Defendants Strollo and Malizia used

the mails and/or wires to make false representations to Ambrosia concerning the consideration

for the sale of the Puerto Rico Property.

36. Specifically, in mid-August of 1994, Defendant Malizia represented that

the purported purchase price of $12,500,000 had been paid in full, in part through the issuance of

five $1,000,000 bearer notes issued to Garita Hotel Limited Partnership but delivered to

Defendant Malizia.

37. Defendants Strollo and Malizia could not account for the remaining

$7,500,000 of the purported purchase price.

38. Upon information and belief, Defendant Isle Verde Beach Hotel & Casino,

S.E. and/or Defendant Pagés did not pay $6,500,000 of the purported consideration for the sale

of the Puerto Rico Property.

39. The Pennsylvania litigation ultimately concluded in Ambrosia's favor and

established, among other things, that Ambrosia Coal was the owner of 100% of the outstanding

shares of Garita Hotel Corporation and that Ambrosia Coal was entitled to the proceeds of the

purported sale of the Puerto Rico Property, including the five bearer notes issued to Garita Hotel

Limited Partnership.

40. Defendant Malizia was ordered to place the five bearer notes into court.

Malizia refused to do so and falsely represented to the Court that the bearer notes and other

-8-

documents supporting his claim to ownership of Garita Hotel Corporation had recently been stolen or could not be located. This representation was made by Affidavit in August of 1994.

41.    Defendants Malizia and Strollo materially misrepresented the facts surrounding the payment of the consideration for the sale of the Puerto Rico Property with the intent to defraud Ambrosia and deprive it of the benefits to which it was legally entitled.

42.    In early 1994, Ambrosia, in its own right and for Garita Hotel Limited Partnership and Garita Hotel Corporation, advised Defendant Isla Verde Beach Hotel & Casino, S.E., its principal (Defendant Pagés) and related entities of Ambrosia's intent to file an action relating to the title of the leasehold interest and/or to seek recovery of the alleged consideration for the purported sale of the leasehold interest. At this time, it did not know the full extent of the improper and fraudulent conduct of the Defendants.

43.    Unbeknownst to Ambrosia, Defendants Pagés, Isla Verde Beach Hotel & Casino, S.E., Isla Verde Beach Hotel & Casino, Inc. and Ana Celia Pagés, through the use of United States mail and wire services, or by means otherwise affecting interstate or foreign commerce, were in the process of negotiating with various persons (including by not necessarily limited to one or more of the Green Isle Defendants and their principals) for the sale of the Puerto Rico Property.

44.    In mid-August 1994, an attorney named Harry Cook contacted Frank Salpietro, counsel for Ambrosia via telephone. Mr. Cook explained that he was representing the principals of the then-yet-to-be-formed Green Isle partnership, who were attempting to negotiate the purchase of the Puerto Rico Property from the Isla Verde Defendants. He explained that his clients were well-respected entrepreneurs from Florida who had high net worth and experience in

developing hotel projects. He further explained that Ambrosia's claim to the property was an impediment to the proposed sale and the new partnership's plans to develop a hotel and casino on the property.

45.    During this telephone call, Mr. Cook proposed a transaction whereby Ambrosia would release its claim to the Puerto Rico Property in exchange for a cash payment and a note payable from the project's cash flow.

46.    During this and at least one other telephone conversation occurring in August 1994, Mr. Cook materially misrepresented certain aspects of the proposed transaction in an effort to induce Ambrosia to relinquish its claims to the Puerto Rico Property, including the following:

a)    that the Strollo Defendants would have no involvement, alleged or otherwise, in the project after the proposed sale;

b)    that Ambrosia would be granted an indirect interest in the Green Isle partnership in exchange for its release of any claim to the Puerto Rico Property, that this partnership would have only two classes of partners – limited and general, and that Ambrosia's interest would not be diluted and would be paid on par with the other partners in the Green Isle partnership;

c)    that the consideration for Ambrosia's release could be paid from the project's cash flow within five years of the opening of the hotel and casino.

47.    During the last few days of August or the first few days of September 1994, Ambrosia's new President, Carmen Shick (Carmen D. Ambrosia's grandson who, along

-10-

with his mother Kathryn Ambrosia Shick, took over management of Ambrosia Coal in 1992) and its counsel traveled to San Juan, Puerto Rico to meet with Defendant Pagés and Mr. Cook to discuss the proposed transaction.

48.    At this meeting, which took place in the Law Offices of Pedro Jimenez in Hato Rey, Puerto Rico, Defendant Pagés and/or Mr. Cook delivered certain projections regarding the proposed project to Ambrosia, stating that the projections were "very conservative." A copy of the projections is attached as Exhibit 1.

49.    Mr. Cook and his law firm took the lead in drafting the documents necessary to consummate the proposed transaction.

50.    Throughout early September 1994, Mr. Cook and Paul Cortes, another lawyer from Mr. Cook's firm representing the Green Isle partnership, used the mails and wires to communicate with Ambrosia regarding the details of the proposed transactions.  In addition to numerous telephone conversations, Mr. Cortes used the mails and/or wires to transmit drafts of various documents to Mr. Salpietro during this timeframe.

51.    On September 9, 1994 Mr. Cortes used the mails to transmit what he represented to be the partnership agreement that was to be executed for the Green Isle partnership. This document was sent at Mr. Salpietro's express request.

52.    This agreement contemplated only two classes of partners – limited and general.  Moreover, the agreement contained provisions preventing the dilution of partnership interests.  Both provisions were consistent with the representations that had been made by Messrs. Cook and Cortes.

-11-

53.    During the course of the aforementioned negotiations, Defendant Pagés (acting for himself and the Isla Verde Defendants) and Defendant Green Isle Partners (which is believed to have existed de facto, if not de jure, at this time) – through their principals and representatives – made material misrepresentations to Ambrosia in an effort to induce Ambrosia, to its detriment, to release its rights and claims to the Puerto Rico Property.

54.    As set forth below, these representations were false and it is believed that the Defendants knew that they were false when made. Further, these Defendants were aware that Ambrosia considered these representations material in that Ambrosia would not have entered into a settlement agreement as structured if the truth had not been concealed. Despite its litigation against Malizia, Strollo and Small Corporate Services, Inc., as described above, at this time Ambrosia had no knowledge that would have made it doubt the purported good intentions or the representations of the Green Isle Defendants and their counsel, especially given the reputation of its principals and its counsel, including Mr. Cook, who was a member of a reputable law firm.

55.    On or about September 15, 1994, induced by the material misrepresentations discussed above, Ambrosia executed a Settlement Agreement (the "1994 Agreement") prepared by Messrs. Cook and Cortes and/or other members of their law firm acting as counsel for the Green Isle Defendants. A copy of the 1994 Agreement is attached as Exhibit 2.

56.    The 1994 Agreement, among other things:

    a)    represented that a Florida limited partnership would own the Puerto Rico Property, and that Defendant Pagés was to receive a "33% limited partnership interest in the Partnership which Pagés contemplates would

-12-

increase to approximately a 45% limited partnership interest in the Partnership at a future date;"

b) provided for the issuance to Ambrosia by Defendant Pagés of a Promissory Note in the principal amount of $3,250,000.00, payments for which were to come from cash distributions made to Defendant Pagés from the Florida limited partnership, with Defendant Pagés transferring one-half of his expected 33% - 45% interest in the partnership to a trust as a source of payment and security for the Note;

c) provided for a cash payment to Ambrosia in the amount of $750,000.00;

d) required the Strollo Defendants to surrender the five bearer notes issued to Garita Hotel Limited Partnership, then believed to be the only assets available resulting from the sale of the Puerto Rico Property; and

e) required Ambrosia to release its claim to the Puerto Rico Property and to the five bearer notes (but not its claim to any other unpaid consideration).

57. The 1994 Agreement was conditioned upon a closing and delivery of various documents, all of which was to take place no later than October 10, 1994 unless extended by agreement of the parties.

58. Throughout October 1994, Ambrosia was advised by Messrs. Cook and Cortes that Defendant Pagés was refusing to close or because the Isla Verde Defendants and Green Isle Defendants could not arrive at terms.

59. On at least two occasions in October of 1994, representatives of Ambrosia traveled to Puerto Rico for a closing, only to be turned away.

60. On October 20, 1994, after several attempts to arrange a closing failed, Ambrosia advised each of the Defendants that the 1994 Agreement was rescinded and rendered null and void, given that the closing and delivery of documents and other consideration were conditions precedent to the effectiveness of the 1994 Agreement. A copy of one such letter is attached hereto as Exhibit 3.

61.     Mr. Cook contacted Mr. Salpietro via telephone the next day, October 21, 1994, and urged him to revoke Ambrosia's rescission and allow the closing to proceed.

62.     Based on the apparent difficulties that had arisen between the Green Isle and Isla Verde Defendants, on October 21, 1994 and in the days leading up to the eventual closing, Ambrosia again requested that Green Isle confirm, inter alia, that the transaction structure remained as previously represented, that the Strollo Defendants would have no further involvement in the project after the proposed transaction, that Ambrosia would be paid on par with the other partners and that Ambrosia's interest in the partnership would not be impaired or diluted.

63.     Mr. Cook affirmed these prior representations again during this telephone conversation, and he promised that a closing on the renewed and revived 1994 Agreement would occur no later than October 25, 1994.

64.     Based on these material representations, all of which were reasonably relied upon and were later discovered to be false, Ambrosia agreed to renew and proceed with the transaction.

65.     Mr. Cook's representations, as set forth in Paragraphs 61-63 above, were made after the dates on which Defendant Green Isle Partners and the other Green Isle Defendants were formed and registered with the State of Florida.

66.     On October 25, 1994, a closing was held wherein Ambrosia executed a Release as provided for in the 1994 Agreement.

67.     Seven hundred fifty thousand dollars ($750,000.00) and the new three million two hundred fifty thousand dollar ($3,250,000.00) Promissory Note were delivered to

-14-

Ambrosia, and the Isla Verde and Green Isle Defendants purported to create a trust to transfer one-half of Defendant Pagés' partnership interest for the benefit of Ambrosia.

68. Immediately after signing the documents related to the 1994 Agreement, Ambrosia wanted to wait for and obtain copies of the closing documents for both the 1994 Agreement and the documents relating to the Green Isle hotel and casino project.

69. Harry Cook and/or Paul Cortes discouraged Ambrosia from doing so, stating that the Pagés/Green Isle closing would take most of the day and that the documents were routine, were as previously discussed, but had yet to be compiled.

70. Mr. Cortes promised to express-mail the closing binder to Ambrosia that day or the next. Reasonably relying upon these representations, Ambrosia departed Puerto Rico and awaited the documentation.

71. Although apparently the Pagés Defendants received their closing binder from Mr. Cortes on October 28, 1994 (just three days after the closing), it was not provided to Ambrosia. Ambrosia continually requested, over the course of several years, information regarding the status of the project, including several written and verbal requests for the closing binder. Ambrosia's requests were ignored. At a minimum, written requests were made on October 26 and November 16, 1994 and February 14, 1996. Verbal requests, via telephone, were made on several occasions during this period and extending into late 1997, when Ambrosia's counsel was still requesting counsel for the other parties (by this time including Hector Pagés counsel on December 19, 1997) provide information that would have been included in the closing binder.

72.    After making the numerous requests set forth above, counsel for Green Isle finally transmitted, via the mails, documents purporting to be the entire closing binder from the October 25, 1994 closing.

73.    The binder sent by Green Isle's counsel consisted of approximately 38 items, and upon initial review there did not appear to be anything unusual or out of the ordinary about the binder or the documents.

74.    In mid-January 1998, Ambrosia obtained possession of documents dated as of December 19, 1995 and titled "Amended and Restated Agreement of Limited Partnership of Green Isle Partners Ltd., S.E." and "Amended and Restated Agreement of Limited Partnership of Green Isle GP Ltd., S.E." (collectively the "Amended Partnership Agreements"). Copies of these documents are attached as Exhibits 4 and 5.

75.    These documents were intentionally concealed by the Green Isle and Isla Verde Defendants until mid-January 1998, when they were produced by counsel for Defendant Pagés after several requests for updates, including requests on December 18, 1997 and January 8, 1998.

76.    The Amended Partnership Agreements revealed a scheme to defraud Ambrosia by, inter alia, reducing Defendant Pagés' interest in the Green Isle partnership by as much as 50% and relegating the interest in trust, which was Ambrosia's primary security for repayment of the $3,250,000.00 note, to a "Class B" limited partnership interest.

77.    In September of 1999, Ambrosia forwarded a draft complaint to the Isla Verde Defendants, the Green Isle Defendants and their counsel. That complaint was limited in scope because much of the Defendants' fraudulent conduct had not yet been discovered.

78.    Defendant Green Isle Partners, through its counsel Harry Cook and Lawrence Rosen, offered to negotiate a settlement of Ambrosia's claims.

79.    Messrs. Salpietro, Cook and Rosen engaged in negotiations via telephone, facsimile and mail throughout November of 1999.

80.    On November 23, 1999, Mr. Rosen contacted Mr. Salpietro via telephone and proposed a settlement of Ambrosia's claims.  Ambrosia accepted this offer the next day.

81.    The settlement involved the payment of $4,250,000.00 from Defendant Green Isle Partners to Ambrosia in exchange for the surrender of the $3,250,000.00 note obtained pursuant to the 1994 Agreement and all rights relating thereto, and an agreement not to file suit.

82.    On November 24, 1999, Harry Cook used the wires to transmit an e-mail indicating that the Green Isle and Isla Verde Defendants had settled with Ambrosia.

83.    Ambrosia required, as a show of good faith, that the Green Isle Defendants place the $4,250,000 to be paid to Ambrosia under the settlement into an escrow account.  They agreed to do so.

84.    Counsel for Green Isle prepared an escrow agreement and other documentation necessary to consummate the settlement.  Drafts of these documents were transmitted to Ambrosia using the mails and/or wires.

85.    On December 1, 1999, Mr. Rosen used the wires to transmit to Ambrosia signature pages of the Escrow Agreement drafted by counsel for Green Isle that had been executed by representatives of Defendant Green Isle Partners..

86. That same day, Mr. Rosen used the wires to transmit the $4,250,000 to be paid to Ambrosia to an escrow account established at the Northern Trust Bank of Florida.

87. On December 2, 1999, Larry Rosen used the wires to transmit a facsimile to Mr. Salpietro purporting to show that the settlement funds had been placed in escrow.

88. Mr. Cook's law firm subsequently prepared the remaining documents necessary to consummate the proposed transaction and forwarded drafts of these to Mr. Salpietro using the mails and/or wires.

89. After the language of documents had been finalized, Mr. Cook contacted Mr. Salpietro via telephone and requested a Certificate of Good Standing from Ambrosia. During this call, he advised that "all that's left to do is to come down [to Puerto Rico, where Mr. Cook's office is located] and sign the documents." On December 14, 1999, counsel for Ambrosia ordered the Certificate of Good Standing and sent it to Mr. Cook upon receipt. Indeed, it is believed and therefore averred that on December 18 and 19, 1999, Green Isle's counsel had prepared letters advising the Puerto Rico Tourism Development Fund of the settlement and the termination of the interest in trust that represented Ambrosia's security for the $3,250,000 Note.

90. The following week, and approximately two days before Ambrosia and its counsel were to travel to Puerto Rico, counsel placed a courtesy call to Mr. Cook to inquire whether he had received Ambrosia's Certificate of Good Standing.

91. Mr. Cook advised that he had received the document, but after some hesitation further advised that there would be no settlement because Defendant Green Isle Partners had "changed its mind."

-18-

92.    When Ambrosia's counsel pressed for an explanation, Mr. Cook referred him to Lawrence Rosen. Counsel for Ambrosia placed a telephone call to Mr. Rosen that day. He stated that Green Isle "did not need Ambrosia because it got its insurance" and that Green Isle could change its mind because "this is America."

93.    Ambrosia subsequently filed its initial Complaint in this action.

94.    Through discovery in this case, Ambrosia learned that Defendant Green Isle Partners was attempting to secure a working capital loan from Marriott International Capital Corporation in an amount of approximately $22,000,000.00 at the same time that Ambrosia was threatening litigation in November of 1999.

95.    Documents obtained during discovery also revealed that a condition to the Marriott loan was the obtaining of title insurance. Such insurance would not issue absent a settlement of Ambrosia's claims and/or an indemnification from Harvey Sandler (the ultimate principal of the Green Isle Defendants) for loss or damage resulting from the lawsuit threatened by Ambrosia.

96.    Green Isle Partners obtained the required title insurance in late December of 1999, and thereafter withdrew the settlement funds from escrow and refused to consummate the settlement it had reached with Ambrosia.

97.    Based on this information, Ambrosia believes that the Defendants exercised bad faith by engaging in settlement negotiations with the intent to cause Ambrosia to delay filing suit, and without any intent to enter into a settlement with Ambrosia. The Defendants were instead concerned with procuring appropriate title insurance to facilitate the Marriott loan. Once that insurance had been obtained, Defendants repudiated the settlement.

-19-

98.    Further, during the course of discovery it was learned that, in connection and in the context of the Marriott loan transaction, the Green Isle Defendants, the Pagés Defendants and their counsel were attempting to develop a strategy to respond to Ambrosia's threat of litigation. These discussions included, but were not necessarily limited to:

a)    discussions via telephone on October 20, 22 and 25, 1999 concerning the filing of a collusive and preemptive action in Puerto Rico;

b)    discussions using the telephone on November 10, 12 and 16, 1999 to develop a strategy concerning the "timing" of settlement discussions with Ambrosia in light of the possible impact of the claim on the Marriott loan;

c)    discussions using the telephone on November 22 and 23, 1999 to discuss the ability to obtain affirmative insurance in the event of a settlement with Ambrosia; and

d)    preparation of an escrow agreement on November 29, 1999 and transmission thereof to Ambrosia using the mails and/or wires in furtherance of the improper and illegal "strategy" of the Green Isle and Pagés Defendants.

99.    Ambrosia also learned, for the first time, of the existence and nature of various side agreements entered into between Defendants Pagés, Malizia and Strollo. This includes a written agreement entered into in September of 1994, a copy of which is attached hereto as Exhibit 6, and another agreement dated August 22, 1991, a copy of which is attached hereto as Exhibit 7 (collectively the "Side Agreements").

100.    In the Side Agreement attached as Exhibit 6, Defendant Pagés acknowledged that he was acting as an agent for the "to be formed" Green Isle partnership.

101.    The Side Agreements were not disclosed to Ambrosia during the negotiation of the 1994 Agreement, even though it is believed and therefore averred that the Green Isle and Pagés Defendants were aware of the existence of these Side Agreements.

102.    The Side Agreements are wholly inconsistent with representations made to Ambrosia by Harry Cook, Paul Cortes and Defendant Pagés concerning the non-involvement of the Strollo Defendants in the project.    In addition, they further demonstrate a fraud and concealment in connection with the consideration paid or to be paid for the Puerto Rico Property.

103.    Ambrosia also discovered that prior to the execution of the 1994 Agreement, Defendants Malizia and Strollo had met with Defendant Pagés and David Ross, who is believed to have been a managing agent of Defendant Green Isle Partners, in New York. Defendant Pagés acknowledged that this meeting took place in March or April of 1994. Ambrosia was not aware that this meeting took place.

104.    At this meeting, it was acknowledged that Defendants Pagés and Strollo were "50/50 partners." Neither the agreement nor the meeting were disclosed to Ambrosia prior to the execution of the 1994 Agreement.

105.    Ambrosia also discovered that Defendant Pagés and Ken DeStefano (who is believed to have been a managing agent of Defendant Green Isle Partners at the time) had met with Defendant Malizia and his counsel in Puerto Rico in the first half of 1999.

106.    At this meeting, Defendant Malizia was provided with financial statements and records relating to the hotel and casino, further evidencing the falsity of the representations

made to Ambrosia that the Strollo Defendants would have no further involvement in the hotel and casino project subsequent to the execution of the 1994 Agreement.

107.    These financial statements and records, which Defendant Malizia eventually produced to Ambrosia, revealed, inter alia, that several "management companies" controlled by Green Isle or its principals were receiving between 4% and 8% "off the top" of the hotel and casino's revenue, in addition to a similar management fee being paid to Ritz-Carlton Hotel Company, LLC.

108.    These records also revealed an unusually large and suspicious loss at the casino and an independent audit report revealing a lack of accounting controls at the casino.

109.    In July of 2000, Ambrosia learned, for the first time, that the closing binder sent to Ambrosia nearly two years after the closing was not the true or complete binder.

110.    The closing binder originally provided to Ambrosia deliberately omitted several material documents.

111.    By way of example only, the original closing binder sent to Ambrosia omitted a letter dated October 25, 1994 (the date of the closing) and a "Confidential Transaction Structure" Memorandum created no later than October 10, 1994 (two weeks prior to the closing).

112.    These documents discussed an expected dilution of Defendant Pagés' interest in the project and also discussed the expected creation of special classes of limited partners (including a "Class B" partner).  Copies of these documents are attached hereto as Exhibits 8 and 9.

113.    The transaction structure discussed in these documents was completely inconsistent with the representations made to Ambrosia by Harry Cook and Paul Cortes during the negotiation of the 1994 Agreement.

114.    Had any of these material facts been disclosed to Ambrosia, it would not have entered into to 1994 Agreement.

115.    Ambrosia's reliance on the misrepresentations described above was reasonable.

116.    The conduct described in the foregoing paragraphs constitutes fraud and racketeering activity.

117.    It is believed and therefore averred that the value of the leasehold interest, prior to improvements, was at least $18,000,000.00, and after improvements is at least $100,000,000.00.

118.    All rights, if any, inuring to Garita Hotel Corporation and Garita Hotel Limited Partnership from the foregoing acts have been assigned to or are owned by Plaintiff.

119.    All conditions precedent to the claims hereinafter asserted have occurred or have been performed.

## CLAIMS AGAINST THE GREEN ISLE DEFENDANTS

**(Excluding RICO Claims, Which are Addressed Beginning at Count XXV)**

### COUNT I
**(Claim Against Defendant Green Isle Partners for Fraud)**

120.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

121.    The actions and concealment of Defendant Green Isle Partners:

a)   Operated as a fraud on Ambrosia by inducing it, to its economic detriment, to act in a manner it would otherwise not have acted if the truth were known;

b)   Operated as a fraud on Ambrosia by devaluing Ambrosia's expectancies arising from the 1994 Agreement and making the expectancies arising therefrom worthless;

c)   Frustrated the purpose of the 1994 Agreement by rendering the expected source of payment to Ambrosia meaningless;

d)   Rendered performance of the 1994 Agreement impossible or impracticable through the dilution of the interest Defendant Pagés was originally contemplated to receive under such Agreement;

e)   Induced Ambrosia to enter into the 1994 Agreement, and thereby relinquish its rights and interest in the Puerto Rico Property, through overstated financial projections and a representation of a source of

payment that this Defendant knew, or had reason to know, would be diluted, impaired or devalued.

122.    This Defendant's fraudulent conduct and concealment began in mid-1994 and continued until at least mid-2000.

123.    As a result of this Defendant's fraud, Ambrosia has suffered severe pecuniary damages, including but not necessarily limited to the loss of the value of the Puerto Rico Property.

WHEREFORE, Plaintiff Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest, punitive damages and costs.

## COUNT II
### (Claim Against Defendant Green Isle Partners for Rescission Damages)

124.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

125.    Defendant Green Isle Partners (and perhaps other Green Isle Defendants as identified in separate counts below or through further discovery) was the primary drafter and negotiator of the 1994 Agreement, and at a minimum constituted a third-party beneficiary of that Agreement.

126.    Defendant Green Isle Partners' fraud and concealment in the inducement, as set forth in Count I above, is material and allows for a rescission of the 1994 Agreement.

127.    The actions of Defendant Green Isle Partners in regard to the documents set forth as Exhibits 4, 5, 8 and 9:

a) Operated as a fraud on Plaintiff as they devalued Ambrosia's expectancies arising from the 1994 Agreement and made the expectancies arising therefrom worthless;

b) Frustrated the purpose of the 1994 Agreement by rendering the expected source of payment to Ambrosia meaningless;

c) Rendered performance of the 1994 Agreement impossible or impracticable through the dilution of the interest Defendant Pagés was originally contemplated to receive under such Agreement.

128.    Rescission of the 1994 Agreement would allow Ambrosia to realize the value of the Puerto Rico Property.

129.    To the extent this Defendant cannot return the leasehold to Ambrosia, it is nonetheless liable for Ambrosia's loss of property.

WHEREFORE, Plaintiff Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest and costs.

## COUNT III
### (Claim Against Defendant Green Isle Partners for Fraud)

130.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

131.    Defendant Green Isle Partners' actions and concealment in connection with the 1999 Settlement operated as a fraud against Ambrosia, upon which Ambrosia reasonably relied to its economic detriment (i.e., forbearance of suit against Green Isle which, if

-26-

filed when originally indicated and but for Defendant Green Isle Partners' fraud, would have given Ambrosia substantial leverage in the litigation).

132.    As an alternative to recovery for damages as alleged in Counts I and II above, Ambrosia is entitled, at a minimum, to recover $4,250,000.00 in damages, plus interest and punitive damages.

WHEREFORE, Ambrosia requests damages in the amount of $4,250,000.00, plus punitive damages, interest and costs.

## COUNT IV
### (Claim Against Defendant Green Isle Partners for
### Dolo in Contrahendo Under Puerto Rico Law)

133.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

134.    The actions of Defendant Green Isle Partners constitutes "dolo in contrahendo" rendering the 1994 Agreement a nullity under the laws of the Commonwealth of Puerto Rico.

135.    Ambrosia would not have entered the 1994 Agreement but for the serious deceit of Defendant Green Isle Partners.

136.    Further, the actions of Defendant Green Isle Partners in 1995, which deliberately diluted or frustrated Plaintiff's expected recourse under the 1994 Agreement, when Defendant knew that such actions would have a material, adverse affect on the 1994 Agreement and the benefits and reasonable expectancies arising therefrom, impaired or devalued the interest or remedies of Ambrosia, and thus rendered this Defendant guilty of dolo in contrahendo.

137.    As a result of the foregoing, Defendant Green Isle Partners is required to indemnify Ambrosia for the losses and damages caused thereby.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest and costs.

## COUNT V
### (Claim Against Defendant Green Isle Partners for Indemnity and Damages for Fraud on Creditors Under Section 3499 of the Civil Code of Puerto Rico)

138.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

139.    Ambrosia has suffered damages through the dilution of its interest in the Puerto Rico Property and the benefits that were to arise through the 1994 Agreement.

140.    As Defendant Green Isle Partners has acquired the Puerto Rico Property and has thwarted the benefits that Ambrosia was to realize from the 1994 Agreement through a fraudulent transaction, it is required pursuant to Section 3499 of the Civil Code of Puerto Rico to indemnify Ambrosia for all damages resulting therefrom.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest and costs.

## COUNT VI
### (Claim Against Defendant Green Isle Partners Under
### Section 3375 of the Civil Code of Puerto Rico)

141.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

142.    As a consequence of diluting, impairing and/or devaluing the interest placed in trust to pay Ambrosia, Defendant Green Isle Partners acquired such interest, and/or benefited from the dilution, impairment or devaluation of that interest.

143.    The acquisition or the benefit derived therefrom was the result of bad faith.

144.    Pursuant to Section 3375 of the Civil Code of Puerto Rico, this Defendant is liable to Ambrosia for all losses and damages resulting therefrom.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest and costs.


## COUNT VII
### (Claim Against Defendant Green Isle Partners for Conspiracy to Defraud)

145.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

146.    The actions of Defendant Green Isle Partners, acting in concert with one or more of the other Defendants, including but not necessarily limited to Defendant Pagés as set forth above, constitute a conspiracy to cheat, defraud and deprive Ambrosia of its right and remedies under the 1994 Agreement and/or its right to the Puerto Rico Property.

147. Ambrosia has been damaged as a direct and proximate result of the foregoing.

148. The actions of this Defendant were willful, wanton, fraudulent, illegal and in conscious disregard of the rights of Ambrosia.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages, interest and costs.

## COUNT VIII
### (Claim Against Defendant Green Isle Partners for Interference with Contractual Relationship)

149. Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

150. By taking deliberate actions to dilute, devalue or impair Ambrosia's remedies under the 1994 Agreement, Defendant Green Isle Partners (and perhaps other Green Isle Defendants as identified in ongoing discovery) has unlawfully interfered with the rights and advantageous relationship that was expected to arise from the 1994 Agreement.

151. The actions of Defendant Green Isle Partners in unlawfully interfering with the contractual or advantageous relationship arising from the 1994 Agreement has resulted in damage to Ambrosia.

152. The actions of Defendant Green Isle Partners were not privileged, and instead were willful, wanton, fraudulent, illegal and in conscious or reckless disregard of the rights of Ambrosia.

-30-

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages, interest and costs.


## COUNT IX
### (Claim Against Defendant Green Isle Partners for Breach of Contract)

153.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

154.    Alternatively, Defendant Green Isle Partners and Ambrosia arrived at the 1999 Settlement whereby Defendant Green Isle Partners would pay Ambrosia $4,250,000.00, which said Defendant failed and refused to pay even though Ambrosia was at all times ready, willing and able to perform.

155.    Said Defendant's failure constitutes breach of contract for which Ambrosia is entitled to compensation.

WHEREFORE, Ambrosia requests damages in an amount of $4,250,000.00, plus interest and costs of suit.


## COUNT X
### (Request Against Defendant Green Isle Partners for Accounting and Claim for Damages)

156.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

157.    Upon information and belief, in addition to the actions taken as set forth above, Defendant Green Isle Partners (directly and through its general partners) has engaged in a

deliberate pattern to defraud creditors like Ambrosia and to siphon funds otherwise available for creditors for the use and gain of the Green Isle Defendants. Subject to further discovery, actions in furtherance of this pattern include but are not necessarily limited to the following:

a) Charging non-related and/or personal expenses against the hotel and casino account (e.g., a long-term lease for a luxury box at the Dade County Arena and the placement of six-figure salaried employees on the hotel or casino payroll when the employees worked for entities related to Defendants but not related to the hotel or casino);

b) Transferring in excess of fifteen percent of the hotel's revenue for the first two quarters of 1999 to Defendant Green Isle Partners, and reflection of an overpayment of nearly $800,000.00 to Defendant Green Isle Partners;

c) Recording inter-company debts of nearly $6,000,000.00 for 1998 without justification or explanation as to the nature of the debts (resulting, coincidentally, in a loss of approximately $6,000,000.00 shown by the casino);

d) Improper accounting for or excessive allowance of "comps" by the casino and other activities leading to an internal investigation regarding casino fraud;

e) Creation of several multi-tiered "management agreements" for the benefit of Defendant Green Isle Partners and its related entities, whereby those entities would receive at least 4%-8% of the gross revenue of the hotel and casino, plus all expenses;

f) Diverting cash flow that would or could otherwise be used to reduce Ambrosia's claim to the pockets of insiders like Harvey Sandler.

158.    As the Defendant Green Isle Partners was knowledgeable that in part the revenues it received were to be used to discharge the obligations due to Ambrosia pursuant to the 1994 Agreement, it owed, at a minimum, a quasi-fiduciary duty to account to Ambrosia for the revenue received, and further would be liable for any damages for diversion of funds.

159.    On or about March 30, 2001, Defendant Green Isle Partners filed an action against, inter alia, Defendant Ritz-Carlton Hotel Company LLC, in the United States District Court for the District of Delaware at Civil Action No. 01-202 (the "Delaware Action"). In that action, Defendant Green Isle Partners detailed, among other things, numerous acts of fraud, negligence and malfeasance committed by its agent, manager and fiduciary (Ritz-Carlton) relating to the finances and accounting for the hotel and casino project. A copy of that Complaint is attached hereto as Exhibit 10.

160.    Defendant Green Isle Partners alleged in the Delaware Action that the hotel and casino project failed as a result of the fraud and malfeasance of its agent, and that these actions "destroy[ed] the value of the Project in Green Isle's hands." (Exhibit 10 ¶ 182). According to the Delaware Action, the fraudulent acts committed by Green Isle's agent included:

a) False entries in the books and records of the project and manipulation of accounts receivable and accounts payable (Exhibit 10 ¶¶ 72-87);

b) Creation of fraudulent expense accounts (Exhibit 10 ¶¶ 88-91);

c) Improper inflation of expenses (Exhibit 10 ¶¶ 107-112);

d) Recording of falsified revenues (Exhibit 10 ¶¶ 113-116); and

-33-

e) Acts of cover up of accounting fraud (Exhibit 10 ¶ 149).

161.   Assuming, <u>arguendo</u>, that Defendant Green Isle Partners did not allege the wrongs set forth in the Delaware Action in bad faith, Defendant Green Isle Partners is nonetheless liable under Florida law, as to third parties (like Ambrosia), for the fraud and malfeasance of its agent, manager and fiduciary.

162.   The improper actions of Defendant Green Isle Partners and/or its agent, manager and fiduciary Ritz-Carlton Hotel Company LLC, directly and proximately caused pecuniary damage to Ambrosia.

WHEREFORE, Ambrosia demands that Defendant Green Isle Partners be made to render a full and complete accounting of all activity in connection with the hotel and casino project, and to pay damages as Ambrosia may be entitled to receive, plus interest and costs.


**COUNT XI**
**(Claim Against Defendant Aces PR, Inc. for Liability as General Partner
of Defendant Green Isle Partners)**

163.   Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

164.   To the extent Defendant Green Isle Partners is deemed liable on any basis to Ambrosia, then Defendant Aces PR, Inc., as a general partner of Defendant Green Isle Partners, is jointly and severally liable with Defendant Green Isle Partners and its other general partners for any losses suffered by Ambrosia.

165.   If it is deemed that any actionable conduct occurring on or prior to October 10, 1994 was not taken by Defendant Green Isle Partners because said Defendant did

not exist (which is denied), then Defendant Aces PR, Inc. would have direct liability to Ambrosia for the pre-October conduct described above, insofar as its representatives would have engaged in the fraudulent conduct and concealment, which in any event was later confirmed and ratified by Defendant Green Isle Partners.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages, interest and costs.

## COUNT XII
### (Claim Against Defendant Rahn PR Ltd., S.E. for Liability as General Partner of Defendant Green Isle Partners)

166.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

167.    To the extent Defendant Green Isle Partners is deemed liable on any basis to Ambrosia, then Defendant Rahn PR Ltd., S.E., as a general partner of Defendant Green Isle Partners, is jointly and severally liable with Defendant Green Isle Partners and its other general partners for any losses suffered by Ambrosia.

168.    If it is deemed that any actionable conduct occurring prior to October 10, 1994 was not taken by Defendant Green Isle Partners because said Defendant did not exist (which is denied), then Defendant Rahn PR Ltd., S.E. would have direct liability to Ambrosia for the pre-October conduct described above, insofar as its representatives would have engaged in the fraudulent conduct and concealment, which in any event was later confirmed and ratified by Defendant Green Isle Partners.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages, interest and costs.

## COUNT XIII
### (Claim Against Defendant Green Isle GP Ltd., S.E. for Liability as General Partners of Defendant Green Isle Partners)

169.     Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

170.     To the extent Defendant Green Isle Partners is deemed liable on any basis to Ambrosia, then Defendant Green Isle GP Ltd., S.E., as a general partner of Defendant Green Isle Partners, is jointly and severally liable with Defendant Green Isle Partners and its other general partners for any losses suffered by Ambrosia.

171.     This Defendant is also liable as a successor-in-interest to Defendant Aces PR, Inc. and Rahn PR, Ltd., S.E., to the extent it replaced one or both of those defendants as general partner of Defendant Green Isle Partners.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages, interest and costs.

## COUNT XIV
### (Claim Against Defendants Rahn Green Isle GP, Inc. and Aces Green Isle GP, Inc. Based on Joint Venture Agreement)

172.     Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

173.    By virtue of a Joint Venture Agreement dated as of December 19, 1995, Defendant Rahn Green Isle GP, Inc. and Defendant Aces Green Isle GP, Inc. formed a venture under the name and style Green Isle JV, S.E. (a defendant herein) for the sole purpose of acting as general partner of Defendant Green Isle GP Ltd., S.E.

174.    To the extent any liability devolves upon Defendant Green Isle GP Ltd., S.E., then Defendants Rahn Green Isle GP, Inc. and Aces Green Isle GP, Inc. are liable jointly and severally for losses suffered by Ambrosia.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages, interest and costs.

## CLAIMS AGAINST THE ISLA VERDE DEFENDANTS
**(Excluding RICO Claims, which are Addressed Beginning at Count XXVII)**

### COUNT XV
**(Claim Against Defendant Pagés and Isla Verde Beach Hotel & Casino, S.E. for Fraud)**

175.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

176.    Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E. (acting through Pagés and its general partner, Isla Verde Beach Hotel & Casino, Inc.) actively participated in the fraudulent conduct and concealment set forth in this Complaint.

177.    The actions and concealment of Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E.:

a) Operated as a fraud on Ambrosia by inducing it, to its economic detriment, to act in a manner it would otherwise not have acted if the truth were known;

b) Operated as a fraud on Ambrosia by devaluing Ambrosia's expectancies arising from the 1994 Agreement and making the expectancies arising therefrom worthless;

c) Frustrated the purpose of the 1994 Agreement by rendering the expected source of payment to Ambrosia meaningless;

d) Rendered performance of the 1994 Agreement impossible or impracticable through dilution of the Pagés interest that said Defendant was originally contemplated to receive under such Agreement;

e) Induced Ambrosia to enter into the 1994 Agreement, and thus relinquish its rights and interest in the Puerto Rico Property, through overstated financial projections and a representation of a source of payment that these Defendants knew, or had reason to know, would be diluted, impaired or devalued;

f) Operated as a fraud on Ambrosia through issuance of a note in the amount of $3,250,000.00 when these Defendants knew or had reason to know that the note would never be paid;

g) Operated as a fraud on Ambrosia by entering into the Side Agreements and continuing to negotiate the Side Agreements even though they advised

-38-

Ambrosia that none of the Strollo Defendants would be involved in the Green Isle hotel and casino project.

178. The fraudulent conduct and concealment of these Defendants was a continuing fraud that continued at least until mid-2000.

179. As a result of the fraud of these Defendants, Ambrosia has suffered severe pecuniary damages, including but not necessarily limited to the loss of the value of the Puerto Rico Property.

WHEREFORE, Plaintiff Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest, punitive damages and costs.

### COUNT XVI
### (Claim Against the Isla Verde Defendants for Dolo in Contrahendo Under Puerto Rico Law)

180. Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

181. The actions of Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E. as described in the foregoing paragraphs constitute "dolo in contrahendo" rendering the 1994 Agreement a nullity under the laws of the Commonwealth of Puerto Rico.

182. The actions of Defendant Pagés in consenting to and signing the Amended Partnership Agreements referenced above and in Exhibits 4 and 5, which deliberately diluted or frustrated Plaintiff's expected recourse under the 1994 Agreement, when this Defendant knew that such actions would have a material, adverse affect on the 1994 Agreement and the benefits

and reasonable expectancies arising therefrom, renders this Defendant guilty of dolo in contrahendo.

183.    Defendants Isla Verde Beach Hotel & Casino, Inc. and Ana Celia Pagés, upon information, had specific knowledge of the fraudulent conduct of Defendant Pagés and Defendant Isla Verde Beach Hotel & Casino, S.E., but remained silent and/or actively concealed the truth from Ambrosia.

184.    Ambrosia would not have entered the 1994 Agreement but for the serious deceit and concealment of the Isla Verde Defendants.

185.    As a result of the foregoing, Ambrosia is entitled to an Order rescinding the 1994 Agreement and any Release executed in connection therewith.  However, since the Puerto Rico Property cannot be returned to Ambrosia, the Isla Verde Defendants are jointly and severally liable to indemnify Ambrosia for the losses and damages caused thereby.  These losses include but are not necessarily limited to the loss of the value of the Puerto Rico Property, as such value is averred above.

WHEREFORE, Plaintiff Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest and costs.

## COUNT XVII
### (Claim Against the Isla Verde Defendants for Conspiracy to Defraud)

186.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

187.    The actions of the Isla Verde Defendants, acting in concert with one or more of the Green Isle Defendants and one or more of the Strollo Defendants as set forth above, constitute a conspiracy to cheat, defraud and deprive Ambrosia of its right and remedies under the 1994 Agreement and/or its rights to the Puerto Rico Property.

188.    Ambrosia has been damaged as a direct and proximate result of the foregoing.

189.    The actions of these Defendants were willful, wonton, fraudulent, illegal and in conscious and knowing disregard of the rights of Ambrosia.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages, interest and costs.

## COUNT XVIII
### (Claim Against Defendant Pagés Under Section 3375 of the Civil Code of Puerto Rico)

190.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

191.    As a consequence of diluting, impairing and/or devaluing the interest placed in trust to pay Ambrosia, Defendant Pagés acquired such interest, and/or benefited from the dilution, impairment or devaluation of that interest.

192.    The acquisition or the benefit derived therefrom was the result of bad faith and fraud.

193.    Pursuant to Section 3375 of the Civil Code of Puerto Rico, Defendant Pagés is liable to Ambrosia for all losses and damages resulting therefrom.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest and costs.

## COUNT XIX
### (Claim Against the Isla Verde Defendants for Rescission)

194.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

195.    The fraud and concealment of the Isla Verde Defendants, or any of them as set forth above, was material and allows for a rescission of the 1994 Agreement.

196.    Rescission of the 1994 Agreement would allow Ambrosia to realize the value of the Puerto Rico Property, as such value is averred in paragraph 57 above.

197.    However, to the extent these Defendants cannot return the leasehold to Ambrosia or put it in a position where it will be able to obtain the Puerto Rico Property or the value of said Property, these Defendants are nonetheless liable for Ambrosia's loss of property.

WHEREFORE, Plaintiff Ambrosia requests damages in an amount exceeding $18,000,000.00, plus interest and costs, along with an Order rescinding the 1994 Agreement and any Release executed in connection therewith, and any such other remedy as may be proper.

<u>**COUNT XX**</u>
**(Claim Against Defendants**
**Pagés and Isla Verde Beach Hotel & Casino, S.E. for Breach of Contact)**

198.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

199.    The actions of Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E., including but not limited to the failure to make payments, the failure to place the proper amount in trust, the frustration of purpose of the Agreement constitute a breach of the 1994 Agreement.

200.    Plaintiff has been damaged as a direct and proximate result of the breach.

WHEREFORE, Plaintiff requests entry of a money judgment against Defendants Pagés and Isla Verde Beach Hotel & Casino, jointly and severally, in an amount exceeding $3,250,000.00 together with interest and costs, and such other remedy as may be proper.

<u>**COUNT XXI**</u>
**(Claim Against Defendants Pagés and**
**Isla Verde Beach Hotel & Casino, S.E. for Breach of Obligation of Good Faith)**

201.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

202.    The actions of Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E., as set forth above, constitute a breach of the obligations of good faith in connection with the 1994 Agreement.

203.    Plaintiff has been damaged as a direct and proximate result of said breach of these obligations.

WHEREFORE, Plaintiff requests entry of a money judgment against Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E., jointly and severally, in an amount exceeding $3,250,000.00 together with interest and costs, and such other remedy as may be proper.

## COUNT XXII
### (Claim Against Defendants Pagés and Isla Verde Beach Hotel & Casino, Inc. for Failure to Pay all Consideration on Sale of the Puerto Rico Property)

204.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

205.    Upon information and belief, Defendant Pagés and/or Defendant Isla Verde Beach Hotel & Casino, Inc. purported to acquire (improperly) the Puerto Rico Property for a stated consideration of $12,500,000.00.  Upon further information, these Defendants paid approximately $1,000,000.00 in cash and issued five $1,000,000.00 bearer notes (which may be worthless as a result of the actions of these Defendants), but never paid the balance of $6,500,000.00 for the Puerto Rico Property.  Indeed, Defendant Pagés, in the presence of Defendant Strollo and in the presence of and through his counsel, admitted that the remaining consideration was not paid, and was only recited as being paid "to make it look good for the bank."

206.    Ambrosia is entitled to receive $12,500,000.00 from Defendant Pagés and Defendant Isla Verde Beach Hotel & Casino, Inc., to the extent it is determined that the sale of

the Puerto Rico Property to these Defendants was proper.  At a minimum, Ambrosia is entitled to receive the unpaid $6,500,000.00.

207.   This claim is without reference to, and independent of, the 1994 Agreement and related documents, which do not release this obligation.

WHEREFORE, Plaintiff demands judgment against Defendants Pagés and Isla Verde Beach Hotel & Casino, Inc., in the amount of $12,500,000.00, together with interest, costs and such other remedy as may be proper.

## COUNT XXIII
### (Claim for Rescission Damages Based on Lack of Consideration Received by Garita)

208.   Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

209.   Neither Garita Hotel Corporation nor Garita Hotel Limited Partnership were provided with consideration for entering into the 1994 Agreement.

210.   Neither Garita Hotel Corporation nor Garita Hotel Limited Partnership were provided with any remedy in the event of a failure by Defendants Pagés, the Isla Verde Defendants or the Green Isle Defendants to comply with the obligations required under the 1994 Agreement, or the obligations required by law.

211.   Lack or failure of consideration renders the 1994 Settlement Agreement void ab initio.

212.   The actions of the Defendants as set forth in this Complaint have caused severe pecuniary damages, for which Plaintiff is entitled to relief.

WHEREFORE, Plaintiff, as assignee of the rights of the Garita entities, requests damages in an amount of at least $18,000,000.00, plus interest and costs.


## COUNT XXIV
### (Claim Against Defendant Isla Verde Beach Hotel & Casino, Inc. as General Partner of Defendant Isla Verde Beach Hotel & Casino, S.E.)

213.    Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

214.    To the extent Defendant Isla Verde Beach Hotel & Casino, S.E. is deemed liable on any basis to Ambrosia, then Defendant Isla Verde Beach Hotel & Casino, Inc., as a general partner of Defendant Isla Verde Beach Hotel & Casino, S.E., is jointly and severally liable with Defendant Isla Verde Beach Hotel & Casino, S.E. for any losses suffered by Ambrosia.

WHEREFORE, Ambrosia requests damages in an amount exceeding $18,000,000.00, plus punitive damages interest and costs.


## RICO CLAIMS

215.    As more fully set forth below, the Isla Verde Defendants, Strollo Defendants and Green Isle Defendants conducted an enterprise within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO") by associating together to achieve a common purpose of acquiring and maintaining control over the Puerto Rico Property and the hotel and casino ultimately constructed on the property.

-46-

216.    This enterprise affected interstate commerce in that the negotiations of the purchase of the Puerto Rico Property, the deliberate creation of a complex organizational web of partnerships, individuals and entities (which has constantly changed) to manage and operate the hotel and casino, and the financing and maintenance of the hotel and casino involved activities that took place in several states and territories of the United States, including Puerto Rico, Florida, Pennsylvania, Ohio and New York. Moreover, as described below, the predicate acts of mail and wire fraud in which the Defendants engaged affected interstate commerce.

217.    In the period from 1991 to early 2001, the above-named Defendants at various times and in varying interests, acquired and maintained control over the enterprise, conducted the affairs of the enterprise, and conspired to accomplish these objectives through a pattern of racketeering activity. As fully described above, this pattern of racketeering activity involved related and continuous acts of mail and wire fraud over the course of more than ten years.

218.    Ambrosia suffered injury to its business and property by reason of Defendants' violations of 18 U.S.C. §1962(b), (c), and (d), as fully described below.

## COUNT XXV
### (Claim Based on 18 U.S.C. §1962(b))

219.    Paragraphs 1-218 are incorporated by reference as if fully set forth herein.

220.    The Defendants that intentionally participated in a pattern of racketeering activity to acquire and maintain control of an enterprise affecting interstate commerce are: Defendants Strollo, Malizia and Small Corporate Services, Inc.(the "Strollo Defendants"), Defendant Pagés, Defendant Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant

-47-

Pagés) and Defendant Green Isle Partnership (acting through its representatives and general partners). There may be other wrongdoers, other than the Defendants listed herein, which will be determined through further discovery.

     221.    The victim of the scheme to defraud was Ambrosia Coal & Construction Company (in its own right and as assignee of the rights of the Garita entities).

     222.    The association in fact of the above-named Defendants and their entities constitutes an enterprise engaged in, and whose activities affect, interstate commerce. In addition, the hotel and casino itself was transformed from an otherwise legitimate business to an enterprise within the meaning of the RICO statutes by virtue of the Defendants' acquisition and maintenance of control of the hotel and casino through a pattern of racketeering activity.

     223.    Each of the above-named Defendants acquired or maintained control over an enterprise engaged in interstate commerce through the following acts, which constitute a pattern of racketeering activity:

    a)   The Strollo Defendants and Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) violated 18.U.S.C. §1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to further a scheme intentionally designed to defraud Ambrosia by depriving it of its interest in the Puerto Rico Property. These wrongful acts are described with particularity in Paragraphs 24-31 of this Fourth Amended Complaint.

    b)   The Strollo Defendants and Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) violated 18 U.S.C.

-48-

§§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to further a scheme intentionally designed to deprive Ambrosia of the consideration for the purported sale of the Puerto Rico Property. These wrongful acts are described with particularity in Paragraphs 31-41 and 205-207 of this Fourth Amended Complaint.

c)  Defendant Pagés, Defendant Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) and Defendant Green Isle Partners (acting through its representative and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to further a scheme intentionally designed to induce Ambrosia to release its claims to the Puerto Rico Property by, among other things, concealing the continuing involvement of the Strollo Defendants in the project, misrepresenting the intent to dilute Ambrosia's interest in the project, and misrepresenting the financial viability of the project. These wrongful acts are described with particularity in Paragraphs 42-66, 68-73, 99-102 and 109-114 of this Fourth Amended Complaint.

d)  Defendants Pagés, Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) and Green Isle Partners (acting through its representatives and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to engage in a scheme intentionally designed to deprive Ambrosia of the benefit of the Note issued in conjunction with the 1994 Agreement by diluting

Ambrosia's collateral or security under that agreement. These wrongful acts are described with particularity in the Paragraphs 74-76, 105-115 and 157-163 of this Fourth Amended Complaint.

e) Upon information, Defendant Green Isle Partners (acting through its representatives and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to engage in a scheme designed to induce Ambrosia not to file suit in late 1999 by fraudulently representing their intent to engage in settlement negotiations and, ultimately, that a settlement had been reached. These wrongful acts are described with particularity in Paragraphs 77-98 of this Fourth Amended Complaint.

f) Defendant Green Isle Partners (acting through its agents, representatives and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by engaging in a scheme to defraud Ambrosia and other creditors by fraudulently concealing the mismanagement of the hotel and casino and the diversion of funds that should have been available for distributions to those creditors. These wrongful acts are described with particularity in Paragraphs 105-108 and 157-163 of this Fourth Amended Complaint.

224.    Each of the aforementioned Defendants intentionally participated in these related schemes to defraud Ambrosia.

225.    Ambrosia reasonably relied upon each of the material misrepresentations made in furtherance of these related schemes to defraud Ambrosia, which misrepresentations are described with particularity in the background section of this Fourth Amended Complaint.

226.    These Defendants engaged in a pattern of racketeering activity as set forth above.  However, all of the Defendants named in this Complaint benefited, with knowledge of the pattern of racketeering activity, by directly or indirectly acquiring interest in, and/or control of the enterprise.  All Defendants are thus liable under this claim.

227.    The percentage of the interest held by a given Defendant at any time varied, but it is believed and therefore averred that all of the Green Isle Defendants had some direct or indirect ownership interest in the enterprise.  It is further believed and therefore averred that Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E. had direct interest, and Defendants Ana Pagés and Isla Verde Beach Hotel & Casino, Inc. had indirect interests by virtue of their participation in Defendant Isla Verde Beach Hotel & Casino, S.E.  Further, it is averred that the Strollo Defendants, by virtue of the Side Agreements (and perhaps other agreements not yet discovered) had at least an indirect interest in the enterprise.

228.    The above-listed predicate acts are related to each other and part of a common plan in that they all had as their object the acquisition, control, and maintenance of control of the Puerto Rico Property and hotel and casino project being constructed thereon.

229.    The above-described predicate acts were continuous, related and occurred over an extended period of time such that they likely amount to a closed-ended scheme, although even after the filing of this action these Defendants, it is believed and therefore averred, have continued and may continue to conceal elements of their schemes and the benefits derived

therefrom, so it may be ongoing and open ended, subject to further discovery. Defendants Pagés, Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés), Green Isle Partners (acting through its representatives and general partners), and the Suollo Defendants (to the extent of their undisclosed interest) conducted an enterprise by associating together to achieve the common purpose of purchasing and obtaining control over the Puerto Rico Property and establishing, constructing and operating a hotel and casino on the Puerto Rico Property.

230.    The enterprise as described above is separate and distinct from the pattern of racketeering activity engaged in by the above-named Defendants, in that such acts exceeded the true purpose and scope of the project and ownership structure previously described. The pattern of racketeering activity by the above-named Defendants involved a fraudulent scheme whereby said Defendants wrongfully deprived Ambrosia of its rights to the Puerto Rico Property and the benefits of the 1994 Agreement and the 1999 Settlement.

231.    As a result of the racketeering activity described above, the above-named Defendants derived the following benefits:

    a)  Defendants Pagés and the Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) improperly received an interest in the Puerto Rico Property, and received monies and/or partnership interests for their attempted sale of the Puerto Rico Property. It is also believed that Defendant Pagés received fees for management and consulting services and tax credits;

    b)  Defendant Green Isle Partners (acting through its representatives and general partners) allegedly purchased the Puerto Rico Property as a result

of the racketeering activity, and were allowed to earn profits, disburse funds, make distributions, take tax credits and otherwise benefit their partners as a result of this activity;

c) The Strollo Defendants allegedly received monies or an interest for the purported sale of the Puerto Rico Property, and also received an interest in the ongoing project from the Side Agreements (and perhaps other agreements that are not yet discovered), all of which occurred with the full knowledge and consent of Defendant Pagés and Defendant Green Isle Partners.

232.    The above-described racketeering activity affected interstate commerce in that the negotiations of the purchase of the Puerto Rico Property, the establishment of the entities to manage the Puerto Rico Property, various representations and concealments relating to the 1994 Agreement, the Side Agreements, the represented status of Ambrosia's security, the non-dilution of Ambrosia's interests and the 1999 Settlement involved activities that took place by use of the mail and wires, and several activities (including various meetings) took place in several states and territories of the United States, including Puerto Rico, Florida, Pennsylvania, Ohio and New York.

233.    To the extent Defendants Aces PR, Inc., Rahn PR Ltd, S.E. or Green Isle GP Ltd, S.E. contend they did not directly participate in the predicate acts set forth herein, which is denied, these Defendants are nonetheless liable, jointly and severally, for the actions of and liability accruing to Defendant Green Isle Partners, insofar as they are general partners of that Defendant.

234.    Similarly, as general partner of Defendant Isla Verde Beach Hotel & Casino, S.E., Defendant Isla Verde Beach Hotel & Casino, Inc. is jointly and severally liable for the wrongful acts of Defendant Isla Verde Beach Hotel & Casino, S.E.

235.    The above-named Defendants have acquired and maintained control of the enterprise through a pattern of racketeering activity described above, in violation of 18 U.S.C. §1962(b).  As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. §1962(b), Ambrosia has been injured in its business and property in that:

a)    Ambrosia has lost its valuable rights and interest in the Puerto Rico Property;

b)    Ambrosia was not paid the consideration purportedly given for the Puerto Rico Property;

c)    Ambrosia has been deprived of the remedies and/or monies provided for under the 1994 Agreement; and

d)    Ambrosia has been deprived of the remedies and/or monies provided for in the 1999 Settlement.

WHEREFORE, Ambrosia requests damages against all of the above-named Defendants, jointly and severally, in an amount exceeding $18,000,000.00, trebled, plus interest, costs and attorney's fees.

## COUNT XXVI
### (Claim Based on 18 U.S.C. §1962(c))

236.     Paragraphs 1-219 are incorporated by reference as if fully set forth herein.

237.     The Defendants that participated in the scheme to defraud Ambrosia that gives rise to this claim are: Defendants Strollo, Malizia and Small Corporate Services, Inc.(the "Strollo Defendants"), Defendant Pagés, Defendant Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) and Defendant Green Isle Partnership (acting through its representatives and general partners). There may be other wrongdoers, other than the Defendants listed herein, which will be determined through further discovery.

238.     The victim of the scheme to defraud was Ambrosia Coal & Construction Company (in its own right and as assignee of the rights of the Garita entities).

239.     The association in fact of the above-named Defendants and their entities constitutes an enterprise engaged in and whose activities affect interstate commerce. In addition, the hotel and casino itself was transformed from an otherwise legitimate business to an enterprise within the meaning of the RICO statutes by virtue of the Defendants' conduct of or and participation in the affairs of the hotel and casino through a pattern of racketeering activity.

240.     Each of the above-named Defendants conducted or participated in the affairs of an enterprise engaged in interstate commerce through the following acts, which constitute a pattern of racketeering activity:

a)     The Strollo Defendants and Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) violated 18.U.S.C. §1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to further a scheme intentionally designed to defraud Ambrosia by

depriving it of its interest in the Puerto Rico Property. These wrongful acts are described with particularity in Paragraphs 24-31 of this Fourth Amended Complaint.

b) The Strollo Defendants and Defendants Pagés and Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to further a scheme intentionally designed to deprive Ambrosia of the consideration for the purported sale of the Puerto Rico Property. These wrongful acts are described with particularity in Paragraphs 31-41 and 205-207 of this Fourth Amended Complaint.

c) Defendant Pagés, Defendant Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) and Defendant Green Isle Partners (acting through its representative and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to further a scheme intentionally designed to induce Ambrosia to release its claims to the Puerto Rico Property by, among other things, concealing the continuing involvement of the Strollo Defendants in the project, misrepresenting the intent to dilute Ambrosia's interest in the project, and misrepresenting the financial viability of the project. These wrongful acts are described with particularity in Paragraphs 42-66, 68-73, 99-102 and 109-114 of this Fourth Amended Complaint.

    d) Defendants Pagés, Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) and Green Isle Partners (acting through its representatives and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to engage in a scheme intentionally designed to deprive Ambrosia of the benefit of the Note issued in conjunction with the 1994 Agreement by diluting Ambrosia's collateral or security under that agreement. These wrongful acts are described with particularity in the Paragraphs 74-76, 105-115 and 157-163 of this Fourth Amended Complaint.

    e) Upon information, Defendant Green Isle Partners (acting through its representatives and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by using the mails and wires to engage in a scheme designed to induce Ambrosia not to file suit in late 1999 by fraudulently representing their intent to engage in settlement negotiations and, ultimately, that a settlement had been reached. These wrongful acts are described with particularity in Paragraphs 77-98 of this Fourth Amended Complaint.

    f) Defendant Green Isle Partners (acting through its agents, representatives and general partners) violated 18 U.S.C. §§1341 and 1343 (prohibiting mail and wire fraud) by engaging in a scheme to defraud Ambrosia and other creditors by fraudulently concealing the mismanagement of the hotel and casino and the diversion of funds that should have been available for

distributions to those creditors. These wrongful acts are described with particularity in Paragraphs 105-108 and 157-163 of this Fourth Amended Complaint.

241. Each of the aforementioned Defendants intentionally participated in these schemes to defraud Ambrosia.

242. Ambrosia reasonably relied upon each of the material misrepresentations made in furtherance of these schemes to defraud Ambrosia, which misrepresentations are described with particularity in the background section of this Fourth Amended Complaint.

243. These Defendants engaged in a pattern of racketeering activity as set forth above. However, all of the Defendants named in this Complaint benefited, with knowledge of the pattern of racketeering activity, by directly or indirectly acquiring interest in, and/or control of the enterprise. All Defendants are thus liable under this claim.

244. The above-described predicate acts are related to each other and part of a common plan in that they all had as their object the maintenance of control of the Puerto Rico Property and the hotel and casino being constructed thereon.

245. The above-described predicate acts were continuous, related and occurred over an extended period of time such that they likely amount to a closed-ended scheme, although even after the filing of this action these Defendants, it is believed and therefore averred, have continued and may continue to conceal elements of their schemes and the benefits derived therefrom, so it may be ongoing and open ended, subject to further discovery. Defendants Pagés, Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés), Green Isle Partners (acting through its representatives and general partners), and the Strollo Defendants (to the extent

of their undisclosed interest) conducted an enterprise by associating together to achieve the common purpose of purchasing and obtaining control over the Puerto Rico Property and establishing, constructing and operating a hotel and casino on the Puerto Rico Property.

246.    At all relevant times, Defendant Green Isle Partners (acting through its representatives and general partners) maintained a management and/or ownership role with respect to the enterprise.  Defendant Pagés and, upon information, Defendant Isla Verde Beach Hotel & Casino, S.E. had a partnership interest or interest in Defendant Green Isle Partners (and possibly other members of the Green Isle Defendants).  It is further believed, upon information, that Defendant Pagés, in addition to his ownership interest, was being paid as an employee of the enterprise, and carried out consulting and management functions for the enterprise.  Moreover, through the Side Agreements (and perhaps other agreements not yet discovered) the Strollo Defendants have arranged, with the knowledge of Defendant Pagés and Defendant Green Isle Partners, to maintain or receive an ownership interest and/or distribution from the enterprise.

247.    The enterprise as described above is separate and distinct from the pattern of racketeering activity engaged in by the above-named Defendants, in that such acts exceeded the true purpose and scope of the project and ownership structure previously described.  The pattern of racketeering activity by the above-named Defendants involved a fraudulent scheme whereby said Defendants purchased, sold and exercised control over the Puerto Rico Property, and maintained control over the Puerto Rico Property, to the injury and detriment of Plaintiff's interest.

248.    As a result of the racketeering activity described above, the above-named Defendants derived the following benefits:

a) Defendants Pagés and the Isla Verde Beach Hotel & Casino, S.E. (acting through Defendant Pagés) improperly received an interest in the Puerto Rico Property, and received monies and/or partnership interests for their attempted sale of the Puerto Rico Property. It is also believed that Defendant Pagés received fees for management and consulting services and tax credits;

b) Defendant Green Isle Partners (acting through its representatives and general partners) allegedly purchased the Puerto Rico Property as a result of the racketeering activity, and were allowed to earn profits, disburse funds, make distributions, take tax credits and otherwise benefit their partners as a result of this activity;

c) The Strollo Defendants allegedly received monies or an interest for the purported sale of the Puerto Rico Property, and also received an interest in the ongoing project from the Side Agreements (and perhaps other agreements that are not yet discovered), all of which occurred with the full knowledge and consent of Defendant Pagés and Defendant Green Isle Partners.

249. The above-described racketeering activity affected interstate commerce in that the negotiations of the purchase of the Puerto Rico Property, the establishment of the entities to manage the Puerto Rico Property, various representations and concealments relating to the 1994 Agreement, the Side Agreements, the represented status of Ambrosia's security, the non-dilution of Ambrosia's interests and the 1999 Settlement involved activities that took place by

use of the mail and wires, and several activities (including various meetings) took place in several states and territories of the United States, including Puerto Rico, Florida, Pennsylvania, Ohio and New York.

250.    To the extent Defendants Aces PR, Inc., Rahn PR Ltd, S.E. or Green Isle GP Ltd, S.E. contend they did not directly participate in the predicate acts set forth herein, which is denied, these Defendants are nonetheless liable, jointly and severally, for the actions of and liability accruing to Defendant Green Isle Partners, insofar as they are general partners of that Defendant.

251.    Similarly, as general partner of Defendant Isla Verde Beach Hotel & Casino, S.E., Defendant Isla Verde Beach Hotel & Casino, Inc. is jointly and severally liable for the wrongful acts of Defendant Isla Verde Beach Hotel & Casino, S.E.

252.    The above-named Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity described above, in violation of 18 U.S.C. §1962(c).  As a direct and proximate result of these Defendants' racketeering activities, Ambrosia has been injured in its business and property in that:

a)  Ambrosia has lost its valuable rights and interest in the Puerto Rico Property, which property has been valued in at least the amount set forth in paragraph 100 above;

b)  Ambrosia was not paid the consideration purportedly given for the Puerto Rico Property;

c)  Ambrosia has been deprived of the remedies and/or monies provided for

under the 1994 Agreement; and

d)  Ambrosia has been deprived of the remedies and/or monies provided for

in the 1999 Settlement.

WHEREFORE, Ambrosia requests damages against all of the above-named

Defendants, jointly and severally, in an amount exceeding $18,000,000.00, trebled, plus interest,

costs and attorney's fees.


### COUNT XXVII
### (Claim Based on 18 U.S.C. §1962(d))

253.    Paragraphs 1-219 are incorporated by reference as if fully set forth herein.

254.    As more fully set forth above, the Defendants agreed and conspired to

violate 18 U.S.C. §§1962(b) and (c).  Specifically:

a)  The Strollo Defendants and Defendants Pagés and Isla Verde Beach Hotel

& Casino S.E. agreed to work together and engage in activities that would

deprive Ambrosia of its rights and interest in the Puerto Rico Property and

its rights to consent to the sale of the Puerto Rico Property;

b)  The Green Isle Defendants, the Isla Verde Defendants and Defendants

Strollo and Malizia worked together and agreed to misrepresent and

conceal the role of the Strollo Defendants in the hotel and casino project

and the existence of Side Agreements evidencing the role of the Strollo

Defendants;

-62-

    c) Defendants Pagés and Green Isle Partners worked together and agreed to engage in activities and take steps that would misrepresent and/or conceal the financial viability of the hotel and casino project in order to induce Ambrosia to enter into the 1994 Agreement;

    d) Defendants Pagés, Isla Verde Beach Hotel and Casino, S.E. and Green Isle Partners worked together and agreed to engage in activities to conceal the dilution or devaluation of Ambrosia's security and other remedies under the 1994 Agreement; and

    e) Defendants Pagés and Green Isle Partners worked together and agreed to engage in activities in order to alienate property and money in fraud of its creditors, including Ambrosia.

255. Said Defendants have intentionally conspired and agreed to directly and indirectly use or invest income or another property interest that was derived from a pattern of racketeering activity in an interstate enterprise, acquire and maintain interest in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Said Defendants knew that their predicate acts were part of a pattern of racketeering activity, and agreed to the commission of those acts to further the schemes described above.

256. As a redirect and proximate result of said Defendants' racketeering activities and conspiracy, Ambrosia has been injured in its business and property in that:

    a) Ambrosia has lost its valuable rights and interest in the Puerto Rico Property;

b) Ambrosia was not paid the consideration purportedly given for the Puerto Rico Property;

c) Ambrosia has been deprived of the remedies and/or monies provided for under the 1994 Agreement; and

d) Ambrosia has been deprived of the remedies and/or monies provided for in the 1999 Settlement.

WHEREFORE, Ambrosia requests damages against all of the above-named Defendants, jointly and severally, in an amount exceeding $18,000,000.00, trebled, plus interest, costs and attorney's fees.

**JURY TRIAL DEMANDED**

Respectfully submitted,

By: _____

ARNALDO VÉLEZ, P.A. (FL Bar #149589)
Attorneys for Plaintiff
35 Almeria Avenue
Coral Gables, FL  33134
(305) 461-9499 (phone)
(305) 461-9498 (fax)
e-mail: avelez1235@aol.com


Frank G. Salpietro (PA Bar #47154)
MEYER UNKOVIC & SCOTT LLP
1300 Oliver Building
Pittsburgh, PA  15222
(412) 456-2800 (phone)
(412) 456-2864 (fax)
e-mail: fgs@muslaw.com
*Admitted Pro Hac Vice*

-64-

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was on February 24, 2005, served upon those persons listed on the attached Service List.

ARNALDO VELEZ, P.A.
Co-counsel for Ambrosia & Garita
35 Almeria Avenue
Coral Gables, FL 33134
Tel: 305-461-9499
Fax: 305-461-9498
-and-
Frank G. Salpietro
MEYER UNKOVIC & SCOTT LLP
1300 Oliver Building
Pittsburgh, PA 15222
Tel:  412-456-2800
Fax: 412-456-2864

BY:_____
        Arnaldo Velez

## SERVICE LIST

Mr. Glenn Waldman
Waldman Feluren Hildebrandt
   & Trigoboff, P.A.
Beacon Point II - Suite 202
2200 N. Commerce Parkway
Weston, FL  33326-3258
Tel: 954-467-8600/Fax: 954-467-6222
*Counsel for Green Isle Partners, et al.*

Mr. George Malizia
2867 S.W. Mariposa Circle
Palm City, FL 34990
*Pro Se*

Mr. Joseph Segeleon
742 Hickory Oak Holw
Augusta, GA 30907-3048
*Pro Se*

Ms. Ina M. Berlingeri-Vincenty
Goldman, Antonetti &
      Cordova, P.S.C.
P. O. Box 70364
San Juan, P.R.  00936-8364
Tel: 787-759-8000/Fax: 787-759-9177
e-mail: iberlingeri@gaclaw.com

Mr. Ricardo A. Reyes
Tobin & Reyes, P.A.
7251 W. Palmetto Park Road, Suite 205
Boca Raton, Florida 33433
(Fax: 561-620-0657)

Mr. Charles Throckmorton
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134
Tel: 305-372-1800/Fax: 305-372-3508
-and-
Mr. Kenneth C. Smuzynski
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005-5901
Tel: 202-434-5000/Fax: 202-434-5029
*Co-counsel for Ritz-Carlton*

Mr. Lenine Strollo, *pro se*
Federal Reg. No. 32830-060
c/o Inmate Central Monitoring Section
Federal Bureau of Prisons
320 First St., N.W., Room 524
Washington, D.C.  20534

Small Corporate Services, Inc.
c/o Mr. Lenine Strollo
Federal Reg. No. 32830-060
c/o Inmate Central Monitoring Section
Federal Bureau of Prisons
320 First St., N.W., Room 524
Washington, D.C.  20534

<u>EXHIBIT C</u>

**RESPONSE TO RICO STANDING ORDER**

1.    State whether the alleged unlawful conduct is in violation of 18 U.S.C.A. §1962(a), (b), (c), and/or (d).

    18 U.S.C.A. §1962(c) (Complaint at Count I)

    18 U.S.C.A. §1962(d) (Complaint at Count II)

2.    List each defendant and state the alleged misconduct and basis of liability of each defendant.

    David Warren (Complaint at ¶¶ 24, 36, 39, 41, 42, 44, 47, 52, 54, 56, 58, 61, 77, 81, 82, 84, 88, 89, 92, 93, 101, 111)

    Milton McGregor (Complaint at ¶¶ 2, 3, 30, 36, 61, 71, 72, 75, 76, 77, 78, 79, 80, 83, 86, 88, 89, 90, 92, 93, 95, 97, 98, 99, 101)

    VictoryLand (Complaint at ¶¶ 2, 3, 30, 36, 61, 71, 72, 75, 76, 78, 80, 83, 85, 86, 88-90, 92, 93, 95, 97, 98, 101, 108)

3.    List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.

    Fred Gray Jr. (Complaint at ¶¶ 30, 36, 39, 44, 54, 61, 69, 71, 72, 75, 76-79, 81, 82, 84, 86, 88, 89, 90, 92, 93, 95, 97, 99, 101, 111)

4.    List the alleged victims and state how each victim was allegedly injured.

    Lucky Palace, LLC (Complaint at ¶¶ 106-12)

    The Charities (Complaint at ¶¶ 106-12)

5.    Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  A description of the pattern of racketeering shall include the following information:

    a.    List the alleged predicate acts and the specific statutes which were allegedly violated;

          (Complaint at ¶¶ 67, 71-72)

    b.    Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;

(Complaint at ¶¶ 64-95)

c.    If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity [sic]." Fed. R. Civ. P. 9(b). Identify the time, place and contents of the alleged misrepresentations, and the identity of person to whom and by whom the alleged misrepresentations were made;

N/A

d.    State whether there has been a criminal conviction for violation of the predicate acts;

No

e.    State whether civil litigation has resulted in a judgment in regard to the predicate acts:

No

f.    Describe how the predicate acts form a "pattern of racketeering activity;" and

(Complaint at ¶¶ 96-97; *see generally id.* at ¶¶ 64-98)

g.    State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.

(Complaint at ¶¶ 2-3, 71-72, 98, 100; *see generally id.* at ¶¶ 64-98)

6.    Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:

a.    State the names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;

(Complaint at ¶ 99)

b.    Describe the structure, purpose, function and course of conduct of the enterprise;

(Complaint at ¶¶ 99-101)

c.    State whether any defendants are employees, officers or directors of the alleged enterprise;

(Complaint at ¶ 99)

d.    State whether any defendants are associated with the alleged enterprise;

(Complaint at ¶ 99)

    e.    State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and

(Complaint at ¶ 99)

    f.    If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

(Complaint at ¶ 101)

7.    State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.

(Complaint at ¶¶ 98-101)

8.    Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.

(Complaint at ¶ 98)

9.    Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.

(Complaint at ¶¶ 98, 100)

10.    Describe the effect of the activities of the enterprise on interstate or foreign commerce.

(Complaint at ¶¶ 102-05)

11.    If the complaint alleges a violation of 18 U.S.C.A. §1962(a), provide the following information:

    a.    State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and

    N/A

    b.    Describe the use or investment of such income.

    N/A

12.      If the complaint alleges a violation of 18 U.S.C.A. §1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.

      N/A

13.      If the complaint alleges a violation of 18 U.S.C.A. §1962(c), provide the following information:

      a.      State who is employed by or associated with the enterprise.

        (Complaint at ¶ 99)

      b.      State whether the same entity is both the liable "person" and the "enterprise" under 18 U.S.C.A. §1962(c).

        (Complaint at ¶¶ 99, 101)

14.      If the complaint alleges a violation of 18 U.S.C.A. §1962(d), describe with detail the alleged conspiracy.

      (Complaint at ¶¶ 77-95)

15.      Describe the alleged injury to business or property.

      (Complaint at ¶¶ 106-12)

16.      Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

      (Complaint at ¶¶ 106-12)

17.      List the damages sustained by reason of the violation of 18 U.S.C.A. §1962, indicating the amount for which each defendant is allegedly liable.

      (Complaint at ¶¶ 108-09)  The amount of actual damages is currently estimated to be $136,227,000 for Lucky Palace and $2,142,000 for the Charities.

18.      List all other federal causes of action, if any, and provide the relevant statute numbers.

      (Complaint at Counts III and IV)

19.      List all pendent state claims, if any.

      (Complaint at Count V)

20.      Provide any additional information that you feel would be helpful to the Court in processing your RICO claim.

All paragraphs of the Complaint that have not been specifically identified herein.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4   MACON COUNTY INVESTMENTS,)
                              )
 5   INC.; REACH ONE, TEACH   )
                              )
 6   ONE OF AMERICA, INC.,    )
                              )
 7        Plaintiffs,    )
                         )
 8   -vs-                )   CASE NO.
                         )
 9   SHERIFF DAVID WARREN,   ) 3:06-CV-224-WKW
                         )
10   in his official capacity )
                         )
11   as the SHERIFF OF MACON )
                         )
12   COUNTY, ALABAMA,        )
                         )
13        Defendant.   )
14         S T I P U L A T I O N S
15        IT IS STIPULATED AND AGREED, by and
16   between the parties through their respective
17   counsel, that the deposition of:
18              DAVID M. WARREN,
19   may be taken before Belinda S. Brewster,
20   Commissioner and Notary Public for the State of
21   Alabama at Large, on the 15th day of August,
22   2006, commencing at approximately 9:10 a.m., at
23   the law offices of Thomas, Means, Gillis & Seay,
```

Page 2

```
 1   P.C., 3121 Zelda Court, Montgomery, Alabama;
 2   said deposition taken pursuant to the Federal
 3   Rules of Civil Procedure.
 4        IT IS STIPULATED AND AGREED that it
 5   shall not be necessary for any objections to be
 6   made by counsel to any questions, except as to
 7   form or leading questions, and that counsel for
 8   the parties may make objections and assign
 9   grounds at the time of the trial, or at the time
10   said deposition is offered in evidence, or prior
11   thereto.
12        In accordance with Rule 5(d) of The
13   Alabama Rules of Civil Procedure, as amended,
14   effective May 15, 1988, I, Belinda S. Brewster,
15   am hereby delivering to Kenneth L. Thomas the
16   original transcript of the oral testimony of
17   David M. Warren taken on the 15th day of August,
18   2006, along with exhibits.
19        Please be advised that this is the
20   same and not retained by the Court Reporter, nor
21   filed with the Court.
22
23
```

Page 3

```
 1        A P P E A R A N C E S
 2   KENNETH L. THOMAS and RAMADANAH SALAAM-JONES,
 3        Attorneys-at-Law, of the law firm of
 4        THOMAS, MEANS, GILLIS & SEAY, P.C.,
 5        3121 Zelda Court, Montgomery,
 6        Alabama 36106; appearing as counsel
 7        for the Plaintiffs.
 8   GARY A. GRASSO, Attorney-at-Law, of the law firm
 9        of GRASSO DUNLEAVY, P.C., 7020
10        County Line Road, Suite 100, Burr
11        Ridge, Illinois 60527; appearing as
12        counsel for the Plaintiffs.
13   FRED D. GRAY and FRED D. GRAY, JR.,
14        Attorneys-at-Law, of the law firm
15        of GRAY, LANGFORD, SAPP, McGOWAN,
16        GRAY & NATHANSON, 104 W. Northside
17        Street, Tuskegee, Alabama 36083;
18        appearing as counsel for the
19        Defendant.
20   ALSO PRESENT:
21   CHARLANNA SPENCER, SASSER, BOLTON, STIDMAN &
22        SEFTON, P.C.
23   GREG A. CARR, SR., Attorney-at-Law
```

Page 4

```
 1        A P P E A R A N C E S (Cont'd.)
 2   REVEREND WALTER WALKER, REACH ONE, TEACH ONE
 3   FRANK THOMAS, MACON COUNTY INVESTMENTS, INC.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

1 (Pages 1 to 4)

Page 261

1    A.    At that time.
2    Q.    So, in July of 2005, it would be a
3  fair assessment that there would be no way that
4  15 charities could apply within your rules for a
5  Class B bingo license?
6    A.    Well, Mr. Thomas had always
7  contended that he wanted to just play for one
8  charity, and I'm not sure if that was his reason
9  for submitting the one he had.
10    Q.    But under the rules that were in
11  force in all of 2005, one charity under the
12  rules could not get a Class B bingo license to
13  operate Class B bingo gaming?
14    A.    Yes.
15    Q.    Okay.  So, what I'm trying to make
16  sure I clearly understand from you is that in
17  July of 2005 there were more than 45 charities
18  with licenses, Class B licenses?
19    A.    I'm not sure.
20    Q.    Well, if there were -- and I
21  represent to you that there were -- that means,
22  based on your rules and regulations that you
23  promulgated, no 15 charities could come together

Page 262

1  in order to meet the requirement that you had
2  set forth?
3    A.    Exactly.
4    Q.    Then the second part of that, you
5  had to have invested in a facility and paid at
6  least $15 million --
7    A.    Uh-huh (affirmative).
8    Q.    -- before you would even consider
9  an application; is that correct?
10    A.    That's true.
11    Q.    Let me ask you this, sheriff.  Just
12  as a person, not as a sheriff.
13          Would you put up a building for $15
14  million and hope that the sheriff will grant you
15  a license?  Just as a person.
16    A.    Probably not.
17    Q.    Okay.  Now, sheriff, if you would,
18  in July of 2005 how could, conceivably and
19  realistically, a nonprofit organization obtain a
20  Class B bingo license?
21          MR. GRAY, JR.:  You mean other than
22  the way that the Class B license holders that
23  got them in 2005 did it?  You want to know how

Page 263

1  did they do it?
2          MR. THOMAS:  No.  My question to
3  him was straightforward, and I think he
4  understood it.
5    Q.    Sheriff?
6    A.    How to -- after?
7    Q.    In July of 2005, with all of the
8  licenses that you had already issued -- which I
9  represent to you were more than 45 because you
10  only would allow 60 to be outstanding.
11          As a matter of fact, in July of
12  '05, a nonprofit organization could not get a
13  Class B license?
14    A.    A nonprofit organization --
15    Q.    Nonprofit.
16    A.    -- could not get a license in 2005?
17    Q.    July of 2005.
18    A.    In July of 2005.  A nonprofit
19  organization may have been able to get a license
20  in 2005.
21    Q.    Under what conditions?
22    A.    A nonprofit -- a nonprofit -- if
23  there were, as you said, around 45 or less than

Page 264

1  45 -- it wasn't 60.  So, a Class B license could
2  be issued to a charity.
3    Q.    But isn't it a fact that in that
4  instance that charity would be limited to the
5  one qualified location, which was VictoryLand?
6    A.    Yes.
7    Q.    Currently, as we have just gone
8  through all of the licenses for 2006, all 60 of
9  the limit that you imposed have been issued?
10    A.    Yes.
11    Q.    So, at this point in time a
12  nonprofit organization could not get a Class B
13  license under any set of circumstances?
14    A.    At this point in time.
15    Q.    Okay.  And an operator could not
16  obtain a qualified location status until they
17  built a facility and had paid at least $15
18  million for it?
19    A.    Yes.
20    Q.    Let me ask you this.  The Reach
21  One, Teach One application and the materials
22  that were submitted by MCI, they had -- in order
23  to have obtained a public liability insurance,

66 (Pages 261 to 264)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 321

1       MR. GRAY:  When was it?
2       MR. GRAY, JR.:  What's the date of
3   this?  Mr. Glasso, what's the date of this?
4       MR. GLASSO:  I don't have the date
5   with me.
6       MR. GRAY, JR.:  Okay.
7       MR. THOMAS:  Why don't you mark
8   that.
9       (Whereupon, said document was
10      marked for identification as
11      Plaintiffs' Exhibit No. 15 to the
12      deposition of David M. Warren.)
13      Q.    Sheriff, let me show you
14  Plaintiffs' Exhibit 15.
15      A.    Uh-huh (affirmative).
16      Q.    And this is a photo wherein I see
17  you are present.  Do you recall that particular
18  time?
19      A.    Yes.
20      Q.    And apparently you are
21  participating in the ribbon cutting, which was
22  held at VictoryLand on March 22nd.  Do you
23  recall what year that was?

Page 322

1       A.    No.
2       Q.    You were made aware that this new
3   wing that had been added to VictoryLand would
4   have 700 new state-of-the-art bingo machines?
5       A.    Yes.
6       Q.    Bringing the total machines for
7   charity bingo at VictoryLand to about 2,500?
8       A.    Yes.
9       MR. GRAY:  That's 16?
10      MR. THOMAS:  This is 15.
11      MR. GRAY, JR.:  Fifteen.
12      Q.    (By Mr. Thomas)  And were some of
13  these machines put in trailers to your
14  knowledge?
15      A.    They were put in structures.
16      Q.    But were the structures trailers or
17  prefabs?
18      A.    It could have been.
19      MR. THOMAS:  We offer Plaintiffs'
20  Exhibit 15 to be made a part of the deposition.
21      Q.    Sheriff, how does that reconcile
22  with your efforts to limit the expansion of
23  Class B bingo gaming in Macon County?

Page 323

1       A.    That is one location.
2       Q.    One location that is expanding?
3       A.    Uh-huh (affirmative).
4       Q.    All right.  What's the difference
5   between one location expanding and another -- I
6   mean, I guess what I'm trying to say, if the
7   Attorney General has expressed concerns about
8   the expansion of gambling in Alabama based on
9   your interpretation --
10      A.    Right.
11      Q.    -- and you're allowing VictoryLand
12  to add 700 more machines, isn't it somewhat
13  inconsistent?
14      A.    It could be interpreted as
15  inconsistent.
16      MR. THOMAS:  Okay.  Let's do this.
17      MR. GRAY, JR.:  Have you got
18  anything else?
19      MR. THOMAS:  Hold on a second,
20  lawyer.  Just hold your --
21      MR. GRAY, JR:  Okay.  We've been
22  here for eight hours.
23      MR. THOMAS:  Yeah.  We've all been

Page 324

1   here.  And we're going to be here on Friday.
2       I want to go ahead and make sure
3   that I've had made a part of his deposition all
4   exhibits.
5       MR. GRAY, JR.:  You just --
6       MR. THOMAS:  Slow down, lawyer.
7   Another minute ain't going to hurt you.  We've
8   been doing petty good all day.
9       And, sheriff, let me just check my
10  notes.  I don't have anything else, sheriff, to
11  ask you.
12      MR. GRAY, JR.:  Thank you.
13      MR. THOMAS:  Thank you, sheriff.
14      THE WITNESS:  All right.  You're
15  welcome.
16      FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

81 (Pages 321 to 324)

## BINGO OPERATIONS AND LEASE AGREEMENT

THIS BINGO OPERATIONS AND LEASE AGREEMENT (the "Agreement") is made and entered into this _8_ day of _December_, 200_3_, by and between _Tuskegee Humanitarian_, a _Multicultural_ nonprofit organization (hereinafter called the "Licensee"), and **Macon County Greyhound Park, Inc. d/b/a "VictoryLand"**, an Alabama corporation (hereinafter called the "Operator").

## W I T N E S S E T H:

WHEREAS, the Licensee has applied for a Class B License by the Sheriff of Macon County, Alabama, to conduct bingo games, all as envisioned by Act No. 2003-124, Regular Session, 2003 (the "Act"), which constitutional amendment was approved by a referendum of the voters of Macon County, Alabama, on November 4, 2003;

WHEREAS, the Licensee may operate bingo games pursuant to the Act and rules and regulations (the "Regulations") promulgated thereunder by the Sheriff of Macon County, Alabama, on owned or leased premises and/or have another business entity operate the bingo games or concessions on behalf of the Licensee in consideration of the payment by the Licensee of rental fees for leased premises and/or consulting fees for the operation and conduct of the bingo games by the other business entity acting on behalf of the Licensee under the Act;

NOW, THEREFORE, in consideration of the terms and conditions of this Agreement and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties hereby agree as follows:

1.    <u>Premises</u>.  In consideration of the rental fees to be paid by the Licensee to the Operator as provided in paragraph 4 below of this Agreement, the Licensee hereby leases from the Operator and the Operator hereby leases to the Licensee on a non-exclusive basis (along with other Class B licensees) and on the terms and conditions as hereinafter provided that certain real and personal property as described in <u>Exhibit "A"</u> attached hereto and made a part hereof, located at the VictoryLand premises in Macon County, Alabama (the "Leased Premises").  Pursuant to the Act, the Licensee hereby grants to the Operator during the term of this Agreement a nonexclusive right to use the Licensee's name in the operating and advertising of bingo games conducted by the Operator on behalf of the Licensee and in accordance with the terms and conditions of the Act, the Regulations, the Class B License held by the Licensee, and this Agreement.

2.    <u>Improvements</u>.  The Licensee has inspected the Leased Premises and by the execution of this Agreement accepts the Leased Premises in their present condition.

3.    <u>Term</u>.  Subject to earlier termination as hereinafter provided, the Term of this Agreement shall be for Twenty (20) years, said Term to commence on _December 8_, 200_3_, and to end on _December 8_, 202_3_.

---

THR00008

4.   <u>Lease Rent: Operation and Consulting Fees</u>.  The Licensee agrees to pay to the Operator a combined rental and consulting fee during the Term of this Lease as hereinafter provided. In consideration thereof, the Operator shall provide the Leased Premises on a non-exclusive basis during the Term hereof for the operation and conduct of bingo games by the Operator for and on behalf of the Licensee in accordance with this Agreement and as envisioned by the Act, the Regulations, and the Class B License issued to the Licensee pursuant thereto.  The Operator may conduct bingo games for and on behalf of the Licensee during such scheduled Bingo Sessions (as hereinafter defined) as the Operator shall designate from time to time in the sole discretion of the Operator.  Also, the Operator shall provide its employees, equipment, including bingo game equipment, facilities, supplies, insurance, utilities, and other resources to conduct the bingo games for the Licensee.  Further, during the term of this Agreement, the Operator shall comply with all requirements of a "qualified location" for the holder of a Class B License as envisioned by the Regulations.

From the Gross Receipts (as hereinafter defined), the Operator shall pay all of its overhead and operating expenses in the operation and conduct of the bingo games conducted on behalf of the Licensee on the Leased Premises during the Term hereof, including but not limited to, the annual Class B license fee, the employee salaries of the Operator, advertising, real and personal property taxes, insurance, utilities, bingo game equipment, computer hardware and software support, paper costs, supplies, repairs, accounting, interest on any debt service associated with the Leased Premises, and all other operating expenses of the Operator associated with the operation and conduct of such bingo games.  In consideration of the use of the Leased Premises and the operations and consulting services provided by the Operator in the conduct of the bingo games on behalf of the Licensee, the Licensee shall pay a monthly lease and consulting fee to the Operator by the Operator retaining an amount equal to (a) the Gross Receipts (as hereinafter defined), <u>minus</u> (b) the operating and overhead expenses of the Operator in conducting the bingo games on behalf of the Licensee for each Bingo Session (as hereinafter defined), and further <u>minus</u> (c) the Bingo Session Charity Fee (as hereinafter defined in paragraph 5 below) *multiplied by* the number of Bingo Sessions operated by the Operator on behalf of the Licensee in the applicable calendar month.

For purposes of this Agreement, the term "Gross Receipts" shall mean the total monies collected by the Operator from the conduct of bingo games (and concessions, if applicable) after deduction for any applicable taxes on said Gross Receipts (other than any income tax of the Operator) and payouts to winners for the Bingo Sessions designated to be for the benefit of the Licensee by the Operator in the applicable calendar month.  Also, for purposes of this Agreement, the term "Bingo Session" or "Bingo Sessions" shall mean the time periods designated by the Operator from time to time (and as allowed by the Regulations) during any given calendar month whereby the Operator will conduct bingo games on behalf of the Licensee at the Leased Premises in accordance with the Act, the Regulations and the Class B License.

THR00009

5.    <u>Bingo Session Charity Fee</u>. For purposes of this Agreement, the term "Bingo Session Charity Fee" shall mean the cash sum of One Thousand Five Hundred Dollars ($1,500). The Operator shall pay to the Licensee within Fourteen (14) calendar days following the end of the applicable calendar month an amount equal to (x) the Bingo Session Charity Fee, *multiplied by* (y) the number of Bingo Sessions conducted by the Operator on behalf of the Licensee for the given calendar month.

6.    <u>Use Restrictions</u>. The use of the Leased Premises by the Operator for and on behalf of the Licensee for the operation and conduct of bingo games and concessions during each Bingo Session at the Leased Premises shall be in accordance with the Act, the Regulations and the Class B License issued to the Licensee, as well as the terms and conditions of this Agreement. The Licensee hereby acknowledges and agrees that other portions of the Leased Premises, including but not limited to the clubhouse, parking facilities, restaurants, kitchens, hallways and restrooms, shall be utilized by racetrack employees and customers of the Operator during the operation of bingo games on behalf of the Licensee at the Leased Premises. The Licensee further hereby acknowledges and agrees that the Leased Premises will also be used during the Term of this Agreement by the Operator for other Class B License holders during Bingo Sessions designated by the Operator for such other nonprofit organizations.

7.    <u>Repairs</u>. The Operator, during the Term of this Agreement, shall, at its expense, make routine repairs as shall be reasonably necessary to keep said Leased Premises (including but not limited to all bingo game equipment, computer hardware and software, heating and air conditioning and plumbing) in good condition and repair, reasonable wear and tear excepted. The Operator further agrees that all damage or injury done to the Leased Premises by any person who may be in or upon the Leased Premises, except the Licensee, the Licensee's agents, servants and employees, shall be repaired by the Operator at its expense.

8.    <u>Assignment and subletting</u>. The Licensee may not assign this Agreement or sublet or assign its interest in the Leased Premises, the Licensee hereby agreeing that this Agreement must be in compliance with the Act, the Regulations, the Class B License and the terms and conditions of this Agreement which require the personal consulting and operations services of the Operator and its employees.

9.    <u>Insolvency</u>. If any proceedings in bankruptcy or insolvency be filed against the Licensee or if any writ of attachment or writ of execution be levied upon the interest herein of the Licensee and such proceedings or levy shall not be released or dismissed within 60 days thereafter, or if any sale of the leasehold interest hereby created or any part thereof should be made under any execution or other judicial process, or if the Licensee shall make any assignment for the benefit of creditors or shall voluntarily institute bankruptcy or insolvency proceedings, the Operator may, at the Operator's option, terminate this Agreement immediately, including the lease provisions for the Leased Premises.

THR00010

10.     __Default by Operator__.  If the Operator fails or neglects to perform, meet or observe any of the Operator's obligations hereunder and such failure or neglect shall continue for a period of thirty (30) calendar days after the Operator's receipt of written notice thereof from the Licensee to the Operator, then the Licensee at any time thereafter prior to the cure of such default, by written notice to the Operator, may lawfully declare the termination hereof.   Notwithstanding any other provisions of this Agreement, where the curing of an alleged default requires more than payment of money, and the work of curing said default cannot reasonably be accomplished within the time otherwise permitted herein, and where the Operator has commenced upon the said work of curing said default and is diligently pursuing same, then the Operator shall be entitled to reasonable time extensions to permit the completion of said work of curing said default, as a condition precedent to termination of this Agreement by the Licensee, and any defect that is cured shall not thereafter be grounds for termination.

11.     __Indemnity and insurance__.  The Operator hereby agrees to indemnify the Licensee against and to hold the Licensee harmless from any and all claims or demands for loss of or damage to property or for injury or death to any person from any cause whatsoever while in, upon, or about said Leased Premises during the Term of this Agreement unless the Licensee's negligence or willful misconduct (or that of the Licensee's employees, agents or contractors) causes or contributes to such damage, injury or death.  The Operator agrees to take out and maintain with a reputable insurance company, at its sole cost and expense, public liability insurance against property damage or personal injury growing out of the use of or occurring on or about the Leased Premises, with combined single limit coverage of at least $5,000,000.  The Operator further agrees to take out and maintain with a reputable insurance company, at its sole cost and expense, liquor liability insurance in such amounts and with such coverage as is required by the Regulations.

Fire and extended coverage insurance on said Leased Premises in the amount of the full insurable value thereof shall be furnished by the Operator throughout the Term of this Agreement.

12.     __Utilities and services__.  All utilities for the Leased Premises will be paid for by the Operator.  The Operator reserves the privilege of stopping any or all of such services in case of accident or breakdown, or for the purpose of making alterations, repairs or improvements, and shall not be liable for the failure to furnish or delay in furnishing any or all of such services when same is caused by or is the result of strikes, labor disputes, labor, fuel or material scarcity, or governmental or other lawful regulations or requirements, or the failure of any corporation, firm or person with whom the Operator may contract for any such service, or for any service incident, to furnish same, or is due to any cause other than the gross negligence of the Operator; and the failure to furnish any of such services in such event shall not be deemed or construed as an eviction or relieve the Licensee from the performance of any of the obligations imposed upon the Licensee by this Agreement.  The Operator shall not be responsible to the Licensee for loss of property in or from the Leased Premises, except where such damages occur through the gross negligence of the Operator;  nor shall the Operator be responsible should any equipment or machinery break down or for any cause cease to function properly on account of any such interruption of service.

THR00011

13.     <u>Laws and regulations</u>.  The Licensee and the Operator shall each, at their own cost and expense, comply promptly with all laws, rules, and orders of all federal, state, and municipal governments, or departments, which may be applicable to the Operator's specific use of the Leased Premises on behalf of the Operator.

14.     <u>Notices</u>.  All notices to be given by the Operator to the Licensee shall be in writing, deposited in the United States mail, certified or registered, with postage prepaid, and addressed to the Licensee as follows:

*Tuskegee Human & Civil Rights Multicultural Center*
*P. O. Box 830 768*
*Tuskegee*, Alabama *36 083*
ATTENTION: *DEBORAH GRAY*

Notices by the Licensee to the Operator shall be in writing, deposited in the United States mail, certified or registered, with postage prepaid, and addressed to the Operator as follows:

Macon County Greyhound Park, Inc.
P. O. Box 129
Shorter, Alabama 36075
ATTENTION:  Mr. Milton E. McGregor
                        President

Notices shall be deemed delivered when deposited in the United States mail, as above provided. Change of address by either party must be by notice given to the other in the same manner as above specified.

15.     <u>Subordination</u>.  The Licensee agrees that this Agreement, including but not limited to the lease provisions hereunder, shall be subordinate to any mortgages or trust deeds that may hereafter be placed upon the Leased Premises, to any and all advances made or to be made under them, to the interest and all obligations secured by them, and to all renewals, replacements and extensions of them; Provided, however, the mortgagee or beneficiary named in any such mortgages or trust deeds shall recognize this Agreement and the lease provisions hereunder of the Licensee in the event of foreclosure or deed in lieu of foreclosure if the Licensee is not in default under the terms of this Agreement or if the time for curing any such default has not expired.

16.     <u>Personal Property</u>.  The Licensee acknowledges that the Licensee has no interest in any personal property or equipment or furniture and fixtures which may be installed by the Operator for the conduct of bingo games upon the Leased Premises, and the Licensee agrees in the future to furnish the Operator, upon request, such waiver or similar document as may be reasonably required by an institutional lender or equipment lessor in connection with the Operator's acquisition or financing respecting such personal property, equipment, furniture and fixtures.

THR00012

17.    Miscellaneous.

(a)  The paragraph captions in this Agreement are for convenience only and shall not in anywise limit or be deemed to construe or interpret the terms and provisions hereof.

(b)  Time is of the essence of this Agreement and of all provisions hereof.

(c)  This Agreement shall be construed and enforced in accordance with the laws of the State of Alabama.

18.    Successors.  Subject to the provisions of paragraph 8 above, all the terms, covenants, and conditions hereof shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto.

19.    Termination of this Agreement.  In addition to other termination provisions of this Agreement, should the Class B License of the Licensee terminate or not be renewed by the Sheriff for any reason, this Agreement, including the lease provisions contained herein, shall immediately terminate on the same date, with the parties to settle any remaining lease and/or consulting fees for the calendar month in which the termination of this Agreement occurs due to the termination or non-renewal of the Class B License of the Licensee, provided, however, should the Class B License of the Licensee be terminated or not be renewed at any time during the Term of this Agreement, the Licensee shall not thereafter conduct bingo games with a Class B License or contract with any third party for the conduct of bingo games with a Class B License for the balance of the Term (calculated as though this Agreement had not terminated) following such termination of this Agreement. Further, this Agreement, including the lease provisions contained herein, may be terminated at the option of the Operator should the Operator elect at any time to discontinue operating bingo games on behalf of the Licensee or should the Operator for any reason no longer be able to operate the bingo games as envisioned by the Act, the Regulations and the Class B License issued to the Licensee.

20.    Partial Invalidity.  In the event any term or provision of this Agreement is declared to be invalid, illegal or unenforceable for any reason whatsoever by a court of competent jurisdiction, such invalidity or illegality shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

[SIGNATURES APPEAR ON NEXT PAGE.]

THR00013

IN WITNESS WHEREOF, the Licensee and the Operator have executed this Agreement on the ___ day of _December_, 200_3_, effective as of the date the Class B License is issued by the Sheriff as contemplated by this Agreement.


LICENSEE:

_Tuskegee Human & Civil Rights Multicultural Center_
a nonprofit organization


By: _Deborah Gray_

    Its _Executive Director_

_____
Witness


OPERATOR:
MACON COUNTY GREYHOUND PARK, INC.


By: _Milton E. McGregor_

    Its President

_____
Witness


AGREEM.TS\MCGP_BingoOpLease

THR00014