IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Hope for Families & Community Services, Inc. et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No: **3:06-cv-01113-WKW-WC** |
| David Warren, et al., | ) ) ) | |
| Defendants. | ) ) | |

## REPLY BRIEF IN SUPPORT OF JOINT MOTION TO DISMISS

Defendants Macon County Greyhound Park, Inc. ("VictoryLand"), and Milton McGregor

("McGregor") submit this Reply Brief in Support of their Motion to Dismiss.[1]

## I.    THE RICO CLAIMS FAIL BECAUSE GRAY IS NOT A PUBLIC SERVANT.

### A.    The *Vaughn* case does not establish that Gray is a public servant.

Plaintiffs would have the Court believe that the definition of "public servant" under Ala.

Code § 13A-10-1(7) is well settled and that under the holding of *Vaughn v. State*, Fred Gray Jr.

("Gray"), a lawyer in private practice who was retained by the Sheriff to assist the Sheriff with the

promulgation of the County Bingo Regulations, is a "public servant" under Alabama law. Plaintiffs

are wrong. As Defendants pointed out in Defendants' Brief in Support of Joint Motion to Dismiss

Plaintiffs' Third Amended Complaint ("Defendants' Supporting Brief"), *Vaughn* did not decide the

---

[1] The standard of review of a motion to dismiss is governed by the principles set out in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) as recognized by this Court in *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 2007 WL 1655993, *2 (M.D.Ala. 2007) and *Pierce v. American General Finance, Inc.*, 2007 WL 2254408, *3 (M.D. Ala. 2007).

issue of whether or not Vaughn was a "public servant" because the issue was never disputed in that case. *Vaughn v. State*, 880 So. 2d 1178, 1200 n. 14 ("Vaughn does not dispute that he falls within the definition of "public servant" in § 13A-10-1(7); his only argument is that he does not also fall within the definition of "public employee" in § 36-25-1(23)."). *See also Vaughan v. Marshall*, 2006 WL 1476043, *8 , n.14 (M.D. Ala. 2006) (where again Vaughn did not dispute that he falls within the definition of "public servant" in § 13A-10-1(7)).

Only one Alabama case deals with the definition of "public servant," and it does not support Plaintiffs' desperate attempt to turn Gray who is not "an officer or employee of government" into a "public servant." In *Ringstaff v. State*, 480 So. 2d 50 (Ala. Cr. App.1985), the court held that an off-duty deputy sheriff was a "public servant" as defined by § 13A-10-1(7) because he is an "officer or employee of government." *Ringstaff*, 480 So. 2d at 51-52.

B.    **Plaintiffs' Michigan cases do not establish that Gray is a public servant**.

Plaintiffs' reliance upon the Michigan cases and the Alabama cases citing them is misplaced. For example, the case of *People v. Salsbury*, 96 N.W. 936 (Mich. 1903) involved the prosecution of the city attorney of Grand Rapids, Michigan ( an employee of government) for accepting a bribe. The issue in *Salsbury* was not whether this government employee was a public servant but whether, as the city attorney, he was properly described as a "judicial officer" in the indictment. *Salsbury*, 96 N.W. at 941 - 942. The case never mentions "public servant." The companion case of *People v. McGarry*, 99 N.W. 147 (Mich. 1904), concerns an action against the individual who was charged with bribing the government employee.  It does not address who is a "public servant" for purposes of the bribery statute. Thus, these cases do not lend support to Plaintiffs' tenuous position.

It is true, as Plaintiffs claim, that *Salsbury* was cited in the 2006 case of *People v. Hoskins*, 2006 WL 933004, \*1 (Mich. Ct. App. Apr. 11, 2006). However, it was cited for an issue that has nothing to do with defining "public servant." *Hoskins,* 2006 WL 933004, \*1 (citing *Salsbury* for the proposition that "[i]t is also generally true that for such evidence [consciousness of guilt] to be considered, it must be connected to the defendant.").

It is also true that *Salsbury* was cited in *Pullen v. Cincinnati Ins. Co.*, 400 So. 2d 393, 400 (Ala. 1981) and *Hammond v. State*, 354 So. 2d 280, 290 (Ala. Crim. App. 1977). Again, *Salsbury* was not cited for any proposition relevant to the issue of whether Gray is a public servant. In *Pullen*, the case was cited for the definition of an "Executive Officer." *Pullen*, 400 So. 2d at 400 ("An officer of the executive department of government; one in whom resides the power to execute the laws; one whose duties are to cause the laws to be executed and obeyed. *People v. Salsbury*, 134 Mich. 537, 96 N.W. (936) 939."). In *Hammond*, it was cited for the proposition that there are three branches of government. *Hammond*, 354 So. 2d at 290-291. *Hammond,* which involved the bribery conviction of the President of the Alabama Public Service Commission, did not address whether he was a "public servant," and the term "public servant" never appears in the decision.

While Plaintiffs point out that the Commentary for § 13A-10-1 notes that definitions were taken "primarily from the Michigan Revised Criminal Code and from Alabama provisions," that comment does not support in any way Plaintiffs' assertion that Gray is a "public servant." After a diligent and conscientious search, Defendants have not located any case from Michigan explaining the meaning of "public servant." Moreover, after a diligent search, Defendants have not located any decision finding that a private attorney was held to be a public servant under any state's statute.

3

Plaintiffs' assertion that the current Michigan bribery statute is "virtually identical to the [Michigan] statute that was at issue in *Salisbury*," Doc.# 83, at 5, is similarly flawed. The current Michigan statute concerns "executive, legislative or judicial officer[s]." M.C.L.A. 750.118. Because Gray is clearly not an executive, judicial or legislative officer, this statute does not support Plaintiffs' argument.

### 3. Under the clear language of Ala. Code Section 13A-10-1(7), Gray cannot be a "public servant" because he is not an officer or employee of government.

Contrary to Plaintiffs' claim, under the clear language of § 13A-10-1(7), Gray cannot be a public servant as he is not an officer or employee of government. "Public servant" is defined as:

> Any officer or employee of government, including legislators and judges and any person or agency participating as an adviser, consultant, or otherwise in performing a governmental function.

Ala. Code 1975 § 13A-10-1(7) (underlining added).

Under the clear language of § 13A-10-1(7), the words underlined above illustrate but do not expand the phrase "[a]ny officer or employee of government." Thus, to be a public servant under the statute, one must be an officer or employee of government. Gray is not such an employee or officer.[2]

To interpret the statute as Plaintiffs urge this Court to do requires the addition of a comma following "judges" so that § 13A-10-1(7) would state: "Any officer or employee of government, including legislators and judges[,] and any person or agency participating as an adviser, consultant,

---

[2] Similarly, the South Carolina Supreme Court held that a public officer is a representative of the sovereign "who is charged by law with duties involving an exercise of some part of the sovereign power, either small or great, in the performance of which the public is concerned, and which are continuing, and not occasional or intermittent." *State v Bridgers*, 495 S.E. 2d 196, 198 (S.C. 1997).

or otherwise in performing a governmental function." Yet no such comma is present and the plain reading of the statute, which this Court is bound to conduct, does not include adding punctuation that is not there. Plaintiffs' construction of the statutory language is contrived and incredible.[3]

A comparison of Alabama's statute to Wyoming's statute, which <u>does</u> contain an extra comma, illustrates the point. Under the Wyoming statute, a "'[p]ublic servant' means any officer or employee of government, including legislators and judges, and any person participating, as juror, witness, advisor, consultant or otherwise, in performing a governmental function." Wyo. Stat. Ann. § 6-5-101(a)(vi). The Wyoming statute, which contains the comma that the Alabama statute does not, includes persons <u>other than</u> officers or employees of government. The Alabama statute plainly relates only to officers or employees or government.

The rationale for why Alabama does not include a comma after "judges" in its statute becomes clear when the definition of "public servant" contained in the subsection dealing with bribery and corrupt influence is examined. Section 13A-10-60(3) states that:

> As used in this article, [Public Servant] includes persons who presently occupy the position of a public servant, as defined in Section 13A-10-1(7), or have been elected, appointed or designated to become a public servant although not yet occupying that position.

It is thus apparent that, for purposes of bribery and obstruction of justice, a public servant must have been "elected, appointed or designated." This requirement is consistent with the limitation of the definition of "public servant" in § 13A-1-10(7) to "officer or employee of government."

---

[3] Plaintiffs' argument that Gray is a public servant leads to an absurd result. When taken to its logical conclusion, every lawyer who ever provides advice or services to any public official could be deemed a public servant, subject to numerous legal obligations that were never contemplated by the lawyer, the client, or the legislature. This is a slippery slope that should not be trod upon.

Furthermore, had the Alabama legislature intended for 13A-10-1(7) to include individuals other than "officer[s] or employee[s] of government," it could have easily included a comma after the word "judges" in the same manner that the Wyoming included a comma in its statutory definition of "public servant." It did not. It would violate the fundamental rule of statutory construction for the Court to now – at Plaintiffs' Request – add a comma to a statute which would result in broadening the statutory definition, when the legislature has chosen not to insert that comma. "The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute." *Ex parte McCall*, 596 So.2d 4 (Ala.1992).

In addition, because the definition of "public servant" is contained in § 13A-10-1(7) as part of the Alabama Criminal Code and because Plaintiffs are trying to use it to allege a violation of Alabama's bribery statute, the Court must strictly construe the statute:

> "Statutes creating crimes are to be strictly construed in favor of the accused; they may not be held to apply to cases not covered by the words used. . . ." *United States v. Resnick*, 299 U.S. 207, 209, 57 S.Ct. 126, 127, 81 L.Ed. 127 (1936). *See also, Ex parte Evers*, 434 So. 2d 813, 816 (Ala.1983); *Fuller v. State*, 257 Ala. 502, 60 So.2d 202, 205 (1952). Moreover, "criminal statutes should not be 'extended by construction.'" *Ex parte Evers*, 434 So. 2d at 817 (quoting *Locklear v. State*, 50 Ala. App. 679, 282 So. 2d 116 (1973)). . .

*Ex parte Jackson*, 614 So. 2d 405, 406 (Ala.1993) (emphasis added).

"It is an ancient rule of statutory construction and an oft-repeated one that penal statutes should be strictly construed against the government or parties seeking to exact statutory penalties and in favor of persons on whom such penalties are sought to be imposed." *Sutherland Statutory Construction*, § 59.03 (1974). In this case, a strict construction of the definition of "public servant" as that term is defined by the plain language of Section 13A-10-1(7) requires a holding that a person must be an officer or employee of government before he can be a "public servant." Moreover, as

noted above, Defendants could not find any case holding a private lawyer to be a public servant

under any state's statute.[4]

## II.     PLAINTIFFS HAVE FAILED TO MEET THEIR HEAVY BURDEN OF SHOWING THAT THERE IS NO CONCEIVABLE RATIONAL BASIS FOR THE ASPECTS OF THE COUNTY BINGO REGULATIONS THAT THEY CHALLENGE.

Plaintiffs' arguments that there is no rational bases for the aspects of the County Bingo

Regulations that they challenge fall far short of meeting their heavy legal burden. Although the

Plaintiffs play lip service to that burden by citing *Board of Trustees of University of Alabama v.*

*Garret*, 531 U.S. 356, 367 (2001), and noting that it is their burden "'to negative any reasonably

conceivable state of facts that could provide a rational basis for the classification,'" (Doc. #83, at 16),

Plaintiffs utterly fail to satisfy their burden.

Plaintiffs fail to mention and completely ignore the "strong presumption of validity"with

which the County Bingo Regulations are imbued. *FCC v. Beach Commc'ns*, 508 U.S. 307, 314

(1993) ("On a rational basis review, a classification in a statute . . . comes to us bearing a strong

presumption of validity."). Likewise, Plaintiffs further ignore the high threshold that this

presumption requires them to cross. "For a plaintiff to overcome the presumption of rationality, he

must meet a heavy burden of showing that the challenged governmental action was '**completely**

---

[4] Plaintiffs' RICO statement is woefully inadequate and lacks the specificity needed by the Defendants and this Court to properly evaluate their claims. Plaintiffs' actions in cutting and pasting paragraph references from their complaint into the RICO statement is subject to the same criticism leveled in another RICO action and should suffer the same result. *See DePaola v. Nissan North America, Inc.*, 2006 WL 1181131 at *12 (M.D. Ala. 2006) (dismissing plaintiff's RICO claims based upon lack of specificity when it failed to provide an adequate RICO statement and noting "[t]he Court next asked plaintiff to complete a 'RICO statement' to better clarify several issues, only to have plaintiff's reply consist of simply cutting and pasting extensively from its earlier briefs without providing the necessary specificity.")

**ludicrously arbitrary**.'" *Phelan v. City of Chicago*, 125 F. Supp. 2d 870, 876 (N.D. Ill. 2000) (emphasis added). Furthermore, Plaintiffs ignore the clear law proving that for purposes of a rational-basis review, the government decision-maker does not have to even articulate the rational basis supporting the regulation. *See Beach Commc'ns*, 508 U.S. at 315 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992)). Moreover, Plaintiffs completely disregard established legal principles providing that:

1.   a governmental choice "is not subject to courtroom fact-finding and may be based upon rational speculation unsupported by evidence or empirical data." *Id.* at 315 (emphasis added);

2.   a governmental "classification does not violate equal protection simply because it is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* at 316, n.7 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)); and

3.   "'logical appropriateness of the inclusion or exclusion of objects or persons and the exact wisdom' and 'nice adaption of remedies are not required" for there to be a rational basis for a governmental regulation. *Id.* (quoting *Heath & Milligan Mfg. Co. v. Worst*, 207 U.S. 338, 354 (1907).

Instead of recognizing the established law, Plaintiffs ignore it, and argue in essence that the County Bingo Regulations could have been drawn in a better way to meet a particular rational basis. In short, Plaintiffs would have this Court strike down the County Bingo Regulations because they were not drafted in a manner more to Plaintiffs' liking. This Court should not engage in such improper judicial activism. The Regulations are rationally based and Plaintiffs' challenge here cannot prevail. The issue of whether the Sheriff should have written the County Bingo Regulations

differently is an issue to be decided by the voters of Macon County in the next election for Sheriff or through lobbying efforts to change the County Bingo Regulations.[5]

Because there is a readily apparent rational basis for each aspect of the regulations challenged by the Plaintiffs, the Court must uphold the County Bingo Regulations. *Beach Commc'ns, Inc.,* 508 U.S. at 313 ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights <u>must be upheld</u> against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (emphasis added).

**A.     Plaintiffs have failed to meet their heavy burden of proving that there is no conceivable rational basis for the Fifteen License Minimum.**

Although only one such basis is necessary to sustain the Fifteen License Minimum, *Beach Commc'ns, Inc.,* 508 U.S. at 313, Defendants' Supporting Brief sets forth multiple separate readily apparent rational bases for the Fifteen License Minimum. First, the Fifteen License Minimum is rationally related to the Sheriff's interest in protecting the integrity of bingo operations in Macon County. One of the stated reasons for the Fifteen License Minimum was "to further avoid the potential abuse of a third party individual or business entity from using one nonprofit organization (or a minimal number) as a 'front' to operate bingo games under a Class B [electronic bingo] license . . ." Commentary to 2004 Regulations at § 2.[6] Plaintiffs have not negated this rational basis, and cannot do so. Instead they simply make the unsupported and incredible claim that Victoryland is a "front." Doc. #83, at 18. Plaintiffs' own allegations belie this assertion by acknowledging that

---

[5] Lucky Place and other Plaintiffs obviously recognize this is the appropriate remedy as they have been engaging in such lobbying efforts. *See* Exhibit A attached hereto.

[6] The Regulations and commentary are attached as Ex. B to the Third Amended Complaint.

currently 59 electronic bingo licenses have been issued to charities who operate electronic bingo games at Victoryland. Doc. #67, ¶ 129. This acknowledgment establishes that the Fifteen License Minimum has kept entities from using one (or a minimal number) of charities as a front to establish an electronic bingo casino. Because this rational basis for the Fifteen License Minimum is clearly plausible, it provides a sufficient rational basis to overcome Plaintiffs' challenge. *See Beach Commc'ns*, 508 U.S. at 313-14 (where there are plausible reasons for the government's action, the Court's inquiry ends).

Second, the Fifteen License Minimum was also designed to ensure that each qualified location for electronic bingo games provides an opportunity to a large represented group of charities to obtain the economic benefits associated with an electronic bingo license. Commentary to 2004 Regulations at § 2. Bingo is a form of gambling. *See California v. Cabazon*, 480 U.S. 202, 211 (1987); *United States v. Hurst*, 951 F. 2d 1490, 1493 (6th Cir. 1991). The regulation of gambling such as the Fifteen License Minimum falls within the police powers of the states. *Gulfstream Park Racing Ass'n Inc. v. Tampa Bay Downs, Inc.,* 399 F. 3d 1276, 1278 (11th Cir. 2005). Surely, it is rational for the Sheriff to issue regulations that ensure that each electronic bingo casino that operates in the County provides benefits to a number of Macon County charities.

Importantly, Plaintiffs offer no direct attack on the Fifteen License Minimum. Instead, they argue that the Sixty License Maximum eliminates any benefits of the Fifteen License Minimum. *Id.* The Sixty License Maximum does no such thing. Rather, it limits electronic bingo activities in Macon County and allows the Sheriff to "more effectively regulate and enforce the proper conduct of such bingo games." Commentary to 2005 County Bingo Regulations, § 2. (The 2005 County Bingo Regulations and commentary are attached as Ex. C to the Third Amended Complaint). Taken

10

together, the Fifteen License Minimum and the Sixty License Maximum ensure (a) that each electronic bingo operation in Macon County benefits a number of charities (at least fifteen), and (b) that there will be no more than four electronic bingo casinos that the Sheriff will have to regulate. Thus, the Fifteen License Minimum also serves as a limit on the number of electronic bingo casinos in Macon County.  Limits on the number of gambling establishments are a proper exercise of the government's police powers. *See, e.g., Ocala Kennel Club, Inc. v. Rosenburg,* 725 F. Supp. 1205, 1207-08 (M.D. Fla. 1989) (recognizing state's power to regulate gambling, including limiting the number of licenses and locations).

Regulations such as the Fifteen License Minimum do not require mathematical precision. *See Beach Commc'ns ,* 508 U.S. at  316, n.7 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485 (1970)).  Moreover, because each of the reasons noted above clearly provides a plausible rational basis for this regulation, the Court must sustain it. *See id.,* at  313-14.

**B.     Plaintiffs have failed to meet their heavy burden of proving that there is no conceivable rational basis for the Sixty License Maximum.**

As noted above, the Sixty License Maximum limits electronic bingo activities in Macon County and allows the Sheriff to "more effectively regulate and enforce the proper conduct of such bingo games." Commentary to 2005 County Bingo Regulations, § 2.   As set forth more fully in Defendants' Supporting Brief (Doc. #76) at 29-31, limits on gambling activities, such as electronic bingo, is without question a rational exercise of the Sheriff's police powers.  Regulation of gambling lies at the heart of the state's police power. *See Johnson v. Collins Entertainment Co. Inc.,* 199 F. 3d 710, 720 (4th Cir. 1999); *Gulfstream Park,* 399 F.3d at 1278.  Moreover, both state and federal courts recognize the power of government to limit the number of gambling establishments or

11

gambling licenses. *See, e.g., Ocala Kennel Club*, 725 F. Supp. at 1207-1208 (state's power to regulate gambling includes limiting licenses and locations); *Primm v. City of Reno*, 252 P.2d 835, 838 (Nev. 1953) (municipalities under appropriate charter provisions may suppress gambling or limit the number of gambling establishments); *Landers v. Eastern Racing Ass'n*, 97 N.E.2d 385, 394 (Mass. 1951) (limiting the number of licensed places is a reasonable exercise of the police power).

Plaintiffs do not contest the inherent rationality of regulations that limit gambling. Instead, they claim that the Sixty License Maximum is not rationally related to controlling the growth of gambling because it does not limit the volume of electronic bingo that can be conducted at a particular facility. Doc. #83, at 19. This argument is simply without merit and ignores the legitimate limits that the Sixty License Maximum places on electronic bingo. As noted above, when taken together with the Fifteen License Minimum, the Sixty License Maximum limits the number of electronic bingo casinos that can be operated at any one time in Macon County. This limitation is clearly rational. It is entirely legitimate for the Sheriff to limit the number of electronic bingo casinos that he must regulate. *Watt v. Firestone*, 491 So. 2d 592, 594 n.4 (Fla. Dist. Ct. App. 1986) (upholding proposed constitutional amendment which limited operation of casinos to hotels of certain size from equal protection challenge because the hotel size requirement limited the number of casinos, required them to be located in tourist-oriented areas and assured professional management of them); *see also Primm*, 252 P.2d at 838; *Landers*, 97 N.E.2d at 394.[7] Without question, a limit on the number of casinos and the number of electronic bingo licenses is clearly a rational control on the growth of gambling. With such a regulation, gambling is limited to a small

---

[7] Similarly, the act creating a County Racing Commission for Mobile County allows only one race track to operate on any given race day. Act No. 2431, Approved Oct. 1, 1971 (as amended), § 10(b).

12

number of locations with which the Sheriff can easily become familiar and effectively regulate. Macon County simply can not be required to allow unlimited electronic bingo casinos or licenses. Although a limit on the volume of electronic bingo at a particular facility could also be established as a further limit on the amount of gambling conducted, the possibility that other restrictions could be applied does not mean, as Plaintiffs contend, that limits on the number of gambling facilities and licenses are not rationally related to limiting gambling.

Because the Fifteen License Minimum and the Sixty License Maximum limit the maximum number of electronic bingo facilities in Macon County, the Sixty License Minimum is, also rationally related to the Sheriff's effective regulation of bingo games. Limiting the number of facilities that the Sheriff must regulate makes his regulation and enforcement efforts more effective. Instead of having a potentially ever-changing and unlimited number of electronic bingo operations to monitor and regulate with limited resources, the maximum number the Sheriff will have to regulate and become familiar with is limited, and currently he need only regulate one. Limits on the number of bingo licences and electronic bingo operations are equivalent to routinely imposed limits on the number of liquor licenses. *See e.g., Simms v. Farris*, 657 F. Supp. 119, 124 (E.D. Ky. 1987) (limiting number of liquor store licenses did not violate equal protection where government needed to regulate such establishments).

**C.    Plaintiffs have failed to show that there is no conceivable rational basis for why the County Bingo Regulations allow 59 of 60 electronic bingo licenses to be issued to charities who operate electronic bingo games at Victoryland.**

Plaintiffs contend that there is no rational basis for the fact that the County Bingo Regulations allow 59 of 60 electronic bingo licenses to be issued to charities who operate electronic bingo games at Victoryland. Plaintiffs contend that (a) the economic benefit to charities is small if all the licenses

13

are held by Victoryland (Doc. #83, at 18) and (b) limiting electronic bingo to a single facility is not rationally related to controlling the growth of gambling. (*Id.,* at 19). These arguments are inappropriate here and fall far short of Plaintiffs' heavy burden of negating "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Garret,* 531 U.S. at 367. Whether any charities would achieve a greater economic benefit if more licenses were issued is not the issue before this Court. As noted above, allowing all the bingo licences to operate electronic bingo games in a single location serves the legitimate purpose of limiting the number of gambling establishments in Macon County and further simplifies the efforts the Sheriff must take to regulate electronic bingo games.

Plaintiffs' complaints about Victoryland's "monopoly" are likewise without merit. Regulation of gambling does not violate the equal protection clause even if it results in a monopoly as long as the underlying regulations have a rational basis to a legitimate governmental power. *See Artichoke Joe's Cal. Grand Casino v. Norton,* 353 F. 3d 712, 740 (9th Cir. 2003) (rejecting equal protection claim that casino gaming law gave Indian tribes a monopoly because law was rationally related to California's interests in regulating gambling).

### D.    Plaintiffs have failed to show that there is no conceivable rational basis for the Existing Facility Requirement.

As noted in Defendants' Supporting Brief (Doc. #76) ¶¶ 32-33, the County Bingo Regulations requirement that a facility exist that can be inspected by the Sheriff prior to issuance of a license (the "Existing Facility Requirement") is rationally related to the legitimate governmental interest of economic development. Plaintiffs claim that economic development cannot be the basis for this aspect of the County Bingo Regulations because it allegedly creates a "Catch 22" in which "no rational

investor would build a facility without a license and no license would be issued until the facility was built." Doc. #83, ¶ 15. This argument fails for two reasons. First, it seeks to impose a far greater standard on the Sheriff than the law allows. <u>Governmental choice</u> "is not subject to courtroom fact-finding and <u>may be based on rational speculation unsupported by evidence or empirical data</u>." *See Beach Commc'ns*, 508 U.S. at 315 (emphasis added). Likewise, the "exact wisdom and nice adaption of remedies are not required" for there to be a rational basis for the regulation. *Id.* (quoting *Heath & Milligan Mfg. Co. v. Worst*, 207 U.S. 338 (1907)). Thus, this aspect of the Regulations does not fail because it might impede some investors. Accordingly, Plaintiffs' challenge to the Existing Facility Requirement must fail.

Second, the Sheriff has obligations to protect the safety and welfare of the citizens of Macon County, which are also served by requiring the inspection of a proposed facility prior to issuance of a license. Plaintiffs' argument totally ignores this legitimate basis that government has for making sure that a facility exists that can be inspected before a license is granted. For example, the Administrative Code of the Alabama Alcoholic Beverage Control ("ABC") Board governing the issuance of liquor licenses has a similar requirement. The ABC Board License Application Procedure states in pertinent part that after the local authorities have processed the application, it will be returned to the "local ABC Board agent, who will thereafter, when appropriate, conduct a neighborhood survey and <u>physical survey of the premises</u>." ABC Board Administrative Code, § 20-X-5-.02 (emphasis added) (a copy of this Code is attached hereto as Exhibit B). A survey of the premises cannot be conducted if premises do not exist. Thus the requirement that the electronic bingo casino exist so that it can be inspected by the Sheriff is consistent with the similar requirement under Alabama law for the issuance of liquor licenses. It is rationally related to the Sheriff's responsibilities to regulate electronic bingo

operations, a form of gambling, the regulation of which lies at the heart of the states' police powers.

*See Johnson v. Collins Entertainment Co. Inc.*, 199 F. 3d 710, 720 (4th Cir. 1999).

## III.   DESPITE THEIR ARGUMENTS, PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS STILL FAIL AS A MATTER OF LAW.

### A.   Despite Plaintiffs' arguments, their tortious interference with business and contractual relations claims fail to state a claim upon which relief can be granted.

As noted in Defendants' Supporting Brief, Plaintiffs' Third Amended Complaint fails to state a claim for tortious interference with contractual and business relationships, and the arguments made in Plaintiffs' Response do not cure the deficiency in their allegations. Under Alabama law, two of the essential elements of a claim of tortious interference are the defendant's knowledge of the contract or business relation and intentional interference by the defendant with the contract or business relation. *See Tom's Food, Inc. v. Carn*, 896 So. 2d 443 (Ala. 2004).

Plaintiffs have not alleged any facts to show that Victoryland or McGregor had knowledge of the existence of the specific contracts between Lucky Palace and the other Plaintiffs. Instead, Plaintiffs now argue that "it is certainly reasonable to infer, for the purposes of a motion to dismiss, that Fred Gray, Jr.'s knowledge of the contractual relationships was passed along to other members of his firm and to Defendants McGregor and Victoryland." Doc. #83, ¶ 20, n 14. Once again, Plaintiffs are attempting to change their allegations and their theory once a defect is identified.

Plaintiffs initially alleged that Defendants supposedly had knowledge of the contracts between Lucky Palace and the other Plaintiffs because Sheriff Warren had knowledge of those contracts. Plaintiffs make this broad leap by asserting that Gray had knowledge of the contracts because he was Sheriff Warren's lawyer and that he also acted as Victoryland's lawyer; thus, Victoryland impliedly had knowledge of the contracts. *See* Doc. #67, ¶ 139, n. 13. However, Plaintiffs admitted at the July

16

2, 2007 hearing that they did not have any evidence upon which to base this allegation when they admitted that they had no evidence that Gray had acted as Victoryland's lawyer, other than what Defendants pointed out in open court was an erroneous entry in a Macon County case listing Gray, instead of his brother Stanley Gray, as counsel for Victoryland.   Realizing the deficiency of the allegations in their Third Amended Complaint, Plaintiffs have now conjured up a new theory. However, the new allegations are distinctly different from the allegations of imputed knowledge asserted in their Third Amended Complaint.  Therefore, the Court cannot rely upon them to breathe life into the defectively-pled claim. Since the only basis upon which Plaintiffs claim that Defendants Victoryland and McGregor had knowledge of the contracts has been proven to be false in open court and Plaintiffs' counsel admitted they had no other evidence, Plaintiffs have failed to allege and cannot show that Victoryland and McGregor had the required knowledge of the existence of the contracts.

Next, Plaintiffs have not alleged and cannot show that Victoryland and McGregor interfered with the contracts between Lucky Palace and the other Plaintiffs.  Plaintiffs admit that they entered into the contracts.  Doc. #67, ¶ 138.  However, it is clear from the allegations contained in the Third Amended Complaint that it was Lucky Palace's failure to either build or lease a facility that rendered performance of the contracts impossible.

Plaintiffs admit that Lucky Palace did not have any facility in which to conduct bingo games at the time the other Plaintiffs applied for electronic bingo licenses.  Plaintiffs argue in their Response that "no rational investor–including Lucky Palace– would build a facility before receiving issuance of a license." Doc. #83, ¶ 21.  However, Defendants have cited other licensing regulation statutes that also require a prospective licensee to have an existing facility in order to seek a license to conduct and operate a business.  *See* Alabama ABC Board Administrative Code § 20-X-5-.02. It  is evident that

17

rational investors do build facilities before receiving issuance of a license to engage in the activity they seek to conduct in the facility. It happens routinely. Therefore, Plaintiffs' argument rings hollow. Performance of the contract was not rendered impossible by Victoryland and McGregor, but rather by the failure of Lucky Palace to either build or secure a facility that meet the regulations in a timely manner. Accordingly, Plaintiffs have failed to plead the elements necessary to establish a claim for tortious interference with contractual and business relations.

**B.    Despite Plaintiffs' arguments, their tortious interference with prospective business relationships claims fail to state a claim upon which relief can be granted.**

The Plaintiffs' claim that McGregor and Victoryland have tortiously interfered with prospective business relationships is also due to be dismissed for failure to state a claim upon which relief can be granted. Plaintiffs essentially allege that if they had built it, patrons would have come. Doc. #67, ¶ 144. They then argue that their venture would be successful based upon their planning and because they allege that Victoryland's venture has been successful. Doc. #83, ¶ 22.

While Alabama recognizes a claim for tortious interference with *prospective* business relationships, the elements which must be pleaded and proven are the same for a claim of tortious interference with existing contractual and business relationships. *See Ex parte Alabama Dep't of Transp.*, 764 So. 2d 1263, 1270 (Ala. 2000) (finding that the plaintiff did not have a reasonable expectancy of the formation of a contract); *see also Tom's Food,* 896 So. 2d at 456-57 (refusing to find tortious interference when the prospective vending account operator "had nothing more than a prospect of obtaining for himself all of [the customers].") Here, Plaintiffs have not alleged and cannot show that the Plaintiffs have *any* relations with *any* party or parties in regards to their speculative business venture. Instead, Plaintiffs only allege that they expected to enter into relationships with numerous

18

patrons and customers. Plaintiffs do not cite any case law to support their novel theory that a business entity which exists only on paper has any reasonable expectancy of the formation of a contract with unspecified members of the general public simply because an existing business has contractual relationships with patrons. Therefore, Plaintiffs' tortious interference with prospective business relationships claim misses the mark and is due to be dismissed.

## IV.    PLAINTIFFS' CONTINUING TORT ARGUMENT DOES NOT EXTEND THE APPLICABLE TWO-YEAR STATUTES OF LIMITATIONS.

### A.    Plaintiffs' continuing tort theory does not extend the two-year statute of limitations for their tortious interference claims.

Despite Plaintiffs' continuing tort arguments, their tortious interference claims against Victoryland and McGregor are barred by the two-year statute of limitations in Section 6-2-38(l) of the Code of Alabama. The date of the alleged interference, if at all, is the date that each set of the County Bingo Regulations was enacted. The last such date is January 6, 2005, the date that the 2005 County Bingo Regulations were enacted. *See* Ex. C to Third Amended Complaint. Plaintiffs try to get around the obvious statute of limitations problem they have concerning their tortious interference claims against Victoryland and McGregor, who were not added as Defendants until March 12, 2007, by arguing that these claims amount to a continuing tort or continuous violation, which tolls the limitations period. Doc. #83, at 24-25. Plaintiffs cite no authority applying the continuous tort doctrine to claims of tortious interference. That is not surprising because Alabama has <u>never</u> applied the continuous tort doctrine to a claim of tortious interference.

The application of the continuous tort doctrine in Alabama has been limited to three scenarios: "(1) when an employer exposes its employee on a continuing basis to harmful substances and conditions . . . ; (2) when there is a 'single sustained method pursued in executing one general scheme,'

as in a blasting case . . . ; and (3) when a plaintiff landowner seeks damages for the contamination of a well or stream." *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220-21 (Ala. 1983). *See also, Jennings v. City of Huntsville*, 677 So. 2d 228 (Ala. 1996)(upholding dismissal where plaintiff failed to allege facts which would establish a "single sustained method in executing one general scheme.").

When Alabama courts apply the continuous tort doctrine, the tort complained about must be of such a nature that it would be impossible to tell which of a series of repeated activities proximately caused the alleged cumulative harm to the plaintiff. *See, e.g., Lehigh Portland Cement Co. v. Donaldson*, 164 So. 97 (Ala. 1935). In *Lehigh Portland* (cited in *Moon*, for the "general scheme" category of continuing tort), the defendants were accused of negligent blasting which "occurred two or three times every day, each having some effect, and all together causing the permanent injuries described." 164 So. at 99-100. Recognizing the difficulty in proving causation in such a scenario, the *Lehigh Portland* court applied the continuing tort doctrine because "[i]t would be very difficult and impracticable to separate each blast in fixing the damage caused by it." *Id*. at 100. Thus, under Alabama law, the continuing tort doctrine only exists where a series of similar events cumulatively cause injury to the plaintiff, such as in a blasting case, <u>and</u> where the harm caused by each separate event cannot be measured. Plaintiffs' tortious interference claims fail to meet this criteria.

In addition, in *Payton v. Monsanto Co.*, 801 So. 2d 829, 835 (Ala. 2001), the Alabama Supreme Court noted that "Alabama law does not recognize a continuing tort in instances where there has been a single act followed by multiple consequences." The Eleventh Circuit Court of Appeals has also held that the "continuing violation" doctrine requires "a series of repeated violations of an identical nature." *Knight v. Columbus, Georgia*, 19 F. 3d 579, 582 (11th Cir. 1994). The *Knight* court

20

also stated that an "on-going 'effect does not transform the act into a continuing violation.'" *Knight*, 19 F. 3d at 585. Thus, Plaintiffs' claims are time-barred.

Plaintiffs argue that "the allegations of the Complaint establish that the Defendants pursued a 'single sustained method' – the promulgation, amendment, and maintenance of the rules and regulations – in 'executing one general scheme'– creating and sustaining Victoryland's monopoly on electronic bingo." (Doc. #83, ¶¶ 24-25). However, the "single act," if any, to trigger the running of the limitations period was the promulgation of the version of the County Bingo Regulations about which Plaintiffs complain. The maintenance of the County Bingo Regulations simply does not constitute an act or a "series of repeated violations of an identical nature." At best, Defendants' claim of "maintenance" could be deemed an "on-going effect" or consequence of the single act of promulgating the regulations, which both the Eleventh Circuit and the Alabama Supreme Court have held does not constitute a continuing tort or continuing violation.

Plaintiffs have challenged four separate and distinct aspects of the County Bingo Regulations: (1) the Fifteen License Minimum (Doc. #67, ¶¶ 46, 129); (2) the Sixty License Maximum (Doc. #67, ¶¶ 55, 129); (3) the allowance of 59 of 60 electronic bingo licenses to be issued to charities which operate electronic bingo games at Victoryland (Doc. #67, ¶ 129); and (4) the "Existing Facility Requirement (*id.*) The Existing Facility Requirement was part of the Original 2003 County Bingo Regulations, which were adopted on December 5, 2003. *See* Ex. A to the Third Amended Complaint. The Fifteen License Minimum was added as part of the 2004 County Bingo Regulations, which were adopted on June 2, 2004. *See* Ex. B to the Third Amended Complaint, § 2. The Sixty License Maximum was added as part of the 2005 Bingo Regulations, which were adopted on January 6, 2005. *See* Ex. C to the Third Amended Complaint, § 2. The Plaintiffs (other than Lucky Palace) filed their

initial complaint on December 18, 2006, against Sheriff Warren asserting a single Section 1983 claim. They filed an Amended Complaint on March 12, 2007, adding Victoryland and McGregor alleging a conspiracy to deprive the Plaintiffs of equal protection of the laws under Section 1985(3), which they later conceded they had no basis for filing and voluntarily dismissed. On June 11, 2007, the Second Amended Complaint was filed asserting for the first time claims under Section 1983 against Victoryland and McGregor. Lucky Palace was not added as a Plaintiff, and the tortious interference claims were not asserted until the Third Amended Complaint was filed on June 29, 2007.

Plaintiffs' tortious interference claims are barred as to aspects of the Original 2003 County Bingo Regulations because they were not filed before December 5, 2005. The Plaintiffs' tortious interference claims are barred as to aspects of the 2004 County Bingo Regulations because they were not filed before June 2, 2006. In addition, the Plaintiffs' tortious interference claims are barred as to the 2005 County Bingo Regulations because they were not filed before January 6, 2007. Even if the statute of limitations had not run when the original complaint was filed on December 18, 2006 as to the 2005 County Bingo Regulations, the Plaintiffs' tortious interference with business and contractual relations claims must be dismissed because they do not meet the relation-back test required by Rule 15(c) of the *Federal Rules of Civil Procedure*.

### B. Plaintiffs' "continuing tort" argument does not extend the applicable two-year statute of limitations for their Section 1983 claims.

The Plaintiffs' Section 1983 claims against Victoryland and McGregor, who were not added as parties until March 12, 2007, are also barred by the applicable two-year statute of limitations. At the time that Victoryland and McGregor were added to the suit, the statute of limitations had already

22

run because, as shown above, the complaint adding these Defendants was not filed within two years of the date on which <u>any</u> of the County Bingo Regulations were promulgated.

Plaintiffs do not dispute the application of the two-year statute of limitations. Instead, Plaintiffs assert that their Section 1983 claims are tolled because they allege a "continuing tort" or "continuing violation." Doc. #83, ¶¶ 25-27. The continuing tort or continuing violation doctrine, however, simply does not apply to Plaintiffs' Section 1983 claims. The Plaintiffs' claims are not of the type of claims to which the continuous tort doctrine applies. As noted above, the Alabama Supreme Court has used the term "continuous tort" to describe repeated tortious conduct that has repeatedly and consciously injured a plaintiff and has limited the application of the continuous tort doctrine to three distinct scenarios. *See Moon*, 435 So. 2d at 220-21. None of those scenarios is applicable to the Plaintiffs' Section 1983 claims, which allege that there is no rational basis for the (1) Fifteen License Minimum, (2) the Sixty License Maximum; (3) the Existing Facility Requirement; or (4) the fact that the County Bingo Regulations allow 59 of 60 licenses to be issued to charities which operate electronic bingo games at Victoryland. Doc. 67, ¶¶ 46, 55, 129.

Like the continuing tort doctrine under Alabama law, the "continuing violation" doctrine, as it is known in federal courts, requires "a series of repeated violations of an identical nature." *See Knight*, 19 F. 3d at 582. Although the Plaintiffs argue that through the "maintenance of the rules and regulations," the violations continue into the present (Doc. #83, ¶¶ 26-27), this argument in nonsensical. Moreover, an "on-going 'effect does not transform the act into a continuing violation.'" *Knight*, 19 F. 3d at 585. The acts complained of by the Plaintiffs that allegedly led to the enactment of the Original 2003 County Bingo Regulations are separate and distinct in nature from the acts that allegedly led to the enactment of the 2004 and later the 2005 County Bingo Regulations.

Furthermore, the Eleventh Circuit expressly rejected application of the continuing violation doctrine in *Lovett v. Ray*, 327 F.3d 1181 (11th Cir. 2003), a case cited by Plaintiffs. In *Lovett,* a state prisoner filed his Section 1983 complaint more than two years after he knew or should have known that the newly-enacted law would apply to delay consideration of his parole, and the Eleventh Circuit upheld the rejection of the prisoner's contention that the continuing violation doctrine prevented his complaint from being time-barred.

Additionally, none of the other cases cited by Plaintiffs in support of their argument for application of the continuing violation doctrine are applicable here. *See, e.g., Donaldson v. O'Connor*, 493 F. 2d 507, 529 (5th Cir. 1974) (applying continuing violation doctrine to false imprisonment claim), *vacated on other grounds*, 422 U.S. 563 (1975); *Knight*, 19 F. 3d at 582 (applying continuing violation doctrine to FLSA claims for paychecks within the past two years, rather than holding that cause of action accrued at the time the officers were mis-classified by their employer as exempt); *Santiago v. Lykes Bros. S.S. Co.*, 986 F. 2d 423, 426 (11th Cir. 1993) (affirming application of continuing tort doctrine to Jones Act case regarding employee's continual exposure to loud noise in the workplace resulting in hearing loss); *Abiff v. Slaton*, 806 F.Supp. 993, 996 (N.D. Ga. 1992) (refusing to apply continuing violation doctrine to inmate's claims regarding forcible shaving incident and due process violations; but applying doctrine to inmate's claims regarding continuing false imprisonment).

Because the continuing violation theory is inapplicable to Plaintiff's Section 1983 claims, as noted in Defendants' Supporting Brief (Doc. #76), ¶¶ 41-44, all of those claims are time barred.

24

## CONCLUSION

For the reasons stated herein and in Defendants' Supporting Brief, the Plaintiffs' Third Amended Complaint is due to be dismissed for failing to state a claim upon which relief can be granted.


s/Peter J. Tepley
Peter J. Tepley (ASB-1112-T46P)
Macon County Greyhound Park, Inc.
d/b/a Victoryland


s/John M. Bolton, III
John M. Bolton, III (ASB-0999-N68J)
One of the Attorneys for Defendant Milton McGregor


OF COUNSEL:
William M. Slaughter (ASB-8283-R67W)
Patricia C. Diak (ASB-9243-K64P)
Peter J. Tepley (ASB-1112-T46P)
Khristi Doss Driver (ASB-2719-I71F)
**Haskell Slaughter Young & Rediker, LLC**
1400 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
Tel.: (205) 251-1000
Fax: (205) 324-1133
E-mail: pt@hsy.com
E-mail: wms@hsy.com
E-mail: pcd@hsy.com
E-mail: kdd@hsy.com

OF COUNSEL:
Augusta S. Dowd (ASB-5274-D58A)
J. Mark White (ASB-5029-H66J)
Rebecca DePalma (ASB-4105-D57R)
**White Arnold Andrews & Dowd P.C.**
2025 Third Avenue North
Suite 600

Birmingham, Alabama 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
E-mail: jmarkwhite@waadlaw.com
E-mail: adowd@waadlaw.com
E-mail: rdepalma@waadlaw.com

OF COUNSEL:
John M. Bolton, III (ASB-0999-N68J)
Charlanna W. Spencer (ASB-6860-R62C)
**Sasser, Bolton & Sefton, P.C.**
100 Colonial Bank Boulevard
Suite B201
Montgomery, AL 36117
Tel: (334) 532-3400
Fax: (334) 532-3434
E-mail: jbolton@sasserlawfirm.com
E-mail: cspencer@sasserlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of August, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Robert K. Spotswood, Esq.
Michael T, Sansbury, Esq.
**Spotswood LLC**
2100 Third Avenue North
Concord Center, Suite 940
Birmingham, AL 35203

Fred D. Gray, Esq.
Fred D. Gray, Jr., Esq.
**Gray Langford Sapp McGowan Gray & Nathanson**
P.O. Box 830239
Tuskegee, AL 36083-0239

James H. Anderson, Esq.
Ryan Wesley Shaw, Esq.
**Beers, Anderson, Jackson, Patty, Van Heest & Fawal, P.C.**
P.O. Box 1988
Montgomery, AL 36102

W. Lewis Garrison
Stephen D. Heniger
**Heniger Garrison Davis, L.L.C.**
2224 1st Avenue North
Birmingham, AL 35203

s/Peter J. Tepley
Of Counsel

26

# WE NEED YOUR HELP

- Hope for Families & Community Services, Inc.
- McRae Prostate Cancer Awareness Foundation
- Shorter Community Development Inc. Shorter Lodge #533

- Shorter Volunteer Fire Department
- Tabernacle Baptist Church
- NCO Club
- Tuskegee Area Family Development and Education Fund

(A PARTIAL LIST OF PARTICIPATING CHARITIES)

## TO BRING MILLIONS OF DOLLARS AND HUNDREDS OF NEW JOBS TO MACON COUNTY!

*Please call today*
# SHERIFF DAVID WARREN
# 334-724-2544
*Ask him to approve our license.*
## He can make it happen.



Artist's rendering of hotel and bingo resort to be built in Macon County

*Southeastern Gaming Opportunities L.L.C.*



Artist's rendering of Lucky Palace Bingo Center for Macon County

## Lucky Palace L.L.C.

ALABAMA ALCOHOLIC BEVERAGE CONTROL BOARD

ADMINISTRATIVE CODE

# CHAPTER 20-X-5 LICENSING

### TABLE OF CONTENTS

20-X-5-.01 Information Required From Applicants For Alcoholic Beverage Licenses

20-X-5-.02 ABC Board License Application Procedure

20-X-5-.03 Club Liquor Retail License

20-X-5-.04 Lounge Retail Liquor License

20-X-5-.05 Restaurant Retail Liquor License

20-X-5-.06 Package Sales

20-X-5-.07 Separate Facilities/Adjoining Facilities - Licenses Required

20-X-5-.08 Renewal Of Alcoholic Beverage License

20-X-5-.09 Change Of Ownership, Management Or Name Of Licensed Establishments

20-X-5-.10 License Transfer

20-X-5-.11 Suspension Or Revocation Of License

20-X-5-.12 Special Events Retail License And Special Retail License

20-X-5-.13 Regulation Of Licensees Operating As "Package Stores"

20-X-5-.14 Requirements Of Financial Responsibility By Licensees

20-X-5-.01 Information Required From Applicants For Alcoholic Beverage Licenses.

(1) Every applicant for an ABC Board license, in addition to information and statements required under Title 28, Code of Ala. 1975, shall also give the ABC Board, as part of such application, the following:

(a) The name, date, place of birth, address, telephone number, race, gender, driver's license number, and social security number of every person who has any proprietary or profit interest in the licensed establishment, except in the case of public corporations, whose shares are traded on a recognized stock exchange.

(b) The true, correct, and complete criminal court record of all arrests and subsequent dispositions for the past ten years of such applicant and any other person having a proprietary or profit interest therein; and in the case of corporations, clubs and associations, of each officer and/or member of the board of directors of such corporation, club, or association. Minor vehicular offenses may be omitted; however, driving while under the influence and reckless driving cases shall be disclosed. In giving such information, there shall be included the name of the court(s) and the disposition of each matter.

(c) In the case of applications by corporations, clubs, and associations, the person(s) making such application shall certify to the correctness, truthfulness and completeness of the application and shall provide the ABC Board with their authority to proffer such application.

(d) An agreement by invitation from the licensee, allowing duly authorized agents of the ABC Board or other duly commissioned law enforcement officers of the state, county, or municipality in which the licensed establishment is located, to enter and search, without a warrant, the licensed premises or any building owned or occupied by the licensee in connection therewith, adjoining, adjacent to, or part of the curtilage thereof, whether used as a private dwelling or not, at any time.

(e) Evidence of primary source of funds, whether owned or borrowed, to be applied in the establishment or acquisition of the business.

(f) Evidence of ownership or lease of the real property where the licensee's business will be located, as follows:

1. If applicant owns property, a copy of the recorded deed as evidence of ownership.

2. If applicant has a contract to purchase property, a copy of the recorded sales contract.

3. If applicant is leasing the property, a copy of the lease agreement, including information regarding:

(i) Lessor's primary business;

(ii) Lessor's involvement in any way with the alcoholic beverage business; and

(iii) Any further interest in or connection with the licensee's business by the lessor.

(g) Such other information as may, at their discretion, be requested by the ABC Board or agents thereof.

(2) In the event any false, incorrect, or incomplete information or statements are found on an application for a license, the license is subject to denial, revocation, or other disciplinary action by the ABC Board, at its discretion, and no waiver, estoppel, or laches will run against the State of Alabama, or the ABC Board, in connection with any false, incorrect, or incomplete information or statements made by an applicant on an application.

(3) It shall be the prerogative of the ABC Board as part of the license application procedure to verify the truthfulness and veracity of all information contained within a license application. Verification may include, but not be limited to, personal interviews and community comment, as well as criminal background information analysis through the Alabama Criminal Justice Information Center (ACJIC).

(4) Any social security number disclosed under this regulation shall be used for the purpose of investigation or verification by the ABC Board and shall not be a matter of public record.

**Author:** ABC Board

**Statutory Authority:** <u>Code of Ala. 1975</u>, §§28-3-49; 28-3A-3(b).

**History:** Repealed and New: Filed August 21, 1998; effective October 16, 1998.

20-X-5-.02 <u>ABC Board License Application Procedure</u>.

(1) On initial contact by an applicant, the enforcement agent will collect the filing fee and may assist in filling out the application, retaining the original and giving the applicant a copy upon request. Responsibility for the truth and veracity of all information provided by the applicant, shall in all cases, remain with the applicant.

(2) The application will be forwarded to the appropriate local governmental authority for processing. The local authority, after processing the application, will return the application to the local ABC Board agent, who will thereafter, when appropriate, conduct a neighborhood survey and physical survey of the premises.

(3) The ABC Board agent upon receiving the application from the local authority will collect the appropriate license fee from the applicant. Within five (5) business days of receiving the appropriate licensee fee from the applicant, the agent shall mail or deliver same to the district office together with the filing fee. The district office shall, within two (2) working days of receipt thereof, mail or deliver the completed and verified application, along with the filing fee and appropriate license fee, to the Montgomery office.

**Author:** ABC Board

**Statutory Authority:** Code of Ala. 1975, §§28-3-49; 28-3A-3(b).

**History: Repealed and New:** Filed August 21, 1998; effective October 16, 1998.

**20-X-5-.03** Club Liquor Retail License.

(1) All membership applications shall contain at least the following:

(a) Applicant's name and date of birth.

(b) Home address and telephone number.

(c) Occupation and place of employment.

(2) An applicant's true identity shall be verified by the club by use of any of the following:

(a) A valid driver's license of any state.

(b) A valid United States Uniformed Service Identification.

(c) A valid passport.

(d) A valid identification issued by any agency of a state for the purpose of identification, bearing a photograph and date of birth of the individual in question.

(3) Upon filing by an applicant of a bona fide membership application, a club may, at its discretion, issue a temporary membership card which will allow the applicant to use the facilities of the club until the application is processed. A temporary membership card shall only be valid for a maximum of thirty calendar days from date of issue. An applicant may receive only one temporary membership card per year, per club.

(4) A complete club membership record shall be maintained, showing the date of application of all proposed members, the date of

admission after election, the date initiation fees and dues are paid and the amounts paid. The record shall also reflect the name of the applicant's sponsor and other remarks deemed desirable. This record shall be either on a standard form or, preferably, a card index or a computer disk, showing the name of the member, the address of the member and the serial number of the membership card issued. Dues shall be accumulated and posted to the proper column in the income records. A separate form or card shall be prepared for each member, and when members are removed or resign, their cards shall be removed from the active file and placed in an inactive file for a period of two years.

(5) Only a permanent club member may bring bona fide guests on the premises of the club at any time. The presence of a non-member (other than a club employee, a person making a sale or delivery to the club, or other individual similarly present solely in connection with the provision of services or materials to or for the club) on the premises of the club, who is not a bona fide guest of a permanent club member shall be a violation of this regulation.

(6) A bona fide guest is deemed to be a person who has a social, civic, business, or charitable relationship with their host, and shall not include persons whose primary purpose in attendance is for the pecuniary benefit of the club. The bona fide guest's host member shall not be an employee of the club then on duty.

(7) Upon initial application for a Class I Club Liquor Retail License and with each renewal thereafter, the applicant shall present to the ABC Board as part of the application process, good and sufficient evidence that the applicant is a bona fide non-profit organization and exists solely for the objects set forth in Section 28-3-1(7)(a)(b), Code of Ala. 1975.

**Author:** ABC Board

**Statutory Authority:** Code of Ala. 1975, §§28-3-1(7)(a); 28-3-43; 28-3-49; 28-3A-3(b).

**History:** Repealed and New: Filed August 21, 1998; effective October 16, 1998. **Amended:** Filed May 2, 2001; effective June 6, 2001.

20-X-5-.04 Lounge Retail Liquor License.

(1) A Lounge Retail Liquor License may be issued to any person, partnership, association, or corporation duly authorized to do business in the State of Alabama once all state and local requirements are met and approval is granted.

(2) There shall be two classes of Lounge Retail Liquor Licenses.

(a) Class I will permit the licensee to sell alcoholic beverages for on-premises and off-premises consumption. All sales for off-premises consumption shall be in original unopened containers.

(b) Class II will permit the licensee to sell alcoholic beverages only for off-premises consumption in the original unopened containers and shall comply with the requirements of 20-X-5-.13.

Author: ABC Board

Statutory Authority: Code of Ala. 1975, §§28-3-49; 28-3A-23.

History: Repealed and New: Filed August 21, 1998; effective October 16, 1998.

20-X-5-.05 Restaurant Retail Liquor License

(1) Restaurant Retail Liquor licenses shall be issued only to reputable persons for locations which are "habitually and principally" used for the purpose of preparing and serving meals for the public to consume on the licensed premises during normal and reasonable dining hours. Only those locations whose customary and primary business is preparing and serving meals to the public will be issued a Restaurant Retail Liquor license.

(2) Restaurant Retail Liquor license applicants shall comply with all pertinent and related requirements of state, county, and where applicable, municipal health departments prior to licensing and shall remain in compliance thereafter for as long as said license shall remain valid.

(3) All Restaurant Retail Liquor licensees shall have a fully equipped and operational kitchen on the licensed premises. The licensee shall maintain and operate said kitchen and shall, upon order of a customer, prepare and serve all food items shown on its menu during normal and reasonable dining hours. Exceptions shall be made where there is a known and provable shortage or temporary unavailable supply of a food item.

(4) Any applicant or licensee shall, upon request, provide to the ABC Board, any records, books, ledgers, menus, receipts, or other documentation necessary to demonstrate compliance with this regulation.

Author: ABC Board

Statutory Authority: Code of Ala. 1975, §§28-3-1(22); 28-3-49; 28-3A-13.

History: Repealed and New: Filed August 21, 1998; effective October 16, 1998.

20-X-5-.06 Package Sales. Lounge Retail Liquor licensees and Club Liquor Retail licensees are authorized to sell alcoholic beverages for off-premises consumption only in original unopened containers.

Author: ABC Board

Statutory Authority: Code of Ala. 1975, §§28-3-49; 28-3A-11; 28-3A-12.

History: Repealed and New: Filed August 21, 1998; effective October 16, 1998.

20-X-5-.07 Separate Facilities/Adjoining Facilities - Licenses Required.

(1) Any person applying for a license or operating a place of business pursuant to a license issued by the ABC Board, whose place of business has openings on different streets, or more than one opening on the same street, and which entrances lead into two separate rooms or into rooms which have no connecting passages or doors ordinarily used by patrons, shall be responsible for the procurement of two ABC Board licenses if alcoholic beverages are sold in both parts of the separate facilities.

(2) It is not the intent of this regulation to require two licenses when the two entrances lead into one dining room or more than one dining room under the same management, if all areas are connected by passages or doors ordinarily used by patrons who are customarily served from the same stock of alcoholic beverages (when all other requirements of Alabama law are met).

Author: ABC Board

Statutory Authority: Code of Ala. 1975, §§28-3-49; 28-3A-23(e).

History: Repealed and New: Filed August 21, 1998; effective October 16, 1998.

20-X-5-.08 Renewal Of Alcoholic Beverage License.

(1) A renewal application for an alcoholic beverage license must be filed with the ABC Board on or before August 1 of each year. No renewal application will be accepted unless accompanied by the appropriate state and county license fees.

(2) Any alcoholic beverage license may be renewed without penalty

during the following fiscal year between October 1 and October 20 and may continue to be renewed after October 20 of such license year by payment of appropriate state and county licensing and filing fees and a penalty of 50% thereof. If a license is not renewed before midnight September 30 of the succeeding license year, the license shall terminate with no privilege of renewal. Thereafter, a new application must be made and a new license issued before continuation of the business.

(3) When an original alcoholic beverage license is issued after August 1 of a license year, a renewal application shall be filed simultaneously with the issuance of the original license.

(4) No retail or wholesale alcoholic beverage licensee may purchase, receive, store, ship, sell or give away any alcoholic beverage(s) or enjoy any of the rights and privileges of said license after midnight of September 30 of any year unless the license shall have been properly renewed prior thereto. No manufacturer or importer alcoholic beverage licensee may purchase, receive, store, ship, sell or give away any alcoholic beverage(s) or enjoy any of the rights and privileges of said license after midnight of December 31 of any year unless the license shall have been properly renewed prior thereto.

(5) Objections and protests concerning alcoholic beverage licenses shall be submitted to the ABC Board within a reasonable time prior to August 1, sufficient for the ABC Board to process the protests and to notify the licensee within the prescribed time period. Interested parties which may lodge license objections or protests include, but are not limited to: state, county and municipal governmental agencies.

(6) The ABC Board may exercise broad discretion in granting, denying or renewing any license.

**Author:** ABC Board

**Statutory Authority:** Code of Ala. 1975, §§28-3-49; 28-3A-5.

**History: Repealed and New:** Filed August 21, 1998; effective October 16, 1998.

20-X-5-.09 Change Of Ownership, Management Or Name Of Licensed Establishments.

(1) ABC Board licenses shall be deemed to expire, terminate, or otherwise be void when there is a substantial change of ownership in the licensed business; when a licensed business is leased, rented or abandoned, or when possession is otherwise surrendered to another party or parties. However, a license may be transferred as provided

by statutes and these regulations. A license issued to a corporation
does not terminate by transfer of ownership of its stock, and no
transfer of license is required even with a complete change in
ownership of the capital stock of a corporate licensee, although the
provisions of section (4), below, do apply.

(2) Upon the death of an individual licensee, sale of the licensed
business, temporary closing of the licensed business, or other
interruption in the operation of a licensed business, the license
shall immediately be delivered to the local ABC Board field office,
to be held pending the reopening of said business according to these
regulations. However, where there is a surviving partner in a
partnership entity possessing a license, or a surviving spouse of a
deceased licensee, such survivor may complete the current license
year operating as a licensee, having the same rights and
responsibilities as the named licensee, without obtaining a new
license, provided: (a) the survivor notifies the ABC Board in writing
within twenty (20) days after the death of the licensee, and (b) the
survivor is otherwise qualified to hold a license. A surviving spouse
or partner must complete a new application in his/her own name and
receive local and state approval prior to operation the next license
year.

(3) When a licensed corporation elects new officers or directors,
said corporation shall notify the ABC Board in writing within twenty
(20) days thereafter. This letter shall contain the names, positions,
social security numbers, places of birth, dates of birth, home
addresses and how long the newly-elected officials have lived at said
addresses. Social security numbers shall be disclosed for
investigative purposes only. No person shall serve as a director or
officer, of a licensed corporation who is otherwise unqualified to
obtain an original license in their own name. This section shall not
apply to corporations whose shares are customarily and regularly
traded or sold on recognized stock exchanges.

(4) When ownership of 20% or more of a corporation's shares is
transferred or there accrues a 20% transfer of shares since the
licensing year began, a corporation shall notify the ABC Board in
writing within twenty (20) days thereafter. The letter shall contain
the name of the person(s) to whom the stock was transferred, social
security number, place of birth, date of birth, home address, how
long the stock transferee has lived at that address and what quantity
of shares was transferred. The licensee's social security number
shall not be disclosed for public record. No person shall own shares
through transfer or accrual in a licensed corporation who is
otherwise unqualified to obtain an original license in their own
name. The ABC Board Hearing Commission shall have discretion in
determining the qualifications of any transferee of stock shares, and
may in its discretion, suspend the corporation's license during the
period of time that the unqualified shareholder retains ownership of

said shares. This section shall not apply to corporations whose shares are customarily and regularly traded or sold on recognized stock exchanges.

(5) When a non-corporate licensee has a change of ownership effecting 20% or more thereof, the licensee shall notify the ABC Board in writing within twenty (20) days thereafter, and a transfer application shall be submitted by the new entity created by such change of ownership. No person shall become the owner or otherwise be interested in the operation of a non-corporate licensed premise who is otherwise unqualified to obtain an original license in their own name.

(6) Additional information concerning licensed businesses shall be submitted when requested by the ABC Board.

(7) In the event an ABC Board licensee changes its trade name during a license year, the licensee must notify the ABC Board within 20 days of such change.

(8) Any social security number disclosed under this regulation shall be used for the purpose of investigation or verification by the ABC Board and shall not be a matter of public record.

**Author:** ABC Board

**Statutory Authority:** <u>Code of Ala. 1975</u>, §§28-3-49; 28-3A-23.

**History: Repealed and New:** Filed August 21, 1998; effective October 16, 1998. **Amended:** Filed May 2, 2001; effective June 6, 2001.

**20-X-5-.10** <u>License Transfer</u>.

(1) Any alcoholic beverage license may be transferred once in any license year from one location to another, within the same governing jurisdiction, upon approval by the ABC Board. Any alcoholic beverage license may also be transferred once in any license year from one licensee to another person, corporation or association for that particular location, upon approval by the ABC Board.

(2) Before a license may be transferred from one licensee to another person, a transferee must:

(a) Be qualified to receive an original license.

(b) Pay a non-refundable filing fee of $50.00 to the ABC Board.

(c) File a transfer application, as if applying for an original license, within twenty (20) days after the transferee assumes control

of the licensed premises; if alcoholic beverages are possessed or sold at said location, the original licensee shall continue to be responsible for the conduct and operation of this aspect of the business until the ABC Board approves said transfer and issues the appropriate license.

(d) Complete the transfer application process and secure any necessary local governing authority approval, within sixty (60) days after notification to the ABC Board of said intention to transfer.

(3) Upon failure of a transferee to submit a completed application in a timely manner as provided herein, the transfer application will be deemed void and the original licensee shall either resume control and operation of the licensed premises within five days thereafter or the license shall then be void.

(4) It shall be the responsibility of a transferor to remain apprised of all activity associated with a transfer application.

(5) A license shall not be transferred if:

(a) The ABC Board has denied or refused to renew a license to the transferee, if said action was based in part on the transferee's qualifications, conduct, or fault within the last five (5) calendar years.

(b) The ABC Board has suspended any license held by the transferee, or imposed fines against the transferee in a cumulative amount of $1,000.00 or more, within the last three (3) calendar years.

(c) A transferor or transferee is the subject of:

(i) A pending criminal action,

(ii) A pending disciplinary action, or

(iii) A license renewal protest before the ABC Board or any court of competent jurisdiction.

(d) A third party has made application for a license at the proposed location for which the transfer is sought and which is still pending.

(e) Taxes, fines, or license fees are currently due and payable on the transferor's license.

(f) Prior to approval of the transfer, the transferor withdraws consent to transfer or fails to timely renew the license.

(6) An application for a location transfer will not be accepted if

there is pending, an existing application for an ownership transfer, nor will an application for an ownership transfer be accepted if there is pending an existing application for a location transfer.

(7) The ABC Board may exercise its broad discretion in granting or denying any license transfer application.

(8) For purposes of this regulation, the term ABC Board shall include the ABC Board Hearing Commission.

**Author:** ABC Board

**Statutory Authority:** Code of Ala. 1975, §§28-3-49; 28-3A-23(j)(k).

**History:** Repealed and New: Filed August 21, 1998; effective October 16, 1998.

**20-X-5-.11 Suspension Or Revocation Of License.**

(1) Upon suspension or revocation of a license and during the interim between the date on which notice of final adjudication of suspension or revocation is given to the licensee and the effective ending date of such suspension or revocation, the licensee is prohibited from purchasing alcoholic beverages under said license.

(2) During a period of suspension, no new or different license will be issued to any other applicant for the same location or in the same business name, as that of the suspended licensee; provided, however, this section is not intended to prohibit innocent landlords or lessors from exercising contractual rights under a rental agreement or a written lease in the event of default by a tenant or lessee.

(3) Immediately following a final adjudicated decision on the question of suspension or revocation, a notice thereof shall be mailed to all appropriate peace officers in the county where the affected license is located. Notice shall also be mailed to all wholesale licensees operating in the territory of the affected license.

(4) During a period of suspension, no alcoholic beverages may be possessed on the licensed premises, nor may a licensee permit others to bring, possess, or consume alcoholic beverages on the licensed premises during such period.

(5) Upon the effective date of a suspension or revocation, merchandisable alcoholic beverages legally purchased by the licensee may be purchased by the ABC Board at 80% of the current ABC Board list price or the Board may approve the sale of such alcoholic beverages to another licensee of the ABC Board. Any other sale of

such alcoholic beverages is prohibited.

(6) During the period of suspension or revocation of an ABC Board
license, the licensee shall post a sign, supplied by the ABC Board,
on the licensed premises stating that their license has been
suspended or revoked. The sign for a suspended license shall read:
"The privilege of selling alcoholic beverages for these premises has
been suspended by the Alabama Alcoholic Beverage Control Board from
(Date) to (Date)." The sign for a revoked license shall read: "The
Alabama Alcoholic Beverage Control Board License Has Been Revoked for
These Premises from (Date) to (Date)." This sign shall be displayed
in a conspicuous location in or on a front window or door and shall
be readily visible from outside the premises.

(7) Within ten days from the beginning of any period of revocation, a
compliance inspection of the premises by agents of the ABC Board
shall be allowed, to ensure the removal of alcoholic beverages from
the premises if said premises is open for business to the general
public, members or guests during the period of suspension or
revocation. Failure to permit said inspection shall disqualify any
last previous licensee from reapplying for any new license for a
period of six months after the revocation is completed.

Author: ABC Board

Statutory Authority: Code of Ala. 1975, §§28-3-49; 28-3A-24(a)(b)(d).

History: Repealed and New: Filed August 21, 1998; effective October
16, 1998.

20-X-5-.12 Special Events Retail License And Special Retail License.
A Special Events Retail license may be issued only after all the
requirements of Section 28-3A-20, Code of Ala. 1975, have been met
and only for a special event. A Special Retail license may be issued
only after all the requirements of Section 28-3A-19, Code of Ala.
1975, have been met. A Special Retail license will not be issued for
an occurrence that is in essence, a special event.

Author: ABC Board

Statutory Authority: Code of Ala. 1975, §§28-3-49; 28-3A-19; 28-3A-
20.

History: Repealed and New: Filed August 21, 1998; effective October
16, 1998.

20-X-5-.13 Regulation Of Licensees Operating As "Package Stores".

(1) In addition to all other requirements of law or rules and

regulations of the ABC Board, all private club licensees and all
lounge retail liquor licensees which operate their licensed premises
primarily for the off-premises sale of alcoholic beverages shall
comply with the following conditions:

(a) The licensee shall have a minimum of 500 square feet of floor
space for the display and sales of alcoholic beverages. The square
footage herein required shall not include areas of the licensed
premises which are not open to the patrons or general membership of
the licensee and/or which are used for office space, storage or
restroom facilities.

(b) Not withstanding the provisions of 20-X-7-.04 or any other
provisions contained herein to the contrary, the licensee is
authorized to sell only snack and delicatessen items, cheeses,
beverage containers, tobacco products, ice, fruit juices and mixers.
The licensee shall not sell general grocery items, novelties,
clothing or any other items of general merchandise.

(c) Any interior door, window or passageway which opens or may be
opened into an adjoining building may be used only by the licensee
and its employees. Such interior openings must be unavailable to the
patrons or customers of the licensee and such passageways must be
clearly marked "employees only."

(d) The licensee shall at all times have in its possession a physical
inventory of liquor and/or wine having a minimum wholesale cost of
$5000.00. The inventory of liquor and/or wine must have been produced
by at least two distilleries and two wineries.

(e) The licensee shall not advertise or identify its premises, prices
or location by the use of flashing or blinking signs.

(f) Any licensee whose license was issued prior to September 30,
1985, shall be exempt from conditions set forth in paragraph 1(a). No
transfer of any license hereby exempted from 1(a) shall be permitted
unless and until the premises are brought into compliance with same.

**Author:** ABC Board

**Statutory Authority:** Code of Ala. 1975, §28-3-49.

**History: Repealed and New:** Filed August 21, 1998; effective October
16, 1998.

20-X-5-.14 Requirements Of Financial Responsibility By Licensees.

(1) All retail licensees of the ABC Board shall comply with the
following conditions of requirements of Financial Responsibility.

(a) Prior to the issuance of any retail alcoholic beverage license after January 1, 1999, or renewal of existing alcoholic beverage retail license after January 1, 1999, each applicant must provide the ABC Board with sufficient information that it has a net worth of at least one hundred thousand dollars ($100,000.00) or has liquor liability (dram shop) insurance coverage in the amount of at least one hundred thousand dollars ($100,000.00). This information may be shown as follows:

1. A statement from a certified public accountant that the applicant has a net worth of at least one hundred thousand dollars ($100,000.00) according to generally accepted accounting principals; or

2. A coverage sheet from a reputable insurance company showing that the applicant has liquor liability (dram shop) insurance of at least one hundred thousand dollars ($100,000.00) for each incident and that coverage is valid from October 1, to September 30.

(2) All retail licensees whose license was issued on or before the effective date of this regulation must comply with all requirements of Paragraph 1 above when applying for the renewal of existing license for the license year of 1999. If any such retail licensee fails to so comply, its retail license shall not be renewed for the fiscal year commencing October 1, 1999.

(3) No application for a new retail license or the renewal of an existing retail license shall be approved unless the application shows affirmatively that the requirements contained herein are met. Failure to comply with the requirements contained herein shall be cause for suspension or revocation of the license.

(4) A retail licensee shall notify the ABC Board at any time that its net worth falls below one hundred thousand dollars ($100,000.00) or that its liquor liability insurance is canceled. In either of such events, the licensee must comply with the requirement of this Financial Responsibility regulation within 15 days or alternatively, the said licensee shall be suspended or revoked. Any licensee which has been suspended for failure to abide by this regulation shall not be reinstated until compliance with Section 1 is met.

**Author:** ABC Board

**Statutory Authority:** <u>Code of Ala. 1975</u>, §§28-3-2; 28-3-49.

**History: Repealed and New:** Filed August 21, 1998; effective October 16, 1998.