**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No.: 3:06-cv-01113-WKW-csc |
| | ) |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY, et al., | ) ) ) |
| | ) |
| Defendants. | ) ) |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT

Pursuant to Rules 15(a) of the Federal Rules of Civil Procedure, the Plaintiffs hereby move for leave to file their Fourth Amended Complaint, which is attached hereto as Exhibit A. In support of their motion, the Charities state as follows:

1.     The Third Amended Complaint was filed on June 29, 2007. (DE 67.) It alleges, among other things, a conspiracy claim pursuant to 42 U.S.C. § 1983.

2.     On July 13, 2007, Defendants McGregor and VictoryLand filed a Joint Motion to Dismiss the Third Amended Complaint. (DE 74.) Among other things, the Defendants argued that the Plaintiffs' § 1983 conspiracy claim is barred by the statute of limitations.

3.     In response to the Defendants' arguments, the Plaintiffs' pointed out that, because the conduct alleged is ongoing, the statute of limitations has not yet begun to run under both federal and state law applying to continuous torts. The Plaintiffs continue to maintain that the continuous tort doctrines prevent the running of the statute of limitations.

4.      In the event that this Court disagrees with the Plaintiffs' continuous-tort arguments, however, the Plaintiffs believe that their § 1983 claim should not be barred by the applicable statutes of limitations because of federal rules regarding the discovery of such claims.

5.      While state law provides the statute of limitation for § 1983 actions, federal law determines when that statute of limitations begins to run. *Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003) (citing *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996)). "Generally, 'the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Id.* (quoting *Rozar*, 85 F.3d at 561-62 (internal marks omitted)). "Plaintiffs must know or have reason to know that they were injured, and must be aware or should be aware of who inflicted the injury." *Rozar*, 85 F.3d at 562 (citing *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987)).

6.      In this case, the Plaintiffs were unaware that Defendants McGregor and VictoryLand were involved in a conspiracy with Defendant Warren to deprive them of their equal protection rights until January 30, 2007, when counsel for the Plaintiff Charities received a copy of the deposition of Defendant Warren that was taken in the *Macon County Investments* case. (Ex. A at ¶¶ 136-37.) That deposition revealed, among other things, (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that the meeting was conducted in the presence of attorney Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray, is an investor in Defendant VictoryLand, (4) that Fred Gray and the law firm of Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C., represent Defendants McGregor and VictoryLand, (5) that Defendant Warren retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, and (6) that

Defendant Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations. (Ex. A at ¶¶ 136.) Those facts indicated the existence of a conspiracy between Defendant Warren and Defendants McGregor and VictoryLand. (Ex. A at ¶¶ 136-37.) The Plaintiff Charities then moved, on March 2, 2007, for leave to file an amended complaint alleging a conspiracy claim. (DE 20.)

7.      The plaintiffs alleged no facts in the Third Amended Complaint that would justify the application of the federal discovery rule. *Cf. In re Southwest Supermarkets, L.L.C.*, 315 B.R. 565, 574 (Bankr. D. Ariz. 2004) ("Nor does the Complaint allege any facts that would justify application of a discovery rule to extend the statutes of limitations as to creditor causes of action."). The Fourth Amended Complaint, on the other hand, does allege the necessary facts to support the application of the rule.

8.      Accordingly, the Plaintiffs request leave to file the Fourth Amended Complaint so that they may receive the benefit of the federal discovery rule.

9.      In addition to the allegations regarding discovery of the conspiracy, the Plaintiffs' Fourth Amended Complaint corrects two aspects of the Third Amended Complaint. First, it corrects certain allegations regarding the representation of Defendants McGregor and VictoryLand by the Gray Law Firm. Second, it corrects several typographical errors that were present in the Third Amended Complaint. Attached as Exhibit B is a red-lined copy of the Fourth Amended Complaint that shows each modification to the Third Amended Complaint.

10.     As this Court is well aware, under Rule 15(a) of the Federal Rules of Civil Procedure, this Court should freely give leave to amend a pleading when justice so requires.

11.     The Fourth Amended Complaint relies upon many of the same facts and circumstances that were relied upon in the original Complaint, the Amended Complaint, the

Second Amended Complaint, and the Third Amended Complaint. "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). Denial of leave to amend therefore constitutes an abuse of discretion unless the court gives sufficient reason, such as futility of amendment, undue delay, bad faith, dilatory motive, undue prejudice, or repeated failure to cure deficiencies by previous amendments. *Id.* In this case, there is not sufficient reason to deny leave to amend.

12.     First, the amendment is not futile. "[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal." *Hall v. United Ins. Co. of America*, 367 F.3d 1255, 1263 (11th Cir. 2004). This Court has never determined that any of the claims alleged in the Fourth Amended Complaint are subject to dismissal. Furthermore, denial of leave to amend for futility is proper only "[i]f the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ." 6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1487, at 637-42 (2d ed. 1990 & Supp. 2005) (footnote omitted). That is not the case here.

13.     Second, the amendment is not unduly delayed. This matter has been pending for about eight months. Lucky Palace was not added as a Plaintiff until June 29, 2007, and separate counsel appeared on its behalf on August 3, 2007. This Court provided in its scheduling order that motions to amend should be filed by September 17, 2007. This motion is being filed well before that deadline.

14.     Third, the amendment is not the product of bad faith or dilatory motive. The Defendants cannot show that this motion is motivated by anything other than a desire to pursue relief from the facts and circumstances alleged.

15.    Fourth, the Defendants will not suffer undue prejudice from this amendment.

a.    Defendants McGregor and VictoryLand have not yet filed a responsive pleading in this matter.

b.    Only Defendant VictoryLand has sought any discovery in this case. While the Charities have commenced written discovery as to each of the Defendants, the Defendants have not yet fully responded to that discovery. The Fourth Amended Complaint will only slightly alter the scope of discovery, if it alters the scope of discovery at all. Finally, no depositions have been scheduled or conducted in this case.

16.    Fifth, the Charities have not repeatedly failed to cure deficiencies by previous amendments. The statute of limitations issue was raised only in response to the Third Amended Complaint, and the proposed amendment will cure any deficiency related to it.

WHEREFORE, the Charities request that this Court grant them leave to file the Fourth Amended Complaint.

DATED:  August 24, 2007.

Respectfully submitted,

s/ Robert K. Spotswood
s/ Michael T. Sansbury
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, Alabama  35213
TEL:   (205) 986-3620
FAX:  (205) 986-3639
E-mail:      rks@spotswoodllc.com
             msansbury@spotswoodllc.com

*Attorneys for the Plaintiff Charities*

5

s/ Stephen D. Heninger
s/ W. Lewis Garrison Jr.
Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:       steve@hgdlawfirm.com
              lewis@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Fred David Gray, Esq.
Fred David Gray Jr., Esq.
Gray, Langford, Sapp, McGowan, Gray,
    Gray & Nathanson PC
P.O. Box 830239
Tuskegee, AL  36083-0239
E-mail:        fgray@glsmgn.com
               jbibb@glsmgn.com
               fgrayjr@glsmgn.com
               thalia@glsmgn.com

James H. Anderson, Esq.
Ryan Wesley Shaw, Esq.
Beers, Anderson, Jackson, Patty, Van Heest &
    Fawal PC
P.O. Box 1988
Montgomery, AL  36102
E-mail:        janderson@beersanderson.com
               wshaw@beersanderson.com

John Mark White, Esq.
Augusta S. Dowd, Esq.
Rebecca DePalma, Esq.
White, Arnold, Andrews & Dowd
2025 Third Avenue, North
Suite 600
Birmingham, AL  35203
E-mail:        mwhite@waadlaw.com
               adowd@waadlaw.com
               rdepalma@waadlaw.com

William M. Slaughter, Esq.
Patricia C. Diak, Esq.
Peter John Tepley, Esq.
Khristi Doss Driver, Esq.
Haskell, Slaughter, Young & Rediker, LLC
1400 Park Place Tower
2001 Park Place North
Birmingham, AL  35203
E-mail:        wms@hsy.com
               pcd@hsy.com
               pt@hsy.com
               kdd@hsy.com

John M. Bolton III, Esq.
Charlanna White Spencer, Esq.
Sasser, Bolton & Sefton PC
PO Box 242127
Montgomery, AL 36124-2127
E-mail:        jbolton@sasserlawfirm.com
               cspencer@sasserlawfirm.com

George L. Beck, Jr.
Capell Howard PC
PO Box 2069
Montgomery, AL 36102-2069
E-mail:        glb@chlaw.com

s/ Michael T. Sansbury
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

|  |  |  |
|---|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC.; BEULAH MISSIONARY BAPTIST CHURCH; E.D. NIXON APARTMENTS, INC.; MCRAE PROSTATE CANCER AWARENESS FOUNDATION; MILSTEAD COMMUNITY CENTER, INC.; NCO NILE CLUB; NEW ELAM MISSIONARY BAPTIST CHURCH; NOTASULGA HIGH SCHOOL PTSA; SHORTER COMMUNITY DEVELOPMENT, INC.; SHORTER LODGE # 533; SHORTER VOLUNTEER FIRE DEPARTMENT; SOJOURNER TRUTH CHAPTER #265 OES; SWEET GUM AME ZION CHURCH; TABERNACLE BAPTIST CHURCH; TUBMAN GARDENS, INC.; TUSKEGEE MACON COUNTY COMMUNITY FOUNDATION, INC.; TUSKEGEE NATIONAL ALUMNI ASSOCIATION; LUCKY PALACE, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 3:06-cv-01113-WKW-csc<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | )<br>) |  |
| v. | )<br>) |  |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY; MILTON MCGREGOR; MACON COUNTY GREYHOUND PARK, INC., | )<br>)<br>)<br>)<br>) |  |
| Defendants. | )<br>) |  |

## FOURTH AMENDED COMPLAINT

1.      This is an action by seventeen Macon County, Alabama, non-profit organizations

("The Charities") and Lucky Palace, LLC, against David Warren in his official capacity as the

Sheriff of Macon County, Alabama; Milton McGregor; and Macon County Greyhound Park, Inc.

("VictoryLand").  This Complaint includes claims: (1) against Defendant Warren, pursuant to 42 U.S.C. § 1983, for violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; (2) against all Defendants, pursuant to 42 U.S.C. § 1983, for a conspiracy to deprive the Charities of the equal protection of the laws; (3) against all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (4) against all Defendants for a conspiracy to violate RICO, (5) against Defendants McGregor and VictoryLand for tortious interference with contractual or business relations, and (6) against Defendants McGregor and VictoryLand for tortious interference with prospective business relationships.

2.    At least since the fall of 2003, Defendants—who, with others, constitute an Enterprise directed by VictoryLand and McGregor, a shareholder and employee of VictoryLand—have engaged in the improper influence of a public servant in connection with the promulgation and amendment of the rules and regulations governing electronic bingo in Macon County.  Said Enterprise is more fully described herein.

3.    Throughout the applicable time period, Defendants VictoryLand and McGregor, through unlawful influence, caused Defendant Warren to arbitrarily promulgate unreasonable rules and regulations for the operation of bingo in Macon County that allowed only one entity— VictoryLand—to operate electronic bingo games.  Not only were the original rules and regulations a product of the influence and designed to favor only VictoryLand, but, through the continued influence of the Enterprise, the rules and regulations were amended twice to ensure that attempts of competitors to enter the market would be thwarted.  These improper activities furthered the Enterprise by allowing it to exist and flourish without competition, to the detriment of the Plaintiffs.

2

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically 42 U.S.C. § 1983 and 18 U.S.C. § 1962. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965(a) because all Defendants reside in this district, all Defendants are subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

## PARTIES

6.      Plaintiff Hope for Families & Community Services, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to prevent abuse and neglect of families and children.

7.      Plaintiff Beulah Missionary Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

8.      Plaintiff E.D. Nixon Apartments, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to provide elderly and handicapped persons with housing facilities and services specially designed to meet their physical, social, and psychological needs, and to promote their health, security, happiness, and usefulness.

9.      Plaintiff McRae Prostate Cancer Awareness Foundation is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to promote prostate health and awareness, prostate cancer support groups for patients

and their families, and research into life-enhancing treatment and an eventual cure for prostate cancer.

10.    Plaintiff Milstead Community Center, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to improve the economic, civic, and social conditions of the community of Milstead, Alabama.

11.    Plaintiff NCO Nile Club is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  It is an organization of non-commissioned officers of the Reserve and National Guard units in and around Tuskegee, Alabama.  Its mission is to maintain liaison between officers and enlisted men; to obtain a higher degree of readiness; to discuss, solve, and eliminate problems in the units, in order to further the common good, general welfare, and relations of their community; to bring about civil betterment through grants, donations, guidance, and support; and to aid charitable, educational, and recreational projects through youth groups.

12.    Plaintiff New Elam Missionary Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

13.    Plaintiff Notasulga High School PTSA is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

14.    Plaintiff Shorter Community Development, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to establish structured support services for homeless and economically disadvantaged individuals, families, and juveniles so that they may lead lives of self-sufficiency.

15.    Plaintiff Shorter Lodge # 533 is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

16.     Plaintiff Shorter Volunteer Fire Department is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

17.     Plaintiff Sojourner Truth Chapter #265 OES is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

18.     Plaintiff Sweet Gum AME Zion Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

19.     Plaintiff Tabernacle Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

20.     Plaintiff Tubman Gardens, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to provide elderly and handicapped persons with housing and services designed to meet their physical, social, and psychological needs and to promote their health, security, happiness, and usefulness.

21.     Plaintiff Tuskegee Macon County Community Foundation, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama. Its mission is to bring together human and financial resources to address and solve community problems.

22.     Plaintiff Tuskegee National Alumni Association is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to foster the ideals of Tuskegee Institute and its founder, Booker T. Washington; to encourage and assist students, graduates, and former students toward the highest development of character and service to mankind; to encourage liberal financial and moral support of Tuskegee Institute and its policies; and to assume and maintain an active national leadership in the promotion and furtherance of Tuskegee Institute.

23.     Plaintiff Lucky Palace, LLC, is a limited liability company formed under the laws of the State of Delaware, and its principal place of business is in the State of Alabama.

24.     Defendant David Warren is a citizen and resident of Macon County in the State of Alabama.  Defendant Warren is also the Sheriff of Macon County.

25.     Defendant Milton McGregor is a citizen and resident of Montgomery County in the State of Alabama.  Defendant McGregor is also the President and majority shareholder of Macon County Greyhound Park, Inc.

26.     Defendant Macon County Greyhound Park, Inc., is a corporation formed under the laws of the State of Alabama, and its principal place of business is in the State of Alabama. Macon County Greyhound Park, Inc., does business as VictoryLand.

## RELEVANT NON-PARTIES

27.     Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C., (hereinafter the "Gray Law Firm") is a professional corporation formed under the laws of the State of Alabama, and its principal place of business is in the State of Alabama.

28.     Fred D. Gray Jr. is a citizen and resident of Macon County in the State of Alabama.  Gray is a shareholder in the Gray Law Firm.

29.     Fred D. Gray is a citizen and resident of Macon County in the State of Alabama. Fred Gray is the father of Fred Gray Jr. and is a shareholder in the Gray Law Firm.  Fred Gray is also a shareholder in Defendant VictoryLand.

## FACTUAL BASIS

30.     Since 1983, Fred Gray and the Gray Law Firm—and, from time to time, Fred Gray Jr.—have represented Defendants VictoryLand and McGregor.  From 1983 to the present, Defendants McGregor and VictoryLand have bestowed at least the following benefits on the

Grays and/or the Gray Law Firm: (1) legal fees; (2) free travel on aircraft owned or chartered by Defendants McGregor and VictoryLand; and (3) substantial dividend payments to Fred Gray in his capacity as a shareholder in VictoryLand.

31.     Amendment 555 of the Constitution of the State of Alabama provides for "local" constitutional amendments.     Pursuant to Amendment 555, any proposed constitutional amendment that affects only one county can be adopted as a valid part of the Constitution by a majority vote of the affected county.     Through this type of amendment, the operation of bingo gaming facilities has been authorized in various counties throughout the State.

32.     On or about November 4, 2003, the voters of Macon County approved Amendment 744 to the Constitution, which governs the operation of bingo gaming in Macon County, Alabama.     Amendment 744 provides that "the operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in Macon County."     *See* Ala. Const. (1901) Amend. 744.     Further, the Amendment provides that the non-profit organization may enter into an agreement with an individual, firm, or a corporation to operate the facility.     Pursuant to Amendment No. 744, the Alabama Legislature delegated the authority to promulgate rules and regulations for the licensing and conduct of bingo games to the Sheriff of Macon County.

33.     Amendment 744 did not limit the number of bingo licenses that could be issued by the Sheriff of Macon County, nor did it restrict the operation of bingo gaming in Macon County to one facility or operator.

34.     When Amendment 744 was approved in November 2003, Lucky Palace embarked on an endeavor to build, own and operate a bingo parlor in Macon County, Alabama.     Lucky Palace hired an experienced management team and licensed a highly visible brand—Planet

7

Hollywood—for its bingo parlor. To finance the construction of its bingo parlor, Lucky Palace secured $54 million in financial commitments. As part of its construction, Lucky Palace plans significant improvements to the local infrastructure, including sewer and water service upgrades, at no cost to Macon County. Lucky Palace's bingo parlor will create 630 new jobs in Macon County.

35.    Lucky Palace was not the only entity interested in operating a bingo parlor in Macon County. VictoryLand was similarly interested, and, on or about November 11, 2003, Defendant McGregor had a conversation with Defendant Warren, the Sheriff of Macon County, about VictoryLand's interest in conducting electronic bingo. That conversation was conducted in the presence of attorney Fred Gray Jr.

36.    Upon information and belief, Fred Gray Jr., Defendant Warren, and Defendant McGregor agreed to formulate rules and regulations for the licensing and conduct of bingo games that would allow only non-profit organizations affiliated with VictoryLand to conduct electronic bingo games.[1] Such rules would grant VictoryLand a monopoly on electronic bingo

---

[1] "Where pleadings concern matters 'peculiarly within the knowledge of the defendants,' conclusory pleading on 'information and belief' should be liberally viewed." *Tankersley v. Albright*, 514 F.2d 956, 965 n.16 (7th Cir. 1975) (quoting *Carroll v. Morrison Hotel Corp.*, 149 F.2d 404, 406 (7th Cir. 1945)). The alleged agreement and its contents are peculiarly within the knowledge of Defendants Warren and McGregor and Fred Gray Jr. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray., is an investor in VictoryLand, (4) that Fred Gray and the Gray Law Firm currently represent Defendants McGregor and VictoryLand and have represented Defendants McGregor and VictoryLand since 1983, (5) that Defendant Warren, despite some knowledge of this past representation, retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, (6) that Sheriff Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a monopoly on the conduct of electronic bingo games in Macon County, and (8) that Defendant Warren issued the one-sided rules and regulations.

gaming in Macon County, allowing it to reap profits of hundreds of millions of dollars, without the threat of competing electronic bingo facilities in the County.

37.    After forming their agreement, Defendants Warren, McGregor, and VictoryLand had an identical or virtually identical interest in promulgating rules and regulations that favored only nonprofit organizations affiliated with Defendant VictoryLand.

38.    In pursuit of that goal, Defendant Warren retained Fred Gray Jr. to formulate the rules and regulations for the licensing and conduct of bingo games.  Fred Gray Jr. did not disclose to Defendant Warren that Fred Gray, his father and law partner, was a shareholder in VictoryLand.

39.    On or about December 5, 2003, Defendant Warren, the Sheriff of Macon County, promulgated "Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("Original Rules"), a true and correct copy of which are attached hereto as Exhibit A.  The Original Rules were primarily drafted by Fred Gray Jr., on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in drafting the Original Rules.

40.    The Original Rules stated that any Macon County non-profit organization could apply for a Class B Bingo License.  They further provided that "[a] Class B Bingo License shall be issued to an applicant who desires to operate any and all games of bingo . . . at a qualified location for the holder of a Class B License."  The Original Rules defined a "qualified location for the holder of a Class B Bingo License" as a location that, among other things, had a value of $5 million, including the land, building and improvements.  Furthermore, to be a qualified location, the location had to be inspected and approved by the Sheriff.  The Original Rules only required one charity to contract with an operator of a qualified location to host bingo, and there was no maximum number of licenses that could be issued.

41.     At the time the Original Rules were promulgated, the only location in Macon County that had a value of $5 million was VictoryLand.  On December 17, 2003—twelve days after the Original Rules were issued—Defendant Warren issued the first Class B Bingo License to the Tuskegee Human and Civil Rights Multicultural Center for the conduct of bingo games at VictoryLand.  Fred Gray is the President of the Tuskegee Human and Civil Rights Multicultural Center.  Defendant McGregor is also an officer of the Tuskegee Human and Civil Rights Multicultural Center.  Defendant Warren—prior to issuing the Class B Bingo License—did not conduct an investigation into, among other things, the value of VictoryLand or the identity of its owners, as required by the Original Rules.  Instead, Defendant Warren relied solely on representations made by Defendant McGregor.

42.     Defendant Warren's interpretation of the Original Rules ensured that VictoryLand would remain the only "qualified location" for the conduct of electronic bingo.  The Original Rules required a "qualified location" to be inspected and approved by the Sheriff.  Defendant Warren interpreted this rule to require that a facility be constructed and visually inspected by him before receiving approval or disapproval.  Furthermore, the Original Rules contained no specifications that, if met, would guarantee approval.  Businesses other than VictoryLand were thus ensnared in a Catch-22: No rational investor would be willing to invest $5 million in a location without a license, and no one could get a license until they invested $5 million in a location.

43.     To escape from this Catch-22, Lucky Palace sought a reasonable accommodation with Defendant Warren.  In or around January 2004, Paul Bracy Jr., President of Lucky Palace, was assured by Defendant Sheriff that anyone who met the requirements set forth in the Original Rules would have no problem obtaining a license to operate bingo games in Macon County.

Based on those assurances, Lucky Palace continued its efforts to establish a "qualified location for the holder of a Class B Bingo License" in Macon County by securing capital investments in excess of $5 million and by ensuring that all other requirements in the Original Rules would be met.

44.    Before Lucky Palace could meet those requirements, however, Defendant Warren, with the assistance of Fred Gray Jr., changed the rules. On or about June 2, 2004, Defendant Warren promulgated an amended set of rules entitled "First Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("First Amended Rules"), a true and correct copy of which are attached hereto as Exhibit B. The First Amended Rules were primarily drafted by Fred Gray Jr. on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in the promulgation of the First Amended Rules. The First Amended Rules were not publicly disclosed by Defendant Warren at the time of their promulgation, and there was no opportunity for public comment on the amendments prior to their promulgation.

45.    On June 2, 2004, Fred Gray Jr. faxed a copy of the First Amended Rules to Defendant McGregor and John Bolton, one of Defendant McGregor's attorneys.

46.    On June 10, 2004, the Tuskegee News disclosed the existence of the First Amended Rules to the public for the first time. The First Amended Rules defined a "qualified location for the holder of a Class B Bingo License" as a location that, among other things, had a value of $15 million, including the land, building and improvements. The First Amended Rules also provided that "[n]o Class B Licensee shall be authorized to operate bingo at any qualified location . . . unless a minimum of fifteen (15) applicants shall first obtain a Class B License for such location." This provision will be referred to hereinafter as the "Fifteen License Minimum."

47.    On or about June 11, 2004—following the disclosure of the First Amended Rules by the Tuskegee News—Lucky Palace again notified Defendant Warren by letter of its intention to build, own, and operate a "qualified location for the holder of a Class B Bingo License" in compliance with the Original Rules.  Lucky Palace asked for confirmation that a Class B Bingo License would be issued to a qualified nonprofit organization that desired to operate bingo games at the location if such a location were built.  Defendant Warren did not respond to the letter.

48.    On or about June 15, 2004, Lucky Palace contacted Defendant Warren by letter to notify him that it was continuing to operate under the Original Rules.  Stressing to Defendant Warren that the process of land purchases, site development, environmental assessments, associated legal and consulting fees and architectural renderings were all based on the Original Rules, Lucky Palace inquired as to the impact of the First Amended Rules on Lucky Palace's planned development.  Defendant Warren did not respond.

49.    On or about July 21, 2004, Bracy and Defendant Warren met in Defendant Warren's office to discuss the concerns of the Lucky Palace lenders and investors over the First Amended Rules and any additional changes that may be forthcoming.

50.    On or about July 30, 2004, Bracy sent, for Defendant Warren's signature, a statement that the First Amended Rules would not be further amended and that, if Lucky Palace complied with the First Amended Rules, there will be no delays or problems in obtaining his approval of its "qualified location for the holder of a Class B Bingo License."  Defendant Warren did not sign the statement.

51.    On or about August 5, 2004, Defendant Warren replied by letter to Bracy and stated that he reserved the right to amend the regulations as necessary but did not see any amendments in the foreseeable future.  He further stated that the First Amended Rules governed

any bingo operations that were currently in existence or that were to be constructed and completed in the following several months.

52.    On or about November 10, 2004—after securing contracts with over fifteen nonprofit organizations—Lucky Palace submitted an Application for Bingo Operator's License. The application was denied because, according to Defendant Warren, Lucky Palace's proposed location did not qualify as it was not completed.

53.    On or about November 23, 2004, Lucky Palace sought clarification on what constituted "capital improvements" under the First Amended Rules. This clarification was to ensure that Lucky Palace could come into compliance with the $15 million requirement for locations in the First Amended Rules. This also placed Defendant Warren on notice that the requirements in place at that time would soon be met by Lucky Palace.

54.    On or about January 6, 2005, Defendant Warren amended his rules again. The amended set of rules was entitled "Second Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("Second Amended Rules"), a true and correct copy of which are attached hereto as Exhibit C. The Second Amended Rules were primarily drafted by Fred Gray Jr. on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in the promulgation of the Second Amended Rules.

55.    The Second Amended Rules stated that "[a]t no time shall there be issued and outstanding more than sixty (60) Class B Licenses for the operation of bingo in Macon County." This provision will be referred to hereinafter as the "Sixty License Maximum."

56.    Defendant Warren promulgated the Second Amended Rules with knowledge that forty-six Class B Bingo Licenses had been, or soon would be, issued to non-profit organizations

with contractual ties to Defendant VictoryLand. Accordingly, the Sixty License Maximum—combined with Fifteen License Minimum—foreclosed the operation of bingo games in Macon County at any location other than VictoryLand.

57.    On March 8, 2005, Pebblin W. Warren, the wife of Defendant Warren, was elected to the Alabama House of Representatives in a special election. On or about July 18, 2005, Representative Warren submitted HB 17, a bill which sought to amend Amendment 744 to incorporate the Second Amended Rules. That amendment would have further insulated VictoryLand from competing bingo parlors in Macon County. HB 17 was not enacted into law.

58.    On or about July 25, 2005, the Charities submitted Charity Application Packages for Class B Bingo Licenses (hereinafter "Applications") to Defendant Warren. The Applications indicated that the Charities intended to conduct bingo at a location owned by Lucky Palace. Pursuant to their contracts with Lucky Palace, the Charities were each guaranteed semi-annual payments of $21,000 for operating bingo games at Lucky Palace's location. To this day, Defendant Warren has failed to issue Class B Bingo Licenses to the Charities.

59.    On or about August 17, 2005, Lucky Palace sent a letter to Defendant Warren in which it expressed its concerns over Defendant Warren's repeated dismissals of efforts to acquire bingo licenses to operate in Macon County. Pre-approval was again requested by Lucky Palace so that it could begin construction on its location and move towards the operation of a "qualified location for the holder of a Class B Bingo License" in Macon County. Defendant Warren did not respond.

60.    By the end of 2005, fifty-eight Class B Bingo Licenses had been issued to non-profit organizations affiliated with VictoryLand. As of today, all sixty Class B Bingo Licenses have been issued to non-profit organizations affiliated with VictoryLand.

61.     As a direct result of Defendant Warren's actions—which, upon information and belief, were conducted at the behest of Defendants McGregor and VictoryLand and with the advice, consent, and influence of Fred Gray Jr.[2]—Lucky Palace has been unable to open and operate its bingo facility and has suffered damages in the form of lost profits.

62.     On several occasions, during meetings between representatives of Lucky Palace and Defendant Warren, Defendant Warren told the representatives that, if Lucky Palace or the Charities wanted Class B Bingo Licenses, then they would have to sue him.

63.     On December 18, 2006, the Charities filed the instant suit against Sheriff Warren and, on March 2, 2007, moved for leave to add McGregor and VictoryLand as Defendants.  On March 6, 2007, Alabama State Senator Myron Penn submitted SB 92, a bill that—like HB 17 submitted by Representative Warren—sought to amend Amendment 744 to incorporate the Second Amended Rules.  Defendant McGregor has contributed at least $10,000 to Senator Penn's campaigns.

## PATTERN OF RACKETEERING ACTIVITY

64.     As described more fully herein, the Defendants are engaged in an ongoing pattern of racketeering as defined by 18 U.S.C. § 1961(5).

---

[2] The reasons for Defendant Warren's conduct are peculiarly within the knowledge of Defendant Warren.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of attorney Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray., is an investor in VictoryLand, (4) that Fred Gray and the Gray Law Firm currently represent Defendants McGregor and VictoryLand and have represented Defendants McGregor and VictoryLand since 1983, (5) that Defendant Warren, despite some knowledge of this past representation, retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, (6) that Sheriff Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations, (7) that the rules and regulations drafted by Fred Gray Jr. gave Defendant VictoryLand a monopoly on the conduct of electronic bingo games in Macon County, and (8) that Defendant Warren issued the one-sided rules and regulations.

65.    The pattern of racketeering activity engaged in by the Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

66.    Under 18 U.S.C. § 1961(1), "racketeering activity" includes any act or threat involving bribery that is chargeable under state law and punishable by imprisonment for more than one year.

67.    The racketeering activity in this case includes an ongoing pattern of violations of Alabama's bribery statutes.

68.    Ala. Code § 13A-10-60, *et seq.*, is entitled "Bribery and Corrupt Influence." Ala. Code § 13A-10-60 incorporates the definition of "public servant" set forth in Ala. Code § 13A-10-1. Ala. Code § 13A-10-1(7) defines a "public servant," in pertinent part, as "[a]ny officer or employee of government, including . . . any person . . . participating as an adviser, consultant, or otherwise in performing a governmental function."

69.    After Fred Gray Jr. was retained by Defendant Warren for the purpose of advising him with respect to the formulation of rules and regulations for the licensing and conduct of bingo games, Fred Gray Jr. became a "public servant," as that term is defined by Ala. Code § 13A-10-1(7). *Cf. Vaughn v. State*, 880 So. 2d 1178 (Ala. Crim. App. 2003) (holding that the president of an architectural, engineering, and urban planning firm, who was retained as a consultant by the state, was a "public servant" as defined by Ala. Code § 13A-10-1(7)); *Vaughan v. Marshall*, 2006 WL 1476043, *8 (M.D. Ala. 2006) ("The evidence was undisputed that Vaughn was hired as a consultant to conduct a comparative site analysis for the State of Alabama; thus, he clearly fell within the definition of a 'public servant.'").

70.    Ala. Code § 13A-10-61(a) states that "[a] person commits the crime of bribery if:

16

(1)     He offers, confers or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced; or

(2)     While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

Ala. Code § 13A-10-61(a).  Ala. Code § 13A-10-61(c) states that "[b]ribery is a Class C felony." Pursuant to Ala. Code § 13A-5-6, a Class C felony is punishable by imprisonment for a term not more than 10 years or less than 1 year and 1 day.

71.     Defendants McGregor and VictoryLand have violated and continue to violate Ala. Code § 13A-10-61(a)(1).   As described more fully herein, Defendants McGregor and VictoryLand, on multiple occasions since January 1, 2003, have offered, conferred, and/or agreed to confer things of value upon Fred Gray, Fred Gray Jr., and the Gray Law Firm, with the intent that Fred Gray Jr.'s opinion, judgment, exercise of discretion, or other actions in advising and consulting with Defendant Warren in the promulgation of, and subsequent amendments to, the rules and regulations for the operation of bingo in Macon County would be corruptly influenced.

72.     Fred Gray Jr. has violated and continue to violate Ala. Code § 13A-10-61(a)(2). As described more fully herein, Fred Gray Jr., on multiple occasions since January 1, 2003, has solicited, accepted, and/or agreed to accept pecuniary benefits from Defendants McGregor and VictoryLand upon an agreement or understanding that Fred Gray Jr.'s opinion, judgment, exercise of discretion, or other actions in promulgating and amending rules and regulations for the operation of bingo in Macon County would be corruptly influenced.

73.     Each such violation of Ala. Code § 13A-10-61 constitutes an act of "racketeering activity" under 18 U.S.C. § 1961(1)(A).

74.     A "thing of value" "does not necessarily mean a substance . . . . [I]t includes an act, or action." *Caruthers v. State*, 74 Ala. 406 (Ala. 1883). "'Value . . . is determined by the application of a subjective, rather than an objective, test, and the requirement of value is satisfied if the thing has sufficient value in the mind of the person concerned so that his actions are influenced.'" *McDonald v. State*, 329 So. 2d 583, 587 (Ala. Cr. App. 1975) (quoting 12 Am. Jur. 2d Bribery § 7).

75.     On numerous occasions since January 1, 2003, Defendants McGregor and VictoryLand have bestowed the following things of value on Fred Gray, Fred Gray Jr. and the Gray Law Firm: (1) legal fees and the promise of future legal fees; (2) free travel on aircraft owned or chartered by Defendants McGregor and VictoryLand and the promise of future free travel; and (3) substantial dividend payments to Fred Gray in his capacity as a shareholder in VictoryLand and the promise of substantial payments in the future.  All of these things had value in the mind of Fred Gray Jr.

76.     In a bribery case, intent may be established by circumstantial evidence.  *See United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996).  The circumstances surrounding the promulgation and amendment of the rules and regulations for electronic bingo establish that (1) Defendants McGregor and VictoryLand intended to corruptly influence Fred Gray Jr. and (2) Fred Gray Jr. agreed or understood that his actions would be corruptly influenced.

77.     Defendant McGregor met with Fred Gray Jr. and Defendant Warren within a week after Amendment 744 was ratified.  Defendant McGregor, at that meeting, did not disclose to Defendant Warren the full extent of the benefits that he had bestowed or planned to bestow on

Fred Gray Jr. Defendant Warren, following the meeting, retained Fred Gray Jr. to draft the rules and regulations and planned to rely on Fred Gray Jr.'s opinion, judgment, and exercise of discretion when Fred Gray Jr. advised and consulted Defendant Warren on the content of those rules and regulations.

78.    Following the meeting, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to aid in the creation rules and regulations that favored Defendant VictoryLand.[3] Upon information and belief, Fred Gray Jr. agreed and understood that, if he created rules and regulations that favored VictoryLand, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[4]

---

[3] The alleged intent is peculiarly within the knowledge of Defendant McGregor. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of Fred Gray Jr., (3) that, from 1983 until the time of the meeting, Defendants McGregor and VictoryLand had bestowed things of value on Fred Gray Jr., (4) that, at the time of the meeting, Fred Gray and the Gray Law Firm represented Defendants McGregor and VictoryLand, (5) that, following the meeting, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (6) that, following the meeting, Fred Gray and the Gray Law Firm continued to represent Defendants McGregor and VictoryLand, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (8) that such a monopoly was not in the best interests of the people of Macon County, (9) that, following the issuance of the rules and regulations, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the rules and regulations, Fred Gray and the Gray Law Firm continued representing Defendants McGregor and VictoryLand.

[4] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of Fred Gray Jr., (3) that, from 1983 until the time of the meeting, Defendants McGregor and VictoryLand had bestowed things of value on Fred Gray Jr., (4) that, at the time of the meeting, Fred Gray and the Gray Law Firm represented Defendants McGregor and

79.    Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in drafting the rules and regulations.[5]    Neither Defendant McGregor nor Fred Gray Jr. disclosed this assistance to Defendant Warren.

80.    As a result of Defendant McGregor's influence, the Original Rules were drafted in such a way that Defendant VictoryLand was the only location in Macon County that could qualify for the conduct of electronic bingo, and its qualification was immediate.  The Original Rules also imposed no requirements on the amount of compensation that a location would have to give to a non-profit organization in exchange for the location's right to conduct electronic bingo on the organization's behalf.    Accordingly, the Original Rules allowed Defendant VictoryLand to be the primary beneficiary of electronic bingo—with its affiliated non-profit organizations receiving little money in return.

---

VictoryLand, (5) that, following the meeting, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (6) that, following the meeting, Fred Gray and the Gray Law Firm continued to represent Defendants McGregor and VictoryLand, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (8) that such a monopoly was not in the best interests of the people of Macon County, (9) that, following the issuance of the rules and regulations, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the rules and regulations, Fred Gray and the Gray Law Firm continued representing Defendants McGregor and VictoryLand.

[5] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that a meeting was conducted in the presence of Fred Gray Jr., (2) that, following the meeting, Fred Gray and the Gray Law Firm continued to represent Defendants McGregor and VictoryLand, (3) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (4) that such a monopoly was not in the best interests of the people of Macon County, (5) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (6) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

81.     Because the Original Rules heavily favored Defendant VictoryLand, they did not serve the interests of the people of Macon County—interests that Defendant Warren, and Fred Gray Jr., as his adviser, were bound to protect and serve.  The Original Rules, among other things, deterred additional investment in Macon County and prevented the creation of additional jobs.  The Original Rules also prevented the establishment of Macon County as a gaming destination.  In addition, the virtual monopoly granted to Defendant VictoryLand obviated any need for VictoryLand to invest in capital improvements to it facilities, to compensate fairly the nonprofit organizations affiliated with it, or to compensate its employees with competitive wages or other benefits.

82.     Fred Gray Jr. presented the Original Rules to Defendant Warren.  Defendant Warren made few, if any, changes to the Original Rules before adopting and promulgating them as the rules and regulation governing electronic bingo.  Instead, Defendant Warren relied on Fred Gray Jr.'s opinion, judgment, and exercise of discretion regarding the content of the Original Rules.

83.     Shortly after the Original Rules were promulgated, Defendant VictoryLand contracted with the Tuskegee Human and Civil Rights Multicultural Center, a nonprofit organization, for the conduct of electronic bingo at VictoryLand.  The Tuskegee Human and Civil Rights Multicultural Center was controlled by Fred Gray and Defendant McGregor.  Under the terms of their contract, the Tuskegee Human and Civil Rights Multicultural Center agreed to accept a flat fee of $10,500 per year from VictoryLand.  In return, VictoryLand would receive all of the proceeds from the conduct of electronic bingo.

84.     The Tuskegee Human and Civil Rights Multicultural Center applied for a license for the conduct of electronic bingo, and Defendant Warren issued that license on December 17,

2003. Defendant Warren, relying on the advice of Fred Gray Jr., made no inquiry into the contractual arrangement between the Tuskegee Human and Civil Rights Multicultural Center and VictoryLand.

85. After Defendant Warren issued a license to the Tuskegee Human and Civil Rights Multicultural Center, Defendant VictoryLand immediately began operating electronic bingo games. The one-sided terms of Defendant VictoryLand's contract with the Tuskegee Human and Civil Rights Multicultural Center allowed Defendant VictoryLand to offer the opportunity to conduct electronic bingo at its location to other nonprofit organizations on a take-it-or-leave-it basis.

86. From December 17, 2003, to June 2004, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr.

87. In early 2004, Plaintiff Lucky Palace was developing firm plans for the construction of an electronic bingo parlor to compete with Defendant VictoryLand. In April 2004, Plaintiff Lucky Palace contracted with Plaintiffs McRae Prostate Awareness Foundation and Shorter Community Development, Inc., for the conduct of electronic bingo. In May 2004, Plaintiff Lucky Palace closed on a purchase of land adjacent to Defendant VictoryLand's bingo parlor.

88. In May 2004, Defendant Warren authorized Fred Gray Jr. to revise the Original Rules using his opinion, judgment, and exercise of discretion. After Fred Gray Jr. received this authorization, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to develop more

onerous rules and regulations for competing facilities.[6]  Upon information and belief, Fred Gray

Jr. agreed and understood that, if he developed more onerous rules and regulations for competing

facilities, Defendants McGregor and VictoryLand would bestow and continue bestowing things

of value on him.[7]

---

[6] The alleged intent is peculiarly within the knowledge of Defendant McGregor.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Original Rules until May 2004, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2004, Fred Gray and the Gray Law Firm represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the Gray Law Firm continued to represent Defendants McGregor and VictoryLand, (5) that the First Amended Rules drafted by Fred Gray Jr. imposed rules and regulations for the conduct of electronic bingo games in Macon County that were even more onerous than the Original Rules, (6) that the monopoly thereby sustained was not in the best interests of the people of Macon County, (7) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, (8) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News, (9) that, following the issuance of the First Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the First Amended Rules, Fred Gray and the Gray Law Firm continued representing Defendants McGregor and VictoryLand.

[7] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Original Rules until May 2004, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2004, Fred Gray and the Gray Law Firm represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the Gray Law Firm continued to represent Defendants McGregor and VictoryLand, (5) that the First Amended Rules drafted by Fred Gray Jr. imposed rules and regulations for the conduct of electronic bingo games in Macon County that were even more onerous than the Original Rules, (6) that the monopoly thereby sustained was not in the best interests of the people of Macon County, (7) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, (8) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News, (9) that, following the issuance of the First Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the

89.    Fred Gray Jr. revised the rules and regulations to impose more onerous requirements on facilities competing with VictoryLand.  Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in revising the rules and regulations.[8]   Fred Gray Jr., without disclosing the assistance received from Defendants McGregor and VictoryLand, advised Defendant Warren to issue the First Amended Rules. Defendant Warren then issued the First Amended Rules with few, if any, changes in June 2004.

90.    From June 2004 to December 2004, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr.

91.    Despite the onerousness of the First Amended Rules, Lucky Palace took steps to meet their requirements after learning about their issuance.  Throughout the fall of 2004, Lucky Palace provided frequent updates to Defendant Warren regarding the status of their venture.  In September 2004, Lucky Palace contracted with seventeen additional non-profit organizations for the conduct of electronic bingo at Lucky Palace's planned facility, bringing the total to nineteen and easily satisfying the 15 License Minimum.  Lucky Palace contracted with additional non-profit organizations in October and December 2004.  In December 2004, Lucky Palace

---

issuance of the First Amended Rules, Fred Gray and the Gray Law Firm continued representing Defendants McGregor and VictoryLand.

[8] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the First Amended Rules through January 2004, Fred Gray and the Gray Law Firm represented Defendants McGregor and VictoryLand, (2) that the First Amended Rules imposed onerous requirements on bingo parlors that intended to compete with VictoryLand, thus shoring up VictoryLand's virtual monopoly on the conduct of electronic bingo games in Macon County, (3) that such a monopoly was not in the best interests of the people of Macon County, (4) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (5) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

purchased a 5.49 acre tract of land directly across the street from Defendant VictoryLand's bingo parlor.

92.     In December 2004, Defendant Warren authorized Fred Gray Jr. to revise the First Amended Rules using his opinion, judgment, and exercise of discretion.  After Fred Gray Jr. received this authorization, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to develop rules and regulations that would prevent the opening of a competing bingo parlor.[9]  Upon information and belief, Fred Gray Jr. agreed and understood that, if he developed more such rules and regulations, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[10]

_____

[9] The alleged intent is peculiarly within the knowledge of Defendant McGregor.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Second Amended Rules until June 2005, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in June 2005, Fred Gray and the Gray Law Firm represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the Gray Law Firm continued to represent Defendants McGregor and VictoryLand, (5) that the Second Amended Rules drafted by Fred Gray Jr. granted a monopoly on electronic bingo to Defendant VictoryLand, (6) that the monopoly thereby granted was not in the best interests of the people of Macon County, (7) that, following the issuance of the Second Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (8) that, following the issuance of the Second Amended Rules, Fred Gray and the Gray Law Firm continued representing Defendants McGregor and VictoryLand.

[10] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Second Amended Rules until May 2005, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2005, Fred Gray and the Gray Law Firm represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the

93.     Fred Gray Jr. revised the rules and regulations to prevent the opening of a bingo parlor that could compete with Defendant VictoryLand.  Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in revising the rules and regulations.[11]   Fred Gray Jr., without disclosing the assistance received from Defendants McGregor and VictoryLand, advised Defendant Warren to issue the Second Amended Rules. Defendant Warren then issued the Second Amended Rules with few, if any, changes on January 6, 2005.

94.     The Second Amended Rules capped the maximum number of Class B Bingo Licenses at 60.  That cap, combined with the requirement that a bingo parlor contract with a minimum of 15 non-profit organizations before conducting electronic bingo, has foreclosed competition for electronic bingo in Macon County.

95.     From January 6, 2005, until the present, Defendants McGregor and VictoryLand have continued to bestow things of value on Fred Gray Jr.

---

Gray Law Firm continued to represent Defendants McGregor and VictoryLand, (5) that the Second Amended Rules drafted by Fred Gray Jr. granted a monopoly on electronic bingo to Defendant VictoryLand, (6) that the monopoly thereby granted was not in the best interests of the people of Macon County, (7) that, following the issuance of the Second Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (8) that, following the issuance of the Second Amended Rules, Fred Gray and the Gray Law Firm continued representing Defendants McGregor and VictoryLand.

[11] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the First Amended Rules through June 2005, Fred Gray and the Gray Law Firm represented Defendants McGregor and VictoryLand, (2) that the Second Amended Rules established an actual monopoly on the conduct of electronic bingo games in Macon County, (3) that such a monopoly was not in the best interests of the people of Macon County, (4) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (5) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

96.     The alleged acts of racketeering activity involve a distinct threat of long-term racketeering activity.

97.     The above-described bribery of Fred Gray Jr. by Defendants McGregor and VictoryLand—which has resulted in the promulgation and maintenance of rules and regulations that deprive the Plaintiffs of the ability to open a business that competes with VictoryLand—has continued for almost four years, is ongoing at the present time, and will continue into the future unless halted by judicial intervention.  This bribery has corruptly influenced Fred Gray Jr.'s opinion, judgment, and exercise of discretion by motivating him to act in his personal interest and in the interest of Defendants McGregor and VictoryLand rather than in the public interest. The bribery continues to corruptly influence Fred Gray Jr.'s opinion, judgment, and exercise of discretion, preventing him from fulfilling his duties as a public servant.

98.     The above-described bribery—which insulates VictoryLand and its profits from any threat of competition—is part of McGregor and VictoryLand's regular way of doing business.  Indeed, the bribery has allowed VictoryLand to (1) avoid investing in capital improvements to its facilities, (2) decline to compensate fairly the nonprofit organizations affiliated with it, (3) refuse to bestow adequate benefits on its employees, whose employment prospects are diminished by VictoryLand's monopoly, and (4) impose unreasonable working conditions on its employees.  The bribery has thus greatly benefited VictoryLand at the expense not only of the Plaintiffs but of the people of Macon County.

**THE ENTERPRISE**

99.     Defendants, as well as Fred Gray Jr., Fred Gray, and the Gray Law Firm, were associated in fact as an "Enterprise," as that term is defined by 18 U.S.C. § 1961(4).  Defendant McGregor was an employee and shareholder of Defendant VictoryLand.  Fred Gray was a

27

shareholder of Defendant VictoryLand. Fred Gray, Fred Gray Jr., and the Gray Law Firm served as attorneys for Defendants McGregor and VictoryLand. Fred Gray Jr. and the Gray Law Firm also served as attorneys for Defendant Warren.

100. That Enterprise was formed for the common purpose of enriching certain of its members through a pattern of bribery that allowed VictoryLand to operate as the sole Class B bingo parlor in Macon County.

101. Each associate of the Enterprise conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Defendant Warren retained Fred Gray Jr. as his adviser. Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr. by providing benefits to Fred Gray, Fred Gray Jr., and the Gray Law Firm. Fred Gray Jr. drafted rules and regulations to establish and maintain Defendant VictoryLand's monopoly. Defendant Warren promulgated those rules and regulations.

102. The Enterprise is engaged in and affects interstate commerce in a variety of ways.

103. The Enterprise is engaged in and affects interstate commerce in that the individuals who participate in Defendant VictoryLand's electronic bingo games travel in interstate commerce to reach Defendant VictoryLand's facility. In fact, Defendant VictoryLand's facility is located immediately next to an interstate highway.

104. The Enterprise is engaged in and affects interstate commerce by advertising its bingo parlor in interstate commerce. Defendant VictoryLand advertises its bingo parlor in publications that circulate outside of Alabama and in television and radio advertisements that reach beyond Alabama. Defendant VictoryLand also maintains an internet website that can be and is accessed by persons outside of Alabama.

105.    The Enterprise affects interstate commerce by limiting the number and variety of bingo transactions and the ability of interstate travelers to choose among competing bingo parlors in Macon County.

**INJURY**

106.    Under 18 U.S.C. § 1964(c), "any person injured in his business or property" by racketeering activities may sue for those injuries and recover treble damages. A plaintiff may recover any damages proximately caused by the racketeering activity, including lost profits. *See, e.g., Maiz v. Virani*, 253 F.3d 641, 662-663 (11th Cir. 2001).

107.    Lucky Palace has secured all of the necessary prerequisites to opening and operating a bingo parlor in Macon County. It has secured real property on which to build its facility. It has hired an architect who produced plans for the facility. It has contracted with an engineer to assist with construction of the facility. It has contracted with a company to manage its bingo parlor. It has licensed a brand name for its facility. It has arranged financing for its facility. It has contracted with nonprofit organizations who are interested in conducting electronic bingo at its facilities. It has located an insurance company that is ready and willing to provide the required insurance. To begin constructing and operating the facility, Lucky Palace needs only a license from Defendant Warren.

108.    Because of the racketeering activity, which has resulted in the creation and maintenance of VictoryLand's monopoly, Lucky Palace is unable to obtain the necessary license and conduct its business for profit. Accordingly, the racketeering activity has been and continues to be the direct and proximate cause of an injury to Lucky Palace's business. As a result of that injury, Lucky Palace has suffered damages in the form of lost profits and the diminished value of their investments.

109.    The Charities have contracted with Lucky Palace to conduct electronic bingo on their behalves.  Under those contracts, each of the Charities is entitled to fixed semi-annual payments of $21,000.  The Charities cannot receive those payments unless they receive licenses from Defendant Warren.  The pattern of racketeering activity has prevented the Charities from obtaining those licenses.  Accordingly, the Charities have been injured in their business and property as a direct and proximate result of the racketeering activity.

110.    The directness of the injuries to the Plaintiffs distinguishes this case from *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006).  The *Anza* court recognized that, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Id.* at 1998.  In *Anza*, the plaintiff's theory was that the defendants "harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers."  *Id.* at 1996-97.  The Court determined that the requirement of proximate causation was not met because "[t]he cause of [the plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."  *Id.* at 1997.

111.    In this case, the cause of the Plaintiffs' asserted harm is a set of actions (Defendant Warren's promulgation of one-sided rules) that is directly related to the alleged RICO violation (the bribery of Fred Gray Jr.).  Accordingly, *Anza* does not control this case.

112.    In addition, the Eleventh Circuit, in a case following *Anza*, reaffirmed that "'proximate cause is not . . . the same thing as a sole cause,' and it is enough for the plaintiff to plead and prove that the defendant's tortious or injurious conduct was a 'substantial factor in the sequence of responsible causation.'"  *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1288 n.5 (11th Cir. 2006) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399, *modified*

*on other grounds by* 30 F.3d 1347 (11th Cir. 1994). The pattern of racketeering activity in this case was certainly a substantial factor, if not the sole factor, in the sequence of causation that led to the Plaintiffs' injuries.

## <u>COUNT I</u>
### (RICO 18 U.S.C. § 1962(c))

113.    The Plaintiffs reallege the facts and allegations set forth in paragraphs 1 through 112 above.

114.    Lucky Palace is a "person," as that term is defined in 18 U.S.C. § 1961(3), which has been injured in its business or property by the conduct of the Defendants in violation of RICO.

115.    The Charities are each, individually, a "person", as that term is defined in 18 U.S.C. § 1961(3), which has been injured in its business or property by the conduct of the Defendants in violation of RICO.

116.    Each Defendant, as well as Fred Gray Jr. and the Gray Law Firm, is a "person," as that term is defined in 18 U.S.C. § 1961(3), culpable for his or its conduct in violation of RICO.

117.    The Defendants have conducted and participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

118.    As a direct and proximate result of the Defendants' violations of 18 U.S.C. § 1962(c), the Plaintiffs have been injured in their business and/or property through lost profits for Lucky Palace and lost licensing fees for the Charities in an amount to be proven at trial. Under 18 U.S.C. § 1964, the Plaintiffs are entitled to bring this action and to recover herein treble damages and the costs of bringing this lawsuit, including attorneys' fees.

**COUNT II**
**(RICO 18 U.S.C. § 1962(d))**

119.    Plaintiffs reallege the facts and allegations set forth in paragraphs 1 through 118 above.

120.    Defendants, being persons employed by or associated with the Enterprise described above, unlawfully and willfully combined, conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

121.    As part of the conspiracy, each Defendant agreed to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above.

122.    The racketeering acts which Defendants committed and caused to be committed were overt acts taken in furtherance of the conspiracy.

123.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property through lost profits for Lucky Palace and lost licensing fees for the Charities in an amount to be proven at trial.  Under 18 U.S.C. § 1964, Plaintiffs are entitled to bring this action and to recover herein treble damages and the costs of bringing this lawsuit, including attorneys' fees.

**COUNT III**
**(Violation of the Equal Protection Clause)**

124.    The Plaintiffs fully incorporate Paragraphs 1-123 by reference as if fully set forth herein.

125.    Defendant Warren, under the color of state law and his authority as Sheriff of Macon County, has intentionally treated the Plaintiffs differently from other similarly-situated organizations, and there is no rational basis for the difference in treatment.  Accordingly, the Plaintiffs have been denied their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

126.    The Charities are Macon County non-profit organizations.  They have submitted completed applications for Class B Bingo Licenses to Defendant Warren.  Those applications fulfill all of the requirements of the Original Rules, the First Amended Rules, and the Second Amended Rules.  Accordingly, the Charities are similarly situated to those fifty-nine Macon County non-profit organizations that have been granted Class B Bingo Licenses.

127.    Lucky Palace is an Alabama limited liability company.  It has submitted to Defendant Warren a completed application for a Class B Bingo Operator's License.  That application fulfills those requirements of the Original Rules, the First Amended Rules, and the Second Amended Rules that have a rational basis.  Accordingly, Lucky Palace is similarly situated to VictoryLand, which is the only organization that has received a Class B Bingo Operator's License.

128.    Defendant Warren has intentionally treated the Plaintiffs differently from their similarly-situated counterparts by failing to issue appropriate licenses to the Plaintiffs in a timely fashion.  That different treatment constitutes intentional and arbitrary discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. There is no rational basis for that different treatment.

129.    There is no rational basis for the Fifteen License Minimum.  There is no rational basis for the Sixty License Maximum.  There is no rational basis for issuing fifty-nine of the

sixty Class B Bingo Licenses available under the Second Amended Rules to nonprofit organizations who desired to operate bingo games at VictoryLand. There is no rational basis for requiring interested organizations to construct or lease a multi-million dollar facility prior to obtaining a Class B Bingo License.

130.    In addition to lacking a rational basis, the requirements stated in Paragraph 129 are arbitrary, capricious, and intended to discriminate against all nonprofit organizations, including the Charities, that desire to operate bingo at locations other than VictoryLand.

<u>**COUNT IV**</u>
**(Conspiracy to Deprive the Plaintiffs of the Equal Protection of the Laws)**

131.    The Plaintiffs fully incorporate Paragraphs 1-130 by reference as if fully set forth herein.

132.    Defendant Warren and Defendant McGregor, in his personal capacity and as an agent for VictoryLand, agreed or had an understanding—reached by, through, and with the assistance and influence of Fred Gray, Fred Gray Jr., and the Gray Law Firm—that Defendant Warren would issue rules and regulations for the licensing and operation of bingo in Macon County that would (1) deprive any nonprofit organization, other than a nonprofit organization associated with VictoryLand, of the ability to obtain a license for the conduct of electronic bingo in Macon County and (2) deprive any organization, other than VictoryLand, of the ability to obtain an operator's license for the conduct of bingo in Macon County. Accordingly, Defendants McGregor and VictoryLand were jointly engaged with Defendant Warren, a state official, in the deprivation of the Plaintiffs' equal protection rights.

133.    By issuing rules and regulations in accordance with that agreement or understanding, Defendant Warren deprived the Plaintiffs of the equal protection of the laws. Defendant Warren perpetuated that deprivation by issuing the First Amended Rules and the

Second Amended Rules. Defendant Warren further perpetuated the deprivation by refusing to consider the Plaintiffs' applications for Class B Bingo Licenses based on his interpretation of the Original Rules, the First Amended Rules, and the Second Amended Rules.

134.    In addition, upon information and belief, Defendant McGregor has taken steps to perpetuate the deprivation by encouraging Representative Warren and Senator Penn, personally or through his agents, to submit legislation seeking to amend Amendment 744 to incorporate the Second Amended Rules.[12]

135.    As a result of the deprivation and its perpetuation, the Plaintiffs have been injured in an amount to be proven at trial.

136.    On January 30, 2007, counsel for the Plaintiff Charities received a copy of the deposition of Defendant Warren that was taken in *Macon County Investments v. Warren*, 3:06-CV-224-WKW (M.D. Ala.). That deposition revealed, among other things, (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that the meeting was conducted in the presence of attorney Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray, is an investor in Defendant VictoryLand, (4) that Fred Gray and the law firm of Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C., represent Defendants McGregor and VictoryLand, (5) that Defendant Warren retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, and (6) that

---

[12]    The alleged encouragement is peculiarly within the knowledge of Defendant McGregor. This allegation is based, in part, on the following facts and circumstances: (1) that Defendant McGregor has close ties with Defendant Warren, who is the husband of Representative Warren, (2) that Defendant McGregor contributed $10,000 to Senator Penn's campaign, (3) that the Second Amended Rules create a monopoly for VictoryLand, (4) that Senator Penn introduced SB 92 on March 6, 2007, four days after the Charities moved to add McGregor and VictoryLand as Defendants, (5) that Senator Penn stated publicly that his goal in submitting SB 92 was "to etch [the Second Amended Rules] into stone," (6) that SB 92 and HB 17 are substantially similar, and (7) the Defendant McGregor publicly acknowledged discussing SB 92 with various people prior to its submission.

Defendant Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations. Those facts indicated the existence of the conspiracy between Defendant Warren and Defendants McGregor and VictoryLand that is alleged herein.

137. Prior to the receipt of that deposition, the Plaintiffs were not aware that Defendants McGregor and VictoryLand had conspired with Defendant Warren to deprive them of their equal protection rights. The Plaintiffs could not have been aware of the conspiracy between the Defendants until, at the very earliest, August 15, 2006, when the deposition was conducted.

## COUNT V
**(Tortious Interference with Contractual and Business Relations)**

138. The Plaintiffs fully incorporate Paragraphs 1-137 by reference as if fully set forth herein.

139. Amendment 744 allowed non-profit organizations to enter into contractual agreements with an individual, firm, or a corporation to operate Class B Bingo facilities within Macon County.

140. In accordance with Amendment 744, each of the Charities individually contracted with Lucky Palace to operate a Class B Bingo facility in Macon County.

141. Upon information and belief, Defendants McGregor and VictoryLand had knowledge of those contractual relationships.[13]

---

[13] The existence of the alleged knowledge is peculiarly within the knowledge of Defendant McGregor. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant Warren had knowledge of those relationships, (2) that Defendants Warren, McGregor, and VictoryLand were represented by the Gray Law Firm, and (3) that Defendant Warren depended on Fred Gray Jr. for advice regarding electronic bingo.

142.    With knowledge of those contractual relationships between Lucky Palace and the Charities, Defendants McGregor and VictoryLand intentionally interfered with those contractual and business relationships by influencing, aiding and/or directing Defendant Warren[14] to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County.  That interference was unjustified.

143.    Because of the promulgation, amendment, and maintenance of those arbitrary, capricious, and irrational rules and regulations, the performance of the contractual relationships between Lucky Palace and the Charities has been rendered impossible.

144.    The Plaintiffs have been damaged—and continue to be damaged—by the intentional interference with their contractual relationships by the actions of Defendants McGregor and VictoryLand.

<u>**COUNT VI**</u>
**(Tortious Interference with Prospective Business Relationships)**

145.    The Plaintiffs fully incorporate Paragraphs 1-144 by reference as if fully set forth herein.

146.    The Plaintiffs reasonably expected that, if allowed to conduct electronic bingo in Macon County, they would be able to enter into contractual and business relationships with numerous patrons and customers.

147.    Upon information and belief, Defendants McGregor and VictoryLand had knowledge of the Plaintiffs' expected contractual and business relationships.[15]

---

[14] The Plaintiffs make no claim against Defendant Warren in this Count.

[15] The existence of the alleged knowledge is peculiarly within the knowledge of Defendant McGregor.  This allegation is based, in part, on the following facts and circumstances: (1) that Defendant Warren had knowledge of those relationships, (2) that Defendants Warren, McGregor, and VictoryLand were represented by the Gray Law Firm, (3) that Defendant Warren

148.    With knowledge of the Plaintiffs' expected contractual and business relationships, Defendants McGregor and VictoryLand intentionally interfered with the Plaintiffs' ability to consummate their expected contractual and business relationships by influencing, aiding and/or directing Defendant Warren[16] to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County.  That interference was unjustified.

149.    Because of the promulgation, amendment, and maintenance of those arbitrary, capricious, and irrational rules and regulations, the Plaintiffs have been unable to consummate their expected contractual and business relationships with numerous patrons and customers.

150.    The Plaintiffs have been damaged—and continue to be damaged—by the intentional interference with their prospective business relationships by the actions of Defendants McGregor and VictoryLand.

WHEREFORE, the Charities pray that this Court enter judgment against the Defendants as follows:

a.    With regard to Sheriff David Warren, for appropriate injunctive relief requiring Sheriff David Warren to, *inter alia*, (1) issue Class B Bingo Licenses to each of the Charities, (2) issue a Class B Bingo Operator's License to Lucky Palace, LLC, (3) suspend the Fifteen License Minimum and the Sixty License Maximum, and (4) allow the Charities to operate any and all games of bingo at the Lucky Palace location;

b.    With regard to Milton McGregor and Macon County Greyhound Park, Inc., for damages in an amount to be proven at trial, treble damages, and punitive damages;[17]

---

depended on Fred Gray Jr. for advice regarding electronic bingo, and (4) that Defendants McGregor and VictoryLand were aware of the popularity of electronic bingo in Macon County.

[16] The Plaintiffs make no claim against Defendant Warren in this Count.

[17] The Plaintiffs do not seek any damages from Defendant Warren.

c.      For costs, including attorney's fees; and

d.      For such further and additional relief as the Court deems just and appropriate.

DATED:  _____, 2007.

Respectfully submitted,

_____
_____
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, AL 35203-3329
Telephone:  (205) 986-3620
Fax:  (205) 986-3639
E-mail:        rks@spotswoodllc.com
               msansbury@spotswoodllc.com

*Attorneys for the Plaintiff Charities*

_____
_____
Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:        steve@hgdlawfirm.com
               lewis@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Fred David Gray, Esq.<br>Fred David Gray Jr., Esq.<br>Gray, Langford, Sapp, McGowan, Gray,<br>    Gray & Nathanson PC<br>P.O. Box 830239<br>Tuskegee, AL 36083-0239<br>E-mail:      fgray@glsmgn.com<br>               jbibb@glsmgn.com<br>               fgrayjr@glsmgn.com<br>               thalia@glsmgn.com | James H. Anderson, Esq.<br>Ryan Wesley Shaw, Esq.<br>Beers, Anderson, Jackson, Patty, Van Heest &<br>    Fawal PC<br>P.O. Box 1988<br>Montgomery, AL 36102<br>E-mail:      janderson@beersanderson.com<br>               wshaw@beersanderson.com |
| John Mark White, Esq.<br>Augusta S. Dowd, Esq.<br>Rebecca DePalma, Esq.<br>White, Arnold, Andrews & Dowd<br>2025 Third Avenue, North<br>Suite 600<br>Birmingham, AL 35203<br>E-mail:      mwhite@waadlaw.com<br>               adowd@waadlaw.com<br>               rdepalma@waadlaw.com | William M. Slaughter, Esq.<br>Patricia C. Diak, Esq.<br>Peter John Tepley, Esq.<br>Khristi Doss Driver, Esq.<br>Haskell, Slaughter, Young & Rediker, LLC<br>1400 Park Place Tower<br>2001 Park Place North<br>Birmingham, AL 35203<br>E-mail:      wms@hsy.com<br>               pcd@hsy.com<br>               pt@hsy.com<br>               kdd@hsy.com |
| John M. Bolton III, Esq.<br>Charlanna White Spencer, Esq.<br>Sasser, Bolton & Sefton PC<br>PO Box 242127<br>Montgomery, AL 36124-2127<br>E-mail:      jbolton@sasserlawfirm.com<br>               cspencer@sasserlawfirm.com | George L. Beck, Jr.<br>Capell Howard PC<br>PO Box 2069<br>Montgomery, AL 36102-2069<br>E-mail:      glb@chlaw.com |

s/ Michael T. Sansbury                    
OF COUNSEL

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC.; BEULAH MISSIONARY BAPTIST CHURCH; E.D. NIXON APARTMENTS, INC.; MCRAE PROSTATE CANCER AWARENESS FOUNDATION; MILSTEAD COMMUNITY CENTER, INC.; NCO NILE CLUB; NEW ELAM MISSIONARY BAPTIST CHURCH; NOTASULGA HIGH SCHOOL PTSA; SHORTER COMMUNITY DEVELOPMENT, INC.; SHORTER LODGE # 533; SHORTER VOLUNTEER FIRE DEPARTMENT; SOJOURNER TRUTH CHAPTER #265 OES; SWEET GUM AME ZION CHURCH; TABERNACLE BAPTIST CHURCH; TUBMAN GARDENS, INC.; TUSKEGEE MACON COUNTY COMMUNITY FOUNDATION, INC.; TUSKEGEE NATIONAL ALUMNI ASSOCIATION; LUCKY PALACE, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Case No.: 3:06-cv-01113-WKW-csc |
| Plaintiffs, | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY; MILTON MCGREGOR; MACON COUNTY GREYHOUND PARK, INC., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## ~~FOURTH~~~~THIRD~~ AMENDED COMPLAINT

1.     This is an action by seventeen Macon County, Alabama, non-profit organizations ("The Charities") and Lucky Palace, LLC, against David Warren in his official capacity as the Sheriff of Macon County, Alabama; Milton McGregor; and Macon County Greyhound Park, Inc.

("VictoryLand").  This Complaint includes claims: (1) against Defendant Warren, pursuant to 42 U.S.C. § 1983, for violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; (2) against all Defendants, pursuant to 42 U.S.C. § 1983, for a conspiracy to deprive the Charities of the equal protection of the laws; (3) against all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (4) against all Defendants~~defendants~~ for a conspiracy to violate RICO, (5) against Defendants McGregor and VictoryLand for tortious interference with contractual or business relations, and (6) against Defendants McGregor and VictoryLand for tortious interference with prospective business relationships.

2.    At least since the fall of 2003, Defendants—who, with others, constitute an Enterprise directed by VictoryLand and McGregor, a shareholder and employee of VictoryLand—have engaged in the improper influence of a public servant in connection with the promulgation and amendment of the rules and regulations governing electronic bingo in Macon County.  Said Enterprise is more fully described herein.

3.    Throughout the applicable time period, Defendants VictoryLand and McGregor, through unlawful influence, caused Defendant Warren to arbitrarily promulgate unreasonable rules and regulations for the operation of bingo in Macon County that allowed only one entity— VictoryLand—to operate electronic bingo games.  Not only were the original rules and regulations a product of the influence and designed to favor only VictoryLand, but, through the continued influence of the Enterprise, the rules and regulations were amended twice to ensure that attempts of competitors to enter the market would be thwarted.  These improper activities furthered the Enterprise by allowing it to exist and flourish without competition, to the detriment of the Plaintiffs.

## JURISDICTION

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically 42 U.S.C. § 1983 and 18 U.S.C. § 1962. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965(a) because all Defendants reside in this district, all Defendants are subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

## PARTIES

6.     Plaintiff Hope for Families & Community Services, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama. Its mission is to prevent abuse and neglect of families and children.

7.     Plaintiff Beulah Missionary Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

8.     Plaintiff E.D. Nixon Apartments, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama. Its mission is to provide elderly and handicapped persons with housing facilities and services specially designed to meet their physical, social, and psychological needs, and to promote their health, security, happiness, and usefulness.

9.     Plaintiff McRae Prostate Cancer Awareness Foundation is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama. Its mission is to promote prostate health and awareness, prostate cancer support groups for patients

and their families, and research into life-enhancing treatment and an eventual cure for prostate cancer.

10.    Plaintiff Milstead Community Center, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to improve the economic, civic, and social conditions of the community of Milstead, Alabama.

11.    Plaintiff NCO Nile Club is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  It is an organization of non-commissioned officers of the Reserve and National Guard units in and around Tuskegee, Alabama.  Its mission is to maintain liaison between officers and enlisted men; to obtain a higher degree of readiness; to discuss, solve, and eliminate problems in the units, in order to further the common good, general welfare, and relations of their community; to bring about civil betterment through grants, donations, guidance, and support; and to aid charitable, educational, and recreational projects through youth groups.

12.    Plaintiff New Elam Missionary Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

13.    Plaintiff Notasulga High School PTSA is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

14.    Plaintiff Shorter Community Development, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to establish structured support services for homeless and economically disadvantaged individuals, families, and juveniles so that they may lead lives of self-sufficiency.

15.    Plaintiff Shorter Lodge # 533 is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

16.    Plaintiff Shorter Volunteer Fire Department is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

17.    Plaintiff Sojourner Truth Chapter #265 OES is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.

18.    Plaintiff Sweet Gum AME Zion Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

19.    Plaintiff Tabernacle Baptist Church is a federally-recognized tax-exempt nonprofit religious organization organized and located in Macon County, Alabama.

20.    Plaintiff Tubman Gardens, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to provide elderly and handicapped persons with housing and services designed to meet their physical, social, and psychological needs and to promote their health, security, happiness, and usefulness.

21.    Plaintiff Tuskegee Macon County Community Foundation, Inc., is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to bring together human and financial resources to address and solve community problems.

22.    Plaintiff Tuskegee National Alumni Association is a federally-recognized tax-exempt nonprofit organization organized and located in Macon County, Alabama.  Its mission is to foster the ideals of Tuskegee Institute and its founder, Booker T. Washington; to encourage and assist students, graduates, and former students toward the highest development of character and service to mankind; to encourage liberal financial and moral support of Tuskegee Institute and its policies; and to assume and maintain an active national leadership in the promotion and furtherance of Tuskegee Institute.

23.     Plaintiff Lucky Palace, LLC, is a limited liability company formed under the laws of the State of Delaware, and its principal place of business is in the State of Alabama.

24.     Defendant David Warren is a citizen and resident of Macon County in the State of Alabama.  Defendant Warren is also the Sheriff of Macon County.

25.     Defendant Milton McGregor is a citizen and resident of Montgomery County in the State of Alabama.  Defendant McGregor is also the President and majority shareholder of Macon County Greyhound Park, Inc.

26.     Defendant Macon County Greyhound Park, Inc., is a corporation formed under the laws of the State of Alabama, and its principal place of business is in the State of Alabama. Macon County Greyhound Park, Inc., does business as VictoryLand.

## RELEVANT NON-PARTIES

27.     Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C., (hereinafter the "Gray Law Firm") is a professional corporation formed under the laws of the State of Alabama, and its principal place of business is in the State of Alabama.

28.     Fred D. Gray Jr. is a citizen and resident of Macon County in the State of Alabama.  Gray is a shareholder in the Gray Law Firm.

29.     Fred D. Gray is a citizen and resident of Macon County in the State of Alabama. Fred Gray is the father of Fred Gray Jr. and is a shareholder in the Gray Law Firm.  Fred Gray is also a shareholder in Defendant VictoryLand.

## FACTUAL BASIS

30.     Since 1983,at least 1992, Fred Gray, Fred Gray Jr., and the Gray Law Firm—and, from time to time, Fred Gray Jr.—have represented Defendants VictoryLand and McGregor. From 19831992 to the present, Defendants McGregor and VictoryLand have bestowed at least

6

the following benefits on the Grays and/or the Gray Law Firm: (1) legal fees; (2) free travel on aircraft owned or chartered by Defendants McGregor and VictoryLand; and (3) substantial dividend payments to Fred Gray in his capacity as a shareholder in VictoryLand.

31.    Amendment 555 of the Constitution of the State of Alabama provides for "local" constitutional amendments.    Pursuant to Amendment 555, any proposed constitutional amendment that affects only one county can be adopted as a valid part of the Constitution by a majority vote of the affected county.    Through this type of amendment, the operation of bingo gaming facilities has been authorized in various counties throughout the State.

32.    On or about November 4, 2003, the voters of Macon County approved Amendment 744 to the Constitution, which governs the operation of bingo gaming in Macon County, Alabama.    Amendment 744 provides that "the operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in Macon County."    *See* Ala. Const. (1901) Amend. 744.    Further, the Amendment provides that the non-profit organization may enter into an agreement with an individual, firm, or a corporation to operate the facility.    Pursuant to Amendment No. 744, the Alabama Legislature delegated the authority to promulgate rules and regulations for the licensing and conduct of bingo games to the Sheriff of Macon County.

33.    Amendment 744 did not limit the number of bingo licenses that could be issued by the Sheriff of Macon County, nor did it restrict the operation of bingo gaming in Macon County to one facility or operator.

34.    When Amendment 744 was approved in November 2003, Lucky Palace embarked on an endeavor to build, own and operate a bingo parlor in Macon County, Alabama.    Lucky Palace hired an experienced management team and licensed a highly visible brand—Planet

Hollywood—for its bingo parlor.  To finance the construction of its bingo parlor, Lucky Palace secured $54 million in financial commitments.  As part of its construction, Lucky Palace plans significant improvements to the local infrastructure, including sewer and water service upgrades, at no cost to Macon County.  Lucky Palace's bingo parlor will create 630 new jobs in Macon County.

35.    Lucky Palace was not the only entity interested in operating a bingo parlor in Macon County.  VictoryLand was similarly interested, and, on or about November 11, 2003, Defendant McGregor had a conversation with Defendant Warren, the Sheriff of Macon County, about VictoryLand's interest in conducting electronic bingo.  That conversation was conducted in the presence of attorney Fred Gray Jr.

36.    Upon information and belief, Fred Gray Jr., Defendant Warren, and Defendant McGregor agreed to formulate rules and regulations for the licensing and conduct of bingo games that would allow only non-profit organizations affiliated with VictoryLand to conduct electronic bingo games.[1]  Such rules would grant VictoryLand a monopoly on electronic bingo

---

[1] "Where pleadings concern matters 'peculiarly within the knowledge of the defendants,' conclusory pleading on 'information and belief' should be liberally viewed."  *Tankersley v. Albright*, 514 F.2d 956, 965 n.16 (7th Cir. 1975) (quoting *Carroll v. Morrison Hotel Corp.*, 149 F.2d 404, 406 (7th Cir. 1945)).  The alleged agreement and its contents are peculiarly within the knowledge of Defendants Warren and McGregor and ~~their attorney,~~ Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of ~~attorney~~ Fred Gray Jr., (3) that Fred Gray <u>and the Gray Law Firm</u>~~Jr.~~ currently represent<u> Defendants</u>~~s~~ ~~Defendant~~ McGregor and VictoryLand and <u>have</u>~~has~~ represented Defendants McGregor and VictoryLand since <u>1983,</u>~~at least 1992,~~ (5) that Defendant Warren, despite some knowledge of this past representation, retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, (6) that Sheriff Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a monopoly on the conduct of electronic bingo games in Macon County, and (8) that Defendant Warren issued the one-sided rules and regulations.

gaming in Macon County, allowing it to reap profits of hundreds of millions of dollars, without the threat of competing electronic bingo facilities in the County.

37.     After forming their agreement, Defendants Warren, ~~and~~ McGregor, and VictoryLand had an identical or virtually identical interest in promulgating rules and regulations that favored only nonprofit organizations affiliated with Defendant VictoryLand.

38.     In pursuit of that ~~their common~~ goal, Defendant~~s~~ Warren~~, McGregor, and VictoryLand~~ retained ~~the same attorney,~~ Fred Gray Jr.~~,~~ to formulate ~~represent them with regard to the formulation of~~ the rules and regulations for the licensing and conduct of bingo games.  Fred Gray Jr. did not disclose to Defendant Warren that Fred Gray, his father and law partner, was a shareholder in VictoryLand.

39.     On or about December 5, 2003, Defendant Warren, the Sheriff of Macon County, promulgated "Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("Original Rules"), a true and correct copy of which are attached hereto as Exhibit A.  The Original Rules were primarily drafted by Fred Gray Jr., on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in drafting the Original Rules.

40.     The Original Rules stated that any Macon County non-profit organization could apply for a Class B Bingo License.  They further provided that "[a] Class B Bingo License shall be issued to an applicant who desires to operate any and all games of bingo . . . at a qualified location for the holder of a Class B License."  The Original Rules defined a "qualified location for the holder of a Class B Bingo License" as a location that, among other things, had a value of $5 million, including the land, building and improvements.  Furthermore, to be a qualified location, the location had to be inspected and approved by the Sheriff.  The Original Rules only

required one charity to contract with an operator of a qualified location to host bingo, and there was no maximum number of licenses that could be issued.

41.    At the time the Original Rules were promulgated, the only location in Macon County that had a value of $5 million was VictoryLand.  On December 17, 2003—twelve days after the Original Rules were issued—Defendant Warren issued the first Class B Bingo License to the Tuskegee Human and Civil Rights Multicultural Center for the conduct of bingo games at VictoryLand.  Fred Gray is the President of the Tuskegee Human and Civil Rights Multicultural Center.  Defendant McGregor is also an officer of the Tuskegee Human and Civil Rights Multicultural Center.  Defendant Warren—prior to issuing the Class B Bingo License—did not conduct an investigation into, among other things, the value of VictoryLand or the identity of its owners, as required by the Original Rules.  Instead, Defendant Warren relied solely on representations made by Defendant McGregor.

42.    Defendant Warren's interpretation of the Original Rules ensured that VictoryLand would remain the only "qualified location" for the conduct of electronic bingo.  The Original Rules required a "qualified location" to be inspected and approved by the Sheriff.  Defendant Warren interpreted this rule to require that a facility be constructed and visually inspected by him before receiving approval or disapproval.  Furthermore, the Original Rules contained no specifications that, if met, would guarantee approval.  Businesses other than VictoryLand were thus ensnared in a Catch-22: No rational investor would be willing to invest $5 million in a location without a license, and no one could get a license until they invested $5 million in a location.

43.    To escape from this Catch-22, Lucky Palace sought a reasonable accommodation with Defendant Warren.  In or around January 2004, Paul Bracy Jr., President of Lucky Palace,

was assured by Defendant Sheriff that anyone who met the requirements set forth in the Original Rules would have no problem obtaining a license to operate bingo games in Macon County. Based on those assurances, Lucky Palace continued its efforts to establish a "qualified location for the holder of a Class B Bingo License" in Macon County by securing capital investments in excess of $5 million and by ensuring that all other requirements in the Original Rules would be met.

44.     Before Lucky Palace could meet those requirements, however, Defendant Warren, with the assistance of Fred Gray Jr., changed the rules.  On or about June 2, 2004, Defendant Warren promulgated an amended set of rules entitled "First Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("First Amended Rules"), a true and correct copy of which are attached hereto as Exhibit B.  The First Amended Rules were primarily drafted by Fred Gray Jr._— the attorney for Defendants Warren, McGregor, and VictoryLand—on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in the promulgation of the First Amended Rules.  The First Amended Rules were not publicly disclosed by Defendant Warren at the time of their promulgation, and there was no opportunity for public comment on the amendments prior to their promulgation.

45.     On June 2, 2004, Fred Gray Jr. faxed a copy of the First Amended Rules to Defendant McGregor and John Bolton, one of Defendant McGregor's attorneys.

46.     On June 10, 2004, the Tuskegee News disclosed the existence of the First Amended Rules to the public for the first time.  The First Amended Rules defined a "qualified location for the holder of a Class B Bingo License" as a location that, among other things, had a value of $15 million, including the land, building and improvements.  The First Amended Rules

also provided that "[n]o Class B Licensee shall be authorized to operate bingo at any qualified location . . . unless a minimum of fifteen (15) applicants shall first obtain a Class B License for such location." This provision will be referred to hereinafter as the "Fifteen License Minimum."

47. On or about June 11, 2004—following the disclosure of the First Amended Rules by the Tuskegee News—Lucky Palace again notified Defendant Warren by letter of its intention to build, own, and operate a "qualified location for the holder of a Class B Bingo License" in compliance with the Original Rules. Lucky Palace asked for confirmation that a Class B Bingo License would be issued to a qualified nonprofit organization that desired to operate bingo games at the location if such a location were built. Defendant Warren did not respond to the letter.

48. On or about June 15, 2004, Lucky Palace contacted Defendant Warren by letter to notify him that it was continuing to operate under the Original Rules. Stressing to Defendant Warren that the process of land purchases, site development, environmental assessments, associated legal and consulting fees and architectural renderings were all based on the Original Rules, Lucky Palace inquired as to the impact of the First Amended Rules on Lucky Palace's planned development. Defendant Warren did not respond.

49. On or about July 21, 2004, Bracy and Defendant Warren met in Defendant Warren's office to discuss the concerns of the Lucky Palace lenders and investors over the First Amended Rules and any additional changes that may be forthcoming.

50. On or about July 30, 2004, Bracy sent, for Defendant Warren's signature, a statement that the First Amended Rules would not be further amended and that, if Lucky Palace complied with the First Amended Rules, there will be no delays or problems in obtaining his approval of its "qualified location for the holder of a Class B Bingo License." Defendant Warren did not sign the statement.

51.     On or about August 5, 2004, Defendant Warren replied by letter to Bracy and stated that he reserved the right to amend the regulations as necessary but did not see any amendments in the foreseeable future.  He further stated that the First Amended Rules governed any bingo operations that were currently in existence or that were to be constructed and completed in the following several months.

52.     On or about November 10, 2004—after securing contracts with over fifteen nonprofit organizations—Lucky Palace submitted an Application for Bingo Operator's License. The application was denied because, according to Defendant Warren, Lucky Palace's proposed location did not qualify as it was not completed.

53.     On or about November 23, 2004, Lucky Palace sought clarification on what constituted "capital improvements" under the First Amended Rules.  This clarification was to ensure that Lucky Palace could come into compliance with the $15 million requirement for locations in the First Amended Rules.  This also placed Defendant Warren on notice that the requirements in place at that time would soon be met by Lucky Palace.

54.     On or about January 6, 2005, Defendant Warren amended his rules again.  The amended set of rules was entitled "Second Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama" ("Second Amended Rules"), a true and correct copy of which are attached hereto as Exhibit C.  The Second Amended Rules were primarily drafted by Fred Gray Jr. —the attorney for Defendants Warren, McGregor, and VictoryLand—on whom Defendant Warren relied for his opinion, judgment, and exercise of discretion in the promulgation of the Second Amended Rules.

55.     The Second Amended Rules stated that "[a]t no time shall there be issued and outstanding more than sixty (60) Class B Licenses for the operation of bingo in Macon County." This provision will be referred to hereinafter as the "Sixty License Maximum."

56.     Defendant Warren promulgated the Second Amended Rules with knowledge that forty-six Class B Bingo Licenses had been, or soon would be, issued to non-profit organizations with contractual ties to Defendant VictoryLand.  Accordingly, the Sixty License Maximum—combined with Fifteen License Minimum—foreclosed the operation of bingo games in Macon County at any location other than VictoryLand.

57.     On March 8, 2005, Pebblin W. Warren, the wife of Defendant Warren, was elected to the Alabama House of Representatives in a special election.  On or about July 18, 2005, Representative Warren submitted HB 17, a bill which sought to amend Amendment 744 to incorporate the Second Amended Rules.  That amendment would have further insulated VictoryLand from competing bingo parlors in Macon County.  HB 17 was not enacted into law.

58.     On or about July 25, 2005, the Charities submitted Charity Application Packages for Class B Bingo Licenses (hereinafter "Applications") to Defendant Warren.  The Applications indicated that the Charities intended to conduct bingo at a location owned by Lucky Palace. Pursuant to their contracts with Lucky Palace, the Charities were each guaranteed semi-annual payments of $21,000 for operating bingo games at Lucky Palace's location.  To this day, Defendant Warren has failed to issue Class B Bingo Licenses to the Charities.

59.     On or about August 17, 2005, Lucky Palace sent a letter to Defendant Warren in which it expressed its concerns over Defendant Warren's repeated dismissals of efforts to acquire bingo licenses to operate in Macon County.  Pre-approval was again requested by Lucky Palace so that it could begin construction on its location and move towards the operation of a

"qualified location for the holder of a Class B Bingo License" in Macon County. Defendant Warren did not respond.

60.     By the end of 2005, fifty-eight Class B Bingo Licenses had been issued to non-profit organizations affiliated with VictoryLand. As of today, all sixty Class B Bingo Licenses have been issued to non-profit organizations affiliated with VictoryLand.

61.     As a direct result of Defendant Warren's actions—which, upon information and belief, were conducted at the behest of Defendants McGregor and VictoryLand and with the advice, consent, and influence of Fred Gray Jr.[2]—Lucky Palace has been unable to open and operate its bingo facility and has suffered damages in the form of lost profits.

62.     On several occasions, during meetings between representatives of Lucky Palace and Defendant Warren, Defendant Warren told the representatives that, if Lucky Palace or the Charities wanted Class B Bingo Licenses, then they would have to sue him.

63.     On December 18, 2006, the Charities filed the instant suit against Sheriff Warren and, on March 2, 2007,2006, moved for leave to add McGregor and VictoryLand as Defendants. On March 6, 2007, Alabama State Senator Myron Penn submitted SB 92, a bill that—like HB 17 submitted by Representative Warren—sought to amend Amendment 744 to incorporate the

---

[2] The reasons for Defendant Warren's conduct are peculiarly within the knowledge of Defendant Warren. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of attorney Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray., is an investor in VictoryLand, (4) that Fred Gray and the Gray Law FirmJr. currently represent Defendantss Defendant McGregor and VictoryLand and havehas represented Defendants McGregor and VictoryLand since 1983,at least 1992, (5) that Defendant Warren, despite some knowledge of this past representation, retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, (6) that Sheriff Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations, (7) that the rules and regulations drafted by Fred Gray Jr. gave Defendant VictoryLand a monopoly on the conduct of electronic bingo games in Macon County, and (8) that Defendant Warren issued the one-sided rules and regulations.

Second Amended Rules.  Defendant McGregor has contributed at least $10,000 to Senator Penn's campaigns.

## PATTERN OF RACKETEERING ACTIVITY

64.     As described more fully herein, the Defendants are engaged in an ongoing pattern of racketeering as defined by 18 U.S.C. § 1961(5).

65.     The pattern of racketeering activity engaged in by the Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

66.     Under 18 U.S.C. § 1961(1), "racketeering activity" includes any act or threat involving bribery that is chargeable under state law and punishable by imprisonment for more than one year.

67.     The racketeering activity in this case includes an ongoing pattern of violations of Alabama's bribery statutes.

68.     Ala. Code § 13A-10-60, *et seq.*, is entitled "Bribery and Corrupt Influence."  Ala. Code § 13A-10-60 incorporates the definition of "public servant" set forth in Ala. Code § 13A-10-1.  Ala. Code § 13A-10-1(7) defines a "public servant," in pertinent part, as "[a]ny officer or employee of government, including . . . any person . . . participating as an adviser, consultant, or otherwise in performing a governmental function."

69.     After Fred Gray Jr. was retained by Defendant Warren for the purpose of advising him with respect to the formulation of rules and regulations for the licensing and conduct of bingo games, Fred Gray Jr. became a "public servant," as that term is defined by Ala. Code § 13A-10-1(7).  *Cf. Vaughn v. State*, 880 So. 2d 1178 (Ala. Crim. App. 2003) (holding that the president of an architectural, engineering, and urban planning firm, who was retained as a

consultant by the state, was a "public servant" as defined by Ala. Code § 13A-10-1(7)); *Vaughan v. Marshall*, 2006 WL 1476043, *8 (M.D. Ala. 2006) ("The evidence was undisputed that Vaughn was hired as a consultant to conduct a comparative site analysis for the State of Alabama; thus, he clearly fell within the definition of a 'public servant.'").

70.    Ala. Code § 13A-10-61(a) states that "[a] person commits the crime of bribery if:

(1)    He offers, confers or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced; or

(2)    While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

Ala. Code § 13A-10-61(a).  Ala. Code § 13A-10-61(c) states that "[b]ribery is a Class C felony." Pursuant to Ala. Code § 13A-5-6, a Class C felony is punishable by imprisonment for a term not more than 10 years or less than 1 year and 1 day.

71.    Defendants McGregor and VictoryLand have violated and continue to violate Ala. Code § 13A-10-61(a)(1).  As described more fully herein, Defendants McGregor and VictoryLand, on multiple occasions since January 1, 2003, have offered, conferred, and/or agreed to confer things of value upon Fred Gray, Fred Gray Jr., and the Gray Law Firm, with the intent that Fred Gray Jr.'s opinion, judgment, exercise of discretion, or other actions in advising and consulting with Defendant Warren in the promulgation of, and subsequent amendments to, the rules and regulations for the operation of bingo in Macon County would be corruptly influenced.

72.    Fred Gray Jr. has violated and continue to violate Ala. Code § 13A-10-61(a)(2). As described more fully herein, Fred Gray Jr., on multiple occasions since January 1, 2003, has

solicited, accepted, and/or agreed to accept pecuniary benefits from Defendants McGregor and VictoryLand upon an agreement or understanding that Fred Gray Jr.'s opinion, judgment, exercise of discretion, or other actions in promulgating and amending rules and regulations for the operation of bingo in Macon County would be corruptly influenced.

73.     Each such violation of Ala. Code § 13A-10-61 constitutes an act of "racketeering activity" under 18 U.S.C. § 1961(1)(A).

74.     A "thing of value" "does not necessarily mean a substance . . . . [I]t includes an act, or action." *Caruthers v. State*, 74 Ala. 406 (Ala. 1883). "'Value . . . is determined by the application of a subjective, rather than an objective, test, and the requirement of value is satisfied if the thing has sufficient value in the mind of the person concerned so that his actions are influenced.'" *McDonald v. State*, 329 So. 2d 583, 587 (Ala. Cr. App. 1975) (quoting 12 Am. Jur. 2d Bribery § 7).

75.     On numerous occasions since January 1, 2003, Defendants McGregor and VictoryLand have bestowed the following things of value on Fred Gray, Fred Gray Jr. and the Gray Law Firm: (1) legal fees and the promise of future legal fees; (2) free travel on aircraft owned or chartered by Defendants McGregor and VictoryLand and the promise of future free travel; and (3) substantial dividend payments to Fred Gray in his capacity as a shareholder in VictoryLand and the promise of substantial payments in the future. All of these things had value in the mind of Fred Gray Jr.

76.     In a bribery case, intent may be established by circumstantial evidence. *See United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996). The circumstances surrounding the promulgation and amendment of the rules and regulations for electronic bingo establish that

(1) Defendants McGregor and VictoryLand intended to corruptly influence Fred Gray Jr. and (2) Fred Gray Jr. agreed or understood that his actions would be corruptly influenced.

77.     Defendant McGregor met with Fred Gray Jr. and Defendant Warren within a week after Amendment 744 was ratified.  Defendant McGregor, at that meeting, did not disclose to Defendant Warren the full extent of the benefits that he had bestowed or planned to bestow on Fred Gray Jr.  Defendant Warren, following the meeting, retained Fred Gray Jr. to draft the rules and regulations and planned to rely on Fred Gray Jr.'s opinion, judgment, and exercise of discretion when Fred Gray Jr. advised and consulted Defendant Warren on the content of those rules and regulations.

78.     Following the meeting, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to aid in the creation rules and regulations that favored Defendant VictoryLand.[3] Upon information and belief, Fred Gray Jr. agreed and understood that, if he created rules and

---

[3] The alleged intent is peculiarly within the knowledge of Defendant McGregor.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of Fred Gray Jr., (3) that, from 1983at least 1992 until the time of the meeting, Defendants McGregor and VictoryLand had bestowed things of value on Fred Gray Jr., (4) that, at the time of the meeting, Fred Gray and the Gray Law FirmJr. represented Defendants McGregor and VictoryLand, (5) that, following the meeting, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (6) that, following the meeting, Fred Gray and the Gray Law FirmJr. continued to represent Defendants McGregor and VictoryLand, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (8) that such a monopoly was not in the best interests of the people of Macon County, (9) that, following the issuance of the rules and regulations, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the rules and regulations,regulation, Fred Gray and the Gray Law FirmJr. continued representing Defendants McGregor and VictoryLand.

regulations that favored VictoryLand, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[4]

79.    Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in drafting the rules and regulations.[5]    Neither Defendant McGregor nor Fred Gray Jr. disclosed ~~the full extent of~~ this assistance to Defendant Warren.

80.    As a result of Defendant McGregor's influence, the Original Rules were drafted in such a way that Defendant VictoryLand was the only location in Macon County that could qualify for the conduct of electronic bingo, and its qualification was immediate.    The Original

---

[4] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr.    This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that a meeting was conducted in the presence of Fred Gray Jr., (3) that, from 1983 ~~at least 1992~~ until the time of the meeting, Defendants McGregor and VictoryLand had bestowed things of value on Fred Gray Jr., (4) that, at the time of the meeting, Fred Gray and the Gray Law Firm ~~Jr.~~ represented Defendants McGregor and VictoryLand, (5) that, following the meeting, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (6) that, following the meeting, Fred Gray and the Gray Law Firm ~~Jr.~~ continued to represent Defendants McGregor and VictoryLand, (7) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (8) that such a monopoly was not in the best interests of the people of Macon County, (9) that, following the issuance of the rules and regulations, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the rules and regulations, ~~regulation,~~ Fred Gray and the Gray Law Firm ~~Jr.~~ continued representing Defendants McGregor and VictoryLand.

[5] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and ~~his attorney,~~ Fred Gray Jr.    This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that a meeting was conducted in the presence of Fred Gray Jr., (2) that, following the meeting, Fred Gray and the Gray Law Firm ~~Jr.~~ continued to represent Defendants McGregor and VictoryLand, (3) that the rules and regulations drafted by Fred Gray Jr. gave VictoryLand a virtual monopoly on the conduct of electronic bingo games in Macon County, (4) that such a monopoly was not in the best interests of the people of Macon County, (5) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (6) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

Rules also imposed no requirements on the amount of compensation that a location would have to give to a non-profit organization in exchange for the location's right to conduct electronic bingo on the organization's behalf. Accordingly, the Original Rules allowed Defendant VictoryLand to be the primary beneficiary of electronic bingo—with its affiliated non-profit organizations receiving little money in return.

81. Because the Original Rules heavily favored Defendant VictoryLand, they did not serve the interests of the people of Macon County—interests that Defendant Warren, and Fred Gray Jr., as his adviser, were bound to protect and serve. The Original Rules, among other things, deterred additional investment in Macon County and prevented the creation of additional jobs. The Original Rules also prevented the establishment of Macon County as a gaming destination. In addition, the virtual monopoly granted to Defendant VictoryLand obviated any need for VictoryLand to invest in capital improvements to it facilities, to compensate fairly the nonprofit organizations affiliated with it, or to compensate its employees with competitive wages or other benefits.

82. Fred Gray Jr. presented the Original Rules to Defendant Warren. Defendant Warren made few, if any, changes to the Original Rules before adopting and promulgating them as the rules and regulation governing electronic bingo. Instead, Defendant Warren relied on Fred Gray Jr.'s opinion, judgment, and exercise of discretion regarding the content of the Original Rules.

83. Shortly after the Original Rules were promulgated, Defendant VictoryLand contracted with the Tuskegee Human and Civil Rights Multicultural Center, a nonprofit organization, for the conduct of electronic bingo at VictoryLand. The Tuskegee Human and Civil Rights Multicultural Center was controlled by Fred Gray and Defendant McGregor. Under

the terms of their contract, the Tuskegee Human and Civil Rights Multicultural Center agreed to accept a flat fee of $10,500 per year from VictoryLand.  In return, VictoryLand would receive all of the proceeds from the conduct of electronic bingo.

84.    The Tuskegee Human and Civil Rights Multicultural Center applied for a license for the conduct of electronic bingo, and Defendant Warren issued that license on December 17, 2003.  Defendant Warren, relying on the advice of Fred Gray Jr., made no inquiry into the contractual arrangement between the Tuskegee Human and Civil Rights Multicultural Center and VictoryLand.

85.    After Defendant Warren issued a license to the Tuskegee Human and Civil Rights Multicultural Center, Defendant VictoryLand immediately began operating electronic bingo games.  The one-sided terms of Defendant VictoryLand's contract with the Tuskegee Human and Civil Rights Multicultural Center allowed Defendant VictoryLand to offer the opportunity to conduct electronic bingo at its location to other nonprofit organizations on a take-it-or-leave-it basis.

86.    From December 17, 2003, to June 2004, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr.

87.    In early 2004, Plaintiff Lucky Palace was developing firm plans for the construction of an electronic bingo parlor to compete with Defendant VictoryLand.  In April 2004, Plaintiff Lucky Palace contracted with Plaintiffs McRae Prostate Awareness Foundation and Shorter Community Development, Inc., for the conduct of electronic bingo.  In May 2004, Plaintiff Lucky Palace closed on a purchase of land adjacent to Defendant VictoryLand's bingo parlor.

88.    In May 2004, Defendant Warren authorized Fred Gray Jr. to revise the Original Rules using his opinion, judgment, and exercise of discretion.  After Fred Gray Jr. received this authorization, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to develop more onerous rules and regulations for competing facilities.[6]  Upon information and belief, Fred Gray Jr. agreed and understood that, if he developed more onerous rules and regulations for competing facilities, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[7]

---

[6] The alleged intent is peculiarly within the knowledge of Defendant McGregor.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Original Rules until May 2004, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2004, Fred Gray and the Gray Law FirmJr. represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the Gray Law FirmJr. continued to represent Defendants McGregor and VictoryLand, (5) that the First Amended Rules drafted by Fred Gray Jr. imposed rules and regulations for the conduct of electronic bingo games in Macon County that were even more onerous than the Original Rules, (6) that the monopoly thereby sustained was not in the best interests of the people of Macon County, (7) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, (8) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News, (9) that, following the issuance of the First Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the First Amended Rules, Fred Gray and the Gray Law FirmJr. continued representing Defendants McGregor and VictoryLand.

[7] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Original Rules until May 2004, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2004, Fred Gray and the Gray Law FirmJr. represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the Gray Law

89.     Fred Gray Jr. revised the rules and regulations to impose more onerous requirements on facilities competing with VictoryLand.  Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in revising the rules and regulations.[8]  Fred Gray Jr., without ~~fully~~ disclosing the assistance received from Defendants McGregor and VictoryLand, advised Defendant Warren to issue the First Amended Rules. Defendant Warren then issued the First Amended Rules with few, if any, changes in June 2004.

90.     From June 2004 to December 2004, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr.

91.     Despite the onerousness of the First Amended Rules, Lucky Palace took steps to meet their requirements after learning about their issuance.  Throughout the fall of 2004, Lucky Palace provided frequent updates to Defendant Warren regarding the status of their venture.  In

---

Firm~~Jr.~~ continued to represent Defendants McGregor and VictoryLand, (5) that the First Amended Rules drafted by Fred Gray Jr. imposed rules and regulations for the conduct of electronic bingo games in Macon County that were even more onerous than the Original Rules, (6) that the monopoly thereby sustained was not in the best interests of the people of Macon County, (7) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, (8) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News, (9) that, following the issuance of the First Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (10) that, following the issuance of the First Amended Rules, Fred Gray and the Gray Law Firm~~Jr.~~ continued representing Defendants McGregor and VictoryLand.

[8] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and ~~his attorney,~~ Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the First Amended Rules through January 2004, Fred Gray and the Gray Law Firm~~Jr.~~ represented Defendants McGregor and VictoryLand, (2) that the First Amended Rules imposed onerous requirements on bingo parlors that intended to compete with VictoryLand, thus shoring up VictoryLand's virtual monopoly on the conduct of electronic bingo games in Macon County, (3) that such a monopoly was not in the best interests of the people of Macon County, (4) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (5) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

September 2004, Lucky Palace contracted with seventeen additional non-profit organizations for the conduct of electronic bingo at Lucky Palace's planned facility, bringing the total to nineteen and easily satisfying the 15 License Minimum. Lucky Palace contracted with additional non-profit organizations in October and December 2004. In December 2004, Lucky Palace purchased a 5.49 acre tract of land directly across the street from Defendant VictoryLand's bingo parlor.

92.     In December 2004, Defendant Warren authorized Fred Gray Jr. to revise the First Amended Rules using his opinion, judgment, and exercise of discretion. After Fred Gray Jr. received this authorization, Defendant McGregor, on behalf of himself and Defendant VictoryLand, intended, upon information and belief, to bestow and continue bestowing things of value on Fred Gray Jr. so long as Fred Gray Jr. used his opinion, judgment, and exercise of discretion to develop rules and regulations that would prevent the opening of a competing bingo parlor.[9] Upon information and belief, Fred Gray Jr. agreed and understood that, if he developed

---

[9] The alleged intent is peculiarly within the knowledge of Defendant McGregor. This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Second Amended Rules until June 2005, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in June 2005, Fred Gray and the Gray Law Firm Jr. represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the Gray Law Firm Jr. continued to represent Defendants McGregor and VictoryLand, (5) that the Second Amended Rules drafted by Fred Gray Jr. granted a monopoly on electronic bingo to Defendant VictoryLand, (6) that the monopoly thereby granted was not in the best interests of the people of Macon County, (7) that, following the issuance of the Second Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (8) that, following the issuance of the Second Amended Rules, Fred Gray and the Gray Law Firm Jr. continued representing Defendants McGregor and VictoryLand.

more such rules and regulations, Defendants McGregor and VictoryLand would bestow and continue bestowing things of value on him.[10]

93.      Fred Gray Jr. revised the rules and regulations to prevent the opening of a bingo parlor that could compete with Defendant VictoryLand.  Upon information and belief, Defendant McGregor, personally and through his agents, assisted Fred Gray Jr. in revising the rules and regulations.[11]  Fred Gray Jr., without ~~fully~~ disclosing the assistance received from Defendants McGregor and VictoryLand, advised Defendant Warren to issue the Second Amended Rules. Defendant Warren then issued the Second Amended Rules with few, if any, changes on January 6, 2005.

---

[10] The alleged agreement and understanding is peculiarly within the knowledge of Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the Second Amended Rules until May 2005, Defendants McGregor and VictoryLand bestowed things of value on Fred Gray Jr., (2) that, in May 2005, Fred Gray and the Gray Law Firm ~~Jr.~~ represented Defendants McGregor and VictoryLand, (3) that, following Defendant Warren's authorization of the revision, Defendants McGregor and VictoryLand continued to bestow things of value on Fred Gray Jr., (4) that, following Defendant Warren's authorization of the revision, Fred Gray and the Gray Law Firm ~~Jr.~~ continued to represent Defendants McGregor and VictoryLand, (5) that the Second Amended Rules drafted by Fred Gray Jr. granted a monopoly on electronic bingo to Defendant VictoryLand, (6) that the monopoly thereby granted was not in the best interests of the people of Macon County, (7) that, following the issuance of the Second Amended Rules, Defendants McGregor and VictoryLand continued bestowing things of value on Fred Gray Jr., and (8) that, following the issuance of the Second Amended Rules, Fred Gray and the Gray Law Firm ~~Jr.~~ continued representing Defendants McGregor and VictoryLand.

[11] The alleged assistance is peculiarly within the knowledge of Defendant McGregor and ~~his attorney,~~ Fred Gray Jr.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that, from the issuance of the First Amended Rules through June 2005, Fred Gray and the Gray Law Firm ~~Jr.~~ represented Defendants McGregor and VictoryLand, (2) that the Second Amended Rules established an actual monopoly on the conduct of electronic bingo games in Macon County, (3) that such a monopoly was not in the best interests of the people of Macon County, (4) that, on June 2, 2004, the day the First Amended Rules were issued, Fred Gray Jr. faxed a copy of those rules to Defendant McGregor and John Bolton, one of his attorneys, and (5) that the First Amended Rules were not revealed to the public until June 10, 2004, when they were disclosed by the Tuskegee News.

94.     The Second Amended Rules capped the maximum number of Class B Bingo Licenses at 60.  That cap, combined with the requirement that a bingo parlor contract with a minimum of 15 non-profit organizations before conducting electronic bingo, has foreclosed competition for electronic bingo in Macon County.

95.     From January 6, 2005, until the present, Defendants McGregor and VictoryLand have continued to bestow things of value on Fred Gray Jr.

96.     The alleged acts of racketeering activity involve a distinct threat of long-term racketeering activity.

97.     The above-described bribery of Fred Gray Jr. by Defendants McGregor and VictoryLand—which has resulted in the promulgation and maintenance of rules and regulations that deprive the Plaintiffs of the ability to open a business that competes with VictoryLand—has continued for almost four years, is ongoing at the present time, and will continue into the future unless halted by judicial intervention.  This bribery has corruptly influenced Fred Gray Jr.'s opinion, judgment, and exercise of discretion by motivating him to act in his personal interest and in the interest of Defendants McGregor and VictoryLand rather than in the public interest. The bribery continues to corruptly influence Fred Gray Jr.'s opinion, judgment, and exercise of discretion, preventing him from fulfilling his duties as a public servant.

98.     The above-described bribery—which insulates VictoryLand and its profits from any threat of competition—is part of McGregor and VictoryLand's regular way of doing business.  Indeed, the bribery has allowed VictoryLand to (1) avoid investing in capital improvements to its facilities, (2) decline to compensate fairly the nonprofit organizations affiliated with it, (3) refuse to bestow adequate benefits on its employees, whose employment prospects are diminished by VictoryLand's monopoly, and (4) impose unreasonable working

conditions on its employees.  The bribery has thus greatly benefited VictoryLand at the expense

not only of the Plaintiffs but of the people of Macon County.

### THE ENTERPRISE

99.    Defendants, as well as Fred Gray Jr., Fred Gray, and the Gray Law Firm, were

associated in fact as an "Enterprise," as that term is defined by 18 U.S.C. § 1961(4).  Defendant

McGregor  was  an  employee  and  shareholder  of  Defendant  VictoryLand.    Fred  Gray  was  a

shareholder of Defendant VictoryLand.  Fred Gray, Fred Gray Jr., and the Gray Law Firm served

as attorneys for Defendants McGregor and VictoryLand.  Fred Gray Jr. and the Gray Law Firm

also served as attorneys for Defendant Warren.

100.    That Enterprise was formed for the common purpose of enriching certain of its

members through a pattern of bribery that allowed VictoryLand to operate as the sole Class B

bingo parlor in Macon County.

101.    Each associate of the Enterprise conducted or participated, directly or indirectly,

in the conduct of the Enterprise's affairs through the pattern of racketeering activity described

above.   Defendant Warren retained Fred Gray Jr. as his adviser.   Defendants McGregor and

VictoryLand bestowed things of value on Fred Gray Jr. by providing benefits to Fred Gray, Fred

Gray Jr., and the Gray Law Firm.  Fred Gray Jr. drafted rules and regulations to establish and

maintain  Defendant  VictoryLand's  monopoly.    Defendant  Warren  promulgated  those  rules  and

regulations.

102.    The Enterprise is engaged in and affects interstate commerce in a variety of ways.

103.    The  Enterprise  is  engaged  in  and  affects  interstate  commerce  in  that  the

individuals  who  participate  in  Defendant  VictoryLand's  electronic  bingo  games  travel  in

interstate commerce to reach Defendant VictoryLand's facility.    In fact, Defendant VictoryLand's facility is located immediately next to an interstate highway.

104.    The Enterprise is engaged in and affects interstate commerce by advertising its bingo parlor in interstate commerce.    Defendant VictoryLand advertises its bingo parlor in publications that circulate outside of Alabama and in television and radio advertisements that reach beyond Alabama.    Defendant VictoryLand also maintains an internet website that can be and is accessed by persons outside of Alabama.

105.    The Enterprise affects interstate commerce by limiting the number and variety of bingo transactions and the ability of interstate travelers to choose among competing bingo parlors in Macon County.

### INJURY

106.    Under 18 U.S.C. § 1964(c), "any person injured in his business or property" by racketeering activities may sue for those injuries and recover treble damages.    A plaintiff may recover any damages proximately caused by the racketeering activity, including lost profits.    *See, e.g., Maiz v. Virani*, 253 F.3d 641, 662-663 (11th Cir. 2001).

107.    Lucky Palace has secured all of the necessary prerequisites to opening and operating a bingo parlor in Macon County.    It has secured real property on which to build its facility.    It has hired an architect who produced plans for the facility.    It has contracted with an engineer to assist with construction of the facility.    It has contracted with a company to manage its bingo parlor.    It has licensed a brand name for its facility.    It has arranged financing for its facility.    It has contracted with nonprofit organizations who are interested in conducting electronic bingo at its facilities.    It has located an insurance company that is ready and willing to

provide the required insurance.  To begin constructing and operating the facility, Lucky Palace needs only a license from Defendant Warren.

108.    Because of the racketeering activity, which has resulted in the creation and maintenance of VictoryLand's monopoly, Lucky Palace is unable to obtain the necessary license and conduct its business for profit.  Accordingly, the racketeering activity has been and continues to be the direct and proximate cause of an injury to Lucky Palace's business.  As a result of that injury, Lucky Palace has suffered damages in the form of lost profits and the diminished value of their investments.

109.    The Charities have contracted with Lucky Palace to conduct electronic bingo on their behalves.  Under those contracts, each of the Charities is entitled to fixed semi-annual payments of $21,000.  The Charities cannot receive those payments unless they receive licenses from Defendant Warren.  The pattern of racketeering activity has prevented the Charities from obtaining those licenses.  Accordingly, the Charities have been injured in their business and property as a direct and proximate result of the racketeering activity.

110.    The directness of the injuries to the Plaintiffs distinguishes this case from *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006).  The *Anza* court recognized that, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Id.* at 1998.  In *Anza*, the plaintiff's theory was that the defendants "harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers."  *Id.* at 1996-97.  The Court determined that the requirement of proximate causation was not met because "[t]he cause of [the plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."  *Id.* at 1997.

111.   In this case, the cause of the Plaintiffs' asserted harm is a set of actions (Defendant Warren's promulgation of one-sided rules) that is directly related to the alleged RICO violation (the bribery of Fred Gray Jr.).   Accordingly, *Anza* does not control this case.

112.   In addition, the Eleventh Circuit, in a case following *Anza*, reaffirmed that "'proximate cause is not . . . the same thing as a sole cause,' and it is enough for the plaintiff to plead and prove that the defendant's tortious or injurious conduct was a 'substantial factor in the sequence of responsible causation.'"   *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1288 n.5 (11th Cir. 2006) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399, *modified on other grounds by* 30 F.3d 1347 (11th Cir. 1994).   The pattern of racketeering activity in this case was certainly a substantial factor, if not the sole factor, in the sequence of causation that led to the Plaintiffs' injuries.

## COUNT I
## (RICO 18 U.S.C. § 1962(c))

113.   The Plaintiffs reallege the facts and allegations set forth in paragraphs 1 through 112 above.

114.   Lucky Palace is a "person," as that term is defined in 18 U.S.C. § 1961(3), which has been injured in its business or property by the conduct of the Defendants in violation of RICO.

115.   The Charities are each, individually, a "person", as that term is defined in 18 U.S.C. § 1961(3), which has been injured in its business or property by the conduct of the Defendants in violation of RICO.

116.   Each Defendant, as well as Fred Gray Jr. and the Gray Law Firm, is a "person," as that term is defined in 18 U.S.C. § 1961(3), culpable for his or its conduct in violation of RICO.

117.    The Defendants have conducted and participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

118.    As a direct and proximate result of the Defendants' violations of 18 U.S.C. § 1962(c), the Plaintiffs have been injured in their business and/or property through lost profits for Lucky Palace and lost licensing fees for the Charities in an amount to be proven at trial. Under 18 U.S.C. § 1964, the Plaintiffs are entitled to bring this action and to recover herein treble damages and the costs of bringing this lawsuit, including attorneys' fees.

## COUNT II
### (RICO 18 U.S.C. § 1962(d))

119.    Plaintiffs reallege the facts and allegations set forth in paragraphs 1 through 118 above.

120.    Defendants, being persons employed by or associated with the Enterprise described above, unlawfully and willfully combined, conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

121.    As part of the conspiracy, each Defendant agreed to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above.

122.    The racketeering acts which Defendants committed and caused to be committed were overt acts taken in furtherance of the conspiracy.

123.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property through lost profits for Lucky Palace

and lost licensing fees for the Charities in an amount to be proven at trial. Under 18 U.S.C. § 1964, Plaintiffs are entitled to bring this action and to recover herein treble damages and the costs of bringing this lawsuit, including attorneys' fees.

**COUNT III**
**(Violation of the Equal Protection Clause)**

124.    The Plaintiffs fully incorporate Paragraphs 1-123 by reference as if fully set forth herein.

125.    Defendant Warren, under the color of state law and his authority as Sheriff of Macon County, has intentionally treated the Plaintiffs differently from other similarly-situated organizations, and there is no rational basis for the difference in treatment. Accordingly, the Plaintiffs have been denied their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

126.    The Charities are Macon County non-profit organizations. They have submitted completed applications for Class B Bingo Licenses to Defendant Warren. Those applications fulfill all of the requirements of the Original Rules, the First Amended Rules, and the Second Amended Rules. Accordingly, the Charities are similarly situated to those fifty-nine Macon County non-profit organizations that have been granted Class B Bingo Licenses.

127.    Lucky Palace is an Alabama limited liability company. It has submitted to Defendant Warren a completed application for a Class B Bingo Operator's License. That application fulfills those requirements of the Original Rules, the First Amended Rules, and the Second Amended Rules that have a rational basis. Accordingly, Lucky Palace is similarly situated to VictoryLand, which is the only organization that has received a Class B Bingo Operator's License.

128.    Defendant Warren has intentionally treated the Plaintiffs differently from their similarly-situated counterparts by failing to issue appropriate licenses to the Plaintiffs in a timely fashion.  That different treatment constitutes intentional and arbitrary discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. There is no rational basis for that different treatment.

129.    There is no rational basis for the Fifteen License Minimum.  There is no rational basis for the Sixty License Maximum.  There is no rational basis for issuing fifty-nine of the sixty Class B Bingo Licenses available under the Second Amended Rules to nonprofit organizations who desired to operate bingo games at VictoryLand.  There is no rational basis for requiring interested organizations to construct or lease a multi-million dollar facility prior to obtaining a Class B Bingo License.

130.    In addition to lacking a rational basis, the requirements stated in Paragraph 129 are arbitrary, capricious, and intended to discriminate against all nonprofit organizations, including the Charities, that desire to operate bingo at locations other than VictoryLand.

### <u>COUNT IV</u>
#### (Conspiracy to Deprive the Plaintiffs of the Equal Protection of the Laws)

131.    The Plaintiffs fully incorporate Paragraphs 1-130 by reference as if fully set forth herein.

132.    Defendant Warren and Defendant McGregor, in his personal capacity and as an agent for VictoryLand, agreed or had an understanding—reached by, through, and with the assistance and influence of Fred Gray, Fred Gray Jr., and the Gray Law Firm—that Defendant Warren would issue rules and regulations for the licensing and operation of bingo in Macon County that would (1) deprive any nonprofit organization, other than a nonprofit organization associated with VictoryLand, of the ability to obtain a license for the conduct of electronic bingo

in Macon County and (2) deprive any organization, other than VictoryLand, of the ability to obtain an operator's license for the conduct of bingo in Macon County. Accordingly, Defendants McGregor and VictoryLand were jointly engaged with Defendant Warren, a state official, in the deprivation of the Plaintiffs' equal protection rights.

133. By issuing rules and regulations in accordance with that agreement or understanding, Defendant Warren deprived the Plaintiffs of the equal protection of the laws. Defendant Warren perpetuated that deprivation by issuing the First Amended Rules and the Second Amended Rules. Defendant Warren further perpetuated the deprivation by refusing to consider the Plaintiffs' applications for Class B Bingo Licenses based on his interpretation of the Original Rules, the First Amended Rules, and the Second Amended Rules.

134. In addition, upon information and belief, Defendant McGregor has taken steps to perpetuate the deprivation by encouraging Representative Warren and Senator Penn, personally or through his agents, to submit legislation seeking to amend Amendment 744 to incorporate the Second Amended Rules.[12]

135. As a result of the deprivation and its perpetuation, the Plaintiffs have been injured in an amount to be proven at trial.

136. On January 30, 2007, counsel for the Plaintiff Charities received a copy of the deposition of Defendant Warren that was taken in *Macon County Investments v. Warren*, 3:06-

---

[12] The alleged encouragement is peculiarly within the knowledge of Defendant McGregor. This allegation is based, in part, on the following facts and circumstances: (1) that Defendant McGregor has close ties with Defendant Warren, who is the husband of Representative Warren, (2) that Defendant McGregor contributed $10,000 to Senator Penn's campaign, (3) that the Second Amended Rules create a monopoly for VictoryLand, (4) that Senator Penn introduced SB 92 on March 6, 2007, four days after the Charities moved to add McGregor and VictoryLand as Defendants, (5) that Senator Penn stated publicly that his goal in submitting SB 92 was "to etch [the Second Amended Rules] into stone," (6) that SB 92 and HB 17 are substantially similar, and (7) the Defendant McGregor publicly acknowledged discussing SB 92 with various people prior to its submission.

CV-224-WKW (M.D. Ala.).  That deposition revealed, among other things, (1) that Defendant McGregor contacted Defendant Warren about a week after Amendment 744 was passed, (2) that the meeting was conducted in the presence of attorney Fred Gray Jr., (3) that Fred Gray Jr.'s father and law partner, Fred Gray, is an investor in Defendant VictoryLand, (4) that Fred Gray and the law firm of Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C., represent Defendants McGregor and VictoryLand, (5) that Defendant Warren retained Fred Gray Jr. to draft and update the rules and regulations for the conduct of bingo in Macon County, and (6) that Defendant Warren relied primarily on Fred Gray Jr.'s judgment in drafting the rules and regulations.  Those facts indicated the existence of the conspiracy between Defendant Warren and Defendants McGregor and VictoryLand that is alleged herein.

137.  Prior to the receipt of that deposition, the Plaintiffs were not aware that Defendants McGregor and VictoryLand had conspired with Defendant Warren to deprive them of their equal protection rights.  The Plaintiffs could not have been aware of the conspiracy between the Defendants until, at the very earliest, August 15, 2006, when the deposition was conducted.

## **COUNT V**
**(Tortious Interference with Contractual and Business Relations)**

138.~~136.~~    The Plaintiffs fully incorporate Paragraphs 1-137~~1-135~~ by reference as if fully set forth herein.

139.~~137.~~    Amendment 744 allowed non-profit organizations to enter into contractual agreements with an individual, firm, or a corporation to operate Class B Bingo facilities within Macon County.

140.~~138.~~    In accordance with Amendment 744, each of the Charities individually contracted with Lucky Palace to operate a Class B Bingo facility in Macon County.

139.141.    Upon information and belief, Defendants McGregor and VictoryLand had knowledge of those contractual relationships.[13]

142.140.    With knowledge of those contractual relationships between Lucky Palace and the Charities, Defendants McGregor and VictoryLand intentionally interfered with those contractual and business relationships by influencing, aiding and/or directing Defendant Warren[14] to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County.  That interference was unjustified.

141.143.    Because of the promulgation, amendment, and maintenance of those arbitrary, capricious, and irrational rules and regulations, the performance of the contractual relationships between Lucky Palace and the Charities has been rendered impossible.

144.142.    The Plaintiffs have been damaged—and continue to be damaged—by the intentional interference with their contractual relationships by the actions of Defendants McGregor and VictoryLand.

## <u>COUNT VI</u>
### (Tortious Interference with Prospective Business Relationships)

145.143.    The Plaintiffs fully incorporate Paragraphs 1-1441-142 by reference as if fully set forth herein.

---

[13] The existence of the alleged knowledge is peculiarly within the knowledge of Defendant McGregor.  This allegation is based on the facts and circumstances alleged in this complaint, including, but not limited to, the following: (1) that Defendant Warren had knowledge of those relationships, (2) that Defendants Warren, McGregor, and VictoryLand were represented by the Gray Law Firm,same attorney, and (3) that Defendant Warren depended on Fred Gray Jr. for advice regarding electronic bingo.

[14] The Plaintiffs make no claim against Defendant Warren in this Count.

146.144.    The Plaintiffs reasonably expected that, if allowed to conduct electronic bingo in Macon County, they would be able to enter into contractual and business relationships with numerous patrons and customers.

145.147.    Upon information and belief, Defendants McGregor and VictoryLand had knowledge of the Plaintiffs' expected contractual and business relationships.[15]

148.146.    With knowledge of the Plaintiffs' expected contractual and business relationships, Defendants McGregor and VictoryLand intentionally interfered with the Plaintiffs' ability to consummate their expected contractual and business relationships by influencing, aiding and/or directing Defendant Warren[16] to promulgate, amend, and maintain unreasonable rules and regulations for the operation of bingo in Macon County.  That interference was unjustified.

147.149.    Because of the promulgation, amendment, and maintenance of those arbitrary, capricious, and irrational rules and regulations, the Plaintiffs have been unable to consummate their expected contractual and business relationships with numerous patrons and customers.

150.148.    The Plaintiffs have been damaged—and continue to be damaged—by the intentional interference with their prospective business relationships by the actions of Defendants McGregor and VictoryLand.

---

[15] The existence of the alleged knowledge is peculiarly within the knowledge of Defendant McGregor.  This allegation is based, in part, on the following facts and circumstances: (1) that Defendant Warren had knowledge of those relationships, (2) that Defendants Warren, McGregor, and VictoryLand were represented by the Gray Law Firm,same attorney, (3) that Defendant Warren depended on Fred Gray Jr. for advice regarding electronic bingo, and (4) that Defendants McGregor and VictoryLand were aware of the popularity of electronic bingo in Macon County.

[16] The Plaintiffs make no claim against Defendant Warren in this Count.

WHEREFORE, the Charities pray that this Court enter judgment against the Defendants as follows:

a.    With regard to Sheriff David Warren, for appropriate injunctive relief requiring Sheriff David Warren to, *inter alia*, (1) issue Class B Bingo Licenses to each of the Charities, (2) issue a Class B Bingo Operator's License to Lucky Palace, LLC, (3) suspend the Fifteen License Minimum and the Sixty License Maximum, and (4) allow the Charities to operate any and all games of bingo at the Lucky Palace location;

b.    With regard to Milton McGregor and Macon County Greyhound Park, Inc., for damages in an amount to be proven at trial, treble damages, and punitive damages;[17]

c.    For costs, including attorney's fees; and

d.    For such further and additional relief as the Court deems just and appropriate.

DATED:    _____, ~~June 29,~~ 2007.

Respectfully submitted,

~~s/ Robert K. Spotswood~~

~~s/ Michael T. Sansbury~~
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, AL 35203-3329
Telephone:  (205) 986-3620
Fax:  (205) 986-3639
E-mail:    rks@spotswoodllc.com
               msansbury@spotswoodllc.com

*Attorneys for the Plaintiff Charities*

---

[17] The Plaintiffs do not seek any damages from Defendant Warren.

_____

_____

Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:         steve@hgdlawfirm.com
                   lewis@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*