**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 3:06-cv-01113-WKW-WC |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

### PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING PRIVILEGE ISSUES

Pursuant to this Court's May 15, 2007 order, the Plaintiffs submit this supplemental brief addressing the application of Alabama Rule of Professional Conduct 1.6, the attorney-client privilege, and the attorney work-product doctrine to the discovery issues before this Court. For the reasons stated below, neither Alabama Rule of Professional Conduct 1.6, the attorney-client privilege, nor the work-product doctrine applies to prevent the discovery sought by the Plaintiffs.

### INTRODUCTION

This Court has asked that privilege issues be addressed with regard to three specific requests, two requests to Defendant VictoryLand that were initially addressed in DE 105 and one request to Fred Gray Jr. that was initially addressed in DE 134:

PLAINTIFF CHARITIES' REQUEST # 11 TO DEFENDANT VICTORYLAND: Please produce any and all documents in your possession or control that contain any communication between you and Fred D. Gray or Fred D. Gray, Jr., relating to the licensing of bingo in Macon County, Alabama.

DEFENDANT VICTORYLAND'S RESPONSE: VictoryLand objects to this request on the grounds that it seeks confidential or proprietary information

and/or information protected by the attorney-client privilege and the work product doctrine.  Further, the request is not reasonably calculated to lead to the discovery of admissible evidence.  The request is overly broad, unduly burdensome and oppressive, and the request is not reasonably limited in scope or time.

PLAINTIFF    CHARITIES'    REQUEST    #    12    TO    DEFENDANT VICTORYLAND:  Please produce any and all documents in your possession or control that contain any communication between you and Fred D. Gray, Fred D. Gray, Jr., or any of their partners and associates, relating to the licensing of bingo in Macon County, Alabama, from January 1, 2003, until January 6, 2005.

DEFENDANT VICTORYLAND'S RESPONSE:  VictoryLand objects to this request on the grounds that it seeks confidential or proprietary information and/or information protected by the attorney-client privilege and the work product doctrine.  Further, the request is not reasonably calculated to lead to the discovery of admissible evidence.  The request is overly broad, unduly burdensome and oppressive, and the request is not reasonably limited in scope.

PLANTIFF CHARITIES' REQUEST # 4 TO FRED D. GRAY JR.:  Please produce any and all documents in your possession or control that contain any communication between you and any of VictoryLand's agents or attorneys regarding electronic bingo.

FRED D GRAY JR.'S RESPONSE:  Produced.  In addition to those documents produced in response to this request, Fred D. Gray, Jr. objects to this production of documents based upon attorney/client privilege and/or attorney work product.  One document is identified as a ten-page copy of the First Amended and Restated Rules and Regulations for the licensing and Operation of Bingo Games in Macon County, Alabama, which contains several handwritten notes by either the attorneys or their client, David Warren.  The privilege is claimed by Defendant David Warren.  The second document is dated January 8, 2007, and is a letter from Fred Gray, Jr. and attorneys for VictoryLand and is work product of both Fred Gray, Jr. and David Warren (Bates Nos. FGJ0001-0027).  The third document is a letter dated January 17, 2007, from attorneys for VictoryLand to Fred Gray, Jr. and is work product of both Fred Gray, Jr. and David Warren (Bates Nos. FGJ0066-0156).

Because no privilege applies to any of the requested documents, this Court should compel

VictoryLand and Fred Gray, Jr. to respond to these requests.

**ARGUMENT**

**I.    Alabama Rule of Professional Responsibility 1.6 has no bearing on the discovery matters before this Court.**

VictoryLand cannot properly rely on Alabama Rule of Professional Responsibility 1.6 as a shield against discovery in this civil litigation.  Rule 1.6 has no impact whatsoever on whether this court should require production of documents and testimony in this case; instead those issues must be resolved exclusively by assessing whether any valid evidentiary objection overrides the Plaintiffs' broad discovery rights in this case.

Rule 1.6 creates a general ethical obligation on the part of all attorneys to protect "information relating to the representation of a client."  Ala. Rules of Prof'l Conduct R. 1.6.  But Rule 1.6, by its terms, applies to a lawyer's conduct *outside* the courtroom, not to judicial proceedings *inside* a courtroom where the court may compel disclosure.  *See, e.g.*, *Smith v. State*, 756 So. 2d 892, 909 (Ala. Crim. App. 1997) (considering a possible violation of Rule 1.6 when attorney disclosed information to the media); *see also United States v. Stepney*, 246 F. Supp. 2d 1069, 1073-74 (N.D. Cal. 2003) (The attorney-client privilege applies inside the courtroom, but "[m]echanisms other than the attorney-client privilege [including the Rule 1.6 ethical duty of confidentiality] protect against voluntary disclosure of confidential communications by counsel" outside the courtroom.).  The comments to Rule 1.6 explicitly recognize that the Rule has no application in this judicial proceeding:

> The principle of confidentiality is given effect in two related bodies of law, the attorney-client privilege (which includes the work product doctrine) in the law of evidence and the rule of confidentiality established in professional ethics.  The attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client.  *The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law*.

Ala. Rules of Prof'l Conduct R. 1.6 cmt. (emphasis added). The Plaintiffs are asking this Court, through a *judicial* proceeding, to compel VictoryLand and Fred Gray, Jr. to respond to certain discovery requests. Rule 1.6, which is only relevant in situations *other* "than those where evidence is sought from the lawyer through compulsion of law," does not apply here.[1]

While the Alabama courts have not yet addressed the inapplicability of Rule 1.6 to judicial proceedings,[2] many other courts, considering similar rules and commentary on those rules, have reached the same conclusion. For example, the Maryland Supreme Court has stated:[3]

> Thus, the rule of confidentiality is broader than the attorney-client privilege. Rule 1.6 applies to confidential communications between a client and an attorney in all situations *except* where the evidence is sought from the lawyer through compulsion of law. In the latter situation, only the attorney-client privilege, not the broader rule of confidentiality, protects against disclosure.

---

[1] Although Rule 1.6 and the attorney-client privilege/work-product doctrine each serve general principles of confidentiality, they do so in distinctively different ways and in different spheres. The attorney-client privilege is an evidentiary rule, applying "in judicial and other proceedings in which a lawyer may be . . . required to produce evidence concerning a client." *Id.* Rule 1.6, by contrast, is an ethical rule that applies "in situations *other* than those where evidence is sought from the lawyer through the compulsion of law." *Id.* Thus, although Rule 1.6 establishes a general ethical obligation to protect information learned during representation, it has no application when a court is asked to compel discovery.

[2] In *Ex parte Taylor Coal Co., Inc.*, 401 So. 2d 1 (Ala. 1981), the Alabama Supreme Court interpreted an older version of the Professional Rules of Ethics and held that a "substantial difference in the law is made between the attorney's ethical responsibility with reference to disclosure of confidential information and his privilege not to testify in court concerning his client's secrets." *Id.* at 8. The *Taylor Coal* court then noted that even if the communication must be disclosed in court (i.e. the attorney-client privilege has been waived), the lawyer has a continued ethical obligation to protect that confidence outside of the court, *id.*—which is consistent with the explicit language of the comments to the current Rule 1.6 that limit the Rule's application to communications made *outside* the courtroom only.

[3] Alabama's Rule 1.6 is based on the pre-2002 Model Rule of Professional Conduct 1.6. In 2002, the rules were updated and explicitly detailed. Nevertheless, the general principles underlying the ethical obligation of confidentiality were not altered, and cases interpreting post-2002 versions of Rule 1.6 are instructive here.

*In re Criminal Investigation No. 1/242Q*, 602 A.2d 1220, 1222 (Md. 1992).  Likewise, the D.C.

Circuit Court of Appeals has held:[4]

> Although Rule 1.6 and the rule protecting attorney-client confidential communication seemingly prohibits similar conduct, the two rules have vastly different legal implications and applications. The primary distinction between the two rules is that the rule of evidence governs admissibility in a trial court; the rule of professional conduct, on the other hand, governs only disciplinary actions of the D.C. Bar.  In creating such a distinction between the rules, we agree with the reasoning of the Michigan Supreme Court that "[t]he admissibility of evidence in a court of law . . . is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines.  Codes of professional conduct play no part in such decisions.

*Adams v. Franklin*, 924 A.2d 993, 999 n.6 (D.C. 2007) (quoting *People v. Green*, 274 N.W.2d

448, 454 (1979)).    *See also Honda Lease Trust v. Middlesex Mut. Assurance Co.*, No.

3:05CV1426(RNC), 2008 WL 349239, *4 (D. Conn. Feb. 6, 2008) (rejecting third party

witness's Rule 1.6 and 1.9 confidentiality objections to producing requested materials, finding

that the rule permits production to comply with a court's order); *CSX Transp., Inc. v. Gilkison*,

No. 5:05CV202, 2007 WL 1880209, *6 (N.D. W.Va. 2007) (affirming magistrate judge's ruling

compelling attorney to respond to discovery requests despite Rule 1.6 objections, as the rule

clearly "permits an attorney to disclose confidential information to the extent necessary to

respond to allegations in any proceeding concerning the lawyer's representation of a client"

(citations omitted)); *In re Estate of Wood*, 818 A.2d 568, 573 (Pa. Super. 2003) (finding that

lawyer was "not entitled to utilize Rule 1.6 in an effort to avoid the trial court's order" on a

motion to compel).

Furthermore, Rule 1.6 does not impose an absolute bar on the revelation of confidential

information:  "A lawyer may reveal such information to the extent the lawyer reasonably

---

[4] The D.C. Rules of Professional Conduct contain a somewhat more expanded version of Rule 1.6, nevertheless the comment regarding the differences in the ethical obligation of confidentiality and the evidentiary protections of the attorney-client privilege are much the same.

believes necessary . . . . to respond to allegations in any proceeding concerning the lawyer's representation of the client." *Id.* at 1.6(b)(2). It is immaterial whether the lawyer is actually a defendant in the lawsuit as long as the "allegations" in the "proceedings" concern his "representation of the client."[5] This case plainly constitutes a "proceeding concerning a lawyer's representation of the client." The Plaintiffs' Complaint alleges that David Warren, Fred Gray, Fred Gray, Jr., and members of Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C. ("the Gray Law Firm"), and agents and lawyers for VictoryLand engaged in unlawful conduct, including an actionable conspiracy under RICO, designed to give VictoryLand a monopoly on electronic bingo in Macon County. The testimony reveals that Defendant Warren retained Gray Jr. to draft rules and regulations governing bingo, authorizing him to speak with VictoryLand about the rules, and that Gray Jr., in fact, repeatedly met with Defendant McGregor and others at VictoryLand about the drafting of the rules. (*See* DE 163 at 23 ("VictoryLand has determined that David Johnson and John Bolton had discussions with Fred Gray, Jr. regarding proposed or suggested Bingo Rules and Regulations and that Milton McGregor may have been present at some of those discussions.").

---

[5] *See Hartman v. Cunningham*, 217 S.W.3d 408, 413 (Tenn. Ct. App. 2006) (Interpreting the same language as the Alabama Rule, and finding that it is "immaterial" whether the lawyer in question is actually named as a defendant in a lawsuit. Under Rule 1.6 "an attorney not only has the right to disclose information [t]o establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, [or] to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved . . ., but also to respond to allegations in any proceeding concerning the lawyer's representation of the client. Thus, [the rule] consists of three separate possibilities, which are delineated as grammatical clauses joined with the word 'or,' not the word 'and.' For this Rule to be applicable, it is necessary only to fall within any one of these possible scenarios, one of which is 'to respond to allegations *in any proceeding* concerning the lawyer's representation of the client." (alterations in original; quotations and citation omitted).

The general confidentiality obligation of Rule 1.6, while important to the attorney-client relationship, cannot be raised as a shield to discovery.[6]  Accordingly, Rule 1.6 should not factor into this Court's decision regarding the various discovery motions at issue.  Instead, VictoryLand and Fred Gray, Jr. must show that the various communications and documents sought are protected by an actual evidentiary privilege.

## II.    Neither VictoryLand nor Fred Gray Jr. can claim the protections of the attorney-client privilege or the work-product privilege with regard to the discovery requests at issue.

Neither the attorney-client privilege nor the work-product doctrine bars the discovery requests made by the Plaintiffs.[7]  The attorney-client privilege only attaches when a communication is actually made to secure legal counsel and is not revealed to a third party.  Likewise the work-product privilege only attaches to work actually completed by an attorney in anticipation of litigation.  In this case, neither privilege applies to prevent the discovery sought by the Plaintiffs.

The Eleventh Circuit's version of the attorney-client privilege requires proof of the following elements:

---

[6] Additionally, this Court has already entered an expansive protective order in this case. That order prohibits the misuse of disclosed information.

[7] Federal privilege law governs the application of both the attorney-client privilege and the attorney work-product doctrine as the Court has federal question jurisdiction over this case. *See* Fed. R. Evid. 501 cmt. ("In nondiversity jurisdiction civil cases, federal privilege law will generally apply"); *see also United States v. Hankins*, 581 F.2d 431, 348 n.13 (5th Cir. 1978) (noting that "state law does not determine the scope of the attorney-client privilege. This is a case in which federal law supplies the rule of decision, and the federal common law therefore determines the scope of the privilege."); *Lykken v. Brady*,  No. CIV. 07-4020-KES, 2008 WL 2077937, *3-*4 (D.S.D. May 14, 2008) (citing numerous courts, including the Second, Third and Seventh Circuits, who have "concluded that, where the issue is the discoverability of evidence that is relevant to both the federal and the state claims, courts have consistently held that federal law determines the existence and scope of any asserted privilege").

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Proceedings 88-9 (MIA)*, 899 F.2d 1039, 1042 (11th Cir. 1990) (quoting *United States v. Jones*, 517 F.2d 666, 670 (5th Cir.1975)).[8]  "The attorney-client privilege, the oldest of the privileges for confidential communications known to the common law, protects the disclosures that a client makes to his attorney, in confidence, for the purpose of securing legal advice or assistance."  *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1414 (11th Cir. 1994) (citations and quotations omitted).  Thus, the privilege only applies if the communication is made in *confidence* and for "*for the purpose* of securing legal advice or assistance."  *Id.*  Further, "[t]he party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential. . . .  the privilege holder must prove the communication was (1) intended to remain confidential and (2) under the circumstances was *reasonably* expected and understood to be confidential."  *Bogle v. McClure*, 332 F.3d 1347, 1357 (11th Cir. 2003) (citations and quotations omitted).  Thus, the privilege holder must actually intend continued confidentiality at the time the communication is made; otherwise, the attorney-client privilege will not attach.  *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976) (attorney-client privilege inapplicable to "information that the client intends his attorney to impart to others").

---

[8]  In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  *Id.* at 1209.

Furthermore, to the extent that any communications between Fred Gray, Jr. and Sheriff Warren occurred in the presence of a third-party (including an agent or attorney for VictoryLand, or Fred Gray—who expressly disavowed representation of Sheriff Warren), those communications are not protected by the attorney-client privilege. This is because the presence of a non-essential third-party "stranger" destroys any reasonable assumption of confidentiality. *In re Grand Jury Proceedings 88-9 (MIA)*, 899 F.2d at 1042 (quoting *Jones*, 517 F.2d at 670) (noting that for the attorney-client privilege to adhere, the communication must be made "without the presence of strangers"); *see United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir. 1983) ("Thus, disclosures made in the presence of third parties may not be intended or reasonably expected to remain confidential." (citation omitted)).[9]

The work-product privilege, on the other hand, "protects from disclosure materials prepared by an attorney acting for his client in anticipation of litigation. This doctrine is distinct from and broader than the attorney-client privilege; it protects materials prepared by the attorney, whether or not disclosed to the client, and it protects materials prepared by agents for the attorney." *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (11th Cir. 1979).

---

[9] The other Circuits are in agreement with the principle that that the attorney-client privilege is waived by a voluntary disclosure to a third party. *See, e.g.*, *United States v. Ary*, 518 F.3d 775, 782 (10th Cir. 2008) ("Because confidentiality is critical to the privilege, it will be lost if the client discloses the substance of an otherwise privileged communication to a third party. The confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived." (citations and quotations omitted)); *United States v. BDO Seidman, LLP*, 492 F.3d 806, 827 (7th Cir. 2007) ("The attorney-client privilege protects only those statements made by the client to the attorney in confidence. A communication is not made in confidence when the client intends that the communication shall be disclosed to unprivileged third parties." (citation omitted)); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) ("[T]he attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties. In addition, a client may waive the privilege by conduct which implies a waiver of the privilege or a consent to disclosure." (citation and quotations omitted)).

Federal Rule of Civil Procedure 26(b)(3) explicitly sets out this doctrine:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representatives (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).

Fed. R. Civ. P. 26(b)(3). Thus, when a document is "prepared in anticipation of litigation," it is generally protected. Furthermore, "because the work product privilege looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, it is not automatically waived by the disclosure to a third party." *In re Grand Jury Subpoena*, 220 F.3d 406, 409 (5th Cir. 2000). But, like the attorney-client privilege, the party seeking to assert the doctrine bears the initial burden of proof. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007); *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006). Once that showing is made, the burden shifts and "Rule 26(b)(3) . . . places a twofold burden on the party seeking discovery. The [party] must show both substantial need and undue hardship." *Castle v. Sangamo Weston, Inc.*, 744 F.2d 1464, 1467 (11th Cir. 1984) (citation omitted).

Considering these two privileges in the context of the Plaintiffs' discovery requests, this Court should find that neither the attorney-client privilege nor the work-product doctrine applies and compel VictoryLand and Fred Gray, Jr.'s to respond to the outstanding discovery requests.

A.    **Documents evidencing communications between VictoryLand and Fred Gray Jr. regarding electronic bingo in Macon County are not privileged and must be disclosed.**

The Plaintiffs have propounded discovery requests to both Fred Gray, Jr. and VictoryLand seeking disclosure of all documents evidencing communications between those two parties regarding electronic bingo. (DE 134 at 2; DE 106 at 10-11.) Communications between Gray, Jr. and any attorneys or agents for VictoryLand are discoverable as neither the attorney-client privilege nor the work-product privilege applies.

10

First, Fred Gray has testified by affidavit that neither he nor Fred Gray Jr. has represented or advised VictoryLand with regard to electronic bingo. (DE 62 Ex. A at 2 & 3.) Accordingly, no privilege existed between VictoryLand and the Grays regarding electronic bingo. *See In re Grand Jury Proceedings 88-9 (MIA)*, 899 F.2d 1039, 1042 (11th Cir. 1990) ("'The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice . . . .'") (quoting *In re Grand Jury Subpoena of Slaughter*, 694 F.2d 1258, 1260 (11th Cir. 1982)).

Second, the protections of the attorney-client relationship only apply when the client actually intends the communication to remain confidential, *see Pipkins*, 528 F.2d at 563. In his deposition, Defendant Warren stated numerous times that he "did not have any objections to [Fred Gray, Jr.] talking to people in getting [the rule drafting] accomplished." (Warren Dep., excerpts attached as Ex. A at 172; *see also* Ex. A at 169-70, 174, 176-78 & 202-03.) Thus, because Warren never had an expectation of confidentiality regarding his retention of Gray Jr. to draft the rules, the attorney-client privilege never attached.

Third, the attorney-client privilege would not apply to any communications that were disclosed to "strangers" to the attorney-client relationship. When otherwise privileged communications are shared outside the bounds of the attorney-client relationship, the privilege is destroyed. *See United States v. Almeida*, 341 F.3d 1318, 1324 (11th Cir. 2003) ("When a defendant conveys information to the lawyer of his co-defendant, as opposed to his own lawyer, the justification for protecting the confidentiality of the information is weak. The policy of fostering frank communication with an attorney is already facilitated by privileging those communications made to the defendant's own attorney; little can be gained by extending the privilege to those communications made to attorneys that do not represent the defendant.").

Therefore, any communications by Defendant Warren to Gray Jr. that were disclosed to Defendant VictoryLand or its attorneys would not be privileged. Similarly, any communications by Defendant VictoryLand to its attorneys that were disclosed to Defendant Warren or his attorneys would not be privileged.

Likewise, the work-product doctrine does not apply. VictoryLand and Fred Gray, Jr. bear the burden of proving that the elements of the work-product doctrine are met with respect to each purportedly privileged document. Specifically, they must prove that the documents were drafted in anticipation of litigation—not in the ordinary course of business. VictoryLand and Fred Gray Jr. bear the heavy burden of proving that any documents created prior to the initial filing of the Complaint, December 18, 2006, were prepared "in anticipation of litigation." They have not met that burden.

Moreover, only the attorney who actually created the document and the client for whom the document was created can assert the privilege. *See AMCO Ins. Co. v. Madera Quality Nut LLC*, No. 1:04-cv-06456-SMS, 2006 WL 931437, *15 (E.D. Cal. Apr. 11, 2006) ("The holder of the immunity includes the attorney who prepared the work product." (emphasis added) (citing *Doubleday v. Ruh*, 149 F.R.D. 601, 606 n.5 (E.D. Cal. 1993))). Thus, Gray Jr. is only entitled to assert the work-product protection as to his own work product, and VictoryLand can only assert the work-product protection as to the work product produced by its own attorneys.

With these principles in mind, it is clear that none of the asserted privileges are valid with respect to the requests at issue. Fred Gray Jr. asserts that three documents are privileged. (DE 134 at 2-3.) However, upon close inspection, it is clear that they are not:

- **A copy of the First Amended and Restated Rules and Regulations with handwritten notes**: This document is not protected under the attorney-client privilege. First, Defendant Warren made clear in his deposition that he did not consider his communications with Gray Jr. to be confidential and intended

disclosure of those communications to third parties. (*See* Ex. A at 169-70, 172, 174, 176, 177-78 & 202-03.) Second, Gray Jr. has not carried his burden of showing the document is a "communication" from Defendant Warren, stating only that the handwritten notes were made "by either the attorneys or their client." Third, to the extent the document was disclosed to VictoryLand,[10] the privilege has been waived. Additionally, no work-product protection applies. The First Amended and Restated Rules were issued in 2004, well in advance of any litigation. Unless Gray, Jr. can somehow demonstrate that the handwritten notes were written "in anticipation of litigation," *In re Grand Jury Proceedings*, 601 F.2d at 171, the work-product protection cannot be asserted. Furthermore, the crime/fraud exception applies. *See infra* Part II.D. This document should be disclosed.

- **January 8, 2007 letter**: Fred Gray, Jr. does not clearly delineate the sender and recipient of this letter in his response: "is a letter from Fred Gray, Jr. and attorneys for VictoryLand." If the letter is from Gray Jr. to attorneys for VictoryLand, it is not privileged. Furthermore, no information has been provided to substantiate a claim that this letter constitutes work product. Even if it is considered work product, the letter is subject to the crime-fraud exception. *See infra* Part II.D. Additionally, even if work-product protections apply, the letter should be produced as the Plaintiffs have a "substantial need" for the document. While "discovery of work product will be denied if a party can obtain the information he seeks by deposition," *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982), the Court has currently denied the Plaintiffs' efforts to depose Gray, Jr. *See, e.g.*, *McNulty v. Bally's Park Place, Inc.*, 120 F.R.D. 27, 30 (E.D. Pa. 1988) (finding substantial need where the party's "independent efforts" to reach the producer of the work product had "proven unavailing").

- **January 17, 2007 letter from attorneys for VictoryLand to Fred Gray, Jr.**: Neither Fred Gray Jr. nor his client Defendant Warren can claim work-product protection for this letter drafted by lawyers for VictoryLand. The letter is not Gray Jr.'s work product, and he is not entitled to withhold it on those grounds. Furthermore, the crime/fraud exception applies. *See infra* Part II.D.

---

[10] Fred Gray Jr.'s response makes the status of the document unclear, stating that the document "contains several handwritten notes by either the attorneys or their client, David Warren." (DE 134 at 2.) David Warren testified that he was only represented by Gray Jr. when drafting the rules governing electronic bingo in Macon County. (Ex. A at 52:15-23.) Accordingly, the Plaintiffs are unsure of what Gray Jr. means by "the *attorneys* or *their* client"— plural. The Plaintiffs can only assume Gray Jr. is referring to attorneys for VictoryLand, especially in light of the relevant discovery request which asks for "any and all documents . . . that contain any communication between you and any of VictoryLand's agents or attorneys regarding electronic bingo." (DE 134 at 2.)

Similarly, VictoryLand has submitted a privilege log listing thirty documents supposedly protected by the attorney-client privilege.[11]  (A copy of VictoryLand's submitted privilege log is attached as Ex. B.)  Presumably, some of these documents are the documents withheld pursuant to VictoryLand's objections to Requests 11 & 12.  (DE 106 at 9-10.)  Nevertheless, VictoryLand has failed to comply with the mandates of both Federal Rule of Civil Procedure 26(b)(5) (requiring that withholding counsel "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim") and this Court's Guidelines to Civil Discovery Practice I.3 (requiring factual detail on all purportedly privileged documents, including, among other things, "[n]ame, address and employer of the author of the document," "[s]ubject of the document," "[p]ersons to whom the document is addressed," "[p]ersons indicated thereon as having received copies," and "[d]egree of confidentiality with which it was treated at the time of its creation and transmission and since").  *See also* Fed. R. Civ. P. 26(b)(5), advisory committee's note (2006) ("The notice shall be as specific as possible in indentifying the information and stating the basis for the claim. . . .  the notice should be sufficiently detailed so as to enable the receiving party and the court to understand the basis for the claim . . . .").  Accordingly, Defendant VictoryLand has not met its burden of establishing the attorney-client privilege, and its claim of privilege should be denied on that basis alone.

---

[11] While VictoryLand has asserted work-product protections in its boiler plate objections to the Plaintiffs' discovery requests, it has not asserted the work-product doctrine as to any of the documents listed in its privilege log.

In addition, the lack of disclosure of the authors, intended recipients, and actual recipients coupled with the paltry descriptions of the documents make it impossible for the Plaintiffs to specifically address relevant privilege issues. Descriptions like "Correspondence between co-counsel regarding legal opinion" and "Document drafted by counsel" are anything but helpful. (Ex. B.) *See* SEC *v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 145 (S.D.N.Y. 2004) ("A description consisting of 'communications' or 'communications with counsel' is insufficient to establish even the minimal showing required in a privilege log because it does not permit the adversary to make an intelligent assessment as to the applicability of a privilege."). Additionally, the privilege log makes repeated references to "co-counsel" regarding documents created well before this lawsuit was filed. The Plaintiffs have no idea who VictoryLand is claiming as "co-counsel" in numerous pre-litigation documents. Based on the skeletal privilege log provided by VictoryLand, the Plaintiffs cannot adequately assess the claimed privilege as to each specific document and must instead rely on the general arguments raised herein. To mitigate this prejudice, the Plaintiffs request that—if this Court is inclined to find that any of the documents listed on the privilege log are privileged—then this Court require VictoryLand to submit a revised privilege log that complies with the discovery rules and allow the Plaintiffs an opportunity to brief the privilege issues based upon the compliant privilege log.

**B.      Documents evidencing communications between VictoryLand and Fred Gray regarding electronic bingo in Macon County are not privileged and must be disclosed.  (DE 106 # 11.)**

Just as the communications between Fred Gray, Jr. and VictoryLand are not encompassed by either the attorney-client privilege and the work-product doctrine, the Plaintiffs, likewise are entitled to disclosure of all communications regarding electronic bingo that occurred between VictoryLand and Fred Gray.  (DE 106 at 9-10.)  Fred Gray has expressly disavowed representing

VictoryLand on electronic bingo matters:  "I was not retained by [VictoryLand] for the purpose of doing anything in connection with Rules and Regulations governing bingo, nor have I, at any time, advised [VictoryLand] concerning the same." (DE 62 at 2.)  Therefore, with regard to electronic bingo in Macon County, Fred Gray was *not* VictoryLand's lawyer.  Accordingly, any communications or documents exchange between VictoryLand and Fred Gray on the subject are not protected by the attorney-client privilege.[12]

"The attorney-client privilege, the oldest of the privileges for confidential communications known to the common law, protects the disclosures that a client makes to his attorney, in confidence, *for the purpose of securing legal advice or assistance*."  Cox, 17 F.3d at 1414 (emphasis added).  Fred Gray was not providing legal advice or assistance to VictoryLand when he communicated with its agents or attorneys regarding electronic bingo.  The Eleventh Circuit has made clear:

> [T]he argument that *any* communication between an attorney and client is protected by the privilege is overbroad. Merely because a matter which a lawyer is asked to reveal might incriminate a client does not make that matter privileged. The privilege is not designed to protect revelation of incriminating matters, only confidential communications between the attorney and client *regarding the matter of representation*.

*In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 997 (11th Cir. 1992) (second emphasis added); *see also In re Allen*, 106 F.3d 582, 609 (4th Cir. 1997) (Niemeyer, J., concurring in part) ("The party asserting the attorney-client privilege carries the burden of establishing, *inter alia*, that . . . the communications for which he claims the attorney-client privilege . . . *concerned matters on which the lawyer was representing him* . . . ." (emphasis added)).  Because any

---

[12] While VictoryLand also objected to this request on the basis of the work product doctrine, VictoryLand's (inadequate) privilege log does not indicate that it is withholding any documents on the basis of the work-product doctrine.  To the extent that VictoryLand claims work product protection with regard to any specific documents, the Plaintiffs reserve the right to address those claims.

communications between VictoryLand and Fred Gray were not privileged, VictoryLand should be compelled to respond to the Plaintiffs' discovery request.

**C.    Documents evidencing communications between VictoryLand and any partners or associates at the Gray Law Firm regarding electronic bingo in Macon County are not privileged and must be disclosed.  (DE 106 # 12.)**

All documents evidencing communications between VictoryLand and any partner or associate at the Gray Law Firm are discoverable, as neither the attorney-client privilege nor the work-product privilege applies.  As discussed above, Fred Gray testified, via affidavit, that neither he nor Fred Gray Jr. was VictoryLand's lawyer with regard to electronic bingo. Accordingly, any communications between VictoryLand and the Gray Law Firm that involved or were shared with Fred Gray or Fred Gray Jr. are not privileged.[13]

Because VictoryLand did not provide an adequate privilege log, the Plaintiffs do not know whether there were communications between VictoryLand and the Gray Law Firm that did not involve and were not shared with either Fred Gray or Fred Gray Jr.  If there were such communications, however, those communications were not privileged.  In his affidavit, Fred Gray testified that "there have been no funds received by the Gray Law Firm from Macon County Greyhound Park that has anything to do with Bingo."  (DE 62 Ex. A at 4.)  No one from the Gray Law Firm represented VictoryLand with respect to electronic bingo, and therefore no privilege can attach to any communications between VictoryLand and the Gray Law Firm

---

[13] While VictoryLand also objected to this request on the basis of the work product doctrine, VictoryLand's (inadequate) privilege log does not indicate that it is withholding any documents on the basis of the work-product doctrine.  To the extent that VictoryLand claims work product protection with regard to any specific documents, the Plaintiffs reserve the right to address those claims.

regarding electronic bingo.[14]  Accordingly, this Court should compel VictoryLand to respond to the Plaintiffs' request and produce all documents containing any communications between agents or attorneys of VictoryLand and any member of the Gray Law Firm.

### D.    The crime/fraud exception applies to abrogate the application of both the attorney-client privilege and the work-product doctrine.

Finally, the well-recognized crime/fraud exception applies to prevent VictoryLand and Fred Gray Jr. from hiding behind either the attorney-client privilege or the attorney work-product doctrine because the attorneys' services were used in furtherance of a crime.

The crime/fraud exception mandates that neither the work-product doctrine nor "[t]he attorney-client privilege . . . protect[s] communications made in furtherance of a crime or fraud." *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987); *Cox*, 17 F.3d at 1422 (noting that the crime/fraud "exception applies to work-product in the same way that it applies to the attorney-client privilege").  The Eleventh Circuit employs a two-prong test in applying the exception:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

---

[14] Indeed, Fred Gray, in his affidavit, implicitly acknowledged that the Gray Law Firm could not have ethically represented VictoryLand with respect to electronic bingo because one of its partners, Fred Gray Jr., represented Defendant Warren with respect to electronic bingo:

> I was not retained by Macon County Greyhound Park for the purpose of doing anything in connection with Rules and Regulations governing Bingo, nor have I, at any time, advised Macon County Greyhound Park concerning the same.  I was not involved because I knew that Fred Gray, Jr., who had represented the Sheriff for over ten years, was working with the Sheriff on the Rules and Regulations.

(DE 62 Ex. A at 2.)

*Cox*, 17 F.3d at 1416 (citation omitted).  "The first prong is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Schroeder*, 842 F.2d at 1226. "The second prong is satisfied by a showing that the communication is related to the criminal or fraudulent activity established under the first prong." *Id.* at 1227.   The purpose of the second prong is to identify "communications that should not be privileged because they were used to further a crime or a fraud." *Id.*

1.      *The Plaintiff have evidence that satisfies the first prong.*

The Plaintiffs have evidence that, if believed by a trier of fact, would establish the elements of bribery that was ongoing.  Defendant Warren testified that he retained Fred Gray Jr. to draft the rules and regulations governing electronic bingo: "I hired Mr. Gray -- Mr. Gray to come up with the rules that would govern the conduct of games in Macon County."  (Ex. A at 159:17-19.)  Fred Gray Jr. thus became a "public servant" under Ala. Code § 13A-10-1(7).  (DE 144 at 16-17 ("Fred Gray, Jr., participated as an advisor in the performance of a governmental function and is thus a public servant under the clear and unambiguous language of § 13A-10-1(7).").)

Ala. Code § 13A-10-61(a) states that "[a] person commits the crime of bribery if:

(1)      He offers, confers or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced; or

(2)      While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

Ala. Code § 13A-10-61(a).  A "thing of value" "does not necessarily mean a substance . . . .  [I]t includes an act, or action."  *Caruthers v. State*, 74 Ala. 406 (Ala. 1883).  "'Value . . . is determined by the application of a subjective, rather than an objective, test, and the requirement of value is satisfied if the thing has sufficient value in the mind of the person concerned so that his actions are influenced.'"  *McDonald v. State*, 329 So. 2d 583, 587 (Ala. Cr. App. 1975) (quoting 12 Am. Jur. 2d Bribery § 7).

The Plaintiffs have evidence that Fred Gray Jr.'s law firm received money in the form of legal fees from VictoryLand.  (DE 62 Ex. A at 3-4.)  The Plaintiffs also have evidence that Fred Gray Jr.'s father received dividend payments from VictoryLand.  (*Id.*)  A jury could conclude, based on this evidence, that Fred Gray Jr. received things of value from VictoryLand.  *See, e.g.,* *United States v. Kemp*, 500 F.3d 257, 285 (3d Cir. 2007) (concluding as a legal matter, "that providing a loan to a public official (or his friends or family) that would have otherwise been unavailable . . . may constitute a bribe"); *United States v. Krilich*, 159 F.3d 1020, 1024 (7th Cir. 1998) (noting that rigging a hole-in-one contest so that the mayor's son would win $40,000 constituted bribing the mayor); *Buchanan County, Va. v. Blankenship*, 496 F. Supp. 2d 715, 722 (W.D. Va. 2007) (recognizing that clothing given to the official's wife constituted a bribe); *United States v. Frega*, 179 F.3d 793, 807 (9th Cir. 1999) (noting that under California law, it is the "intent in making the payment, whether to a judge or to a member of the judge's family," that is critical); *United States v. Biaggi*, 705 F. Supp. 790, 812 (S.D.N.Y. 1988) (finding bribery where stock was put in the name of a close friend of the public official).

Finally, the Plaintiffs have evidence that, if believed by the trier of fact, would establish that Fred Gray Jr. was corruptly influenced.  This element has been explained by the Alabama Court of Criminal Appeals as follows:

      "[a] 'material element' of the crime of bribery is the defendant's corrupt 'intent' at the time of the offense.   *Roden v. State*, 5 Ala. App. 247, 254, 59 So. 751 (1912), *quoted in Pope v. State*, 365 So. 2d 369, 372-73 (Ala. Cr. App. 1978).... As this court has noted, proof of the appellant's 'intent' can be inferred from all of the surrounding circumstances.   *Paige v. State*, 494 So.2d 795 (Ala.Cr.App.1986).

      "... 'It is largely a question of fact, rather than a question of law, for the determination of the jury, whether particular conduct, or particular expressions of the accused, refer to a criminal offense, and spring from his consciousness of guilt.'  *Pope v. State*, 365 So.2d 369, 374 (Ala. Cr. App. 1978)."

*Maddox v. State*, 520 So. 2d 143, 148 (Ala. Crim. App. 1986).  In this case, a jury could infer, from the surrounding circumstances, that Fred Gray Jr. acted with a corrupt intent.

      First, Defendant Warren testified that he hired Fred Gray Jr. to draft rules and regulations for electronic bingo that were in the best interests of the people of Macon County: "When I asked him to do what he did, I trusted him to act in the best interest of the citizens of Macon County, in my best interest."  (Ex. A at 162:1-4.)  Defendant Warren testified that he wanted the rules and regulations for bingo to be written, amended, and applied to be fair to all applicants for licensing and not to be tilted to favor only Victoryland.  (Ex. A at 17:9-16.)  Defendant Warren also testified that it would be improper to construct rules that favored Victoryland.  (Ex. A at 249:9-10.)  Defendant Warren also testified that he did not intend to create a monopoly and that a monopoly would not protect the interests of the citizens of Macon County.  (Ex. A at 306:19-307:10.)  Defendant Warren testified that he did not desire that Victoryland maintain a monopoly on Class B electronic bingo in Macon County.  (Ex. A at 148:6-13.)  Defendant Warren further testified that he did not intend the rules and regulations to benefit Fred Gray or Fred Gray Jr. (Ex. A at 227:4-15) or Milton McGregor and VictoryLand (Ex. A at 227:16-228:7).

      However, a jury could find that the rules and regulations drafted by Fred Gray Jr.— which, among other things, required an applicant to construct a $15 million facility before

applying for a license, imposed a fifteen-charity minimum and a sixty-charity maximum, and granted all sixty licenses to VictoryLand (Ex. A at 122:17-123:7)—did not accord with the Sheriff's intentions. Instead, a jury could find that those rules (1) were tilted to favor only VictoryLand, (2) created a monopoly on electronic bingo, (3) benefitted Fred Gray and Fred Gray Jr., and (4) benefitted McGregor and VictoryLand. Accordingly, the jury could conclude that Fred Gray Jr.'s clear departure from Defendant Warren's intentions indicated that he was acting under corrupt influence and with a corrupt intent.

Furthermore, a jury could conclude that Fred Gray Jr. acted with a corrupt intent through his own actions in formulating the rules and regulations. VictoryLand admitted, in an interrogatory response, that Fred Gray Jr. met with McGregor and McGregor's attorneys regarding the rules and regulations. (*See* DE 163 at 23 ("VictoryLand has determined that David Johnson and John Bolton had discussions with Fred Gray, Jr. regarding proposed or suggested Bingo Rules and Regulations and that Milton McGregor may have been present at some of those discussions.") However, Defendant Warren testified that he did not know with whom Fred Gray Jr. consulted. (Ex. A at 159:2-3.) A jury could infer that Fred Gray Jr's secrecy was evidence of a corrupt intent.

Finally, the jury could conclude that Fred Gray Jr.'s violation of the Rules of Professional Conduct indicated a corrupt intent. *See United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989) (recognizing "the relevance of ethical and professional standards of behavior for lawyers in evaluating criminal intent" (citation omitted)); *United States v. Machi*, 811 F.2d 991, 1000-02 (7th Cir. 1987) (permitting rules of ethical conduct governing attorneys to be introduced into evidence as indicative of defendant attorney's state of mind and interest in criminal scheme; noting with approval efforts during trial to caution jury against inferring that defendant attorney

was guilty of criminal offense simply because he may have violated ethical rules governing conduct of attorneys); *United States v. DeLucca*, 630 F.2d 294, 301 (5th Cir. 1980) (ruling "it is appropriate to consider the canons of professional responsibility as a factor in determining [a defendant attorney's] willing participation in crime" (footnote omitted)).

Under Rule 1.10(a), "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.1, 1.8(c), 1.9 or 2.2."  Fred Gray Jr. and Fred Gray were associated in a firm. (Complaint at ¶¶ 27-29.)  Under Rule 1.7(b),

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client  . . . or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation.

Fred Gray has represented VictoryLand "since shortly after it was incorporated."  (DE 62 Ex. A at 1.)  Fred Gray is also a shareholder in VictoryLand.  (DE 62 Ex. A at 2.)  Fred Gray's ability to represent Defendant Warren with regard to electronic bingo would thus have been adversely affected by both his representation and ownership of VictoryLand once VictoryLand expressed an interest in electronic bingo—which Fred Gray readily recognized (DE 62 Ex. A at 2.). VictoryLand expressed such an interest around November 11, 2003.  (Ex. A at 79:16-80:9.)

Even if Fred Gray believed that his representation of Defendant Warren would not be "adversely affected" by his responsibilities to VictoryLand and his own interests—a belief that could not possibly be deemed "reasonable"—Defendant Warren would still have to consent to such representation "after consultation."  Rule 1.7(b)(2).  However, Fred Gray's interests were not fully disclosed to Defendant Warren.  (Ex. A at 179:20-180:12)  Accordingly, Fred Gray did not obtain the necessary consent after consultation and was prohibited from representing

Defendant Warren. Fred Gray Jr. was similarly prohibited by the imputed disqualification rule in Rule 1.10(a). Fred Gray Jr.'s willingness to violate the Rules of Professional Conduct indicates that he was acting with a corrupt intent.

2.    _The Plaintiffs have satisfied the second prong._

The Plaintiffs have therefore satisfied the first prong of the crime-fraud exception by making a prima facie showing that VictoryLand was engaged in a crime—the bribery of Fred Gray Jr.—when it sought the advice of counsel. To satisfy the second prong, the Plaintiffs must show that counsel's assistance was obtained in furtherance of the crime or was closely related to the crime. Unfortunately, VictoryLand has not provided a privilege log from which a specific showing could be made. *Cf. In re Grand Jury Investigation*, 842 F.2d 1223, 1227 (11th Cir. 1987) (noting that the Court "must take into account that the [Plaintiffs do] not know precisely what the material will reveal or how useful it will be.") However, because the Plaintiffs have only requested communications relating to electronic bingo—and the bribery of Fred Gray Jr. was closely related to electronic bingo—all of the privileged documents that have been identified fall under the crime-fraud exception.

Because the purportedly privileged documents fall under the crime-fraud exception, this Court should compel their disclosure.

## CONCLUSION

Based on the foregoing, the Plaintiffs respectfully request that this Court find no privilege protections and grant the Plaintiffs' Motions to Compel.

DATED: May 30, 2008.

Respectfully submitted,

s/ Robert K. Spotswood
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
Grace L. Kipp (LON 049)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, Alabama  35213
TEL:   (205) 986-3620
FAX:   (205) 986-3639
E-mail:        rks@spotswoodllc.com
               msansbury@spotswoodllc.com
               gkipp@spotswoodllc.com

*Attorneys for the Plaintiff Charities*


s/ Stephen D. Heninger
Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
Gayle L. Douglas (DOU 012)
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:        steve@hgdlawfirm.com
               lewis@hgdlawfirm.com
               gdouglas@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 30, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

John M. Bolton III, Esq.
Charlanna White Spencer, Esq.
Hill Hill Carter Franco Cole & Black P.C.
425 S. Perry Street
Montgomery, AL 36104
E-mail:        jbolton@hillhillcarter.com
                    cspencer@hillhillcarter.com

James H. Anderson, Esq.
Ryan Wesley Shaw, Esq.
Beers, Anderson, Jackson, Patty, Van Heest &
       Fawal PC
P.O. Box 1988
Montgomery, AL 36102
E-mail:        janderson@beersanderson.com
                    wshaw@beersanderson.com

Stephen D. Heninger
W. Lewis Garrison Jr.
Gayle L. Douglas
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:        steve@hgdlawfirm.com
                    lewis@hgdlawfirm.com
                    gdouglas@hgdlawfirm.com

William M. Slaughter, Esq.
Patricia C. Diak, Esq.
Peter John Tepley, Esq.
Khristi Doss Driver, Esq.
Haskell, Slaughter, Young & Rediker, LLC
1400 Park Place Tower
2001 Park Place North
Birmingham, AL  35203
E-mail:        wms@hsy.com
                    pcd@hsy.com
                    pt@hsy.com
                    kdd@hsy.com

Fred David Gray, Esq.
Fred David Gray Jr., Esq.
Gray, Langford, Sapp, McGowan, Gray,
       Gray & Nathanson PC
P.O. Box 830239
Tuskegee, AL  36083-0239
E-mail:        fgray@glsmgn.com
                    jbibb@glsmgn.com
                    fgrayjr@glsmgn.com
                    thalia@glsmgn.com

John Mark White, Esq.
Augusta S. Dowd, Esq.
Rebecca DePalma, Esq.
White, Arnold, Andrews & Dowd
2025 Third Avenue, North
Suite 600
Birmingham, AL  35203
E-mail:        mwhite@waadlaw.com
                    adowd@waadlaw.com
                    rdepalma@waadlaw.com

George L. Beck, Jr.
Capell Howard PC
PO Box 2069
Montgomery, AL 36102-2069
E-mail:        glb@chlaw.com

Ronald G. Davenport, Esq.
Rushton, Stakely, Johnston & Garrett
PO Box 270
Montgomery, AL 36101
E-mail:        rgd@rsjg.com

s/ Michael T. Sansbury
OF COUNSEL

# Exhibit A

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                 EASTERN DIVISION

4

5   CASE NUMBER:  3:06-CV-01113-WKW-WC

6   HOPE FOR FAMILIES & COMMUNITY

7   SERVICES, INC., ET AL.,

8              Plaintiffs,

9              vs.

10  DAVID WARREN, IN HIS OFFICIAL CAPACITY AS

11  THE SHERIFF OF MACON COUNTY, ET AL.,

12              Defendants.

13          S T I P U L A T I O N

14          IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the video deposition of

17  Sheriff David Warren may be taken before

18  Sara Mahler, CCR, at the offices of Beers,

19  Anderson, Jackson, Patty & Van Heest, at 250

20  Commerce Street, Suite 100, Montgomery,

21  Alabama 36104, on the 19th day of March,

22  2008.

23          DEPOSITION OF SHERIFF DAVID WARREN

FREEDOM COURT REPORTING

Page 2

```
 1        IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and the reading
 3   of the deposition by the witness is waived,
 4   the deposition to have the same force and
 5   effect as if full compliance had been had
 6   with all laws and rules of Court relating to
 7   the taking of depositions.
 8        IT IS FURTHER STIPULATED AND
 9   AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17        IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23
```

Page 3

```
 1        * * * * * * * * * * * * *
 2             I N D E X
 3           EXAMINATION
 4                PAGE
 5   By Mr. Heninger ................... 13
 6   By Mr. Sansbury ................... 331
 7        PLAINTIFF'S EXHIBITS
 8                PAGE
 9   Exhibit 1 - "Rule Number One" ...... 16
10   Exhibit 2 - "Rule Number Two" ...... 18
11   Exhibit 3 - "Rule Number Three" .... 19
12   Exhibit 4 - "Rule Number Four" ..... 20
13   Exhibit 5 - Rules and Regulations
14        for licensing bingo
15        games ................... 70
16   Exhibit 6 - First Amended and
17        Restated Rules and
18        regulations for
19        licensing of bingo
20        games ................... 71
21   Exhibit 7 - Second Amended and
22        Restated Rules and
23        regulations for
```

Page 4

```
 1        licensing of bingo
 2        games  ................... 72
 3   Exhibit 8 - Document ............... 75
 4   Exhibit 9 - Application from
 5        Multicultural Center .... 100
 6   Exhibit 10 - Bates LUC 00083 ...... 124
 7   Exhibit 11 - Circle of Trust ...... 163
 8   Exhibit 12 - Letter from
 9        Mr. Bracy ............... 229
10   Exhibit 13 - Letter, 8/5/04,
11        Bates LUC 000899 ........ 230
12   Exhibit 14 - Letter, 10/20/04,
13        Bates LUC 00092 ......... 238
14   Exhibit 15 - Letter, 11/10/04,
15        Bates 00095 ............. 257
16   Exhibit 16 - Series of letters to
17        Sheriff from Mr. Bracy .. 259
18   Exhibit 17 - Check to Sheriff
19        from Lucky Palace, Inc. . 272
20   Exhibit 18 - Fax cover sheet,
21        Bates McGregor 038 ...... 275
22   Exhibit 19 - Exhibit E, Bates LUC
23        080-081 ................. 285
```

Page 5

```
 1   Exhibit 20 - Bates Warren
 2        D0317-D0325 ............. 288
 3   Exhibit 21 - Letter, 7/25/05, LUC
 4        101-107 ................. 290
 5   Exhibit 22 - Bingo Operations and
 6        Lease Agreement ......... 336
 7        * * * * * * * * * * * * *
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 6

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4
5   CASE NUMBER:  3:06-CV-01113-WKW-WC
6
7   HOPE FOR FAMILIES & COMMUNITY
8   SERVICES, INC., ET AL.,
9          Plaintiffs,
10         vs.
11  DAVID WARREN, IN HIS OFFICIAL CAPACITY AS
12  THE SHERIFF OF MACON COUNTY, ET AL.,
13         Defendants.
14
15  BEFORE:
16         SARA MAHLER, Commissioner.
17
18  APPEARANCES:
19         STEPHEN D. HENINGER, ESQUIRE, of
20  HENINGER, GARRISON & DAVIS, 2224 First
21  Avenue North, Birmingham, Alabama 35203,
22  appearing on behalf of the Plaintiff, Lucky
23  Palace.

Page 7

1   APPEARANCES:  (Cont.)
2          GAYLE L. DOUGLAS, ESQUIRE, of
3   HENINGER, GARRISON & DAVIS, 2224 First
4   Avenue North, Birmingham, Alabama 35203,
5   appearing on behalf of the Plaintiff, Lucky
6   Palace.
7          MICHAEL T. SANSBURY, ESQUIRE, of
8   SPOTSWOOD, SANSOM & SANSBURY, 2100 Third
9   Avenue, Suite 940, Birmingham, Alabama
10  35203, appearing on behalf of the Plaintiff
11  Charities.
12         JAMES H. ANDERSON, ESQUIRE, of
13  BEERS, ANDERSON, JACKSON, PATTY & VAN HEEST,
14  250 Commerce Street, Suite 100, Montgomery,
15  Alabama 36104, appearing on behalf of the
16  Defendant, Sheriff David Warren.
17         RYAN WESLEY SHAW, ESQUIRE, of
18  BEERS, ANDERSON, JACKSON, PATTY & VAN HEEST,
19  250 Commerce Street, Suite 100, Montgomery,
20  Alabama 36104, appearing on behalf of the
21  Defendant, Sheriff David Warren.
22
23

Page 8

1   APPEARANCES:  (Cont.)
2          FRED D. GRAY, JR., ESQUIRE, of
3   GRAY, LANGFORD, SAPP, MCGOWAN, GRAY &
4   NATHANSON, 108 Eastside Street, Tuskegee,
5   Alabama 36083, appearing on behalf of the
6   Defendant, Sheriff David Warren.
7          FRED DAVID GRAY, SR., ESQUIRE, of
8   GRAY, LANGFORD, SAPP, MCGOWAN, GRAY &
9   NATHANSON, 108 Eastside Street, Tuskegee,
10  Alabama 36083, appearing on behalf of the
11  Defendant, Sheriff David Warren.
12         JOHN M. BOLTON, III, ESQUIRE, of
13  HILL, HILL, CARTER, FRANCO, COLE & BLACK,
14  425 South Perry Street, Montgomery, Alabama
15  36104, appearing on behalf of the Defendant,
16  Milton McGregor.
17         PETER J. TEPLEY, ESQUIRE, of
18  HASKELL, SLAUGHTER, YOUNG & REDIKER, 2001
19  Park Place North, Suite 1400, Birmingham,
20  Alabama 35203, appearing on behalf of the
21  Defendant, Victoryland.
22
23

Page 9

1   APPEARANCES:  (Cont.)
2          CHARLANNA WHITE SPENCER, ESQUIRE,
3   of SASSER, BOLTON & SEFTON, One Commerce
4   Street, Suite 700, Montgomery, Alabama
5   36103, appearing on behalf of the Defendant,
6   Milton McGregor.
7          REBECCA G. DEPALMA, ESQUIRE, of
8   WHITE, ARNOLD & DOWD, 2025 Third Avenue
9   North, Suite 500, Birmingham, Alabama 35203,
10  appearing on behalf of the Defendant,
11  Victoryland.
12         HOPE S. MARSHALL, ESQUIRE, of
13  WHITE, ARNOLD & DOWD, 2025 Third Avenue
14  North, Suite 500, Birmingham, Alabama 35203,
15  appearing on behalf of the Defendant,
16  Victoryland.
17         RONALD G. DAVENPORT, ESQUIRE, of
18  RUSHTON, STAKELY, JOHNSTON & GARRETT, 184
19  Commerce Street, Montgomery, Alabama 36104,
20  appearing on behalf of the Defendant, The
21  Gray Law Firm.
22
23

3 (Pages 6 to 9)

FREEDOM COURT REPORTING

Page 14

1    Q.    So you understand how a
2  deposition works, I don't need to explain it
3  to you; fair enough?
4    A.    Fair enough.
5    Q.    You have able counsel, so I'm
6  going to assume that you understand I'm here
7  to ask questions and hope to get some
8  answers from you today --
9    A.    Yes, sir.
10   Q.    -- just to gain some insight
11 into your familiarity of what we're here
12 about?
13   A.    Yes, sir, I do.
14   Q.    Are you the sheriff of Macon
15 County, Alabama?
16   A.    I am the sheriff of Macon
17 County, Alabama.
18   Q.    How long have you been the
19 sheriff?
20   A.    For approximately thirteen --
21 I've been the sheriff of Macon County,
22 Alabama, for approximately thirteen years.
23   Q.    And in your capacity as the

Page 15

1  sheriff of Macon County, have you been
2  involved in publishing, promulgating, and
3  enforcing rules and regulations for
4  electronic bingo in Macon County?
5    A.    In my capacity as sheriff, I
6  have been responsible for promulgating the
7  rules and regulations governing bingo in
8  Macon County.
9    Q.    Now, I would bet there are
10 going to be some times during this
11 deposition when you and I may have a
12 disagreement.  But what I want to do at the
13 outset is to get some agreement that I
14 expect you would probably be in with me and
15 my clients on this matter, which would
16 determine where we're headed during the day;
17 fair enough?
18        Would you like to shortcut
19 this if possible?
20   A.    I am here to testify and do
21 whatever.
22        (Whereupon, Plaintiff's
23        Exhibit No. 1 was marked

Page 16

1        for identification.)
2    Q.    Fair enough.  And to make sure
3  there's no misunderstanding about my wording
4  and your understanding, I've handwritten --
5  or type written a few things.
6        What I want to show you first
7  is what I'm going to mark as Plaintiff's
8  Exhibit 1.  And for the Record, I'm asking
9  you whether you agree, disagree, or have no
10 opinion with this, and it says Rule number
11 one:  Rules and regulations for bingo must
12 be written, amended, and applied to be fair
13 to all applicants for licensing and cannot
14 be tilted to favor only Victoryland so it
15 could have a monopoly on electronic bingo in
16 Macon County.
17        Now as stated, would you agree
18 with that, disagree, or just have no
19 opinion?
20   A.    First of all, if I may, I am a
21 stutterer.  At times my speech may seem
22 halting, that is a coping mechanism that I
23 have developed over time, and I just want to

Page 17

1  make that clear on the outset.
2    Q.    I appreciate that.
3        Let's return to this effort
4  I'm trying to have, to see if there are some
5  areas that we can agree at the outset.
6        The first was on Exhibit 1,
7  would you agree as the sheriff of Macon
8  County with the obligations you had on the
9  electronic bingo licensing that the rules
10 and regulations for bingo must written,
11 amended, and applied to be fair to all
12 applicants for licensing and cannot be
13 tilted to favor only Victoryland so it could
14 have a monopoly on electronic bingo in Macon
15 County?
16   A.    I would agree with that.
17   Q.    If you can check that, I will
18 attach it to the deposition, and we'll move
19 from there.
20        MR. ANDERSON:  I think he will
21 just orally say that he agrees with your
22 statement.
23        MR. HENINGER:  Then I'll

FREEDOM COURT REPORTING

Page 50

1  that are proper.
2      Q.    When the citizens of Macon
3  County approved Amendment 744 on November 4,
4  2003, did you know as of that day that you
5  were going to be the person who would be
6  developing and promulgating the rules and
7  regulations for bingo licensing?
8      A.    When the rules were passed, I
9  understood that I would be the person who
10  would be responsible for promulgating rules
11  governing bingo.
12      Q.    So as of that day, you knew it
13  was going to fall on your shoulders?
14      A.    As of that day, I knew that
15  the responsibility for promulgating rules
16  governing bingo would be my responsibility.
17      Q.    Did you feel in your own heart
18  and mind that you were incapable of
19  performing those responsibilities?
20      A.    Sir, I felt in my own heart
21  that I would be capable of obtaining rules
22  and regulations to govern bingo.
23      Q.    You felt that you would be

Page 51

1  able to seek appropriate advice and get
2  consultation to assist you in doing it; fair
3  statement?
4      A.    As I said about the task of
5  promulgating the rules and regulations, I
6  knew I could -- would need and could get
7  assistance.
8      Q.    And did you know from day one
9  that you would likely be going to Fred Gray,
10  Jr., for such assistance?
11      A.    Mr. -- From day one, I don't
12  think right away I considered that right
13  away.  But if I were going to use an
14  attorney, Mr. Gray had been my attorney for
15  years and that's who I would more than
16  likely -- Mr. Gray, Jr., had been my
17  attorney and that's who I would probably
18  seek.
19      Q.    Now, you testified in your
20  earlier deposition on page twenty-five that
21  the rules and regulations for bingo
22  licensing in Macon County were prepared,
23  quote, by my attorney, end quote?

Page 52

1      A.    May I see that?
2      Q.    Certainly.  If you will look
3  with me on page twenty-five, you were asked
4  a question on line four:  Now, Sheriff,
5  these rules were prepared by whom?  And you
6  answered, my attorney; true?
7      A.    Yes, sir.
8      Q.    Which is a true statement;
9  correct?
10      A.    Yes, sir.
11      Q.    And you were referring to Fred
12  Gray, Jr.; true?
13      A.    Fred Gray, Jr., was my
14  attorney, and he prepared these rules.
15      Q.    Did any other person have a
16  hand in preparing the rules and regulations
17  as they were published or promulgated in
18  December 2003, besides you and your
19  attorney, Fred Gray, Jr.?
20      A.    No.  To my knowledge, no one
21  else had any part in preparing these rules
22  other than me and my attorney, Fred Gray,
23  Jr..

Page 53

1      Q.    Sheriff Warren, when you say
2  "to your knowledge" that concerns me, and I
3  need to follow that up with this question.
4  Under the law, David Warren had the
5  obligation to be fair and just in his coming
6  up with the rules and regulations; true?
7      A.    Under the law -- I'm sorry,
8  repeat that again.
9      Q.    Fair enough.  The law gave the
10  responsibility and the burden and duty of
11  coming up with the rules and regulations on
12  Sheriff David Warren.
13      A.    The law -- The law gave -- The
14  law did give the responsibility for
15  promulgating rules to the sheriff, which is
16  me.
17      Q.    The law did not say an
18  attorney or any other person in the county
19  had that obligation or duty.  It only spoke
20  to you; true?
21      A.    The law put the responsibility
22  for coming up with the rules and regulations
23  governing bingo on the sheriff.

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 78

1   is.
2       Q.    Well, who else would matter,
3   Sheriff?
4       A.    Well --
5       Q.    Can you tell me anybody else
6   whose opinion would matter on this topic?
7   You're the boss, aren't you?
8       A.    Sir, I'm trying to answer your
9   question --
10      Q.    No, you aren't.
11      A.    -- as honestly and as
12  forthright as I can.
13      Q.    Okay. We're doing okay. Just
14  so we can understand each other, that's
15  what's important.
16      A.    Yes, sir.
17      Q.    Now, you testified at your
18  earlier deposition that about a week after
19  744 was approved by the citizens of Macon
20  County, you and Mr. Gray met with Milton
21  McGregor. Do you remember that?
22      A.    Yes.
23      Q.    And you testified that you had

Page 79

1   a conversation with Milton McGregor in the
2   presence of Fred Gray, Jr., about a week
3   after the passage of the law where he
4   expressed an interest in conducting bingo in
5   Macon County?
6       A.    Yes, sir.
7       Q.    Where did this meeting take
8   place?
9       A.    If I may regress, Fred Gray,
10  Jr., and I met with Mr. McGregor. And --
11  May I see my -- May I refer to --
12          MR. ANDERSON: Do you remember
13  as you sit here -- I think the question is,
14  do you remember where the meeting took
15  place.
16      Q.    If you need some help, in your
17  earlier deposition it was page fifty-three,
18  where it starts.
19          It actually starts on
20  fifty-two where you say: No, I had a
21  conversation with him in the presence of my
22  attorney. Question: When. Answer:
23  Probably after a week after the passage.

Page 80

1           And then you go on to say: It
2   may have been earlier. I'm really not -- I
3   don't recollect.
4           Would it have been before 744
5   was passed -- Amendment 744 was passed and
6   you said no.
7           Does that sound about right in
8   your recollection?
9       A.    Yes. Yes. The answer to your
10  question that it was prior to -- whether or
11  not it was prior to November 4th, 2003?
12      Q.    (Nods head in the
13  affirmative.)
14      A.    No, it was --
15      Q.    After passage?
16      A.    -- after that.
17      Q.    And you then, you went on to
18  say that he, Mr. McGregor, expressed an
19  interest in conducting bingo, the electronic
20  form; correct?
21      A.    Yes.
22      Q.    And now my question was:
23  Where did this meeting take place?

Page 81

1       A.    To the best of my
2   recollection, it was in the office of
3   Mr. Gray.
4       Q.    Who set the meeting up?
5       A.    Mr. McGregor called me as I --
6   as I -- as I remember.
7       Q.    In advance or the day of the
8   meeting?
9           Here is what I'm trying to
10  figure out, did he say can you meet Tuesday
11  or can you come over right now?
12      A.    No. It was -- To the best of
13  my recollection, it may have been a day or
14  three after the call.
15      Q.    All right. So as I
16  understand, your recollection is after
17  Amendment 744 was passed, you got a call
18  from Milton McGregor where he asked you
19  about attending a meeting a few days after
20  that with your attorney and himself?
21      A.    No. I called Mr. Gray to be
22  there at that meeting.
23      Q.    Okay.

21 (Pages 78 to 81)

FREEDOM COURT REPORTING

Page 122

1    MR. ANDERSON: January 6th,
2  2005.
3    A.   Yes. They did. Yes,
4  Victoryland had a license.
5    Q.   They were the only operator
6  licensed for a location for electronic bingo
7  in Macon County; true?
8    A.   Yes, sir, at that time.
9    Q.   And once they had the sixty
10 charities attached to them, which they have,
11 true?
12   A.   Yes.
13   Q.   Isn't that true?
14   A.   Yes, sir.
15       MR. ANDERSON: You're asking
16 now?
17   Q.   Once they had those sixty
18 charities attached to them, under those
19 rules and regulations you published in
20 Plaintiff's Exhibit 7, so long as those
21 sixty charities are viable and licensed and
22 attached to Victoryland, there can be no
23 other location for electronic bingo in Macon

Page 123

1  County, can there?
2    A.   At this particular point in
3  time, there can be no other with bingo --
4  With Victoryland having sixty charities at
5  this point in time, there can be -- under
6  those circumstances there can be no other
7  entity licensed at this point in time.
8    Q.   So to close this area of
9  questioning, unless and until you amend the
10 rules a third time, currently under those
11 rules and under the current situation in
12 Macon County, no other location can be
13 approved for electronic bingo but
14 Victoryland; true?
15   A.   That is true at this
16 particular point in time, sir.
17       MR. HENINGER: He's got to
18 change the tape.
19       VIDEOGRAPHER: We are off the
20 Record; the time is 1:42 p.m. This is the
21 end of tape number two.
22       (Recess taken.)
23       VIDEOGRAPHER: We are back on

Page 124

1  the Record at 1:50 p.m. This is the
2  beginning of tape number three.
3    Q.   (BY MR. HENINGER): Has there
4  ever been a written response from you to
5  Lucky Palace indicating whether they were
6  approved, denied, or just not reached in
7  their application for a Class B electronic
8  bingo operator's license?
9        MR. BOLTON: Object to form.
10   A.   There were not -- There may
11 not have been a written response, but there
12 was plenty verbal responses for my
13 justifications.
14       (Whereupon, Plaintiff's
15       Exhibit No. 10 was marked
16       for identification.)
17   Q.   Let me show you what I'm
18 marking as Plaintiff's Exhibit 10, which is
19 Bates stamped LUC 00083.
20       MR. TEPLEY: That's
21 Plaintiff's 10?
22       MR. HENINGER: Yes.
23       MR. GRAY, SR.: What's the

Page 125

1  Bates stamp on it?
2        MR. HENINGER: LUC 00083.
3    Q.   You see on that letter where
4  there is some handwriting on the envelope?
5        MR. ANDERSON: On the top?
6        MR. HENINGER: Yes.
7    A.   Yes.
8    Q.   Is that your handwriting?
9    A.   No. It's -- No, that's not my
10 handwriting.
11   Q.   Tell us whose handwriting that
12 is.
13   A.   Judging from the initials
14 here, that looks like -- this looks to be
15 the handwriting of Ms. Mary Davis, who works
16 in my office.
17   Q.   And what is her position in
18 your office?
19   A.   She is my administrative
20 assistant. And they do process bingo
21 applications.
22   Q.   So when she penned that note
23 on the envelope and returned it to Lucky

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 146

1  form.
2      A.    That was not my intention when
3  I wrote the rules and regulations governing
4  bingo in Macon County.
5      Q.    But was it a fact that once
6  you adopted the rules and regulations
7  drafted by Fred Gray, Jr., Victoryland fit
8  those exact rules and regulations as of the
9  time they were adopted?
10     A.    Victoryland met the
11  requirements set forth in the rules and
12  regulations.
13     Q.    At the moment the rules and
14  regulations went into effect?
15     A.    Yes.
16     Q.    No one else did, did they?
17     A.    Victoryland met all of the
18  requirements set forth in the rules and
19  regulations, period.
20     Q.    Did anyone else, any other
21  entity or person, meet all the requirements
22  as a fact of these rules and regulations on
23  December 5, 2003?

Page 147

1      A.    On December 5, 2003,
2  Victoryland was the only qualified location
3  in Macon County.
4      Q.    On June 2nd, 2004, when you
5  issued your First Amended Rules, Victoryland
6  was the only location that could meet those
7  amended rules; true?
8      A.    Victoryland met the rules --
9  the requirements of the rules and
10  regulations set forth.  And at that time,
11  they were -- they was the only qualified
12  location in Macon County.
13     Q.    On January 6th, 2005, when you
14  issued your Second Amended Rules and
15  Regulations, Victoryland met those at the
16  time they were issued; true?
17     A.    Victoryland met all of the
18  requirements set forth in the rules and
19  regulations.  And at that point in time,
20  they were the one operating bingo games
21  in Macon County.
22     Q.    The only one who could, since
23  they're the only one that had a license;

Page 148

1  right?
2      A.    They met all the rules and
3  regulations set forth for a qualified
4  location.
5      Q.    Sheriff Warren, is it your
6  desire that Victoryland maintain a monopoly
7  on Class B electronic bingo in Macon County?
8          MR. ANDERSON:  Object to the
9  form.
10         MR. TEPLEY:  Join.
11         MR. BOLTON:  Same.
12     A.    No, sir.  That is personally
13  not a desire of mine.
14     Q.    Is it your desire as sheriff,
15  or your thinking as sheriff, that the only
16  way your department can monitor and carry
17  out its duties and responsibilities on
18  gaming, is to make sure that Victoryland
19  remains the only location for electronic
20  bingo?
21     A.    Ask that again.
22     Q.    Is it your desire or plan to
23  assure that Victoryland stays the only

Page 149

1  location for electronic bingo gaming in
2  Macon County, so that it doesn't require
3  more man hours or more men from your
4  department to monitor it?
5      A.    While Victoryland -- While my
6  regular duties as sheriff in Macon County
7  and this additional duty present quite a
8  challenge to me, I have no desire that
9  Victoryland -- or no desire or plans that
10  Victoryland be the only qualified location
11  in Macon County.
12     Q.    You have stated earlier that
13  you believe that you have an obligation to
14  make sure as many viable, valid, real
15  charities as possible profit financially
16  from electronic bingo in Macon County; true?
17         MR. ANDERSON:  Object to the
18  form.
19     A.    I have stated -- I have stated
20  my justifications in the commentaries, and
21  they stand for what I meant when I made
22  these amendments.
23     Q.    I'm not sure what you just

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 158

1  form of the question.
2         MR. ANDERSON:  Object to the
3  form.  You can answer.
4      A.   Sir, I have stated what I know
5  concerning that.  And whatever Mr. Gray and
6  I came up with was -- these rules were
7  developed and approved by me as I understood
8  what their functions were to be and what I
9  intended them to be.
10     Q.   Sheriff Warren, were you aware
11  that while the rules were being drafted by
12  Fred Gray, Jr., for bingo licensing in Macon
13  County, that he was consulting with
14  representatives of Victoryland?
15         MR. TEPLEY:  Same objection.
16         MR. ANDERSON:  Same objection.
17     A.   I had no knowledge of that.
18     Q.   Did you inquire of him whether
19  he was getting any input from any source,
20  whatsoever, outside of your circle of trust,
21  which was just you and he?
22     A.   I hired Mr. Gray to come up
23  with the rules and regulations regarding

Page 159

1  Victoryland, regarding bingo in Macon
2  County.  Whether he -- Who he consulted
3  with, I have no knowledge of that.  And at
4  that particular point in time, all I was
5  concerned with was coming up with rules that
6  would adequately govern this activity.
7      Q.   So is that to say that as far
8  as you were concerned, you were not against
9  Mr. Fred Gray, Jr., consulting with
10  representatives of Victoryland in coming up
11  with the drafted rules and regulations which
12  you were going to approve?
13     A.   Again, and maybe I'm being --
14  maybe I'm just being a dunce, but I . . .
15     Q.   I think you're being
16  brilliant.
17     A.   I hired Mr. Gray -- Mr. Gray
18  to come up with the rules that would govern
19  the conduct of games in Macon County.  That
20  was my -- And the rules and what Mr. Gray
21  and I came up with was what I wanted.  I
22  used my discretion on the information that
23  he brought to me.  I exercised what judgment

Page 160

1  I could, given my knowledge of this issue,
2  which was -- which I used as best I could
3  and the rules and regulations that I came up
4  with, I approved and I intended that they
5  govern this activity.
6      Q.   Sheriff Warren?
7      A.   Yes, sir.
8      Q.   While Fred Gray, Jr., was
9  drafting these rules and regulations, and
10  amendments to the rules and regulations, for
11  bingo licensing, electronic bingo gaming
12  licensing, in Macon County, was it okay by
13  you that he was getting input from
14  representatives of Victoryland?
15         MR. TEPLEY:  Object to the
16  form.
17     Q.   Assuming that was happening,
18  was that okay with you?
19     A.   Sir, at the time I instructed
20  Mr. Gray to come up with rules and
21  regulations, that wasn't even an issue.
22     Q.   Maybe not to you, and that's
23  what I want to talk about.  Was it your

Page 161

1  desire that during the work he was
2  performing for you, and you hired him to
3  draft the rules and regulations; true?
4      A.   I did.
5      Q.   Fred Gray, Jr.; true?
6      A.   Yes, sir.
7      Q.   Was it your desire that he
8  share your conversations with him with
9  others, or did you expect them to be kept
10  absolutely confidential under the
11  attorney-client privilege?
12     A.   Sir, Mr. Gray and I have a
13  long history.
14     Q.   I know that.  I'm asking you a
15  specific question.
16     A.   And I'm trying to answer you
17  in the context of the way this question is
18  presented, sir.  You know --
19     Q.   Calm down.  It's going to be
20  okay.
21     A.   Oh, I'm calm.  I'm real calm.
22         Fred Gray, Jr., and I have a
23  long history with one another.  I trusted --

41 (Pages 158 to 161)

Page 162

1  I trust this man.  When I asked him to do
2  what he did, I trusted him to act in the
3  best interest of the citizens of Macon
4  County, in my best interest.  And when we
5  came to the end of the journey, what we came
6  up with was something I knew I approved, we
7  discussed and was what I asked him to do.
8      Q.    Sheriff Warren, am I offending
9  you by my questions?
10     A.    At times, this whole thing has
11 offended me.
12     Q.    Are my questions offending
13 you?
14     A.    No, sir.  I understand you are
15 an attorney, and you're doing what your job
16 is, and that's representing your client.
17     Q.    See, I can't get inside your
18 head.  I have to ask questions.
19     A.    Yes, sir.  I know that.  But,
20 you know --
21         MR. ANDERSON:  Why don't we
22 take a break?
23         MR. HENINGER:  No, not yet.

Page 163

1      A.    That's fine.  I know what you
2  have to do, sir, and I completely respect
3  that.  And I'm trying to be as forthright
4  and honest as I can about --
5          MR. ANDERSON:  Listen to his
6  questions.
7      Q.    So there's no way to change
8  the wording, I'm going to write it.
9          I hope you can read my
10 writing.
11     A.    Yes, sir.
12         (Whereupon, Plaintiff's
13         Exhibit No. 11 was marked
14         for identification.)
15     Q.    We talked about the circle of
16 trust in Exhibit 8, and I've just recreated
17 it, and this will be Exhibit Number 13.  Is
18 that what y'all show?  11, I'm sorry.
19         Because I'm hoping that when
20 you hired Mr. Gray as your trusted lawyer
21 and friend and man you had worked with, that
22 you were reposing the trust of your office
23 and your obligations in him; true?

Page 164

1      A.    I hired Mr. Gray to come up
2  with the rules and regulations, sir.  All
3  this reposing and all that, I don't know
4  about.  That's -- I'm stating you simply
5  what I did.
6      Q.    Thank you.  Then I'll go to
7  this question:  With regard to this circle
8  of trust that was just you and Fred Gray on
9  coming up with the rules and regulations we
10 discussed this morning, first question:  Was
11 it stated by Sheriff Warren that
12 confidential information inside the circle
13 could be discussed with representatives of
14 Victoryland, yes or no?
15         MR. TEPLEY:  Object to the
16 form of the question.
17         MR. GRAY, SR.:  Is your
18 question whether or not he asked that?  I
19 don't understand the question, I'm sorry.
20         MR. HENINGER:  Fred, I can't
21 be responsible for what you understand.  I'd
22 be happy to repeat it.
23         MR. GRAY, SR.:  Repeat it.

Page 165

1      Q.    The question on Exhibit 11 is:
2  Was it stated by Sheriff Warren that
3  confidential information inside the circle
4  could be discussed with representatives of
5  Victoryland?  And I mean could be discussed
6  by Gray, Jr.  Did you tell him he could
7  discuss confidential information between the
8  two of you with representatives of
9  Victoryland?
10         MR. TEPLEY:  Same objection.
11         MR. ANDERSON:  I don't want to
12 waive any attorney-client privilege, Steve.
13 Was it his understanding?  And I want to put
14 the words in your mouth, but . . .
15         MR. HENINGER:  No, James.  And
16 I think --
17         MR. ANDERSON:  Things that he
18 told his lawyer would be confidential.
19         MR. HENINGER:  Not if -- There
20 is no attorney-client privilege if he
21 instructed his lawyer, you can discuss
22 whatever we're doing inside this
23 relationship with Victoryland.

42 (Pages 162 to 165)

Page 166

1    MR. ANDERSON: But if he --
2    MR. HENINGER: That's what I'm
3  asking him.
4    Q.    Did you give permission to
5  Fred Gray, Jr., to disclose and discuss
6  confidential workings between the two of
7  you, with drafts, things of that nature,
8  with representatives of Victoryland?
9    MR. TEPLEY: Object to the
10  form of the question.
11    A.    That --
12    MR. GRAY, SR.: Just a moment.
13    MR. ANDERSON: I'm going to
14  object to attorney-client privilege about
15  what he talked to his lawyers about.
16    MR. HENINGER: If you're going
17  to insist on it, I think we're going to have
18  to call the judge, or at least mark this
19  place.
20    Because, James, I think it's
21  clear that that question is asking him
22  whether he actually stated there would be no
23  breach of attorney-client privilege because

Page 167

1  he was permitted to disclose this
2  confidential information. I don't see how
3  you can claim such a statement would be
4  protected.
5    MR. ANDERSON: I think there's
6  another way you can ask it. And it may have
7  been the way you asked it before. And it --
8    MR. HENINGER: Well I want to
9  go back. Let's stay with this exhibit, and
10  we'll perfect the Record.
11    MR. ANDERSON: Will you let me
12  take a break and talk to my client, and I
13  think I can clear some of this up.
14    MR. HENINGER: You've promised
15  me that three times today.
16    MR. ANDERSON: I know. And
17  we're doing a little better. Let's take a
18  break.
19    VIDEOGRAPHER: This is the end
20  of tape number three. We're off the Record
21  at 2:51 p.m.
22    (Recess taken.)
23    VIDEOGRAPHER: This is the

Page 168

1  beginning of tape number four. We are back
2  on the Record at 3:08 p.m.
3    MR. ANDERSON: Steve, as I
4  mentioned to you off the Record, I think the
5  sheriff has a statement that will help
6  clarify. And I think he got a little
7  confused.
8    Do you want to say something,
9  sheriff?
10    THE WITNESS: Mr. Heninger, I
11  apologize for any confusion. I was sort of
12  confused with the attorney-client privilege
13  thing. What you were asking, it was okay if
14  he talked to somebody to do -- to accomplish
15  what I needed to get done; it was to
16  whomever. As a matter of fact, shortly
17  after this happened, I came to Sheriff D.T.
18  Marshall, because, call it naive or what, I
19  went to him. I thought we were talking
20  about bingo in a traditional sense. And --
21    Q.    You mean card bingo?
22    A.    Yeah. Shortly after, I went
23  to Sheriff D.T. Marshall, I spent maybe a

Page 169

1  couple of hours in his office. He talked to
2  me about it, he gave me a copy of his rules.
3    I brought them back, and I
4  gave them to Fred. He also let me talk to
5  the guy in his office, some tall guy,
6  Sheriff Marshall can --
7    MR. ANDERSON: For
8  clarification, Sheriff Marshall is the
9  sheriff of Montgomery County.
10    A.    Is the sheriff of Montgomery
11  County. And he talked to me about bingo; we
12  had a conversation about bingo. Then the
13  person he has that's over bingo, I went and
14  talked to him. And the rules that -- I got
15  a copy of his rules, and I brought them back
16  and gave them to Fred.
17    Q.    Thank you. Let me go back to
18  where we started.
19    A.    Yes.
20    Q.    Was it your intent that all
21  discussions, work, drafts in this
22  relationship between you and Fred Gray, Jr.,
23  to come up with these rules and regulations,

FREEDOM COURT REPORTING

Page 170

1  be kept confidential between you and he as
2  attorney/client, was that your intent?
3           MR. ANDERSON:  All
4  discussions?
5           MR. HENINGER:  (Nods head
6  affirmatively.)
7      A.  I -- That wasn't -- I did not
8  care if Mr. Gray discussed that with
9  somebody in accomplishing what I had asked
10 him to do.  But there were some things that
11 we discussed that I would -- and I think he
12 knows what those things are that I would
13 rather keep confidential.
14     Q.  He may.  But, see, we need to
15 talk about the ones that you did not.
16         So it was not your intent that
17 all discussions, drafts of rules and
18 regulations for bingo licensing in Macon
19 County be kept confidential and between only
20 you and he until published?  That was not
21 your intent on all discussions?
22     A.  I don't know what my intent
23 exactly was on that issue, because -- I'm

Page 171

1  trying to answer you honest, Mr. Heninger.
2      Q.  You mean that?
3      A.  I relied on Fred to do
4  something I had asked him to do.
5      Q.  And you've told us that many
6  times, thank you.  That's established.
7          I'm only trying to find out if
8  it was your intent when working with Fred
9  Gray, Jr., you selected to help by drafting
10 these rules and regulations for your
11 approval.  Was it your intent in that
12 relationship that all your discussions, all
13 your work product, all your drafts remain
14 confidential as between attorney and client
15 until you approved them and they were
16 released?
17     A.  I expected a certain degree of
18 confidentiality.
19     Q.  Well, attorney-client is
20 totally confidential.  Do you understand
21 that?
22     A.  Yes, sir.
23     Q.  Is that what you intended,

Page 172

1  total confidentiality between you and Fred
2  Gray so that nothing could be disclosed
3  about your discussions, work, or drafts of
4  rules and regulations until you had approved
5  them and published them?  Was that your
6  intent?
7           MR. ANDERSON:  You're asking
8  him about three different areas.
9           MR. HENINGER:  Yes.
10     A.  I did not have any objections
11 to him talking to people in getting this
12 thing accomplished.
13     Q.  He could tell people what
14 y'all had discussed and were thinking of?
15          MR. ANDERSON:  Object to the
16 form.
17     Q.  Could he?
18     A.  He could discuss -- He could
19 discuss what he needed to to achieve the
20 goals and objectives.
21     Q.  Sheriff Warren, could he
22 discuss, under your intent as the client,
23 could he discuss what the two of you had

Page 173

1  discussed, what the two of you were
2  considering to get input from others?
3      A.  I wouldn't -- I'll just answer
4  that by saying I did not object to him --
5  since I have -- I know what you're talking
6  about, I did not object to him talking to
7  anyone to get what I needed accomplished
8  now.  And that's -- was my intentions.
9      Q.  And did you make those
10 intentions known to Fred Gray, Jr.?
11          MR. ANDERSON:  It might get
12 into what he discussed, so I will --
13          MR. HENINGER:  Are you
14 objecting?
15          MR. ANDERSON:  Yes, I'm
16 objecting.
17     Q.  And when you say in your last
18 answer you were explaining that you had a
19 work product that you were looking for from
20 Fred Gray, Jr., in the drafts of the rules
21 and regulations; true?  I mean that's your
22 mission?
23     A.  Yes, sir.

44 (Pages 170 to 173)

FREEDOM COURT REPORTING

Page 174

1     Q.    And you did not object to him
2  discussing that work product with others, if
3  it could improve it?
4     A.    I did not have an objection to
5  him speaking with others to accomplish that
6  goal.
7     Q.    He could disclose what the two
8  of you were discussing?
9     A.    Sir, I didn't say that.
10    Q.    Well, I'm asking.  That's
11  where there was a question mark after that.
12    A.    I just -- I don't think that
13  that came up, you know.
14    Q.    What was your intent?  Could
15  he discuss with those others what y'all had
16  been kicking around as potential rules?
17  What was your intent?
18    A.    The intent was to get rules
19  and regulations to govern bingo.  That --
20    Q.    By any means?
21    A.    As finite as you're putting
22  that, I don't think that came up as a part
23  of the conversation.

Page 175

1     Q.    Sheriff, I'm not your dad and
2  I'm not your lawyer.
3     A.    I understand.
4     Q.    But there's plenty of good
5  lawyers in this room, and I can assure you
6  that the attorney-client privilege, you
7  can't have it and avoid it at the same time,
8  it's one or the other.  And that's why I'm
9  asking you as specifically as I can was it
10  your intent, you the client, Sheriff David
11  Warren, was it your intent that the
12  discussions and drafts and work done between
13  you and Fred Gray, Jr., inside this circle
14  of trust and attorney-client relationship be
15  held in confidence within that relationship?
16          MR. DAVENPORT:  Object to the
17  form.
18    A.    That was probably -- Put in
19  those terms, that may have been -- I'm not
20  an attorney.
21    Q.    I know that.
22    A.    I know you're not my daddy,
23  and I know you're not my attorney, and I'm

Page 176

1  not one either, and I'm just trying to
2  answer the question.  I expected Fred to do
3  what he needed to do to get that assignment
4  accomplished; that -- that -- the directions
5  that I gave him to get bingo -- rules and
6  regulations that would govern bingo.  I
7  didn't care if he spoke with somebody.  Of
8  course -- And that's all I'm saying.
9     Q.    You expected Fred to do
10  whatever he needed to do to get the job
11  done, is that what you said?
12    A.    I did not care -- What I'm
13  saying is, is what I've said:  I did not
14  object to him speaking to somebody to get
15  that job done.
16    Q.    And there is nobody that was
17  hands off for him to speak with, plan with,
18  collaborate with in suggesting rules and
19  regulations; true?
20    A.    At that point in time, that
21  may have been true.
22    Q.    Victoryland wasn't hands off.
23  You gave him -- Or you intended no

Page 177

1  instructions that he not be allowed to talk
2  to people from Victoryland?
3     A.    We did not get into -- I don't
4  know who he spoke with, sir.
5     Q.    I didn't ask you that,
6  Sheriff.  My fault, obviously.
7          I am simply asking you when
8  you say that he was intended by you to be
9  able to talk with others so he could get his
10  job done, and I asked you was it hands off
11  with anyone, and you said no.  No hands off
12  with anyone.
13    A.    Right.
14    Q.    So if there's no hands off,
15  that means he could talk to the owners and
16  operators of Victoryland about the proposed
17  rules for gaming; true?
18    A.    He could talk to whom he
19  needed to talk to at Victoryland, I would
20  think.
21    Q.    He could talk to the lawyers
22  who represent Victoryland if he wanted to;
23  true?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 178

1    A.    Yes.
2    Q.    He could talk to shareholders
3  of Victoryland if he wanted to; true?
4    A.    I would suppose.
5    Q.    He could talk to his father,
6  who is his law partner and a shareholder in
7  Victoryland, to get his input; true?
8    A.    Yes, sir.
9    Q.    That would be all right by
10 you?
11   A.    I had no objections to him
12 speaking with people.
13   Q.    All right.  Did that happen?
14 Did Fred Gray, Jr., as you sit here today,
15 do you know if he received input from
16 representatives of Victoryland in the drafts
17 he presented to you on the rules and
18 regulations for bingo licensing in Macon
19 County?
20   A.    I don't know who he spoke
21 with.
22   Q.    You truly do not?
23   A.    No, sir.

Page 179

1    Q.    As you sit here today, you
2  don't know who he spoke with to get any
3  input about these drafts of the rules and
4  regulations for you to approve?
5    A.    To the best of my
6  recollection, I don't know who he spoke
7  with.
8    Q.    You don't know if he spoke
9  with his father, Fred Gray?
10   A.    I don't -- I just said I don't
11 know who he spoke with.
12   Q.    I understand.  But I'm going
13 to go down the laundry list.  You don't know
14 if he spoke with Milton McGregor?
15   A.    I don't know.
16   Q.    You knew at that time, and had
17 known for a long time that the Gray Law Firm
18 represented Victoryland?
19   A.    Yes, I did.
20   Q.    You knew, and had known for
21 some time, that Fred Gray, a senior partner
22 in that firm, had an interest in
23 Victoryland?

Page 180

1    A.    I knew that he had an
2  interest, but I didn't know -- I knew he was
3  affiliated with Victoryland, but I didn't
4  know how.
5    Q.    You didn't know the extent?
6    A.    No, sir.
7    Q.    But you knew he had an
8  interest in Victoryland and had known that
9  for some time?
10   A.    I knew Mr. Gray had an
11 affiliation with Victoryland.  And to what
12 extent, I didn't know.
13   Q.    You knew Milton McGregor was
14 the principal in Victoryland?
15   A.    Yes.
16   Q.    You knew that Milton McGregor
17 had expressed to you that Victoryland was
18 interested in getting the Class B operator's
19 license while you were drafting your rules?
20        MR. TEPLEY:  Object to the
21 form of the question.
22   A.    I knew that Mr. McGregor was
23 interested in conducting bingo.

Page 181

1    Q.    And it seems appropriate to
2  you, and no conflict of interest, that Fred
3  Gray, Jr., may be getting input from
4  representatives of Victoryland, his firm's
5  client, or from his father, an interest
6  holder in Victoryland, while he's working
7  for you?  That seems okay?
8    A.    I saw no conflict of interest.
9  And I trust Fred, and I had no problems with
10 him representing me.
11   Q.    Sheriff, when you say you saw
12 no conflict of interest, is that because you
13 closed your eyes or because you thought
14 about it and eliminated that?
15        MR. TEPLEY:  Object to the
16 form of the question.
17   A.    I -- I'm sorry.  Again.
18   Q.    When you say you saw no
19 conflict of interest, I take it you're
20 referring back to the times when these rules
21 and regulations were being drafted and the
22 amendments were being drafted.  You saw no
23 conflict with the potential that Fred Gray,

46 (Pages 178 to 181)

FREEDOM COURT REPORTING

Page 202

1    MR. DAVENPORT:  The Record
2 will reflect, I don't think he ever said it
3 was stated.
4    MR. HENINGER:  I want to get
5 it right.  Thank you, Ron.
6    Q.    Was it stated by Sheriff
7 Warren that confidential information inside
8 the circle could be discussed with
9 representatives of Victoryland?
10    MR. ANDERSON:  Not stated --
11 Object to stated to his lawyer.  He stated
12 in his deposition that it was okay.
13    Q.    Would that be a yes or a no?
14    A.    I stated that he could speak
15 to anyone.
16    Q.    Because I'll forget this if I
17 don't do this.  Second question:  Was it
18 permitted in advance by Warren that Gray,
19 Jr., could get input from representatives of
20 Victoryland in drafting the rules?
21    MR. ANDERSON:  Again, without
22 waiving the client privilege, I think he's
23 answered it was okay for him to get input

Page 203

1 outside.
2    Q.    Would the answer to that be
3 yes?
4    A.    My answer was Mr. Gray could
5 speak to anyone to get what I hired him to
6 do accomplished.
7    Q.    Which would include
8 Victoryland and its representatives?
9    A.    I did not object to it.
10    Q.    So yes would be appropriate,
11 wouldn't it?
12    MR. TEPLEY:  I'm going to
13 object.  I think the Record speaks to what
14 he's answering, not the document he's
15 marking.
16    MR. HENINGER:  I think the
17 document is part of the Record, Peter.
18 That's its purpose.  But I understand your
19 objection.
20    MR. TEPLEY:  My objection is
21 that document doesn't reflect his testimony.
22    MR. ANDERSON:  That's fine.
23    Q.    Well, let's get

Page 204

1 clarification --
2    MR. TEPLEY:  I don't object --
3    Q.    -- does Exhibit 11 not reflect
4 what you've told me under oath?
5    A.    Sir, what I told you under
6 oath was that I did not object to Mr. Gray
7 having discussions with anyone to get this
8 done.
9    Q.    I understand.  And I'm trying
10 to simplify it for my benefit.  And if you
11 will allow the witness to see this, since
12 it's his testimony that matters, is that
13 Exhibit 11 an accurate representation of
14 your answer to those two questions?
15    A.    I have stated --
16    Q.    I think you better look at it.
17    A.    I have stated for the Court
18 what my answer to that question was,
19 Mr. Heninger.
20    Q.    Sheriff, I don't want to have
21 to go to court some day and say -- and the
22 judge say, Steve, he never confirmed that
23 Exhibit 11 was the truth.

Page 205

1    I want you to tell me under
2 oath, does that accurately reflect your
3 position and your answer or have I misstated
4 it?
5    MR. ANDERSON:  And I'm, again,
6 taking out when you say was stated.  We are
7 objected to what he stated to his lawyer.
8 He stated, and it's on videotape what he
9 stated so far, Steve.  And being in your
10 words, I mean --
11    Q.    Is it fair and accurate?
12    A.    I have gave you the answer to
13 what I perceive you to be asking me.
14    Q.    I can stay here as long as you
15 can.
16    MR. ANDERSON:  Steve, I don't
17 object to this being an exhibit to his
18 deposition --
19    MR. HENINGER:  It doesn't
20 state today to his lawyer, Jim.  Look at the
21 question.
22    MR. ANDERSON:  I know.  I
23 don't object to this being an exhibit to his

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 226

1  response, he said when Fred Gray and I
2  whenever the last few words, and I'm sure he
3  meant to say Fred Gray, Jr. I didn't want
4  the Record to read wrong.
5      A.   I meant Fred Gray, Jr.
6      Q.   Sheriff Warren, was it your
7  intention to benefit financially from the
8  licensing of charities or locations in Macon
9  County for electronic bingo?
10     A.   Ask that again.
11     Q.   Boy, if you can't say no to
12  that.
13          I'll start over. Was it your
14  intention to personally benefit financially
15  from the drafting of rules and regulations
16  for the licensing of electronic bingo in
17  Macon County, Alabama?
18     A.   No, sir.
19     Q.   You would not?
20     A.   It was not my intention.
21     Q.   It was not your intention to
22  favor someone over another charity or
23  operator, applicant for a license to benefit

Page 227

1  yourself financially?
2      A.   No, sir, that was not my
3  intention.
4      Q.   Was it your intention to
5  benefit Fred Gray, Jr., by his involvement
6  in the drafting of these rules and
7  regulations and amendments so he could
8  benefit by Victoryland receiving favorite
9  treatment?
10         MR. TEPLEY: Object to the
11  form of the question.
12     A.   No, sir, that was not my
13  intentions. I did not intend that Fred Gray
14  would benefit anything from these rules and
15  regulations.
16     Q.   Was it your intention that
17  Milton McGregor and Victoryland and the
18  shareholders in Victoryland benefit
19  financially by being a monopoly holder for
20  electronic bingo in Macon County?
21         MR. BOLTON: Object to the
22  form.
23         MR. ANDERSON: Object to the

Page 228

1  form.
2          MR. TEPLEY: Object to the
3  form.
4      A.   That was -- It was not my
5  intention that Milton McGregor or
6  Victoryland or any of its stockholders
7  benefit personally from a monopoly.
8      Q.   Do you think it was just a
9  coincidence that Victoryland has the one
10  operator's location license and all sixty of
11  the permitted charity licenses to have a
12  monopoly, under the current rules?
13     A.   Victoryland met the current
14  rules and the requirements of the current
15  rules, the charities met the requirements
16  for charities -- for charities and other
17  entities, operating lawfully, and it's sixty
18  of them. And they are doing -- They are
19  conducting bingo in Macon County.
20     Q.   How much money is each charity
21  getting paid by Victoryland right now?
22  Let's take 2007, what did they get paid?
23     A.   I think 2007, they were

Page 229

1  getting paid fifteen thousand dollars.
2      Q.   Do you know what Lucky Palace
3  was assuring they would be paid?
4      A.   Something more than fifteen
5  thousand dollars.
6      Q.   Twenty-one thousand dollars?
7      A.   Twenty-one thousand dollars.
8      Q.   Sound familiar?
9      A.   Uh-huh.
10         (Whereupon, Plaintiff's
11          Exhibit No. 12 was marked
12          for identification.)
13     Q.   We're about to run out of
14  tape.
15         I just want to confirm,
16  Plaintiff's Exhibit 12, do you remember
17  being presented this letter by Mr. Bracy on
18  behalf of Lucky Palace hoping that he could
19  assure his investors that there would be no
20  changes in the rules in the near future. Do
21  you remember that he asked you to sign that?
22         MR. TEPLEY: Object to the
23  form of the question.

58 (Pages 226 to 229)

FREEDOM COURT REPORTING

Page 246

1    A.    It was on television.
2    Q.    And was it -- it was stated
3   that -- or implied that you had given prior
4   approval to someone getting a license for
5   bingo?
6    A.    That was my understanding of
7   how I heard that.
8    Q.    And this offended you?
9    A.    It did not offend me.  I did
10   not -- That was not factual, and it was a
11   misrepresentation of the circumstances at
12   that point in time.
13    Q.    Well, if it were true that
14   Sheriff David Warren had allowed preapproval
15   of an applicant for an operator's license in
16   bingo, that's wrong, isn't it?  Before ever
17   receiving an application, if you had given
18   preapproval to someone for an operator's
19   license for bingo gaming, that would be
20   wrong, wouldn't it?
21    A.    The rules state that you must
22   meet certain requirements, and anybody who
23   met those requirements --

Page 247

1    Q.    If it were true --
2    A.    -- were authorized.
3    Q.    Okay.  If it were true that
4   you had given approval to an applicant for
5   an operator's license before even an
6   application were filed, that would be wrong,
7   wouldn't it?
8    A.    Preapproval without first
9   meeting the requirements of the rules and
10   regulations would be wrong.
11    Q.    So if you gave Milton McGregor
12   the impression, whether it was by a
13   handshake or a wink, that Victoryland was
14   going to be preapproved, that would be
15   wrong, wouldn't it?
16    MR. TEPLEY:  Object to the
17   form of the question.
18    Q.    I know you're going to say
19   that didn't happen.  But I'm saying if it
20   did happen, it's wrong, isn't it?
21    A.    If it did happen without
22   meeting the requirements, that would be
23   wrong.

Page 248

1    Q.    Wow, you said a mouthful.
2   Thank you.
3    If you did give preapproval to
4   Victoryland before an application was even
5   filed and then drafted the rules so they
6   only applied to Victoryland and thereby
7   allowed them to meet all the requirements,
8   it's okay?
9    MR. TEPLEY:  Object to the
10   form of the question.
11    MR. ANDERSON:  Object to the
12   form.
13    Q.    Is that what you're telling
14   me?
15    A.    No, sir.
16    Q.    What are you telling me,
17   Sheriff?  Don't play cat and mouse.  Hit the
18   ball.
19    What are you telling me?
20    A.    I'm telling you that for an
21   entity to conduct bingo in Macon County,
22   they must meet the requirements of the rules
23   and regulations.

Page 249

1    Q.    And I'm asking you, is it okay
2   for you to draft the rules and regulations
3   and skulk them like Michelangelo to look
4   exactly like Victoryland, so Victoryland
5   will get a monopoly?  Is that acceptable
6   under the law?
7    MR. TEPLEY:  Object to the
8   form of the question.
9    A.    For me to construct rules that
10   favored Victoryland would be improper.
11    Q.    And amend them too, if the
12   intent was to favor Victoryland?
13    A.    If the intent was to favor
14   Victoryland, and those rules were intended
15   to favor Victoryland, that would be wrong.
16    Q.    Going back to 14.  You said:
17   Public announcements such as the one that
18   recently occurred, statements from
19   individuals of comments that you have
20   allegedly made to them as well as
21   distribution by you of my recent letter to
22   you, create an appearance of impropriety
23   towards the sheriff's office of some, quote,

63 (Pages 246 to 249)

FREEDOM COURT REPORTING

Page 306

1    Q.    Sheriff Warren, does a
2 monopoly in bingo gaming location serve and
3 protect the citizens of Macon County?
4         MR. BOLTON:  Object to the
5 form.
6    A.    At this point in time, the
7 only reason Victoryland is operating is that
8 they have met all the rules and regulations
9 that were required of them, and they have a
10 license.
11    Q.    Sheriff Warren, does a
12 monopoly for the location of electronic
13 bingo gaming in Macon County serve and
14 protect the citizens of Macon County?
15    A.    It is not my intention to
16 create -- to protect the -- to protect and
17 serve the citizens of Macon County by
18 creating a monopoly.
19    Q.    Does a monopoly in bingo
20 gaming, electronic bingo gaming, serve and
21 protect the citizens of Macon County?
22    A.    In the sense that you are
23 asking that question, I am going to say a

Page 307

1 monopoly, if it existed, protects no one.
2    Q.    Except the person with the
3 monopoly; true?  I mean, if you've got it,
4 it's good for you, isn't it?
5    A.    Let me say this --
6    Q.    I'm going to have to --
7    A.    -- that was not the intention
8 of the rules and regulations to create a
9 monopoly.  That's my statement, that was
10 never my intention.
11    Q.    Why wasn't it your intention
12 to create a monopoly?
13    A.    My intention --
14    Q.    It would be a lot easier to
15 police, wouldn't it?
16    A.    My intentions were to -- and
17 remains to promulgate rules that would serve
18 as a guide for governing -- for the
19 governance of bingo in Macon County.
20    Q.    You are under oath in federal
21 court.
22    A.    Yes, sir.
23    Q.    As we sit here today, as the

Page 308

1 licensing authority for Macon County for
2 bingo, Class B licenses, and that is you,
3 isn't it?
4    A.    Yes, sir.
5    Q.    It is only you, isn't it?
6    A.    Yes, sir.
7    Q.    As you sit here today under
8 oath, under the current rules, as you have
9 amended them and they have been in effect
10 since January of 2005, effectively, whether
11 you intended it or not, effectively,
12 Victoryland has the monopoly on electronic
13 bingo, doesn't it?
14         MR. BOLTON:  Object to the
15 form.
16    Q.    You are under oath.
17    A.    Mr. Heninger, under oath, I am
18 telling you, Victoryland met all of the
19 requirements at that -- at the time they
20 applied for a license.  They have a license
21 at this point in time.  A monopoly was not
22 the intention.
23    Q.    Stay with me.

Page 309

1    A.    Yes, sir.
2    Q.    If I'm tiring you out, you
3 can't follow it, you tell me.
4    A.    We're fine.
5    Q.    I'm asking you if it isn't a
6 fact, under the current rules as we sit here
7 today, Victoryland owns a monopoly in bingo
8 gaming in Macon County because you cannot
9 approve any other license applicants unless
10 you change the rules; true?
11    A.    At this point in time,
12 Victoryland has the only license to operate
13 bingo in Macon County unless the rules are
14 changed.
15    Q.    And the only way the rules can
16 be changed is if you do it; true?
17    A.    I promulgate the rules -- As
18 sheriff of Macon County, I promulgate the
19 rules for bingo.
20    Q.    Have you considered in the
21 past two years changing the rules to allow
22 another location in Macon County, besides
23 Victoryland?

78 (Pages 306 to 309)

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **HOPE FOR FAMILIES & COMMUNITY SERVICES, INC., et al.,** | ) ) ) | **Case No.: 3:06-cv-01113-WKW-csc** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY, et al.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## DEFENDANT MACON COUNTY GREYHOUND PARK, INC.'S PRIVILEGE LOG

| Document Date | Description of Document | Privilege |
|---|---|---|
| January 4, 2007 | Attorney Fax | Attorney Client Privilege |
| Dec. 19, 2006 | Attorney Fax | Attorney Client Privilege |
| Dec. 21, 2004 | Email from counsel to client and co-counsel regarding Bingo Rules and Regulations | Attorney Client Privilege |
| Date unknown (DUK) | Attorney notes regarding Bingo Rules and Regulations | Attorney Client Privilege |
| Nov. 2, 2004 | Correspondence between co-counsel regarding legal opinion | Attorney Client Privilege |
| Sept. 29, 2004 | Fax to client from counsel regarding Gaming. | Attorney Client Privilege |
| Sept. 28, 2004 | Fax from counsel regarding Bingo | Attorney Client Privilege |
| April 8, 2004 | Fax from counsel to client regarding Bingo Rules and Regulations | Attorney Client Privilege |
| DUK | E-mail from counsel to co-counsel and client regarding Bingo | Attorney Client Privilege |

| DUK | Bingo information provided by counsel | Attorney Client Privilege |
|---|---|---|
| Oct. 10, 2003 | E-correspondence from counsel regarding Bingo | Attorney Client Privilege |
| DUK | Document drafted by counsel. | Attorney Client Privilege |
| May 8, 2006 | Fax from counsel to client regarding attorney request | Attorney Client Privilege |
| DUK | Drafts of legislation prepared by counsel. | Attorney Client Privilege |
| April 9, 2007 | Email from counsel to client regarding legislation | Attorney Client Privilege |
| DUK | Document prepared by counsel | Attorney Client Privilege |
| DUK | Legislative document prepared by counsel | Attorney Client Privilege |
| DUK | Legislative document prepared by counsel | Attorney Client Privilege |
| DUK | E-mail from counsel to client regarding legislation | Attorney Client Privilege |
| DUK | Legislative document prepared by counsel | Attorney Client Privilege |
| DUK | Legislative document prepared by counsel | Attorney Client Privilege |
| DUK | Legislative document prepared by counsel | Attorney Client Privilege |
| DUK | Attorney notes regarding Legislation | Attorney Client Privilege |
| DUK | Attorney notes regarding Legislation | Attorney Client Privilege |
| DUK | Attorney notes regarding Legislation | Attorney Client Privilege |
| DUK | Attorney notes regarding Legislation | Attorney Client Privilege |
| DUK | Attorney notes regarding Legislation | Attorney Client Privilege |

| (Nov. 2003) | Correspondence with counsel regarding legal opinion | Attorney Client Privilege |
|---|---|---|
| Sept. 29, 2004 | Fax from counsel to client regarding gaming | Attorney Client Privilege |
| Dec. 6, 2004 | Correspondence from counsel to client regarding legal opinion | Attorney Client Privilege |