**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 3:06-cv-01113-WKW-csc |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' OBJECTIONS TO MEMORANDUM OPINION AND ORDER**

Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
Grace L. Kipp (LON 049)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, Alabama  35213
TEL:   (205) 986-3620
FAX:  (205) 986-3639
E-mail:     rks@spotswoodllc.com
                msansbury@spotswoodllc.com
                gkipp@spotswoodllc.com

*Attorneys for the Plaintiff Charities*

Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
Gayle L.  Douglas (DOU 012)
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:       (205) 326-3336
FAX:      (205) 326-3332
E-mail:    steve@hgdlawfirm.com
               lewis@hgdlawfirm.com
               gdouglas@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PLAINTIFFS' OBJECTIONS TO MEMORANDUM OPINION AND ORDER ....................... 1

ARGUMENT ....................................................................................................... 2

I.     The magistrate judge's denial of the Plaintiffs' motions to compel the discovery of the financial information of Defendants VictoryLand and McGregor was clearly erroneous and contrary to law.  (DE 107 # 15; DE 142 ## 9 & 10; DE 143 # 12) ............................................................... 3

          A.     The requested financial information meets the standards of relevancy under the Federal Rules ............................................. 4

          B.     The magistrate judge's reasons for denying this relevant discovery were clearly erroneous and contrary to law ................................ 7

          C.     The fact that VictoryLand is closely held does not provide a reason for denying relevant discovery ............................... 10

II.    The motion to compel VictoryLand to provide shareholder information was erroneously denied.  (DE 106 ## 13, 14 & 15;  DE 143 #13.) ...................... 12

III.   The motions to compel Fred Gray Jr., Fred Gray, and the Gray Law Firm to produce documents pursuant to Rule 45 subpoenas were erroneously denied. (DE ## 134, 135, 136.) ........................................................... 16

          A.     Fred Gray Jr. should be compelled to produce documents pursuant to the Rule 45 subpoena.  (DE #134.) ..................................................... 17

          B.     Fred Gray should be compelled to produce documents pursuant to the Rule 45 subpoena.  (DE #135.) ......................................................... 21

          C.     The Gray Law Firm should be compelled to produce documents pursuant to the Rule 45 Subpoena.  (DE #136.) ...................................... 24

IV.   The motion to compel Fred Gray Jr. to appear for deposition was erroneously denied.  (DE # 166.) ...................................................... 25

          A.     The Plaintiffs seek to depose Fred Gray Jr. on many relevant topics that are not privileged ................................................................ 26

B.    The Plaintiffs have met their burden of showing that the deposition should be allowed. ................................................................ 27

C.    Fred Gray Jr.'s answer to a single question is not an appropriate substitute for a deposition...................................................... 29

D.    The communications between Fred Gray Jr. and Defendant Warren were not privileged................................................................. 30

   1.    The communications between Fred Gray Jr. and Defendant Warren were not intended to be confidential and are not protected by the attorney-client privilege. ................................... 31

   2.    To the extent it once existed, the attorney-client privilege between Fred Gray Jr. and Defendant Warren has been waived. ...................................................................... 33

V.    The motion to compel Defendant Warren's production of financial information was erroneously denied.  (DE 42 ## 30, 31, 32, 33, 34 & 36.)......... 34

CONCLUSION ............................................................................................. 38

CERTIFICATE OF SERVICE................................................................................ 41

## TABLE OF AUTHORITIES

## CASES

*A. Farber & Partners, Inc. v. Garber*,
    234 F.R.D. 186 (C.D. Cal. 2006) .............................................................. 6, 8

*Bogle v. McClure*,
    332 F.3d 1347 (11th Cir. 2003) ................................................................ 31

*Braxton v. Farmer's Ins. Group*,
    209 F.R.D. 651 (N.D. Ala. 2002) ............................................................. 30

*Buchanan County, Va. v. Blankenship*,
    496 F. Supp. 2d 715 (W.D. Va. 2007) ..................................................... 15

*Coker v. Duke & Co., Inc.*,
    177 F.R.D. 682 (M.D. Ala. 1998) .............................................................. 2

*In re Grand Jury Matter*
    *No. 91-01386*, 969 F.2d 995 (11th Cir. 1992) ........................................ 31

*In re Grand Jury Proceedings*,
    899 F.2d 1039 (11th Cir. 1990) ................................................................ 26

*In re International Systems and Controls Corp. Securities Litigation*,
    693 F.2d 1235 (5th Cir. 1982) .................................................................. 19

*In re Slaughter*,
    694 F.2d 1258 (11th Cir. 1982) ................................................................ 23

*Mallinckrodt Chem. Works v. Goldman, Sachs & Co.*,
    58 F.R.D. 348 (S.D.N.Y. 1973) ............................................................ 2, 36

*McNulty v. Bally's Park Place, Inc.*,
    120 F.R.D. 27 (E.D. Pa. 1988) ................................................................ 19

*Nat'l Org. for Women, Inc. v. Scheidler*,
    510 U.S. 249, 114 S. Ct. 798 (1994) ...................................................... 8, 9

*O'Neal v. United States*,
    258 F.3d 1265 (11th Cir. 2001) ................................................................ 23

*Rowe v. City of Ft. Lauderdale*,
    279 F.3d 1271 (11th Cir. 2002) ............................................................ 4, 36

*Schiessle v. Stephens*,
    717 F.2d 417 (7th Cir. 1983) ........................................................................ 18

*State Farm Mutual Automotive Insurance Co. v. CPT Medical Services, P.C.*,
    375 F. Supp. 2d 141 (E.D.N.Y. 2005) .................................................. 5, 6, 8

*United States v. Biaggi*,
    705 F. Supp. 790 (S.D.N.Y. 1988) ................................................................ 15

*United States v. Davis*,
    810 F.2d 474 (5th Cir. 1987) .................................................................. 5, 36

*United States v. Ellis*,
    595 F.2d 154 (3d Cir. 1979) ................................................................... 5, 36

*United States v. Frega*,
    179 F.3d 793 (9th Cir. 1999) ....................................................................... 15

*United States v. Jannotti*,
    673 F.2d 578 (3d Cir. 1982) ........................................................................ 15

*United States v. Kemp*,
    500 F.3d 257 (3d Cir. 2007) ........................................................................ 15

*United States v. Krilich*,
    159 F.3d 1020 (7th Cir. 1998) ..................................................................... 15

*United States v. Piche*,
    981 F.2d 706 (4th Cir. 1992) .................................................................. 5, 36

*United States v. Pipkins*,
    528 F.2d 559 (5th Cir. 1976) ................................................................ 19, 33

*United States v. Whitney*,
    229 F.3d 1296 (10th Cir. 2000) ............................................................. 5, 36

*Wauchop v. Domino's Pizza, Inc.*,
    138 F.R.D. 539 (N.D. Ind. 1991) ............................................................... 21

## STATUTES AND RULES

28 U.S.C. § 636(b)(1)(A) ................................................................................ 1, 2

42 U.S.C. § 1983 ................................................................................................ 36

Fed. R. App. P. 45 ................................................................................................ 17

Fed. R. Civ. P. 26-32 ........................................................................................... 27

Fed. R. Civ. P. 26(b)(1) .................................................................................... 2, 37

Fed. R. Civ. P. 30(a) ............................................................................................ 27

Fed. R. Civ. P. 31(a) ............................................................................................ 27

Fed. R. Civ. P. 45(c)(3)(a)(iii) ....................................................................... 23, 24

Fed. R. Civ. P. 72(a) ............................................................................................. 1

## OTHER AUTHORITIES

Ala. R. Prof. Conduct 1.7(b) ............................................................................... 18

Charles Alan Wright, *Law of Federal Courts* (2nd ed. 1970) ............................ 2, 36

The Federalist No. 62 (James Madison) ............................................................... 37

*National Organization for Women v. Scheidler: RICO and the Economic Motive Requirement*, 26 CONN. L. REV. 1533 (1994) .................................................. 8

*Video Gambling Bill Dies in the Senate*, Birmingham Business Journal, Apr. 16, 1999 .............. 9

8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (2d ed. 2008) ....................................................................................................... 27

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule 72(a) of the Federal Rules of Civil Procedure, the Plaintiff Charities and Plaintiff Lucky Palace LLC respectfully object to the following portions of the magistrate judge's May 15, 2008, Memorandum Opinion and Order (DE 187):

1.    The denial of Lucky Palace's motion to compel Defendant VictoryLand to answer interrogatories 9 and 10.  (DE 142.)

2.    The denial of Lucky Palace's motion to compel VictoryLand to respond in full to document requests 12 and 13.  (DE 143.)

3.    The denial of the Plaintiff Charities' motion to compel Defendant McGregor to respond to document request 15.  (DE 107.)

4.    The denial of the Plaintiff Charities' motion to compel VictoryLand to respond to document requests 13, 14, 15, 26 (DE 106.)

5.     The denial of the Plaintiffs' motions to compel Fred Gray (DE 134), Fred Gray Jr. (DE 135), and the Gray Law Firm (DE 136) to produce documents pursuant to the Plaintiffs' Rule 45 Subpoenas.

6.    The granting of Fred Gray Jr.'s motion to quash Lucky Palace's deposition notice. (DE 150.)

7.    The denial of the Plaintiff Charities' motion to compel Defendant Warren to respond in full to document 30, 31, 32, 33, 34, and 36.  (DE 42.)

In support of their objections, the Plaintiffs states as follows:

## ARGUMENT

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, this Court must consider timely objections to an order by the magistrate judge and modify or set aside any part of the

order that is clearly erroneous or contrary to law.  Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A).

Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, a party is entitled to broad discovery of information that is relevant and non-privileged:

> Under the federal rules, relevancy is construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.  Courts are required to accord discovery a broad and liberal scope in order to provide parties with information essential to the proper litigation of all relevant facts, to eliminate surprise and to promote settlement.  Where there is a doubt over relevancy, the court should still permit discovery.

*Coker v. Duke & Co., Inc.,* 177 F.R.D. 682, 685 (M.D. Ala. 1998) (citations omitted).  In addition, "[t]he information [sought in discovery] need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  The phrase "reasonably calculated" means "'any possibility that the information sought may be relevant to the subject matter of the action.'"  *Mallinckrodt Chem. Works v. Goldman, Sachs & Co.*, 58 F.R.D. 348, 353 (S.D.N.Y. 1973) (quoting Charles Alan Wright, *Law of Federal Courts* § 81, at 359 n.47 (2nd ed. 1970)).

The information and documents sought by the Plaintiffs in their motions to compel clearly satisfy the standards governing discovery under the Federal Rules.  Nevertheless, the magistrate judge denied vast portions of that discovery in its order.  As set forth below, the magistrate judge's denial of the Plaintiffs' motions to compel was both clearly erroneous and contrary to law.

I.      **The magistrate judge's denial of the Plaintiffs' motions to compel the discovery of the financial information of Defendants VictoryLand and McGregor was clearly erroneous and contrary to law.  (DE 107 # 15; DE 142 ## 9 & 10; DE 143 # 12).**

In the Memorandum Opinion and Order, the magistrate judge denied a number of interrogatories and requests for production on the same bases.  For ease of reference, then, the Plaintiffs have grouped together particular requests where doing so will facilitate this Court's consideration of their objections.

The first category of discovery that the magistrate judge refused to allow concerns financial information relating to VictoryLand.  The interrogatories and requests, and the related objections, are set forth in full below:

PLAINTIFF CHARITIES' REQUEST # 15 TO DEFENDANT McGREGOR:
Please produce any and all documents in your possession or control that reflect or relate to the revenue of VictoryLand including but not limited to financial statements, balance sheets, bank statements, profit reports and income and expense reports for the time period January 1, 2003 to the present date.

DEFENDANT McGREGOR'S RESPONSE:  The Defendant objects to this request on the basis that it seeks personal, private, confidential information, the disclosure of which would amount to an invasion of privacy.  In addition, Defendant objects to this request on the grounds that it is vague, unclear, overly broad, unduly burdensome, immaterial, and irrelevant to any issue in this litigation.  This request is not reasonably calculated to lead to the discovery of relevant information or admissible evidence.  Finally, this request seeks commercial, proprietary and competitive information, the disclosure of which would be harmful to Victoryland and its business.

PLAINTIFF LUCKY PALACE'S INTERROGATORY # 9 TO DEFENDANT VICTORYLAND:  Please state the annual gross revenues for electronic bingo gaming at Victoryland for the years 2003, 2004, 2005 and 2006.

DEFENDANT VICTORYLAND'S RESPONSE:  Victoryland objects to this Interrogatory on the grounds that it seeks information that is not relevant to any claim or defense asserted in the pending litigation and is not reasonably calculated to lead to the discovery of any relevant information.  Further, the request by a party that desires to compete with Victoryland improperly seeks commercial, proprietary, trade secret and competitive information the disclosure of which would be harmful to Victoryland and its business.  This request is

oppressive, vexatious and filed for improper purpose, and designed for use outside this proceeding.

PLAINTIFF LUCKY PALACE'S INTERROGATORY #10 TO DEFENDANT VICTORYLAND: Please state the net profit from electronic bingo gaming at Victoryland for the years 2003, 2004, 2005 and 2006.

DEFENDANT VICTORYLAND'S RESPONSE: Same as above.

PLAINTIFF LUCKY PALACE'S REQUEST # 12 TO DEFENDANT VICTORYLAND: Please produce all documents, internal memos, notes, forecasts, correspondence, emails, electronic filed information regarding all financial information for this Defendant regarding the operation of electronic bingo in Macon County, Alabama, from its inception at Victoryland until the present which show gross revenues, payments, profit, payments to charities and others.

DEFENDANT VICTORYLAND'S RESPONSE: Victoryland objects to this request on the grounds that it is overly broad and seeks documents that are not relevant to any claim or defense asserted in the pending litigation and is not reasonably calculated to lead to the discovery of any relevant information. Victoryland also objects to this request by a party that seeks to compete with Victoryland because it improperly seeks commercial, proprietary, trade secret and competitive information the disclosure of which would be harmful to Victoryland and its business. Victoryland further objects to this request on the grounds that it seeks personal, private proprietary and confidential information of non-parties, the disclosure of which would amount to an invasion of privacy.

The discovery sought is both likely to lead to the discovery of admissible evidence and admissible evidence in its own right. Therefore, the magistrate judge clearly erred by denying the motions to compel this information. That denial was also contrary to law.

A.    **The requested financial information meets the standards of relevancy under the Federal Rules.**

First, the requested financial information is likely to lead to the discovery of admissible evidence of VictoryLand's motive for entering into the alleged conspiracy. To establish a prima facie case of conspiracy, a plaintiff must prove, among other things, that the defendants "reached an understanding to violate his rights." *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1283

(11th Cir. 2002) (quotation and alteration omitted). "The plaintiff does not have to produce a smoking gun to establish the understanding or willful participation required to show a conspiracy, but must show some evidence of *agreement* between the defendants." *Id.* at 1283-84 (quotations and citation omitted; emphasis added). "[A]n *agreement* may be inferred from a variety of circumstances, such as, '*sharing a common motive*, presence in a situation where one could assume participants would not allow bystanders, repeated acts, mutual knowledge with joint action, and the giving out of misinformation to cover up [the illegal activity].'" *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000) (quoting *United States v. Davis*, 810 F.2d 474, 477 (5th Cir. 1987) (citations omitted; emphasis added)); *see also United States v. Piche*, 981 F.2d 706, 717 (4th Cir. 1992); *United States v. Ellis*, 595 F.2d 154, 160 (3d Cir. 1979). Accordingly, the requested financial information will be admissible to prove that Defendants VictoryLand and McGregor were financially motivated to enter into the alleged conspiracy. Specifically, the requested information will show whether VictoryLand and McGregor had hundreds of thousands or hundreds of millions of reasons to enter into the conspiracy and block competitors in the market for electronic bingo in Macon County.

Such information is routinely made discoverable in civil RICO cases, even though it is routinely resisted by RICO defendants. For instance, in *State Farm Mutual Automotive Insurance Co. v. CPT Medical Services, P.C.*, 375 F. Supp. 2d 141 (E.D.N.Y. 2005), State Farm alleged a RICO conspiracy claim that accused two physicians—Aziz and Brutus—of "prescribing medically unnecessary current perception threshold tests ('CPT Tests') to plaintiff's insureds who were injured in automobile accidents." *Id.* at 147. Based on that claim, State Farm sought a broad range of financial documents from Aziz and Brutus, including "Aziz's and Brutus's tax returns, general ledgers, bank records and documents relating to transactions which

generated cash." *Id.* at 155-56. State Farm argued that requested documents "may demonstrate the extent to which defendants profited from, or gained economic advantage from their employment." *Id.* at 156. The magistrate judge granted State Farm's motion to compel. In reviewing the magistrate judge's order, the district court held that the requested documents "may be relevant to establishing that defendants profited from their willingness to order CPT Tests." *Id.* at 156.

Similarly, in *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal. 2006), the plaintiff, in connection with its civil RICO claims, sought "documents—primarily bank records—regarding financial transactions and data involving defendant Garber and/or related entities." *Id.* at 190. These documents also included tax-related documents. *Id.* The magistrate judge noted that the tax related documents were clearly relevant:

> Here, plaintiff has met its burden of showing the information sought is relevant, especially to plaintiff's civil RICO claims. *See, e.g., State Farm Mut. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 156 (E.D.N.Y. 2005) (financial records, including tax returns, relevant in civil RICO action); *U.S. v. Bonanno Organized Crime Family of La Cosa Nostra*, 119 F.R.D. 625, 627 (E.D.N.Y. 1988) (tax returns "clearly relevant" in civil RICO litigation). . . . Therefore, defendant Garber's tax returns and related documents are discoverable in this action, subject to an appropriate protective order as discussed herein.

*Garber*, 234 F.R.D. at 191. Similarly, in this civil RICO action, the requested financial documents are clearly relevant.

But the documents are not only relevant because they show the motive of Defendants VictoryLand and McGregor to enter into the alleged conspiracy. The documents are also relevant because they will be admissible to prove the commission of the predicate acts underlying the Plaintiffs' RICO claims. The alleged predicate acts in this case consist of the bribery of Fred Gray Jr. As alleged in the complaint, Fred Gray Jr.'s father is an investor in VictoryLand. (DE 67 at ¶ 29.) Accordingly, the requested financial information will show how

the electronic bingo monopoly benefited Fred Gray Jr.'s father financially. Such a benefit to Fred Gray Jr.'s father, as alleged in the complaint, is valuable to Fred Gray Jr. (DE 67 at ¶ 75.)[1] Thus, evidence of VictoryLand's profitability will be admissible to prove the receipt of things of value by Fred Gray Jr. in exchange for rules and regulations favoring VictoryLand.

The requested financial information is also relevant to establishing the market for electronic bingo in Macon County. The Plaintiffs' tortious interference claims allege, among other things, that they reasonably expected to profit from electronic bingo in Macon County. (*See, e.g.*, DE 185 at ¶ 146.) The requested financial information will be used to establish the reasonableness of that expectation by establishing the size of the market for electronic bingo in Macon County and the ability of that market to sustain multiple electronic bingo facilities.

Finally, the requested information will be used in the calculation of Lucky Palace's damages. Most significantly, the reliability of Lucky Palace's business forecasts will likely be verified by the financial information requested in Interrogatories 9 and 10.

Accordingly, the requested information will be admissible to prove most of the Plaintiffs' claims as well as damages. That admissibility more than satisfies the standards for discoverability under the Federal Rules. Nevertheless, the magistrate judge flatly denied the Plaintiffs' motions to compel this information.

**B.    The magistrate judge's reasons for denying this relevant discovery were clearly erroneous and contrary to law.**

Despite the likelihood that the requested financial information would be admissible or lead to the discovery of admissible evidence in this case, the magistrate judge gave two reasons

---

[1] In addition, the Plaintiffs attempted to determine, via subpoena, whether Fred Gray Jr. has a direct financial interest in his father's estate. The magistrate judge denied the Plaintiffs' motion to compel that information, as discussed below.

7

for denying the Plaintiffs' motions to compel this information. Neither of those reasons provides a sufficient basis for denying this discovery.

First, the magistrate judge stated that "motive evidence cannot be relevant to the plaintiffs' RICO claims." (DE 187 at 10.) In support of this statement, the magistrate judge quoted the U.S. Supreme Court's statement that "RICO contains no economic motive requirement." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262, 114 S. Ct. 798 (1994). The fact that RICO contains no economic motive requirement, however, does not mean that evidence of an economic motive is never admissible in a RICO case. This distinction is not difficult to grasp—after all, murder contains no economic motive requirement, yet evidence of an economic motive to commit murder would be admissible.

Furthermore, a consideration of the quotation in context makes it clear that the U.S. Supreme Court did not intend, in *Scheidler*, to remove proof of an economic motive from civil RICO cases. In *Scheidler*, the Court was faced with the question of "whether RICO requires proof that either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose." *Id.* at 252. That question arose out of a circuit split: Prior to *Scheidler*, some circuits required proof of an economic motive and some did not. *Id.* at 254-55 (The Second and Eighth Circuits required proof of economic motive while the Third Circuit did not.) The *Scheidler* court did not do away with economically-motivated RICO claims. Rather, the *Scheidler* court determined that RICO claims can proceed even when the enterprise's motive is non-economic.[2] Accordingly, economically-motivated RICO claims remain viable. *See, e.g.*, *Garber*, 234 F.R.D. at 191; *CPT Med. Servs., P.C.*, 375 F. Supp. 2d at 156.

---

[2] For instance, in *Scheidler*, the alleged enterprise—a coalition of antiabortion groups' nationwide conspiracy to shut down abortion clinics through a pattern of racketeering activity in violation of RICO—had a non-economic motive  Jennifer Bullock, *National Orgnaization for*

The second reason given by the magistrate judge in denying the Motion to Compel is that "no reasonable jury . . . could fail to know that VictoryLand is highly profitable" and that the requested financial information "merely would quantify the magnitude of VictoryLand's profitability." (DE 187 at 10.)  As an initial matter, the plaintiffs do not share the magistrate judge's certainty regarding the jury's knowledge of VictoryLand and, in any event, are unaware of any authority that allows discovery to be curtailed based on speculative assumptions about the jury's prior knowledge.  More importantly, however, the magnitude of VictoryLand's profitability goes to the core of this case.  As alleged in the Complaint, the Enterprise was formed and conducted to increase VictoryLand's profitability.  Evidence of VictoryLand's profitability, therefore, would be admissible to prove that VictoryLand had a motive to participate in the Enterprise.  That evidence is especially important, given that, prior to the introduction of electronic bingo, VictoryLand was "in dire financial straits."  (*See* Exhibit A, *Video Gambling Bill Dies in the Senate*, Birmingham Business Journal, Apr. 16, 1999.)

In addition, in proving the allegations of bribery, evidence of the amounts of those bribes would be admissible.  In this case, the bribes came, among other ways, in the form of dividend payments to Fred Gray.  Therefore, the amount of those payments is admissible.  Furthermore, while it is an established fact that Fred Gray was paid some money, the amount of that money is certainly admissible and likely underwent significant change as VictoryLand went from "dire financial straits" to profitability.  Those increased dividends—which transformed the investment of Fred Gray Sr. from a losing one to a winning one—are admissible evidence of Fred Gray Jr.'s motive and intent to grant a monopoly to VictoryLand.

---

*Women v. Scheidler:  RICO and the Economic Motive Requirement*, 26 CONN. L. REV. 1533, 1533-35 (1994).

Because the magistrate judge did not provide adequate reasons for denying the relevant discovery requested by the Plaintiffs, this Court should set aside the magistrate judge's order and grant the motions to compel.

**C.   The fact that VictoryLand is closely held does not provide a reason for denying relevant discovery.**

In addition to the reasons discussed above, the magistrate judge indicated that VictoryLand's status as a closely-held corporation made the requested information overly intrusive.  However, the fact that VictoryLand is a closely-held corporation does not mean that it has an expectation in the privacy of its financial information that would prohibit its discovery.

VictoryLand is involved in an activity that requires a license and is regulated by a state official.  Consequently, VictoryLand cannot reasonably expect a large degree of privacy with regard to its financial information.  Indeed, the Rules and Regulations governing bingo gaming in Macon County, Alabama require:

> *All records*, receipts, accounts and/or lists required to be kept and maintained hereunder *shall be open to inspection by the Sheriff, or his authorized agents* or representatives, during reasonable business hours.
> …
> On or before April 15, 2005, and on or before April 15th of each calendar year thereafter, each license holder who held a license for all or any part of the preceding calendar year *shall file with the Sheriff a verified copy of all records, receipts, accounts* and/or lists required to be kept or maintained hereunder relating to the operation of bingo games for said previous calendar year.

(DE 185 Ex. C §§ 10(c) & (e).)  Furthermore, Defendant Warren testified that he has access to VictoryLand's financial information, even though he has never bothered to review that information:

> **(Mr. Heninger):** Sheriff Warren, have you ever requested of Victoryland, I'm speaking of Macon County Greyhound Park, Incorporated, doing business as Victoryland, that they give you any report or information of their net profit from bingo, electronic bingo, from 2004 until this very day?
> **A:** Those figures are available to me –

10

**Q:** Have you ever requested them?

**A:** -- anytime I want to see them. I have seen them in past times. I will see them this year.

. . .

**Q:** Please tell me what they are, in your best recollection?

**A:** I have not seen them for this year.

**Q:** What was 2004 for bingo only?

**A:** The charities?

**Q:** No, Victoryland. What was Victoryland's net profit for 2004 for bingo only?

**A:** I am not required to keep up with Victoryland's net profit.

**Q:** I'm asking you what you saw. All you've got to do is tell me. Don't tell me what you are required to do. What did you see?

**A:** I don't quite remember what that figure was.

. . .

**Q:** And I don't expect you right now to spit it out to me. But I want your honest truthful answer, have you ever laid your eyes on the official report that shows the net profit for Victoryland from bingo operations only in Macon County for 2004?

**A:** I do not know what bingo's – what Victoryland's net profits are.

**Q:** Have you ever seen it for 2004?

**A:** No, sir.

**Q:** Have you ever asked to see it?

**A:** No, sir.

**Q:** Have you ever seen the figures for the net profits for Victoryland for bingo operations only in Macon County for 2005?

**A:** No, sir.

**Q:** Have you ever asked to see them?

**A:** I have not asked to see them.

. . .

**Q:** Okay. Let me finish the years. Have you seen the official reports of the net profits at Victoryland from bingo operations only in Macon County for 2006?

**A:** No, sir.

**Q:** Have you asked to see them?

**A:** No, sir.

**Q:** And you have not seen the figures for net profits for Victoryland from bingo operations only in Macon County for 2007?

**A:** No, sir.

**Q:** And you haven't asked to see them?

**A:** No, sir.

(Warren Dep., attached as Ex. B at 320-25). Accordingly, VictoryLand has no reasonable

expectation of privacy with regard to its revenues and profits, even though it is a closely-held

11

corporation.  The magistrate judge's decision to deny Lucky Palace's motion to compel this information on the basis that such information would be intrusive is thus clearly erroneous and contrary to law.  Furthermore, any legitimate concerns about intrusiveness are addressed by the protective order in this case, which prohibits the use of this information for anything other than this litigation (unless this Court orders otherwise).

II.     **The motion to compel VictoryLand to provide shareholder information was erroneously denied.  (DE 106 ## 13, 14 & 15;  DE 143 #13.)**

PLAINTIFF LUCKY PALACE'S REQUEST # 13 TO DEFENDANT VICTORYLAND:  All documents and electronically filed information reflecting shareholders and shares held by any shareholder in this Defendants from January 1, 1999 until the present.

DEFENDANT VICTORYLAND'S RESPONSE:  Victoryland objects to this request on the grounds that it seeks documents that are not relevant to any claim or defense asserted in the pending litigation and is not reasonably calculated to lead to the discovery of any relevant information.  Victoryland further objects to this request on the grounds that it seeks personal, private, proprietary and confidential information of non-parties, the disclosure of which would amount to an improper invasion of privacy.

PLAINTIFF CHARITIES' REQUEST # 13 TO DEFENDANT VICTORYLAND:  Please produce any and all documents in your possession or control that reflect or relate to any investment of Sheriff Warren, Pebblin W. Warren, J.B. Walker, Fred D. Gray, Fred D. Gray, Jr. or any of their relatives in VictoryLand.

DEFENDANT VICTORYLAND'S RESPONSE:  Victoryland objects to this request on the grounds that it seeks personal, private, proprietary and confidential information, including information of non-parties, the disclosure of which would amount to an improper invasion of privacy.  Further, the request is not reasonably calculated to lead to the discovery of admissible evidence.  The request is overly broad, unduly burdensome and oppressive, and the request is not reasonably limited in scope or time.

PLAINTIFF CHARITIES' REQUEST # 14 TO DEFENDANT VICTORYLAND:  Please produce any and all documents in your possession or control that reflect or relate in any way, either directly or indirectly, to the ownership and operation of VictoryLand, including but not limited to the corporate status of VictoryLand and the identity of all investors in VictoryLand.

DEFENDANT VICTORYLAND'S RESPONSE:  Victoryland objects to this request on the grounds that it seeks personal, private, proprietary and confidential information, including information of non-parties, the disclosure of which would amount to an improper invasion of privacy.  The request is overly broad, unduly burdensome and oppressive, and the request is not reasonably limited in scope or time.   The request seeks commercial, proprietary and competitive information the disclosure of which would be harmful to Victoryland and its business.  The request seeks documents that are not relevant to any claim or defense asserted in the pending litigation under the Second Amended Complaint, and the request is not reasonably calculated to lead to the discovery of admissible evidence.

PLAINTIFF  CHARITIES'  REQUEST  #  15  TO  DEFENDANT VICTORYLAND:  Please produce any and all documents in your possession or control that reflect or relate to monies paid to the investors in VictoryLand by VictoryLand and its officers, directors, shareholders, employees, representatives, accountants, attorneys or agents since January 1, 2003.

DEFENDANT VICTORYLAND'S RESPONSE:  Victoryland objects to this request on the grounds that it seeks personal, private, proprietary and confidential information, including information of non-parties, the disclosure of which would amount to an improper invasion of privacy.  The request is overly broad, unduly burdensome and oppressive, and the request is not reasonably limited in scope or time.   The request seeks commercial, proprietary and competitive information the disclosure of which would be harmful to Victoryland and its business, and also seeks privileged information.   The request seeks documents that are not relevant to any claim or defense asserted in the pending litigation under the Second Amended Complaint, and the request is not reasonably calculated to lead to the discovery of admissible evidence.

PLAINTIFF  CHARITIES'  REQUEST  #  26  TO  DEFENDANT VICTORYLAND:  Please produce any and all documents in your possession or control that refer or relate in any way to any benefit given by you, any officer, director, shareholder, employee or any other person or entity associated with VictoryLand, either directly or indirectly, to Fred D. Gray, or any of his relatives, partners or associates, including but not limited to gifts, gratuities, political campaign contributions, including payments made to a Political Action Committee, business transactions, transportation services, vacations, privileges at VictoryLand or any other form of tangible or intangible property or service.

DEFENDANT VICTORYLAND'S RESPONSE:  Victoryland objects to this request on the grounds that it seeks personal, private, proprietary and confidential information, including information of non-parties, the disclosure of which would amount to an improper invasion of privacy, and seeks information that is protected by *Noerr-Pennington*.  The request is overly broad, unduly burdensome and oppressive, and the request is not reasonably limited in scope or

13

time. The request seeks documents that are not relevant to any claim or defense asserted in the pending litigation under the Second Amended Complaint, and the request is not reasonably calculated to lead to the discovery of admissible evidence. The request also seeks information protected by the attorney-client privilege.

In ruling on the relevance of these comprehensive requests, the magistrate judge ordered Victoryland to disclose the identity of all shareholders since 1999 but not to disclose "the extent of shareholders' holdings." This limited order prevents the Plaintiffs from discovering a wide variety of relevant information to which they are entitled under the Federal Rules.

The amount of shares held by the shareholders is clearly relevant and discoverable. The Plaintiffs are entitled to this information in order to determine what interest Fred Gray, or any member of Fred Gray Jr.'s family, had both before and after the passage of electronic bingo. The use of Fred Gray Jr. to draft Rules and Regulations for bingo licensing/operation in Macon County puts at issue any familial attachment he may have had to any shareholder(s) of stock in VictoryLand and consequently, the amount that shareholder profited as a result of the passage of Rules and Regulations which secured a monopoly for VictoryLand. Moreover, allowing VictoryLand to withhold information regarding the amount of shares owned by each shareholder would also prevent the Plaintiffs from determining if any shareholder(s) with family ties to Fred Gray Jr. saw the extent of their holdings increase shortly before or soon after the passage of the Rules and Regulations.

The extent of each shareholder's holdings is clearly relevant to this matter and that information should not be withheld due to privacy concerns. First, individuals who are engaged in an activity so closely regulated by the government have little reasonable expectation of privacy. Second, any concerns regarding privacy of the shareholders or confidentiality of the information or documents are resolved by the protective order entered by this Court.

This Court should also grant the motion to compel regarding documents relating to the shares of VictoryLand held by Fred Gray. As alleged in the complaint, the bribery scheme in this case was executed, in part, through dividend payments made to Fred Gray by VictoryLand.[3] The amounts of those payments are clearly relevant to the claims in this case, as the amounts of bribes are relevant in any bribery case. *See United States v. Jannotti*, 673 F.2d 578, 599 (3d Cir. 1982) ("Certainly, the question of the generosity of the sums given [in a bribe] must be viewed in relationship to the circumstances of the acceptors. What would be tempting to an office clerk would plainly not be enough to tempt a millionaire.") Furthermore, the amounts of those payments are especially relevant if they show, as they almost certainly will, that the amounts increased significantly following the creation of VictoryLand's bingo monopoly.

## III. The motions to compel Fred Gray Jr., Fred Gray, and the Gray Law Firm to produce documents pursuant to Rule 45 subpoenas were erroneously denied. (DE ## 134, 135, 136.)

In denying these motions to compel, the magistrate judge did not address the specific documents requested or give individual reasons for the denial of specific requests. Instead, the magistrate judge seems to take issue with the basis of the Plaintiffs' Complaint:

> In a nutshell, the plaintiffs' theory that Fred Gray, Jr. was bribed boils down to this convolution of tortured reasoning: McGregor and VictoryLand paid to Fred Gray and the Gray law firm money or provided other benefits. Fred Gray,

---

[3] While the magistrate judge doubted that giving money to a family member could be the basis for a bribery claim, bribery charges are frequently based on bribes to friends and family. *See, e.g., United States v. Kemp*, 500 F.3d 257, 285 (3d Cir. 2007) (concluding as a legal matter, "that providing a loan to a public official (or his friends or family) that would have otherwise been unavailable . . . may constitute a bribe"); *United States v. Krilich*, 159 F.3d 1020, 1024 (7th Cir. 1998) (noting that rigging a hole-in-one contest so that the mayor's son would win $40,000 constituted bribing the mayor); *Buchanan County, Va. v. Blankenship*, 496 F. Supp. 2d 715, 722 (W.D. Va. 2007) (recognizing that clothing given to the official's wife constituted a bribe); *United States v. Frega*, 179 F.3d 793, 807 (9th Cir. 1999) (noting that under California law, it is the "intent in making the payment, whether to a judge or to a member of the judge's family," that is critical); *United States v. Biaggi*, 705 F. Supp. 790, 812 (S.D.N.Y. 1988) (finding bribery where stock was put in the name of a close friend of the public official).

15

> Jr., as a shareholder [in the Gray law firm] and Fred Gray's son, knew that McGregor and VictoryLand paid his father and the firm money or conferred benefits. The money paid by McGregor and VictoryLand to Fred Gray and the firm or the benefits constituted "a thing of value in the mind of Fred Gray, Jr." in accordance with the Alabama bribery statute. Consequently, because Fred Gray, Jr., knew he would get more money or benefits through his father from McGregor and VictoryLand if he drafted the rules and regulations in a way to favor McGregor and VictoryLand, he was "bribed" to draft the rules in a manner giving VictoryLand a monopoly on electronic bingo in Macon County.
>
> Throughout their motions and briefs on this issue, the plaintiffs remark upon their entitlement to the information sought with the caveat "if their theory is correct." The theory is not correct. It boils down to an assertion that Fred Gray, Jr. is bribed because he thinks his present actions may result in increased benefit to him; he is a bribee in his own mind. The sophistry of this contingent interest argument astounds, but it does not persuade. The argument is simply too attenuated to support the intrusive requests which with two exceptions will be denied.[4]

(DE 187 at 27-28.) The Plaintiffs, of course, disagree with the magistrate judge's description of their complaint. But the Plaintiffs will not belabor the point because the magistrate judge's criticisms of the complaint are simply regurgitations of the Defendants' arguments in their motions to dismiss—arguments which this Court has already rejected.[5] Now that the motions to dismiss have been denied, the Plaintiffs are entitled to discovery in support of their claims.[6]

---

[4] The magistrate judge held that Request Nos. 3 and 4 (DE #136), which asked for documents about the receipt of legal fees by the Gray Law Firm from McGregor or VictoryLand should be produce for *in camera* inspection. (DE 187 at 28).

[5] The magistrate judge noted on at least two occasions that the Plaintiffs' counsel stated "if the bribery theory is correct." That statement was never intended to imply uncertainty about the viability of the Plaintiffs' claims. Rather, it was intended as a respectful acknowledgement of the magistrate judge's concerns about the claims, concerns that he repeatedly expressed.

[6] The magistrate judge also took issue with the Plaintiffs' allegations upon information and belief. (DE 187 at 9 ("As the court will later discuss, there are limits to the discovery process, and the plaintiffs will not be allowed to rummage through the affairs of the defendants based merely on their 'information and belief' assertions.").) The magistrate judge never discussed the limitations on discovery imposed by pleading upon information and belief. However, even the limited discovery that the Plaintiffs have been allowed in this case has provided a sufficient evidentiary basis for many of the allegations that they initially made upon information and belief. (*See* DE 194 at Part II.D.1.)

Because the information sought in the motions to compel Fred Gray, Fred Gray Jr., and the Gray Law Firm to produce documents pursuant to Rule 45 subpoenas is relevant under the liberal discovery rules, the Plaintiffs are entitled to that information in discovery.

**A.    Fred Gray Jr. should be compelled to produce documents pursuant to the Rule 45 subpoena.  (DE #134.)**

The magistrate judge denied each of the requests submitted to Fred Gray Jr. in the Plaintiffs' Rule 45 subpoena.[7]  Those requests asked for the following documents:

> REQUEST NO. 7**:** Please produce any and all documents in your possession or control that contain any communication between you and Fred Gray regarding electronic bingo.
>
>     RESPONSE:   Fred D. Gray Jr. objects to the production of documents responsive to Request Number 7 on the grounds that such document is protected by the attorney/client privilege or under the attorney work product doctrine. Without waiving said objection, Fred D. Gray, Jr. describes said document as follows: An internal memorandum from Fred D. Gray to Fred dated May 2, 2006. The privilege and work product doctrine are claimed by the Defendant David Warren.

There is no question that the requested information is relevant to this litigation.   As alleged in the Complaint, Fred Gray Jr. was unduly influenced by VictoryLand to produce rules and regulation that created a monopoly on electronic bingo for VictoryLand.  The request seeks documents that contain communications between Fred Gray Jr. and an investor and attorney for VictoryLand.

Because of the obvious relevance, the only objection to this request is based on attorney/client privilege and attorney work product.  With regard to privilege, there can be no

---

[7]   The magistrate judge has deferred its decision on this Request No.  4 pending further briefing on the Rule 1.6 confidentiality issue:

> REQUEST NO. 4:  Please produce any and all documents in your possession or control that contain any communication between you and any of VictoryLand's agents or attorneys regarding electronic bingo.

valid privilege objection to Request No. 7, which seeks communications between Fred Gray Jr. and Fred Gray. Fred Gray, in his sworn affidavit, stated (1) that Fred Gray Jr. has not represented VictoryLand in seven years (DE 62 Ex. A at 3) and (2) that that Fred Gray "was not involved" with the promulgation of the Rules and Regulations governing electronic bingo (DE 62 Ex. A at 2). In other words, in response to the ethical problems posed by Fred Gray's ownership interest in VictoryLand,[8] the Gray Law Firm attempted to "Chinese Wall" Fred Gray Jr. from the rest of the Gray Law Firm when he was dealing with electronic bingo.[9] Having erected the "Chinese wall" between Fred Gray and Fred Gray Jr. for purposes of electronic bingo, Fred Gray Jr. cannot now claim that the Chinese wall does not exist for purposes of attorney-client privilege. Accordingly, any communications between Fred Gray and Fred Gray Jr. regarding electronic bingo are not privileged.[10] Those communications, on the other hand, could receive qualified work-product immunity assuming that they meet the standards for such protection. Those standards include a showing that the memorandum is (1) a documents and

---

[8] Indeed, Fred Gray could not have ethically represented Warren because his representation would be materially limited. *See* Ala. R. Prof. Conduct 1.7(b). Fred Gray is an investor in VictoryLand and has a financial interest in VictoryLand's continued monopoly. (DE 67 at ¶ 29.) This material limitation on Fred Gray was not disclosed to Warren. (DE 83 Ex. A.) Accordingly, Fred Gray Jr.'s efforts to withhold internal documents between himself and Fred Gray on the basis of privilege are disingenuous and lend weight to the Plaintiffs' conspiracy claims.

[9] Such a conflict cannot, of course, be eliminated by the erection of a Chinese wall. Chinese walls may be constructed to prevent an attorney from betraying confidential information received by a former client, *see, e.g.*, *Schiessle v. Stephens*, 717 F.2d 417, 421 (7th Cir. 1983), but they cannot be used to deal with conflicts arising out of material limitations to a lawyer's representation.

[10] Furthermore, any privileged communications between Defendant Warren and Fred Gray Jr. would be waived when Fred Gray Jr. shared those communications with Fred Gray, VictoryLand's attorney. *See United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976) (attorney-client privilege inapplicable to "information that the client intends his attorney to impart to others").

tangible thing (2) prepared in anticipation of litigation or for trial and (3) by or for another party or by or for that other party's representative.  The description provided by Fred Gray Jr.—that the document is "[a]n internal memorandum from Fred D. Gray to Fred dated May 2, 2006"—is insufficient to establish the applicability of work-product immunity.

Even if work-product immunity could be established, however, the document should be produced because the Plaintiffs have a "substantial need" for the document.  While "discovery of work product will be denied if a party can obtain the information he seeks by deposition," *In re International Systems and Controls Corp. Securities Litigation*, 693 F.2d 1235, 1239-40 (5th Cir. 1982), a party has a "substantial need" for the work product where the witness is unavailable. *See, e.g., McNulty v. Bally's Park Place, Inc.*, 120 F.R.D. 27, 30 (E.D. Pa. 1988) (finding substantial need where the party's "independent efforts" to reach the producer of the work product had "proven unavailing").  At this point, the Plaintiffs' efforts to depose Fred Gray Jr. have proven unavailing.  Accordingly, they have a substantial need for the document in question even if it is work product.

Request Nos. 13 and 14 are relevant for the same basic reason: They will demonstrate that Fred Gray Jr. received a share of any money that the Gray Law Firm received from Milton McGregor and VictoryLand.

> <u>REQUEST NO. 13</u>**:** Please produce any and all documents in your possession or control that refer or relate to distribution of funds received by the Gray Law Firm to its shareholders.
>
> <u>RESPONSE</u>**:** Fred D. Gray objects to this request pursuant to FRCP 45(c)(3)(A)(iii)(iv) and pursuant to FRCP 45(c)(2)(B), and in the alternative, moves to quash this portion of the subpoena on the grounds that the information sought in item number 13 is unduly burdensome; overly broad in scope and time; not reasonably calculated to lead to admissible evidence; is protected from disclosure by a constitutional right to privacy; is requested for the purpose of harassment, and is otherwise unduly time-consuming, expensive and burdensome.

REQUEST NO. 14: Please produce all federal and state tax returns filed by you since January 1, 2003.

RESPONSE: See response to number 13 above, which is specifically incorporated herein by reference.

As alleged in the Complaint, any monies received by the Gray Law Firm had value in the mind of Fred Gray Jr. and thus constitutes a "thing of value" for the purposes of the Alabama bribery statute. (DE 67 at ¶¶ 74 & 75.)  In addition, evidence that Fred Gray Jr. received money from McGregor and VictoryLand will be admissible to show that Fred Gray Jr. had a motive to structure the Rules and Regulations in a manner favorable to McGregor and VictoryLand and, ultimately, to grant VictoryLand a monopoly on the operation of electronic bingo in Macon County.

These relevant Requests are also properly limited in both time and scope. Request Nos. 13 and 14 seek specific documents and are limited to specific time periods not exceeding four years.  Moreover, Requests Nos. 13 and 14 are narrowly tailored and proper under Rule 45.  The requests are neither expensive nor unduly burdensome, and Fred Gray Jr. did not meet his burden to specify otherwise.  *See, e.g., Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 543-44 (N.D. Ind. 1991).  In any event, the Plaintiffs' requests seek only information regarding the distribution of funds to shareholders and federal and state tax returns. Fred Gray Jr. should be able to locate and produce those documents with relative ease.

**B.    Fred Gray should be compelled to produce documents pursuant to the Rule 45 subpoena.  (DE #135.)**

The magistrate judge denied each of the requests submitted to Fred Gray in the Plaintiffs' Rule 45 subpoena.[11]  Those requests asked for the following documents:

---

[11] The Memorandum Opinion and Order misidentifies DE #136 as DE #135 on pages 28 and 34.

REQUEST NO. 19: Please produce any and all documents in your possession or control that refer or relate in any way to any interest you have in any entity or property owned or operated by Milton McGregor or any corporation in which Milton McGregor is a shareholder, director or officer.

RESPONSE: Fred D. Gray objects to this request pursuant to FRCP 45(c)(3)(A)(iii)(iv) and pursuant to FRCP (c)(2)(B), and in the alternative, moves to quash this portion of the subpoena on the grounds that the information sought in Item number 19 is unduly burdensome; overly broad in scope and time; not reasonably calculated to lead to admissible evidence; is protected from disclosure by a constitutional right to privacy; is requested for the purpose of harassment, and is otherwise unduly time-consuming, expensive and burdensome.

REQUEST NO. 20: Please produce any and all documents in your possession or control that refer or relate in any way to any benefit received by you, your relatives, partners or associates, from any officer, director, shareholder, employee or any other person or entity associated with VictoryLand, either directly or indirectly, including but not limited to gifts, gratuities, political campaign contributions including payments made to a Political Action Committee, business transactions, transportation services, vacations, privileges at VictoryLand or any other form of tangible or intangible property or service.

RESPONSE: See response to Request Number 19, which is specifically incorporated herein by reference.

REQUEST NO. 21: Please produce any and all documents in your possession or control that refer or relate to in any way to any benefit received by you, your relatives, partners or associates, from any corporation in which Milton McGregor is an officer, director, shareholder or employee, either directly or indirectly, including but not limited to gifts, gratuities, political campaign contributions including payments made to a Political Action Committee, business transactions, transportation services, vacations, or any other form of tangible or intangible property or service.

RESPONSE: See response to Request Number 19, which is specifically incorporated herein by reference.

REQUEST NO. 22: Please produce any and all documents in your possession or control that refer or relate in any way to any benefit received by you, your relatives, partners or associates, by any business in which Milton McGregor is the owner, sole proprietor, partner, member, manager or employee, either directly or indirectly, including but not limited to gifts, gratuities, political campaign contributions including payments made to a Political Action Committee, business transactions, transportation services, vacations, or any other form of tangible or intangible property or service.

21

RESPONSE: See response to Request Number 19, which is specifically incorporated herein by reference.

REQUEST NO. 23: Please produce any and all documents in your possession or control that refer or relate to distribution of funds received by the Gray Law Firm to its shareholders.

RESPONSE: See response to Request Number 19, which is specifically incorporated herein by reference.

REQUEST NO. 26: Please produce all federal and state tax returns filed by you since January 1, 2003.

RESPONSE: See response to Request Number 19, which is specifically incorporated herein by reference.

REQUEST NO. 27: Please produce any and all documents related to your last will and testament and any and all trusts or other estate plans in which Fred Gray Jr. is named beneficiary.

RESPONSE: See response to Request Number 19, which is specifically incorporated herein by reference.

REQUEST NO. 28: Please produce any and all documents related to any gifts or loans you have made to Fred Gray, Jr.

RESPONSE: See response to Request Number 19, which is specifically incorporated herein by reference.

As an initial matter, all objections made pursuant to Fed. R. Civ. Pro. 45(c)(3)(a)(iii) are due to be rejected. First, Fred Gray made no specific objections on the basis of any privilege or protected matter and did not identify which specific documents are privileged. Second, these Requests relate to money and other benefits flowing between McGregor, VictoryLand, the Gray Law Firm, Fred Gray, and Fred Gray Jr., not to any advice or other communications that may be flowing between them. Accordingly, the documents requested are not privileged. *See, e.g., O'Neal v. United States*, 258 F.3d 1265, 1276 (11th Cir. 2001) ("[I]t is the law of this circuit that information involving receipt of attorneys' fees from a client is not generally privileged.") (citing *In re Slaughter*, 694 F.2d 1258, 1260 (11th Cir. 1982))).

Request Nos. 19-22 and 26 are all relevant for the same basic reason: They will demonstrate the transfer of money or other benefits to Fred Gray. As alleged in the Complaint (DE 67 at ¶ 75), such benefits would have value in the mind of Fred Gray Jr. and thus constitute "things of value" for the purposes of the Alabama bribery statute (DE 67 at ¶ 74) because —at the very least—Fred Gray Jr. has an interest in his father's financial security and—more than likely—has an interest in his father's estate. Furthermore, Fred Gray Jr. has an interest in the Gray Law Firm, which receives money from VictoryLand. In addition, such evidence would be admissible to show that Fred Gray Jr. had a motive to structure the Rules and Regulations in a manner favorable to McGregor and VictoryLand and, ultimately, to grant VictoryLand a monopoly on the operation of electronic bingo in Macon County.

Request Nos. 24 and 27-28 would show whether Fred Gray Jr. has a direct interest in his father's financial ties with VictoryLand and McGregor. Such evidence would be admissible to demonstrate that Fred Gray Jr. received "things of value" and that he had a motive to structure the Rules and Regulations in a manner favorable to McGregor and VictoryLand and, ultimately, to grant VictoryLand a monopoly on the operation of electronic bingo in Macon County.

**C.    The Gray Law Firm should be compelled to produce documents pursuant to the Rule 45 Subpoena. (DE #136.)**

The magistrate judge denied Request Nos. 2 and 5 which were submitted to the Gray Law Firm via Plaintiffs' Rule 45 subpoena. Those requests asked for the following documents:

REQUEST NO. 2: Please produce any and all documentation in your possession or control that refers or relates to the distribution of funds received by the Gray Law Firm to its shareholders.

RESPONSE: The Gray Firm objects to this request pursuant to FRCP 45(c)(3)(A)(iii)(iv) and pursuant to FRCP 45(c)(2)(B), and in the alternative, moves to quash this portion of the subpoena on the grounds that the information sought in Item number 2 is unduly burdensome; overly broad in scope and time; not reasonably calculated to lead to admissible evidence; is protected from

23

disclosure by a constitutional right to privacy; is requested for the purpose of harassment, and is otherwise unduly time-consuming, expensive and burdensome.

REQUEST NO. 5: Please produce any and all federal and state tax returns filed by the Gray Law Firm since January 1, 2003.

RESPONSE:  See objection in Request No. 2.

The objections made pursuant to Rule 45(c)(3)(a)(iii) are due to be rejected. First, the Gray Law Firm makes no specific objections on the basis of any privilege or protected matter and does not identify which specific documents are privileged. Second, Request Nos. 2 and 5 relate to the finances of the Gray Law Firm, not to any advice that its attorneys may have given, and the Gray Law Firm's internal financial information is not attorney-client privileged.

Request Nos. 2-5 are all relevant for the same basic reason: They will demonstrate the payment of money by Milton McGregor and VictoryLand to the Gray Law Firm and the payment of a share of that money to Fred Gray, a shareholder in the Gray Law Firm. As alleged in the Complaint, that money had value in the mind of Fred Gray Jr. and thus constitutes a "thing of value" for the purposes of the Alabama bribery statute. (DE 67 at ¶¶ 74 & 75.) In addition, evidence that Fred Gray Jr. received money from McGregor and VictoryLand will be admissible to show that Fred Gray Jr. had a motive to structure the Rules and Regulations in a manner favorable to McGregor and VictoryLand and, ultimately, to grant VictoryLand a monopoly on the operation of electronic bingo in Macon County.

## IV.  The motion to compel Fred Gray Jr. to appear for deposition was erroneously denied.  (DE # 166.)

The magistrate judge denied the Plaintiffs' Motion to Compel the deposition of Fred Gray Jr., stating that:

The court has already determined that, except to the extent set forth in this order, the plaintiffs can't have information or documents about financial matter so that is not a reason to allow the deposition of Gray.  Moreover, other than not knowing

24

to whom Gray spoke about rules and regulations for bingo, Lucky Palace has not met its burden showing the deposition should be allowed.

(DE 187 at 30.) The magistrate judge further held that "[a] separate order will issue to Fred Gray Jr. requiring him to identify by name, address and phone number the identity of all persons, except Defendant Warren, to whom he spoke about rules and regulations for bingo gaming in Macon County." (*Id.* at 31.)

The magistrate judge's ruling that Fred Gray Jr. will not have to sit for a deposition is clearly erroneous and contrary to the law. The deposition of Fred Gray Jr. is necessary in order to obtain critical information on many topics, most of which do not fall within any recognized protection. Additionally, the Plaintiffs have a substantial need to obtain Fred Gray Jr.'s deposition testimony as the information is crucial to the preparation of the Plaintiffs' case.

**A.    The Plaintiffs seek to depose Fred Gray Jr. on many relevant topics that are not privileged.**

In his Memorandum Opinion and Order, the magistrate judge did not address the issue of privilege with regard to Fred Gray Jr.'s deposition other than to note that "Lucky Palace has not met its burden showing the deposition should be allowed." However, there is a great deal of relevant information that would be obtained through the deposition of Fred Gray Jr., which is not subject to the attorney-client privilege or the work product rule. That information includes, but is not limited to, the following topics:

(1) The structure of the Gray Law Firm;
(2) The Gray Law Firm's distribution of funds, and the distribution of other benefits, obtained from VictoryLand and Milton McGregor;
(3) Fred Gray Jr.'s interest in Fred Gray's estate;
(4) Fred Gray Jr.'s interest in any entity or property owned by Milton McGregor;
(5) Benefits which Fred Gray Jr. may have received, directly or indirectly, from VictoryLand;
(6) Benefits which Fred Gray Jr. may have received, directly or indirectly, from Milton McGregor;

(7) Fred Gray Jr.'s involvement with the Tuskegee Human and Civil Rights Multicultural Center;

(8) The fees paid to the Gray Law Firm by Milton McGregor and/or VictoryLand;[12]

(9) The fees paid to Fred Gray Jr. by David Warren;[13]

(10) The nature and purpose of the June 2, 2004 facsimile sent by Fred Gray Jr. to Milton McGregor, John Bolton and David Johnston;

(11) The nature and purpose of the letter dated January 17, 2007, from attorneys for VictoryLand to Fred Gray Jr.;[14]

(12) The nature and purpose of the internal memorandum from Fred Gray to Fred Gray Jr.;

(13) All other communications between Fred Gray Jr. and agents or employees of VictoryLand concerning electronic bingo;[15]

(14) All other communications between Fred Gray Jr. and Milton McGregor concerning electronic bingo; and

(15) All other communications between Fred Gray Jr. and any person or entity concerning electronic bingo, other than communications with David Warren.[16]

There was no reason to bar the deposition testimony of Fred Gray Jr. on the above topics—none of which include communications between Defendant Warren and Fred Gray Jr., or work or drafts passed between Defendant Warren and Fred Gray Jr.

Moreover, the federal rules do not support a complete bar to taking the deposition of Fred Gray Jr. on the basis that he is an attorney or that some of the information in the deposition could potentially fall within a privilege category. The federal rules permit the deposition of "any

---

[12] "[T]he receipt of fees from a client normally [is] not privileged." *In re Grand Jury Proceedings*, 899 F.2d 1039, 1042 (11th Cir. 1990).

[13] *Id.*

[14] The letter drafted by attorneys for VictoryLand cannot be the work product of Fred Gray Jr. since it is not his work.

[15] VictoryLand has already admitted, in an interrogatory response, that Fred Gray Jr. met with its attorneys on more than one occasion when drafting the rules and regulations. (*See* DE 163 at 23 ("VictoryLand has determined that David Johnson and John Bolton had discussions with Fred Gray Jr. regarding proposed or suggested Bingo Rules and Regulations and that Milton McGregor may have been present at some of those discussions.")).

[16] David Warren has testified that, "Mr. Gray could speak with anyone to get what I hired him to do accomplished." (Ex. B at 203).

person," Fed. R. Civ. P. 30(a) & 31(a), and do not carve out an exception for attorneys. *See* Fed. R. Civ. P. 26-32. It is clear that no special privilege or immunity shields a person from deposition simply because that individual is an attorney, or even an attorney for a party to the suit. 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2102 (2d ed. 2008).

**B.    The Plaintiffs have met their burden of showing that the deposition should be allowed.**

The information sought through the deposition of Fred Gray Jr. is necessary to the Plaintiffs' case, clearly relevant to the issues presented, and cannot be obtained by other means.

First, the information sought in topics 1-8 listed above will demonstrate whether Fred Gray Jr. received a "thing of value" under the Alabama bribery statute, i.e., shares of the money the Gray Law Firm received from Milton McGregor and VictoryLand, free travel on aircraft owned or chartered by Milton McGregor and VictoryLand, an interest in the dividend payments Fred Gray received from VictoryLand, and/or any benefit construed upon immediate family members who acted as principals in the charities affiliated with VictoryLand. This evidence cannot be obtained from a more practical source.

Additionally, the information sought in topics 9-15 listed above will evidence Fred Gray Jr.'s collaboration with attorneys and agents of VictoryLand and Milton McGregor, and their efforts to influence Fred Gray Jr. to draft and amend the rules and regulations to grant VictoryLand a monopoly on gaming in Macon County. Defendant Warren repeatedly testified that he had no objection to Fred Gray Jr. getting input from other people regarding the drafting of the rules for electronic bingo, "Mr. Gray could speak with anyone to get what I hired him to do accomplished." (Ex. B at 203; *see also*, Ex. B at 168-170, 172, 174, 176-78, 202). However,

Defendant Warren states that he does not know who Fred Gray Jr. spoke with in connection with drafting the rules and regulations:

> **Q:** . . . Did Fred Gray, Jr., as you sit here today, do you know if he received input from representatives of VictoryLand in the drafts he presented to you on the rules and regulations for bingo licensing in Macon County?
>
> **A:** I don't know who he spoke with.
>
> **Q:** You truly do not?
>
> **A:** No, sir.
>
> **Q:** As you sit here today, you don't know who he spoke with to get any input about these drafts of the rules and regulations for you to approve?
>
> **A:** To the best of my recollection, I don't know who he spoke with.

(Ex. B at 178-179.)  Fred Gray Jr. is the only person who can testify about who he received information from and shared information with, regarding the rules and regulations for electronic bingo.[17]   The Plaintiffs have a substantial need for this information and cannot receive this information from any other more practical source—including the method proposed by the magistrate judge.

**C.    Fred Gray Jr.'s answer to a single question is not an appropriate substitute for a deposition.**

Under the terms of the Memorandum Opinion and Order, Fred Gray Jr., an alleged member of the enterprise and conspiracy, will be able to avoid deposition altogether—preventing the Plaintiffs from obtaining relevant information from Fred Gray Jr. on matters outside of any recognizable privilege.  Instead, Fred Gray Jr. is required to answer only a single question regarding the identity of persons "to whom he spoke about rules and regulations for bingo gaming in Macon County."  Notwithstanding the fact that the Plaintiffs have been denied the give-and-take nature of an oral deposition, which all attorneys would agree is an integral

---

[17] Again, VictoryLand has already admitted, in an interrogatory response, that Fred Gray Jr. met with its attorneys on more than one occasion when drafting the rules and regulations. (*See* DE 163 at 23 ("VictoryLand has determined that David Johnson and John Bolton had discussions with Fred Gray, Jr. regarding proposed or suggested Bingo Rules and Regulations and that Milton McGregor may have been present at some of those discussions.")

discovery tool, the single question posed by the magistrate judge leaves much to speculation. Information concerning with whom Fred Gray Jr. spoke regarding the rules and regulations would omit the following relevant information: (1) the exact nature and substance of the communication, (2) the date of the communication, (3) the length of the communication, (4) the number of communications with each person, (5) the locations where the communication took place, (6) the person who initiated the communication, (7) the reason for the communication, (8) actions which took place as a result of the communication, (9) any and all persons who were present during the communication but were not spoken to directly, and, significantly (10) all communications which were written - not verbal.

"The Federal Rules of Civil Procedure strongly favor full discovery whenever possible. Indeed, Rule 26(b) makes discoverable any information regarding any matter, not privileged, that is relevant to the claim or defense of any party, including non-admissible relevant evidence that is reasonably calculated to lead to the discovery of admissible evidence." *Braxton v. Farmer's Ins. Group*, 209 F.R.D. 651, 652-53 (N.D. Ala. 2002) (citations and quotations omitted). The information that Plaintiffs seek through the deposition of Fred Gray Jr. is relevant to the claims asserted in the Complaint. Specifically, the evidence will be admissible in order for the Plaintiffs to prove their claims of conspiracy under the equal protection laws, violations of RICO, conspiracy to violate RICO and the Plaintiffs' various claims of tortious interference.

To date, Plaintiffs have engaged in written discovery, taken the deposition of Defendant Warren and have requested deposition dates for all other remaining defendants; however, Plaintiffs cannot obtain the information sought from any practical source other than the deposition of Fred Gray Jr. Given the numerous non-privileged topics for which testimony is sought and the inability of the Plaintiffs to obtain that information from any other source, the

decision of the magistrate judge to denying the motion to compel Fred Gray Jr.'s deposition is clearly erroneous and contrary to law.

**D.    The communications between Fred Gray Jr. and Defendant Warren were not privileged.**

The Plaintiffs have listed numerous topics for which no recognizable privilege can attach; however, there are serious concerns over whether any privilege could legitimately attach to any communication between Defendant Warren and Fred Gray Jr.  The facts of this case, and the testimony of Defendant Warren, evidences that the communications between Defendant Warren and Fred Gray Jr. concerning electronic bingo and the work passed between them in drafting the rules and regulations were not intended to be confidential.

*1.    The communications between Fred Gray Jr. and Defendant Warren were not intended to be confidential and are not protected by the attorney-client privilege.*

Not all communications between a client and his attorney are privileged.  The Eleventh Circuit has held:

> [T]he argument that *any* communication between an attorney and client is protected by the privilege is overbroad. Merely because a matter which a lawyer is asked to reveal might incriminate a client does not make that matter privileged. The privilege is not designed to protect revelation of incriminating matters, only confidential communications between the attorney and client regarding the matter of representation.

*In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 997 (11th Cir. 1992).  "To determine if a particular communication is confidential and protected by the attorney-client privilege, the privilege holder must prove the communication was (1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential.'"  *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003) (citations omitted).  In light of Defendant Warren's testimony, no privilege can be applied to the communications between Defendant Warren and Fred Gray Jr., or the work and drafts which passed between them.

Defendant Warren stated numerous times in his deposition that he did not intend for his communications with Fred Gray Jr., his work or his drafts to remain confidential.

> **Q:** Was it your intent that all discussions, work, drafts in this relationship between you and Fred Gray, Jr., to come up with these rules and regulations, be kept confidential between you and he as attorney/client, was that your intent?
> . . .
> **A:** I – That wasn't – I did not care if Mr. Gray discussed that with somebody in accomplishing what I had asked him to do.  But there were some things that we discussed that I would – and I think he knows what those things are that I would rather keep confidential.

(Ex. B at 169-70.);

> **A:** I did not have any objections to him talking to people in getting this thing accomplished.
> **Q:** He could tell people what y'all had discussed and were thinking of?
> . . .
> **A:** He could discuss – He could discuss what he needed to to achieve the goals and objectives.

(Ex. B at 172.);

> **Q:** And you did not object to him discussing that work product with others, if it could improve it?
> **A:** I did not have an objection to him speaking with others to accomplish that goal.

(Ex. B at 174.);

> **Q:** And there is nobody that was hands off for him to speak with, plan with, collaborate with in suggesting rules and regulations; true?
> **A:** At that point in time, that may have been true.

(Ex. B at 176.);

> **Q:** . . . No hands off with anyone[?]
> **A:** Right.
> **Q:** So if there's no hands off, that means he could talk to the owners and operators of Victoryland about the proposed rules for gaming; true?
> **A:** He could talk to whom he needed to talk to at Victoryland, I would think.
> **Q:** He could talk to the lawyers who represent Victoryland if he wanted to; true?
> **A:** Yes.

31

| | |
|---|---|
| **Q:** | He could talk to the shareholders of Victoryland if he wanted to; true? |
| **A:** | I would suppose. |
| **Q:** | He could talk to his father, who is his law partner and a shareholder in Victoryland, to get his input; true? |
| **A:** | Yes, sir. |
| **Q:** | That would be all right by you? |
| **A:** | I had no objections to him speaking with people. |

(Ex. B at 177-78.);

| | |
|---|---|
| **A:** | I stated that he could speak to anyone. |
| **Q:** | . . . Was it permitted in advance by Warren that Gray, Jr., could get input from representatives of Victoryland in drafting the rules? |
| **MR. ANDERSON:** | Again, without waiving the client privilege, I think he's answered it was okay for him to get input outside. |
| **Q:** | Would the answer to that be yes? |
| **A:** | My answer was Mr. Gray could speak to anyone to get what I hired him to do accomplished. |
| **Q:** | Which would include Victoryland and its representatives? |
| **A:** | I did not object to it. |

(Ex. B at 202-03.)

There can be no doubt that Defendant Warren had no intention for his communications with Fred Gray Jr. to be kept confidential. Communications made between a client and his attorney which are intended to be further communicated to others outside the privilege, are not privileged. *See*, *United States v. Pipkins*, 528 F.2d at 563. Consequently, no privilege can attach to the communications between Defendant Warren and Fred Gray Jr. or the work and drafts which were passed between them.

2.    *To the extent it once existed, the attorney-client privilege between Fred Gray Jr. and Defendant Warren has been waived.*

It is clear that Defendant Warren did not intend for his communications with Fred Gray Jr. to be kept confidential; however, even if he did intend those communications to be confidential he has waived his privilege by disclosing documents and communications to persons outside the attorney-client relationship. A person upon whom these rules confer a privilege

32

against disclosure waives the privilege if the person voluntarily discloses or consents to disclosure of any significant part of the privileged matter. *See United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976) (attorney-client privilege inapplicable to "information that the client intends his attorney to impart to others").

Defendant Warren has repeatedly testified that Fred Gray Jr. could speak with anyone he needed to, including representatives of VictoryLand, in drafting the rules and regulations governing electronic bingo. (Ex. B at 202-03.) The disclosure of documents to VictoryLand waived any privilege which Defendant Warren may have had on those documents. Likewise, the disclosure of the communications between Defendant Warren and Fred Gray Jr., waived any privilege which may have attached to those communications. Defendant Warren cannot assert a privilege which (1) never existed because the communications and work product were not intended to be confidential; and (2) has been disclosed to others outside the attorney-client relationship.

## V.  The motion to compel Defendant Warren's production of financial information was erroneously denied.  (DE 42 ## 30, 31, 32, 33, 34 & 36.)

PLAINTIFF CHARITIES' REQUEST # 30 TO DEFENDANT WARREN: Please produce any and all documents that reflect or relate to campaign contributions made to any and all of your political campaigns for the office of Sheriff of Macon County, Alabama, including but not limited to records identifying the source of campaign contributions, bank statements for the accounts that held campaign proceeds and any campaign disclosure statements filed with the State.

DEFENDANT WARREN'S AMENDED RESPONSE: Objection. This request is irrelevant, overly broad, unduly burdensome and oppressive. Without waiving the objections and while maintaining the general objections set forth hereinabove, Defendant states that a copy of his 2006 campaign filings pursuant to the Alabama Fair Campaign Practices Act have been photocopied and will be furnished.

PLAINTIFF CHARITIES' REQUEST # 31 TO DEFENDANT WARREN: Please produce any and all documents in your possession or control that refer or

relate to property purchased by you or in your name, including all sources of any payment for the purchase of the property and all sources of any payment for property taxes for the property, since January 1, 2003.

    <u>DEFENDANT WARREN'S RESPONSE</u>: Objection. This request is irrelevant, overly broad, unduly burdensome and oppressive. It will not lead to the discovery of any relevant information or admissible evidence. Defendant avers that this request is intended to harass and it will not lead to any admissible evidence or information relevant to the issues of this lawsuit.

<u>PLAINTIFF CHARITIES' REQUEST # 32 TO DEFENDANT WARREN</u>: Please produce any and all documents in your possession or control that refer or relate to all income earned by you from any source whatsoever since January 1, 2003.

    <u>DEFENDANT WARREN'S RESPONSE</u>: Objection. Additionally, this case is not against the Defendant in any individual capacity and as such Defendant should not be required to furnish the requested documents. This request is irrelevant, overly broad, unduly burdensome and oppressive. It will not lead to discoverable or relevant information. Defendant avers that this request is intended to harass and not lead to any information relevant to the issues of this lawsuit.

<u>PLAINTIFF CHARITIES' REQUEST # 33 TO DEFENDANT WARREN</u>: Please produce all federal and state tax returns filed by you since January 1, 2003.

    <u>DEFENDANT WARREN'S RESPONSE</u>: Objection. Additionally, this case is not against the Defendant in any individual capacity and as such Defendant should not be required to furnish the requested documents. This request is irrelevant, overly broad, unduly burdensome and oppressive. It will not lead to the discovery of relevant information or admissible evidence. Defendant avers that this request is intended to harass him and is not intended to lead to any admissible evidence or other information relevant to the issues of this lawsuit.

<u>PLAINTIFF CHARITIES' REQUEST # 34 TO DEFENDANT WARREN</u>: Please produce any and all documents in your possession or control that refer or relate to all of your assets and liabilities for the time period January 1, 2003 to the present date.

    <u>DEFENDANT WARREN'S RESPONSE</u>: Objection. This case is not against the Defendant in any individual capacity and as such Defendant should not be required to furnish the requested documents. This request is irrelevant, overly broad, unduly burdensome and oppressive. It will not lead to the discovery of relevant information or admissible evidence. Defendant avers that this request is intended to harass and will not lead to any information relevant to the issues of this lawsuit.

PLAINTIFF CHARITIES' REQUEST # 36 TO DEFENDANT WARREN:
Please produce all statements of financial accounts in which you have an interest
or signatory authority, including all bank statements, mortgage account
statements, real estate investment account statements, retirement account
statements, brokerage account statements, trust account statements, including
statements jointly held with your spouse, and the corresponding check registers,
returned checks, and records of wire transfers, for the time period beginning
January 1, 2003 to the present date.

  DEFENDANT WARREN'S RESPONSE: Objection. As this case is not
against the Defendant in any individual capacity, the Defendant should not be
required to furnish the requested documents. This request is irrelevant, overly
broad, unduly burdensome and oppressive. It will not lead to the discovery of
relevant information or admissible evidence. Defendant avers that this request is
intended to harass and will not lead to any information relevant to the issues of
this lawsuit.

  The Charities have sued Defendants Warren, McGregor, and VictoryLand, alleging those

Defendants' intentional and conspiratorial deprivation of the Charities' equal protection rights.

(DE 185 at ¶¶ 131-37.) To establish a prima facie case of conspiracy under 42 U.S.C. § 1983,

the plaintiff must establish, among other things, that the defendants "reached an understanding to

violate his rights." *Rowe*, 279 F.3d at 1283 (quotation and alteration omitted). "The plaintiff

does not have to produce a smoking gun to establish the understanding or willful participation

required to show a conspiracy, but must show some evidence of *agreement* between the

defendants." *Id.* at 1283-84 (quotations and citation omitted; emphasis added). "[A]n *agreement*

may be inferred from a variety of circumstances, such as, '*sharing a common motive*, presence in

a situation where one could assume participants would not allow bystanders, repeated acts,

mutual knowledge with joint action, and the giving out of misinformation to cover up [the illegal

activity].'" *Whitney*, 229 F.3d at 1301 (quoting *Davis*, 810 F.2d at 477 (citations omitted;

emphasis added)); *see also Piche*, 981 F.2d at 717; *Ellis*, 595 F.2d at 160. The common motive

for Defendants McGregor and VictoryLand to enter into such a conspiracy is clear: The alleged

deprivation, which has prevented the Charities from competing with Defendant VictoryLand, has been enormously profitable for Defendants VictoryLand and McGregor. Defendant Warren's motive for entering into the alleged conspiracy, while not as clear, is likely to be clarified by the requested information.

"The information sought [in discovery] need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The phrase "reasonably calculated" means "'any possibility that the information sought may be relevant to the subject matter of the action.'" *Mallinckrodt Chem. Works*, 58 F.R.D. at 353 (quoting Charles Alan Wright, *Law of Federal Courts* § 81, at 359 n.47 (2nd ed. 1970)). The requested information is more than "possibly" relevant; it is almost certainly relevant. The requested information may reveal (1) that Defendant Warren has received financial benefits from his co-conspirators or (2) that Defendant Warren is financially vulnerable and (a) easily enticed by promises of future benefits or (b) willing to ingratiate himself with individuals, like his co-conspirators, who can bestow future benefits upon him. Either revelation would be evidence that Defendant Warren shares a common motive—financial gain—with Defendants McGregor and VictoryLand.

Despite the clear relevance of this information, the magistrate judge denied the motion to compel. The magistrate judge stated that underlying the request is a presumption that public officials who favor some over others are corrupt, a presumption that the magistrate judge labeled "pernicious." (DE 187 at 19.) The magistrate judge further stated that such a presumption "undermines democratic government and substitutes cynicism for the trust upon which democratic government must be founded." (*Id.*) The magistrate judge then noted that, because

public officials have "relatively low incomes," they would all be subject to proof of financial vulnerability.

It is difficult to determine the source of the magistrate judge's statements, since he offered no citations to any case law, law review articles, or political science texts. However, his assertion that democratic government is founded on trust and that a presumption of corruption undermines democratic government would certainly have surprised the author of Federalist 62, who noted that "[i]t is a misfortune incident to republican government, though in a less degree than to other governments, that those who administer it, may forget their obligations to their constituents, and prove unfaithful to their important trust." The Federalist No. 62 (James Madison). Indeed, the system of checks and balances established by the United States Constitution was deliberately intended to ameliorate the temptations of corruption. In short, an assumption of corruption is hardly pernicious.

While public officials, as a class, may indeed be financially vulnerable, that general proposition is not sufficient to deny the requested discovery in this case. Defendant Warren did not simply issue rules and regulations favoring one person over another. Rather, he delegated the drafting of rules and regulations to an interested party (Fred Gray Jr.) and then turned a blind eye to that party's reliance on VictoryLand and its representatives to create those rules and regulations. (*See* Ex. B at 169-70, 172, 174, 176, 177-78, 202-03.) All the while, Defendant Warren maintained neutrality on whether the process should remain free of conflicts of interest or result in rules that created a neutral playing field for the people of Macon County. (Ex. B at 294-96.) Then, while recognizing that a monopoly was not in the best interests of the people of Macon County, (Ex. B at 306-07), Defendant Warren promulgated Gray's rules and regulations and repeatedly amended them to ensure that VictoryLand had a monopoly. (*See* Ex. B at 308-

09.)  Even if there should be a presumption of non-corruption, that presumption has clearly been overcome in this case.

Accordingly, the magistrate judge's denial of the motion to compel the production of Defendant Warren's financial information was erroneously denied.

## CONCLUSION

For these reasons, and for the additional reasons set out in Plaintiffs' original Motions to Compel, this Court should enter an order:

1.    Granting Lucky Palace's motion to compel Defendant VictoryLand to answer interrogatories 9 and 10.  (DE 142.)

2.    Granting Lucky Palace's motion to compel VictoryLand to respond in full to document requests 12 and 13.  (DE 143.)

3.    Granting the Plaintiff Charities' motion to compel Defendant McGregor to respond to document request 15.  (DE 107.)

4.    Granting the Plaintiff Charities' motion to compel VictoryLand to respond to document requests 13, 14, 15, 26 (DE 106).

5.    Granting the Plaintiffs' motions to compel Fred Gray (DE 134), Fred Gray Jr. (DE 135), and the Gray Law Firm (DE 136) to produce documents pursuant to the Plaintiffs' Rule 45 Subpoenas.

6.    Denying Fred Gray Jr.'s motion to quash Lucky Palace's deposition notice.  (DE 150.)

7.    Granting the Plaintiff Charities' motion to compel Defendant Warren to respond in full to document 30, 31, 32, 33, 34, and 36.  (DE 42.)

DATED: May 30, 2008.

Respectfully submitted,

/s/ Stephen D. Heninger
Stephen D. Heninger (HEN 007)
W. Lewis Garrison Jr. (GAR 008)
Gayle L.  Douglas (DOU 012)
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:        steve@hgdlawfirm.com
                  lewis@hgdlawfirm.com
                  gdouglas@hgdlawfirm.com

*Attorneys for Plaintiff Lucky Palace, LLC*

/s/ Robert K. Spotswood
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
Grace L. Kipp (LON 049)
SPOTSWOOD SANSOM & SANSBURY LLC
940 Concord Center
2100 Third Avenue North
Birmingham, Alabama  35213
TEL:   (205) 986-3620
FAX:   (205) 986-3639
E-mail:        rks@spotswoodllc.com
                  msansbury@spotswoodllc.com
                  gkipp@spotswoodllc.com

*Attorneys for the Plaintiff Charities*

39

## CERTIFICATE OF SERVICE

I hereby certify that, on May 30, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

John M. Bolton III, Esq.
Charlanna White Spencer, Esq.
Hill Hill Carter Franco Cole & Black P.C.
425 S. Perry Street
Montgomery, AL 36104
E-mail:      jbolton@hillhillcarter.com
             cspencer@hillhillcarter.com

James H. Anderson, Esq.
Ryan Wesley Shaw, Esq.
Beers, Anderson, Jackson, Patty, Van Heest &
    Fawal PC
P.O. Box 1988
Montgomery, AL  36102
E-mail:      janderson@beersanderson.com
             wshaw@beersanderson.com

Stephen D. Heninger
W. Lewis Garrison Jr.
Gayle L. Douglas
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, Alabama 35203
TEL:   (205) 326-3336
FAX:   (205) 326-3332
E-mail:      steve@hgdlawfirm.com
             lewis@hgdlawfirm.com
             gdouglas@hgdlawfirm.com

William M. Slaughter, Esq.
Patricia C. Diak, Esq.
Peter John Tepley, Esq.
Khristi Doss Driver, Esq.
Haskell, Slaughter, Young & Rediker, LLC
1400 Park Place Tower
2001 Park Place North
Birmingham, AL  35203
E-mail:      wms@hsy.com
             pcd@hsy.com
             pt@hsy.com
             kdd@hsy.com

Fred David Gray, Esq.
Fred David Gray Jr., Esq.
Gray, Langford, Sapp, McGowan, Gray,
    Gray & Nathanson PC
P.O. Box 830239
Tuskegee, AL  36083-0239
E-mail:      fgray@glsmgn.com
             jbibb@glsmgn.com
             fgrayjr@glsmgn.com
             thalia@glsmgn.com

John Mark White, Esq.
Augusta S. Dowd, Esq.
Rebecca DePalma, Esq.
White, Arnold, Andrews & Dowd
2025 Third Avenue, North
Suite 600
Birmingham, AL  35203
E-mail:      mwhite@waadlaw.com
             adowd@waadlaw.com
             rdepalma@waadlaw.com

George L. Beck, Jr.
Capell Howard PC
PO Box 2069
Montgomery, AL 36102-2069
E-mail:      glb@chlaw.com

Ronald G. Davenport, Esq.
Rushton, Stakely, Johnston & Garrett
PO Box 270
Montgomery, AL 36101
E-mail:      rgd@rsjg.com

s/ Michael T. Sansbury
OF COUNSEL

40

# Exhibit A

**Birmingham Business Journal - April 16, 1999**
http://birmingham.bizjournals.com/birmingham/stories/1999/04/12/daily18.html



Friday, April 16, 1999

# Video gambling bill dies in Senate

**Birmingham Business Journal**

A bill, which would have permitted video poker and other video gambling machines at Alabama's four dog tracks, including one in Birmingham, died in the state Senate. One track, VictoryLand a greyhound facility in Macon County, is in dire financial straits according to proponents of the bill because of competition from Mississippi casinos. A teary State Senator George Clay of Tuskegee, said the bill's death could mean the death of VictoryLand and the jobs of some track 300 employees .

*All contents of this site © American City Business Journals Inc. All rights reserved.*

# Exhibit B

FREEDOM COURT REPORTING

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5    CASE NUMBER:  3:06-CV-01113-WKW-WC

6    HOPE FOR FAMILIES & COMMUNITY

7    SERVICES, INC., ET AL.,

8              Plaintiffs,

9              vs.

10   DAVID WARREN, IN HIS OFFICIAL CAPACITY AS

11   THE SHERIFF OF MACON COUNTY, ET AL.,

12             Defendants.

13            S T I P U L A T I O N

14             IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the video deposition of

17   Sheriff David Warren may be taken before

18   Sara Mahler, CCR, at the offices of Beers,

19   Anderson, Jackson, Patty & Van Heest, at 250

20   Commerce Street, Suite 100, Montgomery,

21   Alabama 36104, on the 19th day of March,

22   2008.

23            DEPOSITION OF SHERIFF DAVID WARREN

FREEDOM COURT REPORTING

Page 2

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21       * * * * * * * * * * * * *
22
23

Page 3

1        * * * * * * * * * * * * *
2            I N D E X
3          EXAMINATION
4              PAGE
5    By Mr. Heninger .................... 13
6    By Mr. Sansbury ................... 331
7        PLAINTIFF'S EXHIBITS
8              PAGE
9    Exhibit 1 - "Rule Number One" ...... 16
10   Exhibit 2 - "Rule Number Two" ...... 18
11   Exhibit 3 - "Rule Number Three" .... 19
12   Exhibit 4 - "Rule Number Four" ..... 20
13   Exhibit 5 - Rules and Regulations
14       for licensing bingo
15       games .................... 70
16   Exhibit 6 - First Amended and
17       Restated Rules and
18       regulations for
19       licensing of bingo
20       games .................... 71
21   Exhibit 7 - Second Amended and
22       Restated Rules and
23       regulations for

Page 4

1        licensing of bingo
2        games  .................. 72
3    Exhibit 8 - Document ............... 75
4    Exhibit 9 - Application from
5        Multicultural Center .... 100
6    Exhibit 10 - Bates LUC 00083 ...... 124
7    Exhibit 11 - Circle of Trust ...... 163
8    Exhibit 12 - Letter from
9        Mr. Bracy ............... 229
10   Exhibit 13 - Letter, 8/5/04,
11       Bates LUC 000899 ........ 230
12   Exhibit 14 - Letter, 10/20/04,
13       Bates LUC 00092 ......... 238
14   Exhibit 15 - Letter, 11/10/04,
15       Bates 00095 ............. 257
16   Exhibit 16 - Series of letters to
17       Sheriff from Mr. Bracy .. 259
18   Exhibit 17 - Check to Sheriff
19       from Lucky Palace, Inc. . 272
20   Exhibit 18 - Fax cover sheet,
21       Bates McGregor 038 ...... 275
22   Exhibit 19 - Exhibit E, Bates LUC
23       080-081 ................. 285

Page 5

1    Exhibit 20 - Bates Warren
2        D0317-D0325 ............. 288
3    Exhibit 21 - Letter, 7/25/05, LUC
4        101-107 ................. 290
5    Exhibit 22 - Bingo Operations and
6        Lease Agreement ......... 336
7        * * * * * * * * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 6

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        EASTERN DIVISION
4
5    CASE NUMBER:  3:06-CV-01113-WKW-WC
6
7    HOPE FOR FAMILIES & COMMUNITY
8    SERVICES, INC., ET AL.,
9        Plaintiffs,
10        vs.
11    DAVID WARREN, IN HIS OFFICIAL CAPACITY AS
12    THE SHERIFF OF MACON COUNTY, ET AL.,
13        Defendants.
14
15    BEFORE:
16        SARA MAHLER, Commissioner.
17
18    APPEARANCES:
19        STEPHEN D. HENINGER, ESQUIRE, of
20    HENINGER, GARRISON & DAVIS, 2224 First
21    Avenue North, Birmingham, Alabama 35203,
22    appearing on behalf of the Plaintiff, Lucky
23    Palace.

Page 7

1    APPEARANCES:  (Cont.)
2        GAYLE L. DOUGLAS, ESQUIRE, of
3    HENINGER, GARRISON & DAVIS, 2224 First
4    Avenue North, Birmingham, Alabama 35203,
5    appearing on behalf of the Plaintiff, Lucky
6    Palace.
7        MICHAEL T. SANSBURY, ESQUIRE, of
8    SPOTSWOOD, SANSOM & SANSBURY, 2100 Third
9    Avenue, Suite 940, Birmingham, Alabama
10    35203, appearing on behalf of the Plaintiff
11    Charities.
12        JAMES H. ANDERSON, ESQUIRE, of
13    BEERS, ANDERSON, JACKSON, PATTY & VAN HEEST,
14    250 Commerce Street, Suite 100, Montgomery,
15    Alabama 36104, appearing on behalf of the
16    Defendant, Sheriff David Warren.
17        RYAN WESLEY SHAW, ESQUIRE, of
18    BEERS, ANDERSON, JACKSON, PATTY & VAN HEEST,
19    250 Commerce Street, Suite 100, Montgomery,
20    Alabama 36104, appearing on behalf of the
21    Defendant, Sheriff David Warren.
22
23

Page 8

1    APPEARANCES:  (Cont.)
2        FRED D. GRAY, JR., ESQUIRE, of
3    GRAY, LANGFORD, SAPP, MCGOWAN, GRAY &
4    NATHANSON, 108 Eastside Street, Tuskegee,
5    Alabama 36083, appearing on behalf of the
6    Defendant, Sheriff David Warren.
7        FRED DAVID GRAY, SR., ESQUIRE, of
8    GRAY, LANGFORD, SAPP, MCGOWAN, GRAY &
9    NATHANSON, 108 Eastside Street, Tuskegee,
10    Alabama 36083, appearing on behalf of the
11    Defendant, Sheriff David Warren.
12        JOHN M. BOLTON, III, ESQUIRE, of
13    HILL, HILL, CARTER, FRANCO, COLE & BLACK,
14    425 South Perry Street, Montgomery, Alabama
15    36104, appearing on behalf of the Defendant,
16    Milton McGregor.
17        PETER J. TEPLEY, ESQUIRE, of
18    HASKELL, SLAUGHTER, YOUNG & REDIKER, 2001
19    Park Place North, Suite 1400, Birmingham,
20    Alabama 35203, appearing on behalf of the
21    Defendant, Victoryland.
22
23

Page 9

1    APPEARANCES:  (Cont.)
2        CHARLANNA WHITE SPENCER, ESQUIRE,
3    of SASSER, BOLTON & SEFTON, One Commerce
4    Street, Suite 700, Montgomery, Alabama
5    36103, appearing on behalf of the Defendant,
6    Milton McGregor.
7        REBECCA G. DEPALMA, ESQUIRE, of
8    WHITE, ARNOLD & DOWD, 2025 Third Avenue
9    North, Suite 500, Birmingham, Alabama 35203,
10    appearing on behalf of the Defendant,
11    Victoryland.
12        HOPE S. MARSHALL, ESQUIRE, of
13    WHITE, ARNOLD & DOWD, 2025 Third Avenue
14    North, Suite 500, Birmingham, Alabama 35203,
15    appearing on behalf of the Defendant,
16    Victoryland.
17        RONALD G. DAVENPORT, ESQUIRE, of
18    RUSHTON, STAKELY, JOHNSTON & GARRETT, 184
19    Commerce Street, Montgomery, Alabama 36104,
20    appearing on behalf of the Defendant, The
21    Gray Law Firm.
22
23

3 (Pages 6 to 9)

Page 10

1  APPEARANCES:  (Cont.)
2      ALSO PRESENT:  PAUL BRACY
3          RENNY MCNAUGHTON
4          JODIE HERRING
5
6      * * * * * *
7
8      I, SARA MAHLER, CCR, a Court
9  Reporter of Wetumpka, Alabama, acting as
10  Commissioner, certify that on this date, as
11  provided by the Federal Rules of Civil
12  Procedure and the foregoing stipulation of
13  counsel, there came before me at the offices
14  of Beers, Anderson, Jackson, Patty & Van
15  Heest, 250 Commerce Street, Suite 100,
16  Montgomery, Alabama 36104, beginning at
17  10:00 a.m., Sheriff David Warren, witness in
18  the above cause, for oral examination,
19  whereupon the following proceedings were
20  had:
21      VIDEOGRAPHER:  This begins
22  videotape number one in the deposition of
23  Sheriff David Warren in the matter of Hope

Page 11

1  For Family and Community Services versus
2  David Warren, Case Number C -- excuse me --
3  3:06-CV-01113-WKW-WC in the United States
4  District Court for the Middle District of
5  Alabama.
6      We are on the Record for 10:06
7  a.m. on Wednesday, March the 19th, 2008.
8  This deposition is taking place at
9  Montgomery, Alabama.  My name is Renny
10  McNaughton representing Freedom Court
11  Reporting.
12      Will counsel please identify
13  yourself and state whom you represent for
14  the Record.
15      MR. HENINGER:  Steve Heninger
16  for the Plaintiff Lucky Palace.
17      MR. SANSBURY: Michael Sansbury
18  for the Plaintiff Charities.
19      MS. DOUGLAS:  Gayle Douglas
20  for the Plaintiff Charities.
21      MS. MARSHALL:  Hope Marshall
22  for the Defendant Victoryland.
23      MR. DAVENPORT:  Ron Davenport.

Page 12

1  I'm here for the limited purpose of
2  representing non-parties, Fred Gray, Fred
3  Gray, Jr., and the Gray Law Firm.
4      MS. DEPALMA:  Rebecca DePalma
5  for the Defendant Victoryland.
6      MS. SPENCER:  Charlanna
7  Spencer for the Defendant Milton McGregor.
8      MR. SHAW:  Wes Shaw for the
9  Defendant Sheriff Warren.
10      MR. TEPLEY:  Peter Tepley for
11  Defendant Victoryland which is also in the
12  caption as Macon County Greyhound Park.
13      MR. BOLTON:  John Bolton for
14  the Defendant McGregor.
15      MR. GRAY, SR.:  Fred D. Gray
16  alleged to be a relevant nonparty and
17  alleged to have committed bribery by the
18  plaintiffs.
19      MR. GRAY, JR.:  Fred D. Gray,
20  Jr., for the Defendant Sheriff David Warren.
21      MR. ANDERSON:  James Anderson
22  for Sheriff Warren.
23      MR. GRAY, SR.:  If I didn't

Page 13

1  say it, I also represent Sheriff Warren.
2      MR. ANDERSON:  I also have
3  present my legal assistant, Jodie Herring.
4      VIDEOGRAPHER:  Would the
5  reporter please swear in the witness.
6      SHERIFF DAVID WARREN,
7  being first duly sworn, was examined and
8  testified as follows:
9      COURT REPORTER:  Usual
10  stipulations?
11      MR. ANDERSON:  Yes.
12      MR. HENINGER:  That's fine
13  thanks.
14      EXAMINATION
15  BY MR. HENINGER:
16      Q.    Good morning, Sheriff.
17      A.    Good morning.
18      Q.    I introduced myself earlier to
19  you, I'm Steve Heninger, and I represent
20  Lucky Palace in this matter.
21      Now, you have been through
22  this process before; correct?
23      A.    Yes, I have.

4 (Pages 10 to 13)

FREEDOM COURT REPORTING

Page 14

1    Q.    So you understand how a
2    deposition works, I don't need to explain it
3    to you; fair enough?
4    A.    Fair enough.
5    Q.    You have able counsel, so I'm
6    going to assume that you understand I'm here
7    to ask questions and hope to get some
8    answers from you today --
9    A.    Yes, sir.
10    Q.    -- just to gain some insight
11    into your familiarity of what we're here
12    about?
13    A.    Yes, sir, I do.
14    Q.    Are you the sheriff of Macon
15    County, Alabama?
16    A.    I am the sheriff of Macon
17    County, Alabama.
18    Q.    How long have you been the
19    sheriff?
20    A.    For approximately thirteen --
21    I've been the sheriff of Macon County,
22    Alabama, for approximately thirteen years.
23    Q.    And in your capacity as the

Page 15

1    sheriff of Macon County, have you been
2    involved in publishing, promulgating, and
3    enforcing rules and regulations for
4    electronic bingo in Macon County?
5    A.    In my capacity as sheriff, I
6    have been responsible for promulgating the
7    rules and regulations governing bingo in
8    Macon County.
9    Q.    Now, I would bet there are
10    going to be some times during this
11    deposition when you and I may have a
12    disagreement.  But what I want to do at the
13    outset is to get some agreement that I
14    expect you would probably be in with me and
15    my clients on this matter, which would
16    determine where we're headed during the day;
17    fair enough?
18         Would you like to shortcut
19    this if possible?
20    A.    I am here to testify and do
21    whatever.
22         (Whereupon, Plaintiff's
23         Exhibit No. 1 was marked

Page 16

1         for identification.)
2    Q.    Fair enough.  And to make sure
3    there's no misunderstanding about my wording
4    and your understanding, I've handwritten --
5    or type written a few things.
6         What I want to show you first
7    is what I'm going to mark as Plaintiff's
8    Exhibit 1.  And for the Record, I'm asking
9    you whether you agree, disagree, or have no
10    opinion with this, and it says Rule number
11    one:  Rules and regulations for bingo must
12    be written, amended, and applied to be fair
13    to all applicants for licensing and cannot
14    be tilted to favor only Victoryland so it
15    could have a monopoly on electronic bingo in
16    Macon County.
17         Now as stated, would you agree
18    with that, disagree, or just have no
19    opinion?
20    A.    First of all, if I may, I am a
21    stutterer.  At times my speech may seem
22    halting, that is a coping mechanism that I
23    have developed over time, and I just want to

Page 17

1    make that clear on the outset.
2    Q.    I appreciate that.
3         Let's return to this effort
4    I'm trying to have, to see if there are some
5    areas that we can agree at the outset.
6         The first was on Exhibit 1,
7    would you agree as the sheriff of Macon
8    County with the obligations you had on the
9    electronic bingo licensing that the rules
10    and regulations for bingo must written,
11    amended, and applied to be fair to all
12    applicants for licensing and cannot be
13    tilted to favor only Victoryland so it could
14    have a monopoly on electronic bingo in Macon
15    County?
16    A.    I would agree with that.
17    Q.    If you can check that, I will
18    attach it to the deposition, and we'll move
19    from there.
20         MR. ANDERSON:  I think he will
21    just orally say that he agrees with your
22    statement.
23         MR. HENINGER:  Then I'll

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 18

1  record it, if that's what you would prefer,
2  James.
3           MR. ANDERSON:  Sure.
4       Q.   So on Exhibit 1, you would
5  agree with that; fair?
6       A.   Yes.
7           (Whereupon, Plaintiff's
8           Exhibit No. 2 was marked
9           for identification.)
10      Q.   And what I'm going to mark as
11  Plaintiff's Exhibit 2, Sheriff Warren, is
12  Rule Number two.  Would you agree that the
13  sheriff has a duty to keep any potential
14  conflicts of interest -- Let me make sure
15  you read that with me, I'm sorry.
16          Rule Number two:  Sheriff had
17  a duty to keep any potential conflicts of
18  interest from infecting the rules and
19  regulations from being written, amended, or
20  applied to favor only Victoryland so it
21  could have a monopoly on electronic bingo in
22  Macon County.
23          MR. ANDERSON:  I'm going --

Page 19

1       Q.   Would you agree, disagree, or
2  have no opinion on that?
3           MR. ANDERSON:  I'm going to
4  object to the form of his question, and you
5  can answer, Sheriff.
6           MR. TEPLEY:  I'll join the
7  objection to that.
8       A.   I have no opinion on that.
9       Q.   Have no opinion on whether
10  that's a fair rule or true rule?
11      A.   I have no opinion on that.
12      Q.   So have I marked that
13  correctly, no opinion?
14      A.   (Witness nods head in the
15  affirmative.)
16      Q.   I think you need to answer
17  out.
18      A.   Yes.
19          (Whereupon, Plaintiff's
20          Exhibit No. 3 was marked
21          for identification.)
22      Q.   Thank you.
23          What I'm marking as

Page 20

1  Plaintiff's Exhibit 3, states Rule Number
2  Three:  Sheriff had a duty to prevent anyone
3  from influencing how the rules and
4  regulations were written, amended, or
5  applied to favor Victoryland over all other
6  potential applicants for bingo licensing.
7           MR. ANDERSON:  I'm just going
8  to object to the form.  And you can answer,
9  Sheriff.
10          MR. TEPLEY:  I join the
11  objection.
12      A.   I have no opinion on this.
13      Q.   No opinion?
14      A.   No.
15      Q.   Let me mark that then.  So
16  have I accurately marked that you have no
17  opinion on Rule Number three?
18      A.   Yes, sir.
19          (Whereupon, Plaintiff's
20          Exhibit No. 4 was marked
21          for identification.)
22      Q.   Finally, I want to show you
23  what is marked Plaintiff's Exhibit 4, which

Page 21

1  reads:  Rule Number Four, when collaborating
2  with an attorney to write, amend, or comment
3  on rules and regulations for bingo
4  licensing, there is a duty to make sure no
5  potential conflict of interest is present
6  that could affect the fairness of the rules
7  and regulations and favor only Victoryland.
8           MR. ANDERSON:  Before you
9  answer, I'm going to object to the form of
10  the question.  And, Sheriff, you can answer.
11          MR. TEPLEY:  I'll join the
12  objection.
13      A.   I have no opinion.
14      Q.   I'm going to mark Number 4, as
15  no opinion.  Is that correct?
16      A.   Yes, sir.
17      Q.   Now, you agreed with Rule
18  Number One that the rules and regulations
19  for bingo must be written, amended, and
20  applied to be fair to all applicants for
21  licensing and cannot be tilted to favor only
22  Victoryland so it could have a monopoly on
23  electronic bingo in Macon County; true?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 22

1      A.    Yes.
2      Q.    That's common sense in
3  fairness, isn't it?
4      A.    Yes.
5      Q.    Number 2, sheriff had a duty
6  to keep any potential conflicts of interest
7  from infecting the rules and regulations
8  from being written, amended, or applied to
9  favor only Victoryland so it could have a
10  monopoly on electronic bingo in Macon
11  County, and you expressed the no opinion on
12  that?
13      A.    Yes.
14      Q.    Can I take it from that,
15  Sheriff, that you have believed while you've
16  been engaged in the promulgation and
17  enforcement of rules and regulations for
18  electronic bingo in Macon County, that it is
19  not necessary for you to keep any potential
20  conflicts of interest from infecting those
21  rules and regulations?
22      A.    I said I had no opinion on
23  that at this time.

Page 23

1      Q.    Well, did you have an opinion
2  on that at the time you first became engaged
3  in this matter in December 2003?
4      A.    I had a duty to promulgate
5  rules for the operation of bingo games in
6  Macon County. I did that to the best of my
7  ability and in a way that I thought would be
8  in the best interest of the citizens of
9  Macon County.
10      Q.    Sheriff, would we be correct
11  in understanding that in November, I think
12  specifically November 4, 2003, the voters of
13  Macon County approved Amendment 744?
14      A.    Yes, sir, they did.
15      Q.    And that on December 5, 2003,
16  you promulgated and published the first
17  rules and regulations for licensing for
18  electronic bingo?
19      A.    Yes, that is true.
20      Q.    What I'm trying to determine,
21  since I now have this opportunity to meet
22  with you, is when you were going about your
23  duties and obligations of promulgating those

Page 24

1  rules and regulations, did you consider it
2  to be acceptable to have conflicts of
3  interest injected into your consideration?
4      A.    Sir, I do not believe that was
5  the reality of that situation as it related
6  to me.
7      Q.    Sheriff Warren, do you
8  consider yourself a person who has common
9  sense?
10      A.    Yes, sir.
11      Q.    Do you consider yourself a
12  person who has a conscience?
13      A.    I believe myself to be a
14  person who has a conscience.
15      Q.    Do you consider yourself to be
16  a person who has a sense of fairness?
17      A.    I consider myself to be a
18  person who has a sense of fairness.
19      Q.    When you learned that you
20  would be the person who would be
21  promulgating, publishing, and enforcing the
22  rules and regulations for bingo gaming in
23  Macon County, did you throw away your common

Page 25

1  sense?
2      A.    When I found out that I was
3  going to be the person that would be
4  responsible for promulgating the rules
5  governing bingo in Macon County, I tried to
6  use as much common sense as I thought
7  possible.
8      Q.    Did you try to use fairness in
9  pursuing your obligations and duties in
10  promulgating and publishing the initial
11  rules and regulations?
12      A.    I used as much fairness as I
13  could in promulgating those rules.
14      Q.    Do you believe fairness should
15  come in doses?
16      A.    Sir, fairness, when it relates
17  to this issue, is somewhat subjective when I
18  consider what is in the best interest of the
19  citizens of Macon County. And I tried to be
20  as fair as I could, given those set of
21  circumstances.
22      Q.    I want to make sure I
23  understand what you're saying. Are you

7 (Pages 22 to 25)

FREEDOM COURT REPORTING

Page 26

1  telling me that as you assumed your duties
2  and obligations with regard to promulgating,
3  publishing rules and regulations for
4  licensing of electronic bingo, you had as
5  one of your concerns, fairness to the
6  citizens of Macon County?
7      A.   Yes, I did.
8      Q.   Did you have as one of your
9  concerns, fairness to any applicants for
10  licenses under 744 and the rules you would
11  be publishing?
12     A.   I consider fairness.  Fairness
13  was one of the elements I considered as I
14  promulgated the rules and regulations
15  governing bingo.
16     Q.   Fairness to whom?
17     A.   I was trying to answer your
18  question.  You said that fairness to the
19  applicants, fairness to the citizens of
20  Macon County was one of the elements that I
21  considered as I promulgated these rules.
22     Q.   Well, as you were embarking on
23  these duties and responsibilities in

Page 27

1  November of 2003, you realized that as the
2  sheriff and the person publishing and
3  promulgating these rules, you needed to do
4  so in a manner that would be fair to the
5  citizens of Macon County?
6      A.   I promulgated these rules as I
7  interpreted the legislation and fairness was
8  a -- was one of the elements.
9      Q.   What I'm wanting to do is go
10  down a list of people or the parties to whom
11  you recognized an obligation to be fair.
12         First of all, you've told me
13  it was the citizens of Macon County;
14  correct?
15     A.   Yes.
16     Q.   Secondly, an obligation to be
17  fair with the rules and regulations to the
18  perspective applicants for licenses?
19     A.   Yes, sir.
20     Q.   Anyone else that you felt you
21  needed to consider for fairness when
22  undertaking this task?
23     A.   Well, when I undertook --

Page 28

1  when this task presented itself to me,
2  because I knew nothing about it before it
3  happened, before it was -- before it came
4  before the voters, I did everything I could
5  to do them the best way I could.  And that's
6  my answer.
7      Q.   That's why I'm trying to get
8  some more specifics.  If you will indulge me
9  a few more --
10     A.   Yes, sir.
11     Q.   -- questions throughout the
12  day.
13         When you tell me you have no
14  opinion to Rule Number Two, which is Exhibit
15  Number 2, what I'm trying to find out,
16  Sheriff, is why you have no opinion as to
17  whether potential conflicts of interest
18  should be kept from infecting your
19  publishing of rules and regulations.  Having
20  given you that preface, can you tell me why
21  you have no opinion and had no opinion in
22  November and December of 2003, as to whether
23  you needed to keep out conflicts of interest

Page 29

1  when doing these rules?
2         MR. ANDERSON:  I'm going to
3  object to the form.  You can answer.
4         MR. TEPLEY:  Same objection.
5      A.   In my mind, when I promulgated
6  the rules and regulations governing bingo, I
7  did the best job that I could do.  And, I
8  think, in your first question over there, I
9  answered that I agreed with that and -- that
10  conflict of interest -- and the reason I
11  have no opinion of that, is that it did not
12  weigh in any way as I promulgated these
13  rules.  Those rules are my rules.  I'm the
14  sheriff; I've tried to follow the law the
15  best way I could, and -- That's my answer.
16     Q.   After having been a public
17  officer for many years, you realize that
18  conflicts of interest can be a problem?
19     A.   Yes.
20     Q.   What is your understanding of
21  the term conflict of interest?
22     A.   Let me see if I can put this
23  in words.  When -- I guess my interpretation

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

Page 30

1  of a conflict of interest, when there is
2  something that happens that puts an unfair
3  advantage, gives someone an unfair advantage
4  or -- and the elements that are present sort
5  of a -- would -- I guess the conflict would
6  come in -- the conflict of interest might be
7  when something is -- when something is
8  prearranged to give an advantage.
9      Q.    That's not good, is it?
10     A.    No.
11     Q.    I mean, you recognize that
12 would not be right, to have something
13 prearranged when you're undertaking duties?
14     A.    When -- When undertaking
15 anything, fairness should always be an
16 element.  And when promulgating my rules for
17 the operation of bingo in Macon County, I
18 did the best that I could do to see that
19 that was not an element.
20     Q.    See, here's my problem,
21 Sheriff.  I'm going to be very transparent
22 with you, and I'm not going to try to trick
23 you.

Page 31

1      A.    I understand.
2      Q.    I don't know you; this is the
3  first time I've ever met you.  What I'm
4  seeking to find out is when David Warren
5  tells me and the Court, I did the best I
6  could do, what I need to find out is what
7  was your best?  What was your understanding
8  of certain things for goal lines that you
9  were going to meet?  So I need to ask you
10 specifics about David Warren, okay?
11     A.    Yes, sir.
12     Q.    If when you assumed your
13 duties in promulgating and publishing these
14 rules and regulations in November of 2003,
15 you had agreed to be paid by Milton McGregor
16 and Victoryland to write them in a way to
17 only help them, assume that had happened,
18 wouldn't that be a conflict of interest?
19          MR. ANDERSON:  I'm going to
20 object to the form.  You can answer.
21          MR. TEPLEY:  I join.
22     A.    Sir, first of all, that would
23 never happen.

Page 32

1      Q.    I hope not.  I'm asking a
2  hypothetical.
3      A.    And hypothetically, this was
4  very new to me.  The people who came to me,
5  they came to me in good faith.  I did not
6  know them; I had never met them.
7          What I was trying to do was to
8  make sure that I did no harm by anything
9  that I did to the citizens of Macon County,
10 as I considered these rules and regulations.
11     Q.    Sheriff, I'm just trying to
12 determine what your sense of right or wrong
13 is, and I'm trying to get you on the Record
14 to explain your sense of right or wrong.
15     A.    Yes, sir.
16     Q.    That's why I asked a
17 hypothetical.
18     A.    Yes, sir.
19     Q.    According to your sense of
20 right and wrong, in November of 2003 when
21 amendment 744 was voted as approved and you
22 undertook your duties to publish and
23 promulgate the rules and regulations for

Page 33

1  bingo licensing, if you had agreed to accept
2  payment from Victoryland and Milton McGregor
3  to write them in a way that would give them
4  a monopoly, would that fit with your sense
5  of right and wrong?
6          MR. ANDERSON:  Object to the
7  form.  You can answer.
8          MR. TEPLEY:  I'll join.
9          MR. GRAY, SR.:  Objection.
10     A.    Sir, that is a hypothetical.
11     Q.    It is.
12     A.    And in my almost forty years
13 of being a sheriff, I've dealt with people
14 that would make most people in this room
15 shutter.  And if none of them could -- I've
16 had drug dealers bring me suitcases full of
17 money, and if none of them could buy me --
18 and they were calling my children every day
19 telling them that they were going to kill
20 me, if I didn't take any money from them,
21 hardly gaming -- any of this money would I
22 take.
23          Everything I've ever gotten in

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 34

1    my life -- I'm the second oldest of fourteen
2    children. My mother had us in church every
3    Sunday. My name is David Warren, and I'm
4    the sheriff of Macon County, and I don't
5    operate that way.
6        Q.    So can you agree with me that
7    that would clearly be wrong, if you were to
8    agree to do so, accept money from
9    Victoryland to write these regulations to
10   favor them? It's a simple question.
11       A.    Given, sir, that would be
12   wrong.
13       Q.    There's no question about
14   that, is there? Isn't that an easy answer?
15       A.    I don't see -- If that
16   happened, that would be wrong.
17       Q.    It would be wrong and be a
18   conflict of interest for you to accept
19   money, or any benefits, to write the rules
20   and regulations to favor only Victoryland,
21   wouldn't it?
22       A.    I would -- For me to accept
23   anything to write the rules -- to write the

Page 35

1    rules and regulations that favor not only
2    Victoryland, but anybody, would be wrong.
3        Q.    That's clear, isn't it?
4        A.    That's clear.
5        Q.    Then help me understand,
6    please --
7        A.    Yes, sir.
8        Q.    -- why you don't have an
9    opinion as to whether it would be all right
10   for you to allow someone else to inject a
11   conflict of interest in your consideration?
12            MR. ANDERSON: Object to the
13   form.
14            MR. TEPLEY: Join.
15       A.    Sir, that is a question that
16   you asked, and I -- it was -- You know,
17   sometimes you have to -- I've learned in
18   life, I've had to give a lot of things to
19   the good Lord. And the way that question --
20   What that question infers is so offensive to
21   me, I just have no opinion on it.
22       Q.    I'm sorry, what does that
23   infer that's offensive to you?

Page 36

1        A.    It's just -- Sir, you know,
2    all of this is new to me. All of this was
3    new to me. Before and -- And I can simply
4    say this, that I tried to do the best job
5    that I could do when faced with something
6    that was so new and so different to me. And
7    that's all I can -- That's all I can answer.
8        Q.    Fair enough. Sheriff Warren,
9    before becoming the sheriff of Macon County,
10   you were also a police officer, weren't you?
11       A.    Yes, sir.
12       Q.    Also served as the chief of
13   police for the City of Tuskegee?
14       A.    Yes, sir.
15       Q.    How many years in law
16   enforcement do you have in total?
17       A.    Thirty-five, thirty-seven.
18       Q.    And have you learned during
19   that entire time that your duty, your sworn
20   duty, is to enforce the law?
21       A.    Yes, sir.
22       Q.    Whether you agree with it or
23   not?

Page 37

1        A.    Yes, sir.
2        Q.    As that badge indicates,
3    you're wearing on your lapel today, you're
4    required to enforce the law of sure justice
5    whether you agree with it or not?
6        A.    As the sheriff of Macon
7    County, I try to carry out my duties to the
8    best of my ability. And that's my answer.
9        Q.    Have you ever felt, in your
10   own mind and heart, that you didn't have the
11   ability to enforce the law as written?
12       A.    Being a policeman and being a
13   person who is out there on the front line,
14   every policeman will tell you, at times they
15   feel somewhat overwhelmed by duties. But we
16   try to carry out our duties as best we can
17   anyway.
18       Q.    Again, let me be very
19   transparent.
20       A.    Yes, sir.
21       Q.    As the sheriff of Macon
22   County, if you are downtown and you see me
23   run a red light doing eighty miles an hour,

10 (Pages 34 to 37)

Page 38

1 are you going to arrest me?
2    A.    Yes, sir.
3    Q.    If you see your daughter run a
4 red light doing eighty miles an hour, are
5 you going to arrest her?
6    A.    And they know it.
7    Q.    Would you do it?
8    A.    Yes, sir.
9    Q.    You show no favoritism when
10 you're dealing with the law?
11    A.    No, sir.
12    Q.    It's common sense, isn't it?
13    A.    I would say it was.
14    Q.    We'll come back to these.  But
15 let me go back to just some general
16 information.
17    A.    Yes, sir.
18    Q.    What have you reviewed in
19 effort to prepare for today's deposition?
20    A.    A number of things.
21    Q.    I'm willing to listen.  I have
22 all day.
23    A.    I refreshed my memory on

Page 39

1 things relating to this issue.
2    Q.    Could you be a little more
3 specific?
4    A.    I think I -- Some of the
5 documents, some of the things that have
6 transpired over the time of my involvement
7 in bingo.
8    Q.    Excuse me, but I have to ask
9 you to be as specific as you can.  "Some of
10 the documents" doesn't help me much.
11       MR. ANDERSON:  I thought it
12 was a good answer, but . . .
13    A.    There's a lot of documents.
14    Q.    Jimmy Buffett's parrots?
15    A.    Some of the -- you know, the
16 documents.  All that stuff I've been dealing
17 with.
18    Q.    Did you review your prior
19 deposition?
20    A.    Yes, sir.
21    Q.    Do you have any notes of your
22 own that you have made since you assumed the
23 duties of writing and promulgating and

Page 40

1 publishing the rules and regulations?
2    A.    I'm sure I do, but since I've
3 been doing all of this, plus being the
4 sheriff, I have no idea where they might be,
5 but the notes and all of that.
6    Q.    Have you looked?
7    A.    For this?  Or for what?
8    Q.    Fair enough.
9    A.    I'm trying to --
10    Q.    I'll be more specific.
11    A.    -- get the nature of you.
12    Q.    Sheriff Warren, you understand
13 you've been sued in this case?
14    A.    Yes, sir.
15    Q.    I'm sure you take that very
16 seriously?
17    A.    Yes, sir.
18    Q.    Have you looked, at any point
19 since this lawsuit was filed, to see if you
20 can find any notes you may have made about
21 this bingo rules and regulations writing,
22 any meetings, conversations, phone calls
23 that you might have at your office or at

Page 41

1 home?
2    A.    I've considered -- I've
3 considered a lot of the things and
4 information since -- you know, but
5 nothing -- no more specific than any other.
6    Q.    I'm sorry, we're missing each
7 other.
8       I'm simply asking if you have
9 looked to find any notes you may have made,
10 jotted down at any point in time since
11 November 2003, about these rules and
12 regulations and how licensing was going to
13 be done for bingo in Macon County?
14    A.    At --
15    Q.    Have you looked?
16    A.    Have I looked at any of that
17 stuff?  What, preparing for this?
18    Q.    No, sir.  I'll take
19 responsibility for not being clear.
20       You told me that you almost
21 certainly have some notes; true?  That's
22 what I understood you to say.
23    A.    But I'm not a note kind of

11 (Pages 38 to 41)

FREEDOM COURT REPORTING

Page 42

1  guy.  You know, I --
2       Q.    Sheriff, if you will tell me
3  under oath today you never took a single
4  note, I will accept that.
5       A.    I'm not -- Oh, that's not my
6  testimony.
7       Q.    Well, that's what I want.
8       A.    As to where those notes would
9  be right now, sir, I have no idea.
10      Q.    Okay.  We're going to go one
11 step at a time.
12      A.    Yes, sir.
13      Q.    Have you ever helped somebody
14 old and sick upstairs?
15      A.    Yes, sir.
16      Q.    We're going to do that here.
17      A.    I probably will need it --
18      Q.    One step at a time.
19      A.    -- before it's over.
20      Q.    And I'm probably the one that
21 needs the help.  First question, has David
22 Warren most likely taken some notes since
23 November 2003, to remind himself about what

Page 43

1  he's done or what he's going to do on this
2  bingo licensing?
3       A.    I probably have.
4       Q.    Do you know where those notes
5  are?
6       A.    Now, that is another -- that
7  is --
8       Q.    That's another step.
9       A.    -- that's another story.  I
10 just -- When I -- Okay.  I may plan a drug
11 raid.  When I'm finished with that stuff, I
12 shred it.
13           I may -- If you saw my desk
14 now, it's like this (indicating).  Besides
15 all of this and promulgating and all of the
16 dealing with the rules and enforcing the
17 regulations of bingo and all of that stuff,
18 I'm the sheriff.  I'm sure I handed -- We
19 run a full-time sheriff's department.  And
20 when I tell you that I may have made some
21 notes, in all likelihood, I probably did.
22 But as to where those notes are now, sir,
23 I'm being as honest as I can be, I couldn't

Page 44

1  tell you where they are.
2       Q.    You don't know of a single
3  note, today, about what you did, from
4  November 2003 until now, on bingo licensing
5  rules and regulations?
6       A.    Sir, most of that stuff I
7  discussed with my attorney.  And, you know,
8  once I got what I wanted, and I saw what I
9  wanted was what I wanted, I was pretty much
10 done with that, you know.  And I'm just --
11 it is the way -- It's the way I do stuff.
12      Q.    Sheriff Warren, do you know
13 today, where we could find a single,
14 solitary note about bingo licensing rules
15 and regulations from you?
16      A.    Yes.  I've -- You know, as I
17 see it, I am -- that wouldn't be something I
18 would have been doing that much of.
19      Q.    Sir, I'm just trying to find
20 out if there are any, and if there are,
21 where are they?  That's all I'm trying to
22 find out.
23      A.    Sir, I just told you, I at

Page 45

1  this point in time, I wouldn't know.  I'm
2  pretty sure I've got them around in some of
3  that -- that mountain of papers and things
4  I've got, some things.
5           But let me say this:  If I go
6  to a class concerning a certain thing, I'll
7  take notes, and I'll hold on to them for a
8  while.  But there's so much paper generated
9  by what I do, I'm being honest with you, I
10 could not say to you -- I'm pretty sure
11 there are a lot of notes I've taken, I
12 just -- I don't know where they are now.
13      Q.    Have you looked?
14      A.    For what --
15      Q.    To see if you can find any of
16 them?
17      A.    When everything that we were
18 asked to produce, I did the best job that I
19 could to produce it.
20      Q.    Did you look for your notes,
21 yes or no?
22      A.    I just answered, I did.
23      Q.    I want you to tell me under

12 (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1  oath you looked.
2      A.    I looked everywhere that I
3  could to -- everything that was -- that we
4  were required to turn over, I turned over.
5      Q.    Thank you.  I just want to be
6  able to leave here today knowing that you
7  have sworn under oath that you looked for
8  these notes, but you just couldn't find
9  them, because we don't have any.  Is that
10 true?
11     A.    To the best of my ability,
12 sir, it's the truth.  To the best of my --
13 Let me say this:  To the best of my
14 recollection, that is true.  I'm just -- As
15 I said, my office generates a lot of
16 paperwork, and I just don't hold on to a lot
17 of stuff.
18         MR. ANDERSON:  Let me say for
19 the Record, that my appearance in the case
20 was after some production, and I haven't
21 seen any, but I don't know what may have
22 been produced.  So I think what -- You're
23 asking him if he looked, did he get

Page 47

1  everything to his lawyers?  I'm probably
2  interjecting, I'll let you have -- You're
3  doing a good job asking questions.
4      Q.    If I'm so inarticulate that
5  that's unclear, then I'm sorry, and you
6  deserve better from me.
7         And I'm going to be as simple
8  and as respectful as I can be, Sheriff, I
9  promise you.
10     A.    Yes, sir.
11     Q.    I just want to end this
12 section of the deposition so that I can
13 leave here knowing that Sheriff David Warren
14 is a man of his word, and he has said under
15 oath, I probably took some notes, I have
16 looked to find them, and I can't find any
17 notes on this bingo licensing.  Is that
18 true?
19     A.    As I said, sir, to the best of
20 my recollection, that is true.
21     Q.    All right.
22         MR. ANDERSON:  Let me -- We've
23 been about an hour, let me take a break.

Page 48

1         MR. HENINGER:  Fair enough.
2         VIDEOGRAPHER:  We're going off
3  the Record.
4         (Recess taken.)
5         VIDEOGRAPHER:  We're back on
6  the Record.
7      Q.    (BY MR. HENINGER):  Sheriff,
8  are you the rule-making authority for any
9  other licensing besides bingo?
10     A.    No, sir -- No, I'm not.
11 I'm -- I'm the -- I make rules for no other
12 agent -- for nothing else but bingo.
13     Q.    Have you been a rule maker for
14 any of the policies and procedures that your
15 deputies follow?
16     A.    Yes, sir, in that regard.
17 Yes, I am.  I do make rules and regulations
18 for the operation of the sheriff's office.
19     Q.    Did you make rules for
20 policies and procedures for your police
21 officers when you were the chief of police
22 for Tuskegee?
23     A.    Yes, I did.  I did make rules

Page 49

1  and regulations regarding police operations.
2      Q.    So you're familiar with the
3  situation where it's your obligation to make
4  rules and regulations?
5      A.    Yes, I am familiar with my
6  obligation to make rules and regulations.
7      Q.    When you're making rules and
8  regulations, it's important to make them so
9  that they are clear; true?  So people can
10 follow them?
11     A.    Yes, sir.  I understand that
12 it is important to make rules and
13 regulations that people can follow.
14     Q.    Is it important to make rules
15 and regulations that are effective in
16 accomplishing the purpose?
17     A.    Yes, sir.  It is important to
18 make rules and regulations that are
19 effective.
20     Q.    And that are based in sound
21 judgment and fairness?
22     A.    It is proper to make rules and
23 regulations that are based in fairness and

13 (Pages 46 to 49)

FREEDOM COURT REPORTING

Page 50

1  that are proper.
2      Q.    When the citizens of Macon
3  County approved Amendment 744 on November 4,
4  2003, did you know as of that day that you
5  were going to be the person who would be
6  developing and promulgating the rules and
7  regulations for bingo licensing?
8      A.    When the rules were passed, I
9  understood that I would be the person who
10  would be responsible for promulgating rules
11  governing bingo.
12      Q.    So as of that day, you knew it
13  was going to fall on your shoulders?
14      A.    As of that day, I knew that
15  the responsibility for promulgating rules
16  governing bingo would be my responsibility.
17      Q.    Did you feel in your own heart
18  and mind that you were incapable of
19  performing those responsibilities?
20      A.    Sir, I felt in my own heart
21  that I would be capable of obtaining rules
22  and regulations to govern bingo.
23      Q.    You felt that you would be

Page 51

1  able to seek appropriate advice and get
2  consultation to assist you in doing it; fair
3  statement?
4      A.    As I said about the task of
5  promulgating the rules and regulations, I
6  knew I could -- would need and could get
7  assistance.
8      Q.    And did you know from day one
9  that you would likely be going to Fred Gray,
10  Jr., for such assistance?
11      A.    Mr. -- From day one, I don't
12  think right away I considered that right
13  away.  But if I were going to use an
14  attorney, Mr. Gray had been my attorney for
15  years and that's who I would more than
16  likely -- Mr. Gray, Jr., had been my
17  attorney and that's who I would probably
18  seek.
19      Q.    Now, you testified in your
20  earlier deposition on page twenty-five that
21  the rules and regulations for bingo
22  licensing in Macon County were prepared,
23  quote, by my attorney, end quote?

Page 52

1      A.    May I see that?
2      Q.    Certainly.  If you will look
3  with me on page twenty-five, you were asked
4  a question on line four:  Now, Sheriff,
5  these rules were prepared by whom?  And you
6  answered, my attorney; true?
7      A.    Yes, sir.
8      Q.    Which is a true statement;
9  correct?
10      A.    Yes, sir.
11      Q.    And you were referring to Fred
12  Gray, Jr.; true?
13      A.    Fred Gray, Jr., was my
14  attorney, and he prepared these rules.
15      Q.    Did any other person have a
16  hand in preparing the rules and regulations
17  as they were published or promulgated in
18  December 2003, besides you and your
19  attorney, Fred Gray, Jr.?
20      A.    No.  To my knowledge, no one
21  else had any part in preparing these rules
22  other than me and my attorney, Fred Gray,
23  Jr..

Page 53

1      Q.    Sheriff Warren, when you say
2  "to your knowledge" that concerns me, and I
3  need to follow that up with this question.
4  Under the law, David Warren had the
5  obligation to be fair and just in his coming
6  up with the rules and regulations; true?
7      A.    Under the law -- I'm sorry,
8  repeat that again.
9      Q.    Fair enough.  The law gave the
10  responsibility and the burden and duty of
11  coming up with the rules and regulations on
12  Sheriff David Warren.
13      A.    The law -- The law gave -- The
14  law did give the responsibility for
15  promulgating rules to the sheriff, which is
16  me.
17      Q.    The law did not say an
18  attorney or any other person in the county
19  had that obligation or duty.  It only spoke
20  to you; true?
21      A.    The law put the responsibility
22  for coming up with the rules and regulations
23  governing bingo on the sheriff.

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 54

1    Q.    Then you perceived it to be
2  within your power to seek counsel or
3  consultation and advice on performing your
4  duties and obligations on these rules; true?
5    A.    I sought counsel in preparing
6  the rules governing the operation of bingo
7  in Macon County.
8    Q.    Did you perceive you had that
9  authority?
10   A.    I perceived that I had the
11 authority to get assistance in promulgating
12 these rules and regulations.
13   Q.    Now, you have testified that
14 Fred Gray, Jr., has represented you for many
15 years?
16   A.    Yes, sir.
17   Q.    Has Fred Gray, Sr.,
18 represented you at any time?
19   A.    My --
20        MR. GRAY, SR.:  You mean prior
21 to this litigation here?
22        MR. HENINGER:  Yes, sir.
23   A.    Sir, to the best of my

Page 55

1  recollection, my main -- right after --
2  Mr. Gray has been my attorney since, I
3  guess -- for a good number of years.
4        MR. ANDERSON:  Just to be
5  clear, you're talking about Fred Junior?
6        THE WITNESS:  Fred Junior,
7  yes.
8    Q.    I'm just seeking your best
9  recollection.
10   A.    Yes, sir.
11   Q.    Prior to this case, has Fred
12 Gray, Sr., ever represented you
13 professionally or personally?
14   A.    No, sir.
15   Q.    Done any work for you or your
16 family?
17   A.    No, sir.
18   Q.    Who have you considered your
19 lawyer for the past fifteen years?
20   A.    Fred Gray, Jr.
21   Q.    Has he done things for you
22 personally as a lawyer?
23   A.    To the best of my

Page 56

1  recollection, most of -- most of what
2  Mr. Gray and I dealt with were in a
3  professional sense.
4    Q.    I understand for the most
5  part.  My question was, has he ever
6  represented you or performed legal services
7  for you personally?
8    A.    I just can't recollect.
9    Q.    He hasn't done a will for you?
10   A.    Huh?
11   Q.    He hasn't done a will for you?
12   A.    He will -- Not yet.
13   Q.    Have you ever paid Fred Gray,
14 Jr., a penny for legal services out of your
15 own pocket?
16   A.    I don't recall.
17   Q.    You think you may have?
18   A.    I don't recall.  I don't
19 recall paying Mr. Gray any funds out of my
20 own pocket.  I just don't recall.
21   Q.    Have you ever paid any money
22 to any member of the Gray Law Firm for
23 anything?

Page 57

1        MR. ANDERSON:  In his capacity
2  as sheriff or chief?
3        MR. HENINGER:  If I was
4  unclear, I'm sorry.
5    Q.    Have you ever paid any money
6  out of your own pocket for any services to
7  any person in the Gray Law Firm?
8    A.    I have -- I have, to the best
9  of my recollection, not paid any money to
10 any members of the Gray Law Firm.
11   Q.    Have you ever paid any of your
12 own money to any lawyer for legal services?
13   A.    I need to be a little clear
14 with this, because my wife has an attorney
15 too.  And we may have in union -- Well, our
16 checks go in the same checking account.
17   Q.    Fair enough.
18   A.    So she had -- You know, we may
19 have done -- I'm pretty sure we've paid an
20 attorney for that.
21   Q.    When did you first approach
22 Fred Gray, Jr., about giving you legal
23 assistance in drafting the rules and

FREEDOM COURT REPORTING

Page 58

1  regulations for bingo licensing in Macon
2  County?
3      A.    I guess the first time I
4  contacted Mr. Gray -- Fred Gray, Jr.,
5  regarding the rules and regulations
6  governing bingo, was probably shortly after
7  the passage of the legislation.
8      Q.    Can you be any more specific?
9  The next day, within the first week?
10     A.    Shortly after.
11     Q.    What does that mean to you?
12     A.    Maybe a week or more, a
13  week --
14     Q.    Did you go to see him or call
15  him on the phone?
16     A.    I -- In all likelihood, our
17  first contact -- when -- In all likelihood,
18  when I first contacted Mr. Gray about the
19  rules regarding bingo, the first contact was
20  probably by phone.
21     Q.    Sheriff Warren, did you
22  initiate the contact or did Fred Gray, Jr.,
23  initiate the contact about his getting

Page 59

1  involved in helping with drafting these
2  rules?
3      A.    I'm sure that I initiated the
4  contact.  I initially contacted Mr. Gray
5  regarding the preparation of the rules
6  governing bingo.
7      Q.    Prior to that contact, he had
8  never volunteered or told you, if this comes
9  down and gets passed, I'll help you?
10     A.    Prior to this -- the passage
11  of this -- these rules -- Prior to the
12  passing of the -- of this legislation,
13  Mr. Gray had not said anything to me about
14  the bingo -- the preparation of the bingo
15  rules.
16     Q.    Nor had you said anything to
17  him?
18     A.    I had not said anything to
19  Mr. Gray prior to this legislation becoming
20  reality.  I had not said anything to
21  Mr. Gray.
22     Q.    Sheriff, I mean you no
23  disrespect, but I need to ask you this

Page 60

1  question.
2      A.    Yes, sir.
3      Q.    Is it necessary for you, in
4  response to my questions, that you repeat my
5  question?  And if it is, I understand, but I
6  want to find out.
7      A.    For me to be clear in my own
8  head -- Stutterers have a funny way of
9  processing information, and we have great
10  memories, but they are triggered by odd
11  things.
12     Q.    Are my questions clear to you
13  so far?
14     A.    Your questions are clear to me
15  so far.
16     Q.    You're not having difficulty
17  understanding what I'm asking?
18     A.    No, sir.
19     Q.    All right.  Who has paid Fred
20  Gray, Jr., any fees for his work in
21  collaborating with you to draft and publish
22  these rules and regulations and their
23  amendments?

Page 61

1      A.    The fees that were paid to
2  Mr. Gray for his collaboration in the -- and
3  the preparation of these rules were paid
4  through the Macon County Sheriff's Office.
5      Q.    Do you have a judgment about
6  how much those fees have been?
7          MR. DAVENPORT:  Object to the
8  form. .
9      A.    My -- To the best of my
10  recollection, sir, the fees paid to Mr. Gray
11  thus far --
12         MR. ANDERSON:  Are you just
13  asking about for the rules?
14         MR. HENINGER:  Yes.
15     A.    For the rules?
16     Q.    Yes.
17     A.    In preparing the rules?
18         MR. DAVENPORT:  Just a minute.
19  I'd like to put an objection on the Record.
20  I'd like to take a break and talk with
21  Mr. Anderson.
22         MR. ANDERSON:  Okay.
23         VIDEOGRAPHER:  This is the end

Page 62

1  of videotape number one.  We're off the
2  Record.
3        (Recess taken.)
4        VIDEOGRAPHER:  This is the
5  beginning of tape number two, we're back on
6  the Record.
7        MR. HENINGER:  Ron, is there
8  anything that you need to put on the Record?
9        MR. DAVENPORT:  No.
10    Q.    (BY MR. HENINGER):  We were
11  asking before the break about the fees.  And
12  I'll just mention for the Record, should
13  there be any concern, the 11th Circuit has
14  held the identity of a client and the
15  receipt of fees from a client are not
16  privileged.
17        So my question to you,
18  Sheriff, was whether you could recall the
19  amount of fees paid to Fred Gray, Jr., or
20  his law firm, from the sheriff's department
21  on any assistance they gave on the
22  collaboration and writing of the rules and
23  regulations of bingo?

Page 63

1    A.    Sir, as far as Mr. Gray's fees
2  for his services and the preparation of
3  bingo, I can't remember exactly what they
4  were at this point.
5    Q.    Are you certain as of today he
6  has been paid some money for the work he
7  performed in writing the rules and
8  regulations and amendments to the rules and
9  regulations?
10    A.    Yes, sir.  I'm -- I feel
11  pretty sure that Mr. Gray has been --
12  Mr. Gray, Jr., has been compensated for his
13  services in assisting with the rules and
14  regulations.
15    Q.    Was there an agreed-upon
16  hourly rate for his assistance that the two
17  of you agreed upon before he undertook any
18  efforts for you in this responsibility?
19    A.    I don't remember us discussing
20  a -- an agreed rate for his services in the
21  preparation of the rules and regulations.
22    Q.    Was -- You don't know if there
23  is an agreed-upon lump sum or set fee for

Page 64

1  any involvement he had in this matter?
2    A.    I don't --
3        MR. ANDERSON:  Again, just for
4  the drafting of the rules?
5        MR. HENINGER:  Yes.
6        MR. ANDERSON:  That he paid
7  out of county funds?
8    A.    I don't remember any
9  preagreed-upon amount for his services in
10  drafting the rules and regulations.
11    Q.    Are you confident that if
12  required to do so, you could come up with a
13  documentation that established the exact
14  amount that has been paid to Mr. Gray, Jr.,
15  for his services regarding the drafting of
16  the rules and regulations and the
17  amendments?
18    A.    I am -- I'm pretty sure that
19  we could come up with the amount he was
20  compensated for his services in drafting the
21  rules and regulations.
22    Q.    Were you required to go to the
23  county commission or any other person to get

Page 65

1  approval for your hiring of Mr. Gray, Jr.,
2  to assist you in the drafting of these rules
3  and regulations and the amendments?
4    A.    You know, if -- I don't -- I
5  remember submitting a letter at some point
6  informing the county commission that I would
7  use Mr. Gray for legal services.
8    Q.    Who was the county attorney in
9  November of 2003?
10    A.    I think the county attorney in
11  2003 -- the county of Macon's attorney was,
12  I think, Mr. Smith, Jock Smith.
13    Q.    Jock?
14    A.    If I'm --
15    Q.    Can you tell us why it was you
16  determined not to use the county attorney on
17  this county matter for drafting rules and
18  regulations for bingo gaming and instead
19  went to Mr. Gray, Jr.?
20    A.    Mr. Gray, Jr., had been my
21  attorney -- an attorney I'd used for
22  professional matters long prior to 2003, and
23  he was someone that I trusted; that I had

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1  had many professional encounters with.  And
2  I just trusted -- he was someone that I
3  trusted and that I knew would do what I
4  wanted.
5      Q.    You went to him because you
6  trusted him and you knew that he would do
7  what you wanted him to do?
8      A.    I knew that he would
9  promulgate -- he would assist me in
10 promulgating these rules and regulations.
11     Q.    Who was in charge in this
12 relationship between you and Mr. Gray, you
13 as the client or he as the attorney?
14     A.    Sir, I'm the sheriff, I'm in
15 charge.
16     Q.    Okay.  Were you aware of any
17 prior experience Mr. Gray, Jr., had in
18 drafting or promulgating rules for licensing
19 of any type?
20     A.    I was not aware of Mr. Gray's
21 experience in preparing any rules.  But I
22 knew Mr. Gray to be a very competent
23 attorney.

Page 67

1      Q.    Did you ask him whether he had
2  any specific experience in drafting rules
3  and regulations for any licensing?
4          MR. ANDERSON:  I don't want to
5  waive any attorney-client privilege on what
6  they had discussions about, so I'm going to
7  object and instruct him not to answer about
8  what he talked about in the legal matter.
9      Q.    Was it of any importance to
10 you that you get assistance in drafting the
11 rules and regulations and any amendments
12 thereto on the bingo licensing, that the
13 person giving you assistance have some
14 experience in that specific area?
15     A.    What was important to me, as I
16 set about to accomplish the task of coming
17 up with these rules and regulations, was
18 that I had an attorney that I trusted; that
19 I had confidence in and someone that I was
20 familiar with.
21     Q.    Let me make sure I understand
22 what you're saying.  You're telling us that
23 your paramount concern was that whoever you

Page 68

1  sought advice from would be someone you
2  trusted, were familiar with, and could rely
3  on, more so than specific experience in this
4  area?
5      A.    Those were -- As I went about
6  getting an attorney who would assist me in
7  coming up with these rules and regulations,
8  those were trust and those were elements.
9  They may not have -- I guess -- that may
10 have not -- they -- Those may not have been
11 the most important elements, but they were
12 elements.
13     Q.    Sheriff, what I want to know
14 is what were the most important elements to
15 you when you hired Fred Gray, Jr., to help
16 you draft these rules and regulations?
17     A.    The most important elements to
18 me as I set about the task of drawing up
19 these rules and regulations, as it relates
20 to an attorney, was somebody that I thought
21 to be competent and somebody that I could
22 trust.
23     Q.    And as far as you were

Page 69

1  concerned, Fred Gray, Jr., fit that bill?
2      A.    As far as I was concerned,
3  Mr. Gray, Jr., was competent and I trusted
4  him.
5      Q.    Now, we know that the rules
6  and regulations for bingo licensing in Macon
7  county were drafted by Fred Gray, Jr., for
8  your consideration and approval; true?
9      A.    The rules governing bingo were
10 drafted by Mr. Gray, and -- but they were
11 subject to my discretion and my approval.
12     Q.    Because it's your job and
13 responsibility to promulgate them; true?
14     A.    Sir, not only was it my duty
15 to promulgate these rules and regulations,
16 but these are my rules and regulations.
17     Q.    They were drafted by the
18 person you chose, Fred Gray, Jr.?
19     A.    They were drafted -- The rules
20 and regulations were drafted by Mr. Gray.
21 And they were subject to my discretion and
22 approval.
23     Q.    And the first and second

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 70

1 amendments to these rules were also drafted
2 by Fred Gray, Jr., subject to your approval?
3       A.    The first and second drafting
4 and the amendments were drafted by Mr. Gray,
5 subject to my approval.
6             (Whereupon, Plaintiff's
7             Exhibit No. 5 was marked
8             for identification.)
9       Q.    Just so the Record's complete,
10 I'm going to mark as Plaintiff's Exhibit 5,
11 the Rules and Regulations for the Licensing
12 and Operation of Bingo Games in Macon
13 County, Alabama.
14            Sheriff, if you will look,
15 first of all, at the last page and tell us
16 if that's your signature.
17       A.    Yes, sir.
18       Q.    These are the rules and
19 regulations that were drafted by Mr. Gray,
20 submitted to you, and approved by you to be
21 promulgated?
22       A.    Yes, sir.
23       Q.    Then Plaintiff's Exhibit --

Page 71

1 and I think those became effective on
2 December 5, 2003; correct?
3       A.    Yes.
4             (Whereupon, Plaintiff's
5             Exhibit No. 6 was marked
6             for identification.)
7       Q.    And Plaintiff's Exhibit 6, is
8 the First Amended and Restated Rules and
9 Regulations for the Licensing and Operation
10 of Bingo Games in Macon County, Alabama.
11            See if that also bears your
12 signature.
13            MR. ANDERSON:  On page twelve,
14 just for the Record, of Exhibit 6, which is
15 the sixth rule exhibit.
16       A.    Yes, sir.
17       Q.    That also contains the
18 commentary on the reason for these amended
19 rules; correct?
20       A.    Yes, sir.
21       Q.    Those amended and restated
22 rules and the commentary were also drafted
23 by Mr. Gray at your request and then

Page 72

1 approved by you?
2       A.    They -- They were drafted by
3 Mr. Gray as my reasoning and approved.
4             (Whereupon, Plaintiff's
5             Exhibit No. 7 was marked
6             for identification.)
7       Q.    Then Plaintiff's Exhibit 7
8 is the Second Amended and Restated Rules and
9 Regulations for the Licensing and Operation
10 of Bingo Games in Macon County, Alabama.
11            I'll ask you the same
12 question:  Are those amended and restated
13 rules and regulations drafted by Mr. Gray
14 and submitted to you for approval which you
15 approved and promulgated, along with the
16 commentary?
17       A.    Yes, sir.
18       Q.    Throughout your earlier
19 deposition, Sheriff, you used a term
20 "collaboration," where you said that the
21 rules and the amendments and commentaries to
22 bingo licensing in Macon County were a
23 collaboration between you and Mr. Gray?

Page 73

1       A.    Yes, sir.
2       Q.    What does that mean?
3       A.    Collaboration means with us
4 getting together to a -- a cooperative
5 effort.
6       Q.    Did you consider yourself a
7 team, you and Mr. Gray, in collaborating and
8 cooperating and coming up with a set of
9 rules that you would eventually approve?
10       A.    I considered Mr. Gray as my
11 attorney and who was acting at my direction
12 in promulgating these rules and regulations.
13       Q.    Okay.  So may we take it from
14 that, that you did not consider yourself
15 be a team?
16       A.    Team wouldn't be the word I'd
17 use.
18       Q.    I'm just trying to find out
19 what collaboration means.  Team is not the
20 phrase that you would use to describe the
21 efforts you and Mr. Gray were undertaking
22 together on these rules and regulations?
23       A.    What I would consider our

19 (Pages 70 to 73)

FREEDOM COURT REPORTING

Page 74

1 relationship to be in the formulation of
2 these rules and regulations was I was a
3 client and Mr. Gray was my attorney.
4        Q.    And with regard to that
5 relationship, did you consider that to be a
6 relationship of trust?
7        A.    I regarded that
8 client-attorney relationship to be a trust.
9        Q.    I'm sorry to be so simplistic,
10 but sometimes I think you and I miss each
11 other, and I want to make sure we don't.
12       A.    I know.  I'm getting old.
13       Q.    Have you ever heard the phrase
14 "circle of trust"?
15       A.    Yes, sir.
16       Q.    If we're considering the
17 drafting and promulgation of rules and
18 regulations for bingo licensing in Macon
19 County, the circle of trust that was
20 involved was you and Fred Gray, Jr.; true?
21       A.    Yes, sir.
22       Q.    Was anyone else in this circle
23 of trust?

Page 75

1        A.    Mr. Gray, Jr., was my
2 attorney, and I trusted him.
3        Q.    Was anyone else in this circle
4 of trust regarding the promulgation, the
5 drafting, the adoption of these rules and
6 regulations for bingo licensing in Macon
7 County, besides you and Fred Gray, Jr.?
8        A.    I'm stating Mr. Gray was my
9 attorney, and I guess we were the only ones
10 in this circle of trust, to --
11       MR. ANDERSON:  I guess rather
12 than just saying object to the form, could
13 you give him a definition of what you say
14 circle of trust is?
15       MR. HENINGER:  I'd be happy
16 to.
17            (Whereupon, Plaintiff's
18            Exhibit No. 8 was marked
19            for identification.)
20       Q.    I am discussing the circle of
21 trust of who was involved in drafting and
22 approving and promulgating these rules and
23 regulations for bingo licensing in Macon

Page 76

1 County.  And we have agreed, as I'm going to
2 do on this Plaintiff's Exhibit 8, that you
3 as the sheriff --
4        A.    Yes, sir.
5        Q.    -- and your consultant,
6 attorney Fred Gray, Jr., were in that circle
7 of trust?
8        A.    Yes, sir.
9        Q.    I'm going to show you this
10 exhibit, and I just want to ask you, is
11 there anyone else you would put in that
12 circle of trust for considering and drafting
13 and promulgating the rules and regulations
14 for bingo licensing in Macon County?
15       MR. GRAY, SR.:  The word
16 consultant is yours.  He didn't say that.
17 He said attorney-client.  You injected the
18 word consultant.
19       MR. HENINGER:  Fred, it's
20 because I'm taking the deposition.
21       MR. GRAY, SR.:  I understand.
22 I just want him to understand that you are
23 substituting words for what he said, and I

Page 77

1 want his answer to be responsive and keeping
2 that in mind.
3        MR. HENINGER:  Fair enough.
4        A.    Ask that again.
5        Q.    Fair enough.  Because I don't
6 want you to be confused on this.
7            Whether it was a consultant, a
8 lawyer, a king, a queen, or a rook, was
9 anyone else in your mind, as the approving
10 authority for these rules and regulations,
11 inside the circle of trust for drafting them
12 and approving them, besides you and Fred
13 Gray, Jr.?
14       A.    Not -- As far as I'm
15 concerned, there was only Mr. Fred Gray,
16 Jr., and myself.
17       Q.    All right.  And of course
18 you're the one that's in charge of the
19 situation.  You're the client?
20       A.    Yes, sir.
21       Q.    So, Exhibit 8 is complete and
22 doesn't need any additions?
23       A.    As far as I'm concerned, it

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 78

1  is.
2      Q.    Well, who else would matter,
3  Sheriff?
4      A.    Well --
5      Q.    Can you tell me anybody else
6  whose opinion would matter on this topic?
7  You're the boss, aren't you?
8      A.    Sir, I'm trying to answer your
9  question --
10     Q.    No, you aren't.
11     A.    -- as honestly and as
12  forthright as I can.
13     Q.    Okay.  We're doing okay.  Just
14  so we can understand each other, that's
15  what's important.
16     A.    Yes, sir.
17     Q.    Now, you testified at your
18  earlier deposition that about a week after
19  744 was approved by the citizens of Macon
20  County, you and Mr. Gray met with Milton
21  McGregor.  Do you remember that?
22     A.    Yes.
23     Q.    And you testified that you had

Page 79

1  a conversation with Milton McGregor in the
2  presence of Fred Gray, Jr., about a week
3  after the passage of the law where he
4  expressed an interest in conducting bingo in
5  Macon County?
6      A.    Yes, sir.
7      Q.    Where did this meeting take
8  place?
9      A.    If I may regress, Fred Gray,
10  Jr., and I met with Mr. McGregor.  And --
11  May I see my -- May I refer to --
12         MR. ANDERSON:  Do you remember
13  as you sit here -- I think the question is,
14  do you remember where the meeting took
15  place.
16     Q.    If you need some help, in your
17  earlier deposition it was page fifty-three,
18  where it starts.
19         It actually starts on
20  fifty-two where you say:  No, I had a
21  conversation with him in the presence of my
22  attorney.  Question:  When.  Answer:
23  Probably after a week after the passage.

Page 80

1          And then you go on to say:  It
2  may have been earlier.  I'm really not -- I
3  don't recollect.
4          Would it have been before 744
5  was passed -- Amendment 744 was passed and
6  you said no.
7          Does that sound about right in
8  your recollection?
9      A.    Yes.  Yes.  The answer to your
10  question that it was prior to -- whether or
11  not it was prior to November 4th, 2003?
12     Q.    (Nods head in the
13  affirmative.)
14     A.    No, it was --
15     Q.    After passage?
16     A.    -- after that.
17     Q.    And you then, you went on to
18  say that he, Mr. McGregor, expressed an
19  interest in conducting bingo, the electronic
20  form; correct?
21     A.    Yes.
22     Q.    And now my question was:
23  Where did this meeting take place?

Page 81

1      A.    To the best of my
2  recollection, it was in the office of
3  Mr. Gray.
4      Q.    Who set the meeting up?
5      A.    Mr. McGregor called me as I --
6  as I -- as I remember.
7      Q.    In advance or the day of the
8  meeting?
9          Here is what I'm trying to
10  figure out, did he say can you meet Tuesday
11  or can you come over right now?
12     A.    No.  It was -- To the best of
13  my recollection, it may have been a day or
14  three after the call.
15     Q.    All right.  So as I
16  understand, your recollection is after
17  Amendment 744 was passed, you got a call
18  from Milton McGregor where he asked you
19  about attending a meeting a few days after
20  that with your attorney and himself?
21     A.    No.  I called Mr. Gray to be
22  there at that meeting.
23     Q.    Okay.

21 (Pages 78 to 81)

FREEDOM COURT REPORTING

Page 82

1    A.    If memory serves me correct.
2    Q.    So when Mr. McGregor called
3 you asking for a meeting, he did not ask
4 that it be done in the presence of Mr. Gray,
5 Jr.?
6    A.    No.
7    Q.    Did you tell him, well, I'm
8 going to have to talk to Mr. Gray, Jr.?
9    A.    Wait a minute.  Wait a minute.
10 To the best of my recollection, he asked --
11 he wanted to meet with me.  I wanted, in
12 dealing with that meeting, I believe it was
13 me who contacted Mr. Gray.  I'm pretty sure
14 it was me.
15    Q.    Tell me everything you can
16 recall Milton McGregor saying to you in that
17 phone call asking for a meeting after the
18 bill was passed?
19    A.    That's basically it.
20    Q.    Sheriff, will you meet with me
21 to talk about bingo, is that all he said?
22    A.    To the best of my
23 recollection, the conversation with

Page 83

1 Mr. McGregor went -- It was short over the
2 phone, as I remember.  But there was
3 expressed a desire to meet with me for a
4 discussion.
5    Q.    But you knew it was about
6 electronic bingo, didn't you?  Or did you
7 think it was about opening up Starbucks?
8    A.    I didn't know, sir.  When
9 Mr. McGregor called me, I did not fully know
10 what the meeting would be about, but and
11 that's.
12    Q.    Well, you've used a curious
13 term: You did not fully know.  What I'm
14 trying to find out, Sheriff, is when you're
15 on the phone with him and this bingo gaming
16 law has just passed, and Milton McGregor
17 calls you wanting a meeting, did you
18 understand that it had something to do with
19 electronic bingo licensing?
20    A.    I thought the meeting -- his
21 meeting with me was for the purpose of a
22 discussion regarding gaming.
23    Q.    Did you tell him:  I'll be

Page 84

1 happy to meet with you, but I want someone
2 else present; or let me think about it?
3 What'd you say?
4    A.    As the sheriff in dealing with
5 matters of this type, I've worked -- I've
6 learned from experience to involve your
7 attorney.
8    Q.    I'm not talking about
9 generalities.  I'm sorry, it's my fault
10 again.
11        I'm being specific to this
12 phone call.  To the best of your
13 recollection, when Milton McGregor called
14 you about meeting on this electronic bingo
15 gaming, did you tell him:  I'll be happy to
16 meet with you; no, I have to think about it;
17 let me talk to somebody?  What was your
18 response as you hung up the phone?
19    A.    I don't recall him saying
20 anything at that point about any particular
21 type of gaming.  He simply expressed a
22 desire to meet with me for a discussion.
23 And I don't like meeting with people in

Page 85

1 instances like that without my attorney.
2    Q.    Was this phone call recorded?
3    A.    No.
4    Q.    Do you think you likely took
5 any notes or put anything on your calendar
6 on your desk about that?
7    A.    I may have jotted it down on
8 a -- one of those little pads.
9    Q.    Like a desk pad --
10    A.    Like a little desk pad.
11    Q.    -- that would have the months
12 and the dates on it?
13    A.    Something like that
14 (indicating).  It may have had --
15    Q.    I call them sticky pads, I
16 don't know what you call them.
17    A.    It may have had some
18 information pertaining to meeting.
19    Q.    Did you get this phone call at
20 home or at the office?
21    A.    At the office.
22    Q.    Okay.  Now, when you hung up
23 with Mr. McGregor, had you set an

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 86

1    appointment or did you tell him you'd have
2    to get back with him after you spoke with
3    your attorney?
4         A.    I don't remember.
5         Q.    Okay.  Did you call Fred Gray,
6    Jr., immediately after that?
7         A.    Probably not immediately
8    after.
9         Q.    When you called him, did you
10   set up a meeting with McGregor, eventually?
11        A.    Yes.
12        Q.    And where did the meeting take
13   place?
14        A.    To the best of my knowledge,
15   at the office of Fred Gray, Jr.
16        Q.    At the Gray Law Firm?
17        A.    Yes.
18        Q.    Who was present?
19             MR. ANDERSON:  Take your hand
20   out of your mouth, so she can hear you.
21        A.    I know me; Fred, Fred Gray,
22   Jr.; Milton McGregor; and he may have
23   brought somebody.

Page 87

1         Q.    I want to make sure your
2    answer's clear for the Record.  You said me,
3    Fred, and Fred Gray, Jr.  Did you mean only
4    Fred Gray, Jr.?
5         A.    I mean only Fred Gray, Jr.
6         Q.    Mr. Gray was not present?
7         A.    Mr. Gray was not present.
8         Q.    And then Mr. McGregor may have
9    had somebody with him?
10        A.    He may have had somebody with
11   him.
12        Q.    In what part of the office was
13   this meeting held?  In Fred, Jr.'s, office
14   or in a conference room or where?
15        A.    To the best of my
16   recollection, it was in a conference room.
17        Q.    Did you take notes during the
18   meeting?
19        A.    I don't remember taking any.
20        Q.    Did you explain to
21   Mr. McGregor in that meeting that Fred Gray,
22   Jr., was your lawyer for giving advice on
23   the drafting of the rules and regulations

Page 88

1    that would be published?
2         A.    I don't remember that being a
3    part of our conversation.
4         Q.    You don't remember identifying
5    for Mr. McGregor why it was you wanted this
6    meeting to be held in the presence of Fred
7    Gray, Jr.?
8         A.    I thought it prudent that it
9    would be held at the -- at a place that we
10   would be able to talk.
11        Q.    I understand your thinking of
12   the prudence.  I want to know how you
13   explained to Mr. McGregor why you were at
14   the Gray Law Firm in the presence of Fred
15   Gray, Jr., to have this meeting?
16        A.    I don't --
17             MR. ANDERSON:  Object to the
18   form.
19        A.    I don't think -- I do not
20   think I supplied an explanation -- an
21   explanation to Mr. McGregor why we were
22   there.
23        Q.    You understand that since

Page 89

1    Mr. McGregor was with you and Mr. Gray, Jr.,
2    and one of Mr. McGregor's associates,
3    there's no attorney-client privilege?  You
4    know that?
5             MR. ANDERSON:  I haven't
6    instructed him not to answer.
7         Q.    I'm just trying to find out
8    your understanding.  You've been in law
9    enforcement a long time.
10        A.    Yes.
11        Q.    You've dealt with a lot of
12   lawyers, haven't you?
13        A.    Yes.
14        Q.    Probably more than you would
15   like to?
16        A.    Yes.
17        Q.    But in a meeting where you're
18   with your lawyer who's going to be drafting
19   these rules, and Milton McGregor and
20   associate, did you understand that that was
21   a privileged meeting?
22        A.    I don't think I thought about
23   that -- I just --

23 (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 90

1    Q.    Fair enough.  How long did the
2  meeting last?
3    A.    Not very long.
4    Q.    Were you billed for it, so
5  that we can find out on the bill how long it
6  lasted, according to the bill?
7    A.    Was I billed?
8    Q.    By Mr. Gray.  Did a bill for
9  an hourly rate get submitted for that
10  meeting so we would know how much time was
11  spent on that meeting?
12    A.    Was I -- I am not sure of
13  whether I was billed or not.
14    Q.    Okay.  Who did most of the
15  talking at the meeting?
16    A.    I think Mr. McGregor spoke.
17  There was an exchange of conversation.  He
18  expressed an interest in what he was
19  interested in.
20    Q.    I want to get as detailed as I
21  can, Sheriff.  And if you cannot recall, if
22  your memory is blurry or fuzzy in any way,
23  just tell me, okay?

Page 91

1    A.    Yes.
2    Q.    Did Mr. McGregor say as you
3  were seated there in a conference room, I
4  want you to know I have an interest in
5  electronic bingo gaming in Macon County?  Is
6  that what he said?
7    A.    Mr. McGregor expressed an
8  interest in the gaming, that was the gist of
9  his conversation.
10    Q.    How did he say it?
11    A.    It was -- I can't exactly
12  remember his exact words, but those are --
13  that was what I gathered from the
14  conversation.
15    Q.    And were you surprised at that
16  expression of an interest in a license for
17  bingo?
18    A.    No.  No, I was -- I was not
19  surprised at that, the expression of an
20  interest in -- at the discussion in gaming.
21    Q.    When he expressed his
22  interest, you were aware that you were the
23  authority that would have to approve and

Page 92

1  promulgate the rules for licensing?
2    A.    Yes, I was.  I was aware of
3  that -- of my responsibilities as the person
4  who would be promulgating the rules.
5    Q.    Did you make Mr. McGregor
6  aware of that?
7    A.    I believe that was general
8  knowledge.  I did not -- I don't remember
9  making that -- making an announcement of
10  that at that meeting, but it was understood.
11        As I said, I believe it was
12  general knowledge from the way the bill was
13  structured.
14    Q.    At what point were you as of
15  that moment, in the drafting and getting
16  prepared for the rules and regulations for
17  licensing?
18    A.    I had not done anything as it
19  relates to the rules and regulations at that
20  point.
21    Q.    At that point when you met
22  with Mr. McGregor and Mr. Gray, Jr.,
23  Mr. Gray, Jr., had not even been hired yet

Page 93

1  to draft them?
2    A.    I had not -- I had -- We may
3  have had a discussion on that, I'm not sure.
4  We may have had a discussion on what I
5  required.
6    Q.    You're just not sure?
7    A.    I'm not -- That was --
8    Q.    Then why did you want this
9  meeting with Milton McGregor to take place
10  at Fred Gray, Jr.'s, office with him
11  present?
12    A.    You know, in hindsight, I
13  pretty much have always consulted Fred when
14  anything in my office happens.  If I'm
15  having a personnel problem or if I'm dealing
16  with something, I knew that this would be a
17  situation that you would want an attorney
18  present.
19    Q.    Again, I'm going to be very
20  transparent with you, Sheriff.
21    A.    Yes, sir.
22    Q.    Here we are about a week after
23  passage of 744, bingo gaming, which is going

24 (Pages 90 to 93)

FREEDOM COURT REPORTING

Page 94

1  to be a pretty big deal in Macon County,
2  true?
3        I know you said you didn't
4  think it was going to be as big, but you
5  know it would be big.
6        A.    I had no idea.  You know, I
7  had no idea what this was going to be.
8  Believe you me.  I may have run for the
9  county line had I known.
10       Q.    Do you wish you had?
11       A.    In hindsight.  Well, you know,
12  I'm the sheriff of Macon County, and I have
13  to deal with what it's at.
14       Q.    You're willing to stand up?
15       A.    You have to do what you got to
16  do.
17       Q.    I understand.  But here is my
18  point --
19       A.    Yes, sir.
20       Q.    -- a week after 744 is passed,
21  you get a phone call from Milton McGregor
22  who wants to meet and talk to you about this
23  situation.  You set up a meeting at Fred

Page 95

1  Gray, Jr.'s, office, and you go in and
2  McGregor talks to you about his interest in
3  getting a license for electronic bingo.
4  True, so far?
5        A.    Again --
6        Q.    True, so far?
7        A.    Sir, if I may, Mr. McGregor
8  expressed an interest in gaming.  I --
9  I'm -- I don't quite remember the exact
10  words that he used, but, you know, I'm sure
11  that his -- he expressed an interest.  I
12  can't be so specific as to speak the words
13  that he said.  I know he was interested in
14  this -- in participating in this gaming
15  stuff.
16       Q.    And you've told us that it's
17  been your practice when you meet with
18  someone like that on a matter like this, you
19  want to consult with your attorney, Fred
20  Gray, Jr., true or untrue?
21       A.    In most matters that I would
22  think that an attorney is needed, I would
23  call Mr. Gray.

Page 96

1        Q.    Why did you need an attorney
2  to meet with you and Milton McGregor when he
3  wanted this meeting to express his interest
4  about bingo licensing?
5        A.    I thought it through.
6        Q.    You're a big boy, you could
7  have done it on your own, couldn't you?
8        A.    Yeah.  But big boys -- big
9  boys who are operating in new space and new
10  territory, I had, you know --
11       Q.    Well, you met with Paul Bracy
12  from Lucky Palace several times, didn't you?
13       A.    Yes, sir, I met with
14  Mr. Bracy.
15       Q.    How many times do you recall
16  meeting with Mr. Bracy about electronic
17  bingo licensing?
18       A.    Numerous.
19       Q.    More than three?
20       A.    Probably.
21       Q.    More than five?
22       A.    Numerous times.
23       Q.    At any single meeting with

Page 97

1  Mr. Bracy, was Fred Gray, Jr., present?
2        A.    Mr. Bracy did not have --
3  Mr. Bracy was meeting with me on --
4  Mr. Bracy did not have -- The meetings with
5  Mr. Bracy, I arranged more as a courtesy to
6  listen to what Mr. Bracy was saying.
7        Q.    Sheriff, I'll ask you again:
8  At any meeting with Mr. Paul Bracy and his
9  representatives for Lucky Palace, did you
10  ever have Fred Gray, Jr., present?
11       A.    No, I don't remember having
12  Mr. Gray present at those meetings.
13       MR. ANDERSON:  Is this a good
14  time to stop for lunch?
15       MR. HENINGER:  I'm almost
16  finished.
17       Q.    You know he was not, don't
18  you?
19       MR. ANDERSON:  Know that Fred,
20  Jr., was not?
21       A.    Oh, Fred was not.  No.
22       Q.    At any meeting?
23       A.    He was not present.

25 (Pages 94 to 97)

FREEDOM COURT REPORTING

Page 98

1    Q.    At any meeting with any
2  applicant for a license for being an
3  operator for electronic bingo in Macon
4  County, other than Milton McGregor, have you
5  ever had Fred Gray, Jr., present?
6        MR. TEPLEY:  Object to the
7  form of the question.
8        MR. ANDERSON:  Same objection.
9    A.    I don't recall having an
10  attorney present.
11    Q.    You don't recall Fred Gray,
12  Jr., being present at any meeting with any
13  proposed or potential applicant other than
14  Milton McGregor or Victoryland?
15        MR. TEPLEY:  Same objection.
16    A.    I do not recall having Fred
17  Gray, Jr., present.
18        MR. HENINGER:  All right.  I
19  think -- I know we've got some people that
20  do have to eat, so we'll take a break.  How
21  much time do y'all want?
22        VIDEOGRAPHER:  Off the Record.
23        (Recess was taken.)

Page 99

1        VIDEOGRAPHER:  We're back on
2  the Record; the time is 1:12 p.m.
3    Q.    (BY MR. HENINGER):  Sheriff,
4  we know that on December 5, 2003, you issued
5  the rules and regulations which are
6  Plaintiff's Exhibit 7.
7    A.    Yes, sir.
8    Q.    And do you recall that by
9  December the 12th -- excuse me, by December
10  the 8th you had received application from
11  the first charity to get the license?
12    A.    Uh-huh.
13    Q.    And that charity --
14        MR. ANDERSON:  You have to
15  speak up.
16    A.    Yes, I did.
17    Q.    And that charity was the
18  Tuskegee Human and Civil Rights
19  Multicultural Center; correct?
20    A.    I don't think that was our
21  first charity.
22    Q.    Who was the first charity?
23    A.    It was -- The first charity, I

Page 100

1  believe, was the YMCA.
2    Q.    Was the first charity to
3  receive approval?
4    A.    To the best of my
5  recollection, it was.
6    Q.    Do you have a recollection as
7  to the date you received that first
8  application from a first charity?
9    A.    No, sir, I do not.  I don't
10  know when exactly I received that first
11  application.
12        (Whereupon, Plaintiff's
13        Exhibit No. 9 was marked
14        for identification.)
15    Q.    Perhaps we can reconstruct
16  that when we go through the documents.
17        For the time being let me show
18  you what I'm marking as Plaintiff's Exhibit
19  9, which is an application for bingo license
20  produced by you and your attorneys in this
21  case on December the 8th, 2003, from the
22  Tuskegee Human and Civil Rights
23  Multicultural Center.

Page 101

1        Do you recall that group
2  asking for a license for electronic bingo?
3    A.    I remember them applying for a
4  license.
5    Q.    Now, that is just three days
6  after the rules were published; correct?
7    A.    Yes, this is dated three days
8  after the rules were published.
9    Q.    And the records indicate that
10  the license was granted to that applicant on
11  December the 17th, 2003.  Do you understand
12  that?
13    A.    December 17th, 2003, a license
14  was granted to this -- to the -- that
15  charity.
16    Q.    Were you familiar with the
17  Tuskegee Human and Civil Rights
18  Multicultural Center before they applied for
19  this bingo license?
20    A.    Yes.
21    Q.    Did you know before they
22  applied for this business license that Debra
23  Gray was the executive director?

26 (Pages 98 to 101)

FREEDOM COURT REPORTING

Page 102

1      A.    I didn't exactly know who the
2  deputy director was.  I was familiar with
3  the organization.
4      Q.    Were you aware that Debra Gray
5  was Fred Gray's daughter?
6      A.    Yes.
7      Q.    Fred Gray, Jr.?
8      A.    I was aware that Debra was the
9  daughter of Mr. Gray, Sr.
10     Q.    And the sister of Fred Gray,
11 Jr.?
12     A.    Yes.
13     Q.    And it mentions here on the
14 personal data sheet that Fred D. Gray is the
15 president of this charity?
16     A.    Yes.
17     Q.    Debra Gray is the executive
18 director?
19     A.    I understand Mr. Gray to be
20 the president and Ms. Debra Gray to be
21 the --
22          MR. HENINGER:  For
23 clarification before I keep going, is it

Page 103

1  anyone's understanding at this table that
2  this interrogation is limited to seven
3  hours.
4          MR. GRAY, JR.:  Yes.
5          MR. HENINGER:  Is there any
6  objection from anyone at this table to
7  extending it because of the obvious
8  difficulty we're having with repetition of
9  every question and the answer?
10          MR. ANDERSON:  Yeah.  I don't
11 want to keep him here more than seven hours.
12          MR. HENINGER:  I don't want to
13 either.  I mean, it may be another time.
14 But I need to know if y'all are going to say
15 that this is just like any other deposition,
16 because I think a playing and viewing of it
17 will demonstrate that as the sheriff has
18 discussed, he needs to repeat these, and
19 it's extending the length of time.  And I
20 want to know what kind of battle I'm going
21 to have with y'all on that.
22          MR. ANDERSON:  Let's see where
23 we get today.

Page 104

1          MR. HENINGER:  Okay.
2          MR. TEPLEY:  Steve, for the
3  Record, since you haven't given us copies of
4  the exhibits, if there's Bates numbers on
5  them, can you just read them into the
6  Record?
7          MR. HENINGER:  I will.
8          MR. TEPLEY:  So I can
9  re-create them.
10          MR. HENINGER:  Plaintiff's 9
11 is Bates Warren D0330 through 338.
12     Q.    You understood that this
13 application by that charity that had Debra
14 Gray and Fred Gray involved in it indicated
15 that they would be working with Milton E.
16 McGregor and Walter M. Russell from
17 Victoryland as operators?
18     A.    Yes, that was understood.
19     Q.    When was the license granted
20 to Victoryland to be an operator?
21     A.    I would have to see something
22 to refresh my memory on that.
23     Q.    Victoryland did receive a

Page 105

1  license for operating electronic bingo in
2  Macon County through the charities; correct?
3      A.    Yes, sir.  Victoryland did
4  receive a license to operate.
5      Q.    Has any other license for an
6  operator been issued?
7      A.    Not at -- At this time, none
8  has been issued to any other.
9      Q.    Have any applications been
10 filed by any perspective operators other
11 than Victoryland?
12     A.    There have been -- Other
13 entities have applied to operate bingo in
14 Macon County.
15     Q.    Have each of those applicants
16 been denied such a license?
17     A.    Neither of those applicants
18 that have applied have met full requirements
19 for issuance of a license at this time.
20     Q.    My question must have been
21 unclear.  I'll repeat it for you.
22          Has any other applicant,
23 besides Victoryland, for an electronic bingo

27 (Pages 102 to 105)

FREEDOM COURT REPORTING

Page 106

1  license, been approved in Macon County?
2      A.    No other license has been
3  approved for the operation of bingo at this
4  time.
5      Q.    Has every other applicant for
6  an electronic bingo operator's license in
7  Macon County been denied?
8          MR. ANDERSON:  I'm going to
9  object to form about -- in other words, mean
10  denied.
11          MR. HENINGER:  Denied a
12  license.
13          MR. ANDERSON:  But has there
14  been anybody else that's met the -- I'm
15  sorry.
16          MR. HENINGER:  That's a great
17  question.
18      Q.    If an applicant meets the
19  rules and regulations of Macon County for
20  electronic bingo licensing and operation, do
21  you have the discretion to deny it?  If they
22  meet all the rules and regulations, do you
23  have the discretion to deny such a license?

Page 107

1      A.    If an entity meets all the
2  requirements of the rules and regulations,
3  theoretically -- Well, I do have the option
4  of denying.
5      Q.    For any reason or no reason?
6      A.    Any applicant that fully meets
7  the requirements of the rules and
8  regulations regarding bingo and Macon
9  County, they -- they will be -- they will be
10  approved.
11      Q.    As a matter of course, if they
12  meet the rules and regulations?
13      A.    Any -- Anyone who meets the
14  requirements of the rules and regulations,
15  that's the way it's been.
16      Q.    Well, I mean, I need to know
17  what your frame of mind is as the approving
18  authority.
19      A.    Yes, sir.
20      Q.    You are the approving
21  authority for such licensing; correct?
22      A.    I am.
23      Q.    And your authority is

Page 108

1  nonreviewable except under the rules and
2  regulations; true?
3          MR. TEPLEY:  Object to the
4  form.
5      A.    Would you ask me that again,
6  please.
7      Q.    Under the rules and
8  regulations that you adopted and approved
9  and promulgated, is your decision whether or
10  not to grant a license reviewable?
11      A.    Under the rules and
12  regulations as they're stated, my -- my
13  decision to grant a license, I think is
14  reviewable.
15      Q.    What about to deny?
16      A.    To deny?
17      Q.    Is it reviewable?
18      A.    My rules and regulations, if
19  they are denied, that entity has not met the
20  requirements of the rules and regulations.
21      Q.    What is your understanding
22  under the rules and regulations that you, as
23  the sheriff, adopted and promulgated for

Page 109

1  electronic bingo licensing, what is your
2  understanding as to whether your decision to
3  deny an applicant for a license is
4  reviewable?
5      A.    Under the rules, under the --
6  under the rules and regulations of bingo, my
7  decision to deny an applicant can be
8  reviewed.
9      Q.    By whom?
10      A.    The county commission, as I
11  understand.
12      Q.    That's your understanding?
13      A.    Yes.
14      Q.    Now, when an application is
15  made for an electronic bingo license, it
16  goes to you as the sheriff of Macon County?
17      A.    Yes, sir.
18      Q.    Correct?
19          There are three potential
20  results forthcoming from that application.
21  One potential result is approval and
22  issuance of a license; true?
23      A.    Yes.

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1    Q.    Another potential result is
2  denial of the application; true?
3    A.    That is one of the potential
4  results.
5    Q.    Another would be no action,
6  you just don't respond; true?
7    A.    That is -- The first two are
8  more -- The first two reasons that you
9  stated are more in line with what my actions
10  are.
11    Q.    As the sheriff of Macon
12  County, do you take pride in your office?
13    A.    As the sheriff of Macon
14  County, do I take pride in my office?
15    Q.    Do you think that when a
16  citizen comes to you with a question, you
17  have an obligation to at least address it?
18    A.    When a citizen comes to me
19  with a question, I try to address it.
20    Q.    When an applicant for a
21  license comes to you with an application, do
22  you have an obligation to respond to it in
23  some manner?

Page 111

1    A.    When an applicant comes to me
2  with an application, I have a duty to
3  respond in some manner.
4    Q.    Lucky Palace made application
5  for an electronic bingo operator's license
6  in Macon County; true?
7    A.    Lucky Palace did make an
8  application for gaming and bingo in Macon
9  County.
10    Q.    You were the approving
11  authority on that application; correct?
12    A.    I was the approving authority
13  on that application.
14    Q.    Was it approved?
15    A.    No, it was not.
16    Q.    Was it denied?
17    A.    Lucky Palace did not meet the
18  requirements set forth in the rules and
19  regulations governing bingo.
20    Q.    Sheriff, I'll ask you again:
21  Was the application of Lucky Palace for an
22  electronic bingo gaming license in Macon
23  County denied?

Page 112

1    A.    No.  Not at this point.
2    Q.    It has never been denied?
3    A.    Not at -- No, sir.
4    Q.    Has it ever been acted upon?
5    A.    I acted upon what Mr. Bracy
6  gave me when he applied.
7    Q.    Did you make a response?
8    A.    I responded to Mr. Bracy
9  numerous times.
10    Q.    And what is the reason Lucky
11  Palace does not have a license as they
12  applied for bingo gaming operations in Macon
13  County?
14    A.    A license being approved in
15  Macon County is based on completing --
16  having a building to conduct these games in.
17    Q.    Keep in mind my question is,
18  what is the reason or reasons why Lucky
19  Palace has no electronic bingo gaming
20  license as they applied for in Macon County.
21    A.    Mr. Bracy does not have a
22  qualified location.
23    Q.    No qualified location?

Page 113

1    A.    Yes, sir.
2    Q.    Any other reasons?
3    A.    At this time, there aren't any
4  reasons -- there aren't any other reasons.
5    Q.    Well, Sheriff, at this time,
6  under the Second Amended Rules, there can
7  only be one operator in Macon County; true?
8       MR. ANDERSON:  Object to the
9  form.
10    A.    At this time, there is one
11  operator in Macon County because they met
12  the rules and regulations set forth at that
13  time.
14    Q.    And there are sixty charities
15  associated with Victoryland?
16    A.    And there are sixty charities
17  associated with Victoryland.
18    Q.    So under the Second Amended
19  Rules and Regulations, or Plaintiff's
20  Exhibit 7, no one can be approved as an
21  operator for another location for electronic
22  bingo in Macon County; true?
23    A.    That, theoretically, is not

FREEDOM COURT REPORTING

Page 114

1 true.
2      Q.     Well, let's talk practical
3 first, and then I'll get with you on
4 theoretical.
5           Because you have earlier
6 testified in your earlier deposition, at
7 this point in time, a charity could not get
8 a license under any set of circumstances; is
9 that true?
10          MR. ANDERSON:  Object to the
11 form.
12     Q.     Page two sixty-four, if you
13 need to see it.
14          MR. ANDERSON:  You are
15 asking -- Can you ask him the question?
16     Q.     Yes.  This is your deposition
17 that was given in the Reach One Teach One of
18 America Inc. versus David Warren, and the
19 deposition was taken on August 15, 2006.
20     A.     And as you said -- as you
21 noted, my answer was at that particular
22 point in time.
23     Q.     As we sit here today, how many

Page 115

1 licenses are outstanding and in effect for
2 charities?
3     A.     There are sixty licensed
4 charities involved in -- licensed for
5 participation in --
6     Q.     Class B?
7     A.     -- bingo at this time.
8     Q.     Class B bingo?
9     A.     Class B bingo.
10    Q.     Electronic bingo?
11    A.     Electronic bingo.
12    Q.     As long as there are sixty,
13 you have no power under your rules and
14 regulations that you're promulgated to issue
15 any more to a charity?
16          MR. ANDERSON:  Object to the
17 form.
18    Q.     As they stand; true?
19    A.     That -- As they stand, that is
20 not entirely true.
21    Q.     So you're telling me that your
22 rules, as amended the second time in
23 Plaintiff's Exhibit 7, do not state, that at

Page 116

1 no time can there be sixty-one licenses
2 outstanding to charities?
3          MR. ANDERSON:  Object to the
4 form.
5          MR. TEPLEY:  Join.
6          MR. ANDERSON:  You can answer.
7     A.     What I am saying is at this
8 point in time that is the case.
9     Q.     Were y'all fixing to change
10 those rules again maybe?
11    A.     That could be a possibility in
12 the future.
13    Q.     Are you thinking about it,
14 right now?
15    A.     I'm always open to
16 possibilities.
17    Q.     Who are you listening to about
18 that possibility?
19    A.     Let me answer this -- that
20 question like this:  We are a small, rural
21 sheriff's office.  And at this point in
22 time, this is what the rules are as they
23 relate to bingo, and those are the rules

Page 117

1 that I made, and those are -- that's the
2 reality of it at this time.
3     Q.     So please answer my question,
4 if you can.
5     A.     Yes, sir.
6     Q.     As we sit here today, under
7 any conceivable set of circumstances, can a
8 charity get a license to operate Class B
9 electronic bingo gaming in Macon County over
10 and above what's already in existence at
11 Victoryland?
12    A.     And, sir, I'm answering your
13 question like this:  At this particular
14 point in time, they cannot get a license.
15    Q.     Under any set of circumstances
16 under the current status of the rules?
17    A.     Under the rules at this time,
18 they cannot get a license to operate.
19    Q.     Nor can any operator come in,
20 no matter if they built a five hundred
21 million dollar facility, the most beautiful
22 facility in the world, got all the insurance
23 you wanted, all the security, all the

FREEDOM COURT REPORTING

Page 118

1   parking, employed forty-five thousand
2   people, under the current status of the
3   rules, that operator cannot get a license,
4   can he?
5           MR. ANDERSON:  Object to the
6   form.
7       A.   Sir, at this point in time,
8   that operator would not be able to get a
9   license.
10      Q.   At this point in time, and it
11  has been the case since December 2003,
12  Victoryland is the only possible operator of
13  Class B bingo gaming in Macon County?
14          MR. TEPLEY:  Object to the
15  form.
16          MR. ANDERSON:  Object to the
17  form.
18      Q.   Under the current rules and as
19  they have been amended previously?
20          MR. ANDERSON:  Object to the
21  form.
22          MR. BOLTON:  Same objection.
23      Q.   True?

Page 119

1       A.   That is not entirely true.
2       Q.   I'm willing to listen to you,
3   Sheriff Warren, to explain to us how under
4   the rules an applicant for an operator's
5   license could get such a license when
6   Victoryland already has all sixty charities
7   allowed to be issued?  How can it happen?
8       A.   Well, you said in -- since
9   2003 that was the case.  And that was not
10  the case from 2003 up to this point.  Any --
11  There was a seven-month period when there
12  was nothing done.  When -- You know, when
13  anybody who wanted to get into this could
14  have gotten a license.
15      Q.   As of the time the Second
16  Amended Rules were put into effect, the only
17  location that could qualify for Class B
18  electronic bingo gaming was Victoryland,
19  wasn't it?
20          MR. ANDERSON:  Object to the
21  form.
22          MR. TEPLEY:  Join in.
23          MR. BOLTON:  Same objection.

Page 120

1       A.   You know, to answer your
2   questions, Victoryland was already there.
3   They had met all of the requirements, and
4   that's how they got licensed.
5       Q.   Sheriff Warren, will you be
6   patient with me, and I'll be patient with
7   you?
8       A.   Yes, sir.
9       Q.   As of the time you adopted,
10  published, and promulgated the second
11  amended and restated rules and regulations
12  in Plaintiff's Exhibit 7, no other operating
13  location could get a license for Class B
14  electronic bingo gaming in Macon County
15  except Victoryland under these rules so long
16  as they kept the sixty charities; true?
17          MR. ANDERSON:  Object to the
18  form.
19          MR. BOLTON:  Object to the
20  form.
21          MR. TEPLEY:  Join.
22      A.   Under those rules, Victoryland
23  from the outset met all the rules -- all the

Page 121

1   -- met all the requirements of the rules and
2   regulations, and they were licensed.
3       Q.   I think we're playing a
4   game --
5           MR. ANDERSON:  I think the
6   whole country objection would be you're
7   asking him to assume facts that are not in
8   evidence, Steve.
9           MR. HENINGER:  Exhibit 7 is in
10  there.
11          MR. ANDERSON:  Right.  And the
12  facts that you're asking him to assume at
13  the time that these were adopted, I don't
14  think is correct on the premise.  But that
15  will come out.
16      Q.   Okay.  As of the time you
17  issued the Second Amended Rules and
18  Regulations, which are Plaintiff's Exhibit
19  7, Victoryland had an operator's license;
20  true?
21      A.   At that time, I first amended
22  the rules.
23      Q.   Second amendment.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 122

1    MR. ANDERSON:  January 6th,
2  2005.
3    A.    Yes.  They did.  Yes,
4  Victoryland had a license.
5    Q.    They were the only operator
6  licensed for a location for electronic bingo
7  in Macon County; true?
8    A.    Yes, sir, at that time.
9    Q.    And once they had the sixty
10  charities attached to them, which they have,
11  true?
12    A.    Yes.
13    Q.    Isn't that true?
14    A.    Yes, sir.
15    MR. ANDERSON:  You're asking
16  now?
17    Q.    Once they had those sixty
18  charities attached to them, under those
19  rules and regulations you published in
20  Plaintiff's Exhibit 7, so long as those
21  sixty charities are viable and licensed and
22  attached to Victoryland, there can be no
23  other location for electronic bingo in Macon

Page 123

1  County, can there?
2    A.    At this particular point in
3  time, there can be no other with bingo --
4  With Victoryland having sixty charities at
5  this point in time, there can be -- under
6  those circumstances there can be no other
7  entity licensed at this point in time.
8    Q.    So to close this area of
9  questioning, unless and until you amend the
10  rules a third time, currently under those
11  rules and under the current situation in
12  Macon County, no other location can be
13  approved for electronic bingo but
14  Victoryland; true?
15    A.    That is true at this
16  particular point in time, sir.
17    MR. HENINGER:  He's got to
18  change the tape.
19    VIDEOGRAPHER:  We are off the
20  Record; the time is 1:42 p.m.  This is the
21  end of tape number two.
22    (Recess taken.)
23    VIDEOGRAPHER:  We are back on

Page 124

1  the Record at 1:50 p.m.  This is the
2  beginning of tape number three.
3    Q.    (BY MR. HENINGER):  Has there
4  ever been a written response from you to
5  Lucky Palace indicating whether they were
6  approved, denied, or just not reached in
7  their application for a Class B electronic
8  bingo operator's license?
9    MR. BOLTON:  Object to form.
10    A.    There were not -- There may
11  not have been a written response, but there
12  was plenty verbal responses for my
13  justifications.
14    (Whereupon, Plaintiff's
15    Exhibit No. 10 was marked
16    for identification.)
17    Q.    Let me show you what I'm
18  marking as Plaintiff's Exhibit 10, which is
19  Bates stamped LUC 00083.
20    MR. TEPLEY:  That's
21  Plaintiff's 10?
22    MR. HENINGER:  Yes.
23    MR. GRAY, SR.:  What's the

Page 125

1  Bates stamp on it?
2    MR. HENINGER:  LUC 00083.
3    Q.    You see on that letter where
4  there is some handwriting on the envelope?
5    MR. ANDERSON:  On the top?
6    MR. HENINGER:  Yes.
7    A.    Yes.
8    Q.    Is that your handwriting?
9    A.    No.  It's -- No, that's not my
10  handwriting.
11    Q.    Tell us whose handwriting that
12  is.
13    A.    Judging from the initials
14  here, that looks like -- this looks to be
15  the handwriting of Ms. Mary Davis, who works
16  in my office.
17    Q.    And what is her position in
18  your office?
19    A.    She is my administrative
20  assistant.  And they do process bingo
21  applications.
22    Q.    So when she penned that note
23  on the envelope and returned it to Lucky

FREEDOM COURT REPORTING

Page 126

1  Palace, was she doing it with your
2  authority?
3      A.    To adequately answer your
4  question and to answer it in a way that made
5  some sense, you would have to understand --
6  I would have to articulate how that came
7  into my office and the circumstances of that
8  coming into my office.
9      Q.    Well, you have a lawyer that
10  may wish to go into that with you, but I
11  simply have the question whether on
12  Plaintiff's Exhibit 10, when Mary Davis
13  wrote on the envelope that was sending
14  material to you return, quote, not approved,
15  building not completed, building must
16  qualify, initialed M.D.  And that's what it
17  says, doesn't it?  Is that what it says,
18  Sheriff?
19      A.    Yes, sir, that's what it says.
20      Q.    Thank you, sir.
21          When she wrote that and sent
22  that back to Lucky Palace, was she doing so
23  with the full authority and permission of

Page 127

1  her employer, Sheriff David Warren?
2      A.    She was acting in her capacity
3  as it relates to her role in the processing
4  of bingo applications.
5      Q.    So I'll ask you again:  When
6  she wrote on the envelope and returned it to
7  Lucky Palace, in Plaintiff's Exhibit 10, not
8  approved, building not completed, building
9  must qualify, did she write that message to
10  Lucky Palace and return that envelope to
11  them with your authority or did she do it on
12  her own without authority?
13      A.    I think -- I'll answer
14  your question like this:  In the context of
15  her actions at that particular point in
16  time, she was acting under the authority of
17  my office.
18      Q.    Did she exceed her authority
19  or do something she was not permitted to do?
20      A.    Under the circumstances
21  present at that particular time, I believe
22  she was acting appropriately.
23      Q.    Did you know she did this?

Page 128

1      A.    Yes, sir.
2      Q.    Okay.  And you approved it?
3  Sir?
4      A.    She was acting under the
5  authority of my office when she did it.
6      Q.    Is that the way your office
7  responds to people, by writing on the
8  outside of an envelope in hand that you're
9  not approved for a license?
10      A.    Sir, again, you would have to
11  understand how that came to my office and
12  the circumstances that it came to my -- the
13  way it came to my office.
14      Q.    As we sit here today,
15  Victoryland has a total and singular
16  monopoly on electronic bingo in Macon
17  County, Alabama; correct?
18          MR. BOLTON:  Object to the
19  form.
20          MR. ANDERSON:  Object to the
21  form.
22          MR. TEPLEY:  Join.
23      A.    I would not say that they have

Page 129

1  a -- Victoryland has been issued a license
2  to conduct bingo games in Macon County.  At
3  this point in time, they are the sole entity
4  doing -- conducting bingo in Macon County at
5  this time.
6      Q.    And under the current status
7  of the rules as shown in Plaintiff's Exhibit
8  7, Victoryland will continue in that
9  singular and total monopoly as long as the
10  rules are not amended or it doesn't lose any
11  of those sixty charities; true?
12          MR. ANDERSON:  Object to the
13  form.
14      A.    Bingo -- Victoryland has been
15  issued a license -- Victoryland met all the
16  rules and requirements relating to the
17  conduct of bingo in Macon County, and they
18  have a license -- they are the only entity
19  to do so at this point in time.
20      Q.    Sheriff, do you know what the
21  word monopoly means?
22      A.    Yes.
23      Q.    And I'm not referring to the

33 (Pages 126 to 129)

FREEDOM COURT REPORTING

Page 130

1  Parker Brothers game -- or Milton Bradley?
2      A.    Yes, I understand what you're
3  talking --
4      Q.    You understand monopoly means
5  one with authority to act?  You understand
6  that?
7      A.    Yes, sir.
8      Q.    To operate a Class B
9  electronic bingo facility in Macon County,
10  Alabama, you must have a license; true?
11      A.    Yes, sir.
12      Q.    If you do it without a
13  license, you will be held accountable under
14  the law; true?
15      A.    Yes, sir.
16      Q.    Sheriff will come get you,
17  won't he?
18      A.    Yes.  You will be -- You will
19  be in conflict with the rules and
20  regulations.
21      Q.    So as the sheriff of Macon
22  County and the approving authority and the
23  rule-granting and making authority, if the

Page 131

1  rules stay as they are in Exhibit 7, and
2  Victoryland doesn't lose any of its sixty
3  charities, Victoryland has a monopoly on
4  Class B bingo; true?
5          MR. ANDERSON:  Object to the
6  form.
7          MR. BOLTON:  Same objection.
8      A.    Sir, I hear what you're
9  saying.  But at this point in time, I am the
10  regulator of bingo in Macon County.  And
11  Victoryland has met all the rules and
12  requirements set forth by me at this
13  particular point in time, and they are
14  conducting bingo in Macon County.  You know,
15  there is a tomorrow.
16      Q.    Maybe the sun will come up.
17  Do you think the sun might come up for Lucky
18  Palace tomorrow?
19      A.    I won't speculate on that.
20      Q.    It's not speculation when it's
21  being asked of you.  You're the only one
22  that can determine that, aren't you?
23      A.    I'm --

Page 132

1      Q.    Sir, are you the only one that
2  can determine that?
3      A.    Yes, sir.  I'm the only -- I'm
4  the sole person that can determine that.
5  But I am not going make a statement like
6  that regarding Lucky Palace.
7      Q.    Should Lucky Palace remain
8  hopeful that some day they will get a chance
9  in Macon County to have a Class B operator's
10  license?
11      A.    You know, sir, I will answer
12  that like this.  This is -- As this industry
13  goes, this is fairly young in this.  I could
14  not speculate as to what will happen in the
15  future with this.  I could not rule out any
16  possibility in this situation at this point
17  in time.  I won't rule out any
18  possibilities.
19      Q.    You mentioned earlier that
20  Lucky Palace did not have an existing
21  facility; is that true?
22      A.    Yes, I did.
23      Q.    All right.  Do you know what

Page 133

1  the term Catch 22 means?
2      A.    I believe so.
3      Q.    Under the Initial Rules and
4  the First Amended Rules, an applicant for an
5  operator's license really had a Catch 22 in
6  that the applicant had to invest five
7  million and then fifteen million dollars in
8  capital improvement existing on the ground
9  to have you inspect it and approve it before
10  they could get a license; true?
11      A.    Yes, sir.
12      Q.    That was your intent when you
13  drafted the rules?
14      A.    Yes, sir.  It was my intent
15  that a building be present to inspect before
16  a license was issued.
17      Q.    And, of course, you also knew
18  from your common sense and your many years
19  of existing on the earth and the experience
20  you had as a police officer and a man, you
21  also knew that no reasonable investor would
22  put in five million dollars or fifteen
23  million dollars without knowing they were

34 (Pages 130 to 133)

FREEDOM COURT REPORTING

Page 134

1 going to be able to get a license, didn't
2 you?
3         MR. TEPLEY:  Object to form.
4         MR. ANDERSON:  Object to form.
5     A.    You know, at some point in
6 this thing, this -- I guess my point is
7 every store I've seen open, before they got
8 a license, there was a store there for
9 somebody to inspect; every -- every
10 restaurant that I know of had to have a
11 building to inspect before they were
12 licensed.  And I don't -- Something of this
13 magnitude, I don't think that expecting
14 someone to have a building there before they
15 get a license is asking too much.
16     Q.    Well, you said in your earlier
17 deposition on page 262, that you personally
18 sure wouldn't invest that kind of money
19 without being assured you were going to get
20 a license.
21         MR. TEPLEY:  Object to the
22 form of the question.
23     Q.    Do you remember that?

Page 135

1         MR. GRAY, JR.:  What page?
2         MR. HENINGER:  262.
3     A.    Let me see in the context of
4 how that statement was made.
5         MR. BOLTON:  Is that after he
6 says probably not?
7         MR. HENINGER:  John, is that
8 an objection?
9         MR. BOLTON:  It's just a
10 clarification.
11         MR. ANDERSON:  Bolton's been
12 doing that the whole deposition.  I don't
13 know if you've noticed.
14         MR. HENINGER:  I've noticed.
15         If y'all need a microphone in
16 his helmet to talk with him, that will be
17 okay.  If that happens, can we all stay
18 within the rules?
19         MR. BOLTON:  Yes, sir.
20     A.    In the way that question was
21 asked to me, and me being the sheriff, that
22 was my personal answer.  But --
23     Q.    Let's make sure the Record's

Page 136

1 accurate.  You were asked -- Let me ask you
2 this, Sheriff:  Just as a person, not as a
3 sheriff, would you put up a building for
4 fifteen million dollars and hope that the
5 sheriff will grant you a license, just as a
6 person, and your answer was probably not;
7 correct?
8     A.    That was my -- The response to
9 that answer was a personal response.
10     Q.    I can read.
11     A.    Yes, sir.
12     Q.    Have I read it correctly?
13     A.    Yes, sir.
14     Q.    Thank you.  So let's revisit
15 where we were earlier this morning.  In your
16 intent and design to be fair, use common
17 sense in this new area of electronic bingo
18 licensing, what in your reasoning dictated
19 that there must be a five million dollar
20 building in existence before an application
21 for an operator's license can be granted,
22 when you knew that the only such facility
23 was Victoryland --

Page 137

1         MR. ANDERSON:  I'm going to
2 object to the form.
3     Q.    -- when the rules were
4 initially promulgated on December 5, 2003?
5     A.    You know, sir, as I was -- As
6 I was thinking about that figure, this was
7 something so new to me that -- and my
8 attorney and I had discussion about that.
9 As a matter of fact, we disagreed --
10         MR. ANDERSON:  Don't tell him
11 what -- You can say you've had discussions,
12 but don't get into exactly what.
13     Q.    Before you leave that, and I
14 promise I'm going to come right back to
15 this, you understand that when your attorney
16 makes an objection to attorney-client
17 privilege, you understand what he's doing?
18     A.    Yes, I do.
19     Q.    You understand that the
20 privilege is yours and not your attorney's?
21     A.    Yes.
22     Q.    And is it your express
23 intention to use and invoke your

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 138

1  attorney-client privilege?
2      A.   Not at this time.
3          MR. ANDERSON:  Did you
4  understand his question?
5          THE WITNESS:  Yes.  To invoke
6  attorney-client, yes.
7      Q.   Okay.  But you want to use the
8  attorney-client privilege to block us from
9  legally asking any questions about that?
10      A.   Yes.
11          MR. ANDERSON:  I'm going to
12  object to block.
13      Q.   That's fair enough.  I just
14  want to know --
15          MR. TEPLEY:  I object to the
16  question.
17      Q.   -- what your position is.
18          Now, we were talking about
19  what was going through your mind when you
20  adopted the rules drafted by Fred Gray, Jr.,
21  to say that you had to have a five million
22  dollar building in place before getting an
23  application for an operator's license done,

Page 139

1  when you knew that Victoryland was the only
2  place that met that standard?
3          MR. TEPLEY:  Object to the
4  form of the question.
5          MR. ANDERSON:  Same objection.
6  You can answer.
7      A.   Sir, to answer your question,
8  when I wrote that, I wasn't even thinking
9  about Victoryland.  I was thinking about an
10  amount that would be because -- if I may, I
11  know people who are doing this wouldn't even
12  be interested in Macon County if this wasn't
13  here.
14          In my inexperienced way, I was
15  trying to make sure that whoever did this,
16  there was a substantial investment in the
17  county and that they were serious about
18  doing it.  That was my reasoning for doing
19  it.
20      Q.   And you believed in your heart
21  that anyone that was serious about wanting
22  to help Macon County would come in and spend
23  at least five million dollars on a building

Page 140

1  before they ever filed an application for a
2  license or had any hope of getting a
3  license?  You believed that would happen?
4      A.   That wasn't what I said, sir.
5      Q.   Did you believe that would
6  happen?
7      A.   You asked me when -- what was
8  my reasoning behind making that decision,
9  and I tried to articulate that as best I
10  could.
11      Q.   It's a new question, Sheriff.
12  I'm sorry.
13          Did you believe, when you
14  approved this draft from Fred Gray, Jr.,
15  that a company or an entity or a person
16  would come in and put a five million dollar
17  building up before they even had the right
18  to apply for such a license and then hope
19  you would grant it?  Did you believe that
20  would happen?
21      A.   That was not my thinking when
22  I did that.  I wasn't -- If there was no
23  building there, if there was no Victoryland,

Page 141

1  if there was no -- If there was no other
2  entity there, I was just trying to get some
3  rules and regulations that I thought would
4  benefit Macon County, sir.  That's all I was
5  doing.
6      Q.   Why didn't you make
7  Victoryland build a new building?
8      A.   Because the building that was
9  there met all of the requirements.
10      Q.   Well, the building was there
11  before your requirements, wasn't it?
12      A.   Of any public building, of any
13  public -- Anything that's going to serve the
14  public.
15      Q.   So before I leave this area,
16  it was your specific intention when you
17  approved the drafted rules and regulations
18  from Fred Gray, which were put in effect on
19  December 5, 2003, that no one could receive
20  approval for a license under any
21  circumstances for a Class B operator's
22  license, unless the location was physically
23  finished and in place on the ground in Macon

36 (Pages 138 to 141)

FREEDOM COURT REPORTING

Page 142

1  County?
2          MR. ANDERSON:  You mean Fred
3  Gray, Jr.
4          MR. HENINGER:  I'm sorry, what
5  did I say?
6          MR. ANDERSON:  You said Fred
7  Gray, Sr.
8          MR. HENINGER:  I'm sorry.
9          MR. ANDERSON:  You didn't say
10  Senior, you just said Fred Gray.  I don't
11  have any objection to the question.
12      Q.    Let me start over so there's
13  no confusion.
14          I want to make sure that your
15  testimony is that it was your specific
16  intention, as of the time you approved the
17  drafted rules and regulations from Fred
18  Gray, Jr., that went into effect on December
19  5, 2003, that no applicant under any
20  circumstances could receive a license to be
21  an operator of Class B electronic bingo
22  gaming in Macon County, unless they had in
23  existence a fully completed building at a

Page 143

1  value of over five million dollars -- not
2  value, cost, actual cost, yes or no?
3      A.    I can't answer that.
4          MR. ANDERSON:  I'm going to
5  object to the form of that.
6      A.    The purpose of me promulgating
7  the rules were to govern bingo.  I did not
8  have the slightest inkling that there would
9  be other people.  I had no -- At the
10  particular point in time at the first
11  writing of this thing, I had no idea that
12  bingo was going to be what it became.  I had
13  no earthly idea.
14          MR. ANDERSON:  Sheriff, I'm
15  just going to tell you, he asked you a
16  question, think about the question he asked
17  you.  I'm sorry to interrupt.
18      A.    And then I was just trying --
19      Q.    I'll restate it if you wish me
20  to.
21          MR. ANDERSON:  Listen to what
22  he says.
23      Q.    Will you do your best to

Page 144

1  answer my question?
2      A.    Yes, sir.
3      Q.    Thank you.
4          Was it your specific intention
5  when you approved the drafted rules and
6  regulations from Fred Gray, Jr., on December
7  5, 2003, Class B bingo licensing in Macon
8  County, that no one, under any
9  circumstances, could get an operator's
10  license for a location unless they had in
11  place a fully completed building?
12      A.    That was my intention.  My
13  intention was to provide rules that would
14  govern bingo.  And in my opinion, before I
15  approved a qualified location, there would
16  have to be a building there for me to
17  approve.
18      Q.    So if there had been no
19  facility like Victoryland in existence --
20      A.    Yes, sir.
21      Q.    -- and 744 passed, and you
22  were to enact rules and regulations, you
23  would have insisted that any applicant for

Page 145

1  such a license, including Victoryland, have
2  a building fully finished and in place
3  before you would give them a license?
4      A.    Yes, sir.
5      Q.    Because -- I'm correct, aren't
6  I, that Victoryland's building was in
7  existence before your rules and regulations?
8      A.    Yes, sir.
9      Q.    Your rules and regulations
10  were drafted and approved with Victoryland
11  already meeting the requirements; true?
12      A.    I didn't --
13      Q.    Otherwise they got a license
14  they weren't entitled to.
15      A.    Sir --
16      Q.    So make sure you hear my
17  question.  Your rules and regulations, as
18  drafted, fit Victoryland so that they met
19  the rules and regulations from the moment
20  they were approved by you; true?
21          MR. TEPLEY:  Object to the
22  form.
23          MR. BOLTON:  Object to the

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 146

1 form.
2     A.    That was not my intention when
3 I wrote the rules and regulations governing
4 bingo in Macon County.
5     Q.    But was it a fact that once
6 you adopted the rules and regulations
7 drafted by Fred Gray, Jr., Victoryland fit
8 those exact rules and regulations as of the
9 time they were adopted?
10     A.    Victoryland met the
11 requirements set forth in the rules and
12 regulations.
13     Q.    At the moment the rules and
14 regulations went into effect?
15     A.    Yes.
16     Q.    No one else did, did they?
17     A.    Victoryland met all of the
18 requirements set forth in the rules and
19 regulations, period.
20     Q.    Did anyone else, any other
21 entity or person, meet all the requirements
22 as a fact of these rules and regulations on
23 December 5, 2003?

Page 147

1     A.    On December 5, 2003,
2 Victoryland was the only qualified location
3 in Macon County.
4     Q.    On June 2nd, 2004, when you
5 issued your First Amended Rules, Victoryland
6 was the only location that could meet those
7 amended rules; true?
8     A.    Victoryland met the rules --
9 the requirements of the rules and
10 regulations set forth.  And at that time,
11 they were -- they was the only qualified
12 location in Macon County.
13     Q.    On January 6th, 2005, when you
14 issued your Second Amended Rules and
15 Regulations, Victoryland met those at the
16 time they were issued; true?
17     A.    Victoryland met all of the
18 requirements set forth in the rules and
19 regulations.  And at that point in time,
20 they were the one operating bingo games
21 in Macon County.
22     Q.    The only one who could, since
23 they're the only one that had a license;

Page 148

1 right?
2     A.    They met all the rules and
3 regulations set forth for a qualified
4 location.
5     Q.    Sheriff Warren, is it your
6 desire that Victoryland maintain a monopoly
7 on Class B electronic bingo in Macon County?
8         MR. ANDERSON:  Object to the
9 form.
10         MR. TEPLEY:  Join.
11         MR. BOLTON:  Same.
12     A.    No, sir.  That is personally
13 not a desire of mine.
14     Q.    Is it your desire as sheriff,
15 or your thinking as sheriff, that the only
16 way your department can monitor and carry
17 out its duties and responsibilities on
18 gaming, is to make sure that Victoryland
19 remains the only location for electronic
20 bingo?
21     A.    Ask that again.
22     Q.    Is it your desire or plan to
23 assure that Victoryland stays the only

Page 149

1 location for electronic bingo gaming in
2 Macon County, so that it doesn't require
3 more man hours or more men from your
4 department to monitor it?
5     A.    While Victoryland -- While my
6 regular duties as sheriff in Macon County
7 and this additional duty present quite a
8 challenge to me, I have no desire that
9 Victoryland -- or no desire or plans that
10 Victoryland be the only qualified location
11 in Macon County.
12     Q.    You have stated earlier that
13 you believe that you have an obligation to
14 make sure as many viable, valid, real
15 charities as possible profit financially
16 from electronic bingo in Macon County; true?
17         MR. ANDERSON:  Object to the
18 form.
19     A.    I have stated -- I have stated
20 my justifications in the commentaries, and
21 they stand for what I meant when I made
22 these amendments.
23     Q.    I'm not sure what you just

38 (Pages 146 to 149)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 150

1  said. I'm sorry. But I know my question
2  was: Haven't you taken the position that
3  you have a responsibility to the citizens of
4  Macon County to make sure as many viable,
5  valid, useful charities as possible profit
6  from this electronic bingo?
7       A.    It is -- It was my intent that
8  the charities benefit so that their --
9  their -- so that their positive effect in
10  the community be at a maximum.
11      Q.    Why have you limited it to
12  sixty?
13      A.    Because my reasoning for that
14  is expressed in the commentary, and I think
15  that will really bring home what I was
16  trying -- what I was attempting to do, what
17  my intentions were.
18      Q.    You mentioned in your earlier
19  deposition, if you need to see it, it's at
20  page 122, that one of the reasons you
21  changed the capital requirement on land,
22  building, et cetera from five million
23  dollars to fifteen million dollars in the

Page 151

1  First Amended Rules was to keep, quote,
2  fly-by-nighters from coming in, end quote?
3       A.    Yes, sir.
4       Q.    Do you see that?
5       A.    That was -- The
6  fly-by-nighters was a concern of mine.
7       Q.    And you mentioned you didn't
8  want trailers existing in Macon County where
9  they're doing electronic bingo?
10      A.    Yes, sir.
11      Q.    You're aware that after you
12  granted a license to Victoryland for Class B
13  bingo gaming operations, that they added to
14  their machines and were operating out of
15  trailers?
16          MR. ANDERSON: Object to the
17  form.
18      Q.    Sheriff Warren?
19      A.    I believe those were modular
20  structures.
21      Q.    Not trailers?
22      A.    No, sir.
23      Q.    Do you see a difference

Page 152

1  between a modular structure and a trailer?
2       A.    A trailer is supposed to be
3  somewhat mobile and have the ability to be
4  moved from place to place.
5       Q.    You did approve Victoryland
6  adding on to their electronic bingo
7  machines, didn't you? Or did they do that
8  without your approval?
9          MR. BOLTON: Object to the
10  form.
11      A.    My rules and regulations speak
12  to the regulation and the operation of bingo
13  gaming in Macon County. However, as long as
14  it meets all state and local requirements,
15  state and federal requirements, that a
16  private business chooses to enhance their
17  business, as long as it is lawful, I take no
18  issue with it.
19      Q.    Are you finished?
20      A.    Yes.
21      Q.    Have you ever imposed a limit
22  on Victoryland for the number of electronic
23  bingo gaming machines they can have at that

Page 153

1  location?
2       A.    I have never imposed a limit
3  on Victoryland for the number of machines
4  they have.
5       Q.    If Mr. McGregor and the owners
6  and operators of Victoryland decide to add
7  twenty thousand machines tomorrow, they
8  would not be violating any rule or
9  regulation from your office, true?
10      A.    Sir, if what they did met
11  state, federal requirements at this point in
12  time, all of the laws governing public
13  facilities, and I think they are mentioned
14  in the qualified location, I would not have
15  an objection to it.
16      Q.    Well, you don't have a right,
17  under the rules and regulations, to object,
18  do you?
19      A.    Sir, these -- these rules, as
20  any rules in a relatively new thing,
21  especially in this instance, it will be a
22  work in progress, will be constantly
23  evolving -- as the need presents itself. I

39 (Pages 150 to 153)

FREEDOM COURT REPORTING

Page 154

1  can't tell you what tomorrow will be like in
2  this. The only thing I can do is try to
3  accommodate the rules to make -- to deal
4  with whatever future issues may arise.
5      Q.    Thank you.
6          Sheriff Warren, under the
7  rules, as they currently stand, as approved
8  by you, shown in Exhibit 7, if Victoryland
9  decides to add twenty thousand electronic
10  bingo game machines tonight, you have no
11  authority to prevent that, do you?
12      A.    As the rules and regulations
13  are now -- Wait a minute. Let me say this:
14  As the sheriff of Macon County and a person
15  that deals with -- charged with the
16  regulation of this -- of this law of this --
17  of this industry in Macon County, I can make
18  whatever rules I deem necessary to deal with
19  any situation that comes up. And neither
20  Mr. Milton McGregor or anybody else could do
21  anything about it.
22      Q.    Even if you have ill motives,
23  you can do anything you want, is that what

Page 155

1  you believe?
2      A.    Sir, that was not my
3  statement.
4      Q.    Is that what you believe?
5      A.    I don't believe that.
6      Q.    That you have the power to
7  change the rules however you see fit, even
8  if it is to help one person and cause injury
9  to another?
10          MR. ANDERSON: Object to the
11  form.
12          MR. TEPLEY: Object to the
13  form.
14          MR. BOLTON: Object to the
15  form.
16      A.    If I thought the rules and
17  regulations -- or there was some activity
18  that was going on was not in the best
19  interest of Macon County, I would change it
20  in a heart beat.
21      Q.    But you would have to change
22  the rules to do so, wouldn't you? Sir?
23      A.    I would have to change the

Page 156

1  rules to accomplish that.
2      Q.    So my question to you was:
3  Under the rules as they currently stand at
4  this moment, at 2:40 p.m. on March 19, 2008,
5  with Plaintiff's Exhibit 7 unchanged,
6  Victoryland can add twenty thousand
7  electronic bingo gaming machines at that
8  location if they choose; true?
9      A.    That is a hypothetical. And
10  right now, you may be able to say that was
11  true. But if that action were to be in
12  conflict with what I interpret as the best
13  interest of Macon County, I would act on
14  behalf of the citizens of Macon County.
15      Q.    That's who you always have to
16  act on behalf of, isn't it? They are your
17  employer?
18      A.    Yes, sir. They are.
19      Q.    But you understand you're a
20  state officer? You understand that?
21      A.    I'm a state -- Yes, sir, I do
22  understand that I'm a constitutional officer
23  of the state.

Page 157

1      Q.    Sheriff Warren, were you aware
2  that during the drafting of the rules and
3  regulations by Fred Gray, Jr., that he was
4  consulting with representatives for
5  Victoryland?
6          MR. ANDERSON: Object to the
7  form.
8      A.    I am not aware of who Mr. Gray
9  referenced. I charged Mr. Gray with helping
10  me develop rules and regulations for bingo.
11  What Mr. Gray came up with, we discussed. I
12  used my discretion. I approved what I
13  wanted to approve and the rules that are
14  adopted are the rules that were adopted by
15  the Macon County sheriff.
16      Q.    Are you finished?
17      A.    Yes, sir.
18      Q.    Sheriff Warren, were you aware
19  that during the drafting of the rules and
20  regulations for your approval by Fred Gray,
21  Jr., that he was consulting with
22  representatives of Victoryland?
23          MR. TEPLEY: Object to the

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 158

1    form of the question.
2            MR. ANDERSON:  Object to the
3    form.  You can answer.
4        A.   Sir, I have stated what I know
5    concerning that.  And whatever Mr. Gray and
6    I came up with was -- these rules were
7    developed and approved by me as I understood
8    what their functions were to be and what I
9    intended them to be.
10       Q.   Sheriff Warren, were you aware
11   that while the rules were being drafted by
12   Fred Gray, Jr., for bingo licensing in Macon
13   County, that he was consulting with
14   representatives of Victoryland?
15           MR. TEPLEY:  Same objection.
16           MR. ANDERSON:  Same objection.
17       A.   I had no knowledge of that.
18       Q.   Did you inquire of him whether
19   he was getting any input from any source,
20   whatsoever, outside of your circle of trust,
21   which was just you and he?
22       A.   I hired Mr. Gray to come up
23   with the rules and regulations regarding

Page 159

1    Victoryland, regarding bingo in Macon
2    County.  Whether he -- Who he consulted
3    with, I have no knowledge of that.  And at
4    that particular point in time, all I was
5    concerned with was coming up with rules that
6    would adequately govern this activity.
7        Q.   So is that to say that as far
8    as you were concerned, you were not against
9    Mr. Fred Gray, Jr., consulting with
10   representatives of Victoryland in coming up
11   with the drafted rules and regulations which
12   you were going to approve?
13       A.   Again, and maybe I'm being --
14   maybe I'm just being a dunce, but I . . .
15       Q.   I think you're being
16   brilliant.
17       A.   I hired Mr. Gray -- Mr. Gray
18   to come up with the rules that would govern
19   the conduct of games in Macon County.  That
20   was my -- And the rules and what Mr. Gray
21   and I came up with was what I wanted.  I
22   used my discretion on the information that
23   he brought to me.  I exercised what judgment

Page 160

1    I could, given my knowledge of this issue,
2    which was -- which I used as best I could
3    and the rules and regulations that I came up
4    with, I approved and I intended that they
5    govern this activity.
6        Q.   Sheriff Warren?
7        A.   Yes, sir.
8        Q.   While Fred Gray, Jr., was
9    drafting these rules and regulations, and
10   amendments to the rules and regulations, for
11   bingo licensing, electronic bingo gaming
12   licensing, in Macon County, was it okay by
13   you that he was getting input from
14   representatives of Victoryland?
15           MR. TEPLEY:  Object to the
16   form.
17       Q.   Assuming that was happening,
18   was that okay with you?
19       A.   Sir, at the time I instructed
20   Mr. Gray to come up with rules and
21   regulations, that wasn't even an issue.
22       Q.   Maybe not to you, and that's
23   what I want to talk about.  Was it your

Page 161

1    desire that during the work he was
2    performing for you, and you hired him to
3    draft the rules and regulations; true?
4        A.   I did.
5        Q.   Fred Gray, Jr.; true?
6        A.   Yes, sir.
7        Q.   Was it your desire that he
8    share your conversations with him with
9    others, or did you expect them to be kept
10   absolutely confidential under the
11   attorney-client privilege?
12       A.   Sir, Mr. Gray and I have a
13   long history.
14       Q.   I know that.  I'm asking you a
15   specific question.
16       A.   And I'm trying to answer you
17   in the context of the way this question is
18   presented, sir.  You know --
19       Q.   Calm down.  It's going to be
20   okay.
21       A.   Oh, I'm calm.  I'm real calm.
22           Fred Gray, Jr., and I have a
23   long history with one another.  I trusted --

41 (Pages 158 to 161)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 162

1  I trust this man.  When I asked him to do
2  what he did, I trusted him to act in the
3  best interest of the citizens of Macon
4  County, in my best interest.  And when we
5  came to the end of the journey, what we came
6  up with was something I knew I approved, we
7  discussed and was what I asked him to do.
8          Q.    Sheriff Warren, am I offending
9  you by my questions?
10         A.    At times, this whole thing has
11  offended me.
12         Q.    Are my questions offending
13  you?
14         A.    No, sir.  I understand you are
15  an attorney, and you're doing what your job
16  is, and that's representing your client.
17         Q.    See, I can't get inside your
18  head.  I have to ask questions.
19         A.    Yes, sir.  I know that.  But,
20  you know --
21             MR. ANDERSON:  Why don't we
22  take a break?
23             MR. HENINGER:  No, not yet.

Page 163

1          A.    That's fine.  I know what you
2  have to do, sir, and I completely respect
3  that.  And I'm trying to be as forthright
4  and honest as I can about --
5             MR. ANDERSON:  Listen to his
6  questions.
7          Q.    So there's no way to change
8  the wording, I'm going to write it.
9             I hope you can read my
10  writing.
11         A.    Yes, sir.
12             (Whereupon, Plaintiff's
13             Exhibit No. 11 was marked
14             for identification.)
15         Q.    We talked about the circle of
16  trust in Exhibit 8, and I've just recreated
17  it, and this will be Exhibit Number 13.  Is
18  that what y'all show?  11, I'm sorry.
19             Because I'm hoping that when
20  you hired Mr. Gray as your trusted lawyer
21  and friend and man you had worked with, that
22  you were reposing the trust of your office
23  and your obligations in him; true?

Page 164

1          A.    I hired Mr. Gray to come up
2  with the rules and regulations, sir.  All
3  this reposing and all that, I don't know
4  about.  That's -- I'm stating you simply
5  what I did.
6          Q.    Thank you.  Then I'll go to
7  this question:  With regard to this circle
8  of trust that was just you and Fred Gray on
9  coming up with the rules and regulations we
10  discussed this morning, first question:  Was
11  it stated by Sheriff Warren that
12  confidential information inside the circle
13  could be discussed with representatives of
14  Victoryland, yes or no?
15             MR. TEPLEY:  Object to the
16  form of the question.
17             MR. GRAY, SR.:  Is your
18  question whether or not he asked that?  I
19  don't understand the question, I'm sorry.
20             MR. HENINGER:  Fred, I can't
21  be responsible for what you understand.  I'd
22  be happy to repeat it.
23             MR. GRAY, SR.:  Repeat it.

Page 165

1          Q.    The question on Exhibit 11 is:
2  Was it stated by Sheriff Warren that
3  confidential information inside the circle
4  could be discussed with representatives of
5  Victoryland?  And I mean could be discussed
6  by Gray, Jr.  Did you tell him he could
7  discuss confidential information between the
8  two of you with representatives of
9  Victoryland?
10             MR. TEPLEY:  Same objection.
11             MR. ANDERSON:  I don't want to
12  waive any attorney-client privilege, Steve.
13  Was it his understanding?  And I want to put
14  the words in your mouth, but . . .
15             MR. HENINGER:  No, James.  And
16  I think --
17             MR. ANDERSON:  Things that he
18  told his lawyer would be confidential.
19             MR. HENINGER:  Not if -- There
20  is no attorney-client privilege if he
21  instructed his lawyer, you can discuss
22  whatever we're doing inside this
23  relationship with Victoryland.

42 (Pages 162 to 165)

FREEDOM COURT REPORTING

Page 166

1         MR. ANDERSON: But if he --
2         MR. HENINGER: That's what I'm
3  asking him.
4     Q.    Did you give permission to
5  Fred Gray, Jr., to disclose and discuss
6  confidential workings between the two of
7  you, with drafts, things of that nature,
8  with representatives of Victoryland?
9         MR. TEPLEY: Object to the
10 form of the question.
11    A.    That --
12        MR. GRAY, SR.: Just a moment.
13        MR. ANDERSON: I'm going to
14 object to attorney-client privilege about
15 what he talked to his lawyers about.
16        MR. HENINGER: If you're going
17 to insist on it, I think we're going to have
18 to call the judge, or at least mark this
19 place.
20        Because, James, I think it's
21 clear that that question is asking him
22 whether he actually stated there would be no
23 breach of attorney-client privilege because

Page 167

1  he was permitted to disclose this
2  confidential information. I don't see how
3  you can claim such a statement would be
4  protected.
5         MR. ANDERSON: I think there's
6  another way you can ask it. And it may have
7  been the way you asked it before. And it --
8         MR. HENINGER: Well I want to
9  go back. Let's stay with this exhibit, and
10 we'll perfect the Record.
11        MR. ANDERSON: Will you let me
12 take a break and talk to my client, and I
13 think I can clear some of this up.
14        MR. HENINGER: You've promised
15 me that three times today.
16        MR. ANDERSON: I know. And
17 we're doing a little better. Let's take a
18 break.
19        VIDEOGRAPHER: This is the end
20 of tape number three. We're off the Record
21 at 2:51 p.m.
22        (Recess taken.)
23        VIDEOGRAPHER: This is the

Page 168

1  beginning of tape number four. We are back
2  on the Record at 3:08 p.m.
3         MR. ANDERSON: Steve, as I
4  mentioned to you off the Record, I think the
5  sheriff has a statement that will help
6  clarify. And I think he got a little
7  confused.
8         Do you want to say something,
9  sheriff?
10        THE WITNESS: Mr. Heninger, I
11 apologize for any confusion. I was sort of
12 confused with the attorney-client privilege
13 thing. What you were asking, it was okay if
14 he talked to somebody to do -- to accomplish
15 what I needed to get done; it was to
16 whomever. As a matter of fact, shortly
17 after this happened, I came to Sheriff D.T.
18 Marshall, because, call it naive or what, I
19 went to him. I thought we were talking
20 about bingo in a traditional sense. And --
21    Q.    You mean card bingo?
22    A.    Yeah. Shortly after, I went
23 to Sheriff D.T. Marshall, I spent maybe a

Page 169

1  couple of hours in his office. He talked to
2  me about it, he gave me a copy of his rules.
3         I brought them back, and I
4  gave them to Fred. He also let me talk to
5  the guy in his office, some tall guy,
6  Sheriff Marshall can --
7         MR. ANDERSON: For
8  clarification, Sheriff Marshall is the
9  sheriff of Montgomery County.
10    A.    Is the sheriff of Montgomery
11 County. And he talked to me about bingo; we
12 had a conversation about bingo. Then the
13 person he has that's over bingo, I went and
14 talked to him. And the rules that -- I got
15 a copy of his rules, and I brought them back
16 and gave them to Fred.
17    Q.    Thank you. Let me go back to
18 where we started.
19    A.    Yes.
20    Q.    Was it your intent that all
21 discussions, work, drafts in this
22 relationship between you and Fred Gray, Jr.,
23 to come up with these rules and regulations,

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 170

1  be kept confidential between you and he as
2  attorney/client, was that your intent?
3      MR. ANDERSON:  All
4  discussions?
5      MR. HENINGER:  (Nods head
6  affirmatively.)
7      A.  I -- That wasn't -- I did not
8  care if Mr. Gray discussed that with
9  somebody in accomplishing what I had asked
10 him to do.  But there were some things that
11 we discussed that I would -- and I think he
12 knows what those things are that I would
13 rather keep confidential.
14     Q.  He may.  But, see, we need to
15 talk about the ones that you did not.
16     So it was not your intent that
17 all discussions, drafts of rules and
18 regulations for bingo licensing in Macon
19 County be kept confidential and between only
20 you and he until published?  That was not
21 your intent on all discussions?
22     A.  I don't know what my intent
23 exactly was on that issue, because -- I'm

Page 171

1  trying to answer you honest, Mr. Heninger.
2      Q.  You mean that?
3      A.  I relied on Fred to do
4  something I had asked him to do.
5      Q.  And you've told us that many
6  times, thank you.  That's established.
7      I'm only trying to find out if
8  it was your intent when working with Fred
9  Gray, Jr., you selected to help by drafting
10 these rules and regulations for your
11 approval.  Was it your intent in that
12 relationship that all your discussions, all
13 your work product, all your drafts remain
14 confidential as between attorney and client
15 until you approved them and they were
16 released?
17     A.  I expected a certain degree of
18 confidentiality.
19     Q.  Well, attorney-client is
20 totally confidential.  Do you understand
21 that?
22     A.  Yes, sir.
23     Q.  Is that what you intended,

Page 172

1  total confidentiality between you and Fred
2  Gray so that nothing could be disclosed
3  about your discussions, work, or drafts of
4  rules and regulations until you had approved
5  them and published them?  Was that your
6  intent?
7      MR. ANDERSON:  You're asking
8  him about three different areas.
9      MR. HENINGER:  Yes.
10     A.  I did not have any objections
11 to him talking to people in getting this
12 thing accomplished.
13     Q.  He could tell people what
14 y'all had discussed and were thinking of?
15     MR. ANDERSON:  Object to the
16 form.
17     Q.  Could he?
18     A.  He could discuss -- He could
19 discuss what he needed to to achieve the
20 goals and objectives.
21     Q.  Sheriff Warren, could he
22 discuss, under your intent as the client,
23 could he discuss what the two of you had

Page 173

1  discussed, what the two of you were
2  considering to get input from others?
3      A.  I wouldn't -- I'll just answer
4  that by saying I did not object to him --
5  since I have -- I know what you're talking
6  about, I did not object to him talking to
7  anyone to get what I needed accomplished
8  now.  And that's -- was my intentions.
9      Q.  And did you make those
10 intentions known to Fred Gray, Jr.?
11     MR. ANDERSON:  It might get
12 into what he discussed, so I will --
13     MR. HENINGER:  Are you
14 objecting?
15     MR. ANDERSON:  Yes, I'm
16 objecting.
17     Q.  And when you say in your last
18 answer you were explaining that you had a
19 work product that you were looking for from
20 Fred Gray, Jr., in the drafts of the rules
21 and regulations; true?  I mean that's your
22 mission?
23     A.  Yes, sir.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 174

1    Q.    And you did not object to him
2  discussing that work product with others, if
3  it could improve it?
4    A.    I did not have an objection to
5  him speaking with others to accomplish that
6  goal.
7    Q.    He could disclose what the two
8  of you were discussing?
9    A.    Sir, I didn't say that.
10    Q.    Well, I'm asking.  That's
11  where there was a question mark after that.
12    A.    I just -- I don't think that
13  that came up, you know.
14    Q.    What was your intent?  Could
15  he discuss with those others what y'all had
16  been kicking around as potential rules?
17  What was your intent?
18    A.    The intent was to get rules
19  and regulations to govern bingo.  That --
20    Q.    By any means?
21    A.    As finite as you're putting
22  that, I don't think that came up as a part
23  of the conversation.

Page 175

1    Q.    Sheriff, I'm not your dad and
2  I'm not your lawyer.
3    A.    I understand.
4    Q.    But there's plenty of good
5  lawyers in this room, and I can assure you
6  that the attorney-client privilege, you
7  can't have it and avoid it at the same time,
8  it's one or the other.  And that's why I'm
9  asking you as specifically as I can was it
10  your intent, you the client, Sheriff David
11  Warren, was it your intent that the
12  discussions and drafts and work done between
13  you and Fred Gray, Jr., inside this circle
14  of trust and attorney-client relationship be
15  held in confidence within that relationship?
16          MR. DAVENPORT:  Object to the
17  form.
18    A.    That was probably -- Put in
19  those terms, that may have been -- I'm not
20  an attorney.
21    Q.    I know that.
22    A.    I know you're not my daddy,
23  and I know you're not my attorney, and I'm

Page 176

1  not one either, and I'm just trying to
2  answer the question.  I expected Fred to do
3  what he needed to do to get that assignment
4  accomplished; that -- that -- the directions
5  that I gave him to get bingo -- rules and
6  regulations that would govern bingo.  I
7  didn't care if he spoke with somebody.  Of
8  course -- And that's all I'm saying.
9    Q.    You expected Fred to do
10  whatever he needed to do to get the job
11  done, is that what you said?
12    A.    I did not care -- What I'm
13  saying is, is what I've said:  I did not
14  object to him speaking to somebody to get
15  that job done.
16    Q.    And there is nobody that was
17  hands off for him to speak with, plan with,
18  collaborate with in suggesting rules and
19  regulations; true?
20    A.    At that point in time, that
21  may have been true.
22    Q.    Victoryland wasn't hands off.
23  You gave him -- Or you intended no

Page 177

1  instructions that he not be allowed to talk
2  to people from Victoryland?
3    A.    We did not get into -- I don't
4  know who he spoke with, sir.
5    Q.    I didn't ask you that,
6  Sheriff.  My fault, obviously.
7          I am simply asking you when
8  you say that he was intended by you to be
9  able to talk with others so he could get his
10  job done, and I asked you was it hands off
11  with anyone, and you said no.  No hands off
12  with anyone.
13    A.    Right.
14    Q.    So if there's no hands off,
15  that means he could talk to the owners and
16  operators of Victoryland about the proposed
17  rules for gaming; true?
18    A.    He could talk to whom he
19  needed to talk to at Victoryland, I would
20  think.
21    Q.    He could talk to the lawyers
22  who represent Victoryland if he wanted to;
23  true?

45 (Pages 174 to 177)

FREEDOM COURT REPORTING

Page 178

1    A.    Yes.
2    Q.    He could talk to shareholders
3  of Victoryland if he wanted to; true?
4    A.    I would suppose.
5    Q.    He could talk to his father,
6  who is his law partner and a shareholder in
7  Victoryland, to get his input; true?
8    A.    Yes, sir.
9    Q.    That would be all right by
10 you?
11   A.    I had no objections to him
12 speaking with people.
13   Q.    All right.  Did that happen?
14 Did Fred Gray, Jr., as you sit here today,
15 do you know if he received input from
16 representatives of Victoryland in the drafts
17 he presented to you on the rules and
18 regulations for bingo licensing in Macon
19 County?
20   A.    I don't know who he spoke
21 with.
22   Q.    You truly do not?
23   A.    No, sir.

Page 179

1    Q.    As you sit here today, you
2  don't know who he spoke with to get any
3  input about these drafts of the rules and
4  regulations for you to approve?
5    A.    To the best of my
6  recollection, I don't know who he spoke
7  with.
8    Q.    You don't know if he spoke
9  with his father, Fred Gray?
10   A.    I don't -- I just said I don't
11 know who he spoke with.
12   Q.    I understand.  But I'm going
13 to go down the laundry list.  You don't know
14 if he spoke with Milton McGregor?
15   A.    I don't know.
16   Q.    You knew at that time, and had
17 known for a long time that the Gray Law Firm
18 represented Victoryland?
19   A.    Yes, I did.
20   Q.    You knew, and had known for
21 some time, that Fred Gray, a senior partner
22 in that firm, had an interest in
23 Victoryland?

Page 180

1    A.    I knew that he had an
2  interest, but I didn't know -- I knew he was
3  affiliated with Victoryland, but I didn't
4  know how.
5    Q.    You didn't know the extent?
6    A.    No, sir.
7    Q.    But you knew he had an
8  interest in Victoryland and had known that
9  for some time?
10   A.    I knew Mr. Gray had an
11 affiliation with Victoryland.  And to what
12 extent, I didn't know.
13   Q.    You knew Milton McGregor was
14 the principal in Victoryland?
15   A.    Yes.
16   Q.    You knew that Milton McGregor
17 had expressed to you that Victoryland was
18 interested in getting the Class B operator's
19 license while you were drafting your rules?
20        MR. TEPLEY:  Object to the
21 form of the question.
22   A.    I knew that Mr. McGregor was
23 interested in conducting bingo.

Page 181

1    Q.    And it seems appropriate to
2  you, and no conflict of interest, that Fred
3  Gray, Jr., may be getting input from
4  representatives of Victoryland, his firm's
5  client, or from his father, an interest
6  holder in Victoryland, while he's working
7  for you?  That seems okay?
8    A.    I saw no conflict of interest.
9  And I trust Fred, and I had no problems with
10 him representing me.
11   Q.    Sheriff, when you say you saw
12 no conflict of interest, is that because you
13 closed your eyes or because you thought
14 about it and eliminated that?
15        MR. TEPLEY:  Object to the
16 form of the question.
17   A.    I -- I'm sorry.  Again.
18   Q.    When you say you saw no
19 conflict of interest, I take it you're
20 referring back to the times when these rules
21 and regulations were being drafted and the
22 amendments were being drafted.  You saw no
23 conflict with the potential that Fred Gray,

46 (Pages 178 to 181)

FREEDOM COURT REPORTING

Page 182

1  Jr., was giving you drafts and amended
2  drafts while getting input from Victoryland,
3  a client of his firm's or from lawyers for
4  Victoryland, a client of his firm, or from
5  his father a shareholder, you saw no
6  conflict at that time?
7          MR. TEPLEY:  Objection to the
8  form of the question.
9      A.   Sir, Fred -- I had no problem
10  with Fred Gray, Jr., being my attorney.  The
11  amendments that were made to these rules and
12  regulations are amendments I made as I -- I
13  made at my discretion as I saw the need to
14  make them.
15     Q.   Who drafted them?
16     A.   Mr. Gray at my instruction.
17     Q.   You told him what to draft?
18     A.   I told him what I wanted.
19          MR. ANDERSON:  I'm going to
20  object.  We're not waiving any
21  attorney-client privilege.  I was asleep at
22  the wheel.
23     Q.   So is it your testimony today

Page 183

1  that you gave details about how you desired
2  the amendments to these rules and
3  regulations be drafted?
4          MR. ANDERSON:  I'm going to
5  object to the form, and object on privilege.
6  He's testified they were his ideas.
7          MR. HENINGER:  Okay.
8      Q.   Did you have an obligation to
9  the citizens of Macon County, who entrusted
10  you with the office of sheriff, to make sure
11  this process of writing, publishing, and
12  promulgating these rules for bingo licensing
13  were done fairly and without a conflict of
14  interest?
15     A.   As sheriff, I believe the
16  citizens of Macon County expected me to act
17  in their best interest.
18     Q.   Did you have an obligation to
19  act in a manner that would avoid a conflict
20  of interest?
21     A.   I had --
22     Q.   It's scary that you're
23  delaying answering this, to be honest with

Page 184

1  you.
2      A.   I am trying to -- No, what you
3  want me to do is answer it the way you want
4  me to answer it.
5      Q.   No, sir, I want you to answer
6  it honestly.
7      A.   And I'm just trying to use my
8  words.  That's all I'm doing.
9          I'm sure the citizens of Macon
10  County would prefer me to act in a way that
11  would be with honor and fairness and those
12  things, Mr. Heninger.
13     Q.   Sheriff Warren, I want to see
14  how different you and I are.  I believe that
15  right is right and wrong is wrong,
16  regardless of my words.  No matter how
17  flowery I am, no matter how educated I am, I
18  can't perfume wrong and make it look right.
19  That's what I believe.
20          Now, I want to find out what
21  David Warren believes.  Do you believe that
22  it can ever be made right that a sheriff,
23  entrusted by the people to enact rules and

Page 185

1  regulations, act with a conflict of interest
2  when he does so to favor one entity?
3          MR. TEPLEY:  Object to the
4  form.
5          MR. ANDERSON:  Object to the
6  form.
7      Q.   Can that ever be okay?
8      A.   If that were to be the reality
9  of it, it would not certainly be okay.  And
10  that is my --
11     Q.   And you have earlier testified
12  that you can see how someone would get the
13  impression that this situation was a
14  conflict of interest.  Do you remember that?
15     A.   Yes.  But -- Yes, I remember.
16     Q.   And is that still your
17  opinion, that you can see how someone can
18  look at how all this went down with you
19  doing the rules and regulations and using
20  Fred Gray, Jr., when his firm had
21  Victoryland as a client, his father was a
22  shareholder, that he had discussions with
23  representatives of Victoryland, Victoryland

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 186

1　gets the only license, all the charities are
2　with Victoryland, you can see how to an
3　outsider that looks like a problem?
4　　　　MR. TEPLEY:  Object to the
5　form of the question.
6　　　　MR. BOLTON:  Same objection.
7　　Q.　True?
8　　A.　Mr. Heninger, that would be
9　true if one acted improperly.  Now, I can
10　see where people can infer anything they
11　want to into a situation.  Usually those
12　things are done to their advantage.
13　　　　How I acted because, as far as
14　I'm concerned, people came to me in good
15　faith.  I later found out that they weren't
16　everything they said they were.  And I'm
17　just looking out for the interest of the six
18　hundred and fourteen square miles that is
19　Macon County, and that's all I tried to do.
20　　Q.　While we're talking about what
21　you are required to do and what you did, you
22　understand that the rules and regulations
23　that you approved require you to investigate

Page 187

1　all applicants for operator's licenses,
2　true?
3　　A.　Yes, sir.
4　　Q.　You did not investigate
5　Victoryland when they applied for their
6　license, did you?
7　　　　MR. TEPLEY:  Object to the
8　form of the question.
9　　A.　Is that your question?
10　　Q.　Yes, sir, it is.
11　　A.　I investigated -- I did not do
12　an -- a formal investigation of Victoryland,
13　but I made inquiries.  And since that time,
14　I have -- there was a -- there were -- that
15　has been accomplished and it was
16　accomplished in a way that satisfied me of
17　their standing.
18　　Q.　Section five of your rules and
19　regulations requires that the sheriff shall
20　make investigation of applicants for
21　licenses; correct?
22　　A.　Yes, sir.
23　　Q.　You testified earlier on page

Page 188

1　283, that did you not investigate
2　Victoryland for its capital improvements;
3　correct?
4　　　　MR. ANDERSON:  What line,
5　Steve?
6　　Q.　Line eleven:  I have not
7　formally done it.  Do you see that?
8　　A.　Yes, sir.
9　　Q.　Have you to this day, this
10　deposition was in August 2006, have you to
11　this day investigated Victoryland for its
12　capital improvement?
13　　A.　For their whole -- that whole
14　section in there, they have -- they have
15　been investigated and come to -- and comply
16　with everything that's stated.
17　　Q.　What was the out-of-pocket
18　actual cost, as required by your rules and
19　regulations, spent by Victoryland as of June
20　2nd, 2004, for that facility?  How much
21　actual cost did they have in that facility?
22　　A.　I don't have that information
23　available.

Page 189

1　　Q.　Well, you are required to,
2　aren't you, Sheriff?
3　　　　MR. BOLTON:  Object to the
4　form.
5　　Q.　You are required to have that
6　information by your own rules?
7　　A.　And we have it.
8　　Q.　What did your investigation
9　show on their actual cost for capital
10　improvements as of June 2nd, 2004, when you
11　amended it to require fifteen million
12　dollars?
13　　　　MR. TEPLEY:  Object to the
14　form of the question.
15　　A.　I don't know that right now.
16　I can't answer that right now.
17　　Q.　Where would you go to get that
18　information?
19　　A.　I'm pretty sure I can go to my
20　office and get it.
21　　Q.　Here is the problem I have:
22　We filed a request for production of
23　documents.  Do you know what that means?

FREEDOM COURT REPORTING

Page 190

1    A.    Yes.
2    Q.    We didn't get anything from
3  you that showed any investigation on
4  Victoryland.  And maybe I'm assuming too
5  much, because I thought you would have given
6  it to us if it existed.
7        You told Mr. Thomas at your
8  deposition in August 2006, that you had not
9  formally investigated Victoryland for its
10  capital improvements as of August 2006.  Now
11  I'm asking you what can you show us in June
12  2004, you had, in front of you, to confirm
13  that Victoryland had actually spent a
14  minimum of fifteen million dollars for their
15  facility?
16    A.    I had nothing at that
17  particular point in time.
18    Q.    Let me help you; I'm going to
19  tell what you did have.  Milton McGregor has
20  given to us an affidavit that he says he
21  gave to you.  And in his affidavit he says:
22  I swear the value of our facility is over
23  fifteen million dollars.

Page 191

1        First of all, do you remember
2  getting that affidavit?
3    A.    That would have came -- would
4  have come to -- I'm the sheriff.  I'm -- I
5  have other people dealing with this stuff.
6  That would come to my civil -- civil
7  court person; he deals with investigation,
8  he keeps the records.  He does all of that,
9  Mr. Tommy Miller.
10    Q.    Here is what I'm trying to
11  find out:  If Milton McGregor, the man who
12  had met with you as soon as this law --
13  amendment was passed, and you're thinking
14  about passing the rules.  And he meets with
15  you in the law firm's office that represents
16  him, and happens to be the same law firm
17  that is representing you, and he's
18  interested in bingo.  I'm right so far;
19  correct?
20    A.    Right.
21    Q.    And your rules and regulations
22  that are drafted by Fred Gray, Jr., say that
23  the sheriff shall investigate.  Not may, not

Page 192

1  might, shall; correct?
2    A.    Uh-huh.
3    Q.    That's what it says; right?
4    A.    Right.
5    Q.    Shall means you have to.  You
6  don't have a choice; true?
7    A.    The rules state --
8    Q.    Is that true, Sheriff Warren?
9    A.    The rules say the sheriff has
10  to investigate.
11    Q.    Okay.  If Milton McGregor
12  comes in and just says, Sheriff Warren, here
13  is an affidavit from me.  I swear I can't
14  find the documents, wish I could, but I
15  swear that my building is worth fifteen
16  million dollars, actual cost, you're going
17  to take him at his word or are you going to
18  investigate, under your rules?
19    A.    Under my rules, the
20  investigations were done by my civil
21  criminal court clerk.
22    Q.    What's his name?
23    A.    Tommy Miller.

Page 193

1    Q.    Tommy Miller did an
2  investigation at your office into
3  Victoryland's actual value of cost of
4  capital improvements in June 2004?
5        MR. ANDERSON:  Object to the
6  form.
7    A.    I told Tommy to -- he
8  investigates all of our -- the charities,
9  everything.
10    Q.    I'm only talking about
11  Victoryland right now.  Are you telling me,
12  under oath as the sheriff, that you had
13  Tommy Miller investigate Victoryland's
14  actual cost of their facility to make sure
15  it was fifteen million dollars?
16    A.    I assigned that to him.
17    Q.    Did he do it?
18    A.    I'm assuming that he did.
19    Q.    Do you know what they say
20  about assume?
21    A.    No.
22    Q.    You know what they say?
23    A.    He has always carried out

49 (Pages 190 to 193)

Page 194

1  every instruction I've given him before.
2       Q.    Then why can't we see it?
3  Where is the investigation?
4       A.    Evidently I'll have to find
5  out what he did and make sure that he
6  carried out his orders.
7       Q.    Nothing's been shredded, has
8  it?
9       A.    I wouldn't think so.
10      Q.    Do y'all have a document
11 destruction policy at your department?
12      A.    We do.  But a document like
13 that wouldn't have been destroyed.
14      Q.    I want to make sure that if
15 there was ever an investigation, a formal
16 investigation of Victoryland, regarding any
17 of its licenses in electronic bingo it is
18 still in existence at your office?
19           MR. ANDERSON:  Object to the
20 form.
21      A.    Yes.
22      Q.    You believe that to be true?
23      A.    Say that again, sir.

Page 195

1       Q.    If such an investigation was
2  done, it would be at your office?
3       A.    If such an investigation was
4  done, it would be at my office.
5       Q.    It would not have been
6  destroyed?
7       A.    No, sir.
8       Q.    And whose file cabinet would
9  it be maintained most likely?
10      A.    It would probably be in -- It
11 could be in one of several file cabinets.
12      Q.    When we filed our request for
13 production, did you look or have your people
14 look so you could tell your lawyers if such
15 existed?
16      A.    We gave -- When that request
17 for documents came, I think we tried to
18 supply every document that we had.
19      Q.    Did you look for
20 investigations and files on Victoryland?
21      A.    Again, we tried to produce
22 every document we were demanded to.
23      Q.    Will you look again?

Page 196

1       A.    Yes, I will, sir.
2       Q.    And will you look again for
3  your notes?
4       A.    Yes, sir, I will.
5           MR. ANDERSON:  I'm just making
6  sure on the rule, are you talking about
7  section five of the rule?
8           MR. HENINGER:  I believe
9  that's the section I talked about.
10          Were the sheriff and I in
11 error?
12          MR. ANDERSON:  I'm just saying
13 the rule says:  Sheriff shall make such
14 investigation as he may deem necessary or
15 proper for qualifications.
16          MR. TEPLEY:  Of each
17 applicant.
18      Q.    So would you take that to
19 mean, Sheriff Warren, that you could decide
20 not to investigate Victoryland because you
21 winked at Milton McGregor, but you did
22 investigate Lucky Palace, that it's totally
23 up to your discretion?

Page 197

1           MR. ANDERSON:  Object to the
2  form.
3           MR. TEPLEY:  I join the
4  objection.
5       Q.    Is that how you would
6  interpret that?
7       A.    No, sir.
8       Q.    Whatever you do has to be fair
9  and consistent, doesn't it?
10      A.    Yes, sir.  In any of the
11 dealings I've had, I try to be fair and
12 consistent.
13      Q.    Do you recall meeting with
14 Mr. Bracy in July of 2004 in your offices?
15      A.    I had numerous meetings with
16 Mr. Bracy.
17      Q.    Mr. Bracy -- I'm sorry.
18      A.    I had numerous meetings with
19 Mr. Bracy.  I don't recall that particular
20 one.
21          MR. GRAY, JR.:  What date was
22 that?
23          MR. HENINGER:  July 21, 2004.

FREEDOM COURT REPORTING

Page 198

1     Q.    You recall that Paul Bracy was
2 speaking on behalf of Lucky Palace and its
3 investors; correct?
4     A.    I have stated I don't recall
5 that particular meeting right now.  But if
6 you have --
7     Q.    My fault again, I obviously
8 didn't ask the question correctly.
9          You're sitting here and you
10 see Paul Bracy?
11    A.    Yes.
12    Q.    You've seen him many times
13 before regarding Lucky Palace's attempts to
14 get a license for bingo gaming in Macon
15 County; true?
16    A.    I have.
17    Q.    He has made that known to you,
18 and he has applied for that license; true?
19    A.    Yes.
20    Q.    That application by Lucky
21 Palace has never been denied in writing, has
22 it?
23    A.    No, sir.

Page 199

1     Q.    Do you plan on denying it in
2 writing at some point in time?
3     A.    I'm in court with Mr. Bracy
4 now.  I am -- I have not made any action on
5 Mr. Bracy's complaint.
6     Q.    You mean his application for a
7 license?
8     A.    I mean on his application for
9 a license, excuse me.
10    Q.    Well, reckon when you will get
11 to it?
12    A.    Whenever we get out of court.
13    Q.    We're going to have to wait
14 until we get out of court, Sheriff, for you
15 to get to this application by Lucky Palace?
16    A.    Well, sir, I am in court with
17 Mr. Bracy right now.  And whatever
18 considerations I'll be dealing with
19 Mr. Bracy -- I'll be considering for
20 Mr. Bracy will be once these proceedings are
21 over.  And the answer is whenever we get out
22 of court.
23    Q.    But Lucky Palace can't get a

Page 200

1 license to operate right now under the
2 current rules, can they, under any
3 circumstances --
4          MR. ANDERSON:  Object to the
5 form.
6     Q.    -- because it's locked down by
7 Victoryland; true?
8          MR. TEPLEY:  Same objection.
9     Q.    Under the current rules of
10 Exhibit 7 it is locked down by Victoryland
11 isn't it, Sheriff?
12          MR. TEPLEY:  Object to the
13 form.
14    A.    Under the current rules,
15 Victoryland is licensed to operate bingo in
16 Macon County.
17    Q.    And they are locked in as the
18 only location under the current rules; true?
19          MR. TEPLEY:  Objection.
20    A.    They are the only location.
21 Victoryland, as of this date, is the only
22 location that has met the qualifications of
23 the rules and regulations governing bingo.

Page 201

1     Q.    Let me show you what I'm
2 marking as Plaintiff's Exhibit --
3          MR. HENINGER:  We're at 12?
4          MR. ANDERSON:  Yeah.
5     Q.    And I got ahead of myself, I
6 always do.
7          On 11, just so I can close
8 that out, I had two questions on that.  Was
9 it stated by Sheriff Warren that
10 confidential information inside the circle
11 could be discussed with representatives of
12 Victoryland.  I think we established that
13 you allowed it to be discussed with anyone,
14 not just Victoryland?
15          MR. TEPLEY:  Object to the
16 form.
17    A.    I did not have a problem with
18 him talking to anyone regarding.
19    Q.    So can I put yes there?
20          MR. DAVENPORT:  I'm going to
21 object now.  Now, first off it wasn't
22 stated.
23    Q.    Correct.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 202

1    MR. DAVENPORT: The Record
2 will reflect, I don't think he ever said it
3 was stated.
4    MR. HENINGER: I want to get
5 it right. Thank you, Ron.
6    Q.    Was it stated by Sheriff
7 Warren that confidential information inside
8 the circle could be discussed with
9 representatives of Victoryland?
10    MR. ANDERSON: Not stated --
11 Object to stated to his lawyer. He stated
12 in his deposition that it was okay.
13    Q.    Would that be a yes or a no?
14    A.    I stated that he could speak
15 to anyone.
16    Q.    Because I'll forget this if I
17 don't do this. Second question: Was it
18 permitted in advance by Warren that Gray,
19 Jr., could get input from representatives of
20 Victoryland in drafting the rules?
21    MR. ANDERSON: Again, without
22 waiving the client privilege, I think he's
23 answered it was okay for him to get input

Page 203

1 outside.
2    Q.    Would the answer to that be
3 yes?
4    A.    My answer was Mr. Gray could
5 speak to anyone to get what I hired him to
6 do accomplished.
7    Q.    Which would include
8 Victoryland and its representatives?
9    A.    I did not object to it.
10    Q.    So yes would be appropriate,
11 wouldn't it?
12    MR. TEPLEY: I'm going to
13 object. I think the Record speaks to what
14 he's answering, not the document he's
15 marking.
16    MR. HENINGER: I think the
17 document is part of the Record, Peter.
18 That's its purpose. But I understand your
19 objection.
20    MR. TEPLEY: My objection is
21 that document doesn't reflect his testimony.
22    MR. ANDERSON: That's fine.
23    Q.    Well, let's get

Page 204

1 clarification --
2    MR. TEPLEY: I don't object --
3    Q.    -- does Exhibit 11 not reflect
4 what you've told me under oath?
5    A.    Sir, what I told you under
6 oath was that I did not object to Mr. Gray
7 having discussions with anyone to get this
8 done.
9    Q.    I understand. And I'm trying
10 to simplify it for my benefit. And if you
11 will allow the witness to see this, since
12 it's his testimony that matters, is that
13 Exhibit 11 an accurate representation of
14 your answer to those two questions?
15    A.    I have stated --
16    Q.    I think you better look at it.
17    A.    I have stated for the Court
18 what my answer to that question was,
19 Mr. Heninger.
20    Q.    Sheriff, I don't want to have
21 to go to court some day and say -- and the
22 judge say, Steve, he never confirmed that
23 Exhibit 11 was the truth.

Page 205

1    I want you to tell me under
2 oath, does that accurately reflect your
3 position and your answer or have I misstated
4 it?
5    MR. ANDERSON: And I'm, again,
6 taking out when you say was stated. We are
7 objected to what he stated to his lawyer.
8 He stated, and it's on videotape what he
9 stated so far, Steve. And being in your
10 words, I mean --
11    Q.    Is it fair and accurate?
12    A.    I have gave you the answer to
13 what I perceive you to be asking me.
14    Q.    I can stay here as long as you
15 can.
16    MR. ANDERSON: Steve, I don't
17 object to this being an exhibit to his
18 deposition --
19    MR. HENINGER: It doesn't
20 state today to his lawyer, Jim. Look at the
21 question.
22    MR. ANDERSON: I know. I
23 don't object to this being an exhibit to his

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 206

1  deposition. I'm going to object to it being
2  an exhibit at trial, if that's where we're
3  going, because that's not his words and his
4  language. So -- And what he's got, we've
5  got on videotape.
6        MR. HENINGER: I'll try one
7  more time.
8        Q.   Have I accurately recorded
9  your testimony in a summary form on Exhibit
10 11, or is it wrong? And please do me the
11 courtesy of looking at it before you answer.
12       A.   That is not an accurate
13 representation of my statement,
14 Mr. Heninger.
15       Q.   It is not?
16       A.   I stated what I meant.
17       Q.   It is not accurate? Then
18 would it be accurate if instead of yes I put
19 no to answer each of these?
20       A.   Mr. Heninger, I have stated my
21 answer.
22       Q.   Sheriff Warren, I promise you,
23 I mean you no ill will, but the law gives me

Page 207

1  the right to come here and ask you
2  questions. You can make a speech, but
3  you've got to give me your best effort at
4  answering your questions. They may be
5  stupid, they may be dumb, they may be too
6  long, you may not like that they are on
7  paper or that they're verbal. But today's
8  my day to ask questions for my client, and I
9  have asked you these two questions. And I
10 just want an answer so that it's accurate.
11 And for you to keep saying, well, I've
12 already answered it previously, is a
13 position you can take. But I assure you I'm
14 not going to back off on this.
15       MR. ANDERSON: Steve, I'm
16 going to say that as an effort to try to get
17 a request for admission during the
18 deposition or an interrogatory answer during
19 a deposition, I'm going to object to it.
20 And so you can ask him oral questions. And
21 so I'm objecting. There's some things I
22 could go into. It's not exactly what he
23 said because you've got the word

Page 208

1  confidentiality in there. So that's -- I
2  object to you trying to get him to do a
3  request for admission during the deposition
4  and to get him to do a written interrogatory
5  during the deposition.
6        MR. HENINGER: And the rules
7  say that you can't do that?
8        MR. ANDERSON: I'm saying
9  right now he's answered your questions, and
10 I object to --
11       MR. HENINGER: But under Rule
12 11 you are taking the position that
13 discovery is discretely limited to each
14 rule, and there is no networking done
15 between the rules?
16       MR. ANDERSON: I'm not taking
17 that --
18       MR. HENINGER: Are you
19 stopping me from what I'm attempting to do?
20       MR. ANDERSON: No, I'm
21 objecting to it.
22       MR. HENINGER: Okay. Thank
23 you. Then we understand each other.

Page 209

1        And I respect your right to
2  object, I just disagree with it.
3        MR. ANDERSON: I'm surprised.
4        Q.   But back to the most important
5  person in the room, because it's your
6  testimony that's at issue, not lawyers.
7        Was it stated by Sheriff
8  Warren that confidential information inside
9  the circle of you and Fred Gray, Jr., could
10 be discussed with representatives of
11 Victoryland?
12       MR. DAVENPORT: I'm going to
13 object and assert the attorney-client
14 privilege unless he waves it on behalf of
15 Mr. Gray. That invades the attorney-client
16 privilege, and I'm objecting unless he waves
17 that objection.
18       Q.   Sheriff Warren?
19       A.   Sir, that is not a
20 representation of what I told -- said to
21 Mr. Gray.
22       Q.   Do you assert the
23 attorney-client privilege with regard to

53 (Pages 206 to 209)

FREEDOM COURT REPORTING

Page 210

1   your intent for what Mr. Gray, Jr., was
2   allowed to discuss outside this circle of
3   trust between you and he, or what to bring
4   inside the circle of trust between you and
5   he?
6         A.     You know, Mr. Heninger, that
7   circle of trust is something that I have
8   dealt with, and it usually related to
9   narcotics investigations and that type of
10  thing. Fred and I had an attorney-client
11  privilege in its traditional sense, and I
12  have tried to make clear what my intentions
13  were when I instructed my attorney to act.
14        Q.     Did you intend your
15  attorney-client relationship with Fred Gray,
16  Jr., to block him from sending information
17  outside this circle of trust until you made
18  your decision on the rules and regulations?
19        MR. ANDERSON:  What
20  information?
21        MR. HENINGER:  All
22  discussions, drafts, work on the rules and
23  regulations.

Page 211

1         A.     Sir, I have tried to
2   articulate to you what my relationship with
3   Mr. Gray was, and what I said to him and
4   what I meant to him. I've tried to say that
5   as best I could.
6         Now, you know, I know that may
7   not suffice, but that's what I've tried to
8   do.
9         Q.     I appreciate your trying. But
10  I want you to know that all these lawyers
11  are going to be in front of Judge Watkins
12  talking about attorney-client privilege.
13  And you know who is the tipping point for
14  the whole issue? You. That's why I need to
15  know. You're the only one in this room who
16  can speak to your intent.
17        You understand that, don't
18  you, David? You're the only one in this
19  room who can speak to your intent. Does
20  that make sense to you? Sir?
21        A.     It makes perfect sense.
22        Q.     So my question to you is
23  because the judge is going to have to decide

Page 212

1   when this issue comes up, did David Warren
2   intend, while these drafts of the rules and
3   regulations and then amendments to the rules
4   and regulations were being done inside this
5   circle of trust, did you intend that none of
6   that be discussed outside by Fred Gray, Jr.,
7   or you, until you adopted the rules?
8         A.     Whenever this judge hears what
9   he's going to hear, Mr. Heninger, I want it
10  to be an accurate account of what I said and
11  what I meant. And I have articulated that
12  in this proceedings as best I know how.
13        Q.     Just for the benefit of those
14  of us who are stupid which must only be me,
15  can you answer that question? Did you
16  intend that whatever was discussed, made
17  part of a draft, a work product for the
18  rules and regulations and amendments to the
19  rules and regulations between you and Fred
20  Gray, Jr., did you intend that it stay
21  within your confidential attorney-client
22  relationship and he not share it with anyone
23  until you had acted to approve it?

Page 213

1         A.     Mr. Heninger, I intended to
2   communicate with Mr. Gray just what I have
3   communicated here today. I have put my
4   trust in Mr. Gray many times before. I take
5   it -- I took it at face value that he was a
6   competent attorney. And when I gave him my
7   trust, he knows that I expected him to act
8   in the best interest of me as a client in
9   carrying out what I asked him to do.
10        Q.     Sheriff Warren, was it your
11  intent while working with Fred Gray, Jr., in
12  drafting the rules and regulations for bingo
13  gaming in Macon County that the discussions,
14  work, drafts of the proposed regulations,
15  rules, and amendments later on be kept
16  between the two of you in an attorney-client
17  privilege or not?
18        MR. BOLTON:  Object to the
19  form of the question.
20        MR. ANDERSON:  Same objection.
21  You can answer.
22        A.     As I understood it,
23  Mr. Heninger, in the traditional

54 (Pages 210 to 213)

FREEDOM COURT REPORTING

Page 214

1  relationship between clients and attorneys,
2  I asked Mr. Gray to simply do, accomplish
3  what I instructed him to accomplish.  And I
4  had no objections to him using or speaking
5  to whomever he needed to speak to to
6  accomplish those ends.
7       Q.    So it was not your intent to
8  block that?
9       A.    I'm going to say this, and I'm
10 going to say it again:  I instructed
11 Mr. Gray on what I wanted him to do, and in
12 the traditional sense of an attorney-client
13 relationship, I expected him to get that
14 done, and I've already said I did not object
15 to who he spoke to accomplish those aims.
16      Q.    Sheriff Warren, I'm not a good
17 teacher, and your lawyer's probably twice
18 the teacher I am.  And you can look to him
19 for advice, and he'll tell you if I'm wrong.
20 I do not believe you can have it both ways.
21 You can't have the attorney-client privilege
22 and then divorce yourself from it.  I'm
23 trying to find out which pail your foot's

Page 215

1  in.
2            So I'm going to ask again, and
3  again, and again to ask you to make a
4  commitment.  Did you intend when you were
5  working with Fred Gray, Jr., on these drafts
6  and amendments to the rules and regulations
7  for bingo gaming in Macon County that your
8  discussions with him, your drafts, and your
9  work product be just between the two of you
10 as attorney-client privilege or not?
11           MR. BOLTON:  Object to the
12 form.
13           MR. ANDERSON:  Object to the
14 form.
15      A.    Mr. Heninger, I've given you
16 my answer and that's it.  That's it.  That
17 is my official answer.
18      Q.    Are you afraid to say you
19 didn't intend it?
20      A.    No.  No.  I got fear.
21      Q.    Are you afraid to say you did
22 have fear?
23      A.    There are times that I have

Page 216

1  been fearful in my life, but this ain't one
2  of them.
3       Q.    You got good judgment then.
4            Was it your intent that
5  Mr. Gray allow input through him to you that
6  came from Victoryland to make sure the rules
7  favored Victoryland?
8            MR. TEPLEY:  Object to the
9  form.
10      Q.    Was that your intent?
11      A.    No, sir, that was not my
12 intent.
13      Q.    Was it your intent to prevent
14 that?
15      A.    My intent was to formulate
16 rules to operate bingo in Macon County as
17 best I could.
18      Q.    Did you include within that in
19 your intent, input from Milton McGregor
20 might be valuable on how we draft our rules,
21 regulations, and then amend them later?
22      A.    I did not consider that as a
23 part of my duty to consult with

Page 217

1  Mr. McGregor.
2       Q.    Nor did I ask you that.
3            It sounds to me like you've
4  been telling me for four hours now on the
5  Record that you had a job to do to get these
6  rules and regulations, that it was a new
7  area for you.  You figured you needed some
8  help so you went to your trusted lawyer,
9  Fred Gray, Jr., to get some help, and by
10 whatever means the two of you could come up
11 with rules and regulations to accomplish
12 your mission that was acceptable.  Am I
13 reading it right so far?
14           MR. BOLTON:  Object to the
15 form.
16           MR. TEPLEY:  I join.
17      A.    My intentions were to come up
18 with rules and regulations for the
19 promulgation -- to promulgate rules and
20 regulations that would govern bingo in Macon
21 County.  And I did the best I could do to
22 accomplish that.
23      Q.    Did you intend for Milton

55 (Pages 214 to 217)

FREEDOM COURT REPORTING

Page 218

1  McGregor, or any representative of
2  Victoryland, to have input into how the
3  rules and regulations were drafted and
4  adopted?
5          MR. TEPLEY:  Object to the
6  form of the question.
7          MR. BOLTON:  Same objection.
8      A.    That was not my intent.
9      Q.    Did you object to it?
10     A.    I don't know if that is a
11 fact. I don't know who Mr. Gray conferred
12 with.
13     Q.    Nor did I ask you that.
14         Did you object to or attempt
15 to block Milton McGregor or any
16 representative of Victoryland from having
17 input and access through Fred Gray, Jr., to
18 suggest rules and regulations for licensing?
19     A.    Mr. Heninger, that never came
20 up as an issue.
21     Q.    Did you object to it?
22     A.    There was no need to object if
23 it never came up as an issue.

Page 219

1      Q.    So you never anticipated it as
2  a problem?
3      A.    Mr. Heninger, the rules and
4  regulations that are here before you are the
5  rules that I promulgated and these are the
6  rules that I stand by. And that's it.
7      Q.    Do you know what input, if
8  any, Milton McGregor, or any representatives
9  of Victoryland, had in these rules and
10 amendments that you approved?
11     A.    Mr. Heninger --
12     Q.    Do you know?
13         MR. ANDERSON:  The question is
14 what input, if any, do you know?
15         MR. HENINGER:  Yes.
16     A.    No, sir, I don't.
17     Q.    You don't know if they had any
18 input; true?
19     A.    I do not know who Fred
20 conferred with to accomplish what I asked
21 him to do.
22     Q.    And you don't care who had
23 input, as long as you got the rules done;

Page 220

1  true?
2          MR. TEPLEY:  Object to the
3  form.
4          MR. BOLTON:  Same objection.
5          MR. ANDERSON:  Object to the
6  form. You can answer.
7      A.    Yes, I care.
8      Q.    Well, if you care, why didn't
9  you ask?
10     A.    That was not an issue.
11     Q.    It's an issue today, and I
12 want to know if you care, why didn't you
13 ask?
14     A.    I'm giving you the best answer
15 I can give you today.
16     Q.    No, you're giving me the
17 truth, that's the best you can do. If
18 you cared --
19     A.    I'm giving you my truth.
20     Q.    Let me finish. If you cared,
21 as the sheriff, who was giving input into
22 these rules and regulations, why didn't you
23 ask?

Page 221

1      A.    Sir, I didn't consider Milton
2  McGregor when I was writing these rules or
3  getting them written. I didn't confer with
4  him because the sheriff of Macon County is
5  responsible for making these rules. And
6  that's it.
7      Q.    Did it matter to you where
8  Fred Gray, Jr., was getting help or
9  suggestions on these rules and regulations?
10     A.    I wanted rules and regulations
11 that would be lawful, that would accomplish
12 the goal that they were to accomplish, the
13 goals of governing bingo in Macon County.
14 Mr. Gray got that accomplished.
15     Q.    Did it matter to you how he
16 got it done and who he consulted and what
17 conflicts of interest might have been
18 involved? Did any of that matter to you as
19 long as he came up with some rules and
20 regulations?
21         MR. BOLTON:  Object to the
22 form.
23     A.    What mattered to me was that I

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 222

1  promulgate rules and regulations that would
2  act in the best interest of the citizens of
3  Macon County, and that was it.
4        Q.    Did it matter to you that
5  input was being received from Victoryland
6  into the drafting of rules and regulations
7  and amendments?
8        MR. TEPLEY:  Object to the
9  form of the question.
10       MR. ANDERSON:  Same objection.
11  You can answer.
12       A.    Sir, I don't know who Mr. Gray
13  consulted with.
14       Q.    Let's assume he did, he got
15  input from representatives of Victoryland.
16  Assuming that's true, does that matter to
17  you?
18       A.    In accomplishing what I asked
19  Mr. Gray to do, I did not object to Mr. Gray
20  discussing -- having discussions with
21  anyone.
22       Q.    Including Victoryland?
23       A.    Including Victoryland.

Page 223

1        Q.    Milton McGregor and his
2  lawyers?
3        A.    Including Victoryland.
4        Q.    Do you see Victoryland as
5  Milton McGregor?
6        A.    I see Victoryland as an entity
7  that does bingo in Macon County.
8        Q.    Do you associate Milton
9  McGregor with Victoryland?
10       A.    When you ask in that context,
11  I associate him with Victoryland.
12       Q.    May I have an answer?
13       A.    I think I just gave you one.
14       Q.    I thought you said do I
15  associate him.
16       MR. ANDERSON:  No.  He said I
17  associate him.
18       A.    I said in the context in which
19  you asked the question.
20       Q.    As you sit here today, do you
21  know what benefit Fred Gray, Sr., has
22  received by virtue of Victoryland having the
23  only operator's license in Macon County for

Page 224

1  electronic bingo?
2        MR. ANDERSON:  Object to the
3  form.
4        MR. TEPLEY:  I join.
5        A.    I don't know anything about
6  Mr. Gray's involvement with Victoryland.
7        Q.    Have you sought to find out?
8        A.    That is Mr. Gray's personal
9  business.  My business has been with Fred
10  Gray, Jr.
11       Q.    So may I take that as a no,
12  you've not sought to find out what Mr. Fred
13  Gray may have benefited from Victoryland
14  having the monopoly on operating electronic
15  bingo in Macon County?
16       MR. ANDERSON:  Object to the
17  form.
18       MR. TEPLEY:  Object to the
19  form.
20       MR. DAVENPORT:  Join.
21       A.    I have no involvement of
22  Mr. Gray's involvement with Victoryland.  My
23  sole relationship has been with Fred Gray,

Page 225

1  Jr., in representing me as an attorney.
2        Q.    Well, has it ever crossed your
3  mind to ask the question out of curiosity,
4  did anyone at that law firm get any benefit
5  from allowing Victoryland or its
6  representatives, to have input into Sheriff
7  David Warren's circle in coming up with the
8  rules?  Has it ever crossed your mind to be
9  curious about that?
10       MR. TEPLEY:  Same objection.
11       MR. ANDERSON:  Object to the
12  form.  You can answer.
13       A.    When Fred Gray and I came up
14  with these rules, I went over everything
15  that I needed to; we collaborated on them.
16  But in the final analysis, these are not
17  Milton McGregor's rules, they are not Fred
18  Gray, Jr.'s, rules, these are not Fred Gray,
19  Sr.'s rules.  These are the rules that I
20  approved and that I stand by.
21       Q.    Amen.  But you benefitted --
22       MR. GRAY, JR.:  Can I say one
23  thing just to clarify.  Because in his

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 226

1  response, he said when Fred Gray and I
2  whenever the last few words, and I'm sure he
3  meant to say Fred Gray, Jr. I didn't want
4  the Record to read wrong.
5      A.   I meant Fred Gray, Jr.
6      Q.   Sheriff Warren, was it your
7  intention to benefit financially from the
8  licensing of charities or locations in Macon
9  County for electronic bingo?
10     A.   Ask that again.
11     Q.   Boy, if you can't say no to
12 that.
13         I'll start over. Was it your
14 intention to personally benefit financially
15 from the drafting of rules and regulations
16 for the licensing of electronic bingo in
17 Macon County, Alabama?
18     A.   No, sir.
19     Q.   You would not?
20     A.   It was not my intention.
21     Q.   It was not your intention to
22 favor someone over another charity or
23 operator, applicant for a license to benefit

Page 227

1  yourself financially?
2      A.   No, sir, that was not my
3  intention.
4      Q.   Was it your intention to
5  benefit Fred Gray, Jr., by his involvement
6  in the drafting of these rules and
7  regulations and amendments so he could
8  benefit by Victoryland receiving favorite
9  treatment?
10         MR. TEPLEY:  Object to the
11 form of the question.
12     A.   No, sir, that was not my
13 intentions. I did not intend that Fred Gray
14 would benefit anything from these rules and
15 regulations.
16     Q.   Was it your intention that
17 Milton McGregor and Victoryland and the
18 shareholders in Victoryland benefit
19 financially by being a monopoly holder for
20 electronic bingo in Macon County?
21         MR. BOLTON:  Object to the
22 form.
23         MR. ANDERSON:  Object to the

Page 228

1  form.
2          MR. TEPLEY:  Object to the
3  form.
4      A.   That was -- It was not my
5  intention that Milton McGregor or
6  Victoryland or any of its stockholders
7  benefit personally from a monopoly.
8      Q.   Do you think it was just a
9  coincidence that Victoryland has the one
10 operator's location license and all sixty of
11 the permitted charity licenses to have a
12 monopoly, under the current rules?
13     A.   Victoryland met the current
14 rules and the requirements of the current
15 rules, the charities met the requirements
16 for charities -- for charities and other
17 entities, operating lawfully, and it's sixty
18 of them. And they are doing -- They are
19 conducting bingo in Macon County.
20     Q.   How much money is each charity
21 getting paid by Victoryland right now?
22 Let's take 2007, what did they get paid?
23     A.   I think 2007, they were

Page 229

1  getting paid fifteen thousand dollars.
2      Q.   Do you know what Lucky Palace
3  was assuring they would be paid?
4      A.   Something more than fifteen
5  thousand dollars.
6      Q.   Twenty-one thousand dollars?
7      A.   Twenty-one thousand dollars.
8      Q.   Sound familiar?
9      A.   Uh-huh.
10         (Whereupon, Plaintiff's
11          Exhibit No. 12 was marked
12          for identification.)
13     Q.   We're about to run out of
14 tape.
15         I just want to confirm,
16 Plaintiff's Exhibit 12, do you remember
17 being presented this letter by Mr. Bracy on
18 behalf of Lucky Palace hoping that he could
19 assure his investors that there would be no
20 changes in the rules in the near future. Do
21 you remember that he asked you to sign that?
22         MR. TEPLEY:  Object to the
23 form of the question.

FREEDOM COURT REPORTING

Page 230

1    A.    Yes, sir.
2    Q.    Did he ask you to sign that?
3    A.    Yes, he did.
4    Q.    And did you decline?
5    A.    Yes, I did decline.
6    Q.    And Plaintiff's Exhibit --
7         MR. TEPLEY:  Is there a Bates
8    number on 12?
9         MR. ANDERSON:  It's Bates
10   number LUC 00088.  LUC 88.
11        (Whereupon, Plaintiff's
12        Exhibit No. 13 was marked
13        for identification.)
14   Q.    Plaintiff's Exhibit 13 is
15   Bates number LUC 000899.  A letter dated
16   August 5, 2004, from you to Mr. Bracy and
17   Lucky Palace.  Do you recognize that?
18   A.    Yes, sir, I do.
19        MR. BOLTON:  August what,
20   Steve?
21        MR. HENINGER:  August 5, 2004.
22        MR. ANDERSON:  Right.
23   Q.    That was after you had met

Page 231

1    with him in July of 2004, and you had
2    received his letter, and he asked you to
3    sign Exhibit 12; true?
4    A.    Yes.  Yes, sir.
5    Q.    Who drafted Exhibit 13?
6         Is this your letter or Fred
7    Gray, Jr.'s?
8    A.    That letter --
9    Q.    Somebody else's?
10   A.    That letter is from me.
11   Q.    So it's your words?
12   A.    Yes, sir.
13   Q.    Did you mean it when you wrote
14   it?
15   A.    At the time I wrote it, I
16   meant it.
17   Q.    You weren't trying to
18   fishtail?
19   A.    No, sir.
20   Q.    You were trying to answer a
21   question for some applicant that could bring
22   benefit to the citizens of Macon County,
23   weren't you?

Page 232

1         MR. TEPLEY:  Object to the
2    form of the question.
3    A.    My -- The letter I wrote to
4    Mr. Bracy speaks for itself.
5    Q.    It does indeed.  And you told
6    him you didn't have any plans to amend or
7    change the rules, didn't you?
8    A.    Yes, sir.  But I also told --
9    stated in that letter that this was
10   relatively new, and I reserve the right to
11   change the rules and regulations as needed.
12   Q.    Do you reserve the right to
13   change them tomorrow to increase the
14   charities to ninety and to give Lucky Palace
15   an operator's license if they have fifteen
16   or more charities attached to them?
17        MR. ANDERSON:  Object to the
18   form.
19        MR. TEPLEY:  Join.
20   Q.    Do you reserve the right to do
21   that?
22   A.    I reserve the right to act in
23   this matter.

Page 233

1    Q.    Do you have the guts -- Do you
2    have the guts to upset the apple cart at
3    Victoryland so that they don't have a
4    monopoly anymore?
5         MR. ANDERSON:  Object to the
6    form.
7         MR. TEPLEY:  Object to the
8    form of the question.
9         MR. ANDERSON:  You can answer.
10   A.    I have the guts, the
11   fortitude, and the love for Macon County
12   that I act in its best interest as best I
13   can at all times.
14   Q.    Do you believe that what's
15   good for Victoryland is good for Macon
16   County, period?
17        MR. TEPLEY:  Object to the
18   form of the question.
19   A.    I believe that Macon County
20   is -- Macon County is my home, and I put it
21   above Victoryland, Milton McGregor, and
22   anybody else.
23   Q.    And you believe that if

59 (Pages 230 to 233)

FREEDOM COURT REPORTING

Page 234

1 something is good for Victoryland, it is
2 naturally good for Macon County?
3        A.    Not necessarily.
4        Q.    Something may be good for
5 Victoryland and it's not necessarily good
6 for Macon County?
7        A.    Something may be good for
8 Victoryland, that could be.
9             MR. HENINGER:  I think the
10 tape's at an end.
11             VIDEOGRAPHER:  This is the end
12 of tape number four; we're off the Record at
13 4:28 p.m.
14             (Recess taken.)
15             VIDEOGRAPHER:  This is the
16 beginning of tape number five; we are on the
17 Record at 4:47 p.m.
18        Q.    (BY MR. HENINGER):  Sheriff
19 Warren, what had you done as of December 17,
20 2003, when you issued the first licenses, to
21 determine who were the investors in
22 Victoryland?
23        A.    I believe Tommy went out and

Page 235

1 reviewed their documents.  And he handled
2 all of that.
3        Q.    So is it your belief that
4 there was a formal investigation to
5 determine who the shareholders and investors
6 were at Victoryland?
7             MR. BOLTON:  Object to the
8 form.
9        A.    Was there a formal
10 investigation?  The person that handles the
11 investigations for me, he went to
12 Victoryland.  And when he returned to me, he
13 was -- he saw what he needed to see.
14        Q.    Well, I need to hear what I
15 need to hear.  I'm asking you:  Was a formal
16 investigation done by your office to
17 determine who the shareholders and investors
18 were in Victoryland --
19             MR. ANDERSON:  Object to the
20 form.
21        Q.    -- before you issued them a
22 license?
23             MR. ANDERSON:  Same objection.

Page 236

1        A.    For criminal purposes to
2 see -- there were record checks done.
3        Q.    Was there an investigation
4 done to determine the names of the investors
5 or shareholders of Victoryland before they
6 received a bingo license?
7        A.    That was reviewed, yes, sir.
8        Q.    And where would that formal
9 investigation report that gives each name of
10 each shareholder be found in your office?
11             MR. ANDERSON:  Object to the
12 form.
13        A.    That information -- That
14 information would be -- We don't -- We've
15 got information regarding the results of
16 that investigation.  I'd have to talk to
17 Tommy to find out what he did with it.
18             I'm pretty sure he visited
19 Victoryland, reviewed their -- because we
20 reviewed their information and from there,
21 we were assured that their -- they were in
22 order to issue a license.
23        Q.    You were required to

Page 237

1 investigate to determine the names and
2 interests of shareholders and investors and
3 people, entities granted licenses for bingo;
4 true?
5        A.    Yes.
6        Q.    You're telling me that such an
7 investigation was done of Victoryland to
8 determine the names of the shareholders and
9 investors and their interests before they
10 received a license; true?
11        A.    That was -- That was done by
12 Tommy Miller.
13        Q.    And since you're the sheriff
14 with the authority, did he report it back to
15 you?
16        A.    Yes, he did.
17        Q.    Then you would have known what
18 Fred Gray, Sr.'s, interest was in
19 Victoryland, wouldn't you?
20             MR. ANDERSON:  Object to the
21 form.
22        Q.    Sir?
23        A.    I didn't -- I did not review

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 238

1  that information.  Once Tommy did his
2  inquiry and found that information in order,
3  we -- they were found in compliance.
4       Q.   So did you or didn't you know
5  that Fred Gray was a shareholder and what
6  percentage he had in that corporation which
7  was operating under the name of Victoryland
8  when you gave them a bingo license?
9       A.   I did not review that
10 information.
11          (Whereupon, Plaintiff's
12          Exhibit No. 14 was marked
13          for identification.)
14      Q.   Okay.  Let me show you
15 Plaintiff's Exhibit 14, which is LUC 00092.
16 A letter dated October 20, 2004, from you to
17 Mr. Bracy.  Do you recall that letter?
18      A.   Yes.
19      Q.   Who wrote that letter?  I'm
20 asking in whose words that letter is
21 written.
22      A.   Those are my words.
23      Q.   Did you type it yourself?

Page 239

1       A.   It was -- It was done on my
2  computer at that time, word processor.
3       Q.   Did you type it yourself?
4       A.   Yes, sir.
5       Q.   Did you type Exhibit 13
6  yourself?
7       A.   Yes, sir.
8       Q.   Now, on Exhibit 14, were you
9  aggravated at Paul Bracy when you typed that
10 letter and sent it to him?
11      A.   I was concerned that Mr. Bracy
12 was using a letter that I had given him in a
13 way that was inappropriate.
14      Q.   Did you believe that the
15 letter that you had given him was
16 confidential and could not be shared with
17 anyone?
18      A.   No.  I did not agree with --
19 No, I did not believe that it was
20 confidential.  My concern was of another
21 nature.
22      Q.   Exhibit 13 is the letter you
23 were concerned he was sharing with others,

Page 240

1  isn't it?
2          MR. HENINGER:  Ron, is that 13
3  you have?
4          MR. DAVENPORT:  Yes.  Excuse
5  me.
6          MR. HENINGER:  If you will let
7  him look at that for a moment.
8       Q.   Exhibit 13 is the one you were
9  concerned he was sharing with others?
10         MR. ANDERSON:  Object to the
11 form.
12      A.   Yes.
13      Q.   Because unless I'm mistaken,
14 there are only two letters from you to Lucky
15 Palace and Paul Bracy?
16      A.   Yes.
17      Q.   So I take it from Exhibit 14,
18 which speaks for itself, you were concerned
19 that Bracy was making it seem like he had a
20 commitment from you that Lucky Palace was
21 going to get a license and the rules were
22 not going to be changed again; fair enough?
23      A.   That was not my sole concern.

Page 241

1       Q.   Well, in Exhibit 13, which is
2  written on your official letterhead as the
3  sheriff of Macon County, you make certain
4  statements to him.  And as an official and
5  the official in charge of bingo licensing,
6  there's nothing wrong with him sharing that
7  with others, is there?  You're a public
8  official.
9       A.   It was not the sharing of it
10 with others that concerned me.
11      Q.   Well, that's the only part of
12 my question right now.  We're going to go
13 one step at a time, Sheriff.  It was not a
14 problem for him to take a letter from a
15 public official on public tax paid for
16 stationary and show it to someone else, was
17 it?
18      A.   No.
19      Q.   All right.  What you do have a
20 problem with is that you felt that he had
21 somehow intimated impropriety in your
22 office; true?
23      A.   This letter was a concern.

FREEDOM COURT REPORTING

Page 242

1      Q.    Well, first of all, do you
2  have any criticism of Lucky Palace and its
3  investors and lenders that are facing over
4  fifty million dollars of investment asking
5  you, as the sheriff, to give them some level
6  of assurance that the rules aren't going to
7  be changed again before they apply for a
8  license?
9            MR. ANDERSON:  Object to the
10  form.
11            MR. TEPLEY:  Object to the
12  form of the question.
13      Q.    Have you got any criticism of
14  that?
15      A.    As the sheriff, I reserve the
16  right to change or deal with the rules as I
17  see fit.  I have no objections to Mr. Bracy
18  or Lucky Palace gaining a license in Macon
19  County.  I simply did not want to get more
20  involved in that than I deemed appropriate.
21      Q.    Who has 13?
22            Well, you wrote, and you told
23  me you meant this when you wrote it on

Page 243

1  August 5, 2004, to Lucky Palace and Paul
2  Bracy as president:  As sheriff, I reserve
3  the right to amend the regulations as
4  necessary.  However, I do not foresee any
5  need for any substantive changes in the
6  foreseeable future, period.  I do not intend
7  any such substantive changes any time soon,
8  period.
9            Did you write that?
10      A.    Yes, I wrote it.
11      Q.    And you wrote it because he
12  was asking you for some assurance because of
13  his investors; true?
14      A.    That accurately states his
15  discussion with me.
16      Q.    Then in Exhibit 14, you say:
17  My letter to you was a personal
18  accommodation to you to address your
19  concerns, not a tool for you to utilize in
20  your future business plans.
21            What's wrong with him using
22  that letter however he sees fit when it's a
23  public document, from a public official, on

Page 244

1  taxpayer paid for stationary?
2      A.    Let me simply say this, and
3  one thing I did not do in approving
4  anybody's license and anybody's whatever,
5  and that was get involved with anyone's
6  finances or their -- and that is one place
7  where I wanted to stay void of.
8      Q.    Well, here is my problem, and
9  I know you can shed some light on this to
10  make me see the light.  How is it okay for
11  Victoryland to have input into Fred Gray,
12  Jr., their lawyer, how he drafts the rules
13  and regulations for you, as your lawyer,
14  that somehow coincidentally ends up making
15  them the only monopoly, that's okay.  But
16  it's not okay for Lucky Palace to share one
17  simple letter that you wrote to them?
18            MR. TEPLEY:  Object to the
19  form of the question.
20      Q.    Tell me the difference.
21            MR. ANDERSON:  Object to the
22  form.  You can answer.
23            MR. BOLTON:  Same.

Page 245

1      A.    First of all, as I have stated
2  before, I don't know who Mr. Gray had
3  discussions with.  I do have objections when
4  somebody gets on the airwaves and makes
5  reference -- makes personal references to me
6  and my intentions and what I'm going to do.
7      Q.    What'd they say?
8      A.    I would -- There was a
9  reference to me and that I had, in a sense,
10  approved of something that I had not.  It
11  was inferred that I had approved something
12  that I had not.
13      Q.    Let's not play cat and mouse.
14  What was said?
15      A.    To the best of my
16  recollection, that was what was implied.
17      Q.    Implied that you had approved
18  what?  Sunday baseball, selling of milk in
19  elementary school?
20      A.    No.  Another gaming facility
21  in Macon County.
22      Q.    And was it stated -- You heard
23  this on the radio or TV?

FREEDOM COURT REPORTING

Page 246

1    A.    It was on television.
2    Q.    And was it -- it was stated
3  that -- or implied that you had given prior
4  approval to someone getting a license for
5  bingo?
6    A.    That was my understanding of
7  how I heard that.
8    Q.    And this offended you?
9    A.    It did not offend me.  I did
10  not -- That was not factual, and it was a
11  misrepresentation of the circumstances at
12  that point in time.
13    Q.    Well, if it were true that
14  Sheriff David Warren had allowed preapproval
15  of an applicant for an operator's license in
16  bingo, that's wrong, isn't it?  Before ever
17  receiving an application, if you had given
18  preapproval to someone for an operator's
19  license for bingo gaming, that would be
20  wrong, wouldn't it?
21    A.    The rules state that you must
22  meet certain requirements, and anybody who
23  met those requirements --

Page 247

1    Q.    If it were true --
2    A.    -- were authorized.
3    Q.    Okay.  If it were true that
4  you had given approval to an applicant for
5  an operator's license before even an
6  application were filed, that would be wrong,
7  wouldn't it?
8    A.    Preapproval without first
9  meeting the requirements of the rules and
10  regulations would be wrong.
11    Q.    So if you gave Milton McGregor
12  the impression, whether it was by a
13  handshake or a wink, that Victoryland was
14  going to be preapproved, that would be
15  wrong, wouldn't it?
16    MR. TEPLEY:  Object to the
17  form of the question.
18    Q.    I know you're going to say
19  that didn't happen.  But I'm saying if it
20  did happen, it's wrong, isn't it?
21    A.    If it did happen without
22  meeting the requirements, that would be
23  wrong.

Page 248

1    Q.    Wow, you said a mouthful.
2  Thank you.
3    If you did give preapproval to
4  Victoryland before an application was even
5  filed and then drafted the rules so they
6  only applied to Victoryland and thereby
7  allowed them to meet all the requirements,
8  it's okay?
9    MR. TEPLEY:  Object to the
10  form of the question.
11    MR. ANDERSON:  Object to the
12  form.
13    Q.    Is that what you're telling
14  me?
15    A.    No, sir.
16    Q.    What are you telling me,
17  Sheriff?  Don't play cat and mouse.  Hit the
18  ball.
19    What are you telling me?
20    A.    I'm telling you that for an
21  entity to conduct bingo in Macon County,
22  they must meet the requirements of the rules
23  and regulations.

Page 249

1    Q.    And I'm asking you, is it okay
2  for you to draft the rules and regulations
3  and skulk them like Michelangelo to look
4  exactly like Victoryland, so Victoryland
5  will get a monopoly?  Is that acceptable
6  under the law?
7    MR. TEPLEY:  Object to the
8  form of the question.
9    A.    For me to construct rules that
10  favored Victoryland would be improper.
11    Q.    And amend them too, if the
12  intent was to favor Victoryland?
13    A.    If the intent was to favor
14  Victoryland, and those rules were intended
15  to favor Victoryland, that would be wrong.
16    Q.    Going back to 14.  You said:
17  Public announcements such as the one that
18  recently occurred, statements from
19  individuals of comments that you have
20  allegedly made to them as well as
21  distribution by you of my recent letter to
22  you, create an appearance of impropriety
23  towards the sheriff's office of some, quote,

63 (Pages 246 to 249)

FREEDOM COURT REPORTING

Page 250

1  clandestine, end quote, advance approval of
2  a bingo license, which I do not appreciate.
3  Sincerely, David Warren.
4        You remember that?
5        A.   Yes, sir.
6        Q.   Are you concerned with the
7  appearance of impropriety?
8        A.   You know, what I am concerned
9  with is persons getting on the air,
10 attributing statements to me or attributing
11 actions to me that don't reflect my
12 intentions at that particular point in time.
13       Q.   Sheriff, what I was getting
14 at, which I think is most likely obvious,
15 but I need to get it confirmed by you.
16 You've been in public life a long time.
17       A.   Yes, sir.
18       Q.   Sometimes that light is warm
19 and fuzzy, sometimes it ain't so much fun;
20 true?
21       A.   It's a challenge most times.
22       Q.   But even when a public officer
23 like you knows in his heart he's right, but

Page 251

1  you're the only one that knows.  And things
2  look bad and people are going by the
3  appearance, the appearance of impropriety
4  can cause you some concern, can't it?
5        A.   The appearance of impropriety
6  would cause most people concern.
7        Q.   Well, I mean you referenced it
8  in this letter?
9        A.   Yes.
10       Q.   So -- And in this situation
11 we're here about in this lawsuit, with the
12 way these rules have been drafted, the
13 timing of the amendments, the squeeze out of
14 other license applicants in favor of
15 Victoryland, as a fact, you can see how that
16 gives an appearance of impropriety, can't
17 you?
18       MR. TEPLEY:  Object to the
19 form of the question.
20       MR. ANDERSON:  Object to the
21 form.
22       MR. BOLTON:  Same objection.
23       A.   Again, I will state what I did

Page 252

1  and will do any time in the future, the
2  rules and regulations that I have
3  promulgated are mine.  I wrote those rules
4  with the best interest of the citizens -- I
5  ain't talking about the citizens nowhere
6  else, I'm talking about the citizens of
7  Macon County and mine.
8        Q.   Here.  Here.
9        A.   Yes.
10       Q.   That's your job, isn't it?  Is
11 Milton McGregor a citizen of Macon County?
12       A.   No, sir.
13       Q.   Is Walter Russell a citizen of
14 Macon County?
15       A.   No, sir.
16       Q.   Is Victoryland or the proper
17 legal designation of the Macon County
18 Greyhound Race Track, or whatever it is, a
19 citizen of Macon County?
20       A.   Victoryland is a entity that
21 is within Macon County.
22       Q.   Is its ownership a citizen of
23 Macon County?

Page 253

1        A.   I think it's well known that
2  Mr. McGregor is a citizen of Montgomery
3  County.
4        Q.   What about the entity that
5  runs Victoryland, do you know what county
6  they're a citizen of?  I mean, you
7  investigated them, surely you know that.
8        A.   Victoryland has been in Macon
9  County for over twenty years.
10       Q.   The Macon County Greyhound
11 Park Incorporated, do you know where they
12 are a citizen?
13       A.   There may be citizens in that
14 entity that are from places other than Macon
15 County, I admit that.
16       Q.   You really don't know where
17 it's incorporated, do you?
18       MR. ANDERSON:  Do you
19 understand his question?
20       THE WITNESS:  Yes.
21       Q.   What county was it
22 incorporated within?
23       A.   I would have to refer to some

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 254

1  notes to refresh my memory on that.
2      Q.    Do you owe Milton McGregor any
3  favors?
4      A.    No, sir.
5      Q.    Do you owe anybody that has an
6  ownership interest in Victoryland any
7  favors?
8      A.    No, sir.
9      Q.    Have you ever owed any favors
10  to them for being in your county?  For
11  raising money for your county, have you ever
12  owed any favors to Victoryland or Milton
13  McGregor?
14      A.    No, sir.
15      Q.    So it would not be appropriate
16  to do something improper to benefit them
17  financially, even if it ended up being good
18  for the citizens of Macon County, would it?
19      A.    Again, sir, what you're asking
20  me is something I have answered over and
21  over, and I will say to you:  The rules and
22  regulations that I promulgated were meant to
23  govern the operation of bingo in Macon

Page 255

1  County.  And I tried my best to promulgate
2  those rules so that they would be of a
3  benefit to Macon County.
4      Q.    Thank you, Sheriff.  Now if I
5  can ask my question and get an answer.  Do
6  you believe when looking at the financial
7  impact on the citizens of Macon County, that
8  the ends justifies the means, that as long
9  as something ends up good for the citizens
10  of Macon County using improper, illegal,
11  immoral means, is okay?
12          MR. ANDERSON:  Object to the
13  form.
14          MR. TEPLEY:  Join.
15      A.    Improper, illegal means.
16      Q.    If you left out immoral.
17      A.    Immoral, sorry.  If that were
18  being done, I don't approve of it.
19      Q.    It's not okay by you to do
20  anything, no matter how illegal or improper
21  or unfair, just to benefit the citizens of
22  Macon County?
23      A.    I think I've answered that.

Page 256

1      Q.    I think you have.  I just want
2  to make sure you agree with me that if
3  government stoops that low, it's not good
4  government?
5      A.    Well, if government does stoop
6  that low, it is not good government.
7      Q.    So what started this section
8  of questions and answers was my asking you
9  whether you believe that if Victoryland was
10  giving some financial benefit to the
11  citizens of Macon County by its bingo gaming
12  license, it would be okay to favor them
13  improperly above all others?
14      A.    No, sir.
15      Q.    That's not okay?
16      A.    That was not -- I am not
17  agreeing with that.
18      Q.    You don't think that would be
19  okay?
20      A.    I don't think that would be
21  okay.
22      Q.    Was Mr. Bracy ever rude to
23  you?

Page 257

1      A.    No, sir.
2      Q.    Ever curse you or criticize
3  you for not giving him a license?
4      A.    No, sir.
5          (Whereupon, Plaintiff's
6          Exhibit No. 15 was marked
7          for identification.)
8      Q.    In fact, as I look at the
9  correspondence, and let me mark this, here
10  is a letter that I'm going to mark as
11  Plaintiff's Exhibit 15, it's dated November
12  10, 2004, and it's LUC 00095, which is after
13  he has received this spanking letter from
14  you, Exhibit 14.  And he says, I hope this
15  letter finds you well and goes on to explain
16  how they're doing.
17          Do you remember getting that?
18          MR. TEPLEY:  Object to the
19  form of the question.
20          MR. HENINGER:  What was wrong
21  with the form of that question, do you
22  remember getting that?
23          MR. TEPLEY:  If you want me to

Page 258
1  go into it, I will tell you.
2       MR. HENINGER:  Yeah.
3       MR. TEPLEY:  It was your
4  characterization of his letter.
5       MR. HENINGER:  You object to
6  spanking --
7       MR. TEPLEY:  I object to your
8  characterization --
9       MR. HENINGER:  I join in your
10  objection.
11       MR. TEPLEY:  Are you going to
12  withdraw the question?
13       MR. HENINGER:  No. I want the
14  spanking --
15       MR. ANDERSON:  I didn't object
16  to the spanking.  That's in general, not
17  specifically.
18   A.   Yes.  And I remember receiving
19  this letter from Mr. Bracy.
20       (Whereupon, Plaintiff's
21        Exhibit No. 16 was marked
22        for identification.)
23   Q.   I'm going to make a composite

Page 259
1  Exhibit Number 16, which is the series of
2  letters to you from Mr. Bracy and Lucky
3  Palace beginning in June of 2004, and they
4  begin at LUC 00085, go through 087 and then
5  start again at 090 and go through 094.
6       And just ask you to look at
7  these and confirm that you remember
8  receiving them, if you would, Sheriff.
9       I'm going to need to add to
10  that 00084.
11       MR. ANDERSON:  Stick that on
12  the back.  Keep it in chronological order;
13  want to make sure it's in order.
14       MR. HENINGER:  It is.  Put
15  this on the front, and I'll put the sticker
16  on the front.
17       MR. TEPLEY:  Is 84 another
18  letter from you guys?
19       MR. HENINGER:  It's the first
20  one, June 11th, yes.
21       MR. BOLTON:  Steve, for the
22  Record, what's the date of the 85 to 87
23  letter?

Page 260
1       MR. HENINGER:  June 15, 2004.
2  Just for the Record, the first one is June
3  11, 2004; the second one is June 15, 2004;
4  the third one is July 30, 2004; fourth is
5  August 17, 2004; and fifth is September 3,
6  2004.  Next appears to be updated, that's
7  the one that is LUC 093 and 94.
8   Q.   Did you get a chance to go
9  through those to make sure --
10       MR. ANDERSON:  The question is
11  did he remember receiving these?
12       MR. HENINGER:  Yes.
13       MR. ANDERSON:  Okay.
14       MR. HENINGER:  Did we get an
15  answer?
16       MR. ANDERSON: Not yet.
17       MR. HENINGER:  Is he still
18  looking at them?
19       MR. ANDERSON:  He's starting
20  looking at them.
21   A.   Yes, sir.
22   Q.   Thank you.
23   A.   I remember receiving these

Page 261
1  correspondence.
2       MR. ANDERSON:  Plaintiff's
3  Exhibit 16?
4   A.   Plaintiff's Exhibit 16.
5   Q.   Throughout the application
6  process by Lucky Palace to get an operator's
7  license for electronic bingo in Macon
8  County, did Paul Bracy or any other
9  representative of Lucky Palace or its
10  investors or lenders treat you with disdain
11  or disrespect?
12   A.   No, sir.
13   Q.   Ever do anything other than
14  what you asked them to do?
15   A.   No, sir.
16   Q.   And how was their application
17  for a Class B electronic bingo gaming
18  license for operation at a location in Macon
19  County deficient?
20   A.   First of all, there was no
21  qualified location in Macon County.
22   Q.   What do you mean by that?
23   A.   Mr. Bracy did not have a

FREEDOM COURT REPORTING

Page 262

1  qualified location in Macon County. That --
2  that is a requirement before you are able to
3  conduct bingo games -- to be licensed to
4  conduct --
5      Q.    Well, under the rules only
6  Victoryland had a qualified location; true?
7          MR. TEPLEY:  Object to the
8  form.
9      A.    Victoryland was the first
10 qualified location.
11     Q.    At the times when Lucky Palace
12 had application in and the first amendments
13 came in and the second amendments came in,
14 Lucky Palace could not have a qualified
15 location because that only location was
16 occupied by Victoryland under the rules;
17 true?
18         MR. ANDERSON:  Object to the
19 form.
20         MR. BOLTON:  Object to the
21 form.
22         MR. TEPLEY:  Join.
23     A.    That is not entirely true.

Page 263

1      Q.    Help me understand this. When
2  the rules say that there can only be sixty
3  charities licensed, and when the rules say
4  that a location can only get a license if
5  it's attached to a charity; true?
6      A.    Uh-huh.
7      Q.    How many charities at a
8  minimum?
9      A.    Fifteen.
10     Q.    And if Victoryland has a
11 license after the drafting of the initial
12 rules and regulations, and if Victoryland
13 continues to have that operator's license
14 and all sixty of the allowable charity
15 licenses. Under the current rules, no one
16 else can get an operator's license; true?
17     A.    Under the current -- Under the
18 current rules at this time, that would be a
19 reality.
20     Q.    Can you explain to me how, as
21 a man with common sense, you think any
22 investor would come into Macon County and
23 invest fifteen, twenty, twenty-five, fifty

Page 264

1  million dollars when the rules say they can
2  never even be eligible to apply for a
3  license? Why would you think anybody would
4  do that?
5          MR. TEPLEY:  Object to the
6  form.
7          MR. BOLTON:  Object to the
8  form.
9      A.    When -- At the beginning when
10 the rules and regulations were first
11 instituted, there was seven months there
12 when the license didn't change, the rules
13 didn't change, the amount of money didn't
14 change. As a matter of fact, when the sixty
15 rule was initiated, there were still
16 thirty-nine charities.
17     Q.    Are you finished?
18     A.    Yes, sir.
19     Q.    Now, you told me earlier that
20 as far as you were concerned, for an
21 applicant for an operator's license to get a
22 electronic bingo license in Macon County,
23 they had to have an already-built building

Page 265

1  that you could inspect. Did I hear you
2  correctly?
3      A.    Yes, sir.
4      Q.    Well, if you look at your
5  rules, and I'd be happy to point you to
6  them, you realize that the word location is
7  defined in the rules?
8      A.    Yes, sir.
9      Q.    And do you realize the
10 definition says location shall mean a
11 building comma, hall comma, enclosure comma,
12 room, or outdoor area. Did you know that?
13     A.    Yes, sir.
14     Q.    So an outdoor area without any
15 structure, under your rules, can qualify if
16 inspected by you, did you know that?
17         MR. ANDERSON:  Object to the
18 form.
19     Q.    And you can look at it if
20 you'd like. Let's first look at the first
21 amended rules, which is Number 6. If you
22 will look at the section that deals with
23 definitions of location.

67 (Pages 262 to 265)

FREEDOM COURT REPORTING

Page 266

1    Are you looking at the
2 definition of location?
3    A.    Yes, sir.
4    Q.    Do you realize outdoor area
5 meets the definition of location?
6    A.    Yes.
7    Q.    If you, as the sheriff, choose
8 to inspect and approve an outdoor location,
9 you can do so under your rules, can't you?
10 You don't have to have a building, do you?
11    A.    That was simply defining what
12 was meant by location.
13    Q.    Sir, it's your rules.  I don't
14 know how many times today you've said these
15 are David Warren's rules.
16    A.    That's right.
17    Q.    Your rules give you the wiggle
18 room, if you see fit as the licensing
19 authority, to inspect and find as a
20 qualified location an outdoor area, don't
21 they?
22    MR. ANDERSON:  Object to the
23 form.

Page 267

1    A.    In the context that you are
2 asking that question, that would be, yes.
3    Q.    You didn't choose to do that
4 with Lucky Palace?
5    A.    I didn't choose to do that
6 with anyone.
7    Q.    Did you inspect their outdoor
8 area that they closed on, the property?
9    A.    I knew that -- the location of
10 that property.
11    Q.    But you knew you didn't need
12 to inspect it, because they couldn't qualify
13 anyway.  Victoryland had the only game
14 allowed.
15    MR. ANDERSON:  Object to the
16 form.
17    MR. TEPLEY:  Object to the
18 form.
19    Q.    True?
20    A.    That is not -- In the context
21 in which you are stating that question,
22 that, due to the sixty rule, is true at this
23 time.

Page 268

1    Q.    You explained in the
2 commentary that was drafted by Mr. Gray,
3 Jr., and adopted by you to the second
4 amended rules, that one of the reasons for
5 the amendment in January of '05, was, quote:
6 To follow the policy of the attorney general
7 to limit Class B bingo gaming in Macon
8 County.
9    Do you remember that?
10    MR. ANDERSON:  Where is that?
11    MR. HENINGER:  That's Exhibit
12 7.
13    MR. ANDERSON:  That's what I'm
14 trying to find.
15    MR. HENINGER:  It's the
16 commentary.
17    MR. ANDERSON:  I'm looking for
18 Exhibit 7.  That's 5.
19    A.    Yes, I see that.
20    Q.    All right.  You will
21 acknowledge today that the attorney general
22 never issued a policy to limit Class B bingo
23 gaming in Macon County, did he?

Page 269

1    A.    The attorney general did not
2 issue any prohibition -- limit -- publicly
3 limiting gaming activities in Macon County.
4    Q.    I mean the attorney general
5 never said, Sheriff Warren, don't you let
6 anybody but Victoryland get a license, we
7 want to limit it to one facility.  He never
8 said that, did he?
9    A.    The attorney general never
10 publicly stated that -- The attorney general
11 never publicly stated that he wanted to
12 limit gaming in Macon County.
13    Q.    He never told you to limit the
14 number of machines you let Victoryland
15 operate, did he?
16    A.    The attorney general never
17 made such a statement.
18    Q.    So was this a truthful
19 statement in the commentary when you said
20 that one of the reasons for the amendment of
21 these rules in January of 2005, was to
22 follow the policy of the attorney general to
23 limit Class B bingo gaming in Macon County?

68 (Pages 266 to 269)

FREEDOM COURT REPORTING

Page 270

1    A.    You're asking me what about
2 that?
3    Q.    Is that a truthful statement?
4    A.    The statement that I made in
5 this -- in this rule, and this rule was
6 simply stating what I honestly believed the
7 spirit of the attorney general's language
8 meant to me.
9    Q.    Why didn't you say in your
10 commentary that you were stating what you
11 interpreted to be the spirit of the attorney
12 general, rather than saying you were issuing
13 these amendments to follow the policy of the
14 attorney general to limit bingo gaming in
15 Macon County?  Why not just call a spade a
16 spade and be honest?
17    A.    I think anybody who knows
18 Mr. King knows his opposition to gaming in
19 the state of Alabama.
20    Q.    Yeah.  But the citizens of
21 Macon County had already spoken, hadn't
22 they?  And y'all had an amendment to the
23 Constitution allowing gaming in Macon

Page 271

1 County; true?
2    A.    Yes.
3    Q.    How long did you keep the
4 forty-thousand-dollar payment from Lucky
5 Palace?
6        MR. GRAY, SR.:  Did he finish
7 his question?
8        MR. HENINGER:  I'm sorry.  I
9 thought he had.
10        MR. GRAY, SR.:  I don't think
11 he had.
12    A.    The citizens of Macon County
13 voted on this amendment to authorize bingo
14 gaming in Macon County.  When -- I have
15 always, in my twelve years as the sheriff of
16 Macon County, and my ten years prior to this
17 legislation being enacted, I always
18 interpreted that the citizens expected me to
19 act in their best interest at all times.
20    Q.    Are you through?
21    A.    Yes, sir.
22        (Whereupon, Plaintiff's
23        Exhibit No. 17 was marked

Page 272

1        for identification.)
2    Q.    Let me show you what I'm going
3 to mark as Plaintiff's Exhibit 17.  This is
4 the check to the Macon County sheriff for
5 forty thousand dollars from Lucky Palace
6 Inc., to accompany its application for an
7 operator's license for electronic bingo.
8        MR. TEPLEY:  What's the date
9 on that check.
10        MR. HENINGER:  November 11th,
11 2004.  It's Bates stamped LUC 098.
12    Q.    Do you remember getting the
13 required application fee?
14        MR. BOLTON:  Object to the
15 form.
16    A.    Mr. Bracy's check was
17 premature; Mr. Bracy had not been approved.
18 For him to send my office a check for forty
19 thousand dollars was premature.  I did not
20 cash Mr. Bracy's check, I simply sent it
21 back to him.
22    Q.    When?
23    A.    I'm not sure.

Page 273

1    Q.    It should have been right
2 away, shouldn't it, with some explanation as
3 to why you could not accept it?
4    A.    Mr. Bracy's check was
5 premature.
6    Q.    Do you know if it was in the
7 envelope --
8    A.    He had not --
9    Q.    I'm sorry.  I thought you were
10 finished.
11    A.    He had not been approved for a
12 bingo license.  To send a check for forty
13 thousand dollars to my office at that point
14 in time was premature.
15    Q.    Earlier I asked you to give me
16 each and every deficiency in the Lucky
17 Palace application to be a Class B
18 electronic bingo gaming operator location in
19 Macon County.  You told me they did not have
20 a, quote, qualified location, end quote;
21 correct?
22    A.    Yes, sir.
23    Q.    What other deficiency?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 274

1      A.    That was the main deficiency.
2      Q.    Any other?  I don't care
3   whether it was main, minor, subparagraph 7,
4   what other deficiency did Lucky Palace have
5   in its application for an operator's license
6   other than you're saying they didn't have a,
7   quote, qualified location, end quote?
8      A.    That was the main reason.
9      Q.    I need to know if there is any
10  other reason, not just whether that's the
11  main reason.  Any other reason no matter how
12  minuscule?
13          MR. ANDERSON:  I'm going to
14  object to form.
15          MR. BOLTON:  Me too.
16     A.    I think the overall reason was
17  that Mr. Bracy did not have a qualified
18  location in Macon County.
19     Q.    And you're the license
20  granting authority, so you would know why
21  they didn't get a license, wouldn't you?
22  I'm talking about Lucky Palace.
23     A.    Because they did not have a --

Page 275

1   They did not get a license because they did
2   not have a qualified location at the time.
3      Q.    Period?  That's it?
4      A.    Yes, sir.
5          (Whereupon, Plaintiff's
6           Exhibit No. 18 was marked
7           for identification.)
8      Q.    Okay.  Let me show you what
9   I'm marking as Plaintiff's Exhibit 18.  This
10  is a fax cover sheet, it's McGregor 038.
11          MR. HENINGER:  Do you want to
12  see a copy of it?
13     Q.    Do you know what Paul --
14  Excuse me.  Do you know what Mr. Gray, Jr.,
15  was sending to Milton McGregor, John Bolton,
16  and David Johnson on that date that had to
17  do with the bingo licensing?
18     A.    No, sir.
19     Q.    Did he tell you?
20     A.    I don't remember this
21  document.
22     Q.    Now, that is the date of the
23  first amended rules change.

Page 276

1      A.    It's probably -- It would
2   probably be the first amended rules.
3      Q.    Did you know that the first
4   amended rules were not published in the
5   Macon -- in the Tuskegee News until June
6   10th?
7      A.    As I understand, the -- and
8   correct me if I'm wrong, we were -- every
9   time these were published in the News, that
10  we were at no obligation to publish them at
11  all.  We were all -- Anything that I did, I
12  always published it in the News, if it
13  was -- came at some time after, that was not
14  a -- that was nothing that was done
15  intentionally.
16     Q.    Are you aware of any
17  documents, notes, e-mails, electronic-filed
18  information of any sort that would show what
19  input Mr. Gray, Jr., was getting from John
20  Bolton, David Johnson, or any representative
21  of Victoryland into how these rules and
22  amendments were to be drafted?
23          MR. TEPLEY:  Object to the

Page 277

1   form of the question.
2      A.    I was not aware.
3      Q.    Are you aware today of any of
4   that?  Have you seen any?
5      A.    No.
6      Q.    Are you curious?
7      A.    Let me say this, say it for
8   the time -- I guess the tenth time or how
9   many other times:  The rules, the amendments
10  to the rules, or the rules that I
11  promulgated, they're the rules that I
12  amended when I -- In my opinion they needed
13  to be amended.  And if Mr. Gray did
14  anything, it was carrying out what he deemed
15  to be his responsibilities as my attorney.
16     Q.    Let me make sure I understand
17  what you're saying.  Are you saying that
18  since you approved and signed these drafts
19  of rules and amendments of rules prepared by
20  Mr. Gray Jr., they became your rules?
21     A.    The rules and the amendments
22  that were promulgated by me and the
23  amendments that were -- were the additions

70 (Pages 274 to 277)

FREEDOM COURT REPORTING

Page 278

1 to these rules are mine.
2      Q.    Does that mean in your mind
3 that once they're blessed by you and become
4 your rules, any illegality, unfairness,
5 intentional twisting to favor Victoryland
6 goes away by your blessing because you adopt
7 them as, quote, your rules, end quote?
8           MR. TEPLEY:  Object to the
9 form of the question.
10          MR. ANDERSON:  Object to the
11 form of the question.  You can answer.
12          MR. BOLTON:  Same.
13     A.    The rules that I have
14 promulgated, the rules that govern bingo are
15 the rules that I intended that bingo -- that
16 would govern bingo, any amendments that I
17 made to those rules were not intended to
18 favor anyone.  They were rules.  They
19 were -- Those rules were amended as I saw
20 the need to amend them.
21     Q.    Sheriff Warren, you can't
22 speak for the heart and the mind of
23 Mr. Gray, Jr., can you?

Page 279

1      A.    No, sir, I can't speak for
2 Mr. Gray.
3      Q.    If there was any benefit
4 conferred upon him or promised to him in the
5 way he prepared the drafts to have you
6 approve them of these rules and regulations,
7 the mere fact that you sign off on them
8 doesn't make that okay, does it?
9      A.    For Mr. Gray to act in that
10 fashion, he would have to have my approval.
11 And Mr. Gray, as I sit here today, has
12 carried out what I instructed him to carry
13 out as my attorney.
14     Q.    Did you -- And please give
15 your lawyer time to object between when I
16 ask this and your answer.
17          Did you express to Mr. Gray at
18 the outset of this endeavor to come up with
19 drafts of rules and regulations for the
20 bingo licensing, that if there was any
21 possible conflict of interest or problem
22 with him committing himself only to you,
23 that he let you know about it?

Page 280

1           MR. ANDERSON:  Don't tell him
2 what you talked to your lawyer about.
3           MR. HENINGER:  Are you telling
4 him not to answer?
5           MR. ANDERSON:  Yeah.  The way
6 you've asked it.  I think you can ask it
7 another way.
8      Q.    Did you expect as the client
9 of Mr. Gray, Jr., that he be dedicated to
10 you and the citizens of Macon County only in
11 carrying out what you asked him to do in
12 drafting the rules and regulations for bingo
13 gaming that you were to eventually approve?
14     A.    I believe Mr. Gray has done
15 what I have asked him to, and that was done
16 in what I saw at the time that I did it as
17 in the best interest of the citizens of
18 Macon County.
19     Q.    Did you expect that Mr. Gray,
20 Jr., be totally, singularly committed to you
21 as sheriff and the citizens of Macon County
22 in the work he undertook in this effort to
23 draft rules, regulations, and amendments for

Page 281

1 bingo gaming licenses in Macon County?
2      A.    I expected Mr. Gray, me being
3 his client, and him being my attorney, to
4 carry out the task that I told him to carry
5 out.
6      Q.    Did you expect his total
7 commitment to you and the citizens of Macon
8 County with no allegiance to any other
9 insofar as the work he undertook at your
10 direction?
11     A.    I'll answer that by saying
12 this:  Mr. Gray is my attorney; he has been
13 my attorney long before the bingo rules were
14 regulated.  I trust Mr. Gray, and I know
15 that he is committed -- he was committed to
16 what I instructed -- the duties that I
17 instructed him to carry out.
18     Q.    I just want to make sure you
19 didn't omit intentionally my word totally.
20 Did you expect his total commitment to you
21 and the citizens of Macon County in
22 undertaking this work on the drafting of
23 rules, regulations, and any amendments, with

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 282

1  no allegiance, zero, not one hair allegiance
2  to anyone else?
3       A.   As my attorney, I expected
4  Mr. Gray to behave in the traditional
5  attorney-client -- to conduct himself in the
6  traditional way that an attorney would in
7  dealing with his responsibilities to me as a
8  client and in his duties in carrying out my
9  instructions.
10      Q.   And I will say, he's fortunate
11 to have a client that is so effervescent in
12 praise and trust.  But I think we've covered
13 what your expectations were.
14           MR. ANDERSON:  Steve, are we
15 getting close to where we can take a break?
16           MR. HENINGER:  I'm getting
17 close to wrapping down, if you'll let me.
18 If you can indulge me.  Assuming your
19 witness doesn't need all ten minutes, I'll
20 put that disclaimer in there.
21           MR. ANDERSON:  We're running
22 the four corners on this ten minutes.
23      Q.   Have you said to Mr. Paul

Page 283

1  Bracy that if you want to get a license for
2  Lucky Palace, you're going to have to sue me
3  to get it?
4       A.   At a point in time -- You
5  see -- Let me answer that like this:
6  Mr. Bracy was not the only person trying to
7  get a license in Macon County; there were
8  people calling me night and day.  Toward the
9  end of our relationship, some of our
10 discussions may have been heated and that
11 might have been the impression I gave
12 Mr. Bracy.
13      Q.   When you say they were heated,
14 was he hot at you?
15      A.   I am -- I can't speak as to
16 what Mr. Bracy's feelings are at any time.
17      Q.   Were you hot at him?
18      A.   No.
19      Q.   Well, but you recall at a
20 point in time when you said to him, for
21 Lucky Palace to get a license, you're going
22 to have to sue?
23      A.   Let me answer your question

Page 284

1  like this:  At the time Mr. Bracy became
2  very insistent about that.  At that point in
3  time, the rules and regulations were in
4  effect.  I think in the commentaries I made
5  myself as clear as I could in articulating
6  my reasoning.
7           At that particular point in
8  time, the reality of this situation was that
9  the sixty charities were in effect and
10 Mr. Bracy may have not agreed with that, and
11 we may have had some discussion.  And it is
12 not outside the realm of possibilities that
13 he interpreted my language to be that.
14      Q.   Wow.  Did you tell him he was
15 going to have to sue you or not, Sheriff?
16      A.   I may have.
17      Q.   Thank you.  Do you recall
18 telling him that if it weren't for Harold
19 Powell, you would have had a license long
20 ago?
21      A.   No, sir, I did not.
22      Q.   You deny saying that?
23      A.   I don't remember saying that.

Page 285

1       Q.   Do you deny saying that?
2       A.   I don't remember saying that.
3       Q.   Do you know who Harold Powell
4  is?
5       A.   I know who Harold Powell is.
6       Q.   The town clerk of Shorter?
7       A.   The town clerk in Shorter.
8       Q.   You realize that he was
9  disclosed as being involved as an investor
10 in Lucky Palace?
11      A.   I --
12      Q.   It was sent to you.
13      A.   I believe that Mr. Powell was
14 listed as an investor in Lucky Palace.
15           (Whereupon, Plaintiff's
16           Exhibit No. 19 was marked
17           for identification.)
18      Q.   Well, let's not leave any
19 doubt there.  I'm going to mark as Exhibit
20 19, an Exhibit E that was sent to you by
21 Lucky Palace.  It's LUC 080 and 081.
22           Do you recall getting that as
23 part of the application process?

72 (Pages 282 to 285)

FREEDOM COURT REPORTING

Page 286

1    A.    Yes, sir.
2    Q.    Did you ever get anything like
3  that from Victoryland giving you the names
4  of investors?
5    A.    Anything I've needed to see at
6  Victoryland, I have had absolute access to.
7    Q.    Do you have a problem with
8  Mr. Powell being an investor in lucky
9  Palace?
10    A.    No, sir.
11    Q.    Have you got any family
12  problems that raise concern with you, maybe
13  kids that have had brushes with the law or
14  anything like that?
15    A.    No, sir.
16    Q.    He's an okay guy as far as you
17  are concerned?
18    A.    I have no problem with
19  Mr. Harold Powell.
20    Q.    How about Larry Hooks?
21    A.    Not with Mr. Hooks either.
22    Q.    Do you know Mr. Hooks?
23    A.    I know Mr. Hooks.

Page 287

1    Q.    How many of those gentlemen
2  listed on that Exhibit 19, do you know?
3  Harold Powell, Larry Hooks, and who else?
4    A.    Harold Powell, Larry Hooks,
5  that's -- Those are the only people I
6  know -- wait a minute, let me make sure.
7        I'm familiar with
8  Mr. Washington and Mr. Bracy.
9    Q.    All okay people as far as you
10  are concerned?
11    A.    Yes, sir.  As far as I'm
12  concerned, they're all okay.
13    Q.    Is your wife Pebblen Warren?
14    A.    Yes, she is.
15    Q.    What has been her association
16  with the charity known as Aid to Inmate
17  Mothers?
18    A.    Pebblen has been an active
19  member of the Aid to -- the Macon County Aid
20  to Inmate Mothers and the Montgomery
21  headquarters of Aid to Inmate Mothers a
22  number of years.
23    Q.    You realize that charity was

Page 288

1  approved for a license for bingo gaming on
2  December 17th, 2003?
3    A.    Yes, sir.
4    Q.    By you?
5    A.    Yes, sir.
6    Q.    Your wife was associated with
7  that charity?
8    A.    And -- She was and so were
9  approximately nine families in Macon County
10  who had mothers at Tutwiler.
11        (Whereupon, Plaintiff's
12        Exhibit No. 20 was marked
13        for identification.)
14    Q.    This is Exhibit 20.  It's
15  Warren documents D0317 through D0325.  Can
16  you tell us why in the documents that were
17  produced by you in this case her name has
18  been redacted from this?
19        And I'm showing him page 323.
20  Do you know whose name was at the top of
21  that page?
22    A.    At the top of this page?
23        MR. GRAY, SR.:  Which exhibit

Page 289

1  is that?
2        MR. HENINGER:  20.
3    Q.    You approved it, and I'm sure
4  it wasn't redacted when you approved it.
5  Can you tell me whose name was there before
6  you produced it to us?
7    A.    Looking at this document, I'd
8  have to see if I did -- if whoever redacted,
9  if I'd -- I'd have to see her name on this
10  document.
11    Q.    Can you think of any reason
12  why you would hide your wife's name from an
13  application to us?
14    A.    No.
15        MR. HENINGER:  We've got to
16  shut it down.
17        VIDEOGRAPHER:  We're off the
18  Record; the time is 6:07 p.m.
19        (Recess taken.)
20        VIDEOGRAPHER:  This is the
21  beginning of tape number six; we are on the
22  Record at 6:20 p.m.
23        (Whereupon, Plaintiff's

FREEDOM COURT REPORTING

Page 290

1          Exhibit No. 21 was marked
2          for identification.)
3      Q.    (BY MR. HENINGER): Sheriff
4  Warren, as a matter of housekeeping, I want
5  to show you Plaintiff's Exhibit 21, which is
6  a cover letter dated July 25, 2005, and
7  twenty-two, charity application checks for
8  one thousand dollars from Lucky Palace, and
9  that starts LUC 101 through 107.
10         Do you recall when those were
11 presented your office refused to accept
12 them?  And to be fair with you, on the
13 grounds that they were premature?
14         And if you don't recall,
15 that's fine.
16     A.    Yes, sir, I'm familiar with
17 this.  I'm familiar with --
18     Q.    Would your office have been
19 correct to return those immediately, saying
20 they were premature because no charity
21 licenses were available?
22     A.    Yes, sir.
23     Q.    All right.

Page 291

1      A.    They would have been behaving
2  properly to return these to Lucky Palace.
3      Q.    I want you to assume for the
4  purposes --
5          MR. ANDERSON:  This was July
6  25th, 2005?
7          MR. HENINGER:  Yeah.  For the
8  amended rules for sixty come in in January;
9  right?
10     Q.    I want you to assume that
11 Victoryland, through its proper legal
12 designation Macon County Greyhound Park,
13 Inc., submitted its licensing fee to you and
14 your office on December 16, 2003.  I want
15 you to assume further that you approved a
16 series of charities and Victoryland as the
17 operator location associated with those
18 charities on December 17, 2003.
19         Assuming that to be correct,
20 did Victoryland submit a check prematurely,
21 if they gave it to you a day before you even
22 approved them?
23     A.    The checks -- You're asking

Page 292

1  me -- I'm sorry.  Ask that again, please.
2      Q.    I want you to assume that we
3  will prove that Victoryland's check for its
4  operator's license was submitted to you on
5  December 16, 2003.
6      A.    Yes.
7      Q.    That you approved several
8  charities to be linked with Victoryland as
9  the operator and issued licenses on December
10 17th, 2003.
11         If that's true, did
12 Victoryland submit its check prematurely, as
13 a technicality?
14     A.    I would have to see those
15 checks and see those --
16     Q.    No.  But you have to believe
17 me right now.
18         MR. ANDERSON:  He's asking you
19 if they can prove that.
20     A.    If you could prove that -- If
21 you could prove that that would -- I guess
22 that would say that those checks were --
23     Q.    Premature?

Page 293

1      A.    -- were sent to us
2  prematurely.  But I would also need to know
3  what was going on at the time.  And that's
4  just one context of that -- of my
5  understanding, you're giving me a
6  hypothetical?
7      Q.    True.  And a hypothetical
8  question gets only a hypothetical answer.
9      A.    If that were true, in the
10 spirit of the way you're asking the
11 question, I guess my answer would be that
12 they were premature.
13     Q.    Now, since you and I have been
14 at this for some time --
15     A.    Yes, sir.
16     Q.    -- are you tired?
17         I mean, are you okay to hang
18 for a while?
19     A.    I'm okay to hang for a while.
20     Q.    Because if you start getting
21 fuzzy or can't follow my questions, all
22 you've got to do is raise your hand.
23     A.    No, I'm fine.

FREEDOM COURT REPORTING

Page 294

1    Q.    Okay.  You know, we started
2  this deposition with my proposing four rules
3  to you, one of which you agreed to and the
4  other three you said you had no opinion.  Do
5  you remember that?
6    A.    Yes, sir.
7    Q.    And I want to make sure it
8  hasn't changed, and you haven't had some
9  enlightenment by being in here and thinking
10 about the facts of this case and your duty a
11 little bit further.
12   A.    Yes, sir.
13   Q.    First of all, I want to know,
14 do you still have no opinion as the sheriff
15 and licensing authority for Macon County
16 that you had a duty owed to keep any
17 potential conflicts of interest from
18 infecting the rules and regulations that
19 were written, amended, and applied so that
20 they would favor only Victoryland to have a
21 monopoly on electronic bingo in Macon
22 County?
23        MR. ANDERSON:  I'll object to

Page 295

1  the form of the question.
2        MR. TEPLEY:  I object.
3    Q.    You still have no opinion as
4  to whether you had a duty to prevent that?
5    A.    No opinion.
6    Q.    You're serious about that, you
7  have no opinion as to whether you had a duty
8  to protect the integrity of the rules and
9  regulations being written, drafted, amended,
10 and applied to prevent any potential
11 conflicts of interest from infecting them in
12 favoring Victoryland over everybody else?
13        MR. TEPLEY:  Object to the
14 form of the question.
15        MR. ANDERSON:  Object to the
16 form.  You can answer.
17   A.    I have no opinion of it at
18 this time.
19   Q.    Do you think you might have an
20 opinion tomorrow?
21   A.    Who knows.
22   Q.    Do you think you had an
23 opinion back in December of 2003?

Page 296

1        MR. ANDERSON:  About his a
2  duty?
3    Q.    Yeah.  He had a duty to try to
4  protect the integrity of what you were
5  undertaking on behalf of the citizens of
6  Macon County to make sure that the proposed
7  drafted, and adopted rules and amended rules
8  on licensing were kept from getting infected
9  by somebody else's personal interest to
10 favor Victoryland?
11        MR. TEPLEY:  Object to the
12 form.
13   Q.    You have no opinion on your
14 duties?
15   A.    On that, I have no opinion at
16 this time.
17   Q.    Do you consider yourself a
18 fairly savvy person?
19   A.    At times.
20   Q.    Do you consider yourself a
21 person who's got a pretty good moral
22 compass?
23   A.    At times.

Page 297

1    Q.    Is it a matter of timing, if
2  some applicant hits you on one day they get
3  good morals, on a different day they might
4  not?
5    A.    That wasn't the question.
6    Q.    That is now.
7    A.    You asked me if I had, I
8  guess, scruples or whatever.
9    Q.    I asked you if you thought of
10 yourself as a person with a pretty good
11 moral compass.
12   A.    I try to act morally most all
13 the time.  I try to do the best I can to be
14 a moral and an upstanding person at all
15 times.
16   Q.    Nobody's perfect, not since
17 our Lord left.
18        Have you met anybody perfect?
19   A.    No, sir.  He was perfect and
20 look what they did to Him.
21   Q.    But couldn't you and I agree
22 that you've got an obligation to do certain
23 duties and things even if they don't please

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 298

1  you in your office, as sheriff of Macon
2  County?
3      A.    Most certainly, yes, sir. I
4  have an obligation to carry out duties, be
5  that pleasing or not.
6      Q.    Rule number three I had asked
7  you about was that the sheriff had a duty to
8  prevent anyone from influencing how the
9  rules and regulations were written, amended,
10  or applied to favor Victoryland over all
11  other potential applicants for bingo
12  licensing.
13          You told my you had no opinion
14  about whether you had any such duty. Is
15  that still your opinion?
16          MR. ANDERSON: I'm objecting
17  to the form of it. You can answer.
18          MR. BOLTON: So am I.
19          MR. TEPLEY: Join.
20      A.    I have no opinion of that. I
21  have no opinion of that at this time.
22      Q.    Reckon when you will have an
23  opinion? Can you help me?

Page 299

1          Were you fuzzy or unclear
2  about what your duties were when you were
3  undertaking this drafting and adoption of
4  rules and amended rules for bingo licensing?
5      A.    Sir, I have always tried to
6  act as if I were doing the proper thing when
7  it came to the promulgating the rules and
8  regulations regarding bingo.
9      Q.    Rule number four was, when
10  collaborating with an attorney to write,
11  which is what you did with Mr. Gray, here,
12  didn't you, on the rules?
13      A.    Uh-huh.
14      Q.    Sir?
15      A.    Yes, sir.
16      Q.    And the amendments?
17      A.    I did, yes, sir.
18      Q.    When collaborating with an
19  attorney to write, amend, or comment upon
20  rules and regulations for bingo licensing,
21  there is a duty to make sure no potential
22  conflict of interest is present that could
23  affect the fairness of the rules and

Page 300

1  regulations in favor of only Victoryland?
2          MR. TEPLEY: Object to the
3  form.
4          MR. ANDERSON: Again, object
5  to the form.
6      Q.    Earlier, you told me you
7  didn't have any opinion about whether you
8  had such a duty. Is that still your
9  position?
10      A.    That I have no opinion at this
11  time.
12      Q.    What can happen between now
13  and some other time when you will come to
14  the realization that as the sheriff with the
15  job to come up with these rules and
16  regulations and amendments, you had a duty
17  to make sure no potential conflicts of
18  interest were injected into that process to
19  favor only Victoryland?
20          MR. ANDERSON: Object to the
21  form.
22          MR. TEPLEY: Join.
23          MR. BOLTON: Same objection.

Page 301

1      Q.    What can you consult or what
2  can I show you to make you realize that you
3  should not allow potential conflicts of
4  interest to come into the process to help
5  Victoryland and not others?
6          MR. ANDERSON: I'm going to
7  object to the form, again.
8          MR. TEPLEY: I join.
9      A.    I realize what my duty is.
10  And my duty, as I see it, in promulgating
11  these rules and regulations is to do them in
12  a way that is fair; to do them in a moral
13  way; and to do them in a way that
14  accomplishes what was needed to regulate
15  this industry in Macon County. And I tried
16  to do that as fair and as upright as I could
17  to the best of my ability.
18      Q.    I'm about finished, and I want
19  to wrap it up.
20      A.    Yes, sir.
21      Q.    At the end of the day, when
22  all the rules were written, sculpted,
23  amended, published, as of today Victoryland

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 302

1  effectively has a monopoly on electronic
2  bingo in Macon County; true?
3          MR. ANDERSON:  Object to the
4  form.
5          MR. TEPLEY:  Same.
6          MR. BOLTON:  Join.
7      A.    At the end of the day, my
8  duty, as I saw it, sir, was to promulgate
9  the rules and regulations that would serve
10 the best interest of the people of Macon
11 County, and that is what I tried to do so
12 help me God, to the best of my ability.
13     Q.    Sheriff David Warren, as we
14 sit here today, under the rules as they
15 currently exist, doesn't Victoryland
16 effectively have a monopoly as the only
17 location for electronic bingo that is in
18 existence or can be in existence under the
19 current rules?
20         MR. BOLTON:  Object to the
21 form.
22     A.    That is not entirely true.
23     Q.    Well, give me some facts that

Page 303

1  I can ask you.
2          MR. GRAY, SR.:  I don't think
3  he answered your question.
4      A.    The facts are --
5          MR. HENINGER:  Fred, I'm not
6  going to be in your class tomorrow, and I'm
7  not going in your class today.  I'm trying
8  to do my best job.  I'm sorry.
9          MR. GRAY, SR.:  Just let him
10 answer, that's all I'm saying.
11         MR. HENINGER:  If I could get
12 an answer to my question, and I'm sure you'd
13 agree I'm entitled to that, wouldn't you?
14 And he's entitled to give a full answer to
15 my question.
16         MR. GRAY, SR.:  That's the
17 rule.
18         MR. HENINGER:  But not to give
19 speeches.
20     Q.    Let's start again.  And I
21 apologize for the exchange.
22         I want you to explain to us,
23 how anyone, as of today, can get a license

Page 304

1  as an operator of a location, other than
2  Victoryland, of electronic bingo in Macon
3  County, Alabama, under the current rules?
4  How can we do it?
5          Because I guarantee you, Lucky
6  Palace is going to be at to your office
7  before you get there, and we're going to
8  take care of it.  Tell us what we can do
9  today to get guaranteed a license from you
10 in all fairness under the current rules?
11         MR. ANDERSON:  Object to the
12 form of the question.  He can answer.
13         MR. TEPLEY:  Object to the
14 form of the question.
15     A.    Sir, I can't guarantee anybody
16 a license.
17     Q.    Who can, if not you?
18     A.    You know, I will not guarantee
19 prematurely anyone a license.  The rules and
20 regulations are what they are at this point
21 in time.  I think in my commentary I tried
22 to lay out and articulate, as best I could,
23 my reasoning behind that.

Page 305

1          But, you know, none of these
2  things are etched in stone, and who knows
3  how future events will shape this issue.
4  But as of this point in time, I have tried
5  to do the best I could do to promulgate
6  rules and regulations that would not only
7  serve this industry, serve as a guide for
8  this industry to operate, but rules that
9  would serve and protect the interests of the
10 citizens of Macon County.
11     Q.    Does a monopoly in bingo serve
12 and protect the citizens of Macon County?
13         MR. BOLTON:  Object to the
14 form.
15     A.    Sir, a monopoly is not what is
16 intended by these rules and regulations.
17         At this point in time, the
18 rules and regulations are there for a
19 reason.  Those reasons are -- and the
20 amendments, the reasons for them, my
21 rationale is articulated in the
22 commentaries, and I think it is quite clear
23 what my intentions were.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 306

1    Q.    Sheriff Warren, does a
2  monopoly in bingo gaming location serve and
3  protect the citizens of Macon County?
4          MR. BOLTON:  Object to the
5  form.
6    A.    At this point in time, the
7  only reason Victoryland is operating is that
8  they have met all the rules and regulations
9  that were required of them, and they have a
10 license.
11   Q.    Sheriff Warren, does a
12 monopoly for the location of electronic
13 bingo gaming in Macon County serve and
14 protect the citizens of Macon County?
15   A.    It is not my intention to
16 create -- to protect the -- to protect and
17 serve the citizens of Macon County by
18 creating a monopoly.
19   Q.    Does a monopoly in bingo
20 gaming, electronic bingo gaming, serve and
21 protect the citizens of Macon County?
22   A.    In the sense that you are
23 asking that question, I am going to say a

Page 307

1  monopoly, if it existed, protects no one.
2    Q.    Except the person with the
3  monopoly; true?  I mean, if you've got it,
4  it's good for you, isn't it?
5    A.    Let me say this --
6    Q.    I'm going to have to --
7    A.    -- that was not the intention
8  of the rules and regulations to create a
9  monopoly.  That's my statement, that was
10 never my intention.
11   Q.    Why wasn't it your intention
12 to create a monopoly?
13   A.    My intention --
14   Q.    It would be a lot easier to
15 police, wouldn't it?
16   A.    My intentions were to -- and
17 remains to promulgate rules that would serve
18 as a guide for governing -- for the
19 governance of bingo in Macon County.
20   Q.    You are under oath in federal
21 court.
22   A.    Yes, sir.
23   Q.    As we sit here today, as the

Page 308

1  licensing authority for Macon County for
2  bingo, Class B licenses, and that is you,
3  isn't it?
4    A.    Yes, sir.
5    Q.    It is only you, isn't it?
6    A.    Yes, sir.
7    Q.    As you sit here today under
8  oath, under the current rules, as you have
9  amended them and they have been in effect
10 since January of 2005, effectively, whether
11 you intended it or not, effectively,
12 Victoryland has the monopoly on electronic
13 bingo, doesn't it?
14         MR. BOLTON:  Object to the
15 form.
16   Q.    You are under oath.
17   A.    Mr. Heninger, under oath, I am
18 telling you, Victoryland met all of the
19 requirements at that -- at the time they
20 applied for a license.  They have a license
21 at this point in time.  A monopoly was not
22 the intention.
23   Q.    Stay with me.

Page 309

1    A.    Yes, sir.
2    Q.    If I'm tiring you out, you
3  can't follow it, you tell me.
4    A.    We're fine.
5    Q.    I'm asking you if it isn't a
6  fact, under the current rules as we sit here
7  today, Victoryland owns a monopoly in bingo
8  gaming in Macon County because you cannot
9  approve any other license applicants unless
10 you change the rules; true?
11   A.    At this point in time,
12 Victoryland has the only license to operate
13 bingo in Macon County unless the rules are
14 changed.
15   Q.    And the only way the rules can
16 be changed is if you do it; true?
17   A.    I promulgate the rules -- As
18 sheriff of Macon County, I promulgate the
19 rules for bingo.
20   Q.    Have you considered in the
21 past two years changing the rules to allow
22 another location in Macon County, besides
23 Victoryland?

78 (Pages 306 to 309)

FREEDOM COURT REPORTING

Page 310

1    A.    I have considered a number of
2  things regarding gaming.
3    Q.    Have you considered that
4  specifically, allowing another location?
5    A.    There is always that
6  consideration.
7    Q.    And I assume you have voted it
8  down in your own mind, since you are a
9  singular authority on this matter?
10    A.    Let me answer this like this:
11  You know, I didn't ask for this.  This was
12  something that was thrust upon me by the
13  law.  I have very little experience or
14  expertise in the gaming area.  However, to
15  accomplish what I had to, I did the best
16  that I could.  I did the best that I could
17  to be fair, to be honest, to act in the
18  interest of the citizens of Macon County,
19  and I will continue to do so.  I have --
20  This is not a comfortable situation for me.
21  I would love to be somewhere else.  But --
22    Q.    It's within your power, you
23  realize that?

Page 311

1    A.    There are a lot of things --
2    Q.    Do you realize that, Sheriff
3  Warren?
4    A.    Yes.
5    Q.    You can end this lawsuit in a
6  heart beat.  Do you realize that?
7    A.    I am well aware of what is in
8  my power.
9    Q.    All you have to do is change
10  the rules and allow a qualified applicant to
11  get a license for a location besides
12  Victoryland.  Do you realize that?
13    A.    I realize what my powers are.
14  What my -- What I'm -- No, let me rephrase
15  that.
16        I realize what this
17  legislation has authorized me to do.  I have
18  dealt with those responsibilities as
19  responsible, and I underscore that word,
20  responsible, that is Macon County.  That is
21  not Madison County, that is not Birmingham,
22  that is not Montgomery, that is Macon
23  County.  And I tried to be as responsible,

Page 312

1  not only lawful, but as responsible as I
2  could in carrying out my duties.
3    Q.    Sheriff Warren, does the
4  Constitution of the United States apply to
5  the citizens of Macon County?
6    A.    Yes, sir.
7    Q.    Is the Constitution of the
8  United States above the financial interest
9  of the citizens of Macon County?  Put
10  simply, would you rather that they be
11  treated fairly or make a couple more bucks a
12  year from Victoryland?
13        MR. TEPLEY:  Object to the
14  form of the question.
15    Q.    Honor or money?
16    A.    Huh?
17    Q.    Honor or money?
18        MR. ANDERSON:  Object to the
19  form.
20        MR. TEPLEY:  Same objection.
21        MR. HENINGER:  I'll withdraw
22  it.
23    Q.    And the only reason I went

Page 313

1  down that path, when you start saying
2  Birmingham, Madison County, and looking
3  around Montgomery, like here's a man asking
4  you questions that isn't even a resident of
5  Macon County, me; true?
6    A.    Uh-huh.
7    Q.    But I want to know if my
8  brothers and sisters in Macon County are
9  entitled to less constitutional awareness
10  than I am in Jefferson County --
11        MR. GRAY, SR.:  Sometimes.
12  But we haven't gotten it yet.
13    Q.    -- in your mind as the
14  sheriff?
15    A.    In my mind, as the third
16  African-American sheriff in the County of
17  Macon, I know well --
18    Q.    I bet you do.
19    A.    I'm sixty-one years old.  I
20  know well what the citizens of Macon County
21  has endured.  I know well what my duties are
22  as it relates to the constitution and the
23  citizens of Macon County.  I know well what

FREEDOM COURT REPORTING

Page 314

1  history has shown me that my
2  responsibilities are in Macon County.  And I
3  have always tried to serve the people and
4  the place that I love.  And that is my home,
5  Macon County.  Nobody, nobody, sir, nobody
6  has seen what I've seen from civil rights
7  leaders being shot down in the streets, to
8  people hauled off to jail and the next thing
9  you knew they were just dead.
10        So if anybody wants to come
11  here and ask me -- I'm a descendent of
12  Lucius D. Amerson when it comes to where I
13  stand in history.  These are issues that are
14  new to me.  I have tried to do everything I
15  could do while keeping in mind the interests
16  of the citizens of Macon County.  I mean
17  your client no disregard, no ill-respect.  I
18  mean nobody who applies for this license any
19  disregard or ill-respect.
20        But, sir, Macon County is my
21  home, and those people in Macon County are
22  people that I love.  I would put my life on
23  the line for any of them at any time.  So

Page 315

1  when someone asks me about a citizen of
2  Macon County and his or her rights and
3  protection under the Constitution, I think I
4  know that in more of a historical sense than
5  a lot of people in this room.
6        Q.    More than me, I'll be the
7  first to admit it.
8        Let me say this, Sheriff
9  Warren, I mean you no disrespect, but I must
10  ask you questions about your office.
11        A.    I understand.
12        Q.    And I have to ask you this.
13        A.    Yes, sir.
14        Q.    I'm from this state, but not
15  from your county.  I'm in Birmingham.
16        A.    Yes, sir.
17        Q.    And here I am, a different
18  skin color than you, that is obvious to both
19  of us.
20        A.    Doesn't make any difference.
21        Q.    It shouldn't make a
22  difference, should it?
23        A.    It doesn't make a difference.

Page 316

1        Q.    When will it stop?  When, sir,
2  will it stop being used as a tool for
3  someone to advance his or her financial
4  interests on the backs of your citizens?
5  When will that stop?
6        MR. ANDERSON:  I Object to the
7  form.
8        MR. TEPLEY:  I join.
9        MR. BOLTON:  Same objection.
10        A.    First of all, the citizens of
11  Macon County thank God they are not -- they
12  are not -- they are not used in that regard.
13  Macon County is about much more than that.
14  Tuskegee University is in Macon County.
15        Q.    It sure is.
16        A.    There are Macon County
17  citizens who work hard every day and don't
18  depend on Victoryland and anybody else to
19  make a living.
20        Q.    Yes, sir.  What harm -- Please
21  tell us what harm there is in allowing a
22  class outfit like Lucky Palace, in
23  conjunction with Planet Hollywood, to come

Page 317

1  and build a fifty-plus million dollar
2  facility, employ over six hundred people
3  from Macon County and produce money for
4  charities and for the county, what harm,
5  sir, is there in giving them that chance?
6        MR. ANDERSON:  Object to the
7  form of the question.
8        MR. TEPLEY:  Object to the
9  form.
10        MR. BOLTON:  Object to the
11  form.
12        A.    I don't see a harm in it.
13        Q.    There's no harm to the county,
14  is there?
15        A.    I don't see a harm in that per
16  se.
17        Q.    Who would get hurt?  Honestly,
18  who would get hurt if you allowed it?
19        A.    I'm not in a position to
20  answer that.
21        Q.    You know Victoryland would,
22  don't you?
23        A.    My -- My overriding concern,

80 (Pages 314 to 317)

FREEDOM COURT REPORTING

Page 318

1  be it Victoryland or anybody else, and to be
2  quite honest, this dialogue on gaming is a
3  little disturbing to me.  It has distracted
4  from some of the more pressing matters that
5  people are facing in Macon County.  But, be
6  that as it may, and I think I've earned the
7  right to say this:  I hope that there will
8  come a day when the people of Macon County
9  are not just taken for granted, and that
10  they are -- and when this is seen as the
11  only attraction to Macon County.  I would
12  like to see other things happen in Macon
13  County too.  And Mr. Bracy, I'm pretty sure
14  his organization is as he says it is.  But
15  right now, right now at this point in
16  time -- See, I know why I did this.  If they
17  elect another sheriff, and they tried to,
18  very hard to get another sheriff, they
19  talked about me and my wife on that TV like
20  we were dogs.
21        Q.    Who?
22        A.    Whoever -- Those people who
23  brought all that money in there.

Page 319

1        Q.    Are you saying my clients did
2  that?
3        A.    I'm not -- I said those
4  people.  I didn't call your client's name.
5  My thing is simply this:  At this point in
6  time, I -- from everything that I have seen,
7  I have promulgated rules that I feel that
8  will govern bingo gaming in Macon County
9  properly and while keeping the best interest
10  of the citizens of Macon County -- while
11  keeping the best interest of the citizens of
12  Macon County as my foremost interest.
13        Q.    Sheriff, can you tell us how
14  much net profit just from electronic bingo
15  the Macon County Greyhound Park,
16  Incorporated, otherwise known as
17  Victoryland, made in 2007 in Macon County,
18  after they paid the charities, after paying
19  taxes, what was their net profit from bingo
20  only?
21        A.    That is not something that I'm
22  responsible for.
23        Q.    Aren't you required to monitor

Page 320

1  that?
2        A.    I am required to monitor the
3  charities, to monitor -- to make sure that
4  Victoryland comply with the rules and the
5  regulations.  And that's what I do to the
6  best of my ability.
7        Q.    Don't the rules require that
8  they inform you what their profits are?
9        A.    Upon my request.
10        Q.    Have you made such a request?
11        MR. ANDERSON:  Object to the
12  form.  You can answer.
13        A.    I have made sure that I -- I
14  have made sure that the charities are in
15  order; I've made sure that I kept up with
16  the records on the charities; that I've
17  been -- I followed the law in everything
18  that I was supposed to do regarding that.
19  And that's my -- that's my statement.
20        Q.    Sheriff Warren, have you ever
21  requested of Victoryland, I'm speaking of
22  the Macon County Greyhound Park,
23  Incorporated, doing business as Victoryland,

Page 321

1  that they give you any report or information
2  of their net profit from bingo, electronic
3  bingo, from 2004 until this very day?
4        Those figures are available to
5  me --
6        Q.    Have you ever requested them?
7        A.    -- any time I want to see
8  them.  I have seen them in past times.  I
9  will see them this year.
10        Q.    You have seen them?
11        A.    Yes.
12        Q.    Please tell me what they are,
13  in your best recollection?
14        A.    I have not seen them for this
15  year.
16        Q.    What was 2004 for bingo only?
17        A.    The charities?
18        Q.    No, Victoryland.  What was
19  Victoryland's net profit for 2004 for bingo
20  only?
21        A.    I am not required to keep up
22  with Victoryland's net profit.
23        Q.    I'm asking you what you saw.

81 (Pages 318 to 321)

FREEDOM COURT REPORTING

Page 322

1  All you've got to do is tell me. Don't tell
2  me what you are required to do. What did
3  you see?
4        A.    I don't quite remember what
5  that figure was.
6        Q.    Because it was so little?
7        A.    I just don't remember what it
8  was.
9        Q.    What was it in 2005, the net
10 profit for Victoryland from bingo only in
11 Macon County?
12       A.    I don't know.
13       Q.    Rough figures?
14       A.    I don't know.
15       Q.    Have you seen the figures?
16       A.    I don't know what the figures
17 were.
18       Q.    Have you ever seen the figures
19 from for Victoryland's net profit for 2004
20 for bingo only?
21       A.    I have -- I don't know what
22 those profits were.
23       Q.    Have you ever seen the

Page 323

1  numbers?
2        A.    Sir, I can sit here and repeat
3  what I just told you. I don't know what
4  Victoryland's net profits are.
5        Q.    And I don't expect you right
6  now to spit it out to me. But I want your
7  honest truthful answer, have you ever laid
8  your eyes on the official report that shows
9  the net profit for Victoryland from bingo
10 operations only in Macon County for 2004?
11       A.    I do not know what bingo's --
12 what Victoryland's net profits are.
13       Q.    Have you ever seen it for
14 2004?
15       A.    No, sir.
16       Q.    Have you ever asked to see it?
17       A.    No, sir.
18       Q.    Have you ever seen the figures
19 for the net profits for Victoryland for
20 bingo operations only in Macon County for
21 2005?
22       A.    No, sir.
23       Q.    Have you ever asked to see

Page 324

1  them?
2        A.    I have not asked to see them.
3        Q.    You have every confidence if
4  you did ask they would let you see them?
5              MR. TEPLEY:  Object to the
6  form.
7        Q.    True?
8        A.    I have been given -- I'm sure
9  that if I wanted to see those, I could see
10 them. But I am not concerned, at this point
11 in time, with Victoryland's net profits.
12       Q.    Okay. Let me finish the
13 years.
14             Have you seen the official
15 reports of the net profits at Victoryland
16 from bingo operations only in Macon County
17 for 2006?
18       A.    No, sir.
19       Q.    Have you asked to see them?
20       A.    No, sir.
21       Q.    And you have not seen the
22 figures for net profits for Victoryland from
23 bingo operations only in Macon County for

Page 325

1  2007?
2        A.    No, sir.
3        Q.    And you haven't asked to see
4  them?
5        A.    No, sir.
6        Q.    Sheriff, when the good people
7  of Macon County elected you sheriff, 1995,
8  first time --
9        A.    1995.
10       Q.    -- you don't feel you've
11 occupied your office as a -- as an ostrich,
12 do you? Put your head in the sand?
13             Pat yourself on the back, you
14 can tell me no. I don't think so.
15       A.    I have served the citizens of
16 Macon County to the best of my ability every
17 year, every minute that I've been the
18 sheriff.
19       Q.    Help me understand, why
20 weren't you at least curious -- When you've
21 got the power to demand a report, why aren't
22 you curious to know how much money is
23 Victoryland making off this monopoly?

82 (Pages 322 to 325)

FREEDOM COURT REPORTING

Page 326

1      MR. ANDERSON:  Object to the
2  form.
3      MR. TEPLEY:  Join.
4      Q.    Why aren't you curious?
5      A.    I -- I deal with the
6  charities. I make sure the charities are in
7  order and are getting what they are supposed
8  to get. And that is the extent of my
9  interest in Victoryland. As a matter of
10 fact, it -- I do believe the purpose of this
11 was for a charity.
12     Q.    Yes, sir.
13         I'm almost finished. You've
14 worn me out.
15     A.    You've worn me out too.
16     Q.    But I'm going to give you the
17 opportunity, out of courtesy and respect to
18 you in your office, if there is anything
19 that I have failed to ask you that is
20 burning in your heart that you think we need
21 to know and you need to state, this is your
22 opportunity. Because I have been in court
23 before when a witness will say,

Page 327

1  Mr. Heninger, you never asked me, I would
2  have told you.
3         Is there anything that is
4  heavy on your heart that you think we need
5  to know, Lucky Palace needs to know, hope
6  for families and all the charities need to
7  know that we haven't asked you?
8      MR. ANDERSON:  Object to the
9  form.
10     MR. TEPLEY:  I'll join.
11     A.    At this time, nothing.
12     Q.    You think we've covered it
13 pretty well?
14     A.    I think we've covered it
15 pretty well.
16     Q.    I'm going to ask you for my
17 client, Lucky Palace, and all these
18 charities in this case, can we still hold
19 hope for a license to fairly compete with
20 Victoryland in electronic bingo in Macon
21 County while you're sheriff?
22     A.    Hope springs eternal.
23     Q.    Do we have a chance?

Page 328

1      A.    There's always a chance.
2      Q.    It's in your power, isn't it?
3      A.    Let me say this:  The bingo
4  rules are what they are at this point in
5  time. The bingo rules are my rules; I
6  promulgated them for the sole purpose of
7  operating bingo in Macon County. I tried to
8  carry out my duties as best and as
9  responsible as I can. Whatever amendments,
10 those are amendments I made; I stand by my
11 reasoning for making those amendments.
12     Q.    May I correct you?
13     A.    Yes, sir.
14     Q.    You have never authorized a
15 rule or made an amendment that didn't first
16 get drafted by Mr. Gray, Jr., true?  So far.
17     A.    Mr. Gray, serves as my
18 attorney, Mr. Gray follows my instructions.
19     Q.    We know all that. Please
20 answer my question.
21     A.    Mr. Gray -- Mr. Gray is a
22 person that I trust to act in my best
23 interest and the interest of the citizens of

Page 329

1  Macon County at all times.
2      Q.    Sheriff, every rule and
3  regulation for bingo gaming licensing in
4  Macon County and every amendment, up to now,
5  has been drafted for your consideration by
6  Mr. Gray, Jr.; correct?
7      A.    That is correct. But it is
8  also correct that I read that information.
9      Q.    Sure.
10     A.    That I --
11     Q.    Nor would I suggest otherwise.
12     A.    -- ingested that information,
13 that I used my discretion in coming up with
14 what I wanted these rules to be. And, sir,
15 Mr. Gray, followed my instruction and did
16 what he was instructed to do.
17     Q.    Did you ever reject a proposed
18 rule, regulation, or amended rule and
19 regulation that came from Mr. Gray?
20     MR. TEPLEY:  Object.
21     MR. ANDERSON:  I'm going to
22 object to attorney-client privilege.
23     Q.    Okay. Do you understand in

83 (Pages 326 to 329)

FREEDOM COURT REPORTING

Page 330

1  your position as sheriff of Macon County,
2  you have the power for the first time
3  tomorrow morning to write your own amendment
4  without consulting Mr. Gray, if you see
5  fit --
6      A.    Yes, sir.
7      Q.    -- for licensing, for
8  operators of electronic bingo and charities
9  with regard to Class B licensing in Macon
10 County?  Do you see that you have that
11 power?
12     A.    I have always had the power to
13 do that.  But it was more prudent to act --
14 to have an attorney that I trusted that I
15 could give instruction to, who would carry
16 out and achieve what I wanted him to do.
17         MR. HENINGER:  I'm finished.
18 And I offer these exhibits.  Whatever
19 remaining time I have, Michael may have some
20 questions for the charities.
21         We'll go to the Court.
22         MR. ANDERSON:  I'll let
23 Michael.

Page 331

1          MR. SANSBURY:  Can we go off
2  the Record for a minute?
3          VIDEOGRAPHER:  Off the Record;
4  the time is 7:12 p.m.
5             (Recess taken.)
6          VIDEOGRAPHER:  We're back on
7  the Record; the time is 7:19 p.m.
8          MR. ANDERSON:  I'm just going
9  to say that we pointed out that you have
10 three minutes left when Steve took over.
11 And as an accommodation, I don't mind you
12 going over a little bit, as long as the
13 sheriff feels good.  But I might tell him he
14 gets tired.
15         EXAMINATION
16 BY MR. SANSBURY:
17     Q.    Sheriff Warren, my name is
18 Michael Sansbury.  Good evening.
19         I represent the plaintiff
20 charities in this case.  I'm handing you
21 what's been marked as Plaintiff's Exhibit 9,
22 which is the application of bingo license
23 submitted by Tuskegee and Macon County Civil

Page 332

1  Rights Multicultural Center.
2          And my question to you, as an
3  initial matter, how would an application
4  like that be maintained by your office?
5      A.    As they come in, each -- First
6  of all, each one of them is -- we would --
7  There would be some of the accompanying
8  documents with it.  I guess proof of its --
9          MR. ANDERSON:  He's asking you
10 how it was maintained.
11     A.    How it was maintained, oh.
12 I'm sorry.
13         These are maintained in
14 folders.  Each has their own folder and in a
15 file cabinet.
16     Q.    And you still have all of
17 those in your office?
18     A.    Yes, sir.
19     Q.    And you don't throw any of the
20 documents away that come in that are
21 associated with an application?
22     A.    Not -- Not -- Nothing that's
23 required to consider the license.

Page 333

1      Q.    Okay.  And you said there was
2  some accompanying documents with that
3  application; is that correct?
4      A.    There may be.
5      Q.    And would you have copies of
6  those documents?
7      A.    If they were pertinent to
8  the -- We would maintain copies of those
9  documents if they were pertinent to the
10 processing of the application.
11     Q.    Did you -- I understand that
12 the charities had submitted a document
13 request in this case?
14     A.    Excuse me.
15     Q.    A document request?  Did you
16 understand that the charities had submitted
17 one to you in this case?
18     A.    Yes.
19     Q.    Did you understand that one of
20 the requests is for all application
21 materials associated with the charity's
22 application?
23     A.    Yes.

FREEDOM COURT REPORTING

Page 334

1    Q.    Okay.  Did you submit -- Did
2  you produce all the documents that were in
3  the charity application files that you
4  maintained?
5         MR. ANDERSON:  When you say
6  produce, you mean give them to his lawyer?
7         MR. SANSBURY:  Yes.
8    A.    To the best of my knowledge,
9  that was done.
10   Q.    Okay.  Do you know if that
11 application had a certified copy of a
12 charter, a certificate of incorporation, or
13 bylaws attached to it when it was submitted?
14   A.    I wouldn't have processed
15 this.  I'm out doing the sheriff thing, and
16 the other people are doing this.
17   Q.    So you don't know?
18   A.    I'm not sure if one
19 accompanied this -- I'm not sure what
20 accompanied this document when it -- When
21 these come in, they are sent to the
22 appropriate people to deal with.
23   Q.    So you wouldn't know if any

Page 335

1  documents were submitted with that
2  application or not?
3    A.    I wouldn't know.
4    Q.    Who would know the answer to
5  that question?
6    A.    Tommy Miller.  He's our
7  civil/criminal court.
8    Q.    And Mr. Miller still works in
9  your office?
10   A.    Yes.  But he's out sick.
11   Q.    All right.  Okay.
12         And that would be true for all
13 of the charity applications that were
14 submitted, you wouldn't know if there were
15 any accompanying documents that were
16 submitted with them?
17   A.    When these documents come in,
18 the people who process them would know.
19 And, again, sometimes this stuff goes on and
20 I may be out of the county or sometimes out
21 of the state, but this process goes on and
22 somebody else generally takes care of this,
23 and they report to me.

Page 336

1    Q.    I understand that.  So you're
2  saying that none of the -- You wouldn't
3  know, one way or the other, whether these
4  charity applications had documents
5  accompanying them; is that correct?
6    A.    What -- I would know from the
7  people who processed these documents if they
8  met the requirements for licensing.
9    Q.    So you would rely on Tommy
10 Miller, who is handling applications, to
11 advise you whether all of the documents had
12 been submitted with the application?
13   A.    Yes.
14         (Whereupon, Plaintiff's
15          Exhibit No. 22 was marked
16          for identification.)
17   Q.    All right.  Let me hand you
18 Plaintiff's Exhibit 22.  It's a document
19 entitled bingo operations and lease
20 agreement.  Have you ever seen that document
21 before?
22   A.    Yes, I've seen the lease
23 agreement.

Page 337

1    Q.    You have.  Where did you see
2  that document?
3    A.    You mean this particular
4  document?
5    Q.    Yes.
6    A.    This could be my first time
7  seeing it.
8         MR. TEPLEY:  If you don't
9  mind, could you give us a copy?
10        MR. SANSBURY:  Actually I have
11 copies.
12        MR. ANDERSON:  It's Bates
13 number THR 8 through THR 14.
14   Q.    So have you seen that document
15 before?
16   A.    I don't know if I've seen this
17 particular document before.  I was referring
18 to the lease -- the bingo operations and
19 lease agreement.
20   Q.    Okay.  How many bingo
21 operations and lease agreements have you
22 seen?
23   A.    Probably a lot of them.

FREEDOM COURT REPORTING

Page 338

1    Q.    Do you have a guess?  More
2  than ten?
3    A.    Probably more than ten.
4    Q.    Okay.  Have you ever seen a
5  blank version of that agreement?
6    A.    What do you mean a blank
7  version?
8    Q.    A version that didn't have any
9  names filled out?
10    A.    I'm sure I have seen a blank
11  version of one of these.
12    Q.    Where would you have seen it?
13    A.    I may have not.  Listen.  I do
14  not -- The ones that I have seen are the
15  ones that come into my office.
16    Q.    So you have had versions of
17  that agreement come into your office?
18    A.    Uh-huh.
19    Q.    And you --
20    MR. ANDERSON:  You have to
21  speak up.
22    A.    I'm sorry.  Yes.  Yes, I have
23  had this document come into my office.

Page 339

1    Q.    All right.  And if that
2  document has come into your office, it would
3  be in connection with the charity
4  application; is that correct?
5    A.    It would -- This document
6  would be -- it would be part of the charity
7  package.
8    Q.    And your office would maintain
9  a copy of that document; is that correct?
10    A.    Yes, they would.
11    Q.    Do you know why those
12  documents wouldn't have been produced in
13  this case?
14    MR. ANDERSON:  Object to the
15  form.
16    A.    Why these documents wouldn't
17  have been produced?
18    Q.    Yes, sir.  If we requested
19  copies of all application materials, and
20  your office had that document, do you know
21  why it wouldn't be turned over to us?
22    A.    I think we --
23    MR. ANDERSON:  When you say

Page 340

1  turned over to you, are you talking about
2  through his attorneys during the litigation
3  process?
4    MR. SANSBURY:  (Nods head in
5  the affirmative.)
6    A.    I couldn't -- We produce
7  documents, and we -- I thought they were all
8  turned over.  I'm -- It was my understanding
9  that they were all turned over.
10    Q.    Fair enough.  I'm showing you
11  now a copy of Plaintiff's Exhibit 7, which
12  is the Second Amended Rules and Regulations.
13  Would you mind reading to me what paragraph
14  section 9B says.
15    A.    9B says:  No bingo license
16  shall be issued to any non-profit
17  organization unless the organization shall
18  be in existence for three years -- for at
19  least three years in the county immediately
20  prior to the issuance of the license.
21    Q.    All right.  What does that
22  mean in your words?
23    A.    That the license (sic) has to

Page 341

1  be in existence -- in -- in the county for
2  at least -- for at least three years prior
3  to issuance of the permit.
4    Q.    All right.  And what does in
5  existence in the county mean?
6    A.    Means that it is a charity
7  that has been incorporated and in good
8  standing in the county.
9    Q.    So it has to be incorporated
10  in the county?
11    A.    I'd have to -- If I can
12  refresh my memory, everything is a blur
13  right now.
14    Q.    Take your time.
15    MR. ANDERSON:  If you don't
16  know without looking at the document, you
17  can tell him you don't know without looking
18  at it.
19    A.    I don't know right now.
20    Q.    Is there anything that would
21  refresh your recollection?
22    A.    Right now, I don't know.
23    Q.    What do you mean you don't

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 342

1  know? You don't understand what the rule
2  means?
3      A.    I understand what the rule
4  means. But as I've said to you, I'm
5  sixty-one, I've been sitting here for the
6  last seven hours, everything is somewhat a
7  blur now.
8          I'm pretty sure that I know
9  what constitutes a charity, but right now, I
10  can't answer that.
11      Q.    That wasn't my question
12  though. My question is: What does it mean
13  for a charity to be in existence in the
14  county? Does that mean that it's
15  incorporated there, does it mean all of its
16  activities take place there, does that mean
17  all of its members live there? What does
18  that mean?
19      A.    That a charity in my -- And
20  I'm just speaking now off the top of my
21  head, to the best of my recollection, a
22  charity is one that is -- either one that
23  has been declared a non-profit organization

Page 343

1  by -- because of its -- by -- I forget the
2  name of the agency.
3      Q.    The IRS?
4      A.    The IRS. Or one that has a
5  history that is in good standing and is
6  doing -- currently doing charitable things
7  in the county.
8      Q.    And I understand that. And
9  part of the -- Part of the rules define what
10  a non-profit organization is. What I'm
11  asking is, what does it mean for the
12  organization to be in existence in the
13  county?
14      A.    I guess that would mean active
15  and doing business in the county.
16      Q.    Okay. So doing things in the
17  county. It doesn't necessarily mean that
18  all the members of the organization have to
19  live in the county; is that correct?
20      A.    No, sir.
21      Q.    It doesn't mean that the
22  mailing address has to be in the county; is
23  that correct?

Page 344

1      A.    No, sir.
2      Q.    It doesn't mean that the
3  organization has to be incorporated in the
4  county; is that correct?
5      A.    No, sir.
6      Q.    And it doesn't even mean that
7  all of the activities of the organization
8  have to take place in Macon County, does it?
9      A.    No, it doesn't.
10      Q.    Thank you. Are you familiar
11  with the NCO Nile Club?
12      A.    Yes, I am.
13      Q.    What do you know about the NCO
14  Nile Club?
15      A.    The Nile Club, from my
16  recollection of it, was a -- sort of like
17  a -- I knew it was an NCO organization,
18  Noncommissioned Officers organization. But
19  they also ran a -- sort of a nightclub like.
20      Q.    Have you ever issued a license
21  to NCO Nile Club to conduct bingo of any
22  kind?
23      A.    Class A bingo.

Page 345

1      Q.    And in your opinion, is NCO
2  Nile Club a bonified Macon County charity?
3      A.    They were -- They were -- They
4  applied to -- as a place where card bingo
5  would be played for that organization or
6  charities.
7      Q.    Okay. In order to get a Class
8  A bingo license, they have to be a
9  non-profit organization as defined by your
10  rules; correct?
11      A.    To get a Class A bingo
12  license, that is the card bingo. They would
13  not -- Let me make sure about that.
14          MR. ANDERSON: I'm being told
15  section 2.
16          MR. HENINGER: Section 2 is
17  probably the place to look.
18      A.    Yes, a non-profit
19  organization.
20      Q.    Okay. And section 1-I --
21      A.    Yes.
22      Q.    -- defines a qualified
23  location for the holder of a Class A bingo

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 346

1  license as a location as defined above which
2  has been inspected and approved by the
3  sheriff for the conduct of bingo games?
4      A.   Yes.
5      Q.   Did you inspect and approve
6  the location at which NCO Nile Club
7  conducted Class A bingo?
8      A.   Yes.  Bingo was approved to be
9  played at the Nile club.
10     Q.   Did you do an inspection and
11 approval of the location?
12     A.   I believe Tommy did.
13     Q.   Do you know?
14     A.   Tommy Miller.
15     Q.   Do you know what kind of
16 investigation he might have conducted?
17     A.   It was prescribed in the rules
18 and regulations.
19     Q.   Did you discuss his inspection
20 with him?
21     A.   For the Class A?
22     Q.   Yes, sir.
23     A.   I don't remember discussing it

Page 347

1  with him.
2      Q.   Do you know any other
3  organizations who have applied for and
4  received Class A bingo licenses other than
5  NCO Nile Club?
6      A.   No.
7          MR. SANSBURY:  I think that's
8  all I have.
9          VIDEOGRAPHER:  This is the end
10 of tape number six; we are off the Record at
11 7:40 p.m.
12 (The deposition was concluded at 7:40 p.m.,
13 March 19th, 2008.)

Page 348

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Sara Mahler, Certified Court
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10 transcript form by computer aid under my
11 supervision, and that the foregoing
12 represents, to the best of my ability, a
13 true and correct transcript of the
14 proceedings occurring on said date and at
15 said time.
16     I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22     _____
           Sara Mahler, CCR
23            ACCR #420