**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| HOPE FOR FAMILIES & COMMUNITY SERVICES, INC., et al.,     ) ) ) | Case No.: 3:06-cv-01113-WKW-csc |
| Plaintiffs,     ) ) | |
| v.     ) ) | |
| DAVID WARREN, in his Official Capacity as the SHERIFF OF MACON COUNTY, et al.,     ) ) ) ) | |
| Defendants.     ) | |

**RESPONSE OF DEFENDANTS MACON COUNTY GREYHOUND PARK d/b/a VICTORYLAND AND MILTON MCGREGOR TO PLAINTIFFS' OBJECTION TO MEMORANDUM OPINION AND ORDER**

Defendants Macon County Greyhound Park, Inc. d/b/a Victoryland ("Victoryland") and Milton McGregor ("McGregor") file this response to Plaintiffs' Objection to the Magistrate Judge's Memorandum Opinion and Order [Doc # 195].

As set out below, the Magistrate Judge's Memorandum Opinion and Order (the "Order") is correct and due to be affirmed. The only ground for reversal of the Order is a finding that it is clearly erroneous or contrary to law. *See e.g. Koch Foods of AL, LLC v. General Elec. Capital Corp.*, 531 F. Supp. 2d 1318, 1319 (M.D. Ala. 2008). Because no such finding can be made, Plaintiffs' objections must be overruled.

**STANDARD OF REVIEW**

A "district court reviewing a magistrate judge's discovery order is ... limited by statute and rule to reversing that order only if it is "clearly erroneous or contrary to law." *Koch Foods*, 531 F. Supp. 2d at 1319. *See also* Fed. R. Civ. P. 72(a); *Merritt v. Int'l Broth. of Boilermakers*, 649 F.2d 1013 (5th Cir. 1981). Magistrate judges are afforded broad discretion in resolving

1

discovery disputes and, where as here, a magistrate judge's order is neither clearly erroneous nor contrary to law, "the order must be affirmed." James Wm. Moore, et. al., Moore's Federal Practice § 72.11[1][b] (3d ed. 2008). A magistrate judge's order is clearly erroneous only in the limited situations where "the reviewing court is left with the definite and firm conviction that a mistake has been comitted." *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 74 (N.D.N.Y. 2000). *See also Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999) (A district court must accept the magistrate judge's finding unless after scrutinizing the record, it "form[s] a strong, unyielding belief that a mistake has been made."); *Rowlin v. Alabama Dept. of Public Safety*, 200 F.R.D. 459, 460 (M.D. Ala. 2001) ("Magistrate's orders should not be disturbed absent a clear abuse of discretion that leaves the reviewing court with 'the definite and firm conviction that a mistake has been committed.'").

In easily-comprehended language: "'to be clearly erroneous, a decision must strike [the reviewing court] as more than just maybe or probably wrong; it must . . . strike [the reviewing court] as wrong with the force of a five-week-old unrefrigerated dead fish.'" *Hayes v. Woodford,* 301 F.3d 1054, 1067, n.8 (9th Cir. 2002) (citations omitted). Moreover, **"[w]here there are two permissible views, the reviewing court should not overturn the magistrate judge's decision solely because it would have chosen the other view."** Moore's Federal Practice, *supra*, at § 72.11[1][b] (emphasis added). Further, a magistrate judge's determination can be overturned as contrary to law only if the magistrate judge misinterpreted or misapplied applicable law. *Tompkins*, 92 F. Supp. 2d at 74.

I.    **The Magistrate Judge's Order Denying Access to Victoryland's Financials is
      Correct.**

The Plaintiffs' complaint that the Magistrate Judge wrongfully denied them discovery of

Victoryland's confidential and proprietary financial information is unavailing.[1]  As noted herein,

the financial information, requested is not subject to discovery because: (a) the information

sought constitutes trade secrets or confidential commercial information; (b) Plaintiffs failed to

meet their burden for requiring the production of such information; (c) Plaintiffs seek to compete

with Victoryland; (d) the information sought is not relevant and cannot lead to the discovery of

admissible evidence; (e) the harm that disclosure of Victoryland's trade secrets will cause is not

eliminated by the Protective Order; and (f) the harm to Victoryland far outweighs any need

Plaintiffs might have for the information.  Accordingly, the Magistrate Judge properly denied the

Plaintiffs' motion to compel discovery of Victoryland's financial information and the Magistrate

Judge's decision was neither clearly erroneous nor contrary to the law.

A.    The information sought constitutes trade secrets and confidential commercial
      information.

Plaintiffs entirely ignore and utterly fail to address McGregor's and Victoryland's

legitimate objection that the interrogatories and requests "improperly seek commercial,

proprietary, trade secret and competitive information the disclosure of which would be harmful

to Victoryland and its business."  From the Affidavit of S. Lee Yates [Doc. # 158-2] and the law

of Alabama, it is clear that the revenue information sought by Plaintiffs through these

interrogatories and requests constitutes a "trade secret or other confidential research,

development, or commercial information."

---

[1] Specifically, the Plaintiffs assert that the Magistrate Judge improperly denied their Motion to Compel responses to
the Non-Profit Plaintiffs' Request for Production #15 to Mr. Milton McGregor, Lucky Palace Interrogatories #9 and
# 10 to Victoryland and Lucky Palace's Request #12 to Victoryland. [*See* Doc. #195, at 3-4].  Defendants
incorporate by reference their opposition to the Motions to Compel responses to these discovery requests.  *See* Doc.
# 117, 162 and 163.

3

In determining whether information constitutes a trade secret, federal courts look to state law. *See, e.g, Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1158 (11th Cir. 2004) (applying Alabama Trade Secret Act in determining what constituted trade secret). Alabama law defines a trade secret as information that:

    a.    Is used or intended for use in a trade or business;

    b.    Is included or embodied in a formula, pattern, compilation, computer
          software, drawing, device, method, technique, or process;

    c.    Is not publicly known and is not generally known in the trade or business
          of the person asserting that it is a trade secret;

    d.    Cannot be readily ascertained or derived from publicly available
          information;

    e.    Is the subject of efforts that are reasonable under the circumstances to
          maintain its secrecy; and

    f.    Has significant economic value.

Alabama Code § 8-27-2 (1975).

As shown by the Affidavit of S. Lee Yates [Doc. # 158-2], Victoryland's gross revenues, net profits, financial statements and other financial information concerning electronic bingo are clearly trade secrets under this definition. The financial information that Plaintiffs seek is used by Victoryland in its business and has significant economic value. [Doc. # 158-2, ¶ 4, 9]. Disclosing the information would reveal confidential information relating to corporate revenues. (*See id.,* ¶¶4-8). The release of such information would certainly give potential competitors, including Plaintiffs, an outline of how to compete against Victoryland, to Victoryland's detriment.

Further, Victoryland is a private, closely-held corporation, and as a private, closely-held corporation, Victoryland's corporate financial information, including gross revenues from bingo,

is not publicly known. (*Id.*, ¶¶ 3, 6-7).  Nor can this information be readily ascertained from publicly available information.  (*Id.*, ¶ 7).  Victoryland has also previously taken steps to prevent the disclosure of its financial information by objecting to a subpoena issued by the Plaintiffs to Victoryland for similar information before Victoryland was made a party to the instant action. Accordingly, under Alabama law, the financial information Plaintiffs seek constitutes trade secrets or confidential commercial information not subject to discovery.

Relevant case law supports the Magistrate Judge's Order. Alabama Courts have held that analogous information, including customer lists, financial statements, tax returns, sales evaluations, profit statements, and information concerning gross and net profits constitute trade secrets under the statute.  *See Ex parte W.L. Halsey Grocery Co.*, 897 So. 2d 1028, 1034-1035 (Ala. 2004) (holding that customer lists, financial statements, tax returns, and sales evaluations were trade secrets); *Ex parte Miltope Corp.*, 823 So. 2d 640, 645-646 (Ala. 2001) (holding that "information concerning [] gross and net profit" as well as customer orders and board minutes constituted a trade secret and was not required to be disclosed).  Additionally, federal courts and courts in other jurisdictions have held that company profits and similar financial information of a company is a trade secret. *See Corbett v. Free Press Ass'n*, 50 F.R.D. 179, 180 (D. Vt. 1970) ("profits or losses of a business are generally of a confidential nature"); *Gelb v. American Tel. & Tel. Co.,* 813 F.Supp. 1022, 1034-35 (S.D.N.Y.1993) (internal financial information is confidential); *Uinta Oil Refining Co. v. Continental Oil Co.*, 36 F.R.D. 176, 182 (D. Utah 1964) (quashing subpoena duces tecum that requested profit and loss statements because "matters of profit and income in the depth sought ordinarily are treated as confidential, and the ramifications of such disclosures are difficult to evaluate [and] [t]he foundational data sought would almost completely reveal the operational experiences of the companies."); *Delucca v. GGL Industries,*

5

*Inc.*, 712 So.2d 1186, 1187 (Ct. App. Fl. 1998) (finding  company's business documents, including tax returns, documents reflecting income, and customer's names and addresses, constituted "trade secrets" under Florida law).

Plaintiffs' erroneous assertion that the County Bingo Regulations require the disclosure of Victoryland's financial information [Doc. #195, at 10-12] is misleading, at best. Plaintiffs disingenuously use misleading quotes taken out of context from the County Bingo Regulations and the Sheriff's deposition to argue that Victoryland had no expectation of privacy in its financial information [Doc #195, at 10-11]. The Plaintiffs' selective quote from the County Bingo Regulations [Doc. #195, at 10] does not reveal to the Court either (i) the limited records required to be kept under the Regulations; or (ii) that the records required to be kept are those of the non-profit "license holder," not Victoryland. [Doc. #185-4, § 10].

The non-profit "license holder" as defined by the Regulations means "any nonprofit organization that has been issued a bingo license by the Sheriff pursuant to these Regulations." [Doc. #185-4, § 1(e)]. Of course, the records of the nonprofit organizations (charities) do not include any of Victoryland's financial information. The Regulations simply do not support Plaintiffs' position. As a review of Sections  10(a) and 10(b) of the County Bingo Regulations (which the Plaintiffs failed to mention) makes clear, the non-profit license holders for whom Victoryland operates electronic bingo games are only required to keep copies of their contracts with Victoryland and the sums they receive under the contracts. Specifically, sections 10(a) and 10(b) of the County Bingo Regulations state that:

> Each **license holder** shall keep and maintain the following records accounts pertaining to each bingo session conducted by it for at least three (3) years from the date of such session:
>
> (a)    An itemized list of all gross receipts for each bingo session, which shall I include all receipts derived from the sale of bingo cards, entrance fees,

donations, or form any other source whatsoever pertaining to the operation of such session. **Notwithstanding the foregoing, the holder of a Class B License who has contracted with an individual, firm, association or corporation for the operation of bingo games shall only report the Class B License holder's gross receipts under such contract and provide a copy of such contract to the Sheriff.**

(b)     An itemized list of all expenses, costs and disbursements, other than prizes, paid or given as a result of the operation of any bingo session, together with the name and address of each person to whom said expenses, disbursements or consideration was paid or given; a receipt or invoice for all items purchased and for all services rendered; and such other records as will adequately reflect the amount and nature of such expenses, costs and disbursements. **Notwithstanding the foregoing, the holder of a Class B Bingo License who has contracted with an individual, firm, association or corporation for the operation of bingo games which permits the holder to receive reasonable compensation for the operation of a bingo session net of the costs associated with the operation of the bingo games, including without limitation, building rent, insurance, equipment rental, consulting or management fees, employee expense, utilities, janitorial services, bingo prizes or gifts and the like, shall only be required to maintain a copy of such contract and provide a copy of same to the Sheriff upon request.**

[Doc #185-4, at 9] (emphasis added).

By leaving out Sections 10(a) and 10(b) of the County Bingo Regulations and only quoting Sections 10(c) and 10(e) of the Regulations [*see* Doc 195, at 10], the Plaintiffs have misinformed the Court as to the limited records that must be kept and filed under the County Bingo Regulations. As is evident when all of Section 10 is read in context, the County Bingo Regulations do not require the reporting of any of Victorylands' financial records. Rather, they require the non-profits associated with Victoryland to keep and file their contract with Victoryland and the sums they receive from Victoryland under the contract.[2]

---

[2] The Magistrate Judge correctly recognized that the County Bingo Regulations require non-profit license holders to maintain limited records, and he ordered Victoryland to produce any such limited records (i.e., non-profit bingo contracts and records showing payments under the contracts) that it may have in its possession, custody or control. *See* Order [Doc. #187], at 22.

Simply put. The County Bingo Regulations contain no requirement that Victoryland keep or share records of its profits or other financial records from electronic bingo with the Plaintiffs or the Sheriff. Accordingly, there is no basis whatsoever for Plaintiffs' disingenuous argument that the County Bingo Regulations somehow deprive Victoryland of its expectation of privacy in its confidential, financial records.

Consistent with the Regulations, Victoryland's financial information has not been disclosed to the Sheriff. In his recent deposition, Sheriff Warren testified that he has never seen nor asked to see Victoryland's bingo profits. [Doc. #195-3, at 319-326]. Despite this fact, Plaintiffs again try to mislead the Court by leaving out key portions of the Sheriff's testimony and misconstruing other portions. Taking Sheriff Warren's testimony in context, it is evident that: he has _never_ had access to Victoryland's financial information; he has only had access to information for the Charities as set out in the County Bingo Regulations; and Victorylands' financial information is protected, trade secret and confidential commercial information.

The pertinent line of questioning begins on page 319 of the Sheriff's deposition, not on page 320 where Plaintiffs begin their selective quotes. At page 319, the Sheriff was asked by Plaintiffs' counsel how much net profit Victoryland made in 2007 from electronic bingo, to which he responded: **"That is not something that I'm responsible for."** [Doc. #195-3, at 319][3] (emphasis added). He was then asked whether Victoryland's net profit was something he was required to monitor, and the Sheriff responded "**I am required to monitor the charities**, to monitor—to make sure that Victoryland comply with the rules and the regulations. And that's what I do to the best of my ability." [Doc. #195-3, at 320]. The Sheriff then explained that the charities are required to make their profits available to him on his request and that he has "made

---

[3] The citations to the Sheriff's deposition testimony are to the actual pages of the deposition transcript and not the pages of Doc. #195-3, which is a condensed transcript.

8

sure that the charities are in order; [and] made sure that [he] kept up with all the records on the charities." [Doc. #195-3, at 320] (emphasis added).

In the next set of questions, it is obvious that Sheriff Warren believes Plaintiffs' counsel is still referring to the profits of the charities when asked whether he has seen net profit figures. [Doc. #195-3, at 321-322]. After the Sheriff's discussion on keeping up with the charities' records, the follow-up question asks if he has ever requested Victoryland to give him "any report or, information regarding **their** net profit from bingo, electronic bingo...." [Doc # 195-3 at 320, l.20 – 321, l.23] The ill-formed question and use of the word "their" instead of "its" would logically be deemed to refer to the charities (plural) not Victoryland (singular). During the line of questioning, the Sheriff demonstrates his confusion by asking, "The charities?" [Doc. #195-3, at 321]. Thereafter, the Sheriff explicitly **stated again** that he is **"not required to keep up with Victoryland's net profit."** [Doc. #195-3, at 321] (emphasis added). After that, consistent with the County Bingo Regulations, the Sheriff repeatedly and definitively stated that he has not seen, nor has he asked to see, Victorylands' net profits from electronic bingo.

> Q: And I don't expect you right now to spit it out to me. But I want your honest truthful answer, have you ever laid your eyes on the official report that shows the net profit for Victoryland from bingo operations only in Macon County for 2004?
> A: **I do not know what bingo's–what Victoryland's net profits are.**
> Q: **Have you ever seen it for 2004?**
> A: **No, sir.**
> Q: **Have you ever asked to see it?**
> A: **No, sir.**
> Q: **Have you ever seen the figures for the net profits for Victoryland for bingo operations only in Macon County for 2005?**
> A: **No, sir.**
> Q: **Have you ever asked to see them?**
> A: **I have not asked to see them.**
>      *      *      *
> Q: Okay. Let me finish the years. **Have you seen the official reports of the net profits at Victoryland from bingo operations only in Macon County for 2006?**
> A: **No, sir.**

| Q: | Have you asked to see them? |
|---|---|
| A: | No, sir. |
| Q: | And you have not seen the figures for net profits for Victoryland from bingo operations only in Macon County for 2007? |
| A: | No, sir. |
| Q: | And you haven't asked to see them? |
| A: | No, sir. |

[Doc. #195-3, at 323-25] (emphasis added).

After reading the Sheriff's testimony in context rather than just the portion selected by Plaintiffs, it is evident that the Sheriff has **never** been given access to Victoryland's financial information. Plaintiffs' argument to the contrary is completely without merit and it certainly provides no basis for overturning the Magistrate Judge's Order. Even if, assuming *arguendo*, Plaintiffs' faulty reading of the Sheriff's testimony were accurate, any subjective belief on the part of the Sheriff that he **could** have reviewed Victoryland's financial information if he had asked, does not remove Victoryland's expectation of privacy with regard to its own financials. This is particularly true where the Sheriff has never seen that information and the County Bingo Regulations do not require Victoryland to reveal it.

        B.     <u>Plaintiffs failed to meet their burden for requiring the production of the requested information.</u>

Because it is obvious that the financial information of Victoryland sought by Plaintiffs is protected confidential information, "the burden [was] on [Plaintiffs as] the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." 8 C. Wright & A. Miller, *Federal Practice & Procedure*: Civil § 2043 (2nd ed. 1997). Yet, as the Magistrate Judge concluded, Plaintiffs completely failed to meet this burden:

> On balance the Court concludes that while revenue and profit information only marginally supports the Plaintiffs' claims, its slight evidentiary utility is far

outweighed by the intrusiveness and potential injury of the release of the information about the operation of a closely-held corporation.

Order [Doc. #187], at 10. This conclusion is correct and, accordingly, can not be clearly erroneous. As the Alabama Supreme Court noted in *Ex parte Miltope Corp.*, courts must be very careful in requiring the disclosure of trade secrets because once the information is disclosed, its "valuable secretive nature" cannot be restored, and disclosure of trade secrets can cause irreparable harm:

> Trade secrets should receive greater protection from discovery because they "derive[ ] economic value from being generally unknown and not readily ascertainable by the public." "Once the information becomes available through the discovery process, a subsequent appeal, even if successful, cannot restore the valuable secretive nature." Disclosure of a trade secret could cause "irreparable harm." (internal citations omitted)

*Miltope*, 823 So. 2d at 645.

Due to the problems inherent in the disclosure of trade secrets, the Alabama Supreme Court held in *Miltope* that the trial court abused its discretion in ordering the Defendant to produce information regarding its profits "because of the irreparable harm the disclosure of its trade secrets could do." *Id.* It is clear that if the Court were to override the Magistrate Judge's reasoned decision and compel Victoryland to produce its gross revenues, net profits, and other financial information from electronic bingo to Plaintiffs, one of which admittedly views Victoryland as a competitor, Victoryland will suffer irreparable harm.

C.    Plaintiffs seek to compete with Victoryland.

There can be no dispute that Plaintiffs seek to compete with Victoryland, and such plans provide further support for the Magistrate Judge's Order. Plaintiffs have previously informed this Court that Plaintiff Lucky Palace has a common interest with Libra Securities Holdings, LLC (which has an ownership interest in Lucky Palace) and Libra Securities, LLC (a wholly-owned

subsidiary of Libra Securities Holdings and Lucky Palace's investment banker), which has provided financial and strategic services to Plaintiff Lucky Palace and which "is in partnership with Lucky Palace to secure financing and raising capital for the eventual opening of Bingo operations in Shorter, Alabama." [Doc. #128, ¶¶ 1-4].    Documents authored by the Libra Securities entities (which were produced in response to Victoryland's document subpoena) to obtain financing for Plaintiff Lucky Palace repeatedly refer to Victoryland as a "competitor." Indeed, some of those documents refer to Victoryland as Plaintiff Lucky Palace's "primary competitor." *See* Affidavit of Tepley and Exhibits A-D and F thereto, which were filed under seal in this matter.

Moreover, additional documents produced by the Libra entities and obtained by Victoryland's counsel establish that Plaintiffs have engaged in a strategy to use grassroots pressure, pressure from above, and "political clout" to try to force the Sheriff to give Plaintiffs a bingo license. *See* Affidavit of Tepley and Exhibit E thereto, which were filed under seal. As part of this effort, Plaintiffs papered Macon County with fliers urging citizens to call Sheriff Warren and tell him to approve their bingo license application. [*See* Doc. # 88-2].   Victoryland has no reason to believe that the Plaintiffs have abandoned their campaign to use political pressure to force the Sheriff to provide them with bingo licenses, and has every reason to believe that Plaintiffs will use any financial information obtained from Victoryland to aid them in their plan to compete against Victoryland, all to Victoryland's detriment.   Because of the problems inherent with disclosure of trade secrets, courts should be particularly wary, where as here, the disclosure of trade secrets is sought by a competitor.   "Courts have presumed that disclosure to a competitor [such as Lucky Palace] is more harmful than disclosure to a noncompetitor." *R & D Business Systems v. Xerox Corp.,* 152 F.R.D. 195, 197 (D. Colo. 1993).

D.    The information sought is not relevant and cannot lead to the discovery of admissible evidence.

Even *if* the requested information were not protected or privileged (which it is), Victoryland's financial information is not relevant to any of Plaintiffs' underlying claims. *See Fed. R. Civ. P.* 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, which is **relevant** to the subject matter involved in the pending action.") (emphasis added). "Ordinarily, Rule 26 will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence." *Ranney-Brown Distributors, Inc. v. E.T. Barwick Industries, Inc.*, 75 F.R.D. 3, 5 (S.D. Ohio 1977); *Henderson v. Zurn Industries, Inc.*, 131 F.R.D. 560, 562 (S.D. Ind. 1990); *Bogosian v. Gulf Oil Corp*, 337 F. Supp. 1228 (E.D. Pa. 1971). Furthermore, "[a] district court can deny a motion to compel further discovery if it concludes that the questions are irrelevant." *Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 732 (11th Cir.1984).

In their Objection, Plaintiffs argue that the financial information is relevant (1) to show motive; (2) to show bribery of Fred Gray, Jr. via his father's return on investments as a shareholder in Victoryland; and (3) to support Plaintiffs' claims for damages. Each of these arguments is flawed and must fail here, as they did before the Magistrate Judge.

1.    Plaintiffs do not need the financial information to show motive.

Plaintiffs' argument that the requested financial information would be admissible to show that VictoryLand and McGregor were financially motivated to enter into the alleged conspiracy is a red herring. Plaintiffs' argument is flawed in several respects, including the fact that the requested information improperly seeks commercial, proprietary, trade secret and competitive information, as discussed above, which is to be protected from disclosure. As established above, the Plaintiffs, as competitors, sought confidential trade-secret information, but utterly

failed to meet their burden of establishing that the information sought is "sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information," 8 C. Wright & A. Miller, *Federal Practice & Procedure*: Civil § 2043. *See also Ex parte Miltope*, 823 So. 2d at 644 (finding a protective order ineffective when a competitor is granted expansive discovery of parties' sensitive business information since the court has no system of monitoring the competitor's use of the information).

Moreover, Victoryland's financials do not provide evidence of motive or intent because it is an **"axiomatic conclusion that businesses are operated to make a profit."** *Ex parte Miltope Corp.*, 823 So. 2d at 647 (Hardwood, J. concurring)(refusing to allow discovery of net profits to prove motive). *See also Crawford Broadcasting Co. v. Fine*, 904 So. 2d 221, 225 (Ala. 2004) (ruling in a claim involving defamation that information concerning defendants' compensation was in no way relevant to proving "actual malice" and finding the request constituted harassment). Consequently, Plaintiffs do not need Victoryland's financial information simply to prove that Victoryland sought to make a profit or that it did in fact make a profit. If necessary, Victoryland will stipulate that to date, electronic bingo has been profitable. In fact, at the September 5, 2007, hearing on the Defendants' Motions to Dismiss the Third Amended Complaint, in response to the Plaintiffs' erroneous allegations that due to the alleged monopoly there was no economic development at Victoryland, Defendants submitted photographs to show that Victoryland was engaged in a $100 million renovation of its facility. *See* Transcript of September 5 Hearing [Doc. # 99], at 63, l. 7-20. Given Victorylands' expansion, which is obvious from the road, the Magistrate Judge correctly concluded that:

> No reasonable person and certainly no reasonable jury drawn from the Eastern Division of this District could fail to know that Victoryland is highly profitable. The financial information which the plaintiff seeks merely would quantify the magnitude of Victoryland's profitability

Order [Doc. #187], at 10.

Instead of addressing Defendants' valid objections that the information sought was confidential trade-secret information, which the Magistrate Judge properly sustained, Plaintiffs incorrectly assert that "[s]uch information is routinely made discoverable in civil RICO cases." In support of this misguided contention, the Plaintiffs cite *State Farm Mutual Automotive Insurance Co. v. CPT Medical Services, P.C.*, 375 F. Supp. 2d 141 (E.D.N.Y. 2005), and *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal. 2006). Plaintiffs' reliance on these cases is misplaced, and both of these cases are clearly distinguishable from the present matter for the following reasons: (1) neither case involved a RICO action brought by the Defendant's potential competitor; (2) both cases involved instances in which the money at issue was taken directly from the Plaintiff or the Plaintiff was the court-appointed receiver over the assets; (3) both cases involved claims of unjust enrichment, which (unlike the claims at issue here) require a showing that defendant was financially enriched; and (4) whether the requested information consisted of confidential, proprietary, or trade secret information **was not at issue** in either case.

Review of the *CPT Medical* case shows that it has no relevance to the discovery issues before this Court. In *CPT Medical*, the insurer brought several claims, including a RICO and unjust enrichment claim, against certain physicians. In order to establish a prima facie case of unjust enrichment, the plaintiff was required to prove that the defendant was enriched and the enrichment was at the plaintiff's expense. *Id.* Accordingly, the *CPT Medical* court held that the physicians' financial records were relevant and discoverable in order to "establish[] that defendants profited from their willingness to order CPT Tests." *Id.*, at 156. Clearly, the information was vital in order to establish a critical element of the unjust enrichment claim. No such requirements exist with respect to Plaintiffs' RICO claim. In fact, any alleged illicit

motives of the defendants, or any others, for alleged wrongdoing are entirely irrelevant to the **fundamental issue in this case** which is whether there is a rational basis for the four aspects of the County Bingo Regulations that the Plaintiffs challenge. *See International Paper Co. v. Town of Jay*, 928 F.2d 480, 485 (1st. Cir. 1991) (finding there was a rational basis for the town ordinance, and refusing to delve into the motives of the town counsel, noting that absent a suspect or quasi-suspect classification or a fundamental right, courts will not strike down an ordinance with a rational basis because of an alleged illicit motive); *Wal-Mart Stores, Inc. v. City of Turlock*, 483 F. Supp. 2d 1023, 1036-37 (E.D. Cal. 2007) (noting that one of the reasons an improper motive does not affect an equal protection review of an ordinance is because "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.") (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993)). Likewise, as discussed below at pages 17-19, the Plaintiffs' convoluted and tortured bribery theory cannot support discovery of Victoryland's confidential financial information.

In addition, the insurer in *CPT Medical* was not a competitor of the defendant physicians; therefore, any disclosure of the physicians' financial information would not result in the harmful disclosure of a trade secret that would occur in this case if Plaintiffs were allowed to discover Victoryland's protected financial information.

Like *CPT Medical,* the case of *A. Farber and Partners Inc. v. Garber*, has no bearing on the current matter before the Court. In *Garber*, the RICO action was brought by the court-appointed receiver of the defendants and also included a claim for unjust enrichment. *See Garber*, 417 F. Supp. 2d at 1145. The court-appointed receiver also sought to set aside and annul fraudulent transfers and requested an accounting of the defendant's profits and the

imposition of a constructive trust. *Id.* Unlike here, each of the claims asserted by the receiver in *Garber*, and the relief sought, **directly concerned** the Defendant's financial assets and profits.

In order to establish its prima facie case of unjust enrichment, the receiver in *Garber* was required to show that the defendant was enriched at the plaintiff's expense. In addition, in order to have an accounting performed and a constructive trust imposed, the *Garber* receiver needed access to the defendant company's financial records. These facts are completely inapposite to the facts in this case. As the Magistrate Judge correctly concluded here: "[O ]n balance, ... while the revenue and profit information only marginally supports the plaintiff's claims, its slight evidentiary utility is far outweighed by the intrusiveness and potential injury of the release of the information about the operation of a closely-held corporation." Order [Doc. #187], at 10. This determination is not clearly erroneous.

2.    The requested financials cannot establish the claimed bribery of Fred Gray, Jr., and are not otherwise relevant

The Plaintiffs' argument that Victoryland's confidential and proprietary financial information is somehow relevant to Plaintiffs' bribery allegations because non-party Fred Gray (non-party Fred Gray Jr.'s father) is an investor in Victoryland, and Victoryland's financial information will show that Victoryland's electronic bingo operations economically benefited Fred Gray, and that this benefit in turn would allegedly be valuable to Fred Gray, Jr. [Doc. #195, at 6-7] is such a stretch, it is laughable. No where in this straw-grasping exercise is there any allegation -- much less proof-- that any of the Defendants offered a bribe to Fred Gray, Jr. This argument fails to acknowledge the extremely dubious nature of the Plaintiffs' bribery allegations, which the Magistrate Judge discussed at length. In particular, the Magistrate Judge correctly noted that:

> **In a nutshell, the plaintiffs' theory that Fred Gray, Jr. was bribed boils down to this convolution of tortured reasoning**:   McGregor and VictoryLand paid to Fred Gray and the Gray law firm money or provided other benefits.  Fred Gray, Jr., as a shareholder and Fred Gray's son, knew that McGregor and VictoryLand paid his father and the firm money or conferred benefits.  The money paid by McGregor and VictoryLand to Fred Gray and the firm or the benefits constituted "a thing of value in the mind of Fred Gray, Jr." in accordance with the Alabama bribery statute.  Consequently, because Fred Gray, Jr. knew he would get more money or benefits through his father from McGregor and VictoryLand if he drafted the rules and regulations in a way to favor McGregor and VictoryLand, he was "bribed" to draft the rules in a manner giving VictoryLand a monopoly on electronic bingo in Macon County.
>
> **Throughout their motions and briefs on this issue, the plaintiffs remark upon their entitlement to the information sought with the caveat "if their theory is correct."  The theory is not correct.  It boils down to an assertions that Fred Gray, Jr. is bribed because he thinks his present actions may result in increased benefit to him; he is a bribee in his own mind**.   The sophistry of this contingent interest argument astounds, but it does not persuade.  **The argument is simply too attenuated to support the intrusive requests** which with two exceptions will be denied.

Order [Doc. #187], at 27-28.  In footnote 23 of his Order the Magistrate Judge further

reasoned:

> Stated another way, the [Plaintiffs' bribery allegation] goes like this:
>
> (1)   Fred Gray is an investor in VictoryLand and has represented McGregor and VictoryLand since 1983.
> (2)   Fred Gray, Jr. is Fred Gray's son.
> (3)   Junior knows how much Father has benefitted financially from his relationship with McGregor and VictoryLand.
> (4)   Father's financial benefits constitute "things of value" in Junior's mind.
> (5)   These financial benefits are Junior's "motive" to draft the regulations in a manner to benefit only McGregor and VictoryLand.
> (6)   Because Junior has "benefitted" from Father's financial acumen in terms of the shareholder profits he has received, or he will benefit by means of an inheritance or loans, he has in essence been bribed to draft the rules and regulations in a manner to favor McGregor and VictoryLand.

Given the convoluted and tortured reasoning of Plaintiff's bribery allegations, those

allegations simply cannot support discovery of the confidential and proprietary financial

information of a potential competitor.  As such, the Magistrate Judge was correct when he held that "the intrusiveness and potential injury of the release of the information about the operation of a closely-held corporation," like Victoryland, "far outweighed" the "slight evidentiary utility" such information might have to Plaintiffs' claims.  Order [Doc. #187], at 10.

3.    Plaintiffs do not need Victoryland's revenues for their damages claim or to establish that there is a market for electronic bingo in Macon County.

Plaintiffs do not need Victoryland's revenues for their damages claim.  Plaintiff Lucky Palace served Rule 26 Disclosures in this case in which it claimed actual damages of $136,227,000.[4]  This alleged damage calculation was made by Plaintiffs on their own business model without having access to Victoryland's trade secrets and confidential commercial information.  Whatever calculations Lucky Palace made to come up with that figure must stand on their own.  Likewise, Lucky Palace made determinations about the market when it calculated its damages and that determination was also made without access to Victoryland's trade secrets and confidential commercial and financial information.  Clearly then, Victoryland's financial records are not needed.  Moreover, it would defy logic and fly in the face of established precedent to allow a party to obtain a competitor's trade secrets merely by claiming those secrets were necessary so that the party could verify whether its own subjective profit calculations and market projections were accurate.  "But a common law trial is and always should be an adversary proceeding.  Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." *Hickory v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J. concurring).  Plaintiffs' arguments are unconvincing, and Victorylands' admitted profitability and visible expansion make clear that there is currently a

---

[4] As the Non-Profit Plaintiffs admit in the Rule 26 disclosures, any damages they may have suffered would be based on their contracts with Lucky Palace, which provide them each with $42,000 a year.

market for electronic bingo in Macon County.[5]  Under these facts and applicable law, there is simply no way that the Magistrate Judge's Order could be clearly erroneous.

      E.     <u>The harm that disclosure of Victoryland's trade secrets will cause is not eliminated by the Protective Order.</u>

Plaintiffs incorrectly argue that Victoryland's concerns and rights to maintain its financial and corporate trade secrets as confidential are adequately addressed by the Protective Order that has been entered in this case. However, the Protective Order is simply not adequate to protect Victoryland's trade secrets. While protective orders can minimize the likelihood of a party divulging sensitive or privileged information, they do not eliminate the possibility that such information will be divulged or used for improper purposes. *See Corbett v. Free Press Association, Inc.*, 50 F.R.D. 179, 181 (D. Vt. 1970) ("While such [a protective order] certainly lessens the danger of sensitive information falling into the hands of an unauthorized person, it does not eliminate such a danger."); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 141 (2d Cir. 2004) (holding protective orders are subject to modification or being rescinded at any time); *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir.1993) (holding same). In this case, the Libra entities, with whom Plaintiff Lucky Palace has admittedly "freely shared" "documents and information concerning this litigation" [Doc. #128, ¶ 4], are not parties in this case or parties to the Protective Order.  Since Luck Palace and Libra have claimed attorney-client work produce and common interest privileges for documents sought by Victoryland in this case, Plaintiffs' themselves admit to sharing litigation strategy and documents.  Under such circumstances the Protective Order is woefully inadequate to protect Victoryland's confidential and trade secret

---

[5] Further, as the Magistrate Judge noted, Lucky Palace "remarkably" claimed that "it is not in competition with Victoryland." Order [Doc. #187], at 10 [quoting Doc. #112, at 5]. While this bald assertion by Lucky Palace is contrary to the evidence in the record (*see* Affidavit of Tepley and Exhibits A -D and F thereto, which were filed under seal), the fact that Lucky Palace even made such an assertion is as further reason why Plaintiffs do not need Victorylands' revenues and profits to quantify damages. As the Magistrate Judge correctly observed: "[i]f that be so [Lucky Palace is not a competitor of Victoryland as is asserts] it is difficult to understand how a non-competitor's revenues and profits can quantify Lucky Palace's damages." Order [Doc. #182], at 10.

information. In addition, the non-profit Plaintiffs have stated that they could seek relief from the protective order at a later time. [Doc. 122, ¶ 4], showing that the Protective Order's protections are fluid and assailable.

Thus, the Protective Order in this case does not overcome the significant risk of irreparable harm to Victoryland as a result of disclosure of its protected confidential and trade-secret information. This is particularly true in light of Plaintiffs' substantial political and publicity campaigns designed to harm Victoryland and Plaintiffs' clear and admitted desire to compete with Victoryland. Once Plaintiffs have access to Victoryland's financial information, the harm will have already occurred as a primary competitor is likely to use and profit from the confidential information. *See Ex parte Miltope*, 823 So.2d at 644 (finding a protective order ineffective when a competitor is granted expansive discovery of parties sensitive business information since the court has no system of monitoring the competitor's use of the information).

F.    The harm to Victoryland far outweighs any need Plaintiffs might have for Victoryland confidential financial documents.

For the reasons stated above, the Magistrate Judge correctly held that the potential harm to Victoryland from disclosure of its trade secrets and confidential commercial information far outweighs Plaintiffs' expressed need for the requested information. Order [Doc. #187], at 10. Moreover, the Magistrate Judge correctly applied the relevant legal standards. *See, e.g., Echostar Communications Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 395 (D.Colo. 1998) ("[T]he potential harm which would occur from disclosure of [trade secrets that include revenue projections, price forecasts, pricing options, evaluations of proposed capital structures and analyses] far outweighs [Plaintiffs'] stated needs for it."). Further, Victoryland and McGregor, as the Magistrate Judge correctly held, should not be compelled to produce Victoryland's confidential financial documents to a potential competitor when, as here, those documents are

not relevant to any claim or defense (or might merely have "slight evidentiary utility") and would likely result in competitive harm. *U.S. v. United Fruit Co.*, 410 F.2d 553, 556 (5th Cir. 1969)[6] (holding that courts should "exercise their discretion to avoid unnecessary disclosure of [confidential] information, particularly where the action is between competitors"); *Duracell v. SW Consultants, Inc.*, 126 F.R.D. 576, 578 (N.D. Ga. 1989) (holding discovery is "not intended to forfeit a party's ability to compete effectively in the market by opening up tangentially relevant financial and marketing information to competitors").

## II.    The Magistrate Judge's Order Denying Plaintiffs' Motions to Compel the Production of Private and Confidential Information Regarding Victoryland's Non-Party Shareholders is Correct.

The Plaintiffs' complaint that the Magistrate Judge wrongfully denied them unlimited discovery of detailed confidential and private information concerning Victoryland's shareholders, particularly Fred Gray [Doc. # 195, at 12-15],[7] is without merit.  As discussed, further below, the Magistrate Judge properly limited Plaintiffs' discovery to the "identity of all [Victoryland] shareholders since 1999." Order at 16. The Magistrate Judge's rulings on the shareholder information discovery are neither clearly erroneous nor contrary to established law and they must, therefore, be sustained.  As the Magistrate Judge correctly noted, the Plaintiffs requests for additional private shareholder information, including but not limited to the extent of the non-party shareholders' interest in Victoryland, were properly denied because:

(1)    "Lucky Palace has failed to show that this private information about non-party shareholders is relevant in any sense [and] . . . this request [#13] is simply too broad". [Doc. #

---

[6] The *United First* decision is binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1208 (11th cir.1981) (adopting decisions of the former Fifth Circuit rendered prior to October 1, 1981, as precedent).

[7] Specifically, the Plaintiffs assert that the Magistrate Judge improperly denied their Motion to Compel responses to the Lucky Palace's Request for Production No. #13 to Victoryland and the Non-Profit Plaintiffs' Requests for Production #'s 13, 14, 15 and 26 to Victoryland [Doc. #195 at 12-13).  Victoryland incorporates by reference in Oppositions to the Motions to Compel responses to these discovery requests. *See* Doc. #s 118, 162.

187, at 16];

(2)    "Victoryland has confirmed that Fred Gray has an interest in Victoryland" and the Non-Profit Plaintiffs' desire to know the magnitude of that interest is based upon Plaintiffs' speculative claims and tenuous bribery theory; [Doc. # 187, at 21, denying Non-Profit Plaintiffs' Motion to Compel responses to Requests 13-15]; and

(3)    the Non-profit Plaintiffs' Request 26 is so broad that "[b]y no stretch of any reasonable person's imagination is the information relevant to a claim or defense in this case [and further] it is so fraught with ambiguity as to make it even more unworkable." [Doc. # 187, at 23-24].

In their Objection, the Plaintiffs have utterly failed to establish that the Magistrate Judge's Order on these discovery requests could possibly be wrong, let alone "clearly erroneous." Instead, of meeting their burden of showing clear error on the part of the Magistrate Judge, the Plaintiffs merely claim that: (1) the use of "Fred Gray, Jr. to draft Rules and Regulations for the licensing of bingo/operation in Macon County puts at issue any familial attachment he may have to any shareholder(s) of stock in Victoryland[8]. . ."; (2) as "alleged in the complaint, the bribery scheme in this case was executed, in part, through dividend payments made to Fred Gray by Victoryland;" (3) the Victoryland shareholders are "engaged in an activity so closely regulated by the government [that they] have little reasonable expectation of privacy;" and (4) "any concerns regarding privacy of the shareholders confidential information is resolved by the protective order." [Doc. # 195, at 14-15]. Each of these arguments is unavailing.

The Plaintiffs' first two arguments are just a rehash of their contentions that somehow their sketchy bribery allegations make the confidential non-party shareholder information relevant. Repetition does not make the Plaintiffs' arguments persuasive. For the reasons noted

---

[8] Plaintiffs provide no legal support at all for this bald claim.

above at pages 17-19, the convoluted and tortured reasoning of Plaintiffs' bribery allegations simply cannot support discovery of the confidential and proprietary financial information of the non-party shareholders of a potential competitor. Furthermore, as the Magistrate Judge correctly noted, "Victoryland has confirmed that Fred Gray has an interest in Victoryland." [Doc. # 187, at 21]. This confirmation plus the identity of the Victoryland shareholders that the Magistrate Judge ordered Victoryland to produce provides the Plaintiffs with all the information they need and more than that they are entitled to given their dubious bribery allegations.

The Plaintiffs' claim that the Victoryland shareholders are "engaged in an activity so closely regulated by the government [that they] have little reasonable expectation of privacy" is entirely without merit. Plaintiffs provide no basis whatsoever for this bald allegation. To the extent that Plaintiffs are relying on their previous assertion that the County Bingo Regulations require the disclosure of Victoryland's financial information [Doc. #195, at 10-12], that assertion, which is based on Plaintiffs' disingenuous use of selective and misleading quotes from the County Bingo Regulations and the Sheriff's deposition, is flat wrong for the reasons previously discussed at pages 6-10 above.

Further, Plaintiffs' contention that the Protective Order in this case resolves any concerns over the confidential and private non-party shareholder information that Plaintiffs seek is without merit. As noted above at pages 11 and 12, Plaintiffs not only seek to compete with Victoryland, but they have engaged in a strategy to use grassroots pressure, pressure from above, and "political clout" to force the Sheriff to give them bingo licenses. These competitors have fallen far short of their burden to establish sufficient justification to gain access to confidential and private information concerning Victoryland's shareholders, none of whom are parties to this case. Moreover, while protective orders can minimize the likelihood of a party divulging

sensitive or privileged information, they do not eliminate the possibility that such information will be divulged or used for improper purposes and they can be modified or rescinded. *See Corbett v. Free Press Association, Inc.*, 50 F.R.D. 179, 181 (D. Vt. 1970); *Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004). Here, Libra entities with whom Lucky Palace freely shares case-related documents, information, and litigation strategy are not parties to the Protective Order. In addition, the Non-Profit Plaintiffs have stated that they might seek relief from the Protective Order. [*See* Doc. 122, ¶ 4]. Thus, the Protective Order falls far short from adequately protecting Victoryland's non-party shareholders.

## CONCLUSION

For the reasons stated above, the Magistrate Judge's Memorandum Opinion and Order is correct and due to be affirmed.

Respectfully submitted this 13th day of June, 2008.

/s/ Peter J. Tepley
Peter J. Tepley, One of the Attorneys for
Macon County Greyhound Park, Inc.

/s/ John Bolton, III
One of the Attorneys for Milton McGregor

**OF COUNSEL:**

**HASKELL SLAUGHTER YOUNG & REDIKER, LLC**
William M. Slaughter wms@hsy.com
Patricia C. Diak pcd@hsy.com
Peter J. Tepley pt@hsy.com
Khristi Doss Driver kdd@hsy.com
2001 Park Place North
1400 Park Place Tower
Birmingham, Alabama 35203
205-251-1000 (telephone)
205-324-1133 (facsimile)

**WHITE, ARNOLD & DOWD**
John Mark White mwhite@waadlaw.com
Augusta S. Dowd adowd@waadlaw.com

Rebecca DePalma rdepalma@waadlaw.com
Hope Marshall hmarshall@waadlaw.com
2025 Third Avenue North, Suite 600
Birmingham, AL 35203
205-323-1888 (telephone)
205-323-8907 (facsimile)

**HILL, HILL, CARTER FRANCO, COLE & BLACK, PC**
John M. Bolton, III jbolton@hillhillcarter.com
Charlanna White Spencer cspencer@hillhillcarter.com
425 S. Perry Street
Montgomery, AL 36104
334-834-7600 (telephone)
334-262-4389 (facsimile)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have served a copy of the foregoing answer on the following counsel of record by filing a copy of it through the Court's electronic filing system on this 13th day of June, 2008.

James H. Anderson
Ryan Wesley Shaw
Beers, Anderson, Jackson, Patty, Van Heest & Fawal, P.C.
P.O. Box 1988
Montgomery, AL 36102
janderson@beersanderson.com
wshaw@beersanderson.com

Fred D. Gray, Sr.
Fred D. Gray, Jr.
Gray, Langford, Sapp, McGowan, Gray & Nathanson
P.O. Box 830239
Tuskegee, AL 36083-0239
fgray@glsmgn.com
fgrayjr@glsmgn.com

Robert K. Spotswood
Michael T. Sansbury
Spotswood, Sansom & Sansbury, L.L.C.
940 Concord Center
2100 Third Avenue North
Birmingham, AL 35203
rks@spotswoodllc.com
msansbury@spotswoodllc.com

W. Lewis Garrison
Stephen D. Heninger
Heninger Garrison Davis, L.L.C.
2224 1st Avenue North
Birmingham, AL 35203
wlgarrison@hgdlawfirm.com
steve@hgdlawfirm.com

George L. Beck, Jr.
Capell Howard, PC
P.O. Box 2069
Montgomery, AL 36102-2069
glb@chlaw.com

Ronald G. Davenport
Rushton, Stakely, Johnston & Garrett, P.A.
P.O. Box 270
Montgomery, AL 36101
rgd@rsjg.com

/s/ Peter J. Tepley
Of Counsel