IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

HOPE FOR FAMILIES & COMMUNITY  )
SERVICE, INC., *et al.,*               )
                                    )
        Plaintiffs,        )
                                    )
      v.                )     CASE NO. 3:06-CV-1113-WKW
                                    )           [WO]
DAVID WARREN, *et al.,*        )
                                    )
        Defendants.      )

## MEMORANDUM OPINION AND ORDER

This cause is before the court on Plaintiffs' Objections to the Magistrate Judge's

Memorandum Opinion and Order.  (Doc. # 195.)  Defendants Macon County Greyhound

Park, Inc., d/b/a VictoryLand and Milton McGregor jointly filed a Response to Plaintiffs'

objections (Doc. # 202), as did Defendant David Warren (Doc. # 203).  Non-parties Gray,

Langford, Sapp, McGowan, Gray, Gray & Nathanson; Fred D. Gray; and Fred D. Gray Jr.

also filed a Response to Plaintiffs' Objections to Memorandum Opinion and Order.  (Doc.

# 201.)  Plaintiffs filed a Reply in Support of their Objections to Memorandum Opinion and

Order (Doc. # 206), and upon Plaintiffs' motion (Doc. # 220) the court permitted additional

briefs to be filed (Doc. # 223).  (*See* Docs. # 221, 226 & 229.)

Also before the court are attorney-client privilege and related issues which the

Magistrate Judge ordered the parties to brief.  (Doc. # 188.)  Multiple briefs were filed in

response to that Order (Docs. # 192, 193, 194, 197, 198, 220, 221, 226 & 229), but were not

ripe for the Magistrate Judge's consideration before the reference of discovery matters was

withdrawn (Doc. # 207).

After careful consideration of the arguments of counsel, the relevant law and the

pertinent portions of the record, the court finds that Plaintiffs' Objections to the Magistrate

Judge's Memorandum Opinion and Order are due to be sustained in part and overruled in

part.  Rulings on the pending attorney-client privilege and related issues also are included in

this opinion.

## I.  BACKGROUND

This case finds its origins in Amendment 744 to the Alabama Constitution, which

authorized nonprofit organizations to operate bingo gaming in Macon County, Alabama.

Ala. Const. 1901 amend. No. 744.[1]  Amendment 744, approved by statewide ballot on or

about November 4, 2003 (5th Am. Compl. ¶ 32 (Doc. # 185)), requires the sheriff of Macon

County to promulgate and enforce "rules and regulations for the licensing and operation of

bingo games within the county."  Ala. Const. 1901 amend. No. 744.  Defendant Macon

County Greyhound Park, Inc., which does business as VictoryLand ("VictoryLand"),

---

[1]  The background is recited in more detail in the prior Memorandum Opinion and Order (Doc. # 144), in which this court denied Defendants' motion to dismiss Plaintiffs' claims for conspiracy under 42 U.S.C. § 1983 and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d) ("RICO"), and state-law claims for tortious interference.

presently operates the only electronic bingo parlor in Macon County.[2]  Defendant Milton McGregor ("Mr. McGregor") is VictoryLand's president and majority shareholder.  (5th Am. Compl. ¶¶ 25-26.)  Plaintiff Lucky Palace, LLC ("Lucky Palace"), also desires to conduct electronic bingo operations in Macon County, but is precluded from doing so under the most recent amendments to the bingo rules and regulations, ostensibly written by Sheriff Warren.  Sheriff Warren is the sheriff of Macon County, Alabama, and is sued in his official capacity.  (5th Am. Compl. ¶¶ 1, 24.)  Joining Lucky Palace as plaintiffs in this lawsuit are fifteen Macon County nonprofit organizations (the "Charities") which have contracted with Lucky Palace to conduct electronic bingo at a presently unbuilt location in Macon County owned by Lucky Palace.  (5th Am. Compl. ¶¶ 1, 6-21, 58.)

The Fifth Amended Complaint also identifies and implicates three "relevant non-parties."  (5th Am. Compl. ¶¶ 27-29.)  They are: (1) the law firm of Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C. ("Gray Law Firm"), an Alabama professional corporation; (2) Fred D. Gray Jr. ("Mr. Gray Jr."), an attorney and a shareholder in the Gray Law Firm; (3) Fred D. Gray ("Mr. Gray"), an attorney who is Mr. Gray Jr.'s father.  Mr. Gray not only is a shareholder in the Gray Law Firm, but also is a shareholder in VictoryLand (5th Am. Compl. ¶¶ 27-29), and has represented VictoryLand on non-bingo matters since

---

[2] The electronic bingo scheme created and implemented by Defendant David Warren ("Sheriff Warren") requires licenses to be issued only to charities, which in turn contract with an operator to run electronic bingo gaming.  VictoryLand operates electronic bingo at its dog-track location for sixty charities which are license-holders.  (5th Am. Compl. ¶ 60 (alleging that as of May 13, 2008, "all sixty Class B Bingo Licenses have been issued to non-profit organizations affiliated with VictoryLand").)

approximately 1983 (McGregor Dep. 198 (Ex. A to Doc. # 221); Gray Aff. 2 (Ex. A to Doc. # 62).)  Mr. Gray Jr. is counsel to Sheriff Warren and in that capacity, rendered legal advice regarding all versions of the bingo rules and regulations promulgated by Sheriff Warren.[3] (Gray Aff. 2; Warren Dep. 52-55, 69-70 (Doc. # 168); 5th Am. Compl. ¶¶ 54, 56.) VictoryLand operates under those rules and regulations as enforced by Sheriff Warren.

It is alleged that "VictoryLand and [Mr.] McGregor, through unlawful influence [of Mr. Gray Jr.], caused Sheriff Warren to arbitrarily promulgate unreasonable rules and regulations for the operation of bingo in Macon County that allowed only one entity – VictoryLand – to operate electronic bingo games."  (5th Am. Compl. ¶ 3.)  It is further alleged that, although Mr. Gray Jr. is a private attorney, he acted as a "public servant" when advising Sheriff Warren concerning the promulgation and amendment of the rules and regulations governing electronic bingo in Macon County.  (5th Am. Compl. ¶¶ 2, 28, 36-39, 44, 54, 61, 68-112.)

---

[3] The difference between references to Mr. Gray and Mr. Gray Jr. requires careful attention. Because of the complexity of the Grays' relationships, the reader should beware.  To illustrate, Mr. Gray Jr. represents Sheriff Warren who regulates a business in which his father, Mr. Gray, is a shareholder and for which Mr. Gray serves as legal counsel; Mr. Gray and Mr. Gray Jr. also are law partners and shareholders in the Gray Law Firm, not to mention father and son; both have appeared for and represent Sheriff Warren in this case, and both are named in the Fifth Amended Complaint as interested non-parties.

Those rules and regulations have been amended twice by Sheriff Warren, with the assistance of his counsel, Mr. Gray Jr.[4]  (5th Am. Compl. ¶¶ 54, 56; Warren Dep. 69-70.)  It is alleged that the amendments were implemented to solidify VictoryLand's electronic bingo monopoly.  The First Amended Rules added a provision that "[n]o Class B Licensee shall be authorized to operate bingo at any qualified location . . . unless a minimum of fifteen (15) applicants shall first obtain a Class B License for such location."[5]  (5th Am. Compl. ¶ 46.)  The Second Amended Rules included a new provision that "[a]t no time shall there be issued and outstanding more than sixty (60) Class B Licenses for the operation of bingo in Macon County."  (5th Am. Compl. ¶ 55.)  As alleged, this provision was added with Sheriff Warren's knowledge that, at that time, forty-six Class B licenses "had been, or soon would be, issued to non-profit organizations with contractual ties to . . . VictoryLand."  (5th Am. Compl. ¶ 56.)  The sixty-license maximum combined with the fifteen-license minimum

---

[4]  *See* Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama ("Rules & Regulations"), issued Dec. 5, 2003 (Ex. A to 5th Am. Compl.); First Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama ("First Amended Rules"), issued June 2, 2004 (Ex. B to 5th Am. Compl.); Second Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama ("Second Amended Rules"), issued Jan. 6, 2005 (Ex. C to 5th Am. Compl.).  Throughout, the court refers collectively to the Rules and Regulations and their amendments as "rules and regulations."

[5]  The nonprofit organizations that operate bingo at VictoryLand are Class B licensees, and VictoryLand is a "'qualified location' for the holder of a Class B Bingo License."  (*See, e.g.,* Rules & Regulations at 3.)  The rules and regulations also provide for "Class A" bingo licenses and "qualified locations" for holders of Class A bingo licenses.  (*See, e.g.,* Rules & Regulations at 3.)  "Class A" licenses and "qualified location[s]" for Class A bingo operations concern "paper card bingo" (*see, e.g.,* Rules & Regulations at 3), and are not at issue in this case.

"foreclosed the operation of bingo games in Macon County at any location other than VictoryLand." (5th Am. Compl. ¶ 56.)

The parties and claims have evolved through a series of amendments to the complaint. The Fifth Amended Complaint, which is the operative complaint, sets out the following federal claims against Sheriff Warren, Mr. McGregor and VictoryLand: (1) denial of equal protection in violation of the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983, by effectively denying Lucky Palace's right to operate a Class B bingo facility and the Charities' rights to obtain Class B bingo licenses, as allowed by Amendment 744 to the Alabama Constitution (5th Am. Compl. ¶¶ 124-130); (2) 42 U.S.C. § 1983 conspiracy to deprive Plaintiffs of equal protection (5th Am. Compl. ¶¶ 131-137); and (3) violations of substantive and conspiracy provisions of RICO, 18 U.S.C. § 1962(c)-(d) (5th Am. Compl. ¶¶ 113-123), including an alleged "ongoing pattern of violations of Alabama's bribery statutes," Ala. Code § 13A-10-60, *et seq*. (5th Am. Compl. ¶¶ 67-68). The complaint also alleges state-law tortious interference claims against Mr. McGregor and VictoryLand. (5th Am. Compl. ¶¶ 138-150.)

Discovery disputes have been legion in this litigation, which commenced December 18, 2006.[6] Magistrate Judge Charles S. Coody entered a Memorandum Opinion and Order

---

[6] There is one discovery matter upon which there has been agreement. All parties agreed upon the terms and consented to the entry of a protective order (Doc. # 104) that the Magistrate Judge entered on September 20, 2007 (Doc. # 105). The order provides, among other things, that "[d]ocuments and materials designated as 'CONFIDENTIAL' shall be used solely for purposes of preparation and trial of this lawsuit, and shall not be disclosed by either party or its counsel or any person acting on behalf of or for either party or its counsel, for any purpose whatsoever other than the preparation and trial of this action and any appeal which may ensue." (Protective Order ¶ 3 (Doc. # 105).)

(Doc. # 187), attempting to resolve several disputes, but objections have abounded. Because of the myriad objections and related discovery issues which emerged after the rulings, this court withdrew the reference of discovery motions to the Magistrate Judge. (Doc. # 207.) All pending discovery disputes are before the undersigned for resolution. At issue here are Plaintiffs' Objections to the Magistrate Judge's Memorandum Opinion and Order (Docs. # 187, 195). That opinion addressed one privilege issue (Doc. # 187), to which Plaintiffs object (Doc. # 195). By separate order (Doc. # 188), the Magistrate Judge ordered briefing on other privilege issues which now also are ripe for disposition.

## II. STANDARD OF REVIEW AND GENERAL PRINCIPLES OF LAW

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, the court must consider timely objections to an order by a magistrate judge and modify or set aside any part of the order that is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). A magistrate judge's order is clearly erroneous when the reviewing court is left "with 'the definite and firm conviction that a mistake has been committed.'" *Rowlin v. Ala. Dep't of Pub. Safety*, 200 F.R.D. 459, 460 (M.D. Ala. 2001) (quoting *Germann v. Consol. Rail Corp.*, 153 F.R.D. 499, 500 (N.D.N.Y. 1994)). "The mere fact that a reviewing Court might have decided the issue differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Merrill-Stevens Yacht Sales, LLC v. Fr. Lurssen Werft, GmbH & Co.*, No. 07-61389-CIV, 2008 WL 2690798, at *2 (S.D. Fla. July 2, 2008).

7

Given the issues presently at stake, some discussion of the rules governing the discovery process is helpful at this point.

**A.**   **Discovery of Relevant, Non-Privileged Evidence; Protective Orders**

Pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure, the court has broad discretion to ensure that parties "obtain discovery regarding any matter, not privileged, that is relevant to any party's claim or defense," and "[f]or good cause, . . . may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* "[I]f there is an objection that the discovery goes beyond material relevant to the parties' claims or defenses, the Court . . . become[s] involved to determine whether the discovery is relevant to the claims or defenses[.]" Fed. R. Civ. P. 26(b)(1), advisory committee's note (2000 Amendment). If it is not, the court must determine "whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible." *Id.* Rule 26(b)(1) is "highly flexible," *United States v. Microsoft Corp.*, 165 F.3d 952, 959-60 (D.C. Cir. 1999), and, as a whole, the federal discovery rules are to be construed broadly and liberally, *Herbert v. Lando*, 441 U.S. 153, 177 (1979).

The liberal discovery rules, however, do not automatically signify liberal dissemination of acquired discovery. "In order to preserve the confidentiality of sensitive

materials, a district court may regulate access to the information by issuing a protective order pursuant to Rule 26(c)." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987) (citing Fed. R. Civ. P. 26(c)).  While Rule 26(c) "contains no specific reference to privacy or to other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 n.21 (1984).  The Rule 26(c) standard is "good cause," Fed. R. Civ. P. 26(c), but "courts have superimposed a somewhat more demanding balancing of interests approach to the Rule," *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985).  One of those interests is the "'the countervailing public interest[] which [is] sacrificed by [protective] orders.'" *Shingara v. Skiles*, 420 F.3d 301, 308 (3d Cir. 2005) (quoting *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 785 (3d Cir. 1994)).

### B.   Attorney-Client Privilege and Work-Product Privilege

#### 1.   *Attorney-Client Privilege*

Federal privilege law governs the application of the attorney-client privilege in this case because the court has federal question jurisdiction over the subject matter.  *See* Fed. R. Evid. 501, advisory committee's note ("In non-diversity jurisdiction civil cases, federal privilege law will generally apply."); *see also United States v. Hankins*, 581 F.2d 431, 438 n.13 (5th Cir. 1978) ("[S]tate law does not determine the scope of the attorney-client privilege[;] . . . federal law supplies the rule of decision, and the federal common law therefore determines the scope of the privilege."); *Lykken v. Brady*, No. 07-4020, 2008 WL

2077937, at *3-*4 (D.S.D. May 14, 2008) ("[W]here the issue is the discoverability of evidence that is relevant to both the federal and the state claims, courts have consistently held that federal law determines the existence and scope of any asserted privilege." (collecting cases)).

"The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice." *In re Grand Jury Proceedings 88-9*, 899 F.2d 1039, 1042 (11th Cir. 1990) (internal quotation marks omitted). The protection the privilege affords to communications between the attorney and client applies where:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Federal Grand Jury Proceedings 89-10*, 938 F.2d 1578, 1581 (11th Cir. 1991) (internal quotation marks omitted). "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential." *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003) (internal quotation marks and citations omitted). Hence, non-confidential communications are not protected. "To determine if a particular communication is confidential and protected by the

attorney-client privilege, the privilege holder must prove the communication was '(1) intended to remain confidential and (2) under the circumstances was *reasonably* expected and understood to be confidential.'" *Id.* (quoting *United States v. Bell*, 776 F.2d 965, 971 (11th Cir. 1985)). The protections of the privilege also extend to communications from client to attorney, *see Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice[.]"), but do not extend to the underlying facts which were communicated to the attorney:

> "A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."

*Id.* at 395-96 (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962)).

### 2. *Work-Product Privilege*

The work-product privilege "protects from disclosure materials prepared by an attorney acting for his client in anticipation of litigation." *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979). Tracing the origins of the attorney work-product privilege to a Supreme Court decision decided more than sixty years ago, the Eleventh Circuit reiterated that "'it is essential that a lawyer work with a certain degree of privacy, free from

unnecessary intrusion by opposing parties and their counsel.'" *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1421 (11th Cir.) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)), *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994). "This [privilege] is distinct from and broader than the attorney-client privilege[] . . . ; it protects materials prepared by the attorney, whether or not disclosed to the client, and it protects material prepared by agents for the attorney." *In re Grand Jury Proceedings*, 601 F.2d at 171.

Federal Rule of Civil Procedure 26(b)(3) embodies the work-product privilege, providing that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3). Furthermore, "because the work product privilege looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, it is not automatically waived by the disclosure to a third party." *In re Grand Jury Subpoena*, 220 F.3d 406, 409 (5th Cir. 2000). Like the attorney-client privilege, the party seeking to assert the work-product privilege bears the initial burden of proof. *In re Grand Jury Subpoena*, 510 F.3d 180, 183 (2d Cir. 2007); *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006). Once that showing is made, the burden shifts, and "Rule 26(b)(3) . . . places a twofold burden on the party seeking discovery. The [party] must show both substantial need and undue hardship." *Castle v. Sangamo Weston, Inc.*, 744 F.2d 1464, 1467 (11th Cir. 1984) (citation omitted).

## III.  DISCUSSION

### A.    Plaintiffs' Objections to the Rulings of the Magistrate Judge

Relying on 28 U.S.C. § 636(b)(1)(A) and Rule 72(a) of the Federal Rules of Civil Procedure, Plaintiffs raise seven objections to the Magistrate Judge's Memorandum Opinion and Order entered on May 15, 2008 (Doc. # 187).[7]  For housekeeping purposes, those objections are: (1) the Magistrate Judge's denial of Lucky Palace's motion to compel VictoryLand to answer interrogatories 9 and 10 (*see* Doc. # 142); (2) the denial of Lucky Palace's motion to compel VictoryLand to respond in full to document production requests numbers 12 and 13 (*see* Doc. # 143); (3) the denial of the Charities' motion to compel Mr. McGregor to respond to document production request number 15 (*see* Doc. # 107); (4) the denial of the Charities' motion to compel VictoryLand to respond to document production requests numbers 13, 14, 15 and 26 (*see* Doc. # 106); (5) the denial of Plaintiffs' motions to compel Mr. Gray Jr. (*see* Doc. # 134), Mr. Gray (*see* Doc. # 135), and the Gray Law Firm (*see* Doc. # 136) to produce documents pursuant to Rule 45 subpoenas; (6) the grant of the motion to quash Lucky Palace's deposition notice of Mr. Gray Jr. (*see* Doc. # 150); and (7) the denial of the Charities' motion to compel Sheriff Warren to respond in full to document production requests 30, 31, 32, 33, 34 and 36 (*see* Doc. # 42).  (*See generally* Doc. # 195.)  The court addresses each objection in the subsections below.

---

[7] Although Lucky Palace and the Charities are represented by different counsel, they have joined forces for purposes of filing their objections and related briefs addressing the pending privilege issues; hence, references to "Plaintiffs" include Lucky Palace and the Charities.  Hereafter, for ease of reference, the court refers to the parties' briefs by the docket numbers assigned by the Clerk's Office.

*1.     The Magistrate Judge's Denial of Plaintiffs' Motions to Compel the Discovery of Financial Information of Mr. McGregor and VictoryLand*

This subsection addresses Plaintiffs' objections numbered (1), (2) and (3) pertaining to the Magistrate Judge's order prohibiting Plaintiffs from obtaining financial information relating to VictoryLand.[8]   To summarize, Plaintiffs seek documents and answers to interrogatories from Mr. McGregor and/or VictoryLand relating to VictoryLand's annual gross revenues and net profits for electronic bingo from 2003 to the present, and all financial information for VictoryLand regarding the operation of electronic bingo in Macon County, Alabama, from its inception at VictoryLand until the present that shows gross revenues, profits, and payments to charities and others.   Denying these requests, the Magistrate Judge ruled:

> The charities' motion to compel McGregor (doc. # 107, request 15) asks McGregor for all of VictoryLand's financial information from 2003 to the present.   Lucky Palace's motion to compel VictoryLand (doc. # 142) to answer interrogatories 9 and 10 seeks annual gross revenues and profit for electronic bingo gaming for 2003-2006.   VictoryLand is a closely-held corporation which

---

[8] The specifics of the four requests at issue are as follows.   In interrogatories 9 and 10, Lucky Palace requests VictoryLand to state "annual gross revenues for" and "net profit from electronic bingo gaming at Victory[L]and for the years 2003, 2004, 2005 and 2006."   (Doc. # 142-3.)   In request number 12, Lucky Palace asks VictoryLand to "produce all documents, internal memos, notes, forecasts, correspondence, e-mails, electronic filed information regarding all financial information for [VictoryLand] regarding the operation of electronic bingo in Macon County, Alabama, from its inception at Victory[L]and until the present which show gross revenues, payments, profit, payments to charities or others."   (Doc. # 143-3 at 5-6.)   In request number 15, the Charities request Mr. McGregor to "produce any and all documents in [his] possession or control that reflect or relate to the revenue of Victory[L]and including but not limited to financial statements, balance sheets, bank statements, profit reports and income and expense reports for the time period January 1, 2003 to the present date."   (Doc. # 107-2.)   Lucky Palace's request number 13 pertains to shareholder information and is discussed *infra* in subsection III.A.3.

14

often are characterized as "incorporated partnerships," and it is common practice for them to pay a large percentage of their profits as salary. Lucky Palace argues that the "profitability and volume of income from electronic bingo gaming at VictoryLand go[] to the heart of the motive and intent of this Defendant to seek to maintain and assure a monopoly in Macon County." In *Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 262 (1994), the Supreme Court held that "RICO contains no economic motive requirement." Thus, motive evidence cannot be relevant to the plaintiffs' RICO claims. However, the plaintiffs do assert the existence of a conspiracy, and a conspiracy certainly may be proved by circumstantial evidence, that is, evidence from which a jury reasonably could infer the existence of an agreement to injure the plaintiffs.

No reasonable person and certainly no reasonable jury drawn from the Eastern Division of this District could fail to know that VictoryLand is highly profitable. The financial information which the plaintiff seeks merely would quantify the magnitude of VictoryLand's profitability. Lucky Palace argues that revenue and profit information will show the "damages suffered by [it from] this cabal's effort to exclude all, but VictoryLand . . . " (Pl's. Mo. Compel, doc. # 142 at 5). Remarkably, however, immediately preceding this statement is Lucky Palace's claim that it "is *not* in competition with VictoryLand." *Id.* If that be so, it is difficult to understand how a non-competitor's revenue and profits can quantify Lucky Palace's damages. On balance, the court concludes that while the revenue and profit information only marginally supports the plaintiff's claims, its slight evidentiary utility is far outweighed by the intrusiveness and potential injury of the release of the information about the operation of a closely-held corporation. The motions to compel will be denied.

. . . .

**2. Request # 12.** In this request, Lucky Palace asks the court to order VictoryLand to produce documents reflecting all financial information about electronic bingo in Macon County from its inception at Victoryland until the present showing gross revenues, payments, profit and payments to charities and others. For the same reasons previously discussed above, the court will deny the motion to compel this information.

(Doc. # 187 at 9-10.)

15

Plaintiffs' objections focus principally on the Magistrate Judge's findings that the requested financial information is of inconsequential relevancy (Doc. # 195 at 4-7), that the financial information "'merely would quantify the magnitude of VictoryLand's profitability'" (Doc. # 195 at 9) and that VictoryLand's status as a closely-held corporation makes the disclosure of the "requested information overly intrusive" (Doc. # 195 at 10).  Responding, Mr. McGregor and VictoryLand argue that the documents requested are irrelevant, amount to trade secrets, and constitute confidential and proprietary information.  They further contend that the harm that disclosure of VictoryLand's "trade secrets" would cause is not eliminated by the protective order and "far outweighs" Plaintiffs' need for the information. (*See* Doc. # 202 at 3.)

For the reasons to follow, the court finds that the Magistrate Judge's denial of Plaintiffs' motions to compel disclosure of the requested financial information was, in part, clearly erroneous and contrary to law.  Specifically, this court will order Mr. McGregor and/or VictoryLand to disclose to Plaintiffs the following information: (1) annual gross receipts and annual gross profits[9] of VictoryLand from electronic bingo from the inception of VictoryLand's electronic bingo operations to the present; and (2) all payments by VictoryLand to its charities – to include the amounts, dates and payees, relating to electronic bingo – from the inception of VictoryLand's electronic bingo operations to the present.

---

[9] If the parties cannot agree on a definition of "gross profits" as the term applies to a closely-held corporation in the gaming business, the court will order the matter briefed.  However, in its response, VictoryLand shall fully define its method of arriving at "gross profits" by disclosing all the elements (but not the values) of its formula.

### a.    Relevancy

The Magistrate Judge found that the financial information sought was relevant to the motive of the named parties to enter into a conspiracy, but stopped there and concluded that this limited relevancy was overshadowed by the "intrusiveness and potential injury of the release of the information about the operation of a closely-held corporation."  (Doc. # 187 at 10.)  The relevancy of the financial information to be ordered, however, extends beyond that.

First, to reiterate, relevant evidence is not confined to evidence admissible at trial, and here the court finds that disclosure of the financial information, as noted above to include annual gross receipts, annual gross profits and VictoryLand's payments to charities, is reasonably calculated to lead to the discovery of admissible evidence pertaining to the commission of the predicate acts underlying Plaintiffs' RICO claims, namely, "the bribery of [Mr.] Gray, Jr." (Doc. # 195 at 6-7).  The requested information, viewed alone or in connection with other evidence (*e.g.*, changes in share values or shareholder distributions as a result of increased profitability wrought by electronic bingo, changes in the number and amounts paid to charities), may reveal to what extent, if any, electronic bingo benefitted Mr. Gray, who undisputedly is a shareholder in VictoryLand, and, thus, whether any benefit to Mr. Gray is valuable to his son, Mr. Gray Jr.  Hence, evidence of VictoryLand's profitability could be admissible to prove the receipt of things of value by Mr. Gray Jr. in exchange for rules and regulations granting an alleged bingo monopoly to VictoryLand.

17

Second, because Plaintiffs have alleged that "the Enterprise was formed and conducted to increase VictoryLand's profitability" (Doc. # 195 at 9), the financial information may reveal that VictoryLand, in fact, was or became more profitable because of electronic bingo, thus, suggesting that it had a motive to participate in the alleged enterprise.

Third, the court finds that the information may lead to the discovery of admissible evidence on Plaintiffs' tortious interference claims, specifically, to evidence pertaining to whether the market for electronic bingo in Macon County profitably would sustain multiple electronic bingo facilities, evidence which Plaintiffs could offer to support their assertion that they reasonably expected to profit from operating an electronic bingo facility in Macon County. Fourth, the court cannot conclude that the requested information is not relevant to Plaintiffs' claims for damages.

Moreover, the court finds that *Scheidler*'s holding that "RICO contains no economic motive requirement," 510 U.S. at 262, is not tantamount to a determination that economic motive evidence is completely irrelevant to Plaintiffs' RICO claims. In *Scheidler*, the Court was presenting an additional avenue for proving a RICO claim when it held that "proof that either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose" is not *required* to sustain a RICO claim. 510 U.S. at 252; *see also id.* at 258 ("An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives."); *United States v. Browne*, 505 F.3d 1229, 1273 (11th Cir. 2007) ("The issue in *Scheidler* was whether the alleged enterprise

or racketeering acts *must have* an economic motive." (emphasis added)).  It did not dispose of economically-motivated RICO claims, and notably, Defendants have not attempted to defend the interpretation of and reliance on *Scheidler*.  Overall, the court finds that the financial information subject to disclosure is relevant for these additional purposes, thus, substantially increasing the information's weight which the Magistrate Judge deemed only "slight."  (Doc. # 187 at 11.)  In sum, the court finds that compelling discovery, as set out above – *i.e.*, discovery of VictoryLand's annual gross receipts and annual gross profits from electronic bingo from the inception of VictoryLand's electronic bingo operations to the present, and its payments to charities, including the amounts, dates and payees – is reasonably calculated to lead to the discovery of admissible evidence and may be admissible evidence in its own right.

        **b.**      **Privacy Interests: Closely-held Corporation**

Plaintiffs object to the Magistrate Judge's determination that VictoryLand's status as a closely-held corporation renders the disclosure of the "requested information overly intrusive."  (Doc. # 195 at 10-12.)  Plaintiffs argue that the ruling is wrong because it ignores the public aspect of VictoryLand's electronic bingo operations.  Plaintiffs rely on the rules and regulations governing bingo gaming in Macon County and Sheriff Warren's deposition transcript, specifically, his testimony confirming that VictoryLand's "net profit from . . . electronic bingo" is "available to [him]."  (Doc. # 195 at 10 (quoting Warren Dep. 321).)  In defense of the Magistrate Judge's ruling, Mr. McGregor and VictoryLand contend that, as

a closely-held corporation, VictoryLand is a purely "private" entity immunized from disclosing its financial information.  (Doc. # 202 at 4-5.)  They say that the bingo rules and regulations, as promulgated and amended by Sheriff Warren, "do not require the reporting of any of VictoryLand's financial records," but rather only require disclosure to the sheriff of gross receipts from those charities who hold a license to operate bingo at VictoryLand (Doc. # 202 at 7), and that its "financial information has not been disclosed to the [s]heriff" (Doc. # 202 at 8).  Mr. McGregor and VictoryLand are right about the rules but wrong about the privacy interest.

The Magistrate Judge's finding, as well as Mr. McGregor and VictoryLand's argument, does not paint the full picture.  While the bulk of the rules and regulations' disclosure requirements admittedly applies to the charities, not to VictoryLand, VictoryLand's bingo operations are a matter of intense public interest and not immune from public oversight.  The rules and regulations that govern VictoryLand's bingo operations were promulgated and amended by the sheriff of Macon County, who received his authority from an amendment to the Alabama Constitution passed by the Alabama Legislature and approved by a public, statewide vote.  As established in Article V, § 112 of the Alabama Constitution, the sheriff of Macon County "is an executive officer of the State of Alabama," *Parker v. Amerson*, 519 So. 2d 442, 442 (Ala. 1987), not a private individual.  VictoryLand could not engage in bingo gaming until *the sheriff* found that it had complied with those rules and regulations, and the areas of compliance are far from few.  Among other requirements in the

rules and regulations' most recent iteration, "satisfactory evidence" had to be presented *to the sheriff* (1) that VictoryLand's facility, inclusive of the land and capital improvements, cost $15 million; (2) that VictoryLand was covered by public liability insurance in a specified amount; (3) that it had adequate parking; (4) that it employed "onsite security" and "first aid personnel as prescribed by the Sheriff"; and (5) that its owner, if an individual, had been an Alabama resident for at least three years or, if a legal entity, that its Alabama members, in addition to having resided in-state for at least three years, collectively owned at least two-thirds of the voting rights and equity interests.  (2d Am. Rules 4.)  It also rests with the same public official to ensure that the requirements are met "at all times that any bingo games are being conducted or operated."  (2d Am. Rules 4.)

In addition to VictoryLand's oversight by a public official, there is testimony from Sheriff Warren which supports Plaintiffs' position that, while he may have chosen not to look at VictoryLand's financial information, he had access to it.  (*See, e.g.*, Doc. # 204 at 3; Doc. # 195 at 11; Warren Dep. 321 (testifying that VictoryLand's net profits "are available to [him]," that he can look at those records "any time [he] want[s] to see them," that he has "seen them in past times," and that he "will see them this year").)  While Mr. McGregor and VictoryLand quibble with whether Sheriff Warren meant to say that VictoryLand's financial records are accessible to him or whether he was mistaken (Doc. # 202 at 8-10), the fact is that Sheriff Warren said it under oath.

The court finds that the sheriff's public regulation of VictoryLand's bingo operations, on behalf of the state of Alabama, confers inherent relevancy in exploring the actions of a public official who single-handedly regulates a form of gaming, particularly when the sheriff allegedly creates a bingo monopoly in the absence of the state legislature and voters doing so. Moreover, the evidence that VictoryLand's financial information freely is available to a public official cuts against VictoryLand's argument that the information is private or a trade secret and, thus, not discoverable under the liberal discovery rules.[10] In sum, the court finds that Mr. McGregor and VictoryLand cannot reasonably expect the blanket of privacy to which they say they are entitled with regard to the limited financial information to be disclosed.

### c.    Balancing Plaintiffs' Need Against Privacy Interests

Moreover, the court finds that Plaintiffs' need for VictoryLand's financial information, only a limited amount of which the court is directing VictoryLand to disclose, outweighs Mr. McGregor and VictoryLand's claim of privacy. This is particularly true since, as the Magistrate Judge recognized in other contexts in his opinion (*see, e.g.*, Doc. # 187 at 14, 16, 22), the feared adverse impact of the disclosure of the information is subverted by the protective order (Doc. # 105), which prohibits the use of the information for anything

---

[10] The cases relied upon by Mr. McGregor and VictoryLand for the proposition that VictoryLand's financial information is a trade secret are factually inapposite because there was no evidence in those cases that an outside third party, much less a third-party state official, had access to the information sought to be protected. (*See* Doc. # 202 at 6 (citing *Ex parte W.L. Halsey Grocery Co.*, 897 So. 2d 1028 (Ala. 2004), and *Ex parte Miltope Corp.*, 823 So. 2d 640 (Ala. 2001).) The court also finds that the financial information ordered to be produced is not a trade secret, as that term is defined by Alabama law. *See* Ala. Code § 8-27-2 (Alabama Trade Secrets Act).

other than "preparation and trial of this lawsuit" and proscribes its disclosure for any other purpose.  (*See* Doc. # 105 ¶ 3); *CEH, Inc. v. FV "Seafarer,"* 153 F.R.D. 491, 499 (D.R.I. 1994) ("While a party does have an interest in nondisclosure and confidentiality of its financial records, this interest can be adequately protected by a protective order."); *In re Heritage Bond Litig.*,  No. CV 02-1475, 2004 WL 1970058, at *5 n.12 (C.D. Cal. July 23, 2004) ("Any privacy concerns . . . defendants have in their bank records and related financial statements are adequately protected by the protective order, and are not sufficient to prevent production in this matter.").

### d.    Summary

In sum, the court finds that the Magistrate Judge clearly erred and acted contrary to law in denying Plaintiffs' motions to compel disclosure (by means of propounded interrogatories and requests for production of documents to VictoryLand and/or Mr. McGregor) of VictoryLand's annual gross receipts, annual gross profits from electronic bingo, and payments to its charities, as detailed above.  Otherwise, the court finds that the Magistrate Judge's rulings on Plaintiffs' motions to compel pertaining to VictoryLand's finances are neither clearly erroneous nor contrary to law.

## 2. The Magistrate Judge's Denial of Plaintiffs' Motion to Compel Mr. Gray and the Gray Law Firm to Produce Documents Pursuant to Rule 45 Subpoenas

Plaintiffs object to the Magistrate Judge's denial of Plaintiffs' motion to compel Mr. Gray to produce documents pursuant to a Rule 45 subpoena.[11]  (Doc. # 195 at 21-22; Doc. # 135 (subpoena).)  To summarize, the requested documents relate to Mr. Gray's interest in any of Mr. McGregor's properties or endeavors; any benefits (to include gifts, gratuities, political campaign contributions, transportation services, vacations, privileges at VictoryLand) received by Mr. Gray from Mr. McGregor or any person or entity associated with VictoryLand or one of Mr. McGregor's businesses; Mr. Gray's federal and state tax

---

[11] Specifically, the Charities subpoenaed any and all documents in Mr. Gray's possession or control (1) that "refer or relate to any interest [Mr. Gray] ha[s] in any entity or property owned or operated by [Mr.] McGregor or any corporation in which [Mr.] McGregor is a shareholder, director or officer" (Request No. 19); (2) that "refer or relate in any way to any benefit received by [Mr. Gray], [his] relatives, partners or associates, from any officer, director, shareholder, employee or any other person or entity associated with VictoryLand, either directly or indirectly, including but not limited to gifts, gratuities, political campaign contributions including payments made to a Political Action Committee, business transactions, transportation services, vacations, privileges at VictoryLand or any other form of tangible or intangible property or service" (Request No. 20); (3) that "refer or relate to in any way to any benefit received by [Mr. Gray], [his] relatives, partners or associates, from any corporation in which [Mr.] McGregor is an officer, director, shareholder or employee, either directly or indirectly, including but not limited to gifts, gratuities, political campaign contributions including payments made to a Political Action Committee, business transactions, transportation services, vacations, or any other form of tangible or intangible property or service" (Request No. 21); and (4) that "refer or relate in any way to any benefit received by [Mr. Gray], [his] relatives, partners or associates, by any business in which [Mr.] McGregor is the owner, sole proprietor, partner, member, manager or employee, either directly or indirectly, including but not limited to gifts, gratuities, political campaign contributions including payments made to a Political Action Committee, business transactions, transportation services, vacations, or any other form of tangible or intangible property or service" (Request No. 22).  Plaintiffs further request (1) "any and all documents in [Mr. Gray's] possession or control that refer or relate to distribution of funds received by the Gray Law Firm to its shareholders" (Request No. 24); (2) "all federal and state tax returns filed by [Mr. Gray] since January 1, 2003" (Request No. 26); (3) "any and all documents related to [Mr. Gray's] last will and testament and any and all trusts or other estate plans in which [Mr.] Gray Jr. is a named beneficiary" (Request No. 27); and (4) "any and all documents related to any gifts or loans [Mr. Gray] ha[s] made to [Mr.] Gray, Jr." (Request No. 28).  (See Doc. # 135; Doc. # 195 at 20-22.)

24

returns filed since 2003; Mr. Gray's last will and testament and any trusts or other estate plans in which Mr. Gray Jr. is named the beneficiary; and any gifts or loans made by Mr. Gray to Mr. Gray Jr.  (Doc. # 135 at 2-3.)  Mr. Gray objected, arguing that the information sought was harassing, overly broad in scope and time, not reasonably calculated to lead to admissible evidence, protected from disclosure by a constitutional right to privacy, and otherwise unduly time-consuming, expensive and burdensome.  (Doc. # 135 at 2-3.)

Relatedly, the Magistrate Judge denied Plaintiffs' motion to compel the Gray Law Firm to produce, pursuant to a Rule 45 subpoena, documents "that refer or relate to the distribution of funds received by the Gray Law Firm to its shareholders," and "all federal and state tax returns filed by the Gray Law Firm since January 1, 2003."  Plaintiffs ask the court to overturn these rulings as well.[12]  (Doc. # 195 at 23-24; Doc. # 136.)

Denying Plaintiffs' motions to compel Mr. Gray and the Gray Law Firm to produce documents pursuant to Rule 45 subpoenas, the Magistrate Judge did not address Plaintiffs' requests individually or specifically.  Rather, the Magistrate Judge ruled:

> In a nutshell, the plaintiffs' theory that Fred Gray, Jr. was bribed boils down to this convolution of tortured reasoning:  McGregor and VictoryLand paid to

---

[12] Plaintiffs also challenge the Magistrate Judge's denial of their motion to compel Mr. Gray Jr. to produce, pursuant to a Rule 45 subpoena, "all documents in [his] possession or control that contain any communication between [Mr. Gray Jr.] and [Mr.] Gray regarding electronic bingo."  (Doc. # 195 at 17 (quoting Charities' Request No. 7 to Gray Jr. (Doc. # 134)).)  Additionally, Plaintiffs point out that the Magistrate Judge deferred a ruling, pending additional briefing, on Plaintiffs' motion to compel Mr. Gray Jr. to produce, pursuant to a Rule 45 subpoena, "any and all documents . . . that contain any communication between [Mr. Gray Jr.] and any of VictoryLand's agents or attorneys regarding electronic bingo."  (Doc. # 195 at 17 n.7 (quoting Charities' Request No. 4 to Gray Jr. (Doc. # 134)).)  These issues are addressed later in this opinion and are not part of the discussion of objections to the Magistrate Judge's order, *see infra*, III.B.2.a. & III.B.2.c.

Fred Gray and the Gray law firm money or provided other benefits.  Fred Gray Jr., as a shareholder and Fred Gray's son, knew that McGregor and VictoryLand paid his father and the firm money or conferred benefits.  The money paid by McGregor and VictoryLand to Fred Gray and the firm or the benefits constituted "a thing of value in the mind of Fred Gray, Jr." in accordance with the Alabama bribery statute.  Consequently, because Fred Gray, Jr. knew he would get more money or benefits through his father from McGregor and VictoryLand if he drafted the rules and regulations in a way to favor McGregor and Victoryland, he was "bribed" to draft the rules in a manner giving VictoryLand a monopoly on electronic bingo in Macon County.  Throughout their motions and briefs on this issue, the plaintiffs remark upon their entitlement to the information sought with the caveat "if their theory is correct."  The theory is not correct.  It boils down to an assertion that Fred Gray, Jr. is bribed because he thinks his present actions may result in increased benefit to him; he is a bribee in his own mind.  The sophistry of this contingent interest argument astounds, but it does not persuade.  The argument is simply too attenuated to support the intrusive requests which with two exceptions will be denied.

(Doc. # 185 at 27-28 (internal footnote omitted).)[13]

---

[13] The omitted footnote provides:

Stated another way, the argument goes like this:

(1)     Fred Gray is an investor in VictoryLand and has represented McGregor and VictoryLand since 1983.
(2)     Fred Gray, Jr. is Fred Gray's son.
(3)     Junior knows how much Father has benefitted financially from his relationship with McGregor and VictoryLand.
(4)     Father's financial benefits constitute "things of value" in Junior's mind.
(5)     These financial benefits are Junior's "motive" to draft the regulations in a manner to benefit only McGregor and VictoryLand.
(6)     Because Junior has "benefit[t]ed" from Father's financial acumen in terms of the shareholder profits he has received, or he will benefit by means of an inheritance or loans, he has in essence been bribed to draft the rules and regulations in a manner to favor McGregor and VictoryLand.

(Doc. # 185 at 27-28 n.23.)

The Magistrate Judge's reasoning is clearly erroneous and contrary to law and the law of the case. In the Memorandum Opinion and Order entered on March 5, 2008 (Doc. # 144), denying Defendants' motion to dismiss, this court concluded that, "[b]ecause the case is moving forward on all claims, the parties can expect full discovery."  (Doc. # 144 at 21.) The court allowed claims to proceed beyond the motion to dismiss stage and provided that discovery would be full within the rules and applicable law.  All claims necessarily include the RICO claims which is precisely why, without belaboring the point, the Magistrate Judge is wrong for denying discovery on the premise that Plaintiffs' "theory that Fred Gray, Jr. was bribed" revolves around a "convolution of tortured reasoning," namely, "that Fred Gray, Jr. . . . is a bribee in his own mind" and that "[t]he theory is not correct."  (Doc. # 187 at 27, 28.)

The statement that Mr. Gray Jr. is a "bribee in his own mind" assumes that Mr. Gray Jr. did *not* receive pecuniary benefits after he allegedly cooperated in the charged RICO conspiracy.  At this phase of the litigation, this court assumes neither that he did or did not, but it cannot ignore the allegations that he *did* receive pecuniary benefits.  (*See, e.g.*, 5th Am. Compl. ¶ 72 (alleging that Mr. Gray Jr. "has violated and continue[s] to violate Ala. Code § 13A-10-61(a)(2))); *see also* Ala. Code § 13A-10-61(a)(2) ("A person commits the crime of bribery if . . . [w]hile a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced."); Ala. Code § 13A-10-60(b)(2) (defining "pecuniary benefit" for purposes of

violations of Ala. Code § 13A-10-61(a)(2) as any "[b]enefit in the form of money, property, commercial interests or anything else the primary significance of which is economic gain"). The ruling forecloses discovery of whether Mr. Gray Jr. did receive pecuniary benefits – evidence the existence or nonexistence of which is unknown to this court.  Should such evidence exist, the benefits would not only be in his own mind, but also in his own bank account or elsewhere, and the presence or absence of such benefits most assuredly is relevant and discoverable.  Moreover, the reasoning disregards Mr. Gray Jr.'s alleged expectation of benefit, which exists in every bribe.  *Scienter* in a bribery originates with expectation of benefit.  A public servant who has an "understanding" that his corruptly-influenced action may result in a pecuniary benefit, and then accepts or agrees to accept the benefit directly or through a third person, is guilty of bribery under Alabama law.[14]  *See* Ala. Code § 13A-10-61(a)(2).

Assuming *arguendo* that ultimately Plaintiffs' claims fail either at the summary judgment stage or at trial, an attempt to circumscribe discovery, *after* this court denied Defendants' motion to dismiss for failure to state a claim on core causes of action,

---

[14] The issue of whether Mr. Gray Jr., as legal counsel to a public official (Sheriff Warren) on matters pertaining to that public official's prescribed duties, is a "public servant" was raised in Defendants' motions to dismiss.  In a prior Memorandum Opinion and Order denying the motions, this court concluded that the complaint's facts, "taken as true, are sufficient to state a RICO claim on the theory that [Mr.] Gray, Jr., participated as an advisor in the performance of a governmental function and is thus a public servant under the clear and unambiguous language of § 13A-10-1(7)" of the Alabama Code.  (Doc. # 144 at 16-17.)  The reasoning for that conclusion is explained in the opinion.  (*See* Doc. # 144 at 14-17.)

nevertheless is premature. At this early stage, the court cannot acquiesce in a subjective perspective as to the validity of Plaintiffs' bribery theory.[15]

While the court finds that the Magistrate Judge's reasoning is flawed under Rule 72(a)'s standard, his conclusions as to the scope of discovery need not be overturned in their entirety. On balance, the majority of those findings are neither clearly erroneous nor contrary to law. Plaintiffs' objections are sustained only to the extent that the court will compel Mr. Gray and the Gray Law Firm to make three disclosures. First, Mr. Gray shall produce documents disclosing *all* dividends, distributions, fees (excluding for the moment attorney's fees and retainers, if any)[16] or payments of any nature to him from VictoryLand or Mr. McGregor, not just those dividends, distributions, fees or payments related to electronic bingo, since January 1, 2000. Second, the court will compel Mr. Gray to produce all documents that relate in any way to any benefits, gifts, gratuities or any other direct or indirect benefit, property or service received by Mr. Gray from VictoryLand or Mr. McGregor since January 1, 2000. Third, Mr. Gray and the Gray Law Firm shall produce documents establishing the methods of division of income and profits of the Gray Law Firm among its shareholders, but not the amounts of such divisions, since January 1, 2000.

---

[15] Mr. McGregor and VictoryLand also have grasped onto the "convolution of tortured reasoning" theory, citing it no less than six times in their briefs (*see* Doc. # 197 at 2, 8, 9; Doc. # 202 at 17-18, 24; Doc. # 203 at 11), but for the reasons discussed, the repeated recitation of the statement does nothing for their argument. Those criticisms bear similarities to the arguments made in support of the motions to dismiss. Those arguments and similar protestations against the bribery theory have been rejected and the motions denied. The law of the case is the ruling of this court.

[16] Attorney's fees and retainers are addressed in connection with the discussion on privilege issues, *see infra* III.B.1.

This information is relevant because of the potential that it will demonstrate the transfer of money or other pecuniary benefits to Mr. Gray, which, as alleged in the complaint, would have "had value in the mind of [Mr.] Gray Jr."  (5th Am. Compl. ¶ 75.)  That value, in turn, as Plaintiffs say, arguably would be evidence that Mr. Gray Jr. "had a motive to structure the Rules and Regulations in a manner favorable to [Mr.] McGregor and VictoryLand and, ultimately, to grant VictoryLand a monopoly on the operation of electronic bingo in Macon County."  (Doc. # 195 at 26.)  The information also will be relevant if it does not tend to establish such benefits.  And none of it would be relevant but for the combination of an alleged bingo monopoly and the relationships summarized in *supra* note 3.

### 3.      *The Magistrate Judge's Denial of Plaintiffs' Motion to Compel VictoryLand to Produce Documents Pertaining to Shareholder Information*

Plaintiffs object to the Magistrate Judge's rulings denying their motions to compel the production of documents pertaining to VictoryLand's shareholders.  (Doc. # 195 at 12-15.)  These motions to compel pertain to requests to VictoryLand for the following documents: (1) documents reflecting the names of shareholders, as well as the number of shares held by them, in VictoryLand from January 1, 1999, until the present (Doc. # 143 at 7 (Lucky Palace's Request No. 13)); (2) documents relating "to any investment of Sheriff Warren, Pebblin W. Warren, J.B. Walker, [Mr.] Gray, [Mr.] Gray Jr. or any of their relatives in VictoryLand" (Doc. # 106 at 10 (Charities' Request No. 13)); (3) documents reflecting "ownership and operation of VictoryLand, including but not limited to the corporate status

of VictoryLand and the identity of all investors in VictoryLand" (Doc. # 106 at 12 (Charities'

Request No. 14)); (4) documents reflecting "monies paid to the investors in VictoryLand by

VictoryLand and its officers, directors, shareholders, employees, representatives,

accountants, attorneys or agents since January 1, 2003" (Doc. # 106 at 12 (Charities' Request

No. 15)); and (5) documents that refer or relate in any way to any known benefit given by

VictoryLand, "or any officer, director, shareholder, employee or any other person or entity

associated with VictoryLand, either directly or indirectly, to [Mr.] Gray or any of his

relatives, partners or associates, including but not limited to gifts, gratuities, political

campaign contributions (including payments made to a Political Action Committee) business

transactions, transportation services, vacations, privileges at VictoryLand or any other form

of tangible or intangible property or service," since January 1, 2003 (Doc. # 106 at 17

(Charities' Request No. 26, as subsequently modified by Charities, *see* Doc. # 187 at 23-24)).

Denying Lucky Palace's Request Number 13, the Magistrate Judge reasoned:

**3.     Request # 13 - Shareholders and Shares**.  In this request Lucky
Palace asks the court to compel the production of all documents and
electronically filed information reflecting shareholders and shares held by any
shareholder in VictoryLand since 1999.  The record reflects that VictoryLand
has already stipulated that Fred Gray, Sr. is a shareholder in VictoryLand.
VictoryLand has also stipulated that Fred Gray, Jr., the Sheriff and the
Sheriff's wife are not shareholders.

Lucky Palace wants more; specifically it wants to know the extent of
Fred Gray's holdings as well as the identity of other shareholders.  It argues
that Fred Gray, Jr.'s drafting of the rules and regulations governing bingo
gaming "must be examined with regard to any attachment to a shareholder/
shareholders of stock in VictoryLand."  (Mot. to Compel, doc. # 143 at 7).
Lucky Palace also argues it needs this information to identify potential

31

witnesses with information about VictoryLand's efforts to secure a monopoly in electronic bingo in Macon County. *Id.* at 8. VictoryLand argues that to the extent not already disclosed, the identity of non-party shareholders and the extent of their holdings is both irrelevant and harmful because it is sensitive, private and trade secret information.

Beyond making these claims, VictoryLand offers little to back up its contention that disclosure of the identity of VictoryLand shareholders is harmful in any manner. On balance and with the protective order in place, the court concludes that VictoryLand will be compelled to disclose the identi[t]y of all shareholders since 1999. However, the extent of shareholders' holdings is quite another matter. Lucky Palace has failed to show that this private information about non-party shareholders is relevant in any sense. Further, Lucky Palace's request asks for "the production of all documents and electronically filed information reflecting shareholders." This request is simply too broad; it encompasses all documents on which the name or identity of shareholders is reflected. The identity of the shareholders is enough for the purposes identified by Lucky Palace.

. . . .

**3. [The Charities'] Requests 13-15.** These requests in their narrowed form seek documents which show the magnitude and extent of Fred Gray's ownership or investment in VictoryLand as well as the amount of investment income he has received. VictoryLand has confirmed that Fred Gray has an interest in VictoryLand. The charities want to know the magnitude of that interest

> [b]ecause I think it shows the motivation. If our theory of bribery is a good one, it shows that Fred Gray, Junior had very much an incentive to increase the amount or to grant this monopoly so that his father's interest would multiply.

(Tr. Oral Argument at 43).

The court will not reiterate what it has earlier said about the speculative nature of the plaintiffs' claims. The quote from oral argument shows that the plaintiffs recognize the tenuousness of their bribery theory. These requests will be denied.

32

. . . .

**7.  [The Charities'] Request 26.**  . . .  The broadness of this request is its undoing.  For example, under the terms of the request if a shareholder in VictoryLand was represented in an entirely [different] civil matter by a lawyer in Gray's firm, VictoryLand would be required to disclose the amount of fees paid to the lawyer.  By no stretch of any reasonable person's imagination is this information relevant to a claim or defense in this case.  Beyond that, the limitation on the request is so fraught with ambiguity as to make it even more unworkable, because it poses the question of when does an entity "know" something, a question here which cannot be answered without knowing the minds of persons not parties to this suit.  It is not the function of the court to recast discovery requests into some manageable form even if the court could speculate about what information is sought.  The request will be denied.

(Doc. # 187 at 15-16, 21, 23-24 (internal footnote omitted).)

Mr. McGregor and VictoryLand defend the Magistrate Judge's rulings.  (Doc. # 202 at 22-25.)  In particular, they assert that the Magistrate Judge "properly limited Plaintiffs' discovery to the 'identity of all [VictoryLand] shareholders since 1999,'" given "Plaintiffs' speculative claims and tenuous bribery theory," and because "requests for additional private shareholder information, including . . . the extent of the non-party's shareholders' interest in VictoryLand" are overbroad and irrelevant.  (Doc. # 202 at 22-23.)  Mr. McGregor and VictoryLand also assert that the Magistrate Judge correctly factored into his ruling the fact that Mr. Gray, among other shareholders, is a *non-party* in this lawsuit.  (Doc. # 202 at 22.)

The court finds that the Magistrate Judge's findings are clearly erroneous and contrary to law in one respect.[17]  The court will compel VictoryLand to produce documents reflecting

---

[17] The previous discussion regarding law of the case applies here as well.

Mr. Gray's ownership interest in VictoryLand on January 1, 2003, each transfer of ownership to or from Mr. Gray since that date to the present, to include the number of shares and the percentage of Mr. Gray's ownership interest when compared to the whole, and all dividend or shareholder, director, committee or other payments to Mr. Gray by date, description and amount. The Magistrate Judge's reasoning for disallowing the production of documents pertaining to the extent of Mr. Gray's ownership interest in VictoryLand is premised solely on his belief that Plaintiffs' claims are "speculative" (Doc. # 187 at 21), but, as discussed *supra*, the court has rejected that reasoning. So also then, the court rejects Mr. McGregor and VictoryLand's present assertion that the Magistrate Judge properly prohibited Plaintiffs from discovering the extent of Mr. Gray's ownership interest in VictoryLand given "Plaintiffs' speculative claims and tenuous bribery theory." (Doc. # 202 at 23.)

Also without merit is Mr. McGregor and VictoryLand's relevancy argument. (Doc. # 202 at 22.) The number and percentage of outstanding shares held by Mr. Gray are relevant to determine what interest he held both before and after the birth of electronic bingo and whether his holdings increased shortly before or soon after the passage of the multiple versions of the rules and regulations. Again, the information relating to the shares of VictoryLand held by Mr. Gray is relevant because Plaintiffs have alleged that the "bribery scheme . . . was executed, in part, through dividend payments made to [Mr.] Gray by VictoryLand." (Doc. # 187 at 15.) Further, the court finds that evidence that Mr. Gray received valuable benefits from VictoryLand is relevant to show that Mr. Gray Jr. had a motive to structure the rules and regulations in a manner favorable to Mr. McGregor and

VictoryLand and, ultimately, to grant VictoryLand a monopoly on the operation of electronic bingo in Macon County.[18]  The absence of any such benefits would also be relevant.

Moreover, while not a party in this lawsuit, Mr. Gray specifically is named as a "relevant non-part[y]," as is his son, Mr. Gray Jr. (5th Am. Compl. ¶ 28), and collectively the Grays' names appear more than 200 times in the Fifth Amended Complaint.  In practical terms, Mr. Gray's and Mr. Gray Jr.'s interests in this case parallel the interests of the named Defendants, as the Grays are alleged to be integral players, alongside Mr. McGregor, VictoryLand and Sheriff Warren, in the racketeering enterprise and conspiratorial acts alleged in the complaint.  (5th Am. Compl. ¶¶ 64-105.)  Indeed, in these proceedings, Mr. Gray and Mr. Gray Jr. have denied and vigorously defended against the complaint's allegations that they were involved in a bribery scheme.  Mr. Gray Jr. and Mr. Gray are relatives and law partners; their blending of personal business interests with business of the law firm and its public client, Sheriff Warren, under all the circumstances, is relevant on the

---

[18] The parties do not dispute the general proposition that bribes involving benefits to family members or friends can provide the predicate for a criminal bribery conviction.  (Doc. # 195 at 15 n.3; Doc. # 197 at 12-14.)  *See, e.g., United States v. Kemp*, 500 F.3d 257, 285 (3d Cir. 2007) (concluding "that providing a loan to a public official (or his friends or family) that would have otherwise been unavailable . . . may constitute a bribe"); *United States v. Frega*, 179 F.3d 793, 807 (9th Cir. 1999) (noting that under California law, it is the "intent in making the payment, whether to a judge or to a member of the judge's family," that is critical)*; United States v. Krilich*, 159 F.3d 1020, 1024 (7th Cir. 1998) (noting that rigging a hole-in-one contest so that the mayor's son would win $40,000 constituted bribing the mayor); *Buchanan County v. Blankenship*, 496 F. Supp. 2d 715, 722 (W.D. Va. 2007) (recognizing that clothing given to the official's wife constituted a bribe); *United States v. Biaggi*, 705 F. Supp. 790, 812 (S.D.N.Y. 1988) (finding bribery where stock was put in the name of a close friend of the public official).

pleadings now before the court.  Finally, the court finds that any concerns regarding the privacy of Mr. Gray's ownership interest in VictoryLand or confidentiality of that information are resolved by the protective order.

### 4.    *The Magistrate Judge's Grant of the Motion to Quash Lucky Palace's Deposition Notice of Mr. Gray Jr.*

Plaintiffs object to the Magistrate Judge's grant of the motion to quash Lucky Palace's deposition notice of Mr. Gray Jr., filed by the Gray Law Firm, Mr. Gray, and Mr. Gray Jr. (Doc. # 195 at 25-27; Doc. # 150.)  The Magistrate Judge ruled:

> The court has already determined that, except to the extent set forth in this order, the plaintiffs can't have information or documents about financial matters so that is not a reason to allow the deposition of Gray [Jr].  Moreover, other than not knowing to whom Gray [Jr.] spoke about rules and regulations for bingo, Lucky Palace has not met its burden [of] showing the deposition should be allowed.

(Doc. # 187 at 30.)  The Magistrate Judge further ruled:  "A separate order will issue to Fred Gray Jr. requiring him to identify by name, address and phone number the identity of all persons, except Defendant Warren, to whom he spoke about rules and regulations for bingo gaming in Macon County."[19]  (Doc. # 197 at 31.)

Plaintiffs assert that they "have a substantial need to obtain [Mr.] Gray Jr.'s deposition testimony as the information is crucial to the preparation of [their] case."  (Doc. # 195 at 25, 27-28.)  In particular, Plaintiffs assert that Mr. Gray Jr. "is the only person who can testify

---

[19] In an Order entered on December 29, 2008 (Doc. # 234), the court directed Mr. Gray Jr. to file with the court a written response containing this information which the Magistrate Judge ordered him to disclose.  That order was complied with on December 31, 2008.  (Docs. # 235, 238.)

about who[m] he received information from and shared information with, regarding the rules and regulations for electronic bingo" (Doc. # 195 at 34) and that the Magistrate Judge's solution – requiring Mr. Gray Jr. to answer only limited inquiries – permits Mr. Gray Jr. to avoid providing information as to the substance, date, length of, location of, reason for, and number of communications (Doc. # 195 at 29).

In view of rulings elsewhere in this order, the court finds that the ruling precluding Mr. Gray Jr.'s deposition is clearly erroneous and contrary to law. In this order, the court has expanded the financial documents subject to disclosure, in particular, the financial documents which Mr. Gray and the Gray Law Firm must disclose; thus, the primary reason for refusing to make Mr. Gray Jr. sit for a deposition is no longer viable. Moreover, it is noteworthy that the federal rules permit the deposition of "any person," Fed. R. Civ. P. 30(a)(1), 31(a)(1), and do not carve out an exception for attorneys, even those who represent a party in a lawsuit. Fed. R. Civ. P. 26-32; *see also* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2102 (2d ed. 2008) ("fact that the proposed deponent is an attorney, or even an attorney for a party to the suit, is not an absolute bar to taking his or her deposition, although it may be that the attorney-client privilege will provide a ground for refusal to answer some or all questions"). Finally, Mr. Gray Jr.'s testimony regarding his non-privileged communications with persons not his client is relevant insofar as the communications relate in any manner to bingo rules and regulations or motives underpinning their particulars.

In short, the court will compel Mr. Gray Jr. to appear for a deposition.  The subjects for questioning obviously are constrained in part by the other rulings in this opinion.  While the court agrees with Plaintiffs that Mr. Gray Jr.'s deposition is necessary for them "to obtain critical information on many topics" (Doc. # 195 at 25), Mr. Gray Jr.'s interest in his father's estate or other purely family business is out of bounds.[20]

### 5.      The Magistrate Judge's Denial of the Charities' Motion to Compel Sheriff Warren to Produce Certain Financial Documents

Plaintiffs object to the Magistrate Judge's rulings denying the Charities' motion to compel the production of documents from Sheriff Warren pertaining to his financial information.  (Doc. # 195 at 33-39; Doc. # 42.)  The Charities tendered six requests for production of documents from Sheriff Warren requesting, among other things, documents relating to campaign contributions; documents related to property purchased by Sheriff Warren in his name, including all sources of any payment for the purchase of the property since January 1, 2003; documents relating to all income earned by him from any source since January 1, 2003; all federal and state tax returns filed by Sheriff Warren since January 1, 2003; documents relating to all of Sheriff Warren's assets and liabilities from January 1, 2003, to the present date; all statements of financial accounts in which Sheriff Warren has

---

[20] As to Plaintiffs' argument that any communications between Mr. Gray Jr. and Sheriff Warren concerning electronic bingo at VictoryLand are not privileged such that Plaintiffs may probe Mr. Gray Jr. as to his one-on-one communications with Sheriff Warren concerning electronic bingo at VictoryLand and the drafting of the rules and regulations, (Doc. # 195 at 30), see the court's discussion *infra* at III.B.1.a.iv. on privileges.

an interest or signatory authority.  (*See* Doc. # 195 at 33-35.)  The requests are set out in the

margin.[21]

Plaintiffs argue that they are entitled to the information to ascertain the motive for

Sheriff Warren to join in the alleged RICO conspiracy.  (Doc. # 195 at 35-36.)  Plaintiffs'

position is that the information is relevant because it is reasonably calculated to lead to the

discovery of admissible evidence.  (Doc. # 195 at 36.)  In his responsive brief, Sheriff

Warren merely "incorporates all previous arguments made on his behalf regarding the issues

raised by Plaintiffs[,] as well as the Memorandum and Opinion Order of May 15, 2008

denying Plaintiffs' requests."[22]  (Doc. # 203 ¶ 1.)

The Magistrate Judge examined the purposes proffered by the Charities for these

requests.  During the oral argument held before the Magistrate Judge, the Charities stated that

_____

[21] In the Charities' document production requests 30, 31, 32, 33, 34 and 36 to Sheriff Warren, the Charities ask for (1) all documents "that reflect or relate to campaign contributions made to any and all of [Sheriff Warren's] political campaigns for the office of Sheriff of Macon County, Alabama, including but not limited to records identifying the source of campaign contributions, bank statements for the accounts that held campaign proceeds and any campaign disclosure statements filed with the State" (Request No. 30); (2) all documents "that refer or relate to property purchased by [Sheriff Warren] or in [his] name, including all sources of any payment for the purchase of the property and all sources of any payment for property taxes for the property, since January 1, 2003" (Request No. 31); (3) all documents "that refer or relate to all income earned by [Sheriff Warren] from any source whatsoever since January 1, 2003" (Request No. 32); (4) "all federal and state tax returns filed by [Sheriff Warren] since January 1, 2003" (Request No. 33); (5) all documents "that refer or relate to all of [Sheriff Warren's] assets and liabilities for the time period January 1, 2003 to the present date" (Request No. 34); and (6) all documents pertaining to "statements of financial accounts in which [Sheriff Warren] ha[s] an interest or signatory authority, including all bank statements, mortgage account statements, real estate investment account statements, retirement account statements, brokerage account statements, trust account statements, including statements jointly held with [his] spouse, and the corresponding check registers, returned checks, and records of wire transfers, for the time period beginning January 1, 2003 to the present date" (Request No. 36).

[22] It is insufficient for Sheriff Warren to incorporate by reference, without independent discussion, all seemingly beneficial arguments.

their claim against Sheriff Warren was that he participated in the alleged conspiracy with the "expectation of [receiving] future financial benefit or gains." (Doc. # 187 at 17 (citing H'rg Tr. at 18).)  More particularly, as recited by the Magistrate Judge, the Charities argued that the

> requested information may reveal (1) that Defendant Warren has received financial benefit from his co-conspirators or (2) that Defendant Warren is financially vulnerable and (a) easily enticed by promises of future benefits or (b) willing to ingratiate himself with individuals, like his co-conspirators, who can bestow future benefits upon him.

(Doc. # 187 at 18 (quoting Mot. to Compel at 7 (Doc. # 42)).)  The Magistrate Judge was unpersuaded by the Charities' arguments:

> The presumption underlying the charities' requests –  that public officials who take action which favors some and disfavors others are corrupt – is pernicious. The court is not naive;  some officials are corrupt. But the operative presumption should never favor the existence of corruption. That presumption undermines democratic government and substitutes cynicism for the trust upon which democratic government must be founded.  In the same vein, the financial susceptibility argument is too tenuous to support these intrusive requests about Warren's personal financial condition.  If it were, most every public official whose decisions displease a constituent would be subject to similar claims because most public officials are in a real sense "financially vulnerable" due to their relatively low incomes which seldom match the importance of their responsibilities.

> The charities claim that this information "may reveal" something relevant about Warren.  The phrase "may reveal" underscores how speculative these requests are.  On balance, the speculative nature and the tenuousness of the foundation for the requests compared with the intrusiveness of the requests compels the court to deny them except in one obviously relevant way.  The court will compel Warren to disclose whether since January 1, 2003, he has received and, if so, describe any money, property or thing of value either directly or indirectly from McGregor or VictoryLand, including any campaign contributions.

(Doc. # 187 at 19.)   The footnote immediately following this text states:  "The court recognizes that Warren has produced information about campaign contributions which he has.  Some of the campaign contribution information sought may be publically available and to the extent that it is, Warren may simply refer the charities to the location where he understands it may be found."  (Doc. # 187 at 20 n.15.)

The court finds that the rulings are clearly erroneous and contrary to law to the limited extent that the Magistrate Judge's order will be expanded:  Sheriff Warren, who testified that as of March 2008 he had been the sheriff of Macon County for approximately thirteen years (Warren Dep. 14), shall produce all documents that relate in any way to campaign contributions made to *all* of his political campaigns for the office of Sheriff of Macon County, Alabama, directly or indirectly from VictoryLand or Mr. McGregor, and *all* gifts, gratuities, money, property or any other benefits received directly or indirectly from VictoryLand or Mr. McGregor during that same time period.[23]  To the extent that the scope of the permissible discovery was restricted on the premise that the conspiracy claim against Sheriff Warren is "tenuous," it is unnecessary to repeat the reasons, discussed above, why this court cannot so readily dismiss the conspiracy claim at the discovery stage.

With that said, relevancy also is bolstered because it is possible that the discovery will reveal that Sheriff Warren is financially vulnerable or that he received financial benefits from VictoryLand or Mr. McGregor.  Conversely, to Sheriff Warren's, Mr. McGregor's and

---

[23] Otherwise, the court finds that the Magistrate Judge did not clearly err or rule contrary to law in denying the Charities' motion to compel.

VictoryLand's advantage, it is possible that it will not.  Plaintiffs are entitled to probe evidence pertaining to whether, for the time period ordered, Sheriff Warren shared a common motive – financial gain – with either Mr. McGregor or VictoryLand.  The inferences that can be drawn from the evidence, whether or not ultimately proved, support Plaintiffs' position at this stage of this litigation.  Namely, it could be argued that Sheriff Warren delegated the drafting of rules and regulations to an arguably interested party (Mr. Gray Jr.) and then "turned a blind eye" to that party's reliance on VictoryLand and its representatives to create those rules and regulations.  (Doc. # 195 (citing Warren Dep. 169-70, 172, 174, 176, 177-78, 202-03).)  It further could be argued that, all the while, Sheriff Warren maintained neutrality on whether the process should remain free of conflicts of interest or result in rules that created a neutral playing field for businesses and the citizens of Macon County.  (Warren Dep. 294-96.)  Then, while recognizing that a monopoly was not in the best interests of the citizens of Macon County (Warren Dep. 306-07), it could be argued that Sheriff Warren nevertheless promulgated Mr. Gray Jr.'s rules and regulations and repeatedly amended them to ensure that VictoryLand had and maintained a valuable monopoly (Warren Dep. 308-09).  Again, the absence of such evidence and inferences also is relevant.  In short, the court finds that the relevancy standard is met, *i.e.*, that "[t]he information [sought] . . . appears reasonably calculated to lead to the discovery of admissible evidence,"  Fed. R. Civ. P. 26(b)(1).

### 6.    *Conclusion as to Plaintiffs' Objections to the Magistrate Judge's Rulings*

To summarize, as a result of its rulings on Plaintiffs' objections to the Magistrate Judge's Memorandum Opinion and Order, sustaining some but overruling others, the court will order:

(1)    Mr. McGregor and/or VictoryLand to provide written answers and produce documents to Plaintiffs disclosing: (a) annual gross receipts and annual gross profits of VictoryLand from electronic bingo from the inception of VictoryLand's electronic bingo operations to the present; and (b) all payments by VictoryLand to its charities – to include the amounts, dates and payees, relating to electronic bingo – from the inception of VictoryLand's electronic bingo operations to the present;

(2)    Mr. Gray to produce (a) documents disclosing *all* dividends, distributions, fees (excluding for the moment attorney's fees and retainers, if any) or payments of any nature to him from VictoryLand or Mr. McGregor, not just those dividends, distributions, fees or payments related to electronic bingo, since January 1, 2000; and (b) documents that relate in any way to any benefits, gifts, gratuities or any other direct or indirect benefit, property or service received by Mr. Gray from VictoryLand or Mr. McGregor since January 1, 2000;

(3)    Mr. Gray and the Gray Law Firm to produce documents establishing the methods of division of income and profits of the Gray Law Firm among its shareholders, but not the amounts of such divisions, since January 1, 2000; and

(4)    VictoryLand to produce documents reflecting Mr. Gray's ownership interest in VictoryLand on January 1, 2003, each transfer of ownership to or from Mr. Gray since that date to the present, to include the number of shares and the percentage of Mr. Gray's ownership interest when compared to the whole, and all dividend or shareholder, director, committee or other payments to Mr. Gray by date, description and amount.

The court also overrules the Magistrate Judge's order granting the motion to quash Lucky Palace's deposition notice of Mr. Gray Jr.  Consequently, Mr. Gray Jr. will be directed to appear for a deposition.

## B.    Privilege and Related Issues

With one exception,[24] the Magistrate Judge has not ruled on the pending privilege issues; therefore, the court rules on these issues on a clean slate.

### 1.    *The Gray Law Firm Billing Records*

Plaintiffs served a Rule 45 subpoena on the Gray Law Firm, including in that subpoena two requests for production of documents pertaining to legal fees.  Specifically, Plaintiffs seek "any and all documentation in [the Gray Law Firm's] possession or control that refer[s] or relate[s] to the receipt of legal fees from VictoryLand since January 1, 2003" (Request No. 3), and "any and all documentation in [the Gray Law Firm's] possession or

---

[24] Note 12, *supra*, points to a later discussion of Plaintiffs' objection to the Magistrate Judge's denial of their motion to compel Mr. Gray Jr. to produce, pursuant to a Rule 45 subpoena, "all documents in [his] possession or control that contain any communication between [Mr. Gray Jr.] and [Mr.] Gray regarding electronic bingo."  (Doc. # 195 at 17 (quoting Charities' Request No. 7 to Mr. Gray Jr. ).)  That ruling is addressed in subsection III.B.2.c. below.

control that refer[s] or relate[s] to the receipt of legal fees from [Mr.] McGregor since January 1, 2003" (Request No. 4).  (Doc. # 136 at 2.)

Mr. McGregor and VictoryLand object, without specificity, to the disclosure by the Gray Law Firm of "billing records" on the basis of the work-product privilege.[25]  (Doc. # 193 at 10-11.)  In its *in camera* submission, provided in compliance with the Magistrate Judge's Order, the Gray Law Firm raises the attorney-client privilege, but without much elaboration. (*See* Magistrate Judge Order (Doc. # 188) (directing Gray Law Firm to "deliver to the chambers," along with its billing records, "a written explanation about why any of [its billing] records should not be disclosed").)

Responding to the opposing arguments, Plaintiffs assert that they "are not seeking detailed billing statements which could potentially disclose strategy or attorney opinion." (Doc. # 198 at 12; *see also* Doc. # 195 at 22 (stating that their "requests relate to money and other benefits flowing between [Mr.] McGregor, VictoryLand, the Gray Law Firm and [Mr.] Gray Jr., not to advice or other communication that may be flowing between them")).) Rather, they say that they are asking only for "documents that relate to the actual 'receipt of legal fees,'" or, in other words, that relate to "[t]he *amount* of attorneys' fees received." (Doc. # 198 at 11 (emphasis in original).)

---

[25] No contrary evidence or argument having been presented, the court finds that Mr. McGregor and VictoryLand are proper parties to raise the privilege issues as to the Gray Law Firm's billing records, as the billing records relate to legal fees incurred in matters pertaining to the Gray Law Firm's representation of Mr. McGregor and/or VictoryLand.

In *O'Neal v. United States*, the Eleventh Circuit reiterated "the law of this circuit that information involving receipt of attorneys' fees from a client is not generally privileged." 258 F.3d 1265, 1276 (11th Cir. 2001) (citing *In re Slaughter*, 694 F.2d 1258, 1260 (11th Cir. 1982)); *see also Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992) (as a matter of federal law, "[o]ur decisions have recognized that the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege").  Given Plaintiffs' clarification or modification – whichever it may be – as to the parameters of their Rule 45 subpoena requests for production of documents about legal fees, and the protective order, the court finds that Plaintiffs' requests fall within the bounds permitted by the Eleventh Circuit.  No reason has been given as to how disclosure of the amount of fees paid by VictoryLand and/or Mr. McGregor to the Gray Law Firm for the time period specified would violate "the law of this circuit," *O'Neal*, 285 F.3d at 1276.[26]  The

---

[26] Mr. McGregor and VictoryLand cite a single case from a Florida court in support of their contention that the work-product privilege precludes the disclosure of an attorney's billing records.  *HCA Health Servs. of Florida, Inc. v. Hillman ("Hillman")*, 870 So. 2d 104 (Fla. Dist. Ct. App. 2d Dist. 2003).  (*See* Doc. # 193 at 11.)  That case is readily distinguishable.  First, *Hillman* addressed a different issue under different (Florida) law.  *Hillman* involved an attorney's fee dispute.  The prevailing party attempted to subpoena a host of records relating to the opposing party's billing practices, including "all computer generated records pertaining to attorneys' fees, costs, expenses . . . , or other related documents," *id.* at 106, and the trial court ordered the opposing party to "produce the actual bills submitted to it by its counsel including the date of legal service, the hours charged, and the nature of the services performed," *id.*  Second, the prevailing parties in *Hillman* did not narrow their requests, but asked for all billing records, thereby raising a concern with that court that those records would contain privileged attorney-client information.  *See id.* at 107.  Here, Plaintiffs have narrowly tailored the scope of their request for billing records in an effort to exclude the possibility that privileged information will be disclosed.

court, therefore, finds that the requested documents evidencing the amount of legal fees are not protected by the attorney-client privilege.

Accordingly, the court will direct the Gray Law Firm to disclose the amount of *all* legal fees paid to it from Mr. McGregor and/or VictoryLand from February 2004 to the present.[27] In this regard, the court notes that, in its *in camera* submission, the Gray Law Firm proffers as an alternative solution to the legal fees discovery dispute that it "be allowed to simply submit the amount of billing or statement paid by a particular payor for the period of time in question." It is not clear whether it proposes disclosing two lump sum amounts, one as to the total fees paid by Mr. McGregor and the other as to the total fees paid by VictoryLand but, if it is, the court does not accept in full the proposed alternative solution. With one exception, *see* below, each document submitted *in camera* by the Gray Law Firm pertaining to receipt of legal fees contains an identification label. For added clarity of this ruling, the court specifies, by reference to that label, which documents the Gray Law Firm shall disclose. The Gray Law Firm shall produce, in their entirety, documents labeled FGJ0157, FGJ0158, FGJ0159, FGJ0160, FGJ0161, FGJ0162, FGJ0163, FGJ0164, FGJ0172, FGJ0173, FGJ0174, FGJ0175, FGJ0176, FGJ0177, FGJ0178, FGJ0179, FJG0187, FGJ0192, FGJ0193, FGJ0194, FGJ0195, FGJ0196, FGJ0197, FGJ0198, FGJ0199, FGJ0200, FGJ0201,

---

[27] The time period specified by Plaintiffs is January 1, 2003, to the present; however, in the *in camera* submission, the Gray Law Firm represents that "no records exist prior to [February 2004] due to an extensive fire at the Gray law firm in Tuskegee, Alabama." While there are no records preceding February 2004, the Gray Law Firm is directed to update its disclosures to Plaintiffs to include relevant billing records to the present.

FGJ0202, FGJ0215, FGJ0216, FGJ0217, FGJ0218, FGJ0219, FGJ0220, FGJ0221 and

FGJ0222.  The Gray Law Firm also shall produce, after redacting the description columns,

documents labeled FGJ0165, FGJ0166, FGJ0167, FGJ0168, FGJ0169, FGJ0170, FGJ0171,

FGJ0180, FGJ0181, FGJ0182, FGJ0183, FGJ0184, FGJ0185, FJG0186, FJG0188, FGJ0189,

FGJ0190, FGJ0191, FGJ0203, FGJ0204, FGJ0205, FGJ0206, FGJ0207, FGJ0208, FGJ0209,

FGJ0210, FGJ0211, FGJ0212, FGJ0213 and FGJ0214.  The Gray Law Firm also shall

produce, with no redactions, the one-page document that lists fourteen fee payments from

VictoryLand to the Gray Law Firm and that identifies those fees by date, check number, and

amount.[28]

### 2.   *Documents Evidencing Electronic Bingo Communications Between VictoryLand and Either Mr. Gray, Mr. Gray Jr. or Any Other Partner or Associate of the Gray Law Firm*

At issue here are four of Plaintiffs' discovery requests, two to VictoryLand and two

to Mr. Gray Jr.  Regarding VictoryLand, the Charities served requests for production of

documents, seeking "any and all documents in [VictoryLand's] possession or control that

contain any communication between [it] and [Mr.] Gray or [Mr.] Gray, Jr., relating to the

licensing of bingo in Macon County, Alabama" (Doc. # 194 at 1 (quoting Charities' Request

No. 11 to VictoryLand (Doc. # 106)), and "that contain any communication between [it] and

---

[28] This *in camera* document is contained in a different folder than the other fee documents referenced above.  For further description, this document contains a cover page with a typewritten note stating: "Enclosed under this cover are documents which are withheld [a]nd are partially responsive to the Gray Law Firm's Request No. 3."

[Mr.] Gray, [Mr.] Gray, Jr., or any of their partners and associates relating to the licensing of bingo in Macon County, Alabama, from January 1, 2003, until January 6, 2005" (Doc. # 194 at 2 (quoting Charities' Request No. 12 to VictoryLand (Doc. # 106)).[29]   As to Mr. Gray Jr., the Charities served on him a Rule 45 subpoena, requesting him to "produce any and all documents in [his] possession or control that contain any communication between [him] and any of VictoryLand's agents or attorneys regarding electronic bingo," (Doc. # 194 at 2 (quoting Charities' Request No. 4 to Mr. Gray Jr. (Doc. # 134)), and "that contain any communication between [him] and [Mr.] Gray regarding electronic bingo"[30]  (Doc. # 195 at 17 (quoting Charities' Request No. 7 to Mr. Gray Jr. (Doc. # 134)); *see also supra* note 12.

Mr. McGregor and VictoryLand object to disclosing documents containing the requested communications on the ground of attorney-client privilege.  As discussed *infra* concerning Mr. McGregor and VictoryLand's assertion of the attorney-client privilege on behalf of Mr. Gray Jr. and Sheriff Warren, the assertion is not only perplexing, but also is problematic on standing grounds.  There is no attorney-client privilege relationship between the Gray non-parties and VictoryLand or Mr. McGregor *with respect to electronic bingo.* Nor do the facts support an extension of the attorney-client privilege on "common interest"

---

[29] (*See also* Doc. # 187 at 33 ¶ 12 (deferral by Magistrate Judge on ruling on Plaintiffs' motion to compel VictoryLand to respond to the Charities' requests for production of documents, numbers 11 and 12).)

[30] The documents Plaintiffs seek relate to "electronic bingo."  Included within that topic is licensing of bingo.  All uses of the phrase "electronic bingo" in this section of the opinion include electronic bingo and licensing of bingo, and it is notable also that the parties use the terms interchangeably in their briefs.  Moreover, where the order appears inconsistent on parameter dates for disclosure, it is because the court has mirrored the requests for production.

grounds. Therefore, there can be no privilege among them. While Sheriff Warren is a proper party to raise the attorney-client privilege as to *his* communications with *his* attorney who represented him in matters pertaining to the drafting of bingo rules and regulations (*i.e.,* Mr. Gray Jr.), Sheriff Warren has attempted to raise the privilege in a wholly ineffectual manner. Rule 1.6 of the Alabama Rules of Professional Conduct also has been relied upon as a bar to disclosure of the requested documents. For these reasons which are discussed more fully below, neither the attorney-client privilege nor Rule 1.6 protects against disclosure of the requested documents. Also included in the section is some discussion on the work-product doctrine.

### a. **Attorney-Client Privilege**: **Communications between Mr. Gray Jr. and VictoryLand**

Plaintiffs seek documents from Mr. Gray Jr. and VictoryLand evidencing communications relating to electronic bingo and the licensing of bingo between Mr. Gray Jr. and VictoryLand's agents or attorneys.[31] (Doc. # 194 at 10-15.) Plaintiffs argue that documents containing such communications are discoverable, and are not protected by the attorney-client privilege because Mr. Gray Jr. does not represent VictoryLand. (Doc. # 194

---

[31] It is undisputed that Mr. Gray Jr. was Sheriff Warren's counsel and rendered legal advice to Sheriff Warren regarding the drafting of all versions of the bingo rules and regulations promulgated by Sheriff Warren. (Gray Aff. 2; Warren Dep. 52-55, 69-70; 5th Am. Compl. ¶¶ 54, 56.) Moreover, the testimony reveals that Sheriff Warren authorized Mr. Gray Jr. to speak with representatives of VictoryLand about the rules and regulations, and that Mr. Gray Jr., in fact, met with Mr. McGregor and others at VictoryLand about the drafting of the rules and regulations. (Doc. # 163 at 23, VictoryLand's Answer to Lucky Palace's Interrog. No. 12 ("VictoryLand has determined that [attorneys] David Johns[t]on and John Bolton had discussions with [Mr.] Gray, Jr. regarding proposed or suggested Bingo Rules and Regulations and that [Mr.] McGregor may have been present at some of those discussions.").)

at 11.)  Alternatively, because Mr. Gray Jr.'s client (Sheriff Warren) testified that he had no

objection to Mr. Gray Jr. "'talking to people in getting [the rule drafting] accomplished'"

(Doc. # 194 at 11 (quoting Warren Dep. 172)), Plaintiffs contend that any communications

between Mr. Gray Jr. and VictoryLand's agents or attorneys on the subject of electronic

bingo constitute non-confidential communications made to "strangers" and, thus, are

excepted from the protections of the attorney-client privilege (Doc. # 194 at 11).  Plaintiffs

also raise the crime-fraud exception as eviscerating any claim to the attorney-client privilege

concerning communications between Mr. Gray Jr. and VictoryLand.  (Doc. # 194 at 18-24.)

Mr. McGregor and VictoryLand argue that attorneys Mr. Gray, Mr. Gray Jr., John M.

Bolton III ("Mr. Bolton") and David Johnston ("Mr. Johnston")[32] "have a significant

historical relationship with [Mr.] McGregor and his enterprises, including VictoryLand,"

such that any communications between or among these individuals relating to electronic

bingo are protected by the attorney-client privilege.  (Doc. # 193 at 3, 4.)  Relatedly, they

appear to argue, but without elaboration, that, to the extent that Mr. Gray Jr. had

communications with VictoryLand's agents or attorneys concerning electronic bingo (to

include Mr. Gray Jr.'s communications with Mr. McGregor, Mr. Gray, Mr. Bolton or Mr.

Johnston), the parties these individuals represented shared a "common interest in the subject

discussed," and, thus, those communications should be regarded as "in confidence" for

---

[32] The court assumes that Mr. Bolton and Mr. Johnston fall into the classification of agents or attorneys for VictoryLand.  Mr. Bolton is attorney of record for Mr. McGregor in this litigation. According to Mr. McGregor, Mr. Johnston is his "tax attorney" with whom he (Mr. McGregor) has consulted "on occasion[]" to discuss "potential legislation" in Alabama.  (McGregor Dep. 87.)

purposes of the attorney-client privilege.  (Doc. # 197 at 7 (internal quotation marks omitted).)   Furthermore, Mr. McGregor and VictoryLand argue that the crime-fraud exception is inapplicable on the facts of this case.  (Doc. # 197 at 8-19.)

### i.        Attorney-Client Relationship

The court disagrees with Mr. McGregor and VictoryLand in several crucial respects. Initially, as the parties are aware, "[t]he attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice." *In re Grand Jury Proceedings 88-9*, 899 F.2d at 1042 (internal quotation marks omitted); *see also id.* (holding that attorney-client privilege requires proof of four elements, the first of which is that "the asserted holder of the privilege is or sought to become a client").  Yet, there is no evidence that Mr. Gray Jr. was either VictoryLand's or Mr. McGregor's attorney for matters pertaining to electronic bingo or bingo licensing.  In fact, the opposite is true. Mr. Gray attests that he generally reviews and assigns cases within the Gray Law Firm pertaining to representation of VictoryLand, that he never has "assigned [] [Mr.] Gray, Jr., to any case involving [VictoryLand] during the last seven years," and that "it is [his] understanding that [] [Mr.] Gray, Jr., has never performed any legal work for [Mr.] McGregor."  (Gray Aff. 3.)

Mr. McGregor's testimony supports Mr. Gray's.  At his deposition, Mr. McGregor was asked, "Did [Mr.] [] Gray, Jr. ever represent VictoryLand at any point with regard to drafting, reviewing rules and regulations for bingo licensing in Macon County."  (McGregor

Dep. 197.)   Mr. McGregor answered, "No, he represented the sheriff."   (McGregor

Dep. 197.)  There is no contrary evidence suggesting an attorney-client relationship between

Mr. Gray Jr. and VictoryLand regarding electronic bingo or bingo licensing in Macon

County.  In other words, because Mr. McGregor and VictoryLand are not clients of Mr. Gray

Jr., electronic bingo communications between Mr. Gray Jr. and VictoryLand's agents or

attorneys are not communications between counsel and client; therefore, documents

containing such communications cannot be shielded from disclosure by the attorney-client

privilege.

### ii.    Common Legal Interests

While there is federal case law supporting the general proposition advanced by Mr.

McGregor and VictoryLand (Doc. # 193 at 9-10; Doc. # 197 at 7-8) that the attorney-client

privilege extends to communications among clients, who, although represented by separate

attorneys, have "a common interest in a litigated or non-litigated matter," *In re Grand Jury*

*Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir. 1997) (internal quotation marks

omitted), the evidence in this case is that the interests of Mr. McGregor and VictoryLand are

*not* parallel to those of Sheriff Warren, whom Mr. Gray Jr. represents.[33]   Indeed, one party

is the regulator, the other is the regulated; their interests could not be more legally adverse.

The fact that they might share, or say they do, the same public policy interests "of the best

---

[33] Mr. McGregor and VictoryLand raise the "common legal interest" principle in three short
paragraphs, without applying it to any specific document or communication.  (Doc. # 193 ¶ 17; Doc.
# 197 ¶¶ 13-15.)  Their reliance on a state court case applying California privilege law in the context of
the corporate attorney-client privilege is unpersuasive.  (Doc. # 193 ¶ 17.)

interests of the citizens of Macon County" does not – could not – merge their legal interests as the regulator and the regulated into a common interest.  Here is why.

Sheriff Warren testified that he hired Mr. Gray Jr. to draft rules and regulations for electronic bingo which were "in the best interest of the citizens of Macon County."  (Warren Dep. 162 (Doc. # 168).)  Sheriff Warren further agreed with opposing counsel that the rules and regulations should be "written, amended, and applied to be fair to all applicants for licensing and [should not] be tilted to favor only Victory[L]and so [that] it could have a monopoly on electronic bingo in Macon County."  (Warren Dep. 17.)  Mr. McGregor operates the *sole* electronic bingo facility in Macon County.  It goes without saying that he has an interest in earning profits in his business.  (McGregor Dep. 145 ("The primary function of any business is to make a profit to be able to stay in business.  Because if you don't make a profit, you won't stay in business.").)

While Mr. McGregor testified that he would not "be all right with" rules and regulations which "favor Victory[L]and and prevent any [open] competition for Victory[L]and in Macon County on bingo," (McGregor Dep. 278-79), and that competition can "push [one] to do a better job" (McGregor Dep. 146), it is reasonable to infer, as Plaintiffs argue, that rules and regulations which restrict or effectively prevent the operation of any other electronic bingo facility in Macon County other than VictoryLand would be economically beneficial to Mr. McGregor's electronic bingo business in Macon County, yet adverse to Sheriff Warren's stated objectives.  Indeed, Mr. McGregor admitted that he was

54

"in favor of limiting [electronic] bingo locations[,]" (McGregor Dep. 289), that he "certainly wasn't excited about th[e] possibility" of Lucky Palace building a facility "directly across the county road" from VictoryLand (McGregor Dep. 327-29), and that electronic bingo operations at Lucky Palace could reduce "revenue levels" at VictoryLand and result in job "layoffs" (McGregor Dep. 337-38). In light of the foregoing, it is reasonable to infer that Sheriff Warren's interests in the promulgation of rules and regulations governing electronic bingo in Macon County, when juxtaposed against Mr. McGregor's interests, are clearly adverse. Mr. McGregor's legal and business interests are private; Sheriff Warren's legal interests are public.

Accordingly, the court finds that the "common interest" extension to the attorney-client privilege does not preserve the privilege for any shared communications between Mr. Gray Jr. (on behalf of Sheriff Warren) and VictoryLand's agents or attorneys on subjects pertaining to electronic bingo and the licensing of bingo.

### iii.   Communications with Non-Clients

Plaintiffs argue that "to the extent that any communications between [Mr.] Gray, Jr. and Sheriff Warren occurred in the presence of a third-party (including an agent or attorney for VictoryLand, or [Mr.] Gray[,] who expressly disavowed representation of Sheriff Warren), those communications are not protected by the attorney-client privilege."[34] (Doc. # 194 at 9; *see also* Doc. # 194 at 12 (arguing that "any communications by [Sheriff] Warren

---

[34] For a discussion of why Mr. Gray and Mr. Gray Jr.'s communications are not protected by the attorney-client privilege, *see infra* section III.B.2.c.

to [Mr.] Gray Jr. that were disclosed to [] VictoryLand or its attorneys would not be privileged").) Plaintiffs are correct that communications "divulged to 'strangers' or outsiders can scarcely be considered a confidential communication between attorney and client." *United States v. Gordon-Nikkar*, 518 F.2d 972, 975 (5th Cir. 1975) (citations omitted); *see also In re Federal Grand Jury Proceedings, 89-10*, 938 F.2d at 1581 (delineating as part of third element of attorney-client privilege that communications must not have occurred in "the presence of strangers").  Having found a potential conflict between VictoryLand's and Sheriff Warren's interests in matters pertaining to the governance of electronic bingo in Macon County, and having rejected the "common interest" theory, the court easily finds that VictoryLand's agents or attorneys are strangers or outsiders to the attorney-client relationship between Mr. Gray Jr. and Sheriff Warren; therefore, any electronic bingo communications between VictoryLand's agents or attorneys and Mr. Gray Jr. are not privileged communications.[35]

### iv.    Sheriff Warren's Claim to Attorney-Client Privilege

The preceding observations reveal one conclusive flaw in Mr. McGregor and VictoryLand's assertion of the attorney-client privilege concerning attorney representation of clients on matters pertaining to licensing of bingo and electronic bingo:  They are not clients of any attorney with the Gray Law Firm as to these matters.  Sheriff Warren, on the other hand, as the client of Mr. Gray Jr., holds the attorney-client privilege as to Mr. Gray

---

[35] Based on this finding, the court need not, and declines to, address Plaintiffs' alternative arguments pertaining to a waiver of the attorney-client privilege and the crime-fraud exception.

Jr.'s legal advice to him on drafting of the rules and regulations and their amendments.  On this record, only Sheriff Warren, or Mr. Gray Jr. on his behalf, can assert the attorney-client privilege.  *See Fisher v. United States*, 425 U.S. 391, 402 n.8 (1976) ("[I]t is universally accepted that the attorney-client privilege may be raised by the attorney."); *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 90 (3d Cir. 1992) ("Although the privilege belongs to the client, and only the client may waive it, an attorney may assert the privilege on the client's behalf.").

Sheriff Warren, however, filed only a terse brief, stating merely that he "understands that the issue of attorney-client privilege will be addressed by counsel for non-party [Mr.] Gray, Jr.," but that he did not waive the privilege.  (Doc. # 203.)  Running that simple statement to ground has proven nearly impossible.  The response by counsel for non-party Mr. Gray Jr., to which Sheriff Warren alludes,[36] merely "adopts" by reference some of the prior briefs filed by the Gray Law Firm, Mr. Gray and Mr. Gray Jr. (Docs. # 150, 159, 167), as well as a brief filed by Mr. McGregor and VictoryLand (Doc. # 193).  In their brief (Doc. # 193 ¶¶ 3, 6), in turn, Mr. McGregor and VictoryLand (purported strangers to the representation of Sheriff Warren by Mr. Gray Jr.) touch upon the attorney-client privilege as it pertains to Sheriff Warren's communications with Mr. Gray Jr. and provide further elaboration of that privilege in a subsequently-filed reply brief (Doc. # 197 at 2, 5-7).[37]  No doubt Sheriff Warren raised the attorney-client privilege during his deposition (*see, e.g.,*

---

[36] That response (Doc. # 201) was filed jointly by the Gray Law Firm, Mr. Gray and Mr. Gray Jr.

[37] Interestingly, the parties who submitted the most comprehensive briefing on the issue of *Sheriff Warren*'s attorney-client privilege are Mr. McGregor and VictoryLand.

Warren Dep. 67, 138), but the Magistrate Judge ordered the matter briefed (Doc. # 188).  The problem with Sheriff Warren's brief (Doc. # 203) is that the arguments he attempts to rely upon in invoking the attorney-client privilege are twice removed from him; that is, he relies on an "understand[ing]" that Mr. Gray Jr.'s counsel would file a brief addressing his privilege.  In turn, the brief which was filed by Mr. Gray Jr.'s counsel adopted yet another brief filed, not by Mr. Gray Jr.'s counsel, but by Mr. McGregor and VictoryLand's counsel. That this is all very strange is a given; that it results in a valid claim to a privilege is not. There has been no adequate presentation of arguments on behalf of Sheriff Warren that the communications between Mr. Gray Jr. and agents or attorneys of VictoryLand are privileged.

With that said, however, the court does not embrace Plaintiffs' position that "there are serious concerns over whether *any* privilege could legitimately attach to any communication between [Sheriff] Warren and [Mr.] Gray Jr."[38]  (Doc. # 195 at 36-37 (emphasis added).) Authorizing one's attorney to divulge confidential communications is one thing; Sheriff Warren made it clear he had such communications with Mr. Gray Jr. and that he considered them confidential (Warren Dep. 170; Doc. # 203 ¶ 2).  It is quite another thing for a client to authorize his attorney, after having engaged in privileged communications, to conduct a factual investigation with third parties on matters related to the subject matter of the

---

[38] In a prior subsection (III.A.4.) overruling the Magistrate Judge's grant of the motion to quash Lucky Palace's deposition notice of Mr. Gray Jr., the court noted, *see supra* note 20, that it would address in this section Plaintiffs' argument that any communications between Mr. Gray Jr. and Sheriff Warren concerning electronic bingo at VictoryLand are not privileged such that Plaintiffs may probe Mr. Gray Jr. as to his one-on-one communications with Sheriff Warren concerning electronic bingo at VictoryLand and the drafting of the rules and regulations.  (Doc. # 195 at 30.)

representation so that the attorney will be in a better position to provide sound legal advice. This distinction finds support in the Supreme Court's recognition that while the privilege "protects disclosure of communications," the privilege "does not protect disclosure of the underlying facts by those who communicated with the attorney."[39] *Upjohn*, 449 U.S. at 395.

Indeed, this finding is consistent with Sheriff Warren's testimony. Sheriff Warren expressly authorized Mr. Gray Jr. to talk with third parties on any subject which Mr. Gray Jr. deemed necessary for "accomplishing" the drafting of bingo rules and regulations (with the stated caveat that Mr. Gray Jr. knew those "things" that he (Sheriff Warren) wanted to "keep confidential"). (Warren Dep. 170; *see also* Warren Dep. 172-74.) Of particular pertinence, Sheriff Warren testified that those third parties included VictoryLand's attorneys (one of whom is Mr. Gray), its shareholders (one of whom is Mr. Gray), its "owners and operators," and Mr. Gray Jr.'s "father." (Warren Dep. 177-78.)

---

[39] The court has not overlooked Mr. McGregor and VictoryLand's argument that any internal law firm communications related to electronic bingo between Mr. Gray Jr. and Mr. Gray (or among Mr. Gray Jr., Mr. Gray and any of their associates or partners) are privileged. (Doc. # 193 at 8-9.) Given Plaintiffs' representation as to the parameters of the Charities' requests for production of documents to VictoryLand (request numbers 11 and 12) and to Mr. Gray Jr. (request number 4), (*see* Doc. # 198 at 7), that argument is more appropriately discussed, and is addressed, *infra* in section III.B.2.c. It is notable, however, that, once again, it does not appear on this record that Mr. McGregor and VictoryLand are proper parties to raise the issue of the attorney-client privilege's applicability to such communications because, as discussed above, there is no evidence that any partner or associate of the Gray Law Firm represented either Mr. McGregor or VictoryLand concerning matters pertaining to VictoryLand's electronic bingo operations.

### v.       A Word About the Work-Product Privilege

Given the relatedness between the attorney-client privilege and the work-product privilege, it is appropriate to discuss the attorney work-product privilege at this point. Although in their briefs and *in camera* submissions, Defendants cite the work-product privilege as precluding disclosure of the requested documents, the arguments by Defendants on the issue are lean, ranging from nonexistent in Sheriff Warren's brief (*see* Doc. # 203) to scarcely more than boilerplate in Mr. McGregor and VictoryLand's briefs (*see, e.g.*, Doc. # 193 at 10-11; Doc. # 197 at 10, 11.) For instance, while Mr. McGregor and VictoryLand mention the work-product privilege (*see* Doc. # 193 ¶¶ 6-8), they merely state that "[t]he subpoena seeks material in violation of [Mr.] Gray Jr.'s work product privilege" (Doc. # 193 ¶ 18). Not only is Mr. McGregor and VictoryLand's argument conclusory – ruling on privilege issues in a factual vacuum is not possible – but also Mr. McGregor and VictoryLand have not stated what ground they have to assert the work-product privilege on behalf of Sheriff Warren's attorney (Mr. Gray Jr.). Notably, Sheriff Warren does not rely upon, or even mention, the work-product privilege in his brief (Doc. # 203). The *in camera* submissions fare no better.

Notwithstanding the dearth of argument, in reviewing the *in camera* documents submitted by the Gray non-parties and VictoryLand, the court has shielded from disclosure those documents which on their face clearly are work product within the meaning of Federal

Rule of Civil Procedure 26(b)(3).[40]  *See* Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).").  Other documents clearly are not owed protection under the work-product privilege.

### vi.    Conclusion

In sum, there is no evidence of an attorney-client relationship between Mr. Gray Jr. and VictoryLand.  There also is an absence of evidence of parallel interests between Sheriff Warren and VictoryLand in the promulgation of rules and regulations governing electronic bingo in Macon County; to the contrary, there is evidence of clearly adverse interests. VictoryLand and Mr. Gray are third-party "strangers" to the attorney-client relationship between Mr. Gray Jr. and Sheriff Warren.  Moreover, VictoryLand's and Mr. McGregor's privilege arguments raised on behalf of an adverse third party, as well as Sheriff Warren's attempt to rely on those privilege arguments to preclude disclosure of bingo-related documents flowing between Mr. Gray Jr. and VictoryLand's agents or attorneys, are unpersuasive.  Consequently, the court finds that communications relating to electronic bingo among Mr. Gray Jr. and VictoryLand's attorneys or agents are not protected by the attorney-client privilege.  But, to the extent that the work-product privilege applies to any *in camera*

---

[40] Other documents submitted *in camera* are not discoverable because they fall solely within the purview of Mr. McGregor's attorney-client privilege with respect to communications between Mr. McGregor and his attorneys, Mr. Bolton and Mr. Johnston.

document that contains communications falling outside the protections of the attorney-client privilege, the court has not directed the document's disclosure.

VictoryLand, therefore, shall produce any and all documents in its possession or control (including its attorneys or agents) that contain any communication between it and Mr. Gray Jr. relating to electronic bingo from January 1, 2003, to January 6, 2005.  Of the documents submitted for *in camera* review by VictoryLand, the court finds that the following documents, identified by the number assigned to the document by VictoryLand, are not protected by any privilege and, therefore, shall be disclosed:  PTF00553, PTF00554, PTF00555, PTF00556, PTF00557, PTF00558, PTF00559, PTF00560, MCGP004181, MCGP004182, MCGP004000, MCGP004001 and MCGP004002.

Furthermore, Mr. Gray Jr. shall produce any and all documents in his possession or control that contain any communication between him and any of VictoryLand's agents or attorneys regarding electronic bingo, except those communications relating directly to this or other litigation.  Of the documents jointly submitted for *in camera* review by Mr. Gray Jr., Mr. Gray and the Gray Law Firm, the court finds that the documents labeled FGJ0001 through and including FGJ0027, and FGJ0066 through and including FGJ0156 are responsive to the requests at issue and are not protected by any privilege and, therefore, shall be disclosed.

**b.      Attorney-Client Privilege:  Communications between Mr. Gray or Other Gray Law Firm Attorneys and VictoryLand**

Just as electronic bingo communications between Mr. Gray Jr. and VictoryLand's agents or attorneys are not protected by the attorney-client privilege, Plaintiffs argue that they "likewise are entitled to disclosure of all communications regarding electronic bingo that occurred between VictoryLand and [Mr.] Gray" (Doc. # 194 at 15) and "documents evidencing communications between VictoryLand and any partner or associate at the Gray Law Firm" (Doc. # 194 at 17).  The arguments advanced by Mr. McGregor and VictoryLand in the preceding subsection also are raised by them as a bar to the discovery of documents pertaining to Mr. Gray's electronic bingo communications with VictoryLand.  (Doc. # 193 at 3, 4; Doc. # 197 at 7.)  Mr. McGregor and VictoryLand's arguments again fail.

For substantially the same reasons discussed in the preceding section, the court will compel disclosure.  The information sought relates to electronic bingo and licensing of bingo, but the evidence indicates that Mr. Gray did not represent either Mr. McGregor or VictoryLand on such matters.  By affidavit, Mr. Gray testifies that, although he has represented VictoryLand "since shortly after it was incorporated," he "was not retained by [VictoryLand] for the purpose of doing anything in connection with the Rules and Regulations governing Bingo, nor ha[s] [he], at any time, advised [VictoryLand] concerning the same."  (Gray Aff. 2.)  "[He] was not involved because [he] knew that [] [Mr.] Gray, Jr., who had represented the [s]heriff for over ten years, was working with the [s]heriff on the

Rules and Regulations."  (Gray Aff. 2-3.)  Mr. McGregor's testimony also establishes that, with regard to electronic bingo in Macon County, Mr. Gray was not VictoryLand's attorney:

> Q.  Was Fred Gray, Sr. representing VictoryLand at that time while Fred Gray, Jr. was engaged to draft, review and assist in the publication of any rules and regulations for bingo licensing in Macon County?
>
> A.  Fred Gray, Sr. has represented VictoryLand since 1983.  Fred Gray, Sr. has had nothing to do with representing VictoryLand as far as establishing bingo in Macon County, zero.

(McGregor Dep. 198.)  Based on the foregoing, it cannot be said that Mr. Gray was providing legal advice or assistance to VictoryLand if he communicated with VictoryLand's agents or attorneys regarding matters pertaining to electronic bingo.

Moreover, the fact that Mr. Gray has represented VictoryLand on other matters does not alter the result.  The Eleventh Circuit has made clear, in a comparable circumstance, that "the argument that *any* communication between an attorney and client is protected by the privilege is overbroad. . . .  The privilege is . . . designed to protect . . . only confidential communications between the attorney and client *regarding the matter of representation*."  *In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 997 (11th Cir. 1992) (emphasis added); *see also In re Allen*, 106 F.3d 582, 609 (4th Cir. 1997)  (Niemeyer, J., concurring in part) ("The party asserting the attorney-client privilege carries the burden of establishing, *inter alia*, that . . . communications for which he claims the attorney-client privilege . . . concerned matters on which the lawyer was representing him.").

Nor is there any evidence that any other partner or associate of the Gray Law Firm represented VictoryLand on matters pertaining to electronic bingo.  The evidence is to the contrary:  Mr. Gray attests that "there have been no funds received by the Gray Law Firm from [VictoryLand] that ha[ve] anything to do with Bingo." (Gray Aff. 4; McGregor Dep. 83 (testifying that he did not consult the Gray Law Firm for advice or representation in "areas concerning potential legislation and areas concerning bingo in general").)  Because there is no evidence that either Mr. Gray or any other partner or associate of the Gray Law Firm represented VictoryLand or its agents regarding electronic bingo in Macon County, communications relating to electronic bingo between either Mr. Gray (or the Gray Law Firm) and VictoryLand's agents (or attorneys) are not privileged.

Accordingly, VictoryLand shall produce any and all documents in its possession or control that contain any communication between it, its agents or attorneys, and Mr. Gray – or between it, its agents or attorneys and any other partner or associate with the Gray Law Firm – relating to the establishment, regulation or licensing of bingo in Macon County, Alabama, from January 1, 2003, until January 6, 2005.

Two *in camera* documents submitted by VictoryLand need special attention because of the tangle of relationships and the application of a timeline to the analysis.  They involve two communications by Mr. Gray, who is one of the litigation lawyers for Sheriff Warren, with Mr. McGregor, who sometimes is a client of Mr. Gray on non-bingo matters, but the communications relate to *this* bingo litigation at a point in time *before* Mr. McGregor became

a party to the litigation.  The facsimile transmission cover sheet, labeled MCGP004003, from Mr. Gray to Mr. McGregor, dated January 4, 2007, and its accompanying documents (MCGP004004 to and including MCGP004009), as well as documents labeled MCGP004010 to and including MCGP004022, are not protected by the attorney-client privilege, for the reasons already discussed.[41]  However, these documents nonetheless may be protected under the work-product privilege because they were prepared in anticipation of or connection with this litigation at a time when Mr. Gray was representing Sheriff Warren in this litigation. Application of the work-product privilege is contraindicated, however, because Mr. Gray communicated his work product (ostensibly for Sheriff Warren) to a non-attorney and, at the time, non-party (Mr. McGregor).  The documents are relevant for a number of reasons, none of which have anything to do with the work product contained therein.  On balance, and in view of the immateriality of the actual content of the work product in the documents, the documents will be produced.[42]

### c.    Attorney-Client Privilege:  Intra-Firm Communications

The Magistrate Judge denied Plaintiffs' motion to compel Mr. Gray Jr. to respond, pursuant to a Rule 45 subpoena, to the Charities' seventh request for production of

---

[41] These *in camera* documents are listed on the sealed privilege log as "Privilege Document # 1" and "Privilege Document # 2."

[42] This particular episode illustrates an instance in which some of the documents submitted for *in camera* inspection by VictoryLand rest in the shadow of both sides of the ethical wall.  Mr. Gray, who on the one hand, denies any representation of Sheriff Warren in the drafting of the bingo rules and regulations, now, in the thick of litigation, can traverse the ethical wall to bingo-related matters given his representation of Sheriff Warren to this point in this litigation.  He cannot do so in this instance, however, with a work-product privilege in hand.

documents, pertaining to communications between Mr. Gray Jr. and Mr. Gray regarding electronic bingo.[43]  (Doc. # 187 at 26 n.21.)  The reason for the denial was: "Fred Gray, Jr. and Fred Gray are lawyers and members of the same firm, notwithstanding their familial ties. Communications between lawyers in the same firm regarding their clients are clearly protected by the attorney-client privilege."  (Doc. # 187 at 26 n.1.)

Plaintiffs urge the court to find clear error in this ruling.  (Doc. # 195 at 18-19.) Among the documents sought by Plaintiffs from Mr. Gray Jr. is a "memorandum" submitted *in camera*, dated May 2, 2006, from Mr. Gray to Mr. Gray Jr. and the eleven-page document labeled "First Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama," which is attached to that memorandum and which contains handwritten notations.  (*See, e.g.*, Doc. # 194 at 12-13.)  Pointing out that, as played out by the evidence, Mr. Gray Jr. has not represented VictoryLand on any matters pertaining to electronic bingo (but instead represents Sheriff Warren), and that Mr. Gray maintains that he has not been involved in any way with the promulgation of the bingo rules and regulations, Plaintiffs argue that the Gray Law Firm has "attempted to 'Chinese Wall' [Mr.] Gray Jr. from the rest of the Gray Law Firm when he was dealing with electronic bingo," in order to absolve Mr. Gray from ethical  problems posed by his ownership interest

---

[43] The propriety of the Magistrate Judge's ruling is appropriately discussed here in conjunction with the other pending privilege issues, rather than in a preceding section addressing Plaintiffs' objections to the Magistrate Judge's rulings.

in VictoryLand.[44]  (Doc. # 195 at 18.)  Having erected an intra-firm ethical wall between Mr. Gray and Mr. Gray Jr. for purposes of electronic bingo matters, Plaintiffs argue that Mr. Gray Jr. "cannot now claim that the . . . wall does not exist for purposes of attorney-client privilege."  (Doc. # 195 at 18.)  Hence, Plaintiffs contend that any communications between Mr. Gray and Mr. Gray Jr. regarding electronic bingo are not privileged.[45]  (Doc. # 195 at 18; *see also* Doc. # 198 at 7.)  The arguments presented by Sheriff Warren, the client of Mr. Gray Jr., are essentially nonexistent for reasons set out earlier in this opinion.  The dearth of argument aside, the ruling challenged by Plaintiffs simply is not defensible because the facts of this case do not fall within the general principle upon which the ruling is grounded.

Although an attorney-client privilege for intra-firm communications has been recognized, *see, e.g., United States v. Marlingo*, No. 04-80372, 2005 WL 465432, at *4 (E.D. Mich. Feb. 28, 2005), it also has been recognized that the attorney-client privilege is vitiated when a lawyer's communication with another lawyer in the same firm "implicates or creates a conflict," *In re Sunrise Secs. Litig.*, 130 F.R.D. 560, 597 (E.D. Pa. 1989); *cf. Nesse v.*

---

[44] While not factually on point, two cases have been cited by Plaintiffs to illustrate the concept of an intra-firm ethical wall.  (Doc. # 198 (citing *Norfolk S. Ry. Co. v. Reading Blue Mountain & N. Ry.*, 397 F. Supp. 2d 551, 554 (M.D. Pa. 2005) (An effective intra-firm screen precluding communications between attorneys representing clients with antagonist interests should have a "strong firm policy against breach, including sanctions, physical and/or geographical separation."), and *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1110 (N.D. Cal. 2003) (observing that firm "immediately put an intra-firm ethical wall in place" when it became clear that two attorneys in the same law firm were representing clients with opposing interests).)

[45] Mr. McGregor and VictoryLand defend the Magistrate Judge's ruling, saying that any advice Mr. Gray Jr. obtained from Mr. Gray related to Mr. Gray Jr.'s "representation of Sheriff Warren" is privileged and confidential.  (Doc. # 193 at 8.)  Again, Mr. McGregor and VictoryLand, neither being a client of Mr. Gray or Mr. Gray Jr. as pertains to legal representation on electronic bingo matters, are attempting to insert themselves into an attorney-client relationship in which they play no part.

*Pittman*, 202 F.R.D. 344, 354 (D.D.C. 2001) ("[P]ermitting lawyers to rely on [attorney-client and work-product] privileges[,] although they know or ought to know that they are in a perilous ethical position and in need of truly independent advice[,] discourages them from seeking that advice."). One of the multiple issues in *Sunrise Securities Litigation* involved a law firm's obtaining legal advice from in-house counsel relating to "the law firm's representation of itself (through in house counsel)" and the potential conflict arising from that "representation of itself" (a client in that scenario) and the firm's representation of another client, *see* 130 F.R.D. at 596-97. *Nesse*, in turn, concerned the potential that an attorney's legal advice to a current client was adverse to that of a former client.

Here, the conflict does not arise, as in *Sunrise Securities Litigation*, from the fact that a law firm was an attorney to both an outside client and to itself. Nor, on the present facts, is the conflict between two clients: Mr. Gray renounces any attorney-client relationship with VictoryLand and Mr. McGregor that includes matters of representation pertaining to electronic bingo. That renunciation supports the argument that the non-bingo matters on which Mr. Gray advises his clients, VictoryLand and Mr. McGregor, are unrelated to, and thus not antagonistic to, the bingo matters upon which Mr. Gray Jr. advises his client, Sheriff Warren, or to Mr. Gray's undisputed ownership interest in VictoryLand. The conflict instead is between Mr. Gray's personal investment in VictoryLand and the matters upon which Sheriff Warren obtained the legal services of Mr. Gray Jr. The conflict, outlined *supra* and not repeated here, arises from the legal relationship between the regulator (Sheriff Warren)

and the regulated (VictoryLand), and it appears dubious that Mr. Gray can disassociate himself from that conflict given his legal interest in VictoryLand as one of its shareholders. No reason has been presented, and none can be envisioned, as to why these competing interests are any less conflicting because they are between one attorney in a law firm and a client of another attorney in the same law firm. The rationale espoused in *Nesse* – that the attorney-client privilege ought not be permitted when the internal firm advice should have been sought from an independent source to avoid a taint of ethical impropriety – applies equally here as a matter of federal common law privilege. *See* 202 F.R.D. at 354.

Applying the foregoing principles to the present record,[46] the court finds that Mr. Gray cannot, on the one hand, say that he is a shareholder in VictoryLand with no involvement with Sheriff Warren's legal matters pertaining to electronic bingo, but, at the same time and on the other hand, be shielded by Mr. Gray Jr.'s claim of attorney-client privilege as to internal communications between father and son concerning the subject matter (*i.e.*, the drafting of bingo rules and regulations) of his son's representation of Sheriff Warren. Such over-the-wall discussions fall within no privilege in view of the overall circumstances. This includes both the attorney-client and work-product privileges. For these reasons, the court

---

[46] The conflict – or potential conflict – between the interests of Mr. Gray and his son's client is highlighted to illuminate why Mr. Gray and Mr. Gray Jr.'s reliance on an intra-firm attorney-client privilege with regard to communications between Mr. Gray and Mr. Gray Jr. concerning Mr. Gray Jr.'s representation of Sheriff Warren is not consistent with the law of privilege and is therefore unpersuasive. Whether there has been a breach of any state or other ethical rule, given the Gray Law Firm's concurrent representation of Sheriff Warren and VictoryLand, is not an issue addressed in this opinion.

finds that the Magistrate Judge's ruling on this issue was clearly erroneous and contrary to law.

Accordingly, the court will grant Plaintiffs' motion to compel Mr. Gray Jr. to produce, pursuant to a Rule 45 subpoena, "[a]ny and all documents in [his] possession or control that contain any communication between [him] and [Mr.] Gray regarding electronic bingo." (Doc. # 195 at 17 (quoting Charities' Request No. 7 to Mr. Gray Jr.).) As to the documents submitted *in camera*, Mr. Gray Jr. shall produce the one-page "memorandum" dated May 2, 2006, from Mr. Gray to Mr. Gray Jr., and the eleven-page document labeled "First Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama," which is attached to that memorandum and which contains handwritten notations.

### d.    Rule 1.6 of the Alabama Rules of Professional Conduct

Mr. McGregor and VictoryLand also invoke Rule 1.6 of the Alabama Rules of Professional Conduct as a shield against disclosing the documents in VictoryLand's possession or control that contain any communications concerning electronic bingo gaming between VictoryLand and Mr. Gray, between VictoryLand and Mr. Gray Jr., or between VictoryLand and any partner or associate of the Gray Law Firm. (Doc. # 193 at 4-7; Doc. # 197 at 3-5.) They argue that "[d]isclosure of the information and documents sought by Plaintiffs would violate counsel's [*i.e.*, the Gray Law Firm's] duties under Rule 1.6 of the Alabama Rules of Professional Conduct." (Doc. # 193 at 4 (brackets added); *see also* Doc.

71

# 197 at 3-5.)  Plaintiffs, however, contend that the rule applies only to a lawyer's conduct outside the courtroom, not to judicial proceedings where a court can compel disclosure.  In other words, Plaintiffs say that Rule 1.6 "is not an evidentiary privilege that prohibits discovery; rather, it is an ethical duty that prevents attorneys from disclosing confidential information outside of judicial proceedings."  (Doc. # 198 at 1-2.)  In court proceedings, Plaintiffs argue that only the attorney-client privilege protects against disclosure.[47]  (Doc. # 194 at 3-7.)

Again and first, Mr. McGregor and VictoryLand have not set forth any grounds demonstrating that they are proper parties to invoke Rule 1.6 on *behalf of the Gray Law Firm or any of its associates or partners*, and that should be the end of it.  Second, assuming *arguendo* that the Gray Law Firm (*see* Doc. # 201) adequately preserved the issue of Rule 1.6's applicability (*see* Doc. # 201, adopting Rule 1.6 second-hand arguments raised in Doc.

---

[47] Rule 1.6 provides:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph(b).

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or

(2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

# 150), Rule 1.6 only forecloses, in the proper context, an attorney's disclosure of "information relating to representation of a client." Ala. Rules of Prof'l Conduct R. 1.6.  The documents sought pertain only to information relating to Macon County electronic bingo matters, and, as discussed in other parts of this opinion, the only representation pertaining to Macon County bingo matters was by provided by Mr. Gray Jr., as a partner in the Gray Law Firm, to Sheriff Warren.  As to Mr. Gray Jr.'s representation of Sheriff Warren, which pertained to the drafting of the bingo rules and regulations, the court is persuaded that Plaintiffs have the better argument.

The parties have not cited, and the court has not found, any decision from an Alabama court directly addressing the applicability of Rule 1.6 to judicial proceedings.  The commentary to Rule 1.6 is illuminating; it provides that "[t]he attorney client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client.  The rule of client-lawyer confidentiality applies in situations *other than those where evidence is sought from the lawyer through compulsion of law*."  Ala. Rules of Prof'l Conduct R. 1.6 cmt. (emphasis added).

Also instructive are discussions from other courts interpreting similar ethical rules, and concluding that those rules cannot be used as a shield to producing discovery when it is sought from opposing counsel through compulsion of law in a judicial proceeding.  *See United States v. Stepney*, 246 F. Supp. 2d 1069, 1073-74 (N.D. Cal. 2003) (The attorney-

73

client privilege applies inside the courtroom, but "[m]echanisms other than the attorney-client privilege [including the Rule 1.6 ethical duty of confidentiality] protect against voluntary disclosure of confidential communications by counsel" outside the courtroom.); *Honda Lease Trust v. Middlesex Mut. Assur. Co.*, No. 3:05cv1426, 2008 WL 349239, at *4 (D. Conn. Feb. 6, 2008) (rejecting third party witnesses's Rule 1.6 and 1.9 confidentiality objections to producing requested documents because "[t]hose rules permit confidential information to be produced to comply with a court order"); *Adams v. Franklin*, 924 A.2d 993, 999 n.6 (D.C. 2007) ("'[T]he admissibility of evidence in a court of law . . . is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines.  Codes of professional conduct play no part in such decisions.'" (citation omitted)); *In re Criminal Investigation No. 1/242Q*, 602 A.2d 1220, 1222 (Md. 1992) ("[T]he rule of confidentiality is broader than the attorney-client privilege. Rule 1.6 applies to confidential communications between a client and an attorney in all situations *except* where the 'evidence is sought from the lawyer through compulsion of law.' In the latter situation, only the attorney-client privilege, not the broader rule of confidentiality, protects against disclosure." (citation omitted)).

Based on the foregoing authorities, the court is persuaded that Mr. Gray Jr. cannot use Rule 1.6 to oppose Plaintiffs' motion seeking a court order directing disclosure of the specified documents.  The two informal opinions from the Office of General Counsel, relied upon by Mr. McGregor and VictoryLand, are not to the contrary.  (*See* Doc. # 193, Exs. A

74

& C.)  In each informal opinion, it is expressly acknowledged that disclosure is required upon a court order.  (*See* Doc. # 193 Ex. A (observing that "[t]he only reason you would be allowed to disclose such information [*i.e.*, information protected by Rule 1.6] would be after the informed consent and waiver of your client *or if the court orders you to do so* after you have made appropriate objections" (emphasis added)); (Doc. # 193 Ex. C ("Absent a waiver by the client, *or a court order*, the father and son lawyers should make every effort to protect this information." (emphasis added)).)  Moreover, in one of the informal opinions, it is recognized that the issue of whether Plaintiffs can "challenge the lawyer-client relationships which father and son have with clients A and B, and, thus, whether they have any right to the information which they now seek from the lawyers . . . . is a question *more properly determined by the trial court as a matter of law, rather than as an issue concerning ethics*." (Doc. # 193 Ex. C.)

Accordingly, having carefully considered the ethical, privilege and relevancy arguments in light of the discovery rules and law, the court finds that the documents Plaintiffs seek are not non-discoverable by operation of Rule 1.6.

## IV.  CONCLUSION

For the foregoing reasons, the court finds that the Magistrate Judge's Memorandum Opinion and Order (Doc. # 187), denying Plaintiffs' motions to compel, is clearly erroneous and contrary to law and the law of the case, in part.  Consequently, it is ORDERED that

Plaintiffs' Objections to the Magistrate Judge's Memorandum Opinion and Order (Doc. # 195) are SUSTAINED to the extent that **on or before February 6, 2009**:

(1)     Mr. McGregor and/or VictoryLand are DIRECTED to provide written answers and produce documents to Plaintiffs disclosing: (a) annual gross receipts and annual gross profits of VictoryLand from electronic bingo from the inception of VictoryLand's electronic bingo operations to the present; and (b) all payments by VictoryLand to its charities – to include the amounts, dates and payees, relating to electronic bingo – from the inception of VictoryLand's electronic bingo operations to the present.  If the parties cannot agree on a definition of "gross profits" as the term applies to a closely-held corporation in the gaming business, the court will order the matter briefed.  However, in its response, VictoryLand shall fully define its method of arriving at "gross profits" by disclosing all the elements (but not the values) of its formula.

(2)     Mr. Gray is DIRECTED to produce (a) documents disclosing *all* dividends, distributions, fees (excluding for the moment attorney's fees and retainers, if any) or payments of any nature to him from VictoryLand or Mr. McGregor, not just those dividends, distributions, fees or payments related to electronic bingo, since January 1, 2000; and (b) documents that relate in any way to any benefits, gifts, gratuities or any other direct or indirect benefit, property or service received by Mr. Gray from VictoryLand or Mr. McGregor since January 1, 2000.

(3)     Mr. Gray and the Gray Law Firm are DIRECTED to produce documents establishing the methods of division of income and profits of the Gray Law Firm among its shareholders, but not the amounts of such divisions, since January 1, 2000.

(4)     VictoryLand is DIRECTED to produce documents reflecting Mr. Gray's ownership interest in VictoryLand on January 1, 2003, each transfer of ownership to or from Mr. Gray since that date to the present, to include the number of shares and the percentage of Mr. Gray's ownership interest when compared to the whole, and all dividend or shareholder, director, committee or other payments to Mr. Gray by date, description and amount.

(5)     Sheriff Warren is DIRECTED to produce all documents that relate in any way to campaign contributions made to *all* of his political campaigns for the office of Sheriff of Macon County, Alabama, directly or indirectly from VictoryLand or Mr. McGregor, and *all* gifts, gratuities, money, property or any other benefits received directly or indirectly from VictoryLand or Mr. McGregor during that same time period.  "Directly or indirectly" shall be construed broadly, to include benefits to immediate family members, and to entities owned or controlled by Sheriff Warren or immediate family members.

(6)     Mr. Gray Jr. is DIRECTED to produce, pursuant to a Rule 45 subpoena, "[a]ny and all documents in [his] possession or control that contain any communication between [him] and [Mr.] Gray regarding electronic bingo."  As to the documents submitted *in camera*, Mr. Gray Jr. is DIRECTED to produce the one-page "memorandum" dated May 2, 2006,

from Mr. Gray to Mr. Gray Jr., and the eleven-page document labeled "First Amended and Restated Rules and Regulations for the Licensing and Operation of Bingo Games in Macon County, Alabama," which is attached to that memorandum and which contains handwritten notations.

Furthermore, the court having found that the Magistrate Judge's Memorandum Opinion and Order, granting Mr. Gray Jr.'s motion to quash Lucky Palace's deposition notice, is clearly erroneous and contrary to law, Plaintiffs' objections are SUSTAINED and Mr. Gray Jr. is DIRECTED to appear for a deposition **on or before March 2, 2009,** or at a later time if all parties agree to the later date. The subjects for questioning obviously are constrained in part by the other rulings in this opinion. While the court agrees with Plaintiffs that Mr. Gray Jr.'s deposition is necessary for them "to obtain critical information on many topics" (Doc. # 195 at 25), Mr. Gray Jr.'s interest in his father's estate or other purely family business is out of bounds.

In all other respects, Plaintiffs' Objections to the Magistrate Judge's Memorandum Opinion and Order are OVERRULED.

Consistent with the court's rulings herein on the pending privilege issues, it is further ORDERED that **on or before February 6, 2009,**

(1)     The Gray Law Firm is DIRECTED to disclose the amount of *all* legal fees paid to it from Mr. McGregor and/or VictoryLand from February 2004 to the present. Of the documents submitted *in camera*, the Gray Law Firm is DIRECTED to produce, in their

entirety, documents labeled FGJ0157, FGJ0158, FGJ0159, FGJ0160, FGJ0161, FGJ0162, FGJ0163, FGJ0164, FGJ0172, FGJ0173, FGJ0174, FGJ0175, FGJ0176, FGJ0177, FGJ0178, FGJ0179, FJG0187, FGJ0192, FGJ0193, FGJ0194, FGJ0195, FGJ0196, FGJ0197, FGJ0198, FGJ0199, FGJ0200, FGJ0201, FGJ0202, FGJ0215, FGJ0216, FGJ0217, FGJ0218, FGJ0219, FGJ0220, FGJ0221 and FGJ0222.  The Gray Law Firm further is DIRECTED to produce, after redacting the description columns, documents labeled FGJ0165, FGJ0166, FGJ0167, FGJ0168, FGJ0169, FGJ0170, FGJ0171, FGJ0180, FGJ0181, FGJ0182, FGJ0183, FGJ0184, FGJ0185, FJG0186, FJG0188, FGJ0189, FGJ0190, FGJ0191, FGJ0203, FGJ0204, FGJ0205, FGJ0206, FGJ0207, FGJ0208, FGJ0209, FGJ0210, FGJ0211, FGJ0212, FGJ0213 and FGJ0214.  The Gray Law Firm further is DIRECTED to produce, with no redactions, the one-page document that lists fourteen fee payments from VictoryLand to the Gray Law Firm and that identifies those fees by date, check number, and amount.

(2)    VictoryLand is DIRECTED to produce any and all documents in its possession or control (including its attorneys or agents) that contain any communication between it and Mr. Gray Jr. relating to electronic bingo from January 1, 2003, to January 6, 2005.  Of the documents submitted for *in camera* review by Victoryland, VictoryLand shall produce those documents labeled PTF00553, PTF00554, PTF00555, PTF00556, PTF00557, PTF00558, PTF00559, PTF00560, MCGP004181, MCGP004182, MCGP004000, MCGP004001 and MCGP004002.

(3)     Mr. Gray Jr. is DIRECTED to produce any and all documents in his possession or control that contain any communication between him and any of VictoryLand's agents or attorneys regarding electronic bingo, except those communications relating directly to this or other litigation.  Of the documents jointly submitted for *in camera* review by Mr. Gray Jr., Mr. Gray and the Gray Law Firm, Mr. Gray Jr. is DIRECTED to produce documents labeled FGJ0001 through and including FGJ0027, and FGJ0066 through and including FGJ0156.

(4)     VictoryLand is DIRECTED to produce any and all documents in its possession or control that contain any communication between it, its agents or attorneys, and Mr. Gray – or between it, its agents or attorneys and any other partner or associate with the Gray Law Firm – relating to the establishment, regulation or licensing of bingo in Macon County, Alabama, from January 1, 2003, until January 6, 2005, including the fax transmission cover sheet, labeled MCGP004003, from Mr. Gray to Mr. McGregor, dated January 4, 2007, and its accompanying documents (MCGP004004 to and including MCGP004009), and documents labeled MCGP004010 to and including MCGP004022.

DONE this 26th day of January, 2009.

          /s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE