IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

HOPE FOR FAMILIES & COMMUNITY   )
SERVICE, INC., *et al.*,   )
   )
       Plaintiffs,   )
   )
    v.   )   CASE NO. 3:06-CV-1113-WKW[WO]
   )
DAVID WARREN, in his official capacity   )
as the Sheriff of Macon County,   )
MACON COUNTY GREYHOUND   )
PARK, INC., and MILTON McGREGOR,   )
   )
       Defendants.   )

## MEMORANDUM OPINION AND ORDER

Given the complexity of this case and for the readers' convenience, this opinion is

prefaced with the following table of contents.

| | | | |
|---|---|---|---|
| I. | **INTRODUCTION** | | 4 |
| II. | **JURISDICTION AND VENUE** | | 8 |
| III. | **STANDARD OF REVIEW** | | 8 |
| IV. | **BACKGROUND** | | 11 |
| | A. | **Ratification of Amendment No. 744** | 11 |
| | B. | **Parties** | 12 |
| | C. | **Sheriff Warren's Rules and Regulations Governing Bingo in Macon County** | 17 |
| | | 1. | *Original Rules (December 2003)* | 18 |
| | | 2. | *First Amended Rules (June 2004)* | 27 |
| | | 3. | *Second Amended Rules (January 2005)* | 29 |
| | | 4. | *VictoryLand's Electronic Bingo Licenses* | 31 |
| | | 5. | *VictoryLand's and the Charities' Income* | 35 |
| | | 6. | *Lucky Palace's Pursuit of Class B Bingo Operations in Macon County* | 37 |
| | | 7. | *This Lawsuit (December 2006)* | 42 |
| | | 8. | *Third Amended Rules (December 2008)* | 47 |

| | | | | |
|---|---|---|---|---|
| V. | **DISCUSSION** ............................................................. | | | 48 |
| | A. | <u>**RICO (Counts I and II)**</u> ........................................... | | 48 |
| | | 1. | *§ 1962(c) – Count I* ...................................... | 49 |
| | | | a. | **Bribery: Alabama Code § 13A-10-61(a)** ........... | 50 |
| | | | | i. | **Nature of the Theory** ............................. | 51 |
| | | | | ii. | **Grounds for Summary Judgment** .......... | 52 |
| | | | | iii. | **Thing of Value, Pecuniary Benefit, and Corrupt Influence** ............................ | 53 |
| | | | | iv. | **Alabama Bribery Law** ............................. | 55 |
| | | | | v. | **Application** ............................................. | 62 |
| | | | b. | **Honest Services Mail and Wire Fraud: § 1962(c)** ............................................... | 71 |
| | | | | i. | **Nature of the Theory** ............................. | 71 |
| | | | | ii. | **Initial Observation:** *Skilling* .................. | 73 |
| | | | | iii. | **Grounds for Summary Judgment** ......... | 77 |
| | | | | iv. | **§ 1964(c): RICO Standing** ..................... | 78 |
| | | | | | a. | **Injury to Business or Property** ... | 78 |
| | | | | | b. | **Proximate Cause** ........................ | 83 |
| | | 2. | *§ 1962(d) – Count II* ............................. | 100 |
| | B. | <u>**Equal Protection (Counts III and IV)**</u> ................................. | | 102 |
| | | 1. | *Vice Activities* ...................................... | 104 |
| | | 2. | *Facial Challenges to the Second Amended Rules (The First Category)* ........................................ | 107 |
| | | | a. | **Rational Basis Review** ..................................... | 108 |
| | | | b. | **Existing Facility Requirement** ......................... | 113 |
| | | | c. | **Numerical Licensing Requirements** ............... | 122 |
| | | | d. | **Plaintiffs' Arguments Against Rational Basis Review** ................................... | 134 |
| | | 3. | *Disparate Impact (Second Category)* .......................... | 140 |
| | | 4. | *Unequal Administration of a Facially Neutral Statute (Third Category)* ........................................ | 143 |
| | | | a. | **Nature of the Theory** ....................................... | 143 |
| | | | b. | **Analysis** ........................................................ | 144 |
| | | | | i. | **Intentional Discrimination** .................. | 145 |
| | | | | | (a) | *E & T Realty* **and** *Olech* .............. | 145 |
| | | | | | (b) | **Analysis** ........................................ | 150 |
| | | | | ii. | **Similarly Situated** .................................. | 157 |
| | | | c. | **Conclusion** ....................................................... | 167 |

        5.     *§ 1983 Conspiracy to Deny Equal Protection* .............  167
            a.    **Defendants' Summary Judgment Motion** .....  167
            b.    **Plaintiffs' Summary Judgment Motion** ..........  169

**C.**    **Issues Particular to Sheriff Warren's**
      **Summary Judgment Motion** ................................................  170
      *1.*    *Absolute Legislative Immunity* .................................  170
      *2.*    *Qualified Immunity* ..........................................  174
      *3.*    *Article III Standing* .........................................  174
      *4.*    *Exhaustion of Administrative Remedies* ......................  179
      *5.*    *Equal Protection Claims and Statute of Limitations:*
          *RG Apartments and Greater White Church* .................  180
            a.    **Count III** ...............................................  181
            b.    **Count IV** ...............................................  186

**D.**    **State Law Claims Against Mr. McGregor and**
      **VictoryLand** ..................................................................  187
      *1.*    *Tortious Interference with Contractual or*
          *Business Relationships (Count V)* ...............................  189
            a.    **Knowledge (Element Two)** ...............................  190
                i.    **Plaintiffs' Arguments** ............................  190
                ii.    **Defendants' Arguments** .........................  192
                iii.    **Analysis** ...........................................  193
            b.    **Intentional Interference (Element Four)** ........  199
            c.    **Summary** ...............................................  204
      *2.*    *Tortious Interference with Prospective Business*
          *Relationships (Count VI)* ...............................  204
      *3.*    *Statute of Limitations* .......................................  210
      *4.*    *Summary* .......................................................  214
**VI.**  **CONCLUSION** ...................................................  215
**VII.**  **ORDER** .............................................................  219

## I. INTRODUCTION

Before 1983, Macon County, Alabama, was primarily known as the home of historic Tuskegee Institute, now Tuskegee University, and its famous founder and first president, Dr. Booker T. Washington.  The quiet hamlet began to awaken in 1983 when parimutuel gambling came to Macon County in the form of VictoryLand greyhound racing.  Officially named Macon County Greyhound Park, Inc., VictoryLand was and still is run by its president and majority shareholder, Milton McGregor.

In 2003, with dog racing having run its course, so to speak, the Alabama legislature proposed a constitutional amendment allowing "charitable" bingo in Macon County, and a majority of the qualified Macon County voters favored the amendment.  Lest the reader deduce that Alabama requires a constitutional amendment for mere games of pleasure such as, say, Monopoly® or canasta, what the Alabama legislature had in mind was charitable bingo gambling.  And what others had in mind was electronic bingo gambling, though the word "electronic" does not appear in the amendment.

The constitutional amendment charged the sheriff of Macon County with writing the regulations and with enforcing them.[1]  The word "electronic" surfaced in the sheriff's regulations governing bingo in Macon County.  The regulations were written and adopted within thirty-one days of the passage of the constitutional amendment, and within thirteen days after that, charitable electronic bingo was licensed by Sheriff Warren at VictoryLand.

---

[1] David Warren is the sheriff of Macon County and has been for the past fifteen years.

(According to the regulations, charities have to be licensed first and then contract, if they wish, with an operator of electronic bingo gaming. VictoryLand is a for-profit operator of charitable electronic bingo, operating under an operator's license, for nonprofit organizations that have bingo licenses. The distinction between the operator's license and the charity bingo license is important.) Since December 2003, VictoryLand has been the only "qualified location" for charitable electronic bingo licensed by the sheriff of Macon County.

It is said that charity begins at home, and by any measure short of the national debt, charitable electronic bingo in Macon County was immediately, and has continued to be, successful for VictoryLand and its investors. It is not surprising, then, that other charitable-minded business people noticed an opportunity. In 2004, with some Macon County charities in tow, Lucky Palace, Inc., formed by its president Paul Bracy after the passage of the constitutional amendment, began a conversation with Sheriff Warren about licensing another electronic bingo operation in Macon County in competition with VictoryLand. Soon thereafter, in June 2004, Sheriff Warren amended the regulations, making the licensing of electronic bingo a bit more challenging.

Nevertheless, Lucky Palace continued its planning and stayed in touch with Sheriff Warren. After charitable electronic bingo drew the attention of the public and the Attorney General of Alabama, the Attorney General conducted a road trip investigation of electronic bingo and issued a written news release on the topic in late 2004. Sheriff Warren articulated the findings in that news release as the reason he amended the regulations again, on January

1, 2005, this time to redefine "bingo" and to limit the number of available charity licenses for electronic bingo in Macon County.

Lucky Palace filed an application for an operator's license with Sheriff Warren in November 2004, which was denied in January 2005. The reason given for the denial was that Lucky Palace did not have a "qualified location" for electronic bingo in Macon County. By "qualified location" the sheriff meant a completed facility ready to inspect. The charities which had aligned with Lucky Palace filed an application for their licenses in July 2005; Sheriff Warren denied their applications on the same basis, that there was no "qualified location." To date, no Plaintiff has received a license from Sheriff Warren.

In an attempt to cover its bets, and considering that the regulations had been amended twice in thirteen months, Lucky Palace took a political detour in 2006 and tried to defeat Sheriff Warren in his reelection bid. Sheriff Warren took Lucky Palace to the woodshed, winning an overwhelming reelection victory. Lucky Palace and its charities, having not been so lucky, turned to the courts for relief. That is this case, which is against Sheriff Warren, VictoryLand and Mr. McGregor.

As it turns out, Sheriff Warren had considerable help drafting the bingo regulations and subsequent amendments. After a conversation with Mr. McGregor within a week or so of the passage of the constitutional amendment, Sheriff Warren called his own lawyer to help with drafting the regulations. That lawyer is the son and law partner of the lawyer who has represented VictoryLand and has been a minority shareholder in VictoryLand since its

6

founding in 1983.  Mr. McGregor offered the services of other attorneys retained by him or VictoryLand, an offer Sheriff Warren's attorney accepted.

Because VictoryLand attorneys had a hand in drafting the regulations adopted by the sheriff, Lucky Palace and its charities allege that VictoryLand corruptly influenced Sheriff Warren's lawyer to draft and recommend regulations and amendments thereto, by bribery, loss of honest services, and conspiracy to do the same, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and to the damage of Plaintiffs.  (None of the involved attorneys is a party to this suit, however.) Moreover, Plaintiffs allege violations of their right to equal protection under the United States Constitution through 42 U.S.C. § 1983 in what they claim is unequal treatment by Sheriff Warren  and his regulations, and the conspiracy of all Defendants to violate the Constitution to the detriment of Plaintiffs.[2]  Finally, Plaintiffs contend Alabama law has been violated by Mr. McGregor's and VictoryLand's unlawful interference with business and contractual relations between Lucky Palace and its charities, and with unnamed future patrons of a proposed Lucky Palace charitable electronic bingo operation.  Plaintiffs seek money damages and injunctive relief.

These claims are before the court on motions for summary judgment.  Presently pending are:  (1) One motion filed by Mr. McGregor and VictoryLand (Doc. # 421); (2) six

---

[2] Plaintiffs do not, however, make claims for either procedural or substantive due process violations.  Nor do they bring any challenge to Amendment No. 744 itself.  Moreover, the legality of VictoryLand's electronic bingo operations is not at issue in this case.

motions filed by Sheriff Warren (Docs. # 423, 425, 427, 429, 431, 433); (3) and one motion filed by Plaintiffs (Doc. # 445).[3]  The motions have been fully briefed, and are ready for adjudication.

## II.  JURISDICTION AND VENUE

The parties do not dispute subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367; nor do the parties contest personal jurisdiction or venue.  There are adequate allegations in support of each.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation and internal quotation marks omitted); Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine

---

[3] The multiple briefs filed in support of and in opposition to the summary judgment motions will be referred to by their document numbers.

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. Fed. R. Civ. P. 56(e)(2); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (citation and internal quotation marks omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,*

9

*Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment.").  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate

where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

The standard of review is unaffected by the filing of cross-motions for summary judgment. *See Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001); *see also Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) ("When considering motions from both parties for summary judgment, the court applies the same standard of review and so may not resolve genuine issues of material fact.  Instead, [it  must] consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." (citations omitted)).

## IV.  BACKGROUND

A.    <u>Ratification of Amendment No. 744</u>

On November 4, 2003, in a referendum, a majority of the qualified electors in Macon County, Alabama, approved a proposed constitutional amendment, which became Amendment No. 744 to the Alabama Constitution.  *See* Ala. Const. 1901 amend. No. 744; *see also* Ala. Const. 1901 Art. XVIII § 284.01 (Recomp.) (Amend. No. 425 & Amend. No. 555).[4]  Amendment No. 744[5] makes it legal for nonprofit organizations to operate bingo in

---

[4] Section 284.01 provides, in pertinent part, that "[a]ny proposed constitutional amendment which affects or applies to only one county shall be adopted as a valid part of the constitution by a favorable vote of a majority of the qualified electors of the affected county who vote on the amendment."

[5] Amendment No. 744, which does not mention *electronic* bingo, provides:

The operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in Macon County.  The

Macon County and requires the sheriff to promulgate rules and regulations governing licensing and operation of the county's bingo games.[6]

## B.   Parties

Defendant Macon County Greyhound Park, Inc., which does business as VictoryLand ("VictoryLand"), currently operates the only electronic bingo facility in Macon County,

---

sheriff shall promulgate rules and regulations for the licensing and operation of bingo games within the county. The sheriff shall insure compliance pursuant to any rule or regulation and the following requirements:

(1) No person under the age of 19 years shall be permitted to play any game or games of bingo, nor shall any person under the age of 19 years be permitted to conduct or assist in the operation of any game of bingo.

(2) No bingo license shall be issued to any nonprofit organization, unless the organization shall have been in existence for at least three years in the county immediately prior to the issuance of the permit or license.

(3) Bingo games may be operated on the premises owned or leased by the nonprofit organization operating the bingo game.

(4) A nonprofit organization may enter into a contract with any individual, firm, association, or corporation to have the individual or entity operate bingo games or concessions on behalf of the nonprofit organization. A nonprofit organization may pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game.

(5) A nonprofit organization may lend its name or allow its identity to be used by another person or entity in the operating or advertising of a bingo game in which the nonprofit organization is not directly and solely operating the bingo game.

(6) Prizes given by any nonprofit organization for the playing of bingo games shall not exceed the cash amount or gifts of equivalent value set by rule or regulation during any bingo session during any calendar week.

[6] Another constitutional amendment passed and adopted in 2003 is Amendment No. 743, which authorizes *electronic* marking machines in bingo games in Greene County, Alabama. Macon County is near the eastern border of Alabama, and Greene County is near the western border, roughly 160 miles apart.

Alabama.[7]  VictoryLand was incorporated in 1983 for the purpose of conducting parimutuel

wagering in Macon County.[8]  Defendant Milton McGregor ("McGregor") is VictoryLand's

president and majority shareholder.  (McGregor Dep. 66-67 (Ex. 3 to Doc. # 443 & Ex. I to

Doc. # 446).)  VictoryLand operates electronic bingo under the rules and regulations as

implemented, amended, and enforced by Defendant David Warren ("Sheriff Warren").  In

November 2003, and at all relevant times to this litigation, Warren was the sheriff of Macon

County.

Plaintiff Lucky Palace, LLC ("Lucky Palace"), also desires to conduct electronic

bingo operations in Macon County, but, as detailed later, Sheriff Warren's rules, as amended,

have been applied so as to preclude it from doing so.  In a nutshell, the current form of the

rules requires Class B Bingo Licenses for electronic bingo to be issued only to nonprofit

organizations, which in turn can contract with an operator to run electronic bingo gaming.

However, "[a]t no time shall there be issued and outstanding more than sixty (60) Class B

Licenses for the operation of bingo in Macon County."  (2d Am. Rules § 2.)  VictoryLand

---

[7] VictoryLand's business transcends state lines, attracting patrons who have traveled from other states to play electronic bingo.  (McGregor Dep. 338-39 (Ex. 3 to Doc. # 443 & Ex. I to Doc. # 446); Doc. # 356 ¶ 140.)  Moreover, VictoryLand's advertisements reach beyond Alabama, and VictoryLand's website can be accessed by persons outside of Alabama.  (Doc. # 356 ¶ 141; *see, e.g.*, VictoryLand Website Printouts (Ex. 13 to Doc. # 445).)

[8] As represented by Mr. McGregor, the Alabama Legislature authorized a referendum on July 22, 1983, to permit parimutuel wagering in Macon County, and the resulting statute provided for only one greyhound racing facility in Macon County, with one license issued for the operation of the facility.  (*See* McGregor Dep. 150, 306 ("The statute . . . spelled out that there would be only one parimutuel facility in Macon County, one.").)  Mr. McGregor was the successful applicant.  This was Mr. McGregor's first involvement in the gaming industry.  (McGregor Dep. 42.)

operates electronic bingo at its greyhound racing facility for sixty nonprofit organizations that are Class B Bingo License-holders, meaning that no more Class B Bingo Licenses are available in Macon County (until an incumbent licensee surrenders it license or a licensee loses its license).[9]  (Warren Dep. 113 (Ex. 8 to Doc. # 443 & Ex. M to Doc. # 446).)

Presently joined with Lucky Palace as plaintiffs in this lawsuit are fifteen Macon County nonprofit organizations ("Plaintiff Charities") that have contracted with Lucky Palace to conduct electronic bingo at a presently undeveloped location in Macon County.  The Plaintiff Charities are: (1) Hope for Families & Community Services, Inc.; (2) Beulah Missionary Baptist Church; (3) E. D. Nixon Apartments, Inc.; (4) Greater White Church; (5) McRae Prostate Cancer Awareness Foundation; (6) Milstead Community Center, Inc.; (7) New Elam Missionary Baptist Church; (8) RG Apartments, Inc.; (9) Shorter Community Development, Inc.; (10) Shorter Lodge # 533; (11) Shorter Volunteer Fire Department; (12) Sweet Gum AME Zion Church; (13) Tabernacle Baptist Church; (14) Tubman Gardens, Inc.; and (15) Tuskegee Macon County Community Foundation, Inc.  (6th Am. Compl. (Doc. # 342).)

The operative complaint, which is the Sixth Amended Complaint, also implicates three "relevant non-parties."  (6th Am. Compl. ¶¶ 25-27.)  They are: (1) the law firm of Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, P.C. ("Gray Law Firm"), an Alabama professional corporation; (2) Fred D. Gray Sr. ("Gray Sr."), who is Mr. Gray Jr.'s father, and

---

[9] The Rules use the terms "Class B License" and "Class B Bingo License" interchangeably.

who is an attorney and the majority owner of the Gray Law Firm (Gray Sr. Dep. 25-26, 233 (Ex. 14 to Doc. # 443 & Ex. F to Doc. # 446)); and (3) Fred D. Gray Jr. ("Gray Jr."), who, as an associate in the Gray Law Firm,[10] represented Sheriff Warren in drafting the bingo rules and regulations and certain amendments to those rules.  (*See generally* Gray Jr. Dep. (Ex. 13 to Doc. # 443 & Ex. G to Doc. # 446).)

The Gray Law Firm has performed legal work for VictoryLand since 1983, but does not represent VictoryLand in this lawsuit. (McGregor Aff. ¶ 10 (Ex. 39 to Doc. # 441); Gray Sr. Aff. 1, 3 (Ex. 2 to Doc. # 445).)  Since 1984, VictoryLand has paid the Gray Law Firm a quarterly retainer, and the amount of the retainer has not changed.  (McGregor Aff. ¶ 11; Gray Sr. Dep at 54-55 (Ex. 14 to Doc. # 443).)  The Gray Law Firm also has received other payments from VictoryLand for legal representation in litigation and other matters. (VictoryLand Receipts, FGJ0174, FGJ0217, FGJ0220-21 (Ex. 4 to Doc. # 445); Gray Sr. Dep. 47; McGregor Dep. 77, 84.)[11]  Mr. Gray Sr. has represented VictoryLand on non-bingo legal matters continuously since 1983.  (Gray Sr. Aff. 1-2; McGregor Dep. 198.)  Mr. Gray Sr. and Stanley Gray are the primary attorneys in the Gray Law Firm who have represented

---

[10] Mr. Gray Jr. later became a partner with an equity ownership, *see infra* note 19.  (Gray Sr. Dep. 185.)

[11] Throughout this opinion, citations beginning with "FGJ," "MCGP" and "PTF" are to the designations appearing on the exhibits submitted by the parties.

VictoryLand.[12]  (Gray Sr. Aff. 3; Gray Sr. Dep. 62.)  Mr. Gray Sr. typically determines which lawyers work on which VictoryLand matters.[13]  (Gray Sr. Aff. 3)

In addition to being a shareholder of the Gray Law Firm, Mr. Gray Sr. also has been a minority shareholder in VictoryLand since 1983, and has received dividend payments as a VictoryLand shareholder based upon an ownership percentage that has never changed.[14] (Gray Sr. Aff. 1-2.)  He has received regular shareholder dividends from VictoryLand based on his ownership interest in the company.  (McGregor Aff. ¶¶ 13, 16-17; Gray Sr. Dep. 47.)

---

[12] Stanley Gray is Mr. Gray Jr.'s brother.  (Gray Sr. Dep. 61-62.)

[13] From October 2004 through June 2005, while an associate, Mr. Gray Jr. worked more than 160 hours on a case for which VictoryLand paid the Gray Law Firm's bill.  (Ex. 3 to Doc. # 445; Gray Jr. Dep. 296-301.)

[14]  As explained in a separate Order entered contemporaneously herewith, certain documents exchanged during discovery and submitted by Plaintiffs during the summary judgment briefing period – including Mr. Gray Sr.'s Schedule K-1 tax forms (reporting the amount of Mr. Gray Sr.'s income received from his shareholding in VictoryLand), the amount of Mr. Gray Sr.'s dividend payments from VictoryLand, and the percentage of Mr. Gray Sr.'s ownership interest in VictoryLand – are not subject to public disclosure.  Having balanced the competing interests – in particular, the confidentiality historically given to tax returns, Mr. Gray Sr.'s status as a private individual and a non-party, the lack of materiality of this evidence to resolution of the summary judgment motions and the protected order's exception for material "essential to the prosecution" of claims (Doc. # 352, at 1-2), the court has found that the need for confidentiality outweighs the presumption of public access.

Mr. Gray Jr. "ha[s] been [Sheriff Warren's] attorney for years" (Warren Dep. 50-51 (Ex. 8 to Doc. # 443 & Ex. M to Doc. # 446); Gray Jr. Dep. 57), and in that capacity, rendered legal advice regarding all versions of the bingo rules promulgated by Sheriff Warren.[15]  (Gray Sr. Aff. 2; Warren Dep. 52-55, 69-70.)

## C.   Sheriff Warren's Rules and Regulations Governing Bingo in Macon County

At the core of this litigation are the rules promulgated by Sheriff Warren pursuant to the authority vested in him by Amendment No. 744.  *See* Ala. Const. 1901 amend. No. 744 ("The sheriff shall promulgate rules and regulations for the licensing and operation of bingo games within the county.").  The Original Rules have been amended three times, pursuant to a section in all versions of the Rules that "reserves" the sheriff's "right to amend" them "from time to time as necessary."  (*See* Original Rules, effective Dec. 5, 2003 (Ex. A to Doc. # 342); 1st Am. & Restated Rules & Regulations for the Licensing & Operation of Bingo Games in Macon County, Alabama, effective June 2, 2004 (Ex. B to Doc. # 342); 2d Am. & Restated Rules & Regulations for the Licensing & Operation of Bingo Games in Macon County, Alabama, effective Jan. 1, 2005 (Ex. C to Doc. # 342); 3d Am. & Restated Rules &

---

[15] Although the Gray Law Firm, Mr. Gray Sr. and Mr. Gray Jr. are not parties, they are implicated for alleged conflicts of interest arising in their representation of Defendants: Mr. Gray Jr. represented Sheriff Warren who regulated a business in which his father, Mr. Gray Sr., is a shareholder and for which Mr. Gray Sr. serves as legal counsel; Mr. Gray Sr. and Mr. Gray Jr. also are law partners and shareholders in the Gray Law Firm, not to mention father and son; both appeared for and represented Sheriff Warren in this case, but the day prior to Mr. Gray Jr.'s deposition, they filed a motion to withdraw from representation (Doc. # 319, filed April 6, 2009), which was granted (Doc. # 320). Because of the complexity of the Grays' relationships and the commonality of names, the reader should beware, and to reduce any confusion, they are referred to as "Mr. Gray Sr." and "Mr. Gray Jr."

17

Regulations for the Licensing & Operation of Bingo Games in Macon County, Alabama, effective Dec. 15, 2008 (Ex. D to Doc. # 342).)[16]

### 1.      Original Rules (December 2003)

Sheriff Warren adopted the Original Rules thirty-one days after the passage of Amendment No. 744.  In summary, two types of bingo licenses are authorized by the Original Rules:  Class A Bingo Licenses (paper bingo) and Class B Bingo Licenses (electronic bingo).[17]  (*See, e.g.*, Original Rules §§ 1(g), (h) & 4.)  Nonprofit organizations are permitted to operate bingo games, but must have a license from the sheriff of Macon County to do so.[18] To obtain a Class B Bingo License, a nonprofit organization must complete an application and submit it to the sheriff for approval or denial.  The holder of a Class B Bingo License can conduct electronic bingo games only at a "qualified location," which has been "inspected and approved by the sheriff" and for which "satisfactory evidence" of specified criteria has been demonstrated.  A nonprofit organization can contract with another entity to operate electronic

---

[16] Throughout this opinion, the court refers to these rules as the "Original Rules," "First Amended Rules," "Second Amended Rules," and "Third Amended Rules," and collectively as "Rules," or occasionally as "Rules and Regulations."  The focus in this litigation is on the Original Rules, First Amended Rules, and Second Amended Rules.

[17] Class A Bingo Licenses for the operation of paper bingo are not at issue in this case.

[18] The Rules use the term "nonprofit organizations."  The summary judgment briefs also refer to nonprofit organizations as "charities," and the terms are used interchangeably in this opinion.  There is some debate, discussed *infra*, as to whether certain of the Plaintiff Charities are nonprofit organizations as defined by the Rules.  References herein to "nonprofit organizations" should not be interpreted as a finding one way or the other on that narrow issue.

bingo games on its behalf at a "qualified location." Here is how the Original Rules came to be.

Within a week of voter approval of Amendment No. 744, and after a telephone call from Mr. McGregor, Sheriff Warren sought assistance from Mr. Gray Jr. in drafting the Rules for electronic bingo in Macon County. (Warren Dep. 50-51; Gray Jr. Dep. 57.) At that time, Mr. Gray Jr. was an associate, not a shareholder, in the Gray Law Firm.[19] (Gray Sr. Dep. 185.) Sheriff Warren "did not care if Mr. Gray [Jr.] discussed [the bingo Rules] with [third parties, including VictoryLand's agents and Mr. Gray Sr.] in accomplishing what [he] had asked [Mr. Gray Jr.] to do." (Warren Dep. 170, 177-78, 219.) Sheriff Warren testified that Mr. Gray Jr. could consult others during the rule-drafting process because he trusted Mr. Gray Jr. "to act in the best interest of the citizens of Macon County [and] in [Sheriff Warren's] best interest." (Warren Dep. 162.) Sheriff Warren also testified that, during the drafting process and at the time of his deposition, he did not know to whom Mr. Gray Jr. spoke or from whom he received input during the drafting process. (Warren Dep. 178-79.)

Within days of the passage of Amendment No. 744, Mr. McGregor contacted Sheriff Warren to request a meeting. (Warren Dep. 81.) Sheriff Warren and Mr. McGregor scheduled the meeting to be held on or about November 11, 2003. (Warren Dep. 78; Warren Answer to 6th Am. Compl. ¶ 33 (Doc. # 358).) Sheriff Warren believed that the purpose of

---

[19] The Gray Law Firm became a professional corporation in 2007, and prior to that time, Mr. Gray Jr. did not have an equity ownership in the firm or participate in any profits from the firm. (Gray Sr. Dep. 184-86; Gray Jr. Dep. 241-43 (Ex. 13 to Doc. # 443 & Ex. G to Doc. # 446).)

the meeting would be to discuss gaming, and he invited his attorney, Mr. Gray Jr., to attend. (Warren Dep. 81-84; Gray Jr. Dep. 99-100.)  Mr. Gray Jr., Sheriff Warren and Mr. McGregor met at the law offices of the Gray Law Firm.  (Warren Dep. 80-81, 86-87; Gray Jr. Dep. 98-100; McGregor Answer to 6th Am. Compl. ¶ 33 (Doc. # 356); Warren Answer to 6th Am. Compl. ¶ 94.)  The meeting lasted about twenty minutes. (Gray Jr. Dep. 104.)  The "gist" of what Mr. McGregor conveyed during that meeting was that he had "an interest in gaming" (Warren Dep. 91, 95) and, in particular, "in bingo in Macon County," given that the referendum had passed (Gray Jr. Dep. 104).

Another topic discussed among Mr. McGregor, Mr. Gray Jr. and Sheriff Warren was the fact that Amendment No. 744 "didn't give a lot of guidance" concerning the promulgation of the rules for which Sheriff Warren was responsible. (Gray Jr. Dep. 104-05.) Mr. McGregor informed Sheriff Warren that he (Mr. McGregor) "knew of a lawyer . . . who would get in touch with [Mr. Gray Jr.] and render any kind of support" needed.  (Gray Jr. Dep. 105.)  That lawyer was John Bolton (Gray Jr. Dep. 96, 105),[20] and Mr. Gray Jr. left that meeting with the distinct "feeling" that Mr. Bolton would be contacting him.  (Mr. Gray Jr. Dep. 105.)  That intuition proved correct.  Beginning with this November 11 meeting between the regulator (Sheriff Warren) and the soon-to-be regulated (VictoryLand/Mr. McGregor), Sheriff Warren, through his counsel Mr. Gray Jr., involved VictoryLand or its

---

[20] Mr. Bolton is attorney of record for Mr. McGregor in this litigation.  Also, Mr. Bolton "has represented [Mr. McGregor] from day one concerning bingo in Macon County."  (McGregor Dep. 194-95.)

counsel in every phase of the drafting process, until the Original Rules were adopted on December 5, 2003.

As promised, Mr. Bolton contacted Mr. Gray Jr. "within two weeks of the referendum passing." (Gray Jr. Dep. 96-97; Bolton Dep. 39-40 (Ex. 11 to Doc. # 443 & Ex. B to Doc. # 446).) Mr. Bolton testified that, during his initial conversation with Mr. Gray Jr., he does not "recall" telling Mr. Gray Jr. that he represented Mr. McGregor. Mr. Bolton, however, "understood" that Mr. Gray Jr. represented Sheriff Warren. "I believe he understood that I represented [VictoryLand]. I can't tell you . . . that I recall . . . specifically telling Mr. Gray [Jr.] that or him specifically telling me who he represented." (Bolton Dep. 54.) Similarly, Mr. Gray Jr. "understood" that Mr. Bolton's client was either VictoryLand or Mr. McGregor. (Gray Jr. Dep. 118; *see also* Gray Jr. Dep. 105.)

During that initial conversation, Mr. Gray Jr. told Mr. Bolton that he planned to issue bingo regulations; that he had obtained a copy of the Montgomery County bingo regulations and planned to use them as a model; that he planned to impose some financial or other standards for bingo operators; and that he was considering imposing either a square footage requirement or an investment requirement for bingo operators in Macon County. (Bolton Dep. 42-43.) Mr. Bolton offered his assistance in drafting the Rules. (Bolton Dep. 51-53.) He told Mr. Gray Jr. that he "had worked on a case involving the Montgomery County regulations" and "offered to take a first cut at a draft of the regulations" using the Montgomery County Rules as a "model." (Bolton Dep. 52-53, 63, 80.) Mr. Gray Jr.

21

accepted Mr. Bolton's offer, and within approximately one week, Mr. Bolton submitted a draft set of rules to Mr. Gray Jr.  (Bolton Dep. 53, 63, 72, 85, 119; Draft Rules, MCGP(JMB) 002188 (Ex. 5 to Doc. # 445).)  For this work and all related work on the Macon County bingo Rules, Mr. Bolton was paid by VictoryLand.  (Bolton Dep. 26.)

Following the initial submission of draft rules, there were several communications between Mr. Gray Jr. and Mr. Bolton, and the two exchanged by email annotated drafts of Mr. Bolton's initial draft of rules.[21]  (Bolton Dep. 78-79, 85-88; McGregor Answer to 6th Am. Compl. ¶ 36 (Doc. # 356).)  On November 26, 2003, an email was sent from Mr. Bolton's assistant to Mr. Gray Jr. and others, with the message, "Please see attached.  Macon Co. Bingo Regulations."  (Emails, FGJ0226-227 (Ex. 5 to Doc. # 445).)  Mr. Bolton, Mr. Gray Jr., George David Johnston ("Johnston"),[22] Sheriff Warren and Mr. McGregor met at the Gray Law Firm sometime before Thanksgiving 2003.  (Bolton Dep. 90; Johnston Dep.

---

[21] Mr. Bolton testified:

> My recollection is he [Mr. Gray Jr.] either edited the first draft and sent it back or commented on it or something like that.  I can't recall whether he did red lines, so to speak, or handwritten notations on it.  He may have just communicated in some way comments or changes to that very first draft.
>
> . . . .
>
> What I recall is he [Mr. Gray Jr.] sent comments back, and there could have been – I just don't recall the form that it took, whether they were something that I received by telephone, by e-mail or by fax.

(Bolton Dep. 87.)

[22] Mr. Johnston has been employed as Mr. McGregor's tax attorney for "many years," and also is a shareholder in VictoryLand.  (McGregor Dep. 15, 87-88.)  Mr. Gray Jr. understood that Mr. Johnston represented either VictoryLand or Mr. McGregor.  (Gray Jr. Dep. 133-34.)  Mr. Gray Jr., however, testified that he was not aware that Mr. Johnston was a shareholder in VictoryLand.  (Gray Jr. Dep. 133.)

21 (Ex. 15 to Doc. # 443; Ex. H to Doc. # 446).)  During the meeting, which lasted fifteen

to twenty minutes, the parties discussed the then-current draft of the Rules.  (Bolton Dep. 95-

97; Johnston Dep. 22-24.)  They did not discuss potential conflicts of interest.[23]  (Gray Jr.

Dep. 110-11; Bolton Dep. 110.)  Mr. Gray Jr. "did not think there was any conflict"

concerning his representation of Sheriff Warren related to drafting bingo Rules while the

Gray Law Firm and Mr. Gray Sr. continued to represent VictoryLand on non-bingo matters,

and while Mr. Gray Sr. maintained a minority shareholder interest in VictoryLand.  (Gray Jr.

Dep. 87-88; *see also* Warren Dep. 28-29.)  In short, Mr. Gray Jr. did not perceive, anticipate

or consider any conflicts regarding his representation of Sheriff Warren.  (Gray Jr. Dep. 87-

88, 177.)  Mr. Gray Jr. already represented Sheriff Warren on other matters when he was

retained with respect to the Rules.  (Gray Jr. Dep. 86.)  The Gray Law Firm does not have

a written process for checking conflicts.  (Gray Jr. Dep. 39-41; Gray Sr. Dep. 207-08.)  It

does, however, check for conflicts.  (Gray Jr. Dep. 40.)

Moreover, Sheriff Warren was aware of the Gray Law Firm's ties to and

representation of VictoryLand.  (Warren Dep. 179-80.)  Sheriff Warren also knew that Mr.

Gray Sr. had an "affiliation with" VictoryLand, but he did not know the "extent" of that

---

[23] The "conflict" question, asked of Mr. Gray Jr. at his deposition, was whether during the
meeting "anyone ever sa[id], 'I don't know if this is going to be a problem with the [Gray Law Firm]
representing [Sheriff Warren] and this firm also represent[ing] VictoryLand . . . on other matters and one
of the firm's partners is a shareholder of VictoryLand." (Gray Jr. Dep. 110.)  At his deposition, Mr.
Bolton was asked whether anyone expressed a "concern" regarding the fact that the "licensing authority,
[Sheriff] Warren, and his attorney, [Mr.] Gray, Jr., were meeting with the only likely licensing applicant
for electronic bingo before any rules had been adopted, that being [Mr.] McGregor with his two lawyers,
you and David Johnston." (Bolton Dep. 110.)  Mr. Bolton answered, "No."  (Bolton Dep. 110.)

affiliation.  (Warren Dep. 179-80.)  Additionally, Mr. Gray Sr. testified that Sheriff Warren was "fully aware" not only that the Gray Law Firm represented VictoryLand, but also that Mr. Gray Sr. was a shareholder in VictoryLand.  (Gray Sr. Dep. 92-93, 97, 99, 104-05, 110.)

Mr. Gray Jr., Sheriff Warren, Mr. McGregor and Mr. Bolton reconvened at a later date, but this time in Mr. McGregor's office in Montgomery, Alabama.[24]  (Bolton Dep. 121-22.)  They discussed bingo "regulations in general" at that meeting.  (Bolton Dep. 125.)

On December 3, 2003, Mr. Bolton's assistant sent an email to Mr. Gray Jr., with a message, "Please see attached.  Macon Co. Bingo Regulations."  (Email, FGJ0231; MCGP(JMB)002201-2213 (Ex. 5 to Doc. # 445).)  On December 5, 2003, Mr. Gray Jr. sent an email to Linda Pittman (Mr. McGregor's secretary, *see* McGregor Dep. 323), Mr. Johnston and Beth Herrington (Mr. Johnston's assistant) and attached a revised draft of the bingo rules.  (Email, MCGP(GDJ)002099-2111 (Ex. 5 to Doc. # 445).)  Mr. Gray Jr. asked the recipients to "[c]all upon review."  (Email, FGJ0226 (Ex. 5 to Doc. # 445).)  In the email, Mr. Gray Jr. noted that his "client" (Sheriff Warren) had not reviewed the attached draft. (Email, FGJ0226 (Ex. 5 to Doc. # 445).)  Mr. Gray Jr. emailed two more drafts on the same day to the same VictoryLand recipients, the last with the notation, "This is the draft that is currently being reviewed.  READ CAREFULLY."  (Email, MCGP(GDJ)002126-2146 (Ex. 5 to Doc. # 445).)

---

[24] There is conflicting testimony as to whether Mr. Johnston attended this meeting.  (*Compare* Bolton Dep. 122 *with* Johnston Dep. 31-32.)  Mr. Johnston, however, does not dispute that the meeting occurred.  (Johnston Dep. 31-32.)

Mr. Gray Jr. and Sheriff Warren reviewed the Original Rules together, maybe not "every word," but "every section." (Warren Dep. 196.) During the editing process, Sheriff Warren made some changes to the draft rules. (Gray Jr. Dep. 123-24, 128-29, 138-39, 207-10; Bolton Dep. 86-88, 107, 141-43.) No evidence, however, has been cited as to what those changes were. (Bolton Dep. 106-08 (testifying that edits were made to his proposals, but that he (Mr. Bolton) did not have a record of those edits).) According to Mr. Bolton, Sheriff Warren also "intended to have an investment requirement . . . [, and Mr. Bolton] drafted some proposed language." (Bolton Dep. 100.) Sheriff Warren, however, testified as follows:

> And the rules and what Mr. Gray [Jr.] and I came up with was what I wanted. I used my discretion on the information that he brought to me. I exercised what judgment I could, given my knowledge of this issue, which was – which I used as best I could and the rules and regulations that I came up with, I approved and intended that they govern this activity.

(Warren Dep. 159-60.) Sheriff Warren also testified that "[w]hat Mr. Gray [Jr.] came up with, we discussed. I used my discretion. I approved what I wanted to approve and the rules that are adopted are the rules that were adopted by the Macon County sheriff." (Warren Dep. 157.)

Sheriff Warren signed the Original Rules on December 5, 2003.[25]  (Gray Jr. Dep. 127-28.)  They were adopted without public hearing, comment or other public notice or involvement.  As of December 5, 2003, "VictoryLand met the requirements set forth in the [Original Rules]" and "was the only qualified location in Macon County."  (Warren Dep. 146-47; Original Rules § 1(j) (defining "qualified location").)

On December 16, 2003, Mr. McGregor signed a sworn Operator's Certificate.  The Operator's Certificate contained information relevant to Mr. McGregor's position that VictoryLand was a "qualified location" within the meaning of the Original Rules. (Operator's Certificate (Ex. 10 to Doc. # 445); Warren Aff. ¶ 11 (Ex. 38 to Doc. # 441).)  On December 18, 2003, Sheriff Warren issued VictoryLand a Class B "Bingo Operator's

---

[25] The Montgomery County Rules allegedly used as a model are relevant, according to Plaintiffs, for their dissimilarities to the Macon County Rules.  Significantly, the Montgomery County Rules govern only paper bingo, not electronic bingo.  (Bolton Dep. 57-58.)  Some of the other differences arguably can be attributed to the distinctions between the constitutional amendments that authorized bingo in Montgomery and Macon counties.  For example, unlike Amendment No. 744 for Macon County, the Montgomery County constitutional amendment does not authorize a licensee to contract with or pay consulting fees to a third party operator to operate bingo games on its behalf.  *See* Ala. Const. 1901 amend. 413, Act. No. 82-299 (1982).  Accordingly, the Montgomery County Rules contain language prohibiting certain payments and consulting fees to third parties, and otherwise limit the use of bingo proceeds.

Another distinguishing factor between the Original Rules and the Montgomery County Rules is that Sheriff Warren's Original Rules contain a section permitting "Amendments," while the Montgomery County Rules do not.  (*See* Original Rules § 16 ("The Sheriff reserves the right to amend these Regulations from time to time as necessary, but no amendment shall be effective unless in writing and signed by the Sheriff.").)  Also, the Montgomery County Rules contain no restrictions concerning the value of the building at which bingo may be conducted, while the Original Rules required for the operation of electronic bingo a minimum purchase price of $5 million for the "land, building and other capital improvements (before depreciation)."  (Original Rules 1(j).)

License."[26]  (VictoryLand Bingo Operator's License (Ex. 12 to Doc. # 445).)  By the end of

December 2003, VictoryLand had gross receipts from electronic bingo of $586,867, with

gross profits of $408,481.  (VictoryLand's Independent Auditor's Report; VictoryLand's 2d

Suppl. Resp. to Lucky Palace Interrog. No. 9.)

### 2.    *First Amended Rules (June 2004)*

On June 2, 2004, approximately six months after adopting the Original Rules, Sheriff

Warren amended them, again without public notice, comment or input.[27]  (Warren Dep. 147;

1st Am. Rules.)  VictoryLand's attorneys were involved again in the rule-making process.

Proposals for the amendments originated from Mr. Bolton by email.  (Gray Jr. Dep. 179;

Email, MCGP(JMB)002214-29 (Ex. 6 to Doc. # 445).)  Mr. Gray Jr. made handwritten notes

on the draft that Mr. Bolton emailed him.  (Draft 1st Am. Rules (Ex. 6 to Doc. # 445,

FGS0054-64); Gray Jr. Dep. 185-90.)  On June 2, 2004, Mr. Gray Jr. faxed a copy of the First

Amended Rules to Mr. McGregor, Mr. Bolton and Mr. Johnston.  (Fax Transmission Cover

Sheet and attachment (Ex. 15 to Doc. # 445).)

The First Amended Rules implemented amendments that (1) clarified that a nonprofit

organization must be "active and in good standing," § 1(d); (2) increased the capital

---

[26] Throughout the summary judgment materials, there are repeated references to an "Operator's License."  There is not, however, an application process in the Rules for an Operator's License.  Rather, § 4(a) of the Rules simply provides for payment of an "Operator's License Fee" once the requisite number of Class B Bingo License holders have contracted with the owner of a Class B qualified location.

[27] The First Amended Rules were publicly disclosed on June 10, 2004, in *The Tuskegee News*, a weekly print publication, eight days after the Rules' effective date of June 2, 2004.  (Warren Dep. 276; Warren Answer to 6th Am. Compl. ¶ 60.)

investment requirement of a qualified location from $5 million to $15 million, § 1(j); (3) required that "[n]o Class B Licensee shall be authorized to operate bingo at any qualified location, as defined herein, unless a minimum of fifteen (15) applicants shall first obtain Class B Licenses for such location," § 2; (4) increased the Operator's License Fee from $40,000 to $250,000, § 4(a); (5) increased the single prize limitation from $1 million to $20 million, § 9(f); and (6) added a provision regarding transportation of bingo equipment, § 15. The First Amended Rules also contained a Commentary, setting forth reasons for the amendments. For example, the Commentary set forth the following reason for § 1(j)'s amendment for raising the capital investment requirement:

> The capital investment amount required for a "qualified location" for the holder of a Class B License is hereby increased to $15,000,000 and limited to actual cost in order to require any qualified location to prove a significant investment and financial commitment to Macon County prior to becoming a "qualified location." Further, the capital investment requirement is restricted to actual cost, not based on any valuation, in order to avoid potential dispute or abuse based on any real estate appraisal submitted with an application.

(1st Am. Rules, Commentary, § 1(j).) The Commentary also provided that § 2, imposing a fifteen-license Class B Bingo License minimum, was added

> to maximize economic benefits to numerous nonprofit organizations in Macon County and to further avoid the potential abuse of a third party individual or business entity from using one nonprofit organization (or a minimal number) as a "front" to operate bingo games under a Class B License . . . . By requiring at least fifteen (15) nonprofit organizations to obtain Class B Licenses prior to authorizing such a bingo operation at a qualified location, assurance is provided that a large representative group of charities is afforded the opportunity to obtain the economic benefits associated with a Class B License.

(1st Am. Rules, Commentary, § 2.)

28

### 3.    *Second Amended Rules (January 2005)*

On December 1, 2004, Alabama Attorney General Troy King concluded a six-month

long review of gambling in Alabama and published a news release containing his "findings"

from that review.  Those findings defined requirements for legal bingo video machines.

(King Press Release, Dec. 1, 2004 (Ex. 42 to Doc. # 441).)  Sheriff Warren testified that,

based on those findings, he instructed Mr. Gray Jr. to draft the Second Amended Rules.

(Warren Dep. 182.)  Continuing a familiar pattern, Mr. Bolton sent Mr. Gray Jr. a draft of

the Second Amended Rules, with proposed amendments.  (Mr. Gray Jr. Dep. 179-81; Bolton

Dep. 201-02.)  On January 6, 2005, Sheriff Warren signed the Second Amended Rules, with

an effective date of January 1, 2005.  (Warren Dep. 147; 2d Am. Rules.)  According to

Defendants, the Second Amended Rules were published in *The Tuskegee News* on December

30, 2004.  (Doc. # 440, at 16 (citing Ex. 161).[28])

Of primary relevance, the Second Amended Rules capped the total number of Class

B Bingo Licenses available in Macon County at sixty, as set out in § 2:

> No Class B Licensee shall be authorized to operate bingo at any qualified
> location, as defined herein, unless a minimum of fifteen (15) applicants shall
> first obtain Class B Licenses for such location. . . . .  At no time shall there be
> issued and outstanding more than sixty (60) Class B Licenses for the operation
> of bingo in Macon County.

(2d Am. Rules § 2.)  Mr. Gray Jr. communicated to Mr. Bolton the idea of a limit on the

number of charities that could participate in electronic bingo.  (Bolton Dep. 202-03.)  Sheriff

---

[28] Exhibit 161 does not support the fact for which it is cited.

Warren limited that number to sixty.  (Warren Dep. 150.)  The Second Amended Rules also

modified § 4 to permit Class B Bingo Licenses to be valid for five years, rather than one year.

(2d Am. Rules § 4.)  The Commentary to the Second Amended Rules provided, in part:

> The Attorney General for the State of Alabama has recently conducted
> an exhaustive investigation and review of gaming activities in the State of
> Alabama, including but not limited to, bingo games conducted in Macon
> County, Alabama, pursuant to Amendment No. 744 of the Constitution of
> Alabama.   In response to the Attorney General's recent findings and
> pronouncements, the First Amended and Restated Rules and Regulations For
> the Licensing and Operation of Bingo Games in Macon County (the "Macon
> County Bingo Regulations") are hereby amended and restated to comport and
> comply with the Attorney General's definition of bingo games and policy to
> limit Class B bingo gaming activities in Macon County, Alabama, at a
> reasonable level whereby the Sheriff can more adequately and effectively
> regulate and enforce the proper conduct of such bingo games.  Accordingly,
> the following changes have been made to the Macon County Bingo
> Regulations.
>
> . . . .
>
> **Section 2**:    A new sentence has been added to the end of Section 2
> to limit the number of Class B Licenses that may be issued in order to follow
> the policy of the Attorney General to limit Class B bingo gaming activities in
> Macon County, Alabama, and to allow the Sheriff to more effectively regulate
> and enforce the proper conduct of such bingo games.

(2d Am. Rules, Commentary.)

Sheriff Warren testified that "[t]he attorney general never publicly stated that he

wanted to limit gaming in Macon County."  (Warren Dep. 269.)  Sheriff Warren said,

however, that his rule limiting the number of Class B Bingo Licenses to sixty "was simply

stating what [he] honestly believed the spirit of the attorney general's language meant to

[him]" and that "anybody who knows Mr. King knows his opposition to gaming in the state of Alabama." (Warren Dep. 270.)

Sheriff Warren also testified that the monetary requirement for a "qualified location" was included to keep "fly by nighters" from Macon County. (Warren Dep. 139, 150-51.) He wanted to ensure that a "substantial investment" was made to attract only "serious" investors. (Warren Dep. 139.) He said that when he wrote the Rules, he had "no desire or plans that VictoryLand be the only qualified location in Macon County." (Warren Dep. 149.) VictoryLand, however, "met the requirements set forth in the [Original Rules]." (Warren Dep. 146.) And each time the Rules were amended, VictoryLand "was the only qualified location in Macon County." (Warren Dep. 147.)

### 4.    *VictoryLand's Electronic Bingo Licenses*

On December 8, 2003, three days after the promulgation of the Original Rules, VictoryLand presented Sheriff Warren with applications from twelve Macon County charity organizations that had contracted with VictoryLand for the operation of electronic bingo.[29]

---

[29] Three of these organizations – Aid to Inmate Mothers, Inc., Tuskegee-Macon County YMCA, and Tuskegee Human and Civil Rights Multicultural Center ("Center") – had ties to the players in this case. At the time application was made, Pebblin Warren, who is Sheriff Warren's wife, was the director of Aid to Inmate Mothers. (Ex. 8 to Doc. # 445, at Warren D0317-325; Warren Dep. 287-89.) Walter E. McGowan, a shareholder in the Gray Law Firm, and Willie R. Whitehead, an officer of VictoryLand, were directors of the Tuskegee-Macon County YMCA. (Tuskegee-Macon County YMCA Application for Bingo License (Ex. 8 to Doc. # 445); Warren Dep. 239-40; Gray Jr. Dep. 19; McGregor Dep. 133.) Mr. Gray Sr.'s daughter, Deborah Gray, was the director of the Center, and a member of the Board. Mr. Gray Sr. was an officer and one of the founders of the Center, and in 2003, Mr. McGregor "probably" was a member of the Center's board of directors. (Ex. 8 at Warren D0334; Warren Dep. 100-04; Gray Sr. Aff. 2; Deborah Gray Dep. 13-14, 18 (Ex. E to Doc. # 446); Original Rules § 4(c)(4).) Mr. Gray Jr. also was a member of the board. (Deborah Gray Dep. 18; Thomas L. Coley Jr. Dep. 22 (Ex. D to Doc. # 446).)

31

(Twelve VictoryLand Charity Applications (Ex. 8 to Doc. # 445).)  There is evidence suggesting that at least some of the applications of the initial twelve VictoryLand charities did not contain all the required information, such as "[a] certified copy of the charter, certificate of incorporation, by-laws, or other evidence of legal existence of the organization," and tax exemption documentation.  (Original Rules § 4(c)(2) & (3); Ex. 8 to Doc. # 445; Deputy Tommy Miller Dep. 50-51 (Ex. J to Doc. # 446 & Ex. 13 to Doc. # 461); Warren Dep. 332.)  On December 16, 2003, Mr. McGregor signed an "Operator's Certificate."  The Operator's Certificate was submitted to Sheriff Warren with the Tuskegee-Macon County YMCA's Class B Bingo License materials "as evidence that VictoryLand met the requirements of a qualified location."  (Operator's Certificate (Ex. 10 to Doc. # 445); McGregor Aff., MCGP00001-03; Warren Aff. ¶ 11.)

On December 17, 2003, Sheriff Warren issued Class B Bingo Licenses to the twelve charity-applicants for the operation of electronic bingo at VictoryLand.  (Class B Bingo Licenses (Ex. 11 to Doc. # 445); Ex. C to Warren Aff.)

On December 18, 2003, Sheriff Warren issued VictoryLand a Class B "Bingo Operator's License."  (VictoryLand Operator's License (Ex. 12 to Doc. # 445).)  Sheriff Warren did not conduct a "formal investigation of VictoryLand" prior to declaring it a "qualified location," but he "made inquiries" that "satisfied" him of VictoryLand's "standing."  (Warren Dep. 189.)  Also, Sheriff Warren's deputy, Tommy Miller ("Deputy Miller"), did not speak to Mr. McGregor about the Operator's Certificate or inspect

32

VictoryLand to ensure that the statements in that certificate were correct. (Miller Dep. 68-69.)  Also in December 2003, VictoryLand opened its electronic bingo operations with 303 electronic bingo machines.  (McGregor Aff. ¶ 20.)  Over the next six months VictoryLand increased the number of electronic bingo machines, and by June 1, 2004, VictoryLand had 928 machines.  (McGregor Aff. ¶ 21.)  The number of machines continued to increase, and as of September 2009, VictoryLand had approximately 6,400 electronic bingo machines in operation.  (McGregor Aff. ¶ 23.)

VictoryLand also gradually increased the number of its contracts with Class B Bingo License holders.  Between January 1, 2004, and June 1, 2004, while the Original Rules remained in effect, seventeen additional applications were submitted from VictoryLand charities to Sheriff Warren for Class B Bingo Licenses and were granted.  These applicants also had contracted to conduct electronic bingo at VictoryLand, bringing the total number of VictoryLand's Class B Bingo Licenses to twenty-nine.  Thereafter, on June 2, 2004, the First Amended Rules went into effect.  Between June 2, 2004, and December 31, 2004, Sheriff Warren granted ten more Class B Bingo Licenses to charity organizations contracting with VictoryLand.[30]  (Warren Aff. ¶ 17.)  Hence, as of December 31, 2004, thirty-nine charities had obtained Class B Bingo Licenses, and all thirty-nine of those charities had entered into contracts with VictoryLand for the operation of electronic bingo.

---

[30] On December 31, 2004, Sheriff Warren also issued renewal licenses, as provided in § 4(a), to thirty-nine Class B Bingo License holders.  (Warren Aff. ¶ 18.)

On January 1, 2005, the Second Amended Rules went into effect.  Also, by that date, VictoryLand had negotiated contracts with an additional twenty charities, although those twenty charities had not yet submitted applications to Sheriff Warren for Class B Bingo Licenses.  On February 7, 2005, fourteen of those additional twenty charities received Class B Bingo Licenses from Sheriff Warren, bringing VictoryLand's total number of licensed charities to fifty-three.  Pursuant to the Second Amended Rules, as of February 7, 2005, no other entity could be a "qualified location" for the holder of a Class B Bingo License and conduct electronic bingo in Macon County.  (Warren Dep. 128-29, 115-17.)  This was because the Second Amended Rules required that a "qualified location" have a minimum of fifteen Class B Bingo Licenses, but at the same time prohibited the issuance of more than sixty Class B Bingo Licenses in Macon County.

Six more VictoryLand charities obtained their Class B Bingo Licenses between April 29, 2005 and June 14, 2005; hence, as of June 14, 2005, VictoryLand was operating electronic bingo on behalf of fifty-nine licensed charities.  (Warren Aff. ¶ 26; Ex. C to Warren Aff.) By March 20, 2006, VictoryLand had secured all sixty Class B Bingo Licenses.  (VictoryLand Charities 2006 Class B Bingo Licenses (Ex. 31 to Doc. # 446); Ex. C to Warren Aff.; McGregor Answer to 6th Am. Compl. ¶ 74.)  There is no evidence that Sheriff Warren refused a Class B Bingo License to any VictoryLand charity.

The following chart summarizes the timeline for the issuance of Class B Bingo Licenses for VictoryLand charities, measured against the effective dates of the Rules:

34

| Effective Date of the Rules | Dates Licenses Issued | Number of Class B Bingo License Applications | Number of Class B Bingo Licenses Issued | Contracts made with | Total |
|---|---|---|---|---|---|
| **Dec. 5, 2003 (Original Rules)** | Dec. 17, 2003 | 12 | 12 | VictoryLand | 12 |
| | Jan. 1, 2004 to June 1, 2004 | 17 | 17 | VictoryLand | 29 |
| **June 2, 2004 (First Amended Rules)** | June 2, 2004 to Dec. 31, 2004 | 10 | 10 | VictoryLand | 39 |
| **Jan. 1, 2005 (Second Amended Rules)** | Feb. 7, 2005 | 14 | 14 | VictoryLand | 53 |
| | April 29, 2005 to June 14, 2005 | 6 | 6 | VictoryLand | 59 |

### 5.    *VictoryLand's and the Charities' Income*

VictoryLand's annual gross receipts and annual gross profits from electronic bingo for the years 2003, 2004, 2005, 2006, 2007, and 2008 reflect steady and substantial increases, as set out in the chart below.  (VictoryLand's Independent Auditor's Report (Ex. 30 to Doc. # 446); VictoryLand's 2d Suppl. Resp. to Lucky Palace Interrog. No. 9 (Doc. # 521).) Since the inception of electronic bingo at VictoryLand, Mr. Gray Sr.'s income derived from his minority ownership interest in VictoryLand also has increased substantially.

Combined, the charities contracting with VictoryLand received the following payments from VictoryLand in the years 2004-2008:  2004 ($546,350); 2005 ($978,250); 2006 ($797,650); 2007 ($797,650); and 2008 ($1,300,026).  (VictoryLand Charity Payouts (Ex. 28 to Doc. # 446).)  In 2008, VictoryLand and its charities entered into new lease agreements under which the charities received $3,751.50 as a Bingo Session Charity Fee.[31]

| | VictoryLand's Gross Receipts from Electronic Bingo | VictoryLand's Gross Profits[32] from Electronic Bingo | Total Payments from VictoryLand to its Charities |
| --- | --- | --- | --- |
| 2002[33] | | | |
| 2003 | $      586,867 | $      408,481 | |
| 2004 | $   64,070,688 | $ 49,902,963 | $546,350 |
| 2005 | $ 112,693,949 | $ 89,148,794 | $978,250 |
| 2006 | $ 139,853,391 | $110,936,378 | $797,650 |
| 2007 | $ 157,498,710 | $126,706,748 | $797,650 |
| 2008 | $ 162,571,464 | $125,860,684      (estimated) | $1,300,026 |

---

[31] These agreements provided:  "The Operator [VictoryLand] shall pay to the Licensee within Fourteen (14) calendar days following the end of the applicable calendar month an amount equal to (x) the Bingo Session Charity Fee, multiplied by (y) the number of Bingo Sessions conducted by the Operator on behalf of the Licensee for the given calendar month."  (*See, e.g.*, VictoryLand's Bingo Operations & Lease Agreement § 5 (Ex. 26 to Doc. # 446).)  Plaintiffs have presented evidence from which they extrapolate that VictoryLand conducted roughly seven sessions of electronic bingo in 2008 per charity.  (VictoryLand Bingo Payment Schedule (Ex. 29 to Doc. # 446).)  No objection to this evidence and extrapolation, other than relevancy, has been interposed by Defendants.  (Pls.' Statement of Undisputed Facts ¶ J31 (App. to Doc. # 445); VictoryLand & McGregor's Resp. to Pls.' Statement of Undisputed Facts ¶ J31(Doc. # 460).)

[32] Gross profits are calculated after deducting operating expenses and the payments that go directly to machine vendors.  Gross receipts do not take into account these deductions.

[33] Spaces are left blank principally because disclosures were not required for these years.

36

6.    *Lucky Palace's Pursuit of Class B Bingo Operations in Macon County*

The preceding recital of facts has little contextual meaning absent the overlay of Lucky Palace's timeline.  In early 2003, Paul Bracy, Lucky Palace's president, "became interested" in operating electronic bingo in Macon County.  (Bracy Dep. 59-60 (Ex. 12 to Doc. # 443 & Ex. C to Doc. # 446).)  Lucky Palace was incorporated on February 17, 2004, for the purpose of developing an electronic bingo establishment in Macon County.  (Bracy Letter (Ex. 562 to Doc. # 440); Lucky Palace Articles of Incorporation (Ex. 702 to Doc. # 441).)  Mr. Bracy and his associates met with Sheriff Warren and Deputy Miller in the sheriff's office sometime in the spring of 2004, which was prior to any amendments to the Original Rules.  (Dwight Washington Dep. 24-25 (Ex. N to Doc. # 446).)  At that meeting, Sheriff Warren assured Mr. Bracy that there would be no problem with another entity obtaining an Operator's License, so long as it "follow[ed] the rules and regulations." (Washington Dep. 26.)

On June 11, 2004, unaware that on June 2 Sheriff Warren had amended the Original Rules, Mr. Bracy notified Sheriff Warren by letter that Lucky Palace still intended to establish an electronic bingo facility in Macon County and explained the steps Lucky Palace had taken toward the attainment of that goal.  In the closing paragraph, Mr. Bracy said,

> Given that [Lucky Palace] intends to meet or exceed all of the requirements set forth in the Rules and Regulations issued by the Sheriff of Macon County, Alabama, is there any reason for [Lucky Palace] to expect that a license will not be granted?  [Lucky Palace] is very willing to meet with you or your representative(s) if there is something that may have been overlooked. . . .  If

37

[Lucky Palace] has not heard from your office or representative by June 21, 2004[,] we will assume that a license will be granted.

(June 11, 2004 Letter (Ex. 16 to Doc. # 445, PTF00563).)

On June 15, 2004, Mr. Bracy sent another letter to Sheriff Warren, expressing his "surprise[]" to read the First Amended Rules in *The Tuskegee News*, dated June 10, 2004. (June 15, 2004 Letter (Ex. 16 to Doc. # 445, PTF00564-565).)   Mr. Bracy sought "clarification of the impact of the new requirements on [Lucky Palace's] planned development." (June 15, 2004 Letter (Ex. 16 to Doc. # 445, PTF00564-565).)  In the closing paragraph, Mr. Bracy said, "We are prepared to continue moving ahead with our project as scheduled . . . governed under" the Original Rules.  (June 15, 2004 Letter (Ex. 16 to Doc. # 445, PTF00565).)

On July 21, 2004, Mr. Bracy and Sheriff Warren met in Sheriff Warren's office to discuss Lucky Palace's plans.  On July 30, 2004, Mr. Bracy sent Sheriff Warren a letter and, per a phone conversation earlier that day, sought a signed statement from Sheriff Warren that the First Amended Rules would not be amended again and that there would be "no delays or problems in obtaining the license for a 'Class B' qualified location, for the operation of electronic bingo in Macon County, Alabama."  (July 30, 2004 Letter & Proposed Statement (Ex. 16 to Doc. # 445, PTF00566, PTF00609, PTF00567); Warren Dep. 230-31.)  Sheriff Warren did not sign this statement.  (Warren Answer to 6th Am. Compl. ¶ 64 (Doc. # 358); Warren Dep. 229-30.)  However, on August 5, 2004, Sheriff Warren sent Mr. Bracy a letter stating that, while he "reserve[d] the right to amend the regulations as necessary," he did "not

38

foresee any need for any substantive changes in the foreseeable future." (Aug. 5, 2004 Letter (Ex. 16 to Doc. # 445, PTF00609).) On August 17, 2004, Mr. Bracy responded to Sheriff Warren's August 5 letter, thanking him for his "prompt response." (Aug. 17, 2004 Letter (Ex. 16 to Doc. # 445, PTF00568).)

On September 25, 2004, the *Montgomery Advertiser* published an article about Lucky Palace's efforts to open an electronic bingo facility in Macon County. (Jannell McGrew, *Die Cast for New Bingo Facility*, *Montgomery Advertiser*, Sept. 25, 2004 (Ex. 17 to Doc. # 445).) That article paraphrases Mr. McGregor as saying that "he was not concerned about competition from the new facility" and includes a direct quote from Mr. McGregor that "'competition doesn't concern me at all.'" (Ex. 17.) Mr. McGregor testified that he first learned of Lucky Palace's efforts to become a qualified location for electronic bingo from an article in the *Montgomery Advertiser* (McGregor Dep. 327), but he did not give the date of the article from which he acquired this knowledge.

By November 10, 2004, Lucky Palace had secured contracts with more than fifteen local charities (including the fifteen Plaintiff Charities). (Lucky Palace/Charity Contracts (Ex. 18 to Doc. # 445).) Under those contracts, the charities that affiliated with Lucky Palace would be entitled to a semiannual payment of $21,000 each. (Lucky Palace/Charity Contracts § 5.) Although the Rules do not contain provisions requiring or permitting preapproval, Lucky Palace attempted to secure preapproval of its planned facility by

submitting an application for an electronic bingo Operator's License on November 10, 2004. (Warren Dep. 111-12; Nov. 10, 2004 Application (Ex. 16 to Doc. # 445, PTF00572-575).)

On January 14, 2005, when VictoryLand was operating electronic bingo for thirty-nine charities under the Second Amended Rules, and more than sixty days after he (Sheriff Warren) had received Lucky Palace's application, Sheriff Warren returned Lucky Palace's November 10, 2004 application for an electronic bingo Operator's License.  (Warren Dep. 272-73; Bracy Dep. 193-201; Envelopes (Ex. 23 to Doc. # 446).)  On the envelope returning the application, Mary Davis, Sheriff Warren's administrative assistant, handwrote the following: "Return," "Not Approved," "Building not completed," "Building must qualify." (Envelopes (Ex. 23 to Doc. # 446); Warren Dep. 125-28, 261; Bracy Dep. 199-200.)  Lucky Palace received the returned Operator's License application on January 19, 2005.  (Envelopes (Ex. 23); Bracy Dep. 197-201.)

It was Sheriff Warren's intent "that a building be present to inspect before a license was issued."  (Warren Dep. 133-34, 144.)  Sheriff Warren testified, "You know . . . every store I've seen open, before they get a license, there was a store there for somebody to inspect; every – every restaurant that I know of had to have a building to inspect before they were licensed . . . .  I don't think that expecting someone to have a building there before they get a license is asking too much."  (Warren Dep. 134; *see also* Warren Dep. 144 ("My intention was to provide rules that would govern bingo.  And in my opinion, before I approved a qualified location, there would have to be a building there for me to approve.").)

Hence, the sole reason Sheriff Warren has refused to issue Lucky Palace an Operator's License is because it does not have a "qualified location."  (Warren Dep. 111-13; Warren Dep. 113 (When asked if there was "[a]ny other reason[]" Lucky Palace could not get a license, Sheriff Warren responded, "At this time, there aren't . . . any other reasons.").)

On July 25, 2005, when VictoryLand was operating electronic bingo on behalf of fifty-nine charities, thereby foreclosing another entity from conducting electronic bingo operations in Macon County, Lucky Palace attempted to deliver twenty-two applications for Class B Bingo Licenses, along with checks for the licensing fees, to Sheriff Warren.[34]  (July 25, 2005 Letter & 22 Checks, at PTF00578-PTF00584 (Ex. 16 to Doc. # 445).)  On that same date, Mr. Bracy also sent Sheriff Warren a letter providing information about Lucky Palace that Mr. Bracy believed satisfied the Second Amended Rules pertaining to a "qualified location."  (July 25, 2005 Letter, PTF00578-PTF00584 (Ex. 16 to Doc. # 445).)  Sheriff Warren's office refused to accept Lucky Palace's charity applications and returned them immediately.  (Bracy Dep. 205-06.)  Sheriff Warren's assistant, Ms. Davis, told Mr. Bracy that the charity license applications were "premature" because the applicants "did not have a building," *i.e.*, did not have a "qualified location" at which to conduct electronic bingo. (Bracy Dep. 206.)  No mention was made of the dispositive fact that VictoryLand had sewn

---

[34] The applications are not included as part of this exhibit.  Copies of the individual checks, however, are included and contain notations in the "Remitter" field as to the charity on whose behalf the check was submitted.  There are checks for each Plaintiff Charity, but one – Greater White Church. Plaintiffs have conceded that Greater White Church "did not submit an application for a Class B License to Sheriff Warren, and [that it] was not listed as one of Lucky Palace's 'Contracted Non-Profit Organizations' in documents produced to Sheriff Warren on July 17, 2005."  (Doc. # 466, at 9 n.6.)

up all but one of the available licenses.  The denial was not appealed by the Plaintiff Charities, as permitted by § 14 of the Rules.[35]  (Bracy Dep. 201.)

By March 20, 2006, VictoryLand had secured all sixty Class B Bingo Licenses. (VictoryLand Charities 2006 Class B Bingo Licenses (Ex. 31 to Doc. # 446); Ex. C to Warren Aff.; McGregor Answer to 6th Am. Compl. ¶ 74.)  Plaintiffs attempted to rectify their perceived injury through political means.  Those means included selecting and funding a candidate to run against Sheriff Warren – a candidate who was supportive of Lucky Palace's project and who was committed to expanding gaming in Macon County.  (Windom Dep. 345 (Ex. 1 to Doc. # 443).)  Those efforts, however, did not achieve their desired result, as in the primary election in June 2006, the voters of Macon County overwhelmingly reelected Sheriff Warren over the candidate supported by Plaintiffs.  (Windom Dep. 182.)

### 7.    *This Lawsuit (December 2006)*

On December 18, 2006, seventeen nonprofit organizations – which had contracted with Lucky Palace to conduct electronic bingo at a facility to be constructed and operated by

---

[35] Section 14 provides that

[a]ny nonprofit organization whose application for a license hereunder shall be denied by the Sheriff pursuant to these Regulations shall have the right to appeal such denial to the Macon County Commission and to the Circuit Court of Macon County in the same manner as an appeal of revocation of a license issued hereunder may be appealed pursuant hereto provided, however, that such organization shall not operate any bingo game until such application shall have been granted, and a license issued, pursuant to any order of the said Commission or Court.

(2d Am. Rules § 14.)  Not mentioned is an appeal from the denial of an "Operator's License," and for good reason:  There is no direct provision for an Operator's License, so there can be no appeal from the refusal to issue such.

Lucky Palace and which had applied with Sheriff Warren for, but had not been issued, Class B Bingo Licenses – filed this lawsuit against Sheriff Warren in his official capacity.  (Compl. ¶¶ 4-20, 31-32 (Doc. # 1).)  Mr. McGregor and VictoryLand were added as defendants in the Amended Complaint, filed March 12, 2007.  (Am. Compl. (Doc. # 24).)  Thereafter, four of the original Plaintiffs – NCO Nile Club, Notasulga High School PTSA, Sojourner Truth Chapter # 265, and Tuskegee National Alumni Association – were dismissed without prejudice upon Plaintiffs' motions.  (Docs. # 123, 127, 180, 182, 196, 200.)  Lucky Palace was brought in as a plaintiff by the Third Amended Complaint, filed on June 29, 2007.  (3d Am. Compl. (Doc. # 67).)  Greater White Church and RG Apartments were added as plaintiffs in the Fifth Amended Complaint, filed May 13, 2008.  (5th Am. Compl. (Doc. # 185).)

Presently, Plaintiffs are Lucky Palace and fifteen nonprofit organizations that have contracted with Lucky Palace for the operation of electronic bingo in Macon County. Defendants are Sheriff Warren, sued in his official capacity, and Mr. McGregor and VictoryLand.

The claims have evolved through a series of amendments to the complaint.  The Sixth Amended Complaint is the operative complaint.  Plaintiffs contend that "VictoryLand and [Mr.] McGregor, through the unlawful influence [of Mr. Gray Jr.], caused [Sheriff] Warren to arbitrarily promulgate unreasonable rules and regulations for the operation of bingo in Macon County that allowed only one entity – VictoryLand – to operate electronic bingo

43

games." (6th Am. Compl. ¶ 3.)  Plaintiffs further allege that, although Mr. Gray Jr. is a private attorney, he acted as a "public servant" when advising Sheriff Warren concerning the promulgation and amendment of the Rules governing electronic bingo in Macon County. (6th Am. Compl. ¶¶ 2, 86, 115.)

The Original Rules, First Amended Rules and Second Amended Rules were promulgated by Sheriff Warren, with the assistance of his counsel, Mr. Gray Jr., and Mr. McGregor's and VictoryLand's counsel, Mr. Bolton and Mr. Johnston.  (6th Am. Compl. ¶¶ 58, 68; Warren Dep. 69-70.)  It is alleged that the amendments were implemented to prevent competition with VictoryLand.  The First Amended Rules added a provision that "[n]o Class B Licensee shall be authorized to operate bingo at any qualified location . . . unless a minimum of fifteen (15) applicants shall first obtain a Class B License for such location." (1st Am. Rules § 2; 6th Am. Compl. ¶ 60.)  The Second Amended Rules included a new provision that "[a]t no time shall there be issued and outstanding more than sixty (60) Class B Licenses for the operation of bingo in Macon County."  (2d Am. Rules § 2; 6th Am. Compl. ¶ 69.)  This provision was added at the point in time when more than forty-five Class B Bingo Licenses "had been, or soon would be, issued to nonprofit organizations with contractual ties to . . . VictoryLand."  (6th Am. Compl. ¶ 70; *see also* Warren Dep. 115-17, 128-29 (confirming that by February 7, 2005, VictoryLand's total number of licensed charities was fifty-three); Ex. C to Warren Aff.)  The sixty-license maximum combined with

the fifteen-license minimum, in effect, "foreclosed the operation of [electronic] bingo games in Macon County at any location other than VictoryLand."  (6th Am. Compl. ¶¶ 70, 112.)

The Sixth Amended Complaint contains six counts.  The first two counts allege RICO violations.  Count I alleges that Defendants violated 18 U.S.C. § 1962(c) by conducting and participating in the conduct of an enterprise through a pattern of racketeering activity.  (6th Am. Compl. ¶¶ 150-55.)  The racketeering activity includes acts of bribery chargeable under state law (Ala. Code § 13A-10-61(a)) and acts indictable under 18 U.S.C. §§ 1341 (wire fraud) and 1343 (mail fraud).  (Sixth Am. Compl. ¶¶ 88-135.)  Plaintiffs allege that Mr. McGregor and VictoryLand bribed Mr. Gray Jr. for favorable Rules, and that those alleged bribes took the form of legal fees and retainer payments made to the Gray Law Firm, and shareholder dividends paid to Mr. Gray Sr. based upon his minority ownership interest in VictoryLand.  (6th Am. Compl. ¶¶ 88, 89, 92, 95, 104, 106, 108, 110, 113.)  The RICO mail and wire fraud claim is premised on the theory that, with regard to the promulgation of the Rules, Defendants, the Gray Law Firm, Mr. Gray Sr. and Mr. Gray Jr. engaged and participated in three schemes or artifices:  The citizens of Macon County allegedly were defrauded of the honest services of Mr. Gray Jr. and Sheriff Warren, and Sheriff Warren allegedly was defrauded of the honest services of Mr. Gray Jr., *see* §§ 1341, 1343, 1346.  (6th Am. Compl. ¶ 120.)  The details of these alleged schemes or artifices will be discussed later in this opinion.

Count II alleges a RICO conspiracy under § 1962(d), based upon racketeering activities of bribery, mail fraud, and wire fraud.  All Defendants are named in this count. (6th Am. Compl. ¶¶ 156-60.)

Count III, a Fourteenth Amendment equal protection claim brought pursuant to 42 U.S.C. § 1983, alleges that Sheriff Warren denied Plaintiffs equal protection of the laws by effectively denying Lucky Palace the right to operate a "qualified location" for the conduct of electronic bingo and the Plaintiff Charities' the rights to obtain Class B Bingo Licenses, as allowed by Amendment No. 744. (6th Am. Compl. ¶¶ 161-68.) Count IV alleges a § 1983 conspiracy against all Defendants to deprive Plaintiffs of equal protection.  (6th Am. Compl. ¶¶ 169-75.)  Counts V and VI allege state-law tortious interference claims against Mr. McGregor and VictoryLand.  (6th Am. Compl. ¶¶ 176-88.)

Plaintiffs seek injunctive relief against Sheriff Warren, requiring him to "issue Class B Bingo Licenses to each of the [Plaintiff] Charities," to "issue a Class B Bingo Operator's License to Lucky Palace," to "suspend the Fifteen License Minimum and the Sixty License Maximum," and to "allow the [Plaintiff] Charities to operate any and all games of bingo at the Lucky Palace location."  (6th Am. Compl. 54.)  No damages are sought against Sheriff Warren. (6th Am. Compl. 54 n.3.)  As to Mr. McGregor and VictoryLand, Plaintiffs ask for "damages in an amount to be proven at trial, treble damages and punitive damages."  (6th Am. Compl. 54.)  Plaintiffs also seek costs, including attorney's fees, and "such further and additional relief as the Court deems just and appropriate."  (6th Am. Compl. 54.)

### 8. *Third Amended Rules (December 2008)*

On December 15, 2008, after this lawsuit was filed, Sheriff Warren adopted the Third Amended Rules.  The Third Amended Rules are identical to the Second Amended Rules with two exceptions:  They increase the Operator's License fee from $250,000 to $500,000 per year, and they increase the charity licensing fees from $1000 to $3000 per year.  As set out in the commentary to the Third Amended Rules,

> The revisions are necessary due to the increased litigation over charity bingo in Macon County.  When the Sheriff, in his official capacity, is named in a lawsuit he has no other source of income to pay for his defense other than monies generated through bingo licensing fees.  The fees associated with Class B Bingo Licenses and the Operator's Licenses Fee were initially meant to be divided and used for protecting the citizens of Macon County at bingo-related functions, to support administrative activities associated with the regulation of bingo operations, and to provide for litigation defense.  The substantial increase in litigation threatens to hinder the Sheriff's ability to provide for administrative oversight of bingo regulations and the necessary protection of citizens at bingo-related functions.  Therefore, an increase in Class B Bingo License fees and the Operator's License Fee is necessary.

(3d Am. Rules, Commentary.)  The discussion now turns to the analysis of the three sets of legal claims – RICO, constitutional and state law – in that order.

# V.  DISCUSSION

## A.  **RICO (Counts I and II)**

RICO violations are alleged against VictoryLand, Mr. McGregor and Sheriff Warren in Counts I and II of the Sixth Amended Complaint.  (6th Am. Compl. ¶¶ 150-60.)  Count I alleges that Defendants violated § 1962(c), by conducting and participating in the conduct of an enterprise through a pattern of racketeering activity. (6th Am. Compl. ¶¶ 150-55.)  The racketeering activity includes acts of bribery chargeable under state law and acts indictable under §§ 1341 (wire fraud) and 1343 (mail fraud).  (6th Am. Compl. ¶¶ 83-135.)  Count II alleges a RICO conspiracy claim under § 1962(d), based upon predicate acts of bribery and honest services mail and wire fraud, involving all Defendants.  (6th Am. Compl. ¶¶ 156-60.)

Mr. McGregor and VictoryLand move for summary judgment on the § 1962(c) substantive RICO claim in Count I and the § 1962(d) conspiracy claim in Count II.   (Doc. # 421.)  Sheriff Warren also moves for summary judgment on the RICO claims "to the extent that any claims exist or are perceived to be alleged against [him] under RICO."  (Doc. # 424, at 39.)  Plaintiffs filed a cross-motion for partial summary judgment on the RICO claims in Counts I and II that are based upon predicate acts of honest services mail and wire fraud against Mr. McGregor and VictoryLand.  Because Plaintiffs contend that there are "disputed questions of fact" regarding Sheriff Warren's knowing participation in the enterprise, they have not moved for summary judgment on the RICO claims brought against Sheriff Warren. (Doc. # 445, at 19 n.7.)   Nor have Plaintiffs pressed for summary judgment on the

48

substantive and conspiratorial claims of racketeering in Counts I and II, which are based upon predicate acts of bribery.  (Doc. # 445, at 20 n.8.)

### 1.      § 1962(c) – Count I

It is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." § 1962(c).  A § 1962(c) violation requires proof of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (citation and internal quotation marks omitted). These four elements "apply whether the RICO claim is civil or criminal in nature." *Id.* There also are two additional requirements in civil RICO cases:

> In civil cases, . . . RICO plaintiffs must also satisfy the requirements of 18 U.S.C. § 1964(c).  Section 1964(c) states that "[a]ny person injured in his business or property by reason of" RICO's substantive provisions has the right to "recover threefold the damages he sustains . . . ."  18 U.S.C. § 1964(c). Thus, under § 1964(c), civil RICO claimants, such as the plaintiffs here, must show (1) the requisite injury to "business or property," and (2) that such injury was "by reason of" the substantive RICO violation.

*Id.* at 1282-83.

The third and fourth *Williams* elements requiring proof of a pattern of racketeering activity are the subject of Defendants' summary judgment motions.  A pattern of racketeering

activity requires at least two acts of racketeering.[36]  *Williams*, 465 F.3d at 1283; *see* 18 U.S.C. § 1961(5).

### a.    Bribery: Alabama Code § 13A-10-61(a)

"Racketeering activity" is broadly defined and includes "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year."  § 1961(1)(A).  Plaintiffs contend that the racketeering activity of Defendants[37] includes an ongoing pattern of bribery, in violation of § 13A-10-61(a) of the Alabama Code.  A person commits felony bribery under Alabama law if:

> (1) He offers, confers or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced; or
>
> (2) While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

§ 13A-10-61(a).

---

[36] "An act of racketeering is commonly referred to as a predicate act."  *Williams*, 465 F.3d at 1283 (citation and internal quotation marks omitted).

[37] In Count I, there are multiple RICO theories.  Sheriff Warren questions whether he is a Defendant as to the RICO bribery theory.  (Doc. # 424, at 39.)  Plaintiffs say that he is (Doc. # 465, at 22), but Sheriff Warren's involvement in a RICO *bribery* enterprise is not clear from the Sixth Amended Complaint (6th Am. Compl. ¶¶ 83-116).  This issue need not be decided.  VictoryLand's and Mr. McGregor's arguments apply equally to Sheriff Warren, to the extent that he is being sued on this theory.  In fact, Sheriff Warren's connection to the alleged RICO bribery scheme is even more tenuous.  Accordingly, the findings herein apply also to the RICO bribery claims against Sheriff Warren, and in this section, references to "Defendants" include Sheriff Warren, Mr. McGregor and VictoryLand.

i.        **Nature of the Theory**

Plaintiffs allege specific violations of § 13A-10-61(a)(1) and (a)(2).  First, concerning (a)(1), Plaintiffs contend that Mr. Gray Jr., in his capacity as Sheriff Warren's legal advisor, was a public servant (6th Am. Compl. ¶ 86), and that Mr. McGregor and VictoryLand conferred and offered to confer things of value on Mr. Gray Jr. with the intent that Mr. Gray Jr.'s "actions in advising and consulting with [Sheriff] Warren in the promulgation of, and subsequent amendments to, the rules and regulations for the operation of bingo in Macon County would be corruptly influenced." (6th Am. Compl. ¶¶ 88, 92.)  Those things of value to Mr. Gray Jr. allegedly came in the form of legal fees and retainer payments made to the Gray Law Firm, and shareholder dividend payments made to his father, Mr. Gray Sr.

Second, Plaintiffs allege as predicate acts violations of § 13A-10-61(a)(2).  They contend that Mr. Gray Jr. "has violated" § 13A-10-61(a)(2) because he "solicited, accepted, and/or agreed to accept pecuniary benefits from [Mr.] McGregor and VictoryLand upon an agreement or understanding that [Mr.] Gray Jr.'s opinion, judgment, exercise of discretion, or other actions in promulgating and amending rules and regulations for the operation of bingo in Macon County would be corruptly influenced." (6th Am. Compl. ¶ 89.)  Absent any distinction made by Plaintiffs, it is presumed that the "things of value" allegedly bestowed upon Mr. Gray Jr. also comprise the "pecuniary benefits" allegedly accepted by Mr. Gray Jr., as required by § 13A-10-61(a)(1) and (a)(2).  (*See, e.g.*, Doc. # 464, at 28 (arguing that

Defendants conferred three "'things of value' upon [Mr.] Gray Jr. (and [that Mr.] Gray Jr. subsequently accepted them")).)

### ii.    Grounds for Summary Judgment

Defendants argue that they are entitled to summary judgment on Plaintiffs' RICO bribery theory on essentially four grounds.  The first two arguments rely on Mr. McGregor's and Mr. Gray Jr.'s affidavits, as well as on the Plaintiff Charities' Rule 30(b)(6) deposition testimony, for the contention that there is no evidence that § 13A-10-61(a) has been violated. As the third ground, Defendants argue that there is no evidence that the payments to the Gray Law Firm and/or Mr. Gray Sr. of retainers, legal fees, and shareholder dividends are either "things of value" bestowed upon Mr. Gray Jr. with the intent to corruptly influence him or "pecuniary benefits" accepted by Mr. Gray Jr. with an understanding that his actions would be corruptly influenced.  Fourth and finally, Defendants argue that there are no evidentiary facts to support Plaintiffs' allegation that Mr. Gray Jr. is a "public servant," within the meaning of § 13A-10-61(a).  Plaintiffs assert that they have produced sufficient evidence to create a genuine issue of material fact regarding this RICO claim.

Because Defendants' third ground is dispositive, it is unnecessary to address the other grounds.  More elaboration on the arguments surrounding the third ground is contained in the next subsection, followed by a discussion of the relevant law and its application to the facts of this case.

### iii.     Thing of Value, Pecuniary Benefit and Corrupt Influence

Defendants argue that the legal fees and quarterly retainers Mr. McGregor and VictoryLand paid to the Gray Law Firm and the shareholder dividends paid to Mr. Gray Sr. based upon his ownership interest in VictoryLand do not qualify as "things of value" conferred upon Mr. Gray Jr. with the intent to corruptly influence his actions regarding the formulation of bingo Rules, and were not "pecuniary benefits" accepted by Mr. Gray Jr. with the understanding that his actions would be corruptly influenced, within the meaning of § 13A-10-61(a).  (Doc. # 440, at 81-84.)  For one, Defendants argue that "[t]hese payments . . . are all inherently and presumptively lawful activities" (Doc. # 475, at 17; *see also* Doc. # 440, at 83), and commenced more than two decades prior to the onset of electronic bingo in Macon County and the alleged bribery scheme.  For another, they argue that the potential value (or benefit) to Mr. Gray Jr. is too speculative and remote because it would require Mr. Gray Jr. to believe that the payments would cause "his father's law firm [to] profit and his father's estate [to] increase," so that "when his father eventually died, [Mr.] Gray Jr. might stand to share in the inheritance of that estate."  (Doc. # 475, at 19.)  Defendants expound upon their argument in a 282-word sentence:

> Plaintiffs' argument requires Defendants to have predicted twenty years before it happened that a constitutional amendment would authorize electronic bingo to be played in Macon County, that the amendment would permit third parties to run bingo games for charities, that it would authorize Sheriff Warren to promulgate the rules and regulations for electronic bingo, that Sheriff Warren would ask Mr. Gray Jr. to assist him in preparing the rules, that VictoryLand would already have a facility suitable for electronic bingo operations at the time the bingo amendment was passed, and that electronic bingo would be

profitable – **and then**, based upon that prophecy, VictoryLand and Mr. McGregor entered into an agreement with Gray Jr. in 1983 (five years before he was even licensed to practice law in Alabama and twenty-four years before he would become a partner in his father's law firm), under which VictoryLand would patiently make shareholder payments to Gray [Jr.'s] father and make retainer and legal fee payments to the Gray Law Firm for more than twenty years in the hope that once the predicted events came to pass, Gray Jr. would be able to prevent anyone but VictoryLand's lawyers from having any input into the drafting of the rules that would be promulgated by Sheriff Warren in order to ensure that Lucky Palace could not comply with the rules so that VictoryLand could be the only operator of electronic bingo games in Macon County, and that Gray Jr. would agree to the scheme so that his father's law firm could profit and his father's estate would increase and, as a result, when his father eventually died, Gray Jr. might stand to share in the inheritance of that estate.

(Doc. # 475, at 19 (internal record citations omitted).)

Plaintiffs, however, assert that beginning in January 2003[38] these payments – legal fees and retainer payments to the Gray Law Firm, and shareholder dividends to Mr. Gray Sr. – were transformed into offerings of "things of value" upon Mr. Gray Jr. with the intent to corruptly influence him with respect to the promulgation and amendment of the Rules governing electronic bingo in Macon County, and that Mr. Gray Jr. accepted these "pecuniary benefits" with the understanding that his work on the Rules would be corruptly influenced. As set out in the margin, Plaintiffs give three reasons why each of these

---

[38] The January 2003 date is gleaned from the complaint. (*See, e.g.*, 6th Am. Compl. ¶¶ 88, 89, 92.) Plaintiffs' summary judgment briefs do not refer to January 2003, as the onset of the alleged bribery, but rather suggest that the onset of the bribery occurred between November 4, 2003, when the voters passed Amendment No. 744, and the time leading up to the promulgation of the Original Rules, which was December 5, 2003. (*See, e.g.*, Doc. # 464, at 30-32.)

54

payments should be viewed as valuable to Mr. Gray Jr.[39]  Plaintiffs further argue that they have adduced ample circumstantial evidence that Mr. McGregor and VictoryLand "intended to corruptly influence the rule[-]drafting process and that [Mr.] Gray Jr. was aware of those intentions," and that this evidence satisfies the intent element of their bribery claims.  (Doc. # 464, at 33.)

### iv.    Alabama Bribery Law

The overarching issue is whether these payments – retainer payments and legal fees to the Gray Law Firm, and dividend payments to Mr. Gray Sr. – were "things of value" conferred upon Mr. Gray Jr. with the intent to corruptly influence his actions in the rule-drafting process and were "pecuniary benefits" accepted by Mr. Gray Jr. with the

---

[39] First, Plaintiffs assert that by using his position as Sheriff Warren's attorney to draft Rules favoring VictoryLand, Mr. Gray Jr. gave VictoryLand a financial "pump" so as to ensure that "a stream of revenue" in the form of continued legal fees from VictoryLand and Mr. McGregor to Mr. Gray Jr.'s law firm.  (Doc. # 464, at 29.)  Plaintiffs argue that this anticipated continual stream of revenue was a "thing of value" in Mr. Gray Jr.'s mind.  (Doc. # 464, at 30.)

Second, Plaintiffs assert that VictoryLand's satisfaction of past-due retainer payments, and the prospect of continued timely retainer payments to the Gray Law Firm were "things of value" to Mr. Gray Jr., which have only been possible because of the profits raked in from VictoryLand's electronic bingo operations.  (Doc. # 464, at 30.)  Plaintiffs assert that these things – the expectation of future legal fees from VictoryLand to the Gray Law Firm, the prospect of future retainer payments from VictoryLand to the Gray Law Firm, and VictoryLand's satisfaction of overdue retainer payments to the Gray Law Firm – had value to Mr. Gray Jr. because as an associate of the firm, Mr. Gray Jr.'s "livelihood depended on the firm's success, and his salary and bonuses were based on the firm's productivity."  (Doc. # 464, at 28-30.)  Thus, according to Plaintiffs, the Gray Law Firm and hence Mr. Gray Jr. "were clearly dependent on VictoryLand and [Mr.] McGregor for continued legal fees."  (Doc. # 464, at 29.)

Third, Plaintiffs point out that increases in VictoryLand's revenues resulted in increases in the amount of Mr. Gray Sr.'s shareholder dividend payments, and argue that these increased payments, as well as the expectation of increased future payments, were "things of value" to Mr. Gray Jr.  (Doc. # 464, at 31.)  They argue that "[a]ny increase in VictoryLand's revenues would allow VictoryLand to continue as a viable business and result in a direct increase in [Mr.] Gray Sr.'s dividend payments" (Doc. # 464, at 31), and that it should be inferred that the "unprecedented increases in [Mr. Gray Sr.'s] shareholder dividends after electronic bingo started at VictoryLand" were "things of value" in the mind of Mr. Gray Jr. for purposes of Alabama's bribery statute.  (Doc. # 464, at 32.)

understanding that his actions would be corruptly influenced regarding his role in the formulation of the bingo Rules.  Before analyzing the parties' competing positions on this issue, the parameters of the law must be established.

Pursuant to § 13A-10-60(a)(2), a public servant's acceptance of a "pecuniary benefit" with the understanding that his judgment will be corruptly influenced is a felony.  A "[p]ecuniary benefit" is defined as a "[b]enefit in the form of money, property, commercial interests or anything else the primary significance of which is economic gain." § 13A-10-60(b)(2).  Section 13A-10-61(a)(1), in turn, prohibits the offering, conferring, or agreeing to confer any "thing of value" to corruptly influence a public servant's exercise of judgment.  The phrase "thing of value" is not defined by statute.

Two decisions relied upon Plaintiffs (Doc. # 440, at 81-84), however, illustrate that Alabama courts have broadly interpreted a "thing of value."  *See Caruthers v. State*, 74 Ala. 406 (1883); *Hammond v. State*, 354 So. 2d 280 (Ala. Crim. App. 1977).  In *Hammond*, the defendant, who had served as the Alabama Public Service Commission ("PSC") president, was convicted under a former version of the Alabama bribery statute for inciting the vice president of South Central Bell Telephone Company ("Bell") to give him a "thing of value" to influence the defendant's vote on a telephone rate increase.  *See* 354 So. 2d at 283.  The defendant demanded that Bell's vice president remove a third party's vending machines from the telephone company's plant.  *See id.*  The defendant allegedly made the demand because the third party vendor had refused to pay the defendant a kickback for helping it secure the

vending machine business in Bell's plant. *Id.* at 283, 288. The issue was whether the "doing

of an act" – the removal of the vending machines – was a "thing of value, within the bribery

statute." *Id.* at 288.

*Hammond* held that whether a specified thing has value under Alabama's bribery

statute requires a subjective examination: "[T]he requirement of value is satisfied if the thing

has sufficient value in the mind of the person concerned so that his actions are influenced."

*Id.* at 288-89 (citation and internal quotation marks omitted). Accordingly, it is not a

prerequisite that the "thing of value" have "pecuniary or intrinsic value." *Id.* at 289. "Thing

of value" also includes "value in the sense of a personal advantage of some sort to be derived

by the recipient." *Id.*; *see also McDonald v. State*, 329 So. 2d 583, 595 (Ala. Crim. App.

1975) ("The test of value is the desire of a person for the thing in question."). "The word

*thing* does not necessarily mean a *substance*. In its more generic signification it includes an

act, or action." *Hammond*, 354 So. 2d at 289 (citation and internal quotation marks omitted).

In this regard, the *Hammond* court reiterated that in prior cases, it had construed "thing of

value" to include intangible items, such as offers to provide free labor and sexual favors. *See*

*id.* (citing *Caruthers*, 74 Ala. at 406; *McDonald*, 329 So. 2d at 583). Applying these

principles, the *Hammond* court held that the evidence was sufficient to prove that the

defendant "intended that his threat, transmitted through [Bell's vice president], would cause

the [third party vendor] to give in and pay him money." *Id.* The vice president's action of

removing the vending machines, thus, could "be considered a 'thing of value' to [the defendant]." *Id.*

In *Caruthers*, cited in *Hammond*, the defendant was convicted of offering a bribe to a juror to "chop cotton a week" in return for an acquittal, in violation of a prior version of Alabama's bribery statute. 74 Ala. at 406. At trial, there was evidence that at the close of the case, but prior to deliberations, the defendant signed a note and delivered it to a juror; the note read, "if you will clare [sic] me Will chop cotton a week." *Id.* The court held that "[t]he promise of the defendant to give his *labor* or *services*, as a reward for the corrupt violation of the juror's sworn duty, is a 'gift, gratuity, or thing of value.'" *Id.* And, in *McDonald*, relying on *Caruthers*, the Alabama Court of Criminal Appeals held that "[t]o constitute an offer to accept a bribe, the thing solicited must be valuable and may be some act." 329 So. 2d at 595. "The Alabama statute condemns an offer to accept a bribe by promise of a 'thing of value,' and a conviction may be had on proof that an offer to accept by an accused was made in exchange for his official partiality in matters pending before him." *Id.* (interpreting prior version of bribery statute). Based upon those principles, the Alabama Court of Criminal Appeals held that the judge sought a "thing of value" when he solicited sexual favors in exchange for "maybe tak[ing] care of" a defendant's case pending on the judge's docket. *Id.*

Plaintiffs also contend that *United States v. Gorman*, 807 F.2d 1299 (6th Cir. 1986) although it addressed a federal bribery statute, is instructive. (Doc. # 464, at 30.) *Gorman*

58

involved an interpretation of "anything of value" as used in former 18 U.S.C. § 201(g),[40] now

codified as § 201(c)(1)(B).  The defendant, a former federal prosecutor, argued that the

promise of future employment with a private business, would not have been "a thing of value

because any compensation received would have been for additional duties performed."

*Gorman*, 807 F.2d at 1305.  The Sixth Circuit disagreed.  "The purpose of Section 201(g) is

to reach all situations in which a government agent's judgment concerning his official duties

may be clouded by the receipt of an item of value given to him by reason of his position."

*Id.* at 1304.  The focus must "be placed on the value which the defendant subjectively

attaches to the items received."  *Id.* at 1304-05.  The promised salary would have been three

times the defendant's then-current salary, and the defendant was to remain in his present job

for a two-year period, in part so that he could refer cases to his future employer.  *Id.* at 1305.

Given that the defendant was suffering severe financial difficulties and that "'thing of value'

must be broadly construed," the Sixth Circuit held that "such future employment would

clearly be a thing of value for purposes of Section 201(g)."  *Id.*

In addition to reviewing the cases relied upon by the parties, the court has reviewed

cases cited in the annotations to § 13A-10-61.[41]  In *Williams v. State*, 383 So. 2d 547 (Ala.

---

[40] Section 201(g) provided that "[w]hoever, being a public official, . . . otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him [shall be guilty of an offense]."

[41] Most of the cited decisions in the annotations involved interpretations of prior versions of Alabama's bribery statute.  Those decisions nonetheless are instructive on how Alabama courts construe the state's bribery statute.

Crim. App. 1979), *aff'd*, 383 So. 2d 564 (Ala. 1980), in exchange for his needed approval of a proposed legislative bill legalizing dog racing in Macon County, a state senator was promised an appointment as the attorney for the racing commission. *Id.* at 551-52. The state senator was told that there was "no limit on the salary," *id.* at 551, that the salary could begin at $25,000 the first year with a raise to $50,000 the second year, *id.* at 553, and that the salary would require "about two hours a week working for the commission," *id.* at 554. Notwithstanding this offer, the state senator refused to give his approval for the bill, and the offeror was convicted of bribery. *See id.* The Alabama Court of Criminal Appeals held that the state senator had been offered or promised money or a "thing of value" in an effort "to influence him in the performance of his public and official duties." *Id. Williams* further explained that "[t]he statute condemns the unilateral offer or promise of a bribe." *Id.* at 557. "Proof of a bilateral agreement, that is, that the officer accepted the bribe, is not required" to sustain a conviction. *Id.*; *see also McDonald v. Headrick*, 554 F.2d 253, 254-55 (5th Cir. 1977) (rejecting the defendant's argument on 28 U.S.C. § 2254 review that the Alabama bribery statute required a "bilateral bribery agreement" and holding that there was sufficient evidence to support his bribery conviction for agreeing to accept sexual favors from a female whose case was pending before him in exchange for favorable treatment).

Moreover, in *Ex parte Montgomery*, 12 So. 2d 314 (Ala. 1943), a monetary payment was made to the sheriff. The petitioner-attorney "was a willing vehicle by which money was carried to the sheriff and paid to him in person or used in paying a debt of the sheriff on

which this petitioner was an indorser, and that this was done to influence him in the performance of an official duty."[42]  *Id.* at 318.

Additionally, the following cases demonstrate the type of conduct found prohibitive under former versions of Alabama's bribery statutes.  *See United States v. Chatham*, 677 F.2d 800, 801-04 (5th Cir. 1982) (affirming RICO judgment of conviction predicated upon a violation of a former version of Alabama's bribery statute, where the president of a building testing and inspection company offered cash payments to a mayor in hopes of securing a testing contract on a contemplated new public hospital and fictional new city hall); *Leonard v. State*, 484 So. 2d 1185, 1186 (Ala. Crim. App. 1985) (on appeal from a judgment of conviction under § 13A-10-61, for offering police officers $1,000 in cash, a Lincoln Continental, and future monthly payments, in exchange for the police officers' ignoring the defendant's drug operation and "bust[ing]" those who interfered with it); *Pope v. State*, 365 So. 2d 369, 370 (Ala. Crim. App. 1978) (holding that the evidence was sufficient to support a bail bondsman's conviction for bribery for offering a police officer $1,000 to supply him

---

[42] *Ex parte Montgomery* involved review of the Board of Commissioners of the Alabama State Bar's decision to suspend the petitioner-attorney from the practice of law for two years, based in part upon a finding that the attorney's conduct amounted to the offense of bribery under Alabama law.  12 So. 2d at 315.  The attorney argued that he had not committed bribery because the payment that he had made to the sheriff was "to induce the sheriff to perform a legal duty which he should have done [but refused to do] without compensation," and that it was "not corrupt to pay a sheriff to perform a legal duty which he refused to do without compensation, though the sheriff may be corrupt in so demanding."  *Id.* at 317.  The court rejected that argument.  Observing that "corruption is an element of the offense" of bribery, the court explained that, because it was "corrupt" for the sheriff to receive the payment, the attorney's making of the payment "must also be treated as corrupt."  *Id.*; *see also Maddox v. State*, 520 So. 2d 143, 146 n.5 (Ala. Crim. App. 1986) (explaining that "[e]vidently" in *Ex parte Montgomery*, the attorney had given money to the sheriff's "campaign with the understanding that [the sheriff] would let him appoint an influential deputy after the election").

and others with "inside information" to protect a contemplated prostitution business to be disguised as an "escort service," as well as a percentage of the business's expected profits); *Fuller v. State*, 115 So. 2d 110, 111 (Ala. Ct. App. 1958) (affirming chief deputy sheriff's judgment of conviction for bribery for accepting periodic monetary payments to permit the operation of a bordello); *Jordan v. State*, 156 So. 642 (Ala. Ct. App. 1934) (affirming a state senator's judgment of conviction for demanding money for his vote or official influence concerning a bill that had been introduced in the state senate).

### v.    Application

It is clear from the foregoing cases that a "thing of value," in part because it takes into account subjective viewpoints, encompasses a wide variety of things from money and property (such as cars) to services (such as labor and sex) and other acts (removal of vending machines).  Legal fees, retainer payments, and shareholder dividends are no doubt pecuniary in nature.  There does not appear to be a serious dispute that, excised from the statute and standing alone, any "thing of value" and "pecuniary benefit" include the monetary payments at issue in this case.  Rather, the more salient dispute centers on whether the legal fees,

retainer payments, and shareholder dividends (1) were conferred *upon Mr. Gray Jr.*[43] (2) with the intent to corruptly influence his role in the rule-drafting process, *see* § 13A-10-61(a)(1), and similarly whether (1) Mr. Gray Jr. accepted the pecuniary benefits (2) based upon an understanding that his role in the rule-drafting process would be corruptly influenced, *see* § 13A-10-61(a)(2).

In each of the Alabama decisions cited, there was evidence that the alleged bribe was conferred directly upon the bribee with the intent to corruptly influence the bribee's actions. Of course, whether there was an intent to corruptly influence (or an agreement to be corruptly influenced) can be proven by not only direct, but also circumstantial, evidence. *See generally*

---

[43] On one hand, it cannot be ignored that Mr. Gray Jr. – the alleged bribee – was not the direct recipient of any of these alleged unlawful payments. The Gray Law Firm received the legal fees and retainer payments, and Mr. Gray Jr.'s father was the shareholder who received dividend payments from VictoryLand. The facts, thus, stand in direct contrast to each of the Alabama decisions cited herein. In those cases, the individual who accepted the bribe or the individual who was offered a bribe was to be directly benefitted. In *Hammond*, the PSC president expected that a direct benefit – monetary kickbacks from the third party vendor – would flow to him from the removal of the vending machines from the telephone company plant. *See* 354 So. 2d at 289. In *Caruthers*, the bribed juror was offered free labor from the defendant, *see* 74 Ala. at 406; in *Williams*, the state senator was promised a paid appointment as an attorney, *see* 383 So. 2d at 551-52; in *McDonald*, the defendant judge agreed to accept sexual favors, *see* 554 F.2d at 254-55; in *Ex parte Montgomery*, the sheriff received a monetary payment, 12 So. 2d at 317; in *Chatham*, the mayor was offered cash payments, 677 F.2d at 801; in *Leonard*, police officers were offered cash and a car, *see* 484 So. 2d at 1186; similarly, in *Pope*, police offers were promised cash payments, *see* 365 So. 2d at 370; and in *Fuller*, a sheriff's chief deputy accepted cash payments, *see* 115 So. 2d at 111.

On the other hand, as Plaintiffs point out, other circuits interpreting different bribery laws have concluded that payments to family members can amount to bribes, and so they can. In *United States v. Frega*, 179 F.3d 793 (9th Cir. 1999), where the defendants' bribery conviction under California law was affirmed, "payments and benefits – ranging from automobiles, car repairs, money orders, an apartment, health club memberships, and a queen-sized bed – [were given] to the judges or *members of their families*." *Id.* at 807 (emphasis added). In *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007), the Third Circuit recognized that "providing a loan to a public official (or his friends or family) that would have otherwise been unavailable . . . may constitute a bribe." *Id.* at 285; *see also United States v. Krilich*, 159 F.3d 1020, 1024 (7th Cir. 1998) (the mayor's son won $40,000 in a rigged hole-in-one golf contest).

*Jackson v. State*, 791 So. 2d 979, 1017 (Ala. Crim. App. 2000) ("Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses in the circumstances as developed by and through the evidence." (citations and internal quotation marks omitted)).  For the reasons to follow, it is the absence of any evidence of a connection between the *payments* themselves and the promulgation of the Rules that is fatal to Plaintiffs' RICO bribery claims.

Although not cited by either party, *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990), contains a discussion pertinent to the present issue.  There, the issue was whether legal fees admittedly paid in part for legitimate services also could be considered a bribe, in violation of 18 U.S.C. § 201(b)(2).[44]  *See id.* at 671-72, 682–84.  It explained that a jury could have found that the payment of legal fees was paid "in part as compensation for legal services rendered by the law firm," and in part was a payment that a United States congressman demanded be paid to his son's law firm in exchange for his "assistance as a public official in securing favorable action from other public officials." *Id.* at 683.  There was evidence that the United States congressman "expected to be influenced by the payment to render such assistance." *Id.*  The Second Circuit concluded that a "payment may be found to constitute a bribe . . . where it is sought and paid for both lawful and unlawful purposes." *Id.*  Hence, "[a] valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability." *Id.*  However, to amount to

---

[44] *Gorman*, relied upon by Plaintiffs, *see* 807 F.2d at 1299, and *Biaggi* involved the same federal statute pertaining to bribery of public officials and witnesses.

bribery, there must be evidence that the "unlawful purposes were of substance, not merely vague possibilities that might attend an otherwise legitimate transaction." *Id.* Also, the court cited *United States v. O'Keefe*, 825 F.2d 314 (11th Cir. 1987), as an example of where a payment was made to service providers who also held public office, and the evidence was "insufficient to show any purpose for [the] payment other than a lawful one." *Id.*

In *O'Keefe*, two city officials, who also were partners in a private consulting business, were convicted by a jury for demanding a $32,500 monetary payment in exchange for their votes on city resolutions, in violation of the Hobbs Act. *See* 825 F.2d at 317, 319-20. The district court, however, granted the city officials' motions for judgment of acquittal, and the government appealed. *See id.* at 317. On appeal, the Eleventh Circuit explained that there was proof of the payment and the votes, but the issue was "whether the payment was for official acts or legitimate services to which the defendants were entitled compensation." *Id.* at 320. The city officials argued that the $32,500 payment "was reasonable compensation for legitimate services rendered," namely consulting fees performed as part of their private business. *See id.* at 315 & 317. The Eleventh Circuit agreed. Because the "only evidence" was that lawful services were performed and thus that the defendants had a claim of right to the money received, proof of an extortionist nexus between the votes and payments was missing. *Id.*

*Biaggi*'s discussion of dual purpose payments and *O'Keefe*'s analysis of the absence of an evidentiary link connecting the monetary payment to an illegal purpose illustrate why

65

the same conclusion reached in *O'Keefe* is mandated in this case.  Moreover, there are notable factual distinctions between this case and the Alabama bribery cases that further highlight the failings in the evidentiary record on the issue of bribery.

The first consideration is the purpose of the retainers, legal fees, and shareholder dividends.  It is significant what Plaintiffs have not argued:  that the payments are devoid of any valid purpose whatsoever.  Plaintiffs do not dispute, and evidence supports, that for almost a quarter of a century – decades before the inception of electronic bingo in Macon County – Mr. Gray Sr. and the Gray Law Firm have been employed as legal counsel by Mr. McGregor and/or VictoryLand, VictoryLand has paid the Gray Law Firm quarterly retainer fees, and Mr. Gray Sr. has received dividend payments as a VictoryLand minority shareholder based upon an invariant percentage of ownership.  (Doc. # 440; Doc. # 475, at 17.)  In fact, it is not argued that, prior to January 2003, any of the payments at issue were bribes[45]; those payments thus are not alleged to be things of value or pecuniary benefits, within the parameters of § 13A-10-61(a).  Hence, there is no argument of a bribery connection between Mr. Gray Sr.'s *original* purchase of VictoryLand stock in 1983, or the onset in 1983 of the legal relationship between Mr. McGregor/VictoryLand and the Gray Law Firm, *and* Mr. Gray Jr.'s involvement in the formulation of bingo Rules, some twenty

---

[45] It is not disputed that VictoryLand is a lucrative client of the Gray Law Firm.  (Gray Sr. Dep. 53-54, 58-59.)  Over the past two decades, the Gray Law Firm has billed and received payments from VictoryLand for specified legal representation of VictoryLand in litigation and other matters.  (Ex. 4 to Doc. # 445; Gray Sr. Dep. 47; McGregor Dep. 77, 84.)  Mr. Gray Sr. has represented VictoryLand on non-bingo legal matters continuously since that date.  (Gray Sr. Aff. 1-2; McGregor Dep. 198.)

years later.  Nor is there any evidence or argument that the Grays foresaw or anticipated the high profitability of electronic bingo, which has exponentially increased the share of profits payable on Mr. Gray Sr.'s minority interest in VictoryLand.  While Plaintiffs point out that the timing of the repayment of the overdue retainer payments coincided with the onset of electronic bingo at VictoryLand, they have not argued or pointed to any evidence suggesting that the past-due retainer payments were not at that time legally owing and due.[46]  Plaintiffs also have not contended that the anticipated future retainer payments would differ in kind or amount from those paid since 1984, or would not be supported by any valuable and legal consideration.  Moreover, Plaintiffs have not argued that there is anything illegal about the method by which Mr. Gray Sr.'s dividend payments from VictoryLand has been calculated, *i.e.*, based upon his unchanging percentage of ownership, or that Mr. Gray Sr.'s dividend payments at any time have not been received in proportion to his shareholding.

Similarly, Plaintiffs have not argued or cited evidence that there was an expectation that future legal fees would not be incurred legitimately for services actually performed by the Gray Law Firm or that future legal fees would exceed the value of legal services rendered by the law firm, or would be based upon fraudulent billing.  Moreover, no contention has been advanced that the Gray Law Firm's simultaneous acceptance of legal fees and retainers is unlawful.  *See, e.g.*, *Biaggi*, 909 F.2d at 682 ("[I]t is not uncommon in the practice of law

---

[46] In close temporal proximity to when the Original Rules were passed, VictoryLand paid the Gray Law Firm four payments "to catch up on past quarterly payments."  (Doc. # 460 ¶ B26.)

for legitimate legal fees to be paid in addition to an annual retainer where a law firm handles special tasks and accomplishes significant results.").

In short, it is uncontroverted that the payments prior to January 2003 were lawful. Plaintiffs also have not contended that the lawful components of those payments wholly ceased in January 2003. The alleged payments thus differ markedly from those in the Alabama cases cited above where a payment was made or promised to a public official who obviously had no colorable or lawful claim to any of it. In *Fuller* and *Pope*, for example, the cash payments clearly were not offered to law enforcement officials in exchange for lawful services. *See, e.g.*, *Fuller*, 115 So. 2d at 111 (monetary payments made to a law enforcement officer in exchange for protection of a prostitution operation); *Pope*, 365 So. 2d at 370 (same). The alleged offer of future legal fees also is distinguishable from the bribe in *Williams*, where an arguably lucrative annual salary was offered to a state senator in exchange for minimal work (two hours of work a week). *See* 383 So. 2d at 554. Nor has any case been cited where, similar to here, there had been a long history of lawful payments, which suddenly turned corrupt. *Cf. United States v. McNair*, 605 F.3d 1152, 1196 (11th Cir. 2010) (affirming 18 U.S.C. § 666 bribery convictions and noting that "[t]here was no evidence of gifts to these 'friends' before the sewer project began").

*Biaggi* teaches that the existence of a valid purpose for payment does not necessarily mean that the alleged bribee is home free, as a payment can constitute a bribe when lawful and unlawful (*i.e.*, bribery) purposes for the payment coincide. But, here, evidence of any

unlawfulness is glaringly absent.  Plaintiffs posit that there is ample evidence that Mr. McGregor's and VictoryLand's agents had a hand in drafting the Rules, which at every angle and amendment clearly favored VictoryLand.   But, even accepting Plaintiffs' argument as true – *i.e.*, that Mr. McGregor and VictoryLand "intended to corruptly influence the rule-drafting process and that [Mr.] Gray Jr. was aware of those intentions" (Doc. # 464, at 33) – there is no evidence, direct or circumstantial, that the payments were tainted with an intent to corruptly influence Mr. Gray Jr.  There is, similar to the scenario in *O'Keefe*, evidence of payments (retainers, legal fees, and shareholder dividends) and Rules favorable to VictoryLand, but what is lacking is any evidence that lawful services were not performed for the legal fees, that the retainers were unlawful, that the fees were excessive, or that Mr. Gray Sr. was not legitimately entitled to the dividends based upon his ownership interest in VictoryLand.  In other words, there is no evidence from which to infer that all of a sudden in 2003, Mr. McGregor turned these payments – legal fees and retainer payments to the Gray Law Firm, and shareholder dividends to Mr. Gray Sr. – into offerings of "things of value" upon Mr. Gray Jr. with the intent to corruptly influence him with respect to the promulgation and amendment of the Rules governing electronic bingo in Macon County, or that Mr. Gray Jr. accepted these "pecuniary benefits" with the understanding that his work on the Rules would be corruptly influenced.

Indeed, the evidence tends in the opposite direction.  In spite of the birth of bingo, the retainer has remained unchanged, Mr. Gray Sr.'s ownership percentage has held steady

(though the returns have increased astronomically), and Mr. Gray Jr. started the bingo project with no VictoryLand stock and continues in that poor state.  On this record, to infer a bribery nexus between the Rules and the payments requires speculation far too excessive to overcome summary judgment.  *See Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988) (noting that an inference is not reasonable if it is based upon "speculation and conjecture").  In other words, there is insufficient evidence from which it reasonably can be inferred that the "unlawful purposes were of substance, not merely vague possibilities that might attend an otherwise legitimate transaction."  *Biaggi*, 909 F.2d at 683.

It should also be noted here that discovery has been liberally permitted in this case.  (*See, e.g.*, Mem. Op. & Order, at 21 (Doc. # 144) ("Because the case is moving forward on all claims, the parties can expect full discovery.").)  This is why earlier in the litigation, this court reasoned that prior to full discovery, it could not assume either that Mr. Gray Jr. did or did not accept pecuniary benefits, within the meaning of § 13A-10-61(a), but at the same time it could not "ignore the allegations that he *did* receive pecuniary benefits."  (Doc. # 252, at 27.)  Discovery was permitted to ferret out "whether Mr. Gray Jr. did receive pecuniary benefits – evidence the existence or nonexistence of which is unknown to this court."  (Doc. # 252, at 28.)  Despite the expansion in scope, discovery has not uncovered any significantly probative evidence that permits the RICO bribery theory to survive summary judgment.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' RICO bribery claim.

**b.    Honest Services Mail and Wire Fraud: § 1962(c)**

**i.    Nature of the Theory**

In Count I, Plaintiffs bring a RICO claim against Mr. McGregor, VictoryLand and Sheriff Warren for a violation of § 1962(c), based on predicate acts of honest services mail and wire fraud, which, pursuant to § 1964(c), would entitle them to recover treble damages. Plaintiffs allege that the predicate acts of mail and wire fraud defrauded the citizens of Macon County of the honest services of Mr. Gray Jr. and Sheriff Warren, and defrauded Sheriff Warren of the honest services of Mr. Gray Jr., *see* §§ 1341, 1343, 1346.  (6th Am. Compl. ¶ 120.)  Hence, there are three alleged schemes to defraud.

First, Plaintiffs allege that Defendants engaged in a scheme or artifice to deprive the public of Sheriff Warren's honest services by ensuring that the Rules were promulgated for the benefit of VictoryLand, and not the public.  Specifically, Plaintiffs claim that Sheriff Warren "turn[ed] a blind eye" to the conflicts of interest created by Mr. Gray Jr.'s and Mr. McGregor's involvement in the rule-drafting process. (6th Am. Compl. ¶¶ 120-26.) Second, Plaintiffs allege that Defendants engaged in a scheme or artifice to deprive the public of Mr. Gray Jr.'s honest services following the ratification of Amendment No. 744.  (6th Am. Compl. ¶ 129.)  Plaintiffs allege that Mr. Gray Jr. drafted the Rules to further his own personal interests, that those personal interests created conflicts of interest that Mr. Gray Jr. did not disclose to the public, and that the Gray Law Firm and Mr. Gray Sr. failed to prevent the conflicts of interest.  (6th Am. Compl. ¶¶ 128-30.)  Third, Plaintiffs aver that Defendants

engaged in a scheme or artifice to deprive Sheriff Warren of the honest services of Mr. Gray Jr., who did not fully disclose the conflicts of interest to Sheriff Warren or advise Sheriff Warren that VictoryLand's agents drafted the Rules.[47]   (6th Am. Compl. ¶¶ 120, 131.)

Mr. McGregor and VictoryLand allegedly participated in these three schemes to defraud in two principal ways.  First, they directed their attorneys Mr. Bolton and Mr. Johnston to draft Rules (and amendments thereto), highly favorable to VictoryLand and prohibitively exclusionary to competitors, for Sheriff Warren's promulgation.  Second, they bestowed benefits (retainer payments and legal fees) on the Gray Law Firm and Mr. Gray Sr. so that Mr. Gray Jr. would advise Sheriff Warren to enact the Rules drafted by VictoryLand's agents.  (6th Am. Compl. ¶¶ 123, 129, 132.)  It further is alleged that Mr. McGregor and VictoryLand used the mails and interstate wires in furtherance of the schemes to defraud, namely, by exchanging with Mr. Gray Jr. proposed Rules governing bingo by email and facsimile, and mailing numerous checks over a five-year period to the Gray Law Firm and/or Mr. Gray Jr.  (6th Am. Compl. ¶¶ 134-35.)  Plaintiffs also contend that Sheriff Warren used the mails on at least two occasions, sending letters to Mr. Bracy and returning Lucky Palace's application for an Operator's License.  (Doc. # 465, at 23.)

Plaintiffs contend that Defendants' honest services mail and wire fraud has resulted in Rules that favor VictoryLand, but that have prevented Plaintiffs from obtaining the necessary licenses for operating and conducting electronic bingo in Macon County.  As a

---

[47] Peculiarly, Sheriff Warren is both a victim and a defendant on this theory in the RICO count.

result, Plaintiffs allege that Lucky Palace has been injured in the form of lost profits and that the Plaintiff Charities have suffered injuries based upon the semi-annual contractual payments of $21,000 they would have received from Lucky Palace had it received a license to operate electronic bingo in Macon County.  (Doc. # 445, at 37-38; 6th Am. Compl. ¶¶ 143, 145-46.)

### ii.    Initial Observation: *Skilling*

RICO "takes aim at 'racketeering activity,' which it defines as . . . any act 'indictable' under numerous specific federal criminal provisions, including mail and wire fraud." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481 (1985) (citing § 1961(1)).  Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citation and internal quotation marks omitted).  The terms "scheme or artifice to defraud," as used in the mail and wire fraud statutes, "include[] a scheme or artifice to deprive another of the intangible right of honest services."  § 1346.

This term, § 1346 was under scrutiny in three cases pending before the United States Supreme Court.  In *Skilling v. United States*, No. 08-1394, 2010 WL 2518587 (June 24, 2010), the Court examined the high-profile conviction of Jeffrey Skilling, a former Enron top executive, who was convicted of a conspiracy to defraud Enron's shareholders of their right to his honest services "by misrepresenting the company's fiscal health, thereby artificially

inflating its stock price," and benefitting financially because his compensation was tied to the performance of Enron's stock. *Id.* at *31. The issue was "whether Skilling's conspiracy conviction was premised on an improper theory of honest-services wire fraud." *Id.* at *23. Skilling argued that § 1346 was unconstitutionally vague and, alternatively, that his conduct did not fall within the statute's reach. *Id.*

The Supreme Court did not invalidate § 1346, but rather held that it "encompass[es] only bribery and kickback schemes," thereby saving the statute from a due process void-for-vagueness challenge. *Id.* at *30. In reaching its holding, the Court examined the origin of the honest services doctrine, in particular, Congress' enactment of § 1346 in response to the Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), which "stopped the development of the intangible-rights doctrine in its tracks." *Id.* at *25. "Congress responded swiftly" to *McNally*, enacting § 1346 to include in the definition of "scheme or artifice to defraud" schemes or artifices "to deprive another of the intangible right of honest services." § 1346. *Id.* The *Skilling* Court explained: "While the honest-services cases preceding *McNally* dominantly and consistently applied the fraud statute to bribery and kickback schemes – schemes that were the basis of most honest-services prosecutions – there was considerable disarray over the statute's application to conduct outside that core category." *Id.* at *26. "It has long been our practice . . . before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting

construction." *Id.* And, in view of § 1346's history and pre-*McNally* decisions, the Court opined:

> [T]here is no doubt that Congress intended § 1346 to reach at *least* bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes only the bribe-and-kickback core of the pre-*McNally* case law.

*Id.* at *28. Under this limiting construction of § 1346, "Skilling did not commit honest-services fraud." *Id.* at *31. The government had not alleged that Skilling "solicited or accepted side payments from a third party in exchange for making the [charged] misrepresentations," and, thus, he did not conspire to commit honest services fraud.[48] *Id.*

The Supreme Court also rejected the government's argument that § 1346 should proscribe "undisclosed self-dealing by a public official or private employee – *i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interest of those to whom he owes a fiduciary duty." *Id.* at *28 (internal quotation marks omitted). "In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, . . . a reasonable limiting construction of § 1346 must exclude this amorphous category of cases." *Id.* at *29.

---

[48] The court remanded the question of whether the error was harmless in light of other theories that could have supported Skilling's conspiracy conviction. *Skilling*, 2010 WL 2518587, at *31. Additionally, the other two cases before the Court involving § 1346 issues were remanded for further consideration in light of *Skilling*. *See Black v. United States*, No. 08-876, 2010 WL 2518593 (U.S. June 24, 2010); *Weyhrauch v. United States*, No. 08-196, 2010 WL 2518696 (U.S. June 24, 2010).

The issue is the effect *Skilling*'s holding has on Plaintiffs' RICO honest services mail and wire fraud claim.  The answer is that *Skilling*, in large part, dooms the claim.  Plaintiffs' three § 1346 theories, as discussed, focus primarily on honest services fraud by means of self-dealing and undisclosed conflicts of interests resulting in personal gain to VictoryLand and Mr. McGregor (in the form of favorable electronic bingo Rules).  These theories fall squarely within the category of cases rejected by the *Skilling* Court as coming within § 1346's confines.

Confusingly, however, Plaintiffs also allude to honest services fraud predicated on VictoryLand's and Mr. McGregor's alleged bribery of Mr. Gray Jr., a purported public official.  While bribery of a public official fits within the scope of § 1346, as narrowed by *Skilling*, the theory nonetheless fails for the reasons discussed in the preceding section.  It is not necessary to analyze further *Skilling*'s impact on Plaintiffs' theories, the impact of which has not been briefed, because there is another reason in the civil RICO context, which has been fully briefed, why the honest services mail and wire fraud theory cannot survive summary judgment.  The summary judgment briefing, which preceded *Skilling*, focused on § 1964(c)'s proximate cause requirement (a requirement in civil, not criminal, RICO cases), and as explained below, evidence of proximate cause is lacking.  In other words, assuming *arguendo* that some part of Plaintiffs' RICO honest services mail and wire fraud claim survives *Skilling*, Defendants nonetheless are entitled to summary judgment because Plaintiffs' injuries were not proximately caused by the RICO violation.

76

### iii.    Grounds for Summary Judgment

In addition to satisfying the four elements of § 1962(c), *Williams*, 465 F.3d at 1282,

civil RICO plaintiffs also must demonstrate the demands of § 1964(c) to merit a private right

of action for treble damages; namely, RICO plaintiffs must show that they suffered an injury

to their "business or property by reason of a violation" of RICO's substantive provisions (*i.e.*,

§ 1962), § 1964(c).  In *Williams*, the Eleventh Circuit referred to § 1964(c) as a "statutory

standing" requirement, rather than as a standing requirement under Article III of the United

States Constitution.  465 F.3d at 1291.

Mr. McGregor and VictoryLand raise two main challenges to Plaintiffs' RICO honest

services mail and wire fraud claim.[49]  First, they argue that Plaintiffs lack RICO standing, as

required by § 1964(c), because they have failed to show both (1) an injury to "business or

property" and (2) that such injury was "by reason of" the substantive RICO violation.

Second, as to § 1962(c)'s four elements, they contend that Plaintiffs' honest services mail

and wire fraud claim fails on the first element:  "[N]one of the conduct that Plaintiffs have

imputed to Defendants, even if it were true, constitutes the deprivation of honest services by

mail or wire fraud under 18 U.S.C. § 1346."[50]  (Doc. # 440, at 92-93.)  The latter argument

implicates *Skilling*, and the negative effect of *Skilling* on Plaintiffs' honest services mail and

---

[49]  Again, Mr. McGregor's and VictoryLand's arguments apply equally to Sheriff Warren.
Accordingly, the findings herein also are dispositive as to the RICO honest services mail and wire fraud
claim against Sheriff Warren.

[50]  Mr. McGregor and VictoryLand argue that it "is unnecessary to determine whether Plaintiffs
have established the final three elements of a RICO violation."  (Doc. # 440, at 93.)  They, thus, have not
moved for summary judgment on these three elements.

wire fraud theory is addressed above.  Alternatively, Defendants are entitled to prevail at summary judgment on one of their standing arguments, as discussed below.

### iv.     § 1964(c): RICO Standing

Based upon the summary judgment standard, there is sufficient evidence of harm to Plaintiffs' business or property.  There, however, is insufficient evidence that Plaintiffs' alleged injuries were proximately caused by the RICO violation, as required by § 1964(c)'s "by reason of" language.  Accordingly, as explained below, Plaintiffs do not have RICO statutory standing to bring an honest services mail and wire fraud claim.

### a.     Injury to Business or Property

The terms "'business or property' are . . . words of limitation."  *Grogan v. Platt*, 835 F.2d 844, 846 (11th Cir. 1988); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("The phrase 'business or property' . . . retains restrictive significance.").  The Eleventh Circuit has applied that limitation to exclude, for example, "damages normally recoverable for personal injuries, such as mental anguish, [from] . . . the rubric of 'business or property[,]'" *Grogan*, 835 F.2d at 846, and "for those pecuniary losses that are most properly

understood as part of a personal injury claim," *id.* at 848[51]; *accord Pilkington v. United Airlines*, 112 F.3d 1532, 1536 (11th Cir. 1997).

Mr. McGregor and VictoryLand contend that the alleged deprivation of Sheriff Warren's and the Macon County citizens' right to honest services is not an injury to business or property because the "direct injury" resulting from honest services fraud is "a deprivation of an intangible right, rather than an injury to business or property." (Doc. # 475, at 32.) In other words, they assert that any alleged § 1346 scheme to defraud "could at most only deprive Plaintiffs of an intangible right to honest services, which is not a sufficiently particularized and concrete loss to business or property to confer standing." (Doc. # 459, at 22-23.) Plaintiffs, however, contend that their compensable *injuries* are their lost profits, not the deprivation of honest services.[52] (Doc. # 445, at 37-38.) Having examined the cases

---

[51] In *Grogan*, the Eleventh Circuit affirmed the dismissal of § 1964(c) personal injury and wrongful death actions brought by FBI agents who had been injured (and the estates of FBI agents who had been killed) in a shoot-out with criminals. The court explained: "In our view, the ordinary meaning of the phrase 'injured in his business or property' excludes personal injury, including the pecuniary losses therefrom." 835 F.2d at 847. "We agree that '[h]ad Congress intended to create a federal treble damages remedy for cases involving bodily injury, injury to reputation, mental or emotional anguish, or the like, all of which will cause some financial loss, it could have enacted a statute referring to injury generally, without any restrictive language.'" *Id.* (citation omitted).

[52] In their brief, Plaintiffs also mention that Lucky Palace has suffered injuries in the form of "the diminished value of [its] investments." (Doc. # 445, at 38.) Plaintiffs, however, as noted by Defendants (Doc. # 459, at 30 n.14), have not pointed to evidence of Lucky Palace's investments or provided an explanation of what those investments encompass or how the investments have diminished. Given this absence of evidence or argument, to the extent that Plaintiffs are seeking to recover for Lucky Palace's alleged diminished value in investments, summary judgment is due to be granted in Defendants' favor.

relied upon by Mr. McGregor and VictoryLand in light of the arguments presented, the court finds that they are mistaken as to the nature of the injuries alleged.[53]

In *Doe v. Roe*, 958 F.2d 763 (7th Cir. 1992), the plaintiff-client brought RICO claims against her divorce lawyer, claiming that the lawyer coerced her into having sexual relations with him as payment for his legal services. *See id.* at 765. The plaintiff argued that she had suffered at least three § 1964(c) "property" injuries, one of which allegedly arose from the lawyer's concealment of his fraudulent practice of requiring sexual services from female clientele and demanding increased unbargained-for fees. *See id.* at 769. The *Doe* court opined that this injury, at best, amounted to a "breach of [the lawyer's] fiduciary duty to provide honest services," but that "these fiduciary violations did not harm [the plaintiff] in a commercial or propriety sense" or "result in any economic loss to [the plaintiff]." *Id.*

Mr. McGregor and VictoryLand hone in on footnote five of the *Doe* opinion. In that footnote, the Seventh Circuit noted that, although the plaintiff's "claim sounding in the loss of honest services might satisfy" the mail and wire fraud statutes to the extent that the alleged violations occurred after § 1346's effective date (*i.e.*, November 18, 1988), and consequently "could serve as the predicate racketeering acts, they could not be a direct basis for civil RICO

---

[53] Those cases are: *Ove v. Gwinn*, 264 F.3d 817 (9th Cir. 2001); *Doe v. Roe*, 958 F.2d 763 (7th Cir. 1992); *Twp. of Marlboro v. Scannapieco*, 545 F. Supp. 2d 452 (D.N.J. 2008); *Marina Point Dev. Assocs. v. United States*, 364 F. Supp. 2d 1144 (C.D. Cal. 2005); *Pharmacare v. Caremark*, 965 F. Supp. 1411 (D. Haw. 1996); and *Marshall v. City of Atlanta*, 195 B.R. 156 (Bankr. N.D. Ga. 1996).

liability since § 1964(c)'s requirement of injury to property would still not be met." *Doe*, 958 F.2d at 769 n.5.

Similarly, in *Marina Point Development Associates v. United States*, 364 F. Supp. 2d 1144 (C.D. Cal. 2005), also relied upon by Mr. McGregor and VictoryLand, the plaintiff alleged that the § 1964(c) injury was the deprivation of honest government services pertaining to the denial of a permit needed for the development of a resort on the plaintiff's lakefront property. *See id.* at 1145-46. Citing Ninth Circuit decisions that had defined "'business or property' injury to include only tangible and concrete financial loss," the court concluded that "the deprivation of the right to honest governmental services is not a tangible and concrete financial loss, and so is not injury to 'business or property' as required by section 1964(c)." *Id.* at 1148.

The remainder of the cases relied upon by Mr. McGregor and VictoryLand stand for essentially the same principle, *i.e.*, that a § 1964(c) *injury* cannot take the form of an alleged deprivation of honest services. *See Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) ("[T]he deprivation of 'honest services' does not constitute concrete financial loss" sufficient to

establish an *injury* to state a RICO claim).  The court, however, need not belabor these cases, as they, as well as *Doe* and *Marina Point*, are distinguishable.[54]

It is true that the alleged *predicate acts* here sound in a loss of honest services, but Plaintiffs do not claim, as did the plaintiffs in *Doe* and the other cases cited above, that the loss of honest services is the § 1964(c) *injury*.  To the contrary, Plaintiffs claim that they sustained economic business and/or property injuries in the form of lost profits and contractual payments when they were unable to obtain the necessary licenses from Sheriff Warren to operate and conduct electronic bingo in Macon County.  The court, thus, finds that Mr. McGregor and VictoryLand have not demonstrated that the dictum in footnote five of the *Doe* opinion applies in this case because Plaintiffs do not allege that the loss of honest services is the "direct basis for civil RICO liability."  *Doe*, 958 F.2d at 769 n.5.

Moreover, as Plaintiffs point out (Doc. # 464, at 52), the Eleventh Circuit has held that lost profits can constitute an "injury to business or property" flowing from a violation of

---

[54] After the *Marina Point* court issued its opinion, the principal Ninth Circuit decisions upon which the *Marina Point* court relied – *Guerrero v. Gates*, 357 F.3d 911 (9th Cir. 2004); *Diaz v. Gates*, 380 F.3d 480 (9th Cir. 2004); and *Oscar v. Univ. Students Co-operative Ass'n*, 965 F.2d 783 (9th Cir. 1992) – were either withdrawn, rejected or called into doubt.  *See Guerrero v. Gates*, 442 F.3d 697 (9th Cir. 2006) (rehearing); *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (*en banc*) (holding that an injury is compensable under RICO if the injury constitutes "harm to a specific business or property interest" and if the alleged business or property interest is cognizable under state law); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1005 (9th Cir. 2008) (observing that *Oscar*'s "rules" have been "overruled").  *But see Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir. 2009) (noting that *Newcal* "suggests that we overruled *Oscar* in *Diaz*.  However, our more recent holding in *Canyon County* [*v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008)] explicitly states that 'concrete financial loss' is a necessary element of a RICO claim, 519 F.3d at 975 (quoting *Oscar*, 965 F.2d at 785), and *Diaz* itself employs the 'financial loss' requirement, 420 F.3d at 898-900." (internal citation omitted)).  Mr. McGregor and VictoryLand fail to address how these subsequent developments impact *Marina Point*; the court also declines to do so for the simple reason that it is unnecessary, given other findings herein.

§ 1962(c).  *See Maiz v. Virani*, 253 F.3d 641, 663-64 (11th Cir. 2001).  However, there is a caveat:  "The recoverability of these kinds of damages is a function of proximate cause, and must be assessed on a case by case basis."  *Id.*; *see also Sound Video Unlimited, Inc. v. Video Shack Inc.*, 700 F. Supp. 127, 142 (S.D.N.Y. 1988) (observing that under RICO, "recovery of lost profits should be subject to the ordinary limitations concerning remoteness (or proximate cause) and speculativeness (or certainty)" (citation and internal quotation marks omitted)).  The failure of Mr. McGregor and VictoryLand to prevail on this argument, however, ultimately does not save Plaintiffs' claim, because even assuming *arguendo* that Plaintiffs have suffered a compensable injury under RICO, they still must show proximate cause, which they cannot do.

### b.    Proximate Cause

Mr. McGregor and VictoryLand  also assert that Plaintiffs cannot show that the lost profits and contractual payments they claim that they would have received had they obtained licenses from Sheriff Warren to operate and conduct electronic bingo in Macon County were proximately caused by the alleged RICO violations.  They argue that Plaintiffs' claimed injuries of lost profits and contractual payments are not the "direct result of the alleged conduct constituting the RICO violation." (Doc. # 459, at 26, 29; Doc. # 440, at 102-04; Doc. # 475, at 46.)  Instead, relying upon *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), Mr. McGregor and VictoryLand  contend that these claimed financial losses are "secondary injur[ies]." (Doc. # 475, at 44-45.)  In response, Plaintiffs argue that Sheriff Warren's

"refusal to consider" their license applications, "which arose from the rules and regulations produced by . . . Defendants' racketeering activity, has been and continues to be the direct and proximate cause of an injury to Lucky Palace's business." (Doc. # 445, at 37; Doc. # 464, at 42.) Plaintiffs further argue that Defendants' "racketeering activities have prevented the [Plaintiff] Charities from obtaining . . . licenses" to operate electronic bingo in Macon County at a proposed Lucky Palace facility. (Doc. # 445, at 38.)

Section 1964(c)'s "by reason of" language embodies a proximate cause requirement. "[A] plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury."[55] *Anza*, 547 U.S. at 453 (relying on *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)); *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1350 n.14 (11th Cir. 2008) (noting that "RICO standing is really just a heightened proximate causation standard, as it requires a claimant to prove that he was injured in his business or property 'by reason of' the RICO violation").

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547

---

[55] *Holmes* is the seminal case on § 1964(c)'s proximate cause requirement. *See Anza*, 547 U.S. at 456-57. In *Holmes*, the Supreme Court recognized that § 1964(c)'s language could "be read to mean that a plaintiff is injured 'by reason of' a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962(c), the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury." 503 U.S. at 265-66. The Court held, however, that the language was not intended to be read so expansively. *See id.* at 266 (observing the "very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover"); *see also Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2140 (2008) (In *Holmes*, "we concluded that § 1964(c) likewise requires the plaintiff to establish proximate cause in order to show injury 'by reason of' a RICO violation." (citing *Holmes*, 503 U.S. at 268)).

U.S. at 461.  This central question originates from the "common-law foundations of the proximate-cause requirement, and specifically the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.'"  *Id.* at 457 (quoting *Holmes*, 503 U.S. at 268); *see also Williams*, 465 F.3d at 1287.  Hence, a plaintiff who complains "of harm flowing merely from the misfortunes vested upon a third person by the defendants' acts [is] generally said to stand at too remote a distance to recover."  *Holmes*, 503 U.S. at 268-69.  Under the remoteness concept, standing is limited to those "directly" injured by a defendant's conduct.  *See id.* at 269-70.

In *Anza*, the plaintiff and the defendant were competitor companies, both offering steel products and related services in the same geographical area.[56]  547 U.S. at 454.  The plaintiff brought a § 1962(c) civil RICO claim, alleging that the defendant was able to reduce its prices, thereby gaining market share at the plaintiff's expense, by not charging the required state sales tax and concealing that illegality by filing fraudulent state tax returns.  *See id.*  The goal of the defendant's conduct "was to give [the defendant] a competitive advantage over [the plaintiff]."  *Id.* at 455-56.  As to this claim, the court below (the Second Circuit) held that "where a complaint alleges a pattern of racketeering activity 'that was intended to and did give the defendant a competitive advantage over the plaintiff, the complaint adequately pleads proximate cause, and the plaintiff has standing to pursue a civil RICO claim.'"  *Id.* at 445

---

[56] After summary judgment briefing closed in this case, the Supreme Court issued *HemiGroup, LLC v. City of New York*, 130 S. Ct. 983 (2010), which relies upon *Anza* and provides additional relevant discussion of § 1964(c)'s "by reason of" requirement.  *HemiGroup* is discussed later in this opinion.

(citation omitted). The Supreme Court disagreed: "A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.* at 460.

Relying principally upon *Holmes*, the *Anza* Court concluded that the plaintiff lacked statutory standing under § 1964(c) and, thus, could not maintain its § 1962(c) claim. *See Anza*, 547 U.S. at 457. The Court reiterated that the compensable injury that flows from a § 1962(c) violation "'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" *Id.* (quoting *Sedima,* 473 U.S. at 497). The plaintiff's "theory" was that the defendant "harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers." *Id.* at 457-58. The RICO violation was that the defendant's business was "conducted . . . through a pattern of mail and wire fraud." *Id.* at 458. "The direct victim of this conduct was the State of New York, not [the plaintiff]." *Id.*

The Supreme Court concluded that the "proper referent of the proximate-cause analysis [was] an alleged practice of conducting [the defendant's] business through a pattern of *defrauding the State*." *Anza*, 547 U.S. at 458 (citation omitted). It acknowledged that the plaintiff may have "suffered its own harms" when the defendant did not require customers to pay the applicable state sales tax. *Id.* The Court explained that "[t]he cause of [the plaintiff's] asserted harms [*i.e.*, lost profits], however, is a set of actions (offering lowering prices)

86

entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* The alleged RICO violation directly caused the State to be defrauded of taxes, not the plaintiff to lose money to its competitor. Given the plaintiff's indirect injury, the Court held that § 1964(c)'s requirement of proximate cause was not satisfied. *See id.* at 460.

The Court explained that two of the "motivating principle[s]" for requiring proximate causation under § 1964(c), as set out in *Holmes*, further illustrated why the plaintiff's injury was not the "direct result" of a RICO violation. *Anza*, 547 U.S. at 458-59. Those motivating principles include (1) the difficulty of calculating damages caused by remote actions and distinguishing among causal factors unrelated to the asserted racketeering activity, and (2) the prospect that more immediate victims of an alleged RICO violation can be expected to pursue their own claims. *See id.* at 458-60.

Applying the first principle, the *Anza* Court observed that the plaintiff categorized its "injury" as "its own loss of sales resulting from [the defendant's] decreased prices for cash-paying customers." 547 U.S. at 458. However, the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud." *Id.* Moreover, as to the second principle, the *Anza* Court concluded that the state of New York, the more "immediate victim[]," could have in "relatively straightforward" fashion calculated the tax revenue unpaid by the defendant and pursued remedies to collect the delinquency.[57] *Id.* at 460.

---

[57] That there was a "lack of any appreciable risk of duplicative recoveries," *i.e.*, the third motivating principle recognized in *Holmes*, did not alter the court's holding. *Anza*, 547 U.S. at 459.

The Supreme Court also found § 1964(c)'s proximate cause requirement lacking in its recent decision in *HemiGroup, LLC v. City of New York*, 130 S. Ct. 983 (2010).   In *HemiGroup*, the city of New York ("City") brought a RICO action against Hemi Group ("Hemi"), an out-of-state company that sold cigarettes online to City residents, but did not, as required by federal law (*i.e.*, the Jenkins Act), submit information about its sales to New York residents. *Id.* at 986-87.  It was alleged that Hemi's "'interstate sale of cigarettes and the failure to file Jenkins Act reports identifying those sales' constitute[d] the RICO predicate offenses of mail and wire fraud in violation of § 1962(c), for which § 1964(c) provide[d] a private cause of action." *Id.* at 987.  The City further alleged that it "suffered injury in the form of lost tax revenue – its 'business or property' in RICO terms – 'by reason of'" Hemi's fraud. *Id.* at 988.  Based upon these allegations, the Supreme Court held that the City had not suffered an injury "by reason of" the alleged fraud. *Id.* at 994.  The Supreme Court discussed its prior teachings in *Holmes* and *Anza* concerning the proximate cause requirement embedded in § 1964(c)'s "by reason of" language. *Id.* at 988-90.   It explained that the City's RICO claim "suffere[d] from the same defect as the claim in *Anza*":

> Here, the conduct directly responsible for the City's harm was the customers' failure to pay their taxes.  And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports.  Thus, as in *Anza*, the conduct directly causing the harm was distinct from the conduct giving rise to the fraud.

*Id.* at 990 (citing *Anza*, 547 U.S. at 458).

Turning back to this case, Plaintiffs formulate the proximate cause analysis as follows: Sheriff Warren's refusal to consider and grant licenses to Lucky Palace and the Plaintiff

88

Charities, "which arose from the rules and regulations produced by Defendants' racketeering activities, has been and continues to be the direct and proximate cause of an injury to Lucky Palace's business" (in the form of lost profits), and to the Plaintiff Charities' "business and property" (in the form of lost semi-annual contractual payments from Lucky Palace).  (Doc. # 445, at 37.)  This formulation is devoid of analysis; it is but a mere legal conclusion, and it is incorrect.

The analysis appropriately begins by identifying the predicate acts.  *See Anza*, 547 U.S. at 457 ("[T]he compensable injury flowing from a [§ 1962(c)] *violation* . . . 'necessarily is the *harm caused by predicate acts* sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" (quoting *Sedima*, 473 U.S. at 497) (emphasis added)).  Mail and wire fraud are the predicate acts and require, among other things, proof of a scheme or artifice to defraud.  *See* §§ 1341, 1343.  Here, the alleged scheme or artifice is one to defraud the citizens of Macon County and Sheriff Warren – of the intangible right of honest services, *see* § 1346.  More specifically, the predicate acts are that Mr. McGregor and VictoryLand exchanged with Mr. Gray Jr. by email and facsimile proposed Rules governing bingo, and caused numerous checks for legal fees and retainer payments to be mailed over a five-year period to the Gray Law Firm and/or Mr. Gray Sr. in furtherance of the scheme to defraud the citizens of Macon County and Sheriff Warren of honest services.  (*See* 6th Am. Compl. ¶¶ 118-35.)  Sheriff Warren, in turn, used the mails on at least two occasions, sending letters to Mr. Bracy and returning Lucky Palace's

application for an Operator's License, all allegedly in furtherance of a scheme or artifice to deprive the citizens of Macon County of the honest services of Sheriff Warren. (Doc. # 465, at 23.)  The RICO violation alleged is that Mr. McGregor, VictoryLand and Sheriff Warren conducted their affairs through this pattern of honest services mail and wire fraud.  *See Anza*, 547 U.S. at 458 ("The RICO violation alleged by [the plaintiff] is that the [defendant] conducted [its] affairs through a pattern of mail fraud and wire fraud.").

Plaintiffs' theory is that Mr. McGregor and VictoryLand harmed Plaintiffs by participating in schemes to defraud the citizens of Macon County and Sheriff Warren of their intangible right to receive honest services (by clandestinely drafting proposed Rules for Sheriff Warren's promulgation and by bribing Mr. Gray Jr. to advise Sheriff Warren to adopt those Rules).  Furthermore, as to Sheriff Warren, the theory is that he harmed Plaintiffs by remaining willfully blind to the conflicts of interest created by Mr. Gray Jr.'s and Mr. McGregor's involvement in the rule-drafting process.  The product of those dishonest services (Rules governing electronic bingo in Macon County) allowed Sheriff Warren to reject Plaintiffs' applications for licenses to conduct and operate electronic bingo.  (Doc. # 445, at 37; 6th Am. Compl. ¶ 145); *accord Anza*, 547 U.S. at 457-58 (The plaintiff's "theory is that [the defendant] harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designated to attract more customers.").  The *direct victims* of Mr. McGregor's and VictoryLand's alleged misconduct were the citizens of Macon

County and Sheriff Warren – not Plaintiffs.  Similarly, the direct victims of Sheriff Warren's alleged misconduct were the citizens of Macon County – not Plaintiffs.

First, the citizens of Macon County allegedly have been defrauded, and those citizens deprived of the honest services of Sheriff Warren and Mr. Gray Jr.  The citizens are the ones who Plaintiffs assert have lost the benefits associated with a competitive market, including higher quality products and services, lower prices, increased jobs and services, and additional infrastructure.  (Doc. # 445, at 33.)  Indeed, Plaintiffs make a point of particularizing the harms to the citizens of Macon County, to include: (1) "reduced competition and thus reduced checks on price and controls on quality," which among other things allows VictoryLand to "increase charges to its patrons"; (2) "the loss of additional jobs and additional infrastructure (*e.g.*, sewers) that would have been provided by Lucky Palace had VictoryLand not secured a monopoly"; and (3) "limit[ed] governmental revenues, which, in turn, limit the provision of services to the citizens of Macon County."  (Doc. # 445, at 33; Michael A. Williams, Ph.D. ¶¶ 45-57.)  As to these contentions, "[t]he proper referent of the proximate-cause analysis" is an alleged practice of providing dishonest services through a pattern of defrauding the citizens of Macon County.

Second, with respect to Sheriff Warren (as the victim), he was allegedly defrauded of the honest services of his lawyer, Mr. Gray Jr.  As to this contention, the proper referent of the proximate-cause analysis is an alleged practice of providing dishonest services through a pattern of defrauding Sheriff Warren.  The direct victim here is Sheriff Warren.  Plaintiffs

nonetheless contend that they have been "directly injured by . . . Defendants' interference in the attorney-client relationship between [Mr.] Gray Jr. and Sheriff Warren."  (Doc. # 464, at 49-50.)  Namely, "[b]y depriving Sheriff Warren of the honest services of [Mr.] Gray Jr.," Plaintiffs contend that "Defendants secured a monopoly on electronic bingo in Macon County," thereby preventing Plaintiffs "from participating in the market for electronic bingo." (Doc. # 464, at 50.)  Plaintiffs cite *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131 (2008), as support for their argument that they suffered a direct injury. (Doc. # 464, at 49-50.)

In *Bridge*, regular bidders at the county's auctions of tax liens sued competitors, alleging that the competitors engaged in mail fraud by submitting false affidavits that they had complied with the "single, simultaneous bidder rule."  128 S. Ct. at 2135-36.  As a result of their falsifications to the county, the competitors were able to place multiple bids and received a greater number of liens than they legally should have.  *Id.* at 2136.  The competitors argued that the regular bidders lacked standing to raise RICO claims because they could not show that they – as opposed to the county – were the recipients of the false affidavits or that they actually relied on the false attestations.  *Id.* at 2136-37.  The Supreme Court disagreed.  It held that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."  *Id.* at 2145.

To be sure, *Bridge* rejected the argument that a plaintiff who brings a mail fraud claim *must* demonstrate that it relied on the defendant's misrepresentations to establish § 1964(c)'s

proximate cause requirement.  *Id.  Bridge*, however, did not disturb *Anza*'s and *Holmes*'s

holdings that the alleged violation must be both the "but for" and the proximate cause of the

injury to demonstrate that the injury was "by reason of" a RICO violation.  *Id.* at 2141-42.

Rather, in *Bridge*, the Supreme Court picked up where *Anza* left off.  The *Anza* Court had

declined to address the defendants' alternative argument that a RICO claim predicated on mail

or wire fraud requires proof that the plaintiff relied on the defendant's misrepresentations.

*See* 547 U.S. at 461.  Hence, *Anza*'s and *Holmes*'s principles still must be satisfied in that a

plaintiff must demonstrate that "'the alleged violation led directly to the plaintiff's injuries.'"

*Bridge*, 128 S. Ct. at 2142 (quoting *Anza*, 547 U.S. at 461); *see also HemiGroup*, 130 S. Ct.

at 992 (*Bridge* "reaffirmed the requirement that there must be 'a sufficiently direct

relationship between the defendant's wrongful conduct and the plaintiff's injury.'").[58]

---

[58] Another notable point made in *Bridge* was that the absence of first-party reliance "may in some cases tend to show that an injury was not sufficiently direct to satisfy § 1964(c)'s proximate-cause requirement." 128 S. Ct. at 2144.  The *Bridge* Court pronounced that "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *Id.* "[T]he complete absence of reliance may prevent the plaintiff from establishing proximate cause." *Id.* Thus, in *Bridge*, "for example, if the county knew petitioners' attestations were false but nonetheless permitted them to participate in the auction, then arguably the county's actions would constitute an intervening cause breaking the chain of causation between petitioners' misrepresentations and respondents' injury." *Id.*

The same arguably could be said here as to the RICO theory that Sheriff Warren was deprived of the honest services of Mr. Gray Jr. when Mr. Gray Jr. failed to fully disclose to Sheriff Warren (*i.e.*, suppressed) that VictoryLand's agents drafted the Rules and that various representational conflicts of interest existed.  Plaintiffs have not argued that they relied upon Mr. Gray Jr.'s alleged suppressions, but, at the same time, they have not argued that *anyone* relied upon those suppressions.  They have not contended, for instance, that Sheriff Warren acted in reliance on his attorney's suppressions, and on this record, such an argument would be difficult to make.  To explain, when the different pieces of the litigation puzzle are put together, part of Plaintiffs' RICO theory against Sheriff Warren (as the defendant) is that he defrauded the public by "intentionally turning a blind eye to the presence of any conflicts of interest in the promulgation and amendment of [the Rules]," and by issuing Rules that benefitted the private interests of Mr. McGregor and VictoryLand, rather than the interests of the public. (*See, e.g.*, 6th Am. Compl. ¶ 122; *see also* Doc. # 465, at 22 n.12 ("It is unclear from the record whether

Moreover, in *Bridge*, proximate cause was neither in doubt nor at issue; it was undisputed that the plaintiff, a competitor, was the "primary and intended victim[ ] of the scheme to defraud." 128 S. Ct. at 2139. Indeed, the *Bridge* Court cited favorably the lower courts' conclusions that the plaintiffs and other losing bidders "were the *only* parties injured by the [defendants'] misrepresentations." *Id.* at 2144. The county suffered no loss. Plaintiffs do not and cannot make that contention in this case. As discussed above, their claim rests on the premise that parties other than themselves were directly injured by the schemes to defraud. All in all, the court finds that the facts of this case are more in line with *Anza*'s, than with *Bridge*'s.

Here, the cause of Plaintiffs' asserted harms (*i.e.*, lost sales and contractual payments) is a series of actions (being denied electronic bingo licenses) that are "entirely distinct" from the alleged RICO violation (defrauding the citizens of Macon County and Sheriff Warren of honest services). *Anza*, 547 U.S. at 458 ("The cause of [the plaintiff's] asserted harms [*i.e.*, lost profits], however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."). In other words, the conduct directly responsible for Plaintiffs' harm was the promulgation of Rules that had the effect of

---

[Sheriff Warren] was willfully ignorant or fully aware of the activities of the Enterprise.").) This theory appears directly at odds with Plaintiffs' theory that Sheriff Warren (as the victim) suffered innocently when Mr. Gray Jr. failed to disclose that there were conflicts of interest and that VictoryLand's agents drafted the Rules. Although first-party reliance is not required to prove § 1964(c) proximate case, the teachings of the *Bridge* Court indicate that absence of reliance by any party weighs against a finding of proximate cause. Such may be the case here.

precluding Plaintiffs' entry into the Macon County electronic bingo market.  The conduct constituting the alleged fraud was Defendants' failure to provide honest services to Macon County citizens and Sheriff Warren.  Hence, "the conduct directly causing the harm [is] distinct from the conduct giving rise to the fraud."  *HemiGroup*, 130 S. Ct. at 990.

*Anza* commands this finding, notwithstanding Plaintiffs' assertions that the ulterior goal of Defendants was to give VictoryLand exclusive control over electronic bingo operations in Macon County and to prevent Lucky Palace and the Plaintiff Charities from competing with it in the electronic bingo business.  Plaintiffs' assertions comport with the court of appeals' holding in *Anza*, but that holding was overturned.  *See* 547 U.S. at 460 (rejecting the Second Circuit's "reasoning that because the [defendants] allegedly sought to gain a competitive advantage over [the plaintiff], it [was] immaterial whether they took an indirect route to accomplish their goal").  Instead, the *Anza* Court held that "[a] RICO plaintiff cannot circumvent the proximate cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense."  *Id.*  And *HemiGroup* drove home this point:  "In *Anza* . . . [the plaintiff] alleged that [the defendants'] scheme 'was to give [the defendants] a competitive advantage over [the plaintiff].'"  *HemiGroup*, 130 S. Ct at 991 (quoting *Anza*, 547 U.S. at 454-55).  "But that allegation did not prevent the Court from concluding that [the defendants'] fraud directly harmed only the State, not [the plaintiff]."  *Id.*  A RICO plaintiff "cannot escape the proximate cause requirement merely by alleging

that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct. Otherwise, our RICO proximate cause precedent would become a mere pleading rule." *Id.*

Also, particularly apropos here is the *Anza* Court's admonition that a direct causal nexus between the RICO violation and a plaintiff's injuries "has particular resonance when applied to claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws." 547 U.S. at 460; *see also City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 441-42 (2d Cir. 2008) (noting that "*Anza* involved a RICO claim of a competitor complaining of another merchant's ability to offer lower prices, and the Court's holding sought to limit RICO standing in that type of case").

On a similar line of argument, Plaintiffs argue that, as a "foreseeable . . . consequence" of the schemes to defraud, they "were prevented from participating in the market for electronic bingo." (Doc. # 464, at 59.) However, the Supreme Court in *HemiGroup* soundly rejected foreseeability as the governing standard:

> The dissent would have RICO's proximate cause requirement turn on foreseeability, rather than on the existence of a sufficiently "direct relationship" between the fraud and the harm. It would find that the City has satisfied that requirement because "the harm is foreseeable; it is a consequence that Hemi intended, indeed desired; and it falls well within the set of risks that Congress sought to prevent." Post, at 997-998 (opinion of BREYER, J.). If this line of reasoning sounds familiar, it should. It is precisely the argument lodged against the majority opinion in *Anza*. There, the dissent criticized the majority's view for "permit[ting] a defendant to evade liability for harms that are not only foreseeable, but the intended consequences of the defendant's unlawful behavior." 547 U.S. at 470 . . . (THOMAS, J., concurring in part and dissenting in part). But the dissent there did not carry the day, and no one has asked us to revisit *Anza*.

130 S. Ct. at 991.  Based upon this rejection, Plaintiffs' foreseeability argument is not persuasive.

With that said, the court is mindful of Plaintiffs' asserted injuries, just as the Court in *Anza* acknowledged the plaintiff's asserted harms.  *See* 547 U.S. at 458.  Plaintiffs contend that they suffered their own harms when the citizens of Macon County and Sheriff Warren were deprived of honest services – Plaintiffs' applications for licenses to operate and conduct electronic bingo in Macon County were rejected under the Second Amended Rules and they allegedly lost profits and contractual payments.  (Doc. # 445, at 37.)  Indeed, no matter what efforts Lucky Palace and the Plaintiff Charities expend in pursuit of operating electronic bingo in Macon County, they are precluded from doing so under the current circumstances and the present version of the Rules, given that the maximum number of Class B Bingo Licenses has been issued to VictoryLand's charities.[59]  It, thus, is impossible for Plaintiffs to earn even their first Macon County dollar from electronic bingo operations without the necessary licenses from Sheriff Warren.  But these circumstances, even assuming *arguendo* that they are sufficient to establish "but for" causation, are too generalized to satisfy the more rigorous requirement for proximate causation.  *See generally HemiGroup*, 130 S. Ct. at 989 (observing

---

[59] To recap, this is because the Second Amended Rules added a requirement that a qualified location must have a minimum of fifteen charity licenses (*i.e.*, Class B Bingo Licenses), but at the same time prohibited the issuance of more than sixty charity licenses countywide.  By March 20, 2006, VictoryLand had secured all sixty charity licenses.  (2006 VictoryLand Charity Licenses (Ex. 31 to Doc. # 446); McGregor's Answer to 6th Am. Compl. ¶ 74.)

that "'the general [but incorrect] tendency'" in the "proximate cause inquiries under RICO"

is "'not to go beyond the first [but for] step'" (quoting *Holmes*, 503 U.S. at 271-72)).[60]

Plaintiffs insist that they did enough to warrant at least an assurance from Sheriff

Warren that, if construction of Lucky Palace commenced, he would grant Lucky Palace and

the Plaintiff Charities the required Operator's License and Class B Bingo Licenses.  (Doc.

# 464, at 41.)  Mr. McGregor and VictoryLand take issue with that assertion, contending,

among other things, that "there are a plethora of reasons why the Lucky Palace facility was

never constructed, why electronic bingo was never played at that conceptual facility, and why

the Plaintiff [Charities] never received any fees from this hoped-for electronic bingo operation

– reasons that are completely unrelated to the alleged RICO violations."  (Doc. # 475, at 46-

47; Doc. # 440, at 102-03; Doc. # 459, at 28.)

---

[60] *James Cape & Sons Co. v. PCC Construction*, 453 F.3d 396 (7th Cir. 2007), cited by Mr.
McGregor and VictoryLand, is illustrative.  In *James Cape & Sons*, which involved a civil RICO claim,
the issue was whether, in order to avoid judgment on the pleadings, the plaintiff had shown that its
injuries were proximately caused by the defendant-competitors' "bid rigging" scheme to defraud the
Wisconsin Department of Transportation ("WisDOT").  *See id.* at 403-04.  By law, WisDOT awarded
construction projects to the eligible bidder who made the lowest bid.  *See id.* at 398.  One of the
plaintiff's former employees participated in the bid-rigging scheme by disclosing the plaintiff's
confidential bid information to competitors, thereby permitting the competitors "to lower or raise their
bids to just under the amount that [the plaintiff] was going to bid."  *Id.*  The plaintiff alleged that it lost
millions of dollars of business because its share of the market was reduced and it lost contracts with
WisDOT that it would have received but for the bid-rigging scheme.  *Id.*
    Relying largely on *Anza*, the Seventh Circuit held that § 1964(c)'s proximate cause requirement
precluded recovery because it "could never be certain whether [the plaintiff] would have won any of the
contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted
pattern of fraud.'"  *Id.* at 403 (quoting *Anza*, 547 U.S. at 458).  The court concluded that the conspirators
could have won bids without the bid-rigging scheme, and the plaintiff could not show that it lost business
as a result of the bid-rigging scheme.  *Id.*

The problem with Plaintiffs' position is that they have not explained why the steps they took – purchasing real estate, hiring an engineer, *etc.* – would have qualified them for licenses to operate electronic bingo in Macon County under a set of rules and regulations that had not been allegedly tainted by the schemes to defraud.  As has been noted, while Amendment No. 744 commands the sheriff of Macon County to oversee compliance with six listed criteria and requires him to promulgate rules and regulations for the licensing and operation of bingo games in Macon County, it provides virtually no guidance as to what those rules and regulations should or must contain.  The constitutional amendment itself obviously leaves the sheriff with substantial discretion in determining the substance of rules and regulations.  It simply is too difficult to envision all of the potential formulations of the rules and regulations that could exist absent the alleged fraud, and to determine whether under those infinite possibilities Plaintiffs could have satisfied all of the requirements to operate and conduct

electronic bingo in Macon County.  The determination could never be made without a substantial measure of guesswork.[61]

In sum, Plaintiffs have not shown that their injuries were proximately caused by the schemes to defraud.  Accordingly, all Defendants are entitled to summary judgment on Plaintiffs' RICO honest services mail and wire fraud claim.

### 2.    § 1962(d) – Count II

"Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including § 1962(c)."  *Am. Dental Ass'n*, 605 F.3d at 1293.  Plaintiffs' § 1962(d) claim alleges that Defendants conspired to violate § 1962(c).  "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993); *see Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (noting that where a complaint

---

[61] It, therefore, is unnecessary to delve deeper into Mr. McGregor and VictoryLand's argument that calculating lost profits, the amount of which Plaintiffs admit is disputed (Doc. # 445, at 38 n.14), would be too speculative, as they are mere expectancy damages.  Additionally, Plaintiffs have not explained why the citizens of Macon County and Sheriff Warren, the ones who allegedly were directly deprived of specified honest services, could not effectively vindicate their interests.  *See Anza*, 547 U.S. at 460 (holding that the state of New York that directly lost tax revenues as a result of the defendant's tax evasion was better suited to bring a civil RICO claim).  It certainly could be argued, however, that the citizens of Macon County would have "concrete incentives," *HemiGroup*, 130 S. Ct. at 990, to seek redress for the "reduced competition," loss of jobs and infrastructure (*e.g.*, sewers) and restraints on the provision of services allegedly flowing from the honest services of which they purportedly were deprived (Doc. # 445, at 33); *accord HemiGroup*, 130 S. Ct. at 990-91 ("We do not opine on whether the State could bring a RICO action for any lost tax revenue.  Suffice it to say that the State would have concrete incentives to try.").  And, Sheriff Warren also would be better suited than Plaintiffs and have an incentive to seek redress for Mr. Gray Jr.'s alleged breaches of fiduciary duties owed to him by virtue of their attorney-client relationship.

fails to state a substantive RICO claim, the conspiracy allegation "simply concludes that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation").  As a result of the findings above, the § 1962(c) substantive claims are no longer viable; thus, the conspiracy claim necessarily fails.  Accordingly, summary judgment is due to be entered in favor of Defendants on Count II, the § 1962(d) conspiracy claim.

**B.**     **Equal Protection (Counts III and IV)**

Counts III and IV of the Sixth Amended Complaint allege infringements of Plaintiffs'

right to equal protection under the Fourteenth Amendment, as enforced by § 1983.  Count III

is against Sheriff Warren in his official capacity.  Plaintiffs raise facial, disparate impact and

as applied equal protection challenges to the Second Amended Rules.  (Doc. # 445, at 44-50.)

Count IV alleges that Sheriff Warren and Mr. McGregor, individually and as an agent for

VictoryLand, engaged in a § 1983 conspiracy to deprive Plaintiffs of equal protection.  It is

alleged that they

> agreed or had an understanding – reached by, through, and with the assistance
> and influence of Fred Gray, Fred Gray Jr., and the Gray Law Firm – that
> Defendant Warren would issue rules and regulations for the licensing and
> operation of bingo in Macon County that would (1) deprive any nonprofit
> organization, other than a nonprofit organization associated with VictoryLand,
> of the ability to obtain a license for the conduct of electronic bingo in Macon
> County and (2) deprive any organization, other than VictoryLand, of the ability
> to obtain an operator's license for the conduct of bingo in Macon County.
> Accordingly, Defendants McGregor and VictoryLand were jointly engaged
> with Defendant Warren, a state official, in the deprivation of the Plaintiffs'
> equal protection rights.

(6th Am. Compl. ¶ 170.)

The Fourteenth Amendment's Equal Protection Clause provides that no state shall

"deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const.

amend. XIV.  The mandate of the Equal Protection Clause essentially is "that all persons

similarly situated should be treated alike."  *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432,

439 (1985); *see also Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ("'Equal Protection' . . .

emphasizes disparity in treatment by a State between classes of individuals whose situations

are arguably indistinguishable."). Section 1983 was enacted to enforce the Fourteenth Amendment. *Conn v. Gabbert*, 526 U.S. 286, 290 (1999) ("Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights."). A cause of action pursuant to § 1983 requires proof that (1) a person acting under color of law (2) deprived the plaintiff of a federal or constitutional right. *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995). "Conspiring to violate another person's constitutional rights [also] violates section 1983." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002). To prevail on a § 1983 conspiracy claim, "a plaintiff must show an underlying actual denial of [his] constitutional rights," and "that the defendants reached an understanding to deny the plaintiff's rights." *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) (citations and internal quotation marks omitted).

Plaintiffs cite *E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987), for the principle that equal protection claims fall into three categories. *Id.* at 1112 n.5. The first category enumerated in *E & T Realty* is a claim that a "statute discriminates on its face." *Id.* To prevail, a plaintiff must prove that there is "no rational relationship" between the regulatory classification and a legitimate governmental goal; however, if a suspect class or fundamental right is at issue, the level of scrutiny is heightened. *Id.* "The second type of equal protection claim is that neutral application of a facially neutral statute has a disparate impact." *Id.* The third type of claim, an as applied claim, "is that defendants are unequally administering a facially neutral statute." *Id.*; *see also* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law, Substance & Procedure*, § 18.4 (4th ed. 2008) (Under equal

protection review, a law may establish a classification either "on its face," in its purpose or effect, or in its application.).  Plaintiffs contend that their equal protection theories fall into all three categories, and that they are entitled to summary judgment on their substantive and conspiratorial equal protection claims.  (Doc. # 445, at 41.)

Defendants move for summary judgment on Counts III and IV.  Sheriff Warren asserts that Plaintiffs have not demonstrated a violation of the Equal Protection Clause, and that, therefore, Counts III and IV fail.  (Doc. # 424, at 41-45.)  Mr. McGregor and VictoryLand, named only in Count IV, argue that Plaintiffs' § 1983 conspiracy claim falters because "Plaintiffs as a matter of law cannot show that there was a violation of their federal rights." (Doc. # 440, at 139.)  Because Defendants challenge the viability of the substantive equal protection claim on essentially the same grounds, their arguments apply to both Counts III and IV and will be addressed together.

### 1.    *Vice Activities*

The Supreme Court has placed gambling in the same category as other "products or activities deemed harmful, such as cigarettes, alcoholic beverages, and prostitution." *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 346 (1986); *see also id.* at 341 (observing that gambling brings with it the potential for compulsive gambling, which has as unfortunate secondary effects increased crime and financial ruin); *Grimes v. Bd. of Comm'rs of City of Las Vegas*, 1 P.2d 570, 572 (Nev. 1931) ("Gaming as a calling or business is in the same class as the selling of intoxicating liquors in respect to deleterious tendency.").

104

Gambling, like the other enumerations, is a "vice activity." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183 (1999).

Because gambling "falls into a category of 'vice' activity," it "c[an] be, and frequently has been, banned altogether." *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993); *see also Primm v. City of Reno*, 252 P. 2d 835, 837-38 (Nev. 1953) ("On account of the nature of the business of gambling, which is capable of being so conducted as to be a source of evil, a very wide discretion is thus conferred, not only to restrict the number of licenses in the city, but to pass all reasonable rules and regulations concerning it which the city authorities may deem necessary for the police government of the municipality." (citation and internal quotation marks omitted)). In the regulatory aspect, thus, courts have distinguished between vice activities and "generic economic" activities. *Artichoke Joe's Calif. Grand Casino v. Norton*, 353 F.3d 712, 739 (9th Cir. 2003) (citing *State v. Heretic, Inc.*, 588 S.E.2d 224, 225-26 (Ga. 2003)). In *Heretic*, for example, the court rejected the plaintiffs' comparison of alcohol sales to furniture sales: "The present case is distinguishable because the state lacks the interest in regulating the sale of furniture that it has in regulating the sale of alcohol, which poses significant risks to the health and safety of the general public." 588 S.E.2d at 225-26.

Moreover, it is well established that "[t]he regulation of gambling devices is within the police power of the State." *Opinion of the Justices*, 795 So. 2d 630, 646 (Ala. 2001); *see also Artichoke Joe's*, 353 F.3d at 737 ("The circuits that have given significant attention to equal protection challenges to state gambling laws have, by and large, held that 'the regulation of gambling lies at the heart of the state's police power.'" (collecting cases)); *Rodriguez v. Jones*,

105

64 So. 2d 278, 279 (Fla. 1953) (States may exercise "greater control" over gambling "because of the noxious qualities of the enterprise as distinguished from those enterprises not affected with a public interest and those enterprises over which the exercise of the police power is not so essential for the public welfare.").  "Formulations of that [police] power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens.  The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens." *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999).  "The question of how best to regulate gambling activity is also one to which different states can arrive at different answers based on their different experiences." *Id.*  Hence, the Supreme Court has rejected "equal protection challenges to legislative classifications aimed at reducing specific harms associated with vice activity." *Artichoke Joe's*, 353 F.3d at 737-38 (citing *Edge Broad. Co.*, 509 U.S. at 426).  And those "classifications have withstood scrutiny whether they distinguish between States, political subdivisions within a state, or establishments within the same locality." *Id.* at 738.  With respect to "vice activities," a "state is free to enact legislation that accords different treatment to different localities, and even to different establishments within the same locality, so long as that differentiation is tied to a legitimate interest in the health, safety, or welfare of its citizens." *Id.* at 740; *see also Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 438 (8th Cir. 2007) ("No one would question that [the State] has the power to regulate gambling in the interest of the public health, safety, and general welfare." (citation and internal quotation marks omitted)).

Sheriff Warren has the authority to implement rules for the regulation of bingo games in Macon County.  Amendment No. 744 grants him that authority.  *See* Ala. Const. 1901 amend. No. 744  ("The sheriff shall promulgate rules and regulations for the licensing and operation of bingo games within the county.").  Sheriff Warren also has regulatory authority pursuant to his "police powers."  *Opinion of the Justices*, 795 So. 2d at 630.  There is no challenge in this case to Sheriff Warren's authority to regulate bingo in Macon County.

### 2.   *Facial Challenges to the Second Amended Rules (The First Category)*

Plaintiffs' equal protection claim includes facial challenges to two provisions of the Second Amended Rules.  The first relates to the Operator's License that Lucky Palace wants; the second to Class B Bingo Licenses that the Plaintiff Charities want.  First, Plaintiffs assert that there is no rational basis for the requirement in the Second Amended Rules that a "'qualified location' be in existence" for inspection and approval by Sheriff Warren "*before* an operator's license would issue" (the "existing facility requirement").[62]  (Doc. # 445, at 44-46.)  Second, Plaintiffs argue that the Second Amended Rules are facially invalid because the interplay between the requirement that no Class B Bingo Licensee "shall be authorized to operate bingo at any qualified location . . . unless a minimum of fifteen (15) applicants shall first obtain Class B [Bingo] Licenses" and the requirement that no more than sixty Class B Bingo Licenses shall be issued for the operation of bingo in Macon County (together the "numerical licensing requirements") give VictoryLand a monopoly on electronic bingo in Macon County.  (Doc. # 445, at 46-50.)

---

[62] The arguments presume that approval as a "qualified location" would result in the issuance of an Operator's License.  *See supra* note 26.

### a.    Rational Basis Review

Plaintiffs concede, and this court previously has found, that the Rules and Regulations do not treat entities differently on the basis of race or another suspect classification, and that because those Rules govern a gambling activity, they do not impinge on fundamental rights. (*See* Mem. Op. & Order, at 20 (Doc. # 144).)  Accordingly, Plaintiffs' facial equal protection claim is subject to rational basis review.  "If a law treats individuals differently on the basis of race or another suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny."  *Leib v. Hillsborough County Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009); *see also Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002) (citing voting as an example of a fundamental right and race or national origin as examples of suspect characteristics).  "Otherwise, the law need only have a rational basis – *i.e.*, it need only be rationally related to a legitimate government purpose."  *Leib*, 558 F.3d at 1306.

The rational basis "standard of review is a paradigm of judicial restraint[,]" *F.C.C. v. Beach Commc'ns., Inc.*, 508 U.S. 307, 314 (1993), and does not give the courts "a license . . . to judge the wisdom, fairness or logic of legislative choices," *id.* at 313.  Rational basis review "affords states 'wide latitude' when crafting 'social or economic legislation.'"  *Deen v. Egleston*, 597 F.3d 1223, 1230 (11th Cir. 2010) (quoting *Cleburne*, 473 U.S. at 440); *see also Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989) ("Economic and social legislation is presumed valid if it is rationally related to a legitimate state interest." (citation and internal quotation marks omitted)); *Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.*, 825 F.2d 367, 370 (11th Cir. 1987) ("[T]he equal protection clause allows

108

governmental bodies wide latitude in enacting social and economic legislation; the federal courts do not sit as arbiters of the wisdom or utility of these laws.").

The rational basis test asks, first, "whether the government has the power or authority to regulate the particular area in question" and, second, "whether there is a rational relationship between the government's objective and the means it has chosen to achieve it." *Leib*, 558 F.3d at 1306.  That Sheriff Warren had such authority is not disputed.  In *Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995), the Eleventh Circuit broke down the second inquiry into two steps.  "The first step . . . is identifying a legitimate government purpose – a goal – which the enacting government body could have been pursuing." *Id.* at 921.  The second step "asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." *Id.* at 922.

A governmental purpose must be "legitimate," but it need not have been the actual purpose.  *Haves*, 52 F.3d at 921.  This is because "[t]he *actual* motivations of the enacting governmental body are entirely irrelevant" to the rational basis inquiry.  *Id.* at 922; *see also Zilich v. Longo*, 34 F.3d 359, 363 (6th Cir. 1994) (Courts "may not invalidate . . . legislative action based on the allegedly improper motives of legislators."); *Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551, 555 (7th Cir. 1988) (Consideration of legislative motive would subject a "vast amount of routine legislation – federal, state, and local . . . to invalidation by a federal court upon evidence that the legislation, though on its face concerned only with the most ordinary matters of governmental

administration, had actually been intended to punish the legislators' political opponents, or reward the legislators' friends with largesse obtained by taxes on their enemies.").

Indeed, it is well established that the "Equal Protection Clause does not require government decisionmakers to articulate any reason for their actions." *Haves*, 52 F.3d at 922 (citing *Beach*, 508 U.S. at 315). The legitimate governmental purpose merely has to be one "which the enacting government body *could* have been pursuing." *Id.* at 921. It, thus, is permissible to probe the full realm of hypotheticals in ascertaining whether a proper purpose exists for the challenged legislation. *Id.* at 922. A court is "not bound by the parties' arguments as to what legitimate state interests the statute seeks to further." *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004). Relatedly, as highlighted in *Haves*, the purpose need not have evidentiary support in the record. *See* 52 F.3d at 921.

Whether there is a rational basis that "further[s] the hypothesized [governmental] purpose" also is not dependent upon "whether that basis was actually considered by the legislative body," but instead focuses upon the existence of "a conceivably rational basis." *Id.* (citation and internal quotation marks omitted); *see also U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (Under rational basis review, it is "'constitutionally irrelevant [what] reasoning in fact underlay the legislative decision.'"). "[A] statute is presumed constitutional, and the burden is on the one attacking the law to negate every conceivable basis that might support it, even if that basis has no foundation in the record." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993); *Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1546 (11th

Cir. 1994) (Government has no obligation to produce evidence to sustain the rationality of a statutory classification.).

In other words, if there are "plausible reasons" for the government's action, the court's "inquiry is at an end." *Beach*, 508 U.S. at 313-14. Thus, "[i]n the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996) (collecting cases). Because states are "accorded wide latitude in the regulation of their local economies under their police powers, . . . rational distinctions may be made with substantially less than mathematical exactitude." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (*per curiam*). A legislative classification "need not be drawn so as to fit with precision the legitimate purposes animating it." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 814 (1976). "Even foolish and misdirected" regulations "are generally valid" under rational basis review. *Craigmiles*, 312 F.3d at 223-24.

Rational basis review strictly limits the function of the court. The court cannot (1) strike down a regulation if a "conceivably rational basis" exists for the enacting governmental officials to believe that the regulation would further the hypothesized purpose, *Haves*, 52 F.3d at 921; (2) consider the motivations of the enacting governmental officials, *id.*; (3) "judge the wisdom, fairness, or logic of legislative choices," *Beach*, 508 U.S. 313; (4) "speculate as to whether some other scheme could have better regulated the evils in question," *Powers*, 379 F.3d at 1217 (citing *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S.

356, 378 (1973)); (5) strike down a regulation because it did "not succeed in bringing about the result it s[ought] to accomplish" or because the regulation "lack[s] razor-sharp precision," *id.* (citations to Supreme Court decisions omitted); or (6) invalidate a "statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice," *id.* (citing *Vance v. Bradley*, 440 U.S. 93, 110-11 (1979)).

With that said, rational basis scrutiny, while very deferential, is not "'toothless.'" *Deen*, 597 F.3d at 1230 (quoting *Schweiker v. Wilson*, 450 U.S. 221, 101 (1981)). "'The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives – such as a bare . . . desire to harm a politically unpopular group – are not legitimate state interests.'" *Id.* (quoting *Cleburne*, 473 U.S. at 446-47).

Finally, whether there is a rational basis for a government regulation is a question of law to be determined by the court. *See Greenbriar,* 881 F.2d at 1578; *Myers v. County of Orange*, 157 F.3d 75 n.3 (2d Cir. 1998) ("The issue of whether the [municipal] policy has a rational basis and therefore does not violate the Equal Protection Clause . . . is a legal issue for the court and not a factual issue for jury determination."); *see also Izquierdo Prieto v. Mercado Rosa*, 894 F.2d 467, 471 (1st Cir. 1990) (Under rational basis review, rationality is "a question of law for the judge – not the jury – to determine."); *accord Schism v. United States*, 972 F. Supp. 1398, 1407 (M.D. Fla. 1997).

### b.       Existing Facility Requirement

The "qualified location" provision found in the Second Amended Rules, which the parties refer to as the "existing facility" requirement,[63] is the subject of the first equal protection challenge.  Plaintiffs contend that the classification and different treatment of entities without existing facilities is not rationally related to any legitimate governmental purpose.[64]  Defendants, however, assert that the existing facility requirement is "rationally

---

[63] It provides:

"Qualified location" for the holder of a Class B Bingo License shall mean a location, as defined above, which has been inspected and approved by the Sheriff for the conduct of bingo games and other lawful activities and for which the license applicant shall submit satisfactory evidence that the location has in place the following at all times that any bingo games are being conducted or operated; (i) public liability insurance in an amount not less than $5,000,000; (ii) if liquor is served, liquor liability insurance in the amount of not less than $1,000,000; (iii) adequate parking for patrons and employees; (iv) onsite security as prescribed by the Sheriff; (v) onsite first aid personnel as prescribed by the Sheriff; (vi) cash or surety bond in an amount not less than $1,000,000; (vii) such accounting procedures, controls and security monitoring as necessary to preserve and promote the integrity of the operation of bingo games and to ensure the protection of the charitable license holder and its patrons; (viii) satisfactory evidence that the owner or owners of the location paid at least $15,000,000 for the land, building and other capital improvements (before depreciation) comprising said location; (ix) satisfactory evidence that the location is fully compliant with the Americans with Disabilities Act ("ADA"); and (x) satisfactory evidence that the owner or owners of such location have been residents of the State of Alabama for at least three (3) years or, if the owner is a partnership, association, corporation, limited liability company, or other business entity, satisfactory evidence that those partners, members, or stockholders of such entity that own collectively at least two-thirds (2/3) of the voting rights and equity interests of such entity, are individuals that have been residents of the State of Alabama for at least three (3) years.

(2d Am. Rules § 1(j).)

[64] As a threshold matter, legislation that does not classify individuals or entities for different treatment does not violate the Equal Protection Clause.  *See United States v. Pitts*, 908 F.2d 458, 459 (9th Cir. 1990) ("Before we review any statute for an equal protection violation, . . . the challenger must demonstrate that it classifies persons in some manner.").  Plaintiffs complain that the Second Amended Rules "favor[]" VictoryLand, "the only entity in Macon County that possessed a 'qualified location.'" (Doc. # 445, at 44.)  It appears then that Plaintiffs are complaining that the Second Amended Rules distinguish on their face between entities which on the date of the Rules' enactment had an "existing facility," and those which did not.

113

related to the legitimate governmental interest of economic development," as it ensures a "significant investment in and commitment to the economic development of Macon County."[65]  (Doc. # 440, at 132, 133-34; Doc. # 459, at 74; Doc. # 475, at 53.)  Plaintiffs do not dispute that "[p]romoting economic development is a traditional and long-accepted function of government."  *Kelo v. City of New London, Conn.*, 545 U.S. 469, 484 (2005); *W. Seafood Co. v. United States*, 202 F. App'x 670, 674-75 (5th Cir. 2006).  In fact, Plaintiffs retort that they are not challenging the existing facility requirement with respect to the *amount* of the investment; they say they "were prepared to invest far more than $15 million." (Doc. # 464, at 57.)  They argue that the requirement that a facility physically exist before it can be approved as a "qualified location" and an Operator's License[66] issued is not rationally related to the legitimate governmental interest of economic development and investment in the community.  (Doc. # 464, at 57.)  To the contrary, Plaintiffs say that the

---

[65] Under rational basis review, Defendants have no burden to make any particularized justification to support the Rules.  In this case, however, Defendants assert that they offer this basis to demonstrate that Plaintiffs cannot meet their heavy burden of disproving every conceivable rational basis for the existing facility requirement.  (Doc. # 459, at 75 n.38.)  Defendants also point out that Sheriff Warren, as the enacting government official, actually considered this basis.  In this respect, they point to the commentary to the First Amended Rules, which increased the capital investment amount required for a "qualified location" from $5 million to $15 million, and Sheriff Warren's deposition testimony.  (*See* Doc. # 459, at 75 (citing 1st Am. Rules, which provide that the capital investment requirement was increased from $5 million to $15 million to ensure that "a significant investment and financial commitment to Macon County prior to becoming a 'qualified location'"); Warren Dep. 139 (testifying that he "was trying to make sure that whoever did this [*i.e.*, conducted electronic bingo], [made] a substantial investment in the county and . . . w[as] serious about doing it").  Defendants again correctly assert that the constitutional analysis would be unaffected, even if this reason had not been articulated by Sheriff Warren.  This is because the "proper inquiry is concerned with the existence of a conceivably rational basis, not whether that basis was actually considered by the legislative body."  *Haves*, 52 F.3d at 921-22.

[66] *See supra* note 26.

existing-facility requirement only inhibits economic development and investment, since reasonable investors would be unwilling to risk such an investment in the absence of some assurance that a license would issue.  (Doc # 464, at 57.)

Defendants say that the requirement that a proposed electronic bingo facility exist for inspection prior to licensing "is rationally related to other legitimate government interests, including . . . protecting the safety and well being of the citizens of Macon County," and that Sheriff Warren's ability "to protect the safety and welfare of the citizens of Macon County . . . is served by requiring that a facility exist that can be inspected prior to the issuance of a license."  (Doc. # 459, at 76; *see also* Doc. # 440, at 134-36; Warren Dep. 134 ("I don't think expecting someone to have a building there before [he] get[s] a license is asking too much.").)  Sheriff Warren also points out that the requirement of an existing facility further serves to limit electronic bingo in his regulatory territory of Macon County, and that " limiting . . . a vice activity such as gambling is a plausible" and recognized legitimate reason for government regulation.  (Doc. # 458, at 28.)

Plaintiffs have not contested the legitimacy of a governmental interest in the protection of the public's safety and welfare.  Instead, Plaintiffs argue that requiring an existing facility as a requirement for licensing is arbitrary and not *rationally related* to this proposed legitimate governmental interest.  (Doc. # 464, at 57.)

115

Thus, the arguments having been sifted, the issue is whether there is a rational relationship between a public safety goal and the Second Amended Rules' requirement that a $15 million facility must be erected prior to inspection and Operator's License approval.[67]

Sheriff Warren is the chief law enforcement official responsible for the safety of patrons at facilities where electronic bingo is conducted.   The Rules and Regulations pertaining to the sheriff's inspection address matters concerning the physical structure of the building potentially affecting the safety and welfare of the public.   These include public liability insurance, liquor liability insurance, "adequate" parking (patron safety), onsite security (protection of patrons from criminal activity), onsite first aid personnel (protection of patrons' health and general welfare), compliance with the Americans with Disabilities Act, and the requirement that all applicable building code requirements are met.   (2d Am. Rules § 1(f) & (j).)   The safety and welfare of the citizens of Macon County, thus, is furthered, perhaps imperfectly, by requiring that a facility exist that can be inspected prior to the issuance of an Operator's License.

Plaintiffs are correct that Lucky Palace (or any entity without an existing facility) must make tremendous expenditures to build a facility, and that it certainly would be good business practice to obtain preconstruction approval, or some sort of intermediate assurance,

---

[67] Later, Plaintiffs argue that the requirement of an existing facility (inspected and approved by the sheriff as a qualified location) for the issuance of a Class B Bingo License is an oral change to the Second Amended Rules – that the existing facility requirement for a *Class B Bingo License* is not facially in the Rules, but was added to avoid issuance of Class B Bingo Licenses to the Plaintiff Charities.   There is no argument, indeed Plaintiffs concede, that for purposes of the present analysis, the Second Amended Rules require an existing facility (that has been inspected and approved by Sheriff Warren as a qualified location) before an *Operator's License* will be issued.

prior to building a $15 million facility.[68]  There may be other ways, or intermediate steps, to

obtain a license that do not require the raising of a physical structure, but "rational-basis

review does not give courts the option to speculate as to whether some other scheme could

have better regulated the evils in question."  *Powers*, 379 F.3d at 1217.  Similarly, "[i]n the

area of economics and social welfare," legislation may be "imperfect" and "result[] in some

inequality" and still withstand rational basis scrutiny.  *Fritz*, 449 U.S. at 175.  Under rational

basis review, the existing facility requirement "need not be in every respect logically

consistent with its aims to be constitutional."[69]  *Williamson v. Lee Optical of Okla.*, 348 U.S.

483, 487-88 (1955).

The thrust of Plaintiffs' argument against a rational basis finding is that there are "no

firm legal standards for licensing under the existing-facility requirement" and that, therefore,

requiring that a facility be constructed for inspection prior to its approval as a "qualified

location" is not rationally related to the legitimate governmental interest of public safety.

---

[68] Plaintiffs argue that, unlike liquor license ordinances that provide extensive intermediate procedures for obtaining a liquor license, including the preconstruction review of plans by city departments and agencies and the ability to correct any deficiencies with those plans prior to construction, Sheriff Warren has no incremental building standards governing the electronic bingo licensing procedures.  (Doc. # 464, at 59.)

[69] Additionally, that public safety is not an articulated goal in the commentary to the Rules does not prevent it from qualifying as a conceivably rational basis for the existing facility requirement.  *See Haves*, 52 F.3d at 921-22 (The legitimate governmental objective merely has to be one "which the enacting government body *could* have been pursuing," *id.* at 921, and, thus, even a hypothetical reason suffices as a proper purpose for challenged legislation, *id.* at 922.).  Indeed, in *Williamson v. Lee Optical of Okla.*, 348 U.S. 483 (1955), the Supreme Court applied the rational basis test to uphold state legislation that arguably promoted the public's health and safety, even without evidence of a salutary effect.  *See id.* at 487.  The law was constitutional because it conceivably advanced the public good:  "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."  *Id.* at 488.

(Doc. # 464, at 57-58.)  Plaintiffs give five reasons why the court should find that the existing facility requirement amounts to a standardless scheme of unbridled discretion:  (1) the definition of "qualified location" includes only "vague requirements"; (2) there are no standards governing Sheriff Warren's inspection and approval; (3) the amendments to the Rules, which occurred over a thirteen-month period, made it "impossible for a potential entrant to know whether the standards governing his entry at the time construction commenced would be the same at the time construction was completed"; (4) Sheriff Warren was "unreliable" because he amended the First Amended Rules five months after he represented to Lucky Palace that he foresaw no further changes to the Rules; and (5) "most importantly," Sheriff Warren had "unfettered discretion" because he testified that he had "the option of denying" an application for a license even if the applicant met all of the requirements set out in the Rules.[70]   (Doc. # 464, at 58-59.)

For their argument that the existing facility requirement contains "no firm legal standards" (Doc. # 445, at 45; Doc. # 464, at 59), Plaintiffs rely upon *Browning-Ferris Industries of Alabama, Inc. v. Pegues*, 710 F. Supp. 313 (M.D. Ala. 1987) (Hobbs, C. J.), and *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964).[71]  Plaintiffs argue, that just as in *Browning-Ferris*, "the existing facility requirement – coupled with Sheriff Warren's unfettered

---

[70] Defendants, on the other hand, point out that Sheriff Warren also testified that any applicant that fully meets the requirements of the Rules regarding bingo would be approved.  (Warren Dep. 107; Warren Answer to 6th Am. Compl. ¶¶ 41, 57.)

[71] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

discretion – required Lucky Palace to make 'enormous investments of time and money' with no assurance that a license would ever be granted and inflicted 'substantial hardship' on Lucky Palace who [sic] 'had to go through the lengthy and expensive process' of constructing a facility 'only to face the unpredictability of the [Sheriff's] approval.'" (Doc. # 464, at 58.)

Plaintiffs' argument relies exclusively on *Browning-Ferris*'s discussion of a due process, not an equal protection, claim. *See* 710 F. Supp. at 315. "It would be difficult to conceive of a statute which is more susceptible of arbitrariness in violation of the Fourteenth Amendment['s Due Process Clause] than one that gives absolute discretion to a legislature to allow licensing but provides no clue for determining the basis on which a license would be granted." *Id.* The legislation at issue, therefore, was struck down for its "complete absence of standards" because it "violate[d] the Due Process Clause of the Constitution."[72]

---

[72] It is true that *Browning-Ferris* made a passing reference to "equal protection" in its due process analysis. *See* 710 F. Supp. at 315. This reference to equal protection, injected during the discussion of a due process analysis, provides an insufficient basis for concluding that the statute challenged in *Browning-Ferris* independently violated the Equal Protection Clause because of the statute's lack of standards. Moreover, the case law cited by *Browning-Ferris* in support of a finding that the statute was unconstitutionally vague, and its processes arbitrary and capricious, concerned due process. Given the differences between the equal protection and due process clauses, the analysis in *Browning-Ferris* does not apply to this case. *Browning-Ferris* did contain an equal protection analysis in a separate section; however, the section of the opinion addressing the equal protection claim is devoid of any mention of the statute's absence of standards and, in any event, is not relied upon by Plaintiffs.

*Id.* at 315 & 317; *see also Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 660 (11th Cir. 1984) (Commercial regulation violates *due process* on vagueness grounds when it "provide[s] 'no rule or standard at all.'" (quoting *Exxon Corp. v. Busbee*, 644 F.2d 1030, 1033 (5th Cir. 1981) (emphasis added)).

Plaintiffs have not brought a Fourteenth Amendment *due process* claim challenging the Rules or Amendment No. 744 as being standardless or void for vagueness.  To the extent that Plaintiffs seek to invoke the Due Process Clause, that theory is absent in all versions of the complaint, including the most recent one.[73]  *Cf. Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  This new unpled theory will not be

---

Thus, it is unnecessary to decide whether the existing facility requirement passes muster under the Due Process Clause.  It is notable that the legislation at issue in *Browning-Ferris* did not fail under the Due Process Clause because there were "no firm legal standards" for obtaining legislative approval, the standard proposed by Plaintiffs (Doc. # 445, at 45), but rather because the legislation was "complete[ly] absen[t] of standards," contained "no guidelines," and "provide[d] no clue for determining the basis on which a license would be granted."  *Browning-Ferris*, 710 F. Supp. at 315.  *Browning-Ferris* turned on the total absence of even a single statutory criterion for the state legislature's approval of hazardous waste facilities in Alabama; the statute merely provided that the state legislature must "giv[e] approval" for a permit.  *See id.* at 314.

Plaintiffs also assert that, like the legislature in *Browning-Ferris*, Sheriff Warren had "unfettered" discretion to grant or deny a license, but again there is precedent that the Equal Protection Clause is not the proper vehicle through which to bring such a claim.  In *Leib*, observing the plaintiff's "fail[ure] to articulate the precise nature of [his] claim," the Eleventh Circuit explained that the plaintiff's "chief argument in support of the unbridled discretion claim is that the 'purpose of the underlying statute' standard is too nebulous for people of ordinary intelligence to comply with – which . . . is the gravamen of a *void-for-vagueness claim*."  558 F.3d at 1309 (emphasis added); *see also Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) ("'[A] state's legislative enactment is void for vagueness under the due process clause of the fourteenth amendment if it 'is inherently standardless, enforceable only on the exercise of an unlimited, and hence arbitrary, discretion vested in the state.'" (citation omitted)).

[73] The court expresses no opinion on whether a due process claim would have merit.  The absence of that claim is merely noted.

considered at this late stage of the game.  (*See* 2d Am. Scheduling Order ¶ 4 (Doc. # 341) (establishing June 2, 2009, as the deadline for amending the pleadings).)

Other than *Browning-Ferris*, Plaintiffs rely upon *Hornsby*, but *Hornsby* only further demonstrates that Plaintiffs' argument is grounded in the wrong provision of the Fourteenth Amendment.  An argument was made in *Hornsby* pertaining to the alleged unbridled discretion exercised by the licensing authority in denying a liquor permit, but the Fifth Circuit's discussion at that point was centered on a denial of due process.  *See* 612 F.2d at 610 (In the context of its due process analysis, observing that "[i]n addition, [the plaintiff] was not afforded an opportunity to know, through reasonable regulations promulgated by the board, of the objective standards which had to be met to obtain a license."); *Maher v. City of New Orleans*, 516 F.2d 1051, 1063 n.60 (5th Cir. 1975) (noting that in *Hornsby*, a successful attack was "mounted on the denial of [a] liquor permit[], because of a total absence of proper standards to govern the administrative discretion," and that "the unfettered, unreviewable power granted the agency in th[at] situation[] offended due process"); *see also Clark v. City of Fremont, Neb.*, 377 F. Supp. 327, 335 (D. Neb. 1974) (citing "[a] line of Fifth Circuit decisions," including *Hornsby*, that stands for the principle that, while municipal authorities have broad power "to regulate liquor traffic . . . , they are not freed from *due process* requirements in granting liquor licenses, and thus are not to be allowed to exercise an uncontrolled discretion in regard to liquor licensing" (emphasis added)).

This brings the analysis back to the fact that the key portions of *Browning-Ferris* and *Hornsby* upon which Plaintiffs rely relate to due process, not equal protection, challenges. No other decision has been cited by Plaintiffs in support of their argument. Plaintiffs have relied on the Due Process Clause (the square peg), but attempt to prevail in this action on a claim invoking the Equal Protection Clause (the round hole). In sum, Plaintiffs have not met their burden of establishing that the existing facility requirement is not rationally related to the legitimate governmental interest of public safety and welfare.

### c.      Numerical Licensing Requirements

Plaintiffs' second facial challenge is to the numerical licensing requirements that allegedly give VictoryLand a monopoly on electronic bingo in Macon County without any rational basis. This challenge directly implicates the Class B Bingo Licenses of the Plaintiff Charities and indirectly Lucky Palace's proposed Operator's License. Plaintiffs' argument is as follows: The Second Amended Rules, which were effective January 1, 2005, provide that the owner of a "qualified location" cannot operate electronic bingo unless it is affiliated with at least fifteen Class B Bingo License holders. The Second Amended Rules simultaneously cap the number of Class B Bingo Licenses at sixty. On July 25, 2005, which was approximately six months after the effective date of the Second Amended Rules, Plaintiffs "attempted to submit their application for Class B licenses." (Doc. # 445, at 46.) On that date, however, there were fifty-nine Class B Bingo Licenses issued and under contract with VictoryLand, thereby making it impossible under the Second Amended Rules

"for any 'qualified location' other than VictoryLand to conduct electronic bingo in Macon County." (Doc. # 445, at 46.) Plaintiffs frame the issue as "whether the classification drawn by the Second Amended Rules – which allows electronic bingo to be conducted only at VictoryLand – is rationally related to a legitimate state interest." (Doc. # 445, at 47.)

Plaintiffs argue that their burden of negating every conceivable rational basis easily is met based upon Sheriff Warren's "mind." (Doc. # 445, at 48.) Sheriff Warren testified that he did not intend for the Rules and Regulations to create a monopoly, and that "a monopoly protects no one." (Doc. # 445, at 48 (citing Warren Dep. 306-07).) Because Sheriff Warren's testimony establishes that "no governmental purpose for creating a monopoly could conceivably have been the policy or purpose of Sheriff Warren," Plaintiffs argue that they have met their burden. (Doc. # 445, at 49 (citing *Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).) Finally, Plaintiffs argue that to the extent the numerical licensing requirements are sought to be justified on the basis that a "monopoly [for VictoryLand] [is] in the best interests of Macon County," that purpose is not legitimate under rational basis scrutiny. (Doc. # 445, at 49.) The arguments will be addressed in turn, but some initial observations about Plaintiffs' theory are in order.

Plaintiffs rely on three faulty assumptions: first, that the Second Amended Rules *on their face* give VictoryLand the exclusive right to conduct electronic bingo in Macon County; second, that delving into Sheriff Warren's motives is a proper endeavor under rational basis

review; and third, that a regulation's effect of creating a monopoly is the *sine qua non* of "irrational" under the Equal Protection Clause.

As to the first assumption, while it is true that there is nothing in the Second Amended Rules that forecloses all sixty Class B Bingo License holders from contracting with a single electronic bingo operator, the minimum and maximum licensing requirements, on their face, permit up to four electronic bingo casinos to operate in Macon County at one time. That is, under the Second Amended Rules, it is plausible that a "qualified location" owner could limit its contracts with Class B Bingo License holders to fifteen, the minimum number required for the operation of electronic bingo at any one qualified location. Plaintiffs have not complained that the operation of electronic bingo at four (or even two or three) facilities would be unconstitutional, only that a "monopoly" of one is unconstitutional. Hence, under Plaintiffs' definition of "monopoly," the Second Amended Rules are not facially invalid because there is a conceivable set of circumstances by which more than one facility could operate electronic bingo in Macon County.

Turning to Plaintiffs' second assumption, as previously explained, rational basis review does not permit an examination of Sheriff Warren's motives for adding the fifteen-license minimum in the First Amended Rules and then less than seven months later, again amending the Rules to add a countywide sixty-license cap. *See Haves*, 52 F.3d at 923 (The plaintiffs' "evidence of improper motive does not create a genuine issue of material fact sufficient to survive summary judgment because the actual purposes of Ordinance 10932 are

124

not relevant to a rational-basis equal protection inquiry."); *see also infra* at VI.B.2.d. for further discussion pertaining to Plaintiffs' argument that Sheriff Warren harbored antipathy that should be considered in evaluating the facial challenges.  Hence, Sheriff Warren's motives, even if improper, are constitutionally irrelevant as to the facial challenge.  That is, for purposes of rational basis scrutiny, it matters not whether Sheriff Warren imposed the numerical licensing requirements so as to enable VictoryLand to corner the electronic bingo market.  Even if an improper motive could be inferred from the *timing* of the first and second amendments to the Rules, the suggested implication being that Sheriff Warren amended the Rules incrementally to solidify VictoryLand's "monopoly," that improper motive cannot be considered when assessing whether the numerical licensing requirements survive rational basis scrutiny under the Equal Protection Clause in a facial challenge.  *See Bannum, Inc. v. City of Fort Lauderdale, Fla.*, 157 F.3d 819, 822 n.3 (11th Cir. 1998) ("Because the governing body's motive is irrelevant for purposes of rational basis review, we are not at liberty to attach any legal significance to the timing of the City's decision to enforce its zoning ordinance in this case.").

This brings the court to Plaintiffs' third assumption that economic regulations creating monopolies are *per se* unconstitutional under the Equal Protection Clause.  While it may seem counterintuitive, there are, as Defendants point out (Doc. # 440, at 131-32), numerous cases in which no equal protection violation under rational basis review has been found, even when the effect of the regulation was to create a "monopoly."  *See, e.g., City of New Orleans*,

427 U.S. at 300 (A grandfather clause's length-of-operation exception to an ordinance's ban on pushcart vendors selling food in the French Quarter, which effectively created a "monopoly" for the lone two excepted pushcart food vendors, survived equal protection scrutiny; the city could have believed that the two excepted vendors, because of their longevity of operation, had "become part of [the French Quarter's] distinctive character and charm," which was a legitimate goal of the ordinance under rational basis review (internal quotation marks omitted)); *Pac. States Box & Basket Co. v. White*, 296 U.S. 176, 184 (1935) ("[T]he grant of a monopoly, if otherwise an appropriate exercise of the police power, is not void as denying equal protection of the law."); *Artichoke Joe's*, 353 F.3d at 736 ("Where there exists an appropriate connection to the state's police power, even the grant of a monopoly does not, in itself, offend equal protection principles.").  Clearly, the Second Amended Rules are not *per se* unconstitutional.

Turning to proper rational basis review, it must be determined first, whether there is a legitimate governmental purpose that  Sheriff Warren could have been pursuing when he implemented the numerical licensing requirements, which had the effect of limiting the number of electronic bingo facilities that can operate in Macon County.  If there is a legitimate governmental purpose, the second inquiry is whether a rational basis exists for Sheriff Warren to have believed that the numerical licensing requirements would further the hypothesized purpose.  *See Haves*, 52 F.3d at 921-22.

126

Gaming restrictions on the number and location of gaming facilities have been found rationally related to a variety of legitimate governmental purposes. The following cases are illustrative. In *Artichoke Joe's*, a California law that gave tribes an undisputed "monopoly" on Class III casino-style gambling on tribal lands was "reasonably designed to defend against the criminal infiltration of gaming operations" and furthered the legitimate governmental purpose of "ensuring that such gaming activities are free from criminal and other undesirable elements." 353 F.3d at 740 (citation and internal quotation marks omitted). In *Ocala Kennel Club, Inc. v. Rosenberg*, 725 F. Supp. 1205 (M.D. Fla. 1989), a Florida statute restricting the location of race tracks to one per every 100-mile radius was rationally related to the legitimate governmental purpose of "protect[ing] the revenue-producing capacity of the pari-mutuel industry." *Id.* at 1209. The statute passed equal protection muster, notwithstanding that at the time the plaintiff filed his application for a permit to operate a greyhound racing track in Marion County, there was no "qualifying location" in the state of Florida due to the 100-mile distance restriction. *Id.* at 1207. In *Watt v. Firestone*, 491 So. 2d 592 (Fla. Dist. Ct. App. 1986), a state constitutional amendment requiring that a casino must be situated in a hotel comprising at least 500 sleeping rooms was found to be rationally related to "assur[ing] that such establishments 1) will be limited in number; 2) will be found in tourist-oriented areas; [and] 3) will be subject to professional management," *id.* at 594 & n.4.

In *Helton v. Hunt*, 330 F.3d 242 (4th Cir. 2003), the Fourth Circuit held that a statute banning the operation of video gaming machines, but containing a grandfather clause

exempting machines that were present and operating in North Carolina on certain dates, did not violate equal protection principles. *See id.* at 244-45.  While the classification "seem[ed] unfair," it was not unconstitutional.  *Id.* at 246.  Because the "regulation of gambling 'lies at the heart of the state's police power,'" it was "beyond question that North Carolina has a legitimate government interest in the supervision of the video gaming industry." *Id.* (citation omitted).  That supervision included "restricting the number of new gaming machines in the state as a means of limiting the impact of gambling on the lives of its citizens." *Id.*  "The establishment of two dates – one on which any such machine must have been in operation within the State and the other, earlier date upon which the machine must have been listed on the tax rolls rationally furthers that purpose." *Id.*

In *Rodriguez*, an equal protection challenge was lodged against the constitutionality of a Florida statute that provided that "in no event shall any jai alai fronton be licensed to operate within twenty miles of a fronton already licensed."  64 So. 2d at 279 (citation and internal quotation marks omitted).  Because Florida law permitted "pari-mutuel wagering on the game of jai alai[,]" it "is but another form of authorized gambling." *Id.*  The plaintiff, who was denied a license to operate a fronton in Dade County because of the twenty-mile restriction, conceded that the restriction was a "valid exercise of the police power in the regulation of authorized gambling," but argued that the statute was "monopolistic." *Id.* at 280.  The plaintiff emphasized that, when the statute was enacted, there was only one jai alai fronton operating in Florida, and its location in Dade County precluded any other fronton

operator from setting up business in Dade County due to the twenty-mile restriction. *Id.* The court rejected the argument: "If a distance limitation between gambling enterprises is a reasonable regulation – and this is conceded by appellant – then the fact that the regulation incidentally creates a monopoly is of no moment." *Id.*

In *Landers v. Eastern Racing Association*, 97 N.E.2d 385 (Mass. 1951), a Massachusetts statute regulating wagering on horse racing withstood a state equal protection challenge. *Id.* at 393-95. Rejecting the argument that the statute was unconstitutional because it "grant[ed] a privilege and indulgence to a limited number of individuals," the court said, "The limitation of the number of licensed places within the territory of a town or city is a reasonable exercise of the police power, and therefore is not in conflict with the Constitution of the Commonwealth." *Id.* at 395. A similar principle was noted in *Primm*, where the denial of an applicant's license to conduct gambling and serve liquor on certain premises was upheld based upon the city council's decision that it was not in the "best interests of the community to permit the spread of gambling" to that side of town. 252 P.2d at 836. The *Primm* court observed that "[t]he power to restrict the number of licenses in the city is . . . a very necessary implication from the power to license and regulate gambling. This discretion is derived from the police power of the state." *Id.* at 837 (quoting *Grimes*, 1 P.2d at 572, in which it also was recognized that limitations on the number of licenses for

129

liquor and gaming were reasonable as a method of protecting society from the evils accompanying them).[74]

The foregoing cases reveal that on their face, Sheriff Warren's numerical licensing requirements easily pass rational basis scrutiny. The fifteen-license minimum and sixty-license maximum work together to restrict the number of electronic bingo gaming facilities in Macon County to a maximum of four. The power to restrict the number of gaming facilities, as illustrated above, is a valid exercise of Sheriff Warren's police regulatory powers of a vice activity, here, electronic bingo.

Moreover, the Commentary to the Second Amended Rules provides that the sixty-license maximum was imposed to limit electronic bingo activities in Macon County so as to allow the sheriff to "more effectively regulate and enforce proper conduct of such bingo games." There is ample authority from which to conclude that gambling carries with it heightened law enforcement needs, including the potential for "criminal infiltration of

---

[74] Given that courts have placed liquor and gambling in the same "vice" category, decisions interpreting liquor regulations also provide meaningful comparisons. Restrictions on the number of liquor licenses in a geographical area have been found not to violate equal protection in a number of cases. In *Simms v. Farris*, 657 F. Supp. 119 (E.D. Ky. 1987), an equal protection challenge was brought against a Kentucky statute that limited the "number and location of liquor licenses that [could] be issued in the unincorporated areas of certain counties in Kentucky." *Id.* at 119. One challenge was that the statute granted existing licensees a "monopoly." *Id.* at 121. The court, however, held that there was a "rational basis for the statute, namely, the need to regulate establishments serving alcoholic beverages," and that, therefore, the equal protection claim failed under rational basis scrutiny. *Id.* at 124. Finally, in *Bergmann v. City of Melrose*, 420 N.W.2d 663 (Minn. Ct. App. 1988), the court found that "[l]ocating liquor establishments in particular areas for law enforcement purposes is a legitimate exercise of a city's police powers," and that this location restriction was rationally related to "facilitat[ing] law enforcement and liquor control." *Id.* at 667. "The city could have reasonably concluded that an additional liquor-only establishment, located away from the downtown area where police patrols of liquor establishments are concentrated, would unduly burden its limited police resources." *Id.* at 667-68.

gaming operations," *Artichoke Joe*'s, 353 F.3d at 740, and for compulsive gambling and its secondary effects of crime, *Posadas*, 478 U.S. at 341.  There is a legitimate governmental interest in facilitating law enforcement control of electronic bingo which, in turn, advances the safety and welfare of the public.

Having found a plausible legitimate governmental purpose, the court must next determine whether the numerical licensing requirements are rationally related to that legitimate governmental purpose.  Obviously, the fewer electronic bingo facilities, the easier it is for the sheriff to ensure compliance with the Rules (a duty with which the sheriff was specifically charged by Amendment No. 744), and to otherwise provide patrol supervision at and near the establishments themselves.  Sheriff Warren also could have believed that fewer facilities would allow him to better allocate police resources, permit a greater concentration of law enforcement presence and patrol, or simplify the efforts the sheriff must take to regulate and enforce proper conduct of the electronic bingo games.  And Sheriff Warren could have believed that a limitation on the number of electronic bingo halls would correspondingly reduce the risk of crime.  Accordingly, restricting the number of electronic bingo facilities that can operate in Macon County furthers the legitimate governmental interest of facilitating law enforcement patrol and control of electronic bingo for the safety and welfare of the public.

Moreover, while social costs associated with gambling and its effect on moral conscience are publicly debated, Sheriff Warren also could have believed that a legitimate

purpose for regulatory restrictions on gambling was the alleviation of the social costs associated with it.  In general terms, the non-benign effects of the gambling business have been recognized by the courts.  *See Posadas*, 478 U.S. at 344 (categorizing gambling as a potentially harmful vice activity); *Primm*, 252 P.2d at 837 (observing that gambling "is capable of being so conducted as to be a source of evil"); *Rodriguez*, 64 So. 2d at 279 (noting that gambling has "noxious qualities"); *Grimes*, 1 P.2d at 572 (noting the "deleterious tendency" of the gaming business).  Hence, in *Helton*, a statute precluding the expansion of gaming was held rationally related to reigning in the negative impact of gambling on society. *See* 330 F.3d at 246.  It is plausible that the restrictions on the number of electronic bingo facilities in Macon County were imposed to curb a perceived unfavorable effect of gambling on the public.

Furthermore, based upon the authority of *City of New Orleans*, *Pacific States Box & Basket Co.*, *Artichoke Joe's* and *Rodriguez*, discussed above, the fact that all of the available licenses under the Second Amended Rules have been issued to charities that have contracted with VictoryLand for the operation of electronic bingo, thereby giving VictoryLand a monopoly in this gaming industry, does not facially invalidate the rules.  *See, e.g.*, *City of New Orleans*, 427 U.S. at 300; *Pac. States Box & Basket Co.*, 296 U.S. at 184; *Artichoke Joe's*, 353 F.3d at 736; *Rodriguez*, 64 So. 2d at 280.

In another effort to invalidate the numerical licensing requirements, Plaintiffs rely upon the Sixth Circuit's pronouncement in *Craigmiles* that "protecting a discrete interest

132

group from economic competition is not a legitimate governmental purpose," 312 F.3d at 224. (*See* Doc. # 445, at 49.) Plaintiffs' argument need not detain the court long. *Craigmiles* involved an equal protection challenge to an amendment to the Tennessee Funeral Directors and Embalmers Act ("FDEA") that required casket vendors to obtain a funeral director license as a prerequisite to selling caskets. The *Craigmiles* court held that the state's proffered justifications for requiring a casket vendor to go through the costly and onerous process of obtaining a funeral director's license "c[a]me close to striking [the court] with 'the force of a five-week-old, unrefrigerated dead fish.'" 312 F.3d at 225 (quoting *United States v. Searan*, 259 F.3d 434, 447 (6th Cir. 2001)). Holding that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose," the only conceivable purpose of the FDEA (*i.e.*, economic protection of funeral directors), the Sixth Circuit invalidated the state statute's "naked attempt to raise a fortress protecting the monopoly rents that funeral directors extract from consumers." *Id.* at 229.

Here, however, the court is not faced with deciding whether a monopolistic purpose is a legitimate governmental purpose under rational basis review because there are plausible legitimate interests for the Second Amended Rules' numerical licensing requirements that have nothing to do with economic protectionism. As discussed, there is a conceivable rational basis for the numerical licensing requirements that is steeped in ensuring efficacious law enforcement and regulatory control for the safety and welfare of the public. The public safety/welfare rationale is amply supported by the case law and the record in this case, and

133

thus, it cannot be said that this rationale stinks like a "'five-week-old, unrefrigerated dead fish.'"  *Id.* at 225 (citation omitted).  Other plausible bases have been demonstrated as well.

In sum, the Second Amended Rules' numerical licensing requirements pass muster under rational basis review.  Because there are "plausible reasons" for the Second Amended Rules' numerical licensing requirements, the court's facial challenge "inquiry is at an end." *Beach*, 508 U.S. at 313-14.  Plaintiffs, however, argue that the inquiry is not at an end.

### d.    Plaintiffs' Arguments Against Rational Basis Review

As pertains to their facial challenge, Plaintiffs make a final argument that needs to be addressed.  Notwithstanding the absence of an infringement upon a suspect classification or fundamental right, Plaintiffs argue that "there is reason to infer antipathy or undue favoritism" on the part of Sheriff Warren and that, therefore, the court should depart from "traditional" rational basis review (Doc. # 445, at 50; Doc. # 464, at 65), in favor of a standard of review that examines Sheriff Warren's "intentions and motivations" in promulgating the Rules (Doc. # 464, at 64 n.29).  Plaintiffs contend that antipathy on Sheriff Warren's part should be inferred from the alleged "conflicts of interest" and "undue influence" exhibited by Mr. McGregor's and VictoryLand's involvement in the rule-making process.  (Doc. # 445, at 51; Doc. # 464, at 65.)  At the very least, Plaintiffs suggest that any proffered justifications for the challenged portions of the Second Amended Rules are too "attenuated" and, thus, irrational.  (Doc. # 445, at 50-51.)

134

In support of their arguments, Plaintiffs rely upon *Vance*, 440 U.S. at 93. (Doc. # 445, at 50; Doc. # 464, at 64.)  They also point to *Cleburne* and *Romer*, suggesting that in those cases, the Supreme Court relied upon evidence of the government's aversion to groups that claimed a denial of equal protection to invalidate the legislation under rational basis scrutiny. *See Cleburne*, 473 U.S. at 432; *Romer*, 517 U.S. at 620.

Defendants, on the other hand, contend that Plaintiffs are "attempt[ing] to bootstrap some form of heightened review by arguing that animus or antipathy renders the rational basis inquiry inapplicable" (Doc. # 475, at 51 n.8), and that the cases relied upon by Plaintiffs are distinguishable.  They contend *Romer* is unparalleled on its facts (Doc. # 475, at 61) and "does not stand for the wholesale proposition that alleging animus renders the rational basis inapplicable as Plaintiffs would have this court believe."  (Doc. # 475, at 62; Doc. # 459, at 83-86.)  However, Plaintiffs rely on equal protection language in *Vance* that "[t]he Constitution presumes that, *absent some reason to infer antipathy*, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." 440 U.S. at 97 (emphasis added).

In *Romer*, the Supreme Court used the rational basis test to invalidate a provision of the Colorado state constitution ("Amendment 2") that repealed existing laws and policies protecting homosexuals from discrimination, and forbade "reinstatement of these laws and policies."  517 U.S. at 627.  Amendment 2 was purely "status based," *id.* at 635, and

135

amounted to a "[s]weeping and comprehensive . . . change" in homosexuals' "legal status" under Colorado law, *id.* at 627.  It "identifie[d] persons by a single trait [sexual orientation] and then denie[d] them protection across the board."  *Id.* at 633.  The Court struck down Amendment 2 because its "sheer breadth [was] so discontinuous with the reasons offered for it that the amendment seem[ed] inexplicable by anything but animus toward the class it affect[ed]; it lack[ed] a rational relationship to legitimate state interests."  *Id.* at 632.

In *Cleburne*, the Court held that the City of Cleburne's zoning ordinance that required a "special use permit" for the operation of a group home for mentally disabled persons, but did not require a special use permit for other similar kinds of group homes, violated the Equal Protection Clause as applied to the plaintiff group home.  *See* 473 U.S. at 447-50.  The Court rejected the lower court's decision that "mental retardation" is a quasi-suspect classification, *id.* at 442, but explained that rational basis review did not leave the mentally disabled "entirely unprotected from invidious discrimination."  *Id.* at 446.  The denial of the special use permit still had to be "rationally related to a legitimate governmental purpose."  *Id.* Hence, a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *Id.*  The City of Cleburne, however, had.  The Court concluded that "requiring the permit . . . appears to . . . rest on an irrational prejudice against the mentally retarded."  *Id.* at 450.

*Romer* and *Cleburne* are distinguishable because in those cases the regulations were not supported by *any* legitimate governmental interest, while here the challenged sections of

the Second Amended Rules are.[75]  As explained *supra*, the existing facility requirement is

rationally related to public safety and welfare interests, and the numerical licensing

requirements are rationally related to legitimate law enforcement purposes.  Hence, it cannot

be said, as in *Romer* and *Cleburne*, that the only conceivable purpose of the Second

---

[75] Additionally, at least two circuits – the Tenth and Sixth – have held *Romer* and *Cleburne* inapplicable to economic regulation, such as that in this case.  In *Kleinsmith v. Shurtleff*, 571 F.3d 1033 (10th Cir. 2009), an out-of-state attorney brought an equal protection challenge to a Utah statute that "require[d] all attorneys who act as trustees of real-property trust deeds in Utah to "maintain[] a place within the state."  *Id.* at 1035-36.  The attorney argued that the real purpose of the statute was to harm an "unpopular group," *i.e.*, out-of-state attorneys, and that *Romer* prohibited such a purpose.  *Id.* at 1048. The Tenth Circuit dismissed the argument, reiterating that in a prior binding decision, it had rejected "an equal-protection claim by persons who sought to sell caskets within Oklahoma over the Internet" on the ground that "*Romer* (and its apparent heightened rational-basis review) does not apply to state economic regulation."  *Id.*  (citing *Powers*, 379 F.3d at 1222-25); *see also Yeiter v. Sec'y of Health & Human Servs.*, 818 F.2d 8, 10 (6th Cir. 1987) (rejecting the plaintiff's argument that *Cleburne* should be applied to invalidate a statute regulating in the "area of economics and social welfare" (citation and internal quotation marks omitted)).  And, in *Powers*, the Tenth Circuit observed that the Supreme Court "has never applied *Cleburne*-style rational-basis review to economic issues."  379 F.3d at 1224.

137

Amended Rules is "a bare . . . desire to harm" VictoryLand's perceived competitors.[76]

*Powers*, 379 F.3d at 1224 (internal punctuation marks and citation omitted).

Moreover, as to Plaintiffs' reliance on *Vance*'s "antipathy" language, whether there

was evidence of antipathy was not at issue in *Vance*, and Plaintiffs have not cited any cases

explaining what constitutes evidence from which antipathy can be inferred or what standard

applies when evidence of antipathy is present.   The Supreme Court has talked about

"antipathy" in the context of heightened scrutiny for suspect and quasi-suspect groups.   In

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), for example, the

Court observed that "[c]ertain classifications . . . in themselves supply *a reason to infer*

---

[76] Case law suggests that where there is a conceivable rational basis, a court need not look any further in rejecting an equal protection challenge, even if there is commingling with an improper purpose. *See Univ. of Ala.*, 531 U.S. at 367 (rejecting proposition that "*Cleburne* stands for the broad proposition that state decisionmaking reflecting 'negative attitudes' or 'fear' necessarily runs afoul of the Fourteenth Amendment," and adding that, "although such biases may often accompany irrational (and therefore unconstitutional) discrimination, their presence *alone* does not a constitutional violation make."); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004) ("Although it is difficult to show that a law violates the equal protection clause under rational basis review, it is not impossible, since some laws are so irrational or absurd on their face it is clear they can be motivated by *nothing other than* animus or prejudice against a group." (emphasis added) (citing *Romer* and *Cleburne*)); *Williams v. Pryor*, 240 F.3d 944 (11th Cir. 2001) ("The significance of *Romer* . . . is the Court's holding that Colorado's provision had not been enacted in pursuit of *any legitimate government* interest"; the provision was "an exceptional and . . . invalid form of legislation."); *Milner v. Apfel*, 148 F.3d 812, 817 (7th Cir. 1998) (opining that the basis for the holdings in *Cleburne* and *Romer* was that where "a law is challenged as a denial of equal protection, and all that the government can come up with in defense of the law is that the people who are hurt by it happen to be irrationally hated or irrationally feared, . . . it is difficult to argue that the law is rational if 'rational' in this setting is to mean anything more than democratic  preference"); *Shahar v. Bowers*, 114 F.3d 1097, 1110 (11th Cir. 1997) (*en banc*) ("*Romer* . . . struck down an amendment to a state constitution as irrational because the amendment's *sole* purpose was to disadvantage a particular class of people."); *Gavin v. Branstad*, 122 F.3d 1081, 1090 (8th Cir. 1997) ("Our identification of legitimate governmental interests that are rationally related to the reforms enacted by the PLRA is dispositive of the prisoners' argument that the only purpose of the statute is to disempower a politically unpopular group, as in *Romer*."); *Steffan v. Perry*, 41 F.3d 677, 708 (D.C. Cir. 1994) ("[G]overnment actions depriving individuals of the equal protection of the laws on the sole basis of invidious prejudice or unreasoned antipathy can never be deemed 'rational.'" (citing, among others cases, *Cleburne*)).

*antipathy*.  Race is the paradigm." *Id.* at 272 (citations omitted); *accord Cleburne*, 473 U.S. at 440 (Because "race, alienage, or national origin" is "so seldom relevant to the achievement of any legitimate state interest," a statute that classifies individuals on these bases is "deemed to reflect prejudice and *antipathy*" and, thus, must be subjected to strict scrutiny (emphasis added)).  Moreover, in *Deen*, in which state legislation excepting the mentally incompetent from a limitations statute's tolling provision in medical malpractice actions was upheld under rational basis review, the Eleventh Circuit explained that the legislation referred only "generally to the 'legally incompetent because of mental retardation or mental illness,'" and did not "evince any animus towards the mentally retarded."  597 F.3d at 1238.  The *Deen* court explained that the legislation stood in "stark contrast to the legislation that was struck down in" *Cleburne*, which classified the mentally retarded as "feebleminded."  *Id.* (quoting *Cleburne*, 473 U.S. at 436).  The *Deen* court concluded, "The mere inclusion of the mentally retarded in the statute's definition of the legally incompetent does not suggest that animus towards the retarded motivated the statute."  *Id.*

Here, neither suspect nor quasi-suspect classifications are at issue; antipathy, therefore, cannot be presumed.  And, as in *Deen*, there is nothing on the face of the Rules that evinces any animus toward Plaintiffs specifically, or anticipated competitors of VictoryLand generally.  In fact, as discussed above, the Second Amended Rules, on their face, do not foreclose competition by allowing at the outer limit four electronic bingo facilities in Macon County.  Furthermore, Plaintiffs have not cited any case, and none has been found, that a

regulator's alleged "undue favoritism" (Doc. # 445, at 50) for a local business (here allegedly VictoryLand) is evidence from which antipathy against a perceived competitor can be inferred within the meaning of *Vance*.

Based upon the foregoing, Plaintiffs' arguments fail to persuade that anything other than rational basis review applies to their facial equal protection claims.

### 3.   *Disparate Impact (Second Category)*

As an alternative equal protection theory, Plaintiffs argue that, "[e]ven if the challenged provisions of the Second Amended Rules were facially neutral, they still violate equal protection because, as the result of purposeful discrimination, they have had a disparate impact" on Plaintiffs because "electronic bingo has been – and can be – licensed only at VictoryLand."  (Doc. # 445, at 52-53); *see E & T Realty*, 830 F.2d at 1112 n.4 ("The second type of equal protection claim is that neutral application of a facially neutral statute has a disparate impact," which requires proof of "purposeful discrimination.").   In response, Defendants argue that this type of disparate impact theory is inapplicable because "there is no suspect class or fundamental right at issue." (Doc. # 459, at 86; Doc. # 475, at 63.) Defendants have the better argument.

The cases cited by Plaintiffs involved laws that, although neutral on their face, had a "disparate impact upon a group that has historically been the victim of discrimination." *Feeney*, 442 U.S. at 272 (gender-based equal protection challenge to a statute that gave hiring preferences for state civil service positions to veterans); *Washington v. Davis,* 426 U.S. 229

140

(1976) (equal protection challenge to a police department's facially-neutral job-related

employment test that in its application had a disproportionate impact on African-Americans);

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (equal

protection challenge to village's refusal to rezone property to permit construction of federally

financed low-cost housing, with effect being that the denial disproportionately affected

African-Americans); *see also McCleskey v. Kemp*, 753 F.2d 877, 925 n.19 (11th Cir. 1985)

("*Washington* and *Arlington* recognize that when a neutral law has a disparate impact upon

a group that has historically been a victim of discrimination, an unconstitutional purpose may

still be at work.").  Discrimination against suspect and quasi-suspect classes was at issue in

*Feeney*, *Washington* and *Village of Arlington Heights*.

No case has been cited holding in effect that businesses competing for electronic

bingo licenses constitute a group that "has historically been the victim of discrimination."

*Feeney*, 442 U.S. at 272.  Indeed, Plaintiffs concede that they "have located no cases in

which such a claim has been made on behalf of a commercial interest."[77]  (Doc. # 445, at 52

---

[77] Plaintiffs also observe that *E & T Realty* did "not make a reference to any requirement that the 'purposeful discrimination' have a disparate impact on a *protected class*."  (Doc. # 445, at 52 (emphasis added) (citing *E & T Realty*, 830 F.2d at 1112 n.2).)  But their interpretation – namely, that "[i]f the court in *E & T Realty* intended to limit this type of claim to cases involving protected classes, it presumably would have said so" – asks far too much of *E & T Realty*'s footnote upon which Plaintiffs rely.  As Plaintiffs recognize, the two cases cited by *E & T Realty* are *Washington* and *Feeney*, which "involved protected classes."  (Doc. # 445, at 52.)  Moreover, the theory that neutral application of a facially-neutral statute had a disparate impact was not at issue in *E & T Realty*.  *See* 830 F.2d at 1112 n.5 (observing that the plaintiffs were contending that "defendants [were] unequally administering a facially neutral statute").  The *E & T Realty* footnote merely recognizes "three broad categories" into which equal protection claims can be divided.  *Id.*  In sum, Plaintiffs' argument is too far-reaching to have persuasive value.

n.9.) Nonetheless, they argue that a disparate-impact theory has been litigated in cases "involv[ing] neither a suspect class nor a constitutionally protected right." (Doc. # 471, at 16.) The argument is unpersuasive.

In one such case cited by Plaintiffs, *Williams v. Illinois*, 399 U.S. 235 (1970), the Supreme Court held that an Illinois statute that required prisoners to be incarcerated beyond the statutory maximum sentence if their fines had not been paid violated the prisoners' equal protection rights. *See id.* at 241. The holding in *Williams* was narrow: "We hold only that the Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status." *Id.* at 244. Notably, *Williams* involved an individual's fundamental right to be free from involuntary confinement. *See id.* at 263 (The courts "will squint hard at any legislation that deprives an individual of his liberty – his right to remain free.") (Harlan, J., concurring). Additionally, *Reese v. Michigan*, 234 F.3d 1269 (6th Cir. 2000) (*per curiam*), an unpublished table decision, involved a disparate impact claim brought under the Americans with Disabilities Act, not under the Equal Protection Clause.

Accordingly, Plaintiffs' equal protection theory that the Second Amended Rules, although neutral on their face, had a disparate impact on VictoryLand's electronic bingo competitors, is not legally cognizable. Summary judgment, therefore, is due to be entered in favor of Defendants on this claim.[78]

---

[78] Defendants argue that there is no equal protection disparate impact claim in the Sixth Amended Complaint. (Doc. # 475, at 63.) The court is inclined to agree. The allegations in the Sixth

142

### 4.     *Unequal Administration of a Facially Neutral Statute (Third Category)*

Finally, the Plaintiff Charities[79] argue that, "[e]ven if the Second Amended Rules were facially neutral, they have been unequally administered."  (Doc. # 445, at 54 (citing *E & T Realty*, 830 F.2d at 1112 n.5).)  In *E & T Realty*, the Eleventh Circuit observed that a third type of equal protection claim is that a defendant is "unequally administering a facially neutral statute," which "can result from either misapplication (*i.e.*, departure from or distortion of the law) or selective enforcement (*i.e.*, correct enforcement in only a fraction of cases)."  830 F.2d at 1112 n.5.  This claim is closer to the equal protection mark.

### a.     Nature of the Theory

The Plaintiff Charities' theory is as follows.  On July 25, 2005, Lucky Palace attempted to deliver twenty-two charity applications for Class B Bingo Licenses (not for an

---

Amended Complaint never refer to "disparate impact" or similar language, or otherwise allude to this theory.  (*See* 6th Am. Compl. ¶¶ 161-68.)  There is only a general reference to "intentional . . . discrimination" (6th Am. Compl. ¶ 166), but more would seem to be required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  *See id.* at 555 ("[D]etailed factual allegations" are not required, but something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is necessary.); *accord Pulla v. Amoco Oil Co.*, 72 F.3d 648, 658 (8th Cir. 1995) (refusing under Fed. R. Civ. P. 8(a) to permit the plaintiff to pursue a disparate impact theory based upon the complaint's "general allegation of [age] discrimination").  At the very least, based upon this pleading observation, summary judgment in favor of Defendants on Plaintiffs' asserted "disparate impact" theory, a theory that is not legally cognizable on these facts, is not precluded by failure of Defendants to divine the claim from the Sixth Amended Complaint and to address it in their opening summary judgment brief, particularly since the claim has been thoroughly briefed in Defendants' response to Plaintiffs' motion for summary judgment and in Defendants' summary judgment reply brief.  (*See* Doc. # 464, at 54-55 (arguing in Plaintiffs' response to Defendants' summary judgment motion that Defendants failed to address Plaintiffs' disparate impact claim).)

[79] Lucky Palace is not included as a plaintiff in this theory.  (*See* Doc. # 445, at 54-56.)

Operator's License), along with checks for the application fees, to Sheriff Warren.[80]  (July 25, 2005 Letter & 22 Checks, at PTF00578-PTF00584 (Ex. 16 to Doc. # 445).)  Sheriff Warren's office, however, refused to accept any of the applications on the articulated basis that Lucky Palace "did not have a building," *i.e.*, did not have a "qualified location" at which to conduct electronic bingo.  (Bracy Dep. 206.)  The Plaintiff Charities argue that the Second Amended Rules do not make the issuance of a Class B Bingo License contingent upon there being in existence a "qualified location" and that, therefore, Sheriff Warren's departure from the Rules can only indicate purposeful discrimination.  (Doc. # 445, at 54.)

The Plaintiff Charities further contend that they are similarly situated to VictoryLand's charities, and that Sheriff Warren treated them differently from VictoryLand's charities when he "created" a new unwritten reason to reject the Plaintiff Charities' applications.  (Doc. # 471, at 18-19.)  "By refusing to even consider the applications of the Plaintiff Charities based on a nonexistent requirement," Sheriff Warren acted arbitrarily and irrationally, and denied them equal protection of the law.  (Doc. # 445, at 55; *see also* Doc. # 471, at 19.)  This equal protection claim is the subject of cross-motions for summary judgment.

### b.    Analysis

In *E & T Realty*, the Eleventh Circuit held that a claim that a defendant has unequally administered a facially neutral statute cannot be proved "merely by showing an arbitrary and irrational difference between the results of two particular applications of a facially neutral

---

[80] Lucky Palace had secured contracts with more than fifteen nonprofit organizations much earlier, by November 10, 2004.   (Lucky Palace/Charity Contracts (Ex. 18 to Doc. # 445).)

statute." 830 F.2d at 1112. A plaintiff also must show (1) different treatment of similarly situated individuals, *id.* at 1109, and (2) "intentional or purposeful discrimination," *id.* at 1112-13. The parties disagree as to whether the Plaintiff Charities and VictoryLand's charities are similarly situated and whether Sheriff Warren purposefully discriminated against the Plaintiff Charities in refusing to consider their Class B Bingo License applications. Those concepts will be addressed in reverse order.

### i.     Intentional Discrimination

### (a)     *E & T Realty* and *Olech*

The parties agree that "intentional or purposeful discrimination," the standard enunciated in *E & T Realty*, is an element of the Plaintiff Charities' equal protection claim. (Doc. # 445, at 55; Doc. # 459, at 96.) Some initial observations about this element are appropriate. Additionally, although *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), is not cited by the parties, that decision should not be overlooked as it is the seminal "as applied, class of one" case, and it is helpful also for its discussion on intentional conduct.

*E & T Realty* imposes a requirement of intentional or purposeful discrimination where the claim is that a defendant is unequally administering a facially neutral statute. 830 F.2d at 1112 ("[T]o prevail on a claim that defendant unequally applied a facially neutral statute, a plaintiff must show intentional discrimination."); *see also id.* at 1113 ("[I]ntentional or purposeful discrimination' must be shown." (quoting *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)). Hence, "absent proof that defendant[] acted with discriminatory intent," there can

145

be no equal protection violation where the theory is that the defendant unequally administered a facially neutral law. *Id.* at 1113.

In *Olech*, decided thirteen years after *E & T Realty*, the Supreme Court "first expressly recognized" the "class of one" equal protection claim. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1200 (11th Cir. 2007) (citing *Olech*, 528 U.S. at 562). Prior to *Olech*, "[t]he 'class of one' phrasing had never been used by the Court in the equal protection context." *Id.* at 1202. In *Olech*, the plaintiff had requested the municipality to connect her to the city water supply. The municipality initially demanded a thirty-three-foot easement in exchange for this service, but had required other surrounding property owners to give only a fifteen-foot easement. *See Olech*, 528 U.S. at 563. The plaintiff filed suit, alleging that the municipality, motivated by "ill will," acted "irrational[ly]" and "wholly arbitrar[ily]" in requiring the thirty-three-foot easement, in violation of her equal protection rights. *Id.* In a short *per curiam* opinion, the Supreme Court held that the Equal Protection Clause may give rise to a cause of action on behalf of a "class of one" even "where the plaintiff d[oes] not allege membership in a class or group." *Id.* at 564. Thus, in cases in which heightened scrutiny does not apply, *Olech* holds that a plaintiff may invoke the Equal Protection Clause in "class of one" claims if he has been "intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment."[81] *Id.*

---

[81] Although referred to as a "class of one" claim, "the number of individuals in a class is immaterial for equal protection analysis." *Olech*, 528 U.S. at 564 n.1.

146

The *Olech* Court observed that there was long-standing precedent that the Equal Protection Clause protected individuals from "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  528 U.S. at 564 (citation and  internal quotation marks omitted).  The Court concluded that the complaint was sufficient to withstand a motion to dismiss, explaining that it could "fairly be construed" as alleging that the municipality "*intentionally* demanded a 33-foot easement as a condition of connecting [the plaintiff's] property to the municipal water supply where the [municipality] required only a 15-foot easement from other similarly situated property owners."  *Id.* at 565 (emphasis added).  Those allegations, in combination with averments of "irrational and wholly arbitrary" action, were "sufficient to state a claim for relief under traditional equal protection analysis," thus, making it unnecessary to "reach the alternative theory" that the municipality harbored "subjective ill will" against the plaintiff.  *Id.* (internal quotation marks omitted).

Based upon *Olech*, a plaintiff can successfully bring a class of one equal protection claim by showing that (1) the defendant intentionally treated him differently from others similarly situated, and (2) there was no rational basis for the difference in treatment (or, in other words that the differential treatment was "irrational and wholly arbitrary").  528 U.S. at 565; *see also Griffin Indus.*, 496 F.3d at 1202 (The elements of an *Olech* class of one claim are (1) whether "defendants intentionally treated [the plaintiff] differently from others who were similarly situated, and (2) if so, whether . . . there was [a] rational basis for the disparate

treatment.").  Notably absent is a requirement of ill will when the difference in treatment is alleged to be intentional, irrational and wholly arbitrary.

Neither party has cited cases discussing the impact, if any, of *Olech* on *E & T Realty*'s "purposeful discrimination" requirement.  In *Campbell v. Rainbow City, Alabama*, the Eleventh Circuit explained that in *E & T Realty*, it had "recognized any individual's right to be free from intentional discrimination at the hands of government officials." 434 F.3d 1306, 1314-15 (11th Cir. 2006) (citing *E & T Realty*, 830 F.2d at 1112). The *Campbell* court indicated that *E & T Realty* involved a "traditional type of equal protection claim, basically a selective enforcement claim," and that to prevail on that type of claim, plaintiffs had to show that "they were treated differently from other similarly situated individuals," and that the defendant "unequally applied a facially neutral ordinance for the purpose of discriminating against [them]."  434 F.3d at 1314.

The *Campbell* court, however, suggested that the *Olech* "class of one" equal protection claim was of a slightly different species.  The *Campbell* court observed that the plaintiffs' claim before it, as well as the lower court's jury instruction, "seem[ed] to mirror a newer trend in equal protection law, . . . 'a class of one claim' without a necessary showing of ill will or *discriminatory purpose*."  434 F.3d at 1314 (citing *Olech*, 528 U.S. at 564; emphasis added).  It noted that some circuits have interpreted *Olech* "to still require ill will

on the part of the defendant,"[82] while "other circuits following *Olech* have found that a plaintiff can also bring a successful equal protection claim merely by 'negativing every conceivable basis which might support' the government action." *Id.* at 1314 n.6.  The *Campbell* court deemed it unnecessary to the outcome of the case to decide the unanswered *Olech* question of whether ill will is required to show a "class of one" equal protection claim because the plaintiffs could not satisfy either test.[83] *Id.*  And, in *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027 (11th Cir. 2008), the Eleventh Circuit, relying on *Campbell*, indicated that a "class of one" analysis requires "'that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiffs.'"[84] 529 F.3d at 1045 (quoting *Campbell*, 434 F.3d at 1314).

Based upon the foregoing, the difference between intentional ("intentionally treated differently," as used in *Olech*) and purposeful or intentional discrimination (as used in *E & T Realty*) has not been fully developed.  It may be that the terms are substantially synonymous, but *Olech* did not elaborate upon what is required to demonstrate intentional

---

[82] For example, in the Sixth Circuit and Seventh Circuit, "animus or ill will" requires proof that "the challenged government actions were motivated by personal malice unrelated to the defendant's official duties." *Klimik v. Kent County Sheriff's Dep't*, 91 F. App'x 396, 401 (6th Cir. 2004) (citing *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000)).

[83] In *Campbell*, the equal protection claim failed for lack of evidence of a similarly situated comparator.  *See* 434 F.3d at 1314-17.

[84] The reference to "class of one" would appear to be to *Olech*, given an earlier reference to that decision.  *See Young Apartments*, 529 F.3d at 1032 n.1 (citing *Olech* in its description of "class of one" claims, but not extending its discussion of *Olech* beyond this citation); *see also Leib*, 558 F.3d at 1306 (same standard).

conduct.[85]   Nor, as indicated in *Campbell*, has it been decided in this circuit whether a plaintiff is required to prove "ill will" to prevail on an *Olech* "class of one" claim.   The parties have not briefed these finer points, instead relying on the parameters set out in *E & T Realty*.   The court, thus, shall do the same, at least for now.   For the reasons to follow, the court finds that there are genuine issues for trial on the issue of purposeful or intentional discrimination.

### (b)     Analysis

In *E & T Realty*, the Eleventh Circuit explained that evidence of "[m]ere error or mistake in judgment when applying a facially neutral statute" is insufficient to show intentional discrimination.   830 F.2d at 1114.   "Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause."   *Id.* (remanding for the district court to "determine whether defendants purposefully discriminated against plaintiffs").   "'Discriminatory purpose' implies more than intent as volition or intent as awareness of consequences.   It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group."   *Id.* (quoting *Feeney*, 442 U.S. at 279).   The *E & T Realty* court

---

[85] *See Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) (noting that "[t]he role of motive is left unclear by the Supreme Court's [*Olech*] decision.   On the one hand the Court recited the standard formula that the equal protection clause forbids intentional differences in treatment for which there is no rational basis.   On the other hand it said that the claim that the difference in treatment was 'irrational and wholly arbitrary' . . . was sufficient and that the Court was not reaching our 'alternative theory of subjective ill will'"); *Hicks v. Jackson County Comm'n*, 374 F. Supp. 2d 1084, 1094 (N.D. Ala. 2005) (observing that "[i]n the wake of *Olech*, the lower courts have struggled to define the contours of class-of-one cases").

noted that direct evidence of purposeful discrimination is not required; "[p]urposeful discrimination can be shown by circumstantial evidence."[86] *Id.* at 1114 n.9 (citing *Vill. of Arlington Heights*, 429 U.S. at 266). In *Village of Arlington Heights,* the Supreme Court enumerated several factors that are circumstantially relevant for probing purposeful discrimination. *See* 429 U.S. at 267-69. Those factors include: (1) the historical background of the challenged decision, such as the "specific sequence of events leading" to it; (2) deviations from normal substantive criteria; and (3) the disparate impact of the governmental action. *Id.*

The *Village of Arlington Heights* factors, cited with approval in *E & T Realty*, provide a helpful framework for analyzing Sheriff Warren's intent. The Plaintiff Charities argue that the events leading up to the promulgation of the Second Amended Rules, the disparate impact caused by the Rules, and Sheriff Warren's deviation from those Rules raise an inference of purposeful or intentional discrimination. (Doc. # 445, at 52-53, 55.) Defendants, however, argue that there is not a "shred" of evidence of purposeful or intentional discrimination. (Doc. # 459, 92-94, 96.)

First, with regard to the historical background of the challenged decision, the Plaintiff Charities argue that the sequence of events, beginning with the promulgation of the Original Rules, is circumstantial evidence from which it can be inferred that Sheriff Warren's ultimate

---

[86] In *E & T Realty*, the court noted, for example, that "purposeful discrimination can be indirectly proven by a 'stark' pattern of adverse impact on a particular group," and directed the district court on remand to decide "whether such a stark pattern exists." 830 F.2d at 1114 n.9 (quoting *Vill. of Arlington Heights*, 429 U.S. at 266).

refusal to grant the Plaintiff Charities' applications for Class B Bingo Licenses was the result of intentional discrimination.  In particular, they argue that Sheriff Warren promulgated the Original Rules so that only VictoryLand would meet the requirements for a "qualified location" and thwarted Lucky Palace's attempts to conform to those Rules by continually amending them so as to "create greater barriers to entry."  (Doc. # 455, at 53.)  The timing of the action of Sheriff Warren circumstantially supports the Plaintiff Charities' theory vis-a-vis when he learned of Lucky Palace's interest in electronic bingo.

Moreover, there is testimony from Sheriff Warren that, on December 5, 2003, the effective date of the Original Rules, VictoryLand met the requirements for a qualified location and "was the only qualified location in Macon County."  (Warren Dep. 146-47.)  It also is undisputed that Sheriff Warren declared VictoryLand a "qualified location" each time that definition was amended, and that the First Amended Rules raised the ante for any entity (other than VictoryLand) to satisfy the requirements for a "qualified location" by increasing the capital investment requirement from $5 million to $15 million and by requiring a qualified location to amass a minimum of fifteen Class B License holders before electronic bingo operations could commence.  Moreover, the short amount of time that it took VictoryLand to acquire fifty-nine licenses after the Second Amended Rules went into effect adds to the equation of intentional discrimination in that it establishes, albeit circumstantially,

a temporal connection between the actions of Sheriff Warren and those of the other Defendants. Taken together, the historical factors weigh in favor of the Plaintiff Charities.[87]

Second, turning to departures from normal procedures, the Plaintiff Charities argue that Sheriff Warren deviated from the requirements of the Second Amended Rules by requiring them to have a "qualified location," meaning an existing facility inspected and approved by Sheriff Warren, as a condition for obtaining a Class B Bingo License. (*See* Doc. # 445, at 54-55.) As discussed in the next subsection, it is not clear that one of the Second Amended Rules' criteria for obtaining a Class B Bingo License is the existence of a "qualified location" and, thus, whether Sheriff Warren refused to consider the Plaintiff Charities' applications based upon their failure to satisfy an unwritten requirement. From

---

[87] There arguably is substantial circumstantial evidence that Sheriff Warren's reason for refusing to consider the Class B Bingo License applications of the Plaintiff Charities was pretextual. It is undisputed that on July 25, 2005, VictoryLand was already operating electronic bingo on behalf of fifty-nine charities, thereby foreclosing another entity from conducting electronic bingo operations in Macon County, given the Second Amended Rules' countywide sixty-license cap. Hence, even if at that point Lucky Palace had owned a Class B "qualified location," it would have been impossible for Lucky Palace to have secured at least fifteen Class B Bingo Licenses, as required under the Second Amended Rules for the operation of electronic bingo at a "qualified location." It also is undisputed that, after the Plaintiff Charities' Class B Bingo License applications were returned, all sixty of the available Class B Bingo Licenses ultimately were issued to charity applicants associated with VictoryLand.

Relatedly, the Plaintiff Charities also argue that there is nothing in the Second Amended Rules that conditions the issuance of a Class B Bingo License upon there being fifteen Class B Bingo Licenses available. It is unclear whether the Plaintiff Charities are asserting an independent theory that Sheriff Warren violated his own Rules by returning the Plaintiff Charities' applications when not all of the sixty Class B Bingo Licenses had been issued. (*See* Doc. # 465, at 25 n.14.) Because the Plaintiff Charities have not pointed to any evidence, and Defendants have not argued, that the applications were refused because there were no longer fifteen Class B Bingo Licenses available, the court finds that it is unnecessary to the outcome of the present cross-motions to address this potential argument. Indeed, the only reason Sheriff Warren gave for rejecting the applications was the absence of an existing facility – not that there was only one Class B Bingo License unsnared by VictoryLand.

153

this evidence, an argument can be made that Sheriff Warren departed from his own written Rules in refusing to consider the Plaintiff Charities' applications.

Moreover, there is evidence of a deep and continuing involvement of VictoryLand's attorneys in the drafting process of the Rules. This cozy relationship between VictoryLand (the regulated) and Sheriff Warren (the regulator) raises questions of material fact as to whether normal, proper procedures were used for drafting the Rules. Sheriff Warren's retention of unbridled standardless discretion to amend the Rules – as to timing and content – also strikes the court as at least unusual in a public regulatory sense. Considered in light of potential conflicts of interest among Defendants and their agents discussed elsewhere in this opinion, Sheriff Warren's discretion to amend the Rules at will, without clear standards, without notice, and without public input is circumstantially suspect. The second factor also weighs in favor of the Plaintiff Charities.

Third, the Plaintiff Charities point to the impact the Second Amended Rules had on them. They have presented evidence that, on January 1, 2005, the effective date of the Second Amended Rules that capped the total number of Class B Bingo Licenses available in Macon County at sixty, thirty-nine Class B Bingo License holders were operating electronic bingo at VictoryLand (Ex. 11 to Doc. # 446), and that by February 7, 2005, fourteen additional charities obtained Class B Bingo Licenses for the operation of electronic bingo at VictoryLand (Ex. 20 to Doc. # 446). Hence, as of February 7, 2005, fifty-three Class B Bingo License holders were operating electronic bingo at VictoryLand. Considering

that the Second Amended Rules required a "qualified location" to have a minimum of fifteen Class B Bingo Licenses and also included an overall sixty-license cap, VictoryLand sewed up the Macon County market on electronic bingo in a little more than a month after the effective date of the Second Amended Rules.  Based upon these circumstances, the Plaintiff Charities have presented sufficient evidence from which a reasonable jury could infer a disparate impact in that VictoryLand is licensed to operate electronic bingo in Macon County to the exclusion of the rest of the world.

Defendants, on the other hand, point to Sheriff Warren's testimony that he "had no intent for VictoryLand to be the only gaming facility in Macon County." (Doc. # 459, at 94.) Defendants also argue that the evidence does not show that "Sheriff Warren intentionally 'selected a course of action' to discriminate against Plaintiffs to purposefully forestall their efforts to build a gaming facility in Macon County." (Doc. # 459, at 94.)  Sheriff Warren's testimony obviously is relevant, but not the last word, on the issue of purposeful discrimination.  Discriminatory motives are elusive, and subject to proof by circumstantial evidence.  The timing and content of the Rule changes, the resulting actions of VictoryLand and impact on the Plaintiff Charities, the arguably pretextual nature of Sheriff Warren's explanation for denying the Class B Bingo Licenses, and the arguably unrelenting influence of VictoryLand lawyers in the drafting process of the Rules and two of the amendments, when viewed in the light most favorable to the Plaintiff Charities, is circumstantial evidence

contradicting Sheriff Warren's words.  This evidence establishes a material factual dispute regarding purposeful discrimination.

In sum, based upon the evidence pertaining to the historical background of the promulgation and amendments to the Rules, the substantive departures from normal procedures, and the disparate impact the Rules had on the Plaintiff Charities, a serious question has been raised as to intentional discrimination underlying the decision to refuse to consider the Plaintiff Charities' applications for Class B Bingo Licenses so as to create a jury issue on this element of their as applied equal protection claim.  The evidence entitles neither party to summary judgment on the question of whether Sheriff Warren intentionally discriminated against the Plaintiff Charities in denying their Class B Bingo License applications.[88]

---

[88] Defendants' other argument is unpersuasive.  Defendants argue that the Sixth Amended Complaint does not contain a "class of one" claim at all.  (Doc. # 475, at 63-64.)  It is true that the pleadings do not use the words "class of one," but Defendants have pointed to no authority that requires that precise phrasing.  The Sixth Amended Complaint contains allegations that the Plaintiff Charities were "intentionally treated . . . differently from their similarly situated counterparts," that the "different treatment" amounted to "intentional and arbitrary discrimination," and lacked a "rational basis," in violation of the Equal Protection Clause.  (6th Am. Compl. ¶ 166.)  These are the hallmark allegations of a class of one equal protection claim.  *See Olech*, 528 U.S. at 564 (Even absent allegations of "membership in a class or group," a plaintiff may bring a "class of one" claim "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."); *see also E & T Realty*, 830 F.2d at 1113 (requiring a showing of "purposeful discrimination").  To the extent that Defendants challenge the sufficiency of these allegations, which typically would be done at the Rule 12(b)(6) stage, any confusion as to the precise theory the Plaintiff Charities were alleging under the Equal Protection Clause has been clarified by Plaintiffs' pending motion for partial summary judgment.  Based upon the foregoing, if lack of notice is Defendants' claim, the court finds that they have sufficient notice of the *Olech* class of one theory.

Finally, Defendants argue that Lucky Palace's § 1983 equal protection claims are barred by the applicable statute of limitations.  (Doc. # 440, at 140-43.)  Because Lucky Palace's equal protection claims do not survive Defendants' motions for summary judgment on the merits, it is not necessary to address this argument.

ii.      **Similarly Situated**

To avoid summary judgment, it is not enough for the Plaintiff Charities to establish a genuine issue of material fact that purposeful discrimination occurred. The Plaintiff Charities must also establish a question of material fact as to their being similarly situated to VictoryLand's charities.

Because "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause," a plaintiff in an "unequally administered" claim must show a similarly situated comparator. *E & T Realty*, 830 F.2d at 1109; *see also Olech*, 528 U.S. at 564; *Griffin Indus.*, 496 F.3d at 1207 ("The reason that there is a 'similarly situated' requirement in the first place is that at their heart, equal protection claims, even 'class of one' claims, are basically claims of discrimination." (citation and internal quotation marks omitted)). A similarly situated comparator is one who is "*prima facie* identical in all relevant respects." *Campbell*, 434 F.3d at 1314. And relevancy is viewed through the eyes of an "objectively reasonable governmental decisionmaker." *Griffin Indus.*, 496 F.3d at 1204; *see also Grider v. City of Auburn*, 628 F. Supp. 2d 1322, 1338 (M.D. Ala. 2009) (The relevancy requirement "captures only differences that would be relevant to an objectively reasonable decisionmaker."). The showing of a similarly situated comparator requires "some specificity," *Griffin Indus.*, 496 F.3d at 1204, and the standard is "strict." *Young Apartments*, 529 F.3d at 1045 ("[T]he same strict 'similarly situated' standard applies whether an equal protection claim is brought under a 'class of one' theory or a traditional theory of unlawful

discrimination" (citing *Griffin Indus.*, 496 F.3d at 1204-05[89])).  Hence, a plaintiff will not be permitted to "rely on broad generalities in identifying a comparator."  *Griffin Indus.*, 496 F.3d at 1204.

The Eleventh Circuit has distinguished "complex, multi-factored government decisionmaking processes," *Griffin Indus.*, 496 F.3d at 1205, comprising "varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time," *id.* at 1203, from *Olech*-type regulations where the decisionmaking is "one-dimensional" and resolvable through the use of a "simplistic post-hoc caricature of the decisionmaking process," *id*; *see also id.* (observing that in *Olech* "the only relevant factor was the size of the easement required in return for connection to the municipal water supply"); *see also Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2147 (2008) ("What seems to have been significant in *Olech* and the cited cases was the existence of a clear standard against which departures, even for a single plaintiff, c[an] be readily assessed."). In the multi-dimensional decision-making process, the "similarly situated' requirement will

---

[89] Also, in *Griffin Industries*, the Eleventh Circuit could envision "no reason that a plaintiff in a 'class of one' case should be subjected to a more lenient 'similarly situated' requirement than [it] ha[s] imposed in other contexts."  496 F.3d at 1204-05.  Another context specifically discussed by the *Griffin Industries* court was the similarly situated requirement imposed upon plaintiffs who bring private employment discrimination claims under the Equal Protection Clause "outside of the 'class of one' context" where a proposed comparator must be "similarly situated in *all relevant respects*."  *Id.* at 1204; *see also Grider*, 628 F. Supp. 2d at 1337 (The class-of-one similarly situated "standard is similar to the standard as applied in other contexts, such as employment discrimination." (citing *Griffin Indus.*, 496 F.3d at 1204-05)).

be more difficult to establish."[90]   *Griffin Indus.*, 496 F.3d at 1204.   Furthermore, "[d]etermining whether individuals are similarly situated is generally a factual issue for the jury." *Eggleston v. Bieluch*, 203 F. App'x 257, 264 (11th Cir. 2006); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

The parties' arguments with respect to the similarly situated requirement have different focuses.  For the reasons to follow, neither focus is well taken.  Because these are competing motions for summary judgment, the court necessarily applies the appropriate assumptions to each side of the contest.  Ultimately, it is obvious that genuine issues of material fact exist, and that summary judgment is inappropriate for either party on the similarly situated question.

Defendants argue that because Lucky Palace, the entity with which the Plaintiff Charities had contracted, did not have a "qualified location" in Macon County for the operation of electronic bingo, the Plaintiff Charities are not similarly situated to VictoryLand's charities, which had a "qualified location" for the operation of electronic bingo (*i.e.*, VictoryLand).  (Doc. # 459, at 91-92; Doc. # 458, at 27.)  Defendants contend that "to obtain a Class B Bingo [L]icense (which covers electronic bingo), an organization could only conduct bingo games at a 'qualified location' in Macon County."  (Doc. # 459, at 91.)

---

[90] No argument has been advanced that the Second Amended Rules involve the type of multi-dimensional, extended decisionmaking process, identified in *Griffin Industries*, for which it is especially difficult to prove a similarly situated comparator.  The facts and arguments here suggest, at least at this juncture, a scenario more similar to *E & T Realty*.

The Plaintiff Charities, however, argue that the Second Amended Rules do not make the issuance of a Class B Bingo License, as opposed to an Operator's License, contingent upon there being *in existence* a "qualified location." (Doc. # 445, at 54.) In other words, Plaintiffs' position is that, under the Second Amended Rules, "an applicant for a Class B License could receive such a license even if the location at which the licensee sought to conduct electronic bingo were not yet qualified." (Doc. # 445, at 54; *see also* Doc. # 471 ("[T]he Plaintiff Charities should have been able to secure licenses . . . regardless of whether Plaintiff Lucky Palace's location was complete. Indeed, that is precisely how the rules were drafted."); Doc. # 465, at 21 n.11 ("[A] qualified location [under the Second Amended Rules] was a prerequisite for the operation of electronic bingo but was not required for the issuance of [a] Class B license.").)

In support of their position that a "qualified location" (*i.e.*, an existing facility inspected and approved by the sheriff) is a prerequisite to securing a Class B Bingo License, Defendants rely upon the definition in the Second Amended Rules of "Class B Bingo License" (§ 1(h)), which provides: "'Class B Bingo License' shall mean a license issued to an applicant who desires to operate any and all games of bingo as defined hereinabove, at a qualified location."[91] They point out that a "qualified location," as defined in § 1(j), is a "location . . . which has been inspected and approved by the Sheriff for the conduct of bingo games." (Doc. # 459, at 91.)

---

[91] This definition is the same in the Original Rules and their amendments.

The Plaintiff Charities, however, cite other parts of the Second Amended Rules for their position that the phrase "desires to operate . . . bingo . . . at a qualified location" does not mean that the existence of a "qualified location" must precede the issuance of a Class B Bingo License.  This position finds support in § 4(c) of the Second Amended Rules, which sets forth seven categories of "information" that must be "fully provide[d]" to the sheriff before a Class B Bingo License will be issued.  That "information" pertains to the applicant's date of incorporation, certificate of incorporation, tax exempt status, officers and directors, any sureties, and the "*exact physical location at which the applicant will conduct the bingo games.*" (Doc. # 424, at 6 (emphasis added).)  The Plaintiff Charities point out that only the "exact physical location" relates to the electronic bingo premises, but that there is nothing in the Rules indicating that "exact physical location" is synonymous with "qualified location." (Doc. # 445, at 54.)  The Plaintiff Charities also emphasize that the definition of "qualified location" in § 1(j) of the Second Amended Rules refers to the submission of "satisfactory evidence" that the "location" has in place specified requirements "at all times that any bingo games are being conducted or operated." (Doc. # 445, at 54.)  Based upon that language, the Plaintiff Charities argue that a "qualified location" need only exist "when bingo games are being 'conducted or operated,' not when an applicant [for a Class B Bingo License] is applying." (Doc. # 445, at 54.)

Finally, the Plaintiff Charities cite § 2 of the Second Amended Rules with the now familiar language that "[n]o Class B Licensee shall be authorized to operate bingo at any

qualified location, as defined herein, unless a minimum of fifteen (15) applicants *shall first obtain* Class B licenses for such location."  (Doc. # 445, at 54 (emphasis added).)  This section "implies that a charity can become a licensee before fifteen licenses are issued for a particular location, even though the licensee could not conduct bingo before fifteen licenses had been issued."[92]  (Doc. # 445, at 55.)

Ultimately, four considerations resolve the issue in favor of allowing a jury to decide the similarly situated issue.  First, as the parties' divergent arguments reveal, the Second Amended Rules do not clearly require the existence of a qualified location before the issuance of a Class B Bingo License.  Second, the Rules define "qualified location" as being "for the *holder* of a Class B Bingo Licensee."  (2d Am. Rules § 1(j) (emphasis added).)  Using "holder" rather than "applicant for a Class B Bingo License" clearly signals that the Class B Bingo License would have already been issued.  That is the only way one becomes a license *holder*.  Third, taking the words at face value and in context, a reasonable reading of the Second Amended Rules giving effect to all the requirements is that Class B Bingo Licenses may be issued before a qualified location exists, by the applicant expressing a "desire[]" to conduct electronic bingo in the future at a qualified location, § 1(h),[93] as

---

[92] Defendants may be correct that it would be impractical to issue a Class B Bingo License to an applicant who at the time of application lacked a "qualified location" at which to commence electronic bingo operations.  But, the issue would appear to be instead whether this practicality has been incorporated into the Second Amended Rules.

[93] The verb "desires," inserted in the definition of a Class B Bingo License, § 1(h), could, under a reasonable interpretation, mean that the license applicant merely has to harbor hope or an intention that one day it will have a "qualified location" at which to conduct electronic bingo.

described in the application by exact physical location. Fourth, this reading is reasonable in the overall regulatory scheme. It allows, in an incremental fashion, charities to get their Class B Bingo Licenses so that an operator has some assurance that, upon completion and inspection of a multi-million dollar qualified location, it will be able to obtain an Operator's License. (Plaintiffs acknowledge that a qualified location is required under the Rules for the issuance of an Operator's License.) Taking all the above factors into consideration, and in the absence of other arguments by Defendants, there is sufficient evidence for a jury to conclude that the Plaintiff Charities are similarly situated to VictoryLand's charities, *i.e.*, that because the Rules do not require an existing location prior to the issuance of a Class B Bingo License to a charity, Lucky Palace's charities are in all material respects similarly situated to VictoryLand's charities.

Neither party has cited any case law or suggested another method for resolving the exact requirements of the Second Amended Rules in this area. The evidence establishes a material issue of fact as to whether Sheriff Warren misapplied his own rules. On this record and briefing, this issue is best left for evidentiary development at trial, with the issue of whether the parties are similarly situated being ultimately decided by the jury. Defendants' motion on this issue is due to be denied.

This brings the discussion to the Plaintiff Charities' summary judgment motion, with their specific contentions on the similarly situated element of their as applied equal protection claim. The contentions lack a meaningful analysis of what is required to demonstrate the

requisite degree of similarity between the Plaintiff Charities and the VictoryLand charities. The Plaintiff Charities liken themselves to those licensed charities which have contracted with VictoryLand for the operation of electronic bingo.  The Plaintiff Charities assert that they

> [are] similarly situated to VictoryLand's charities in seeking to affiliate with a licensed electronic bingo operator in Macon County.  Both sets of charities prepared and submitted applications to Sheriff Warren.  Both sets of charities were seeking to benefit from Amendment 744 and the start of electronic bingo [in] Macon County.

(Doc. # 445, at 42 (internal citation omitted).)

It can be assumed for purposes of this analysis, and no doubt it is true, that both groups were equally eager to profit from electronic bingo in Macon County and that, with one exception,[94] both groups applied to Sheriff Warren for Class B Bingo Licenses. Defendants, however, are correct that this comparison speaks too broadly.  (Doc. # 459, at 89.)  In particular, it is the absence of a meaningful discussion of evidence showing whether the individual applicants complied with (or arguably complied with) the written requirements of the Second Amended Rules that leaves a void in the Plaintiff Charities' similarly situated analysis.  It may be that the Plaintiff Charities are arguing that they were denied Class B Bingo Licenses, notwithstanding that their applications fully complied with the Second

----

[94] Plaintiffs' factual statement, above, is incorrect in one respect.  Plaintiffs have conceded that Greater White Church did not submit an application for a Class B Bingo License to Sheriff Warren. (Doc. # 466, at 9 n.6.)  This alone would appear to render Greater White Church dissimilarly situated to VictoryLand's charities.  However, as discussed later in this opinion, Greater White Church's (as well as RG Apartments') § 1983 equal protection claim is barred by the applicable two-year statute of limitations and, thus, fails for that independent reason.

Amended Rules.  Or it may be that they are arguing that, even if their applications were

deficient, VictoryLand's charities, which have secured Class B Bingo Licenses, also clearly

did not meet the requirements of Sheriff Warren's Rules.[95]  But the Plaintiff Charities have

not analyzed the evidence and, thus, have not laid out an evidentiary foundation as to how

---

[95] The latter theory, implicating selective enforcement, would find support in *E & T Realty*.  In *E & T Realty*, the county had imposed a moratorium on connections to the sewer system, but there was an exception permitting connections that would not use more water than the "most recent former use."  *See* 830 F.2d at 1108.  The plaintiff-property owners alleged that the moratorium committee members violated their equal protection rights by denying their application for an increased sewer allocation for a proposed outpatient hospital clinic, but then permitting another property owner just a few blocks away to increase its building's sewage based upon its most recent former use in order to accommodate the same clinic.  *Id.*  The Eleventh Circuit remanded the case, in part, because the district court had failed to address whether the plaintiffs were similarly situated to the applicant whose sewer allocation was granted.  *Id.* at 1009-10.  "Different treatment of dissimilarly situated persons does not violate the equal protection clause."  *Id.* at 1109.  In that case, the plaintiffs were "clearly unentitled" to the sewage increase; only if the facts bore out that the successful applicant was also "clearly unentitled" to an increase, which required more than a showing that the comparator "might be entitled to a permit," would the similarly situated requirement be satisfied.  *Id.* at 1111-12.

their applications stand up against those submitted by the VictoryLand charities.[96]   The Plaintiff Charities, not the court, should make the argument.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").  The motion by the Plaintiff Charities is due to be denied.

At the very least, the briefs establish that there are genuine issues of material fact surrounding both the Plaintiff Charities' and the VictoryLand charities' compliance with the governing Rules for the issuance of Class B Bingo Licenses.  These factual rifts exemplify why summary judgment is inappropriate for any party on the similarly situated component of the equal protection claim.

---

[96] The closest the Plaintiff Charities come to putting at issue the caliber of the VictoryLand charities' applications and Sheriff Warren's selective enforcement of the Rules is in a footnote in which they mention that "[m]any of the charities associated with VictoryLand did not qualify under the rules and regulations yet were improperly issued bingo licenses."  (Doc. # 445, at 42 n.16.)  But, the footnote ends there, without further discussion.  While it includes a bare citation to certain paragraphs of a separately filed, but challenged, "statement of undisputed facts," these "facts" undermine, rather than support, the entry of summary judgment in the Plaintiff Charities' favor.

Moreover, arguments set out in other parts of the parties' briefs further intimate that the question of qualifications is best resolved by the jury.  For example, Sheriff Warren has argued (in the section of his brief devoted to challenging standing) that at least four of the Plaintiff Charities – Milstead Community Center, RG Apartments, Tubman Gardens and Tuskegee Macon County Community Foundation, Inc. – failed to meet the requirements of the Rules to obtain Class B Bingo Licenses because they were not "active" in Macon County during the relevant time or were not a qualifying "tax exempt" organization.  (*See, e.g.*, Doc. # 426, at 25; Doc. # 428, at 25; Doc. # 430, at 25; Doc. # 432, at 27.)  But, the relevance of Sheriff Warren's argument to the "class of one" claim, if any, has not been addressed, and no evidence has been cited in the parties' "class of one" discussion that Sheriff Warren articulated these alleged deficiencies when he turned down these charities' applications.  It should be noted, however, to the extent that these cited deficiencies are relevant here, the deficiencies are vigorously denied by the Plaintiff Charities, which argue that "at the very least, disputed questions of material fact regarding the qualifications of" these Plaintiff Charities exist.  (Doc. # 466, at 12-19.)

### c.   Conclusion

Careful review of the law and the facts reveals that there remain genuine issues of material fact as to the Plaintiff Charities' as applied equal protection claim predicated on a theory that Sheriff Warren unequally administered the facially-neutral Second Amended Rules.  Summary judgment on this claim, therefore, is not appropriate for either party, and will be denied.

### 5.   *§ 1983 Conspiracy to Deny Equal Protection*

In Count IV, Plaintiffs bring a § 1983 conspiracy claim against all Defendants arising out of the substantive claim that Plaintiffs were denied their rights to equal protection of the law.  (6th Am. Compl. ¶¶ 169-75.)  A § 1983 conspiracy claim requires proof of "(1) a violation of the plaintiff's federal rights and (2) an agreement among the defendants to violate those rights." *Newsome v. Lee County, Ala.*, 431 F. Supp. 2d 1189, 1202 (M.D. Ala. 2006) (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990)); *see also Strength v. Hubert*, 854 F.2d 421, 425 (11th Cir. 1988).

### a.   Defendants' Summary Judgment Motion

Mr. McGregor and VictoryLand rest their summary judgment motion on Plaintiffs' purported failure to "show that there was a violation of their federal rights."  (Doc. # 440, at 139.)  Hence, they assert that "there is no need to address whether there was an agreement among the Defendants to violate [] Plaintiffs['] equal protection rights."  (Doc. # 440, at 139 (emphasis omitted).)  Sheriff Warren's motion also focuses only on the underlying equal

167

protection claim, with no discussion of the second element of a § 1983 conspiracy claim. (Doc. # 424, at 41-45.)

Because none of Lucky Palace's § 1983 substantive equal protection claims survives summary judgment, Lucky Palace's § 1983 conspiracy claim necessarily fails altogether on the first element. The Plaintiff Charities' § 1983 equal protection conspiracy claim fails on the first element as to all but one equal protection theory. As discussed, there exist rational bases for the Second Amended Rules' existing facility requirement and numerical licensing requirements. Additionally, the Plaintiff Charities' equal protection theory alleging that the Second Amended Rules, although facially neutral, had a disparate impact on them fails as a matter of law. A § 1983 conspiracy claim, thus, cannot rest on these alleged substantive equal protection theories, and Defendants are entitled to summary judgment. However, as detailed in the previous subsection, there is a substantive equal protection claim proceeding to trial – the Plaintiff Charities' claim that Sheriff Warren unequally administered the facially neutral Second Amended Rules in refusing to grant the Plaintiff Charities Class B Bingo Licenses. Because Defendants have not devoted any substantive discussion to the second § 1983 conspiracy element, this element remains unchallenged by Defendants. Having failed to demonstrate the absence of a genuine issue of material fact as to both elements of the Plaintiff Charities' § 1983 conspiracy claim predicated upon Sheriff Warren's refusal to consider the Plaintiff Charities' Class B Bingo License applications, Defendants are not entitled to summary judgment.

### b.   Plaintiffs' Summary Judgment Motion

Plaintiffs also have moved for summary judgment on their § 1983 conspiracy claim. (Doc. # 445, at 56-58.)  None of Lucky Palace's § 1983 substantive equal protection claims survived summary judgment; obviously, then Lucky Palace is not entitled to summary judgment.  Moreover, as discussed above, a genuine issue of material fact exists as to whether Sheriff Warren unequally applied the facially neutral Second Amended Rules in refusing to consider the Plaintiff Charities Class B Bingo License applications, meaning that the first element of the § 1983 conspiracy claim must be resolved by the jury.  Accordingly, the Plaintiff Charities are not entitled to summary judgment on their § 1983 equal protection conspiracy claim predicated on this theory.

C.  **Issues Particular to Sheriff Warren's Summary Judgment Motion**

Sheriff Warren raises a number of threshold defenses to all claims.  For purposes of this discussion, it is helpful to reiterate that Sheriff Warren is sued for injunctive relief only in his official capacity as the sheriff of Macon County.  (6th Am. Compl., at 1, 54.)

1.  *Absolute Legislative Immunity*

Sheriff Warren asserts that he is entitled to absolute legislative immunity on Plaintiffs' § 1983 equal protection claims because those claims relate to his promulgation of Rules governing electronic bingo in Macon County.  (Doc. # 424, at 25; Doc. # 474 at 10.)  He argues that drafting regulations is a traditionally legislative function.  (Doc. # 424, at 26.)  Plaintiffs, on the other hand, argue that, even if Sheriff Warren was acting in a legislative capacity when he promulgated the Rules, he is not shielded by legislative immunity for § 1983 equal protection claims challenging his administration or enforcement of those Rules.  (Doc. # 465, at 5.)  Because the surviving equal protection claim involves only Sheriff Warren's administrative or enforcement acts, Sheriff Warren is not entitled to legislative immunity for these acts.[97]

Absolute legislative immunity "was not abrogated by § 1983, and it applies with equal force to suits seeking damages and those seeking declaratory or injunctive relief."  *Scott v.*

_____

[97] The substantive rulings in this case have considerably narrowed the discussion for purposes of determining Sheriff Warren's entitlement to legislative immunity.  For example, it is unnecessary to address Plaintiffs' contention that the RICO claims "are not properly subject to any legislative immunity defense" (Doc. # 465, at 4 n.2), as the RICO claims have been disposed of on the merits.  It also is contested, but need not be decided, whether Sheriff Warren is immune for acts pertaining to his promulgation of the Rules and the amendments; as discussed, the remaining equal protection claim involves only Sheriff Warren's enforcement acts.

*Taylor*, 405 F.3d 1251, 1254 (11th Cir. 2005) (citing *Supreme Court of Va. v. Consumers Union of the U.S.*, 446 U.S. 719 (1980)).   Federal, state, regional and local officials are entitled to absolute legislative immunity under § 1983 when engaging in "legislative activity."  *Bogan v. Scott-Harris*, 523 U.S. 44, 46 (1998); *Bryant v. Jones*, 573 F.3d 1281, 1305 (11th Cir. 2009).   The test for determining whether legislative immunity attaches focuses not on the legislator's title, or even on the official's motive or intent, but rather upon "the function in which he was engaged that gave rise to [the] claim."  *Bryant*, 575 F.3d at 1305; *Scott*, 405 F.3d at 1256 n.7 ("[I]mproper motives . . . are irrelevant with respect to determining the applicability of legislative immunity.").   Hence, legislative immunity is not limited to legislators; it also shields officials in the executive and judicial branches from suit when they are acting "in a legislative capacity."  *Bogan*, 523 U.S. at 55; *see also Bryant*, 575 F.3d at 1305 ("Because the applicability of legislative immunity necessarily focuses on particular acts or functions, not on particular actors or functionaries, immunity also extends to legislative acts performed by executive officials and other non-legislators.").

Legislative immunity, although broad, is restrained by the obvious requirement that the act in question must be legislative.  "A legislative act involves policy-making rather than mere administrative application of existing policies."  *Crymes v. DeKalb County, Ga.*, 923 F.2d 1482, 1485 (11th Cir. 1991).  "Acts of . . . enforcement rather than rule-making are not legislative."  *Id.*  An act is "more likely administrative" when "the facts utilized in making a decision are specific, rather than general, in nature," or when "the decision impacts specific

171

individuals, rather than the general population." *Id.* In *Crymes*, the county commissioners' decision "to uphold the denial of the development permit for [the plaintiff's] property" involved "the application of policy to a specific party" and, thus, was not a legislative act. *Id.* at 1486. On those facts, the county commissioners were not entitled to absolute legislative immunity. *Id.* Also, in *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988), cited with approval in *Crymes*, the Ninth Circuit held that city council members were not entitled to legislative immunity because their denial of a building permit was "executive, rather than legislative" in nature. 857 F.2d at 1304. Their "decision neither applied to the general community, nor involved the promulgation of legislative policy as a defined and binding rule of conduct. Rather, it was directed specifically and solely at" the plaintiff. *Id.* (internal citation omitted); *see also Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992) (The "denial of licenses" is "generally not protected by the doctrine of legislative immunity.").

Moreover, the Supreme Court has recognized that an official may be entitled to absolute immunity for some, but not all, of his functions. Hence, when an official exercises multiple functions, those functions must be examined separately to determine the applicability of legislative immunity. For example, in *Consumers Union*, the United States Supreme Court held that the Supreme Court of Virginia acted in a legislative capacity in promulgating its state code of professional responsibility, and in that capacity, the supreme court and its chief justice were entitled to legislative immunity on the § 1983 claims. *See* 446

172

U.S. at 733-34. However, as to the § 1983 claims against these defendants with respect to their enforcement of the code, they "were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies were." *Id.* at 736.

To begin with, it is clear from the foregoing authorities that the fact that Sheriff Warren is an executive, not a legislative, officer of the state of Alabama does not forestall the application of legislative immunity. *See Ex parte Shelley*, Nos. 1080588, 1080863, 2009 WL 2997498, at *4 (Ala. Sept. 18, 2009) (published) (Alabama sheriffs are state executive officers, pursuant to the Alabama Constitution of 1901, Article V, § 112.). That is, title is not determinative. Rather, the focus is on the nature of the challenged act. Here, the specific act is Sheriff Warren's "refusal to accept" the Plaintiff Charities' Class B Bingo License applications. (Doc. # 465, at 12-13.) This refusal stems from the manner in which Sheriff Warren applied the Second Amended Rules to specific entities, *i.e.*, the Plaintiff Charities; the refusal did not apply to the "general community," *Bateson*, 857 F.2d at 1304. Sheriff Warren applied an existing policy (albeit allegedly wrongly) to the Plaintiff Charities and refused to accept their Class B Bingo License applications because they did not have a qualified location. (Warren Dep. 111-13); *see Crymes*, 923 F.2d at 1485. Because this act involves Sheriff Warren's enforcement of the Second Amended Rules, not his promulgation of those Rules, Sheriff Warren's motion for summary judgment based upon legislative immunity is due to be denied.

## 2.    *Qualified Immunity*

Sheriff Warren asserts that qualified immunity insulates him from liability "from all claims."  (Doc. # 424, at 27-30.)  Qualified immunity, however, is inapplicable because Sheriff Warren is sued only in his official capacity.  An official "sued in his official capacity . . . is not, of course, entitled to . . . the individual capacity defense of qualified immunity." *Bruce v. Beary*, 498 F.3d 1232, 1249 n.33 (11th Cir. 2007).  Sheriff Warren's qualified immunity arguments, thus, merit no discussion, and his motion for summary judgment based upon this defense is due to be denied.

## 3.    *Article III Standing*

Sheriff Warren also argues that Plaintiffs lack Article III standing because their claims cannot be redressed.[98]  For the reasons to follow, the court disagrees.

The requirement of Article III standing is both a constitutional limitation on federal court jurisdiction and a prudential limitation on its exercise.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To establish Article III standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984). Standing contains three elements:   The injury must be (1) "concrete, particularized, and actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by

---

[98]  Lucky Palace's equal protection claims fail, not because of a lack of standing as raised by Sheriff Warren, but on the merits as discussed above.  However, because Article III standing is "a threshold jurisdictional question" that is "independent of the merits of a party's claims," *Dimaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008), Sheriff Warren's standing arguments as to Lucky Palace are addressed in this section.

a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, No. 09-475, 2010 WL 2471057, at *8 (U.S. June 21, 2010); *see also Lujan*, 504 U.S. at 560-61.

Sheriff Warren's motion focuses on the third element.  Sheriff Warren argues that Plaintiffs' claims are not redressable because Lucky Palace does not "have a qualified location as required by the Rules within which to operate electronic bingo and [the] Plaintiff Charities that have contracted with Lucky Palace do not have a qualified location within which to participate in electronic bingo."  (Doc. # 424, at 37-38.)  Hence, Sheriff Warren argues that the injury – that Plaintiffs cannot conduct electronic bingo in Macon County – is not redressable because Plaintiffs fail to meet the "qualified location" requirement of the Second Amended Rules and that their license applications were legitimately refused on that ground.  (Doc. # 424, at 37.)

In response, Plaintiffs do not dispute that Sheriff Warren interpreted and applied the Second Amended Rules "to require an existing facility prior to licensing" and that "none of the Plaintiffs had a qualified location at the time Sheriff Warren rejected the Plaintiff Charities' applications for Class B Bingo Licenses."  (Doc. # 465, at 15 (internal citation omitted)).  Plaintiffs, however, argue that Sheriff Warren's assertion that Plaintiffs' injuries are not redressable is "erroneous."  (Doc. # 465, at 15.)  Plaintiffs assert that "redressability only comes into play when – ignoring the *challenged provisions* – a plaintiff cannot *otherwise* satisfy the existing requirements."  (Doc. # 465, at 16 (emphasis in original).)  Here, Plaintiffs assert that the very requirement that they are challenging is the "soundness

of the existing-facility requirement," and that "Sheriff Warren has not identified any unchallenged provisions of the rules and regulations that the Plaintiffs fail to satisfy." (Doc. # 465, at 16.)  Hence, Plaintiffs argue that "[i]rrespective of the 'qualified location' requirement, . . . [they] have standing." (Doc. # 465, at 16.)

Both parties argue that *KH Outdoor, L.L.C. v. Clay County, Fla.*, 482 F.3d 1299 (11th Cir. 2007), supports their position.  In that case, the Eleventh Circuit held that the plaintiffs lacked standing to bring a § 1983 claim challenging the constitutionality of a sign ordinance prohibiting the erection of new billboards.  *Id.* at 1303-04.  The plaintiffs' injury – that their proposed billboards could not be erected – was not redressable.  *Id.* at 1303.  "Any injury [the plaintiffs] actually suffered from the billboard and offsite sign prohibition is not redressible because the applications failed to meet the requirements of other statutes and regulations not challenged."  *Id.*  Hence, even if the plaintiffs obtained a favorable decision on their claim challenging the constitutionality of the sign ordinance, the plaintiffs' sign permit applications still could have been denied for failure to comply with other applicable statutes and regulations that the plaintiffs had not challenged.  *Id.* at 1304-05.

*KH Outdoor* works in Plaintiffs' favor, at least as to eleven Plaintiffs.[99]  As to these Plaintiff Charities, Sheriff Warren's sole argument is that they lack standing because they do

---

[99] Those Plaintiffs are:  (1) Beulah Missionary Baptist Church; (2) E. D. Nixon Apartments, Inc.; (3) McRae Prostate Cancer Awareness Foundation; (4) New Elam Missionary Baptist Church, (5) Shorter Community Development, Inc.; (6) Shorter Lodge # 533; (7) Shorter Volunteer Fire Department; (8) Sweet Gum AME Zion Church; (9) Tabernacle Baptist Church; (10) Greater White Church; and (11) Lucky Palace.  The remaining charities are in the dock on other issues, discussed *infra.*

not have a qualified location at which to conduct electronic bingo and, therefore, fail to meet the requirements of the Second Amended Rules.  (*See* Warren Dep. 273-75.)  But, the qualified location requirement of the Second Amended Rules is at the core of Plaintiffs' equal protection challenges, as discussed earlier in this opinion.  Sheriff Warren does not argue that Plaintiffs have failed to satisfy other of the Second Amended Rules' requirements. For that reason, *KH Outdoor* is distinguishable.  Accordingly, Sheriff Warren's motion for summary judgment challenging the foregoing eleven charities' standing is due to be denied.

The same outcome is mandated, but for a different reason, as to four other Plaintiff Charities:  (1) Milstead Community Center ("Milstead"); (2) Tubman Gardens; (3) Tuskegee Macon County Community Foundation ("TMCCF"), Inc.; and (4) RG Apartments.  Sheriff Warren argues that these four Plaintiff Charities also fail to meet the requirements of the Second Amended Rules because they were not "active" in Macon County, as provided in § 1(d).  (*See, e.g.*, Doc. # 426, at 25; Doc. # 428, at 25; Doc. # 430, at 25; Doc. # 432, at 27.) Hence, Sheriff Warren argues that, irrespective of the qualified location requirement, he could have refused to give these Plaintiff Charities Class B Bingo Licenses.[100]

---

[100] Section 1(d) of the Second Amended Rules provides:  "'Nonprofit organization' shall mean a bona fide organization that is *active* and in good standing for charitable, educational, or other lawful purposes which operates without profit to its members and/or which has been classified by the Internal Revenue Service as a tax exempt organization."  (2d Am. Rules § 1(d) (emphasis added).)  The requirement that a nonprofit organization be "active" was added in the First Amended Rules, effective June 2, 2004.  As indicated in the Commentary to the First Amended Rules, the definition of "nonprofit organization" was

> amended to add the phrase "that is active and in good standing" in order to protect the truly viable charities in Macon County, Alabama, from a nonprofit organization that does not provide material charitable or educational benefits to Macon County and/or is an otherwise dormant, inactive nonprofit organization used primarily as a subterfuge to

Milstead, Tubman Gardens, TMCCF and RG Apartments do not dispute that in this action they have not challenged as unconstitutional the "active" requirement of § 1(d) of the Second Amended Rules; however, they contend that § 1(d) requires only that a nonprofit organization "be active at the time of issuance" of a license, and that on July 25, 2005, when their applications were submitted, they satisfied the "active" requirement.[101]  (Doc. # 466, at 13-19.)  Pursuant to § 1(d), as set out in the margin, a nonprofit organization must be active "for charitable, educational, or other lawful purposes," and the commentary to the First Amended Rules further intimates that an active nonprofit organization must be one that provides "material charitable or educational benefits to Macon County."  In light of those parameters, the court has reviewed the evidence cited for and against a finding of activeness. It concludes that the nature, extent and timeframe of each of these four charities' activities and the determination of whether these activities are "material," are for charitable, educational or other lawful purposes, are beneficial to Macon County and make the charities "active" are questions of material fact properly for the jury.  These factual disputes preclude a finding at this stage that Milstead, Tubman Gardens, TMCCF and RG Apartments lack standing to bring their claims.  Sheriff Warren's motion for summary judgment for lack of standing, therefore, is due to be denied.

---

obtain a bingo license to operate games of bingo either directly or by contract with a third party individual or business entity.

(1st Am. Rules, Commentary.)

[101] The Second Amended Rules went into effect on January 1, 2005.

### 4.    *Exhaustion of Administrative Remedies*

Sheriff Warren contends that, because none of the Plaintiff Charities appealed his refusal to grant them Class B Bingo Licenses to the Macon County Commission or Macon County Circuit Court, pursuant to § 14 of the Second Amended Rules,[102] Plaintiffs' claims are not "ripe for adjudication" for failure to exhaust administrative remedies. (Doc. # 424, at 38; Doc. # 426, at 26; Doc. # 428, at 25; Doc. # 430, at 26; Doc. # 432, at 27.)  In response, the Plaintiff Charities argue that § 1983 does not require exhaustion of administrative remedies, but even if it did, any appeal would have been futile. (Doc. # 466, at 11 & 12 n.9.)

In *Beaulieu v. City of Alabaster*, 454 F.3d 1219 (11th Cir. 2006), the Eleventh Circuit held "that there is no requirement that a plaintiff exhaust his administrative remedies before filing suit under § 1983." *Id.* at 1226; *see also Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 501-02 (1982) ("[T]his Court has stated categorically that exhaustion is not a prerequisite to an action under § 1983, and we have not deviated from that position.").  Based upon the clear authority of *Beaulieu* and *Patsy*, and no contrary law having been cited by

---

[102] Section 14 provides

> Any nonprofit organization whose application for a license hereunder shall be denied by the Sheriff pursuant to these Regulations shall have the right to appeal such denial to the Macon County Commission and to the Circuit Court of Macon County in the same manner as an appeal of a revocation of a license issued hereunder may be appealed pursuant hereto provided, however, that such organization shall not operate any bingo game until such application shall have been granted, and a license issued, pursuant to any order of the said Commission or Court.

(2d Am. Rules § 14.)

Sheriff Warren, a failure to exhaust the appeal remedies permitted in the Second Amended Rules does not preclude judicial review.   Sheriff Warren, therefore, is not entitled to summary judgment based on his contention that the Plaintiff Charities' equal protection claim is premature for failure to exhaust administrative remedies.

### 5.    *Equal Protection Claims and Statute of Limitations:  RG Apartments and Greater White Church*

Sheriff Warren argues that because RG Apartments and Greater White Church were not added as Plaintiffs until the Fifth Amended Complaint, filed on May 13, 2008, their § 1983 equal protection substantive and conspiracy claims in Counts III and IV are barred by the applicable two-year statute of limitations.[103]  (Doc. # 434, at 17-19; Doc. # 432, at 31-32.)  RG Apartments and Greater White Church concede that they were added as Plaintiffs after the statute of limitations had lapsed on their § 1983 equal protection claims in Count III.[104]   However, they contend that their claims "relate back" to the timely-filed original Complaint in accordance with Rule 15(c) of the Federal Rules of Civil Procedure and, thus, are timely.   As to Count IV, RG Apartments and Greater White Church assert that facts supporting the § 1983 conspiracy claim "did not come to light until, at the very earliest, Sheriff Warren's August 15, 2006, deposition" taken in a related case.  (Doc. # 466, at 6.) Therefore, they argue that their § 1983 conspiracy claims did not accrue until August 15,

---

[103] The parties agree that the statute of limitations for a § 1983 claim arising out of events occurring in Alabama is two years.  *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008).

[104] Based upon this concession, it is unnecessary to choose between the parties' conflicting accrual dates.

2006, and thus were timely added in the May 2008 Fifth Amended Complaint.  (Doc. # 466, at 6.)

### a.    Count III

The issue is whether the Fifth Amended Complaint adding RG Apartments and Greater White Church as Plaintiffs relates back to the original Complaint, pursuant to Rule 15(c), so as to render the § 1983 equal protection claims timely.[105]  "Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations."  *Krupski v. Costa Crociere S. p. A.*, No. 09-337, 2010 WL 2243705, at *3 (U.S. June 7, 2010).  The rule provides that an amended pleading "relates back" to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Moreover, Rule 15(c)(1)(C) "imposes an additional requirement for pleadings . . . that also involve a change in the party

---

[105] Although not addressed by the parties, the assignment of burdens should be noted.  Sheriff Warren bears the initial summary judgment burden of demonstrating the applicability of the affirmative defense of statute of limitations.  *See Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) ("Burden is on [the] defendant to adduce evidence supporting affirmative defense, not upon movant to negate its existence." (citation omitted)).  Sheriff Warren meets that burden based upon RG Apartments' and Greater White Church's concession that the statute of limitations had expired on their claims by the time they were brought into this lawsuit.  RG Apartments and Greater White Church, on the other hand, carry the initial summary judgment burden with respect to the relation back doctrine. *See Dodson v. Hillcrest Secs.*, Nos. 92-2353, 92-2381, 1996 WL 459772 at *10 (5th Cir. 1996) (unpublished) ("While [the defendant] had the burden on summary judgment of presenting evidence sufficient to prove its statute of limitations defense, [the plaintiff] had the burden of proof to rebut the statute of limitations grounds by relation back under Rule 15(c)."); *cf. Stark v. Dynascan Corp.*, 902 F.2d 549, 551 (7th Cir. 1990) ("On a motion for summary judgment, the burden is on the plaintiff to present facts which, if true, would justify equitable tolling of the statute of limitations.").

against whom the claim is asserted." *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008).[106]  Namely, the defendant against whom the new plaintiff is bringing a claim must have "(i) received such notice of the action that it will not be prejudiced in defending on the merits . . . and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).  The requirements of Rule 15(c)(1)(C) must have occurred within the time period required for service of process under Rule 4(m) – 120 days after filing of the original complaint.  *See* Fed. R. Civ. P. 15(c)(1)(C).  Relation back under Rule 15(c)(1)(C) "also still must meet the common transaction or occurrence test of Rule 15(c)(1)(B)."  *Makro Capital of Am.*, 543 F.3d at 1258.

RG Apartments and Greater White Church, therefore, must satisfy three relation back requirements:  first, that their § 1983 equal protection claim arises out of the same conduct, transaction or occurrence as the claim in the original Complaint; second, that Sheriff Warren received notice sufficient to avoid prejudice of RG Apartments' and Greater White Church's action; and, third, that Sheriff Warren knew or should have known that he would have been called upon to defend RG Apartments' and Greater White Church's claims.  *See Makro*

---

[106] Although Rule 15(c) "technically references amendments that change the parties against whom claims are asserted," the Eleventh Circuit has "applied it to situations in which new plaintiffs were added."  *Makro Capital of Am.*, 543 F.3d at 1259 (citing *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1131-33 (11th Cir. 2004)).  And, as noted in *Krupski*, Rule 15(c)(1)(C) "is not limited to the circumstance of a plaintiff filing an amended complaint seeking to bring in a new defendant."  2010 WL 2243705, at *7 n.3.  The terminology, above, is phrased to parallel the circumstance presented in this case – a new plaintiff bringing a claim against an existing defendant.

*Capital of Am.*, 543 F.3d at 1258.  Because the second requirement is dispositive, it is unnecessary to address the first and third requirements.

Greater White Church acknowledges that Sheriff Warren "may not have received notice of [its] identity prior to the expiration of the statute of limitations" because it did not apply for a Class B Bingo License.  (*See* Doc. # 466, at 9 n.6.)  Greater White Church, however, joins RG Apartments in arguing that Sheriff Warren was on notice that he may have to later defend against claims brought by *any* charity that had entered into a contract with Lucky Palace for the operation of electronic bingo and that, therefore, the notice element of relation back is satisfied.  The court disagrees.

*Williams v. United States*, 405 F.2d 234 (5th Cir. 1968), although permitting an amendment adding a new plaintiff, is instructive.  In that case, a minor, through his mother as next friend, brought suit against the government for injuries suffered from the explosion of an Army M-80 firecracker.  *See id.* at 235.  Years later, the mother moved to amend the complaint to appear as a plaintiff "in her own right" for loss of services from her son's injuries, but the district court refused to allow the amendment on statute of limitations grounds.  The Fifth Circuit reversed, holding that on the "unique" facts, *id.* at 236, the mother's claim related back to the date of the original pleading under Rule 15(c) and therefore, was timely, *see id.* at 237.

*Williams* opined that "notice is the critical element involved in Rule 15(c) determinations."  405 F.2d at 236; *see also Woods v. Ind. Univ.-Purdue Univ. at*

183

*Indianapolis*, 996 F.2d 880, 888 (7th Cir. 1993) ("'Notice,' as that term is employed in the rule, serves as the means for evaluating prejudice.").  When a new party is introduced in an untimely amendment, "[n]ot only must the adversary have had notice about the operational facts, but it must have had fair notice that a legal claim existed in and was in effect being asserted by, the party belatedly brought in." *Williams*, 405 F.2d at 238.  Because the original complaint revealed the presence of the mother as her son's representative and because state law was clear that "liability to the minor would give rise to a liability to the parent," the government had fair notice the mother's claim was also involved.  *Id.* at 239.  The untimely amendment, therefore, related back to the date of the original pleading under Rule 15(c).  *Id.*

In *Pappion v. Dow Chemical Co.*, 627 F. Supp. 1576 (W.D. La. 1986), applying *Williams*, the court explained that a defendant's prior knowledge of a prospective plaintiff's "existence" is insufficient, in and of itself, to permit relation back under Rule 15(c), even if the claim arises out of the same transaction or occurrence as the original complaint.  *Id.* at 1581 (citing *Williams*, 405 F.2d at 234-39).  "[T]he additional plaintiff must have in some manner already been involved in the action, so that the defendant was on notice that it was in effect already defending the action against the new plaintiff who seeks to be added by the late amendment."  *Id.*  There are sound policy reasons for not permitting mere knowledge of the existence of a potential plaintiff to suffice for relation back purposes:

> Often, a defendant may have notice of the existence of a possible plaintiff or of a possible claim against it.  When the applicable period of limitations passes, however, the purpose of the statute of limitations has been served, in that defendant no longer needs to retain evidence and witnesses that may be

necessary for its defense, and can devote to more useful purposes the resources that it had been reserving for the defense of the possible claim.  The policy for statutes of limitations would be circumvented if a plaintiff is allowed to amend his complaint and add a new plaintiff merely because the new plaintiff's claim arose from the same transaction or occurrence of the original claim and the defendant was aware that the new plaintiff existed.

*Id.* at 1581-82.

Unlike in *Williams*, no evidence has been cited that would have alerted Sheriff Warren that RG Apartments and Greater White Church would seek to join this litigation more than two years after its commencement.  Nor has any evidence been cited indicating that Sheriff Warren understood when the original Complaint was filed that their claims were at issue.  Unlike in *Williams*, there is no evidence that Greater White Church and RG Apartments were involved in this lawsuit, in any capacity, prior to the filing of the proposed Fifth Amended Complaint that added their claims or that they had a claim that was in effect being asserted by them.  These two Plaintiff Charities are not mentioned in any of the complaints preceding the Fifth Amended Complaint.  At best, RG Apartments (but not Greater White Church) has demonstrated that Sheriff Warren had notice of RG Apartments' existence when its Class B Bingo License application was submitted, but even assuming that Sheriff Warren knew of RG Apartments' existence, there is no evidence that he knew that it was part and parcel of this lawsuit.[107]  Because RG Apartments and Greater White Church have not demonstrated

---

[107] As discussed, not even notice of that type has been shown or argued as to Greater White Church, which did not submit a Class B Bingo License application to Sheriff Warren.

that Sheriff Warren received notice under Rule 15(c)(1)(C)(i) sufficient to avert undue prejudice, their claims do not relate back to the filing of this lawsuit.

In sum, RG Apartments and Greater White Church concede that they joined this lawsuit after the two-year statute of limitations expired on their § 1983 equal protection claims.  They have failed to create a genuine issue of material fact with respect to the second element of the relation back doctrine.  Accordingly, Sheriff Warren's motion for summary judgment raising the statute of limitations as a bar to RG Apartments' and Greater White Church's § 1983 equal protection claim in Count III is due to be granted.

### b.    Count IV

RG Apartments' and Greater White Church's § 1983 conspiracy claim hinges on the demonstration of an underlying actual denial of their equal protection rights.  Because those underlying equal protection claims are barred by the statute of limitations, the § 1983 conspiracy claim fails as well.  *See Grider*, 628 F. Supp. 2d at 1346 (finding that in § 1983 civil conspiracies, "the statute of limitations runs separately for each individual overt act of the conspiracy").  Accordingly, Sheriff Warren is entitled to summary judgment on RG Apartments' and Greater White Church's § 1983 conspiracy claim.

**D.    State Law Claims Against Mr. McGregor and VictoryLand**

Counts V and VI allege tort claims under Alabama law.  Count V is a claim for tortious interference with contractual and business relations between Lucky Palace and the Plaintiff Charities for the operation of electronic bingo in Macon County.  Count VI is a claim for tortious interference with Plaintiffs' prospective contractual and business relationships with patrons and customers of the anticipated Lucky Palace electronic bingo casino.  These two counts are brought against Mr. McGregor and VictoryLand only, not against Sheriff Warren.[108]  (6th Am. Compl. ¶¶ 180 n.1, 186 n.2.)

Tortious interference with a contractual relationship and tortious interference with a business relationship are "separate and distinct" torts.  *White Sands Group, L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1054 (Ala. 2008) ("*White Sands I*") (citation and internal quotation marks omitted).  A legal significance of that separation is that "the absence of a valid contract is not fatal to [a] claim of tortious interference with a business relationship."  *Id.* Count V alleges both torts.

The elements of a cause of action for tortious interference with a business relationship, as recently clarified by the Supreme Court of Alabama, are: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009) ("*White*

---

[108] In this section, references to "Defendants" are to Mr. McGregor and VictoryLand.

*Sands II*").[109]  Tortious interference with contractual relations, on the other hand, differs as to the first element above because "[a] claim of tortious interference with a contractual relationship presupposes the existence of an enforceable contract."  *White Sands I*, 998 So. 2d at 1054.  Otherwise, the elements of both torts overlap.[110]  *See generally Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 597 (Ala. 1986) (pronouncing a rule "broad enough to encompass both interference with business relations and interference with contractual relations"), *overruled on other grounds* in *White Sands II*, 32 So. 3d at 14.[111]  The parties have filed cross-motions for summary judgment for the disposition of Counts V and VI.

---

[109] *White Sands II* was decided on September 4, 2009, two weeks prior to the date the parties in this case filed their summary judgment motions.  *White Sands II* further elucidates the principles guiding a claim for tortious interference with business relations.  It cleared up a perceived ambiguity in prior Alabama law by holding that absence of justification is not part of a plaintiff's *prima facie* case for a claim of intentional interference with business relationships, but rather that justification is an affirmative defense.  *White Sands II*, 32 So. 3d at 12.  While this case does not turn on that element, the clarification is noted because Plaintiffs have referred to this element as being part of their *prima facie* case.  (Doc. # 445, at 58, 59-61.)  Moreover, *White Sands II* clearly established that a plaintiff is not required to produce evidence of fraud, force, or coercion as an element of his case.  *White Sands II*, 32 So. 3d at 14.

[110] The parties do not argue that the claims bear any other distinguishing elements, and Alabama decisions that have addressed both claims generally define the first element as the only non-parallel element.  Indeed, a contract is certainly a "protectible business relationship" so that it would be reasonable to say that interference with a contract is a subset of interference with a protectible business relationship.

[111] *White Sands II* overruled *Gross* to the extent that it required a plaintiff to prove absence of justification as an element of the *prima facie* case, *see supra* note 109.  *See White Sands II*, 32 So. 3d at 14.

**1.     *Tortious Interference with Contractual or Business Relationships (Count V)***

Plaintiffs bring a claim in Count V that Defendants intentionally interfered with the contractual and business relations between Lucky Palace and the Plaintiff Charities by influencing and/or directing Sheriff Warren to promulgate unreasonable Rules for the operation of electronic bingo in Macon County, and that those Rules have rendered the contractual relationships impossible. (6th Am. Compl. ¶¶ 176-82.) Plaintiffs argue that there is no genuine issue of material fact as to each element of their claim, and that they are entitled to judgment as a matter of law.   Defendants, however, contend that summary judgment is inappropriate for Plaintiffs, but appropriate for them, because Plaintiffs have not produced any evidence that Defendants knew of contracts between Lucky Palace and the Plaintiff Charities (element two) or that they interfered with those contracts (element four).[112] For the reasons to follow, the court finds that genuine issues of material fact exist for trial on elements two and four of the *White Sands II* test and that, therefore, neither party is entitled to summary judgment on the tortious interference claim in Count V.

---

[112] To prevail on their motion for summary judgment, Plaintiffs must show that there is no genuine issue of material fact as to *all* elements of their claims.  By contrast, Defendants can prevail by showing that there is no genuine issue of material fact as to *any* element of a claim.

### a.       Knowledge (Element Two)

### i.       Plaintiffs' Arguments

In support of their motion for summary judgment, Plaintiffs argue that by September 25, 2004, at the latest, Mr. McGregor and VictoryLand "had knowledge of the business relationship between Lucky Palace and the Plaintiff Charities[,] and Lucky Palace's intention to enter into the electronic bingo market in Macon County."  (Doc. # 445, at 59.)  To demonstrate knowledge, Plaintiffs submit a newspaper article, titled "Die Cast for New Bingo Facility," that appeared in the *Montgomery Advertiser* on September 25, 2004, and was written by Jannell McGrew.  That article paraphrases Mr. McGregor as saying that "he was not concerned about competition from the new facility" and includes a direct quote from Mr. McGregor that "'competition doesn't concern me at all.'"  (Jannell McGrew, *Die Cast for New Bingo Facility*, *Montgomery Advertiser*, Sept. 25, 2004 (Ex. 17 to Doc. # 445).)

Plaintiffs also point to deposition testimony from Mr. McGregor.  Asked when he first learned that Lucky Palace was "seeking to be a qualified location for [electronic] bingo in Macon County," Mr. McGregor responded, "The first time I recall that I learned that was in an article in the [*Montgomery Advertiser*]."  (McGregor Dep. 327.)  Neither the date of the article nor the date Mr. McGregor read the article is mentioned in this deposition excerpt. The newspaper article and the excerpt from Mr. McGregor's deposition are the two evidentiary sources upon which Plaintiffs rely to show that Mr. McGregor had knowledge

at the latest by September 25, 2004,[113] of a business relationship between Lucky Palace and

the Plaintiff Charities.[114]

---

[113] The inference to be drawn from the deposition testimony is that Mr. McGregor learned of Lucky Palace's endeavors by reading a newspaper publication issued some time prior to his statement being quoted in the September 25, 2004 article.

[114] Newspaper articles generally are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted. *See United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005) ("The Miami Herald articles are . . . inadmissible hearsay, as they are relevant primarily to establish the truth of their contents – the identity of the gunmen."). Indeed, statements in newspapers often present hearsay within hearsay problems. *Id.* at 1211 n.23 ("[T]he articles are likely a reporter's account of what eyewitnesses reported; in other words, double hearsay forbidden by Rule 805."). And, "[t]he general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation and internal footnote omitted). An argument could be made that Mr. McGregor's actual statements in the *Montgomery Advertiser* article – revealing that at least as of September 25, 2004, he knew about Lucky Palace's existence and plans – are admissible as nonhearsay admissions by a party opponent, *see* Fed. R. Evid. 801(d)(2), or because they are offered to show Mr. McGregor's state of mind, *see* Fed. R. Evid. 803(3). There, thus, does not appear to be a double hearsay problem. *See Green v. Baca*, 226 F.R.D. 624, 638 n.22 (C.D. Cal. 2005) ("The [*Los Angeles Times*] articles are not double hearsay to the extent they repeat statements made by Sheriff Leroy Baca, as such comments would be the admissions of a party opponent."). However, Plaintiffs rely upon Mr. McGregor's statements in a *Montgomery Advertiser* article, rather than upon the reporter's deposition testimony or attestations about those statements. *See Larez v. Los Angeles,* 946 F.2d 630, 642 (9th Cir. 1991) ("The statements' repetition in the newspapers . . . posed a more difficult [hearsay] problem . . . ."). A reporter's written text of what a party said is an out-of-court statement. *See id.* ("[T]he reporters' transcriptions were out-of-court statements. By attributing quotations to [the defendant], the reporters necessarily made the implicit statement, "[The defendant] said this!" As the reporters' statements were made in newspapers, they were, *a fortiori*, statements made out-of-court.").

*Macuba* would appear to prohibit introduction of Mr. McGregor's statements in the form of a newspaper article, but here, Defendants have not objected to the newspaper article or its statements on hearsay grounds, and there is authority that their failure to object amounts to a waiver of any hearsay objection to the statements' consideration at the summary judgment stage. *See BGHA, LLC v. City of Universal City, Tex.*, 340 F.3d 295, 299 (5th Cir. 2003) (Party waived hearsay objection to affidavits introduced in support of motion for summary judgment "by failing to object below to the admission of the affidavits."); *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1297 n.17 (5th Cir. 1994) ("The Contractors now contend that this paper is hearsay, and cannot be relied on by the district court in rendering summary judgment. However, they did not raise this hearsay objection below, so the error, if any, is waived.").

It also is notable that Defendants do not argue that the newspaper article contains an inaccurate report of what Mr. McGregor told the reporter or that the reporter had a motive to lie. Mr. McGregor's challenge to the article is not to its truth or authenticity, but instead that the statements attributed to him in that article are insufficient to create an inference of knowledge that he knew about contracts between Lucky Palace and any nonprofit organization. (*See* Doc. # 459, at 104.) Based upon this posture, the court has considered the statements in the newspaper article in ruling on the summary judgment motions for the purpose of pinpointing a date when Mr. McGregor learned of Lucky Palace's plans to enter the Macon County electronic bingo market.

Finally, Plaintiffs argue that it can be inferred, based upon evidence of Mr. McGregor's familiarity with the Rules' contracting requirements, that Mr. McGregor was "aware that . . . Lucky Palace had entered into – or planned to enter into – contracts with certain local nonprofit organizations" for the operation of electronic bingo in Macon County. (Doc. # 464, at 15-16.)  It is not required, according to Plaintiffs, to prove that Mr. McGregor "knew the exact identities of the nonprofit organizations" with which Lucky Palace had entered into contracts or business relations.  (Doc. # 464, at 15.)

### ii.  Defendants' Arguments

In support of their summary judgment motion, Defendants argue that there is undisputed testimony that neither Mr. McGregor nor VictoryLand had any knowledge "of the existence of . . . contracts" between Lucky Palace and the Plaintiff Charities.  (Doc. # 459, at 105.)  Defendants rely upon the deposition testimony of the Plaintiff Charities' representatives, each of whom testified that he or she had no knowledge of any evidence that either Mr. McGregor or VictoryLand was aware of any contractual relationships between Lucky Palace and the Plaintiff Charities.  (Doc. # 459, at 105; Doc. # 440, at 67-71.)

Furthermore, responding to Plaintiffs' summary judgment motion, Defendants contend that the September 25, 2004 article does not constitute "undisputed evidence that Defendants were aware of the contracts that Lucky Palace had entered into with" the Plaintiff Charities.  (Doc. # 459, at 104.)  Defendants emphasize that the September 25, 2004 article "makes no mention of any nonprofit organization, whether any nonprofit organization had contracted

with Lucky Palace as of that date, or the identity of any nonprofit organization associated with Lucky Palace." (Doc. # 459, at 104.) Defendants also argue that at least ten of the Plaintiff Charities entered into contracts with Lucky Palace after the September 25, 2004 article was printed in the *Montgomery Advertiser*, and, thus, "the article could not possibly prove that Defendants had knowledge of those contracts." (Doc. # 459, at 104 n.55.)

### iii.    Analysis

The parties' arguments bring to the forefront several issues. The first deals with the focus of the summary judgment briefs. Defendants' arguments center on Mr. McGregor's alleged absence of notice that Lucky Palace had entered into *contracts* with any of the Plaintiff Charities. The argument ignores well-established Alabama law that the intentional interference tort extends to business relations, as well as to contractual relations. *See White Sands I*, 998 So. 2d at 1054. Because the claim for tortious interference with business relations was not addressed in Defendants' opening summary judgment brief, it could be found that Defendants did not discharge their initial burden of informing the court of the basis for their motion and demonstrating the absence of a genuine issue of material fact as to that distinct tort. *See Celotex Corp.*, 477 U.S. at 323. However, Plaintiffs do not mention this deficiency. Rather, addressing Defendants' contentions, they simply merge the analyses of the two distinct torts, focusing generally on business and contractual dealings, but without

specific delineation as to when in time the business dealings resulted in contracts.[115]   (Doc. # 464, at 16.)   Because Alabama tortious interference law encompasses business relations generally as well as contractual ones specifically, the emphasis on contracts by Mr. McGregor and VictoryLand has no purchase.   The parties' differing emphasis, however, is one of the reasons that summary judgment is not appropriate on Count V.

The second issue pertains to the specificity of knowledge a defendant must have of the business or contractual relationship.   *Teitel v. Wal-Mart Stores, Inc.*, 287 F. Supp. 2d 1268 (M.D. Ala. 2003), relied upon by Plaintiffs, is instructive.   The *Teitel* court denied cross-motions for summary judgment on a claim under Alabama law for tortious interference with business relations.   *See id.* at 1279-82.   In that case, Wal-Mart argued that it had no knowledge of the plaintiffs' and the third party's business relationship, with which it was accused of interfering.   *See id.* at 1281.   The court disagreed: "The tort of interference with prospective contractual relations does not require that a tort-feasor have knowledge of a specific third person whom its misconduct prevented from entering into a business relation with the plaintiff."   *Id.* (citation omitted).   The court explained that "'[t]here was no basis in law or logic'" for the argument that a defendant's "lack of knowledge of the identity of the party to the business relationship" forecloses liability.   *Id.* (quoting *Verkin v. Melroy*, 699 F.2d 729, 733 (5th Cir. 1983)).   "'[A]ll that is necessary is that the tortfeasor know that *some*

---

[115] It appears that some, but not all, of the Plaintiff Charities had entered into contracts with Lucky Palace by September 25, 2004, but that by January 19, 2005, Lucky Palace had secured contracts with all fifteen of the Plaintiff Charities.   (*See* Doc. # 440, at 62 n.17 (listing dates of the contracts between Lucky Palace and the Plaintiff Charities).)

party or parties had a prospective contractual relationship.'"  *Id.* (quoting *Verkin*, 699 F.2d

at 733); *see also Verkin*, 699 F.2d at 733 (It was sufficient to sustain a jury verdict that there

was evidence that the defendant-broker "knew that some [other] brokers had a prospective

contractual relationship that would entitle them to a commission on the sale of the

apartments"; it was not necessary to prove that the defendant knew the "identity" of those

other brokers.).  The court in *Teitel* found that evidence "provide[d] a sufficient basis to raise

an issue of fact with regard to whether [Wal-Mart] was aware of business relations between

the Plaintiffs and some third party, even if they were unaware of the relationship with [the

third party] specifically."  287 F. Supp. 2d at 1281.

　　　*Spring Hill Lighting & Supply Co. v. Square D Co.*, 662 So. 2d 1141 (Ala. 1995), also

addressed the knowledge requirement in the context of a tortious interference claim.  In that

case, the Alabama State Docks Departments ("Docks Department") issued an invitation for

bids for the refurbishment of a pier in Mobile.  The plaintiff, Spring Hill Lighting, Inc.

("Spring Hill"), submitted a proposal to an electrical contractor ("Smith Electric") to provide

an electrical substation for the project, and included in the proposal that products

manufactured by Siemens Energy & Automation ("Siemens") would be used for the

substation. Smith Electric included Spring Hill's quotation in its proposal to the construction

company.  The construction company, in turn, incorporated Smith Electric's proposal in its

bid and won the contract.  The construction company subcontracted the electrical work to

Smith Electric, but the Docks Department's project engineer said that the Siemens equipment

did not comply with a contract specification requiring that the transformer be manufactured by Square D or an approved equivalent.  Smith Electric, thus, canceled its order with Spring Hill and obtained Square D equipment through another vendor.  Spring Hill sued the Docks Department, Square D and others, asserting that they had intentionally interfered with Spring Hill's business relations with Smith Electric.  *See id.* at 1145.

On summary judgment, the defendants argued that there was no evidence that "they were aware of the business relation between Spring Hill and Smith Electric; rather, they s[aid] they simply knew that Siemens was applying for approval of its products as substitutes for the specified Square D products."  *Id.* at 1150.  The Supreme Court of Alabama disagreed.  It explained that there was evidence that the Docks Department's project electrical engineer knew that a Siemens substation had been installed in a prior Docks Department pier project, and that Spring Hill had supplied the Siemens equipment.  From that evidence, the court held that a reasonable jury could infer that the defendants knew that the proposed Siemens equipment would be supplied through Spring Hill and that, therefore, Spring Hill had created a genuine issue for trial on the question of knowledge.  *Id.*

Based upon the foregoing authorities, any argument that Mr. McGregor had to know the identities of the specific charities that had entered into contracts or business dealings with Lucky Palace for the operation of electronic bingo in Macon County is rejected.  Under *Spring Hill* and *Teitel*, it is sufficient if there are facts from which it can be inferred that Defendants knew that Lucky Palace was engaged in business relations with some third-party

196

charities for the purpose of securing contracts for the operation of electronic bingo in Macon County, regardless of whether Defendants knew exactly which charities were involved in those relations.  Such evidence exists in this record.

First, there is evidence that at the latest by September 25, 2004 (the publication date of the *Montgomery Advertiser* article in which Mr. McGregor is quoted), Mr. McGregor was aware that Lucky Palace sought to conduct electronic bingo in Macon County.  The date Defendants acquired knowledge of those relations is important because Plaintiffs have alleged that Defendants knowingly and intentionally interfered with those relations by unjustifiedly influencing Sheriff Warren to promulgate Rules making it impossible for Lucky Palace and the Plaintiff Charities to perform their contractual relationships.  (*See* 6th Am. Compl. ¶¶ 176-82.)  Hence, evidence of knowledge by at least September 2004 would mean that Mr. McGregor learned of those relationships after the effective date of the First Amended Rules (June 2, 2004), but prior to the effective date of the Second Amended Rules (January 1, 2005).

Second, it may be true that there is no direct summary judgment evidence of Defendants' knowledge.  The *Montgomery Advertiser* article quoting Mr. McGregor is silent as to whether Lucky Palace had entered into contracts or business dealings with any of the Plaintiff Charities, and the Plaintiff Charities have no direct evidence that Defendants knew about their contracts with Lucky Palace.  Defendants' knowledge of the contractual or business relations, however, does not have to be proved by direct evidence; it can be inferred

197

from circumstantial evidence.  In this respect, all versions of the Rules, the earliest version of which was in effect in December 2003, explicitly required that a corporation, such as Lucky Palace, had to enter into contracts with nonprofit organizations to operate electronic bingo games on behalf of those nonprofit organizations.  (*See, e.g.*, 1st Am. Rules §§ 4(a) & 9(d).)  There is evidence, as discussed in other parts of this opinion, that Defendants' agents were involved in drafting the Original Rules, the First Amended Rules, and the Second Amended Rules.  There also is evidence that Mr. McGregor himself was operating electronic bingo at VictoryLand on behalf of nonprofit organizations, *pursuant to those Rules*.

The court finds that this evidence is sufficient to create a genuine issue of material fact as to Mr. McGregor's familiarity with the Rules and whether he was aware of business or contractual relations between Lucky Palace and nonprofit organizations, even if he did not know the names of those organizations.  Summary judgment, therefore, is not appropriate for either party on the knowledge component of Plaintiffs' claim for tortious interference with contractual and business relations.  Furthermore, because a genuine issue of material fact exists as to at least one element of Count V, Plaintiffs' motion for summary judgment on this claim is due to be denied, and it is unnecessary to address Plaintiffs' arguments for summary judgment as to the other elements.  Defendants' summary judgment contentions as to the fourth element, however, still must be addressed, *see supra* note 112.

### b.   Intentional Interference (Element Four)

Under Alabama law, intentional interference encompasses purposeful interference. "'[I]ntentional interference' takes place when acts or omissions are purposely directed at the interference, *i.e.*, when the acts or omissions were designed to interfere in some way with a plaintiff's contract or business relationship." Orrin K. Ames III, *Tortious Interference with Business Relationships: the Changing Contours of this Commercial Tort*, 35 Cumb. Law Review 336 (2004-2005) (discussing Alabama law), cited with approval in *White Sands II*, 32 So. 3d at 15. Even "[i]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional." *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1270 (M.D. Ala. 2001) (quoting Restatement (Second) of Torts § 767 cmt. d and recognizing that Alabama courts have relied on the Restatement (Second) of Torts in defining the elements of tortious interference claims). "In other words, there is liability for an interference that is incidental to the defendant's independent purpose and desire but known by him to be a necessary consequence of his action." Michael L. Roberts & Gregory S. Cusimano, *Alabama Tort Law*, § 26.03 (4th ed. 2004).

As to this element, Defendants argue that there is no evidence that Mr. McGregor or VictoryLand "in any way interfered with those contracts" between Lucky Palace and the Plaintiff Charities. (Doc. # 71.) Defendants' initial argument relies upon an underlying

assumption that there is no evidence, direct or circumstantial, that Defendants had knowledge of a contractual relationship between Lucky Palace and any of the Plaintiff Charities.  That is, Defendants argue that the absence of evidence of knowledge is dispositive of whether Defendants intentionally interfered with those contracts.  Because Defendants' underlying assumption has been rejected, the argument Defendants extract from that premise also fails. The only other evidence Defendants offer of lack of interference is deposition testimony from the Plaintiff Charities' representatives to the effect that they knew of no interference by Defendants with their contracts with Lucky Palace.  (Doc. # 440, at 68-71; *see, e.g.*, Austin Dep. 90 (Milstead's representative responded "No," when asked whether "VictoryLand ever d[id] anything to interfere with Milstead's relationship with Lucky Palace in any way.").)

Plaintiffs, however, respond that "Defendants intentionally kept their interference secret, and none of the Plaintiff Charities could be expected to know the full extent of the Defendants' misconduct."  (Doc. # 464, at 16 n.8.)  But Plaintiffs have much stronger arguments.  Plaintiffs also argue that evidence of Defendants' involvement in drafting the Second Amended Rules, which capped the total number of Class B Bingo Licenses available in the county at sixty, is circumstantial evidence of intentional interference.  (Doc. # 464, at 17.)  Finally, Plaintiffs rely upon *Ex parte Henderson*, 732 So. 2d 295 (Ala. 1999), in which the Supreme Court of Alabama observed that evidence of a "strong financial motive" on the part of the defendant can support a finding of intentional interference.  *Id.* at 298.  The financial motive argument will be addressed first.

200

There is evidence that Mr. McGregor and VictoryLand profited sizably from electronic bingo. The evidence establishes that, in December 2003, prior to substantial electronic bingo operations, VictoryLand's gross electronic bingo profits were $408,481. In 2004, the first full year of electronic bingo operations at VictoryLand, VictoryLand's gross profits from electronic bingo increased to $49,902,963. In 2008, VictoryLand's estimated gross profits were $125,860,684.34, an increase in overall gross profits from electronic bingo operations of 152 percent from 2004 to 2008. (Ex. 30 to Doc. # 446; *see also* Michael A. Williams, Ph.D. Decl. ¶ 34 ("Between 2004, when [VictoryLand's] bingo gaming revenues were $49,902,963, and 2007, when bingo gaming revenues exceeded $ 126 million, the annual average growth rate was 36 percent.").) A larger financial incentive to interfere with competition is difficult to imagine. It is notable also that those gross profits were reduced only marginally by the payments made to VictoryLand's contracting charities. The annual combined total of payments made to the charities was $546,350 (2004); $978,250 (2005); $797,650 (2006); $797,650 (2007); and $1,300,026 (2008). Quantified into percentages, the payouts each year to the charities accounted for .50 to .80 of one percent of the total annual gross profits derived from electronic bingo. While it is recognized that there are operating and other costs associated with VictoryLand's electronic bingo operations, the amount of the payouts VictoryLand made to its contracting charities is relevant and material when compared to what VictoryLand retained. The comparison provides an evidentiary glimpse of the overall profitability to VictoryLand and, thus, is relevant and material to the issue of

economic motive.  Moreover, the evidence, in its totality, provides an adequate basis from which a reasonable jury could infer a strong financial motive by Defendants to intentionally interfere with the contractual or business relations between Lucky Palace and the Plaintiff Charities.

Plaintiffs also have compelling arguments arising out of circumstantial evidence of Defendants' involvement in the rule-making process.  First, there is evidence that "from day one" Mr. Bolton represented Mr. McGregor "concerning bingo in Macon County" (McGregor Dep. 194-95, 197, 206), and that beginning in November 2003, prior to the promulgation of the Original Rules, and continuing at least until January 2005, when the Second Amended Rules became effective, Defendants, through their agent Mr. Bolton, inserted themselves into the rule-drafting process.  In particular, as to the Second Amended Rules, Plaintiffs have submitted testimony from Mr. Bolton that he sent Mr. Gray Jr. a draft of the Second Amended Rules, with suggested and proposed amendments.  (Mr. Gray Jr. Dep. 179-81; Bolton Dep. 201-02.)  Second, there is the timing of the Second Amended Rules:  They were promulgated just barely three months after September 25, 2004, the date Mr. McGregor publically expressed knowledge of Lucky Palace's intentions and, by inference, its business relations with nonprofit organizations.

Third, it is undisputed that the Second Amended Rules, effective January 6, 2005, contain an amendment that "[a]t no time shall there be issued and outstanding more than sixty (60) Class B Bingo Licenses for the operation of bingo in Macon County."  (2d Am.

Rules § 2.)  Furthermore, there is evidence that within a month of the promulgation of the Second Amended Rules, Sheriff Warren issued fourteen licenses to charities associated with VictoryLand, bringing VictoryLand's total number of charities to at least fifty-three.  (Ex. C to Warren Aff.; Ex. 20 to Doc. # 446.)  Because the Second Amended Rules required that a "qualified location" have a minimum of fifteen Class B Bingo Licenses, while simultaneously capping the number of Class B Bingo Licenses available in the county at sixty, VictoryLand's acquisition of fifty-three Class B Bingo Licenses had the effect of preventing Lucky Palace's electronic bingo operations endeavor.  In other words, there were no longer fifteen Class B Bingo Licenses available, the minimum required for the operation of electronic bingo at a qualified location.

Although some of the details remain murky as to which individual or individuals proposed and crafted the Rules' amendments, and in particular the sixty-license cap, the court finds that evidence of the involvement of Defendants' agent (Mr. Bolton) in submitting draft Second Amended Rules to Sheriff Warren's attorney (Mr. Gray Jr.), combined with evidence of a substantial financial motive and the timing of the Rules, creates a genuine issue of material fact as to whether Defendants intentionally interfered with the contractual or business relations between Lucky Palace and the Plaintiff Charities.

c.      **Summary**

Accordingly, summary judgment is due to be denied on Plaintiffs' claim in Count V for tortious interference with business or contractual relations between Lucky Palace and its charities.

2.      ***Tortious Interference with Prospective Business Relationships (Count VI)***

As grounds for Count VI, Plaintiffs argue that Mr. McGregor and VictoryLand tortiously interfered with prospective business relationships between them and prospective patrons and customers of a Lucky Palace electronic bingo facility based upon their "substantial influence over the process of drafting the rules and regulations . . . to the point of absolutely blocking . . . those anticipated business relationships." (Doc. # 445, at 64; *see also* 6th Am. Compl. ¶¶ 145-50.) The problems with Count VI, according to Defendants, are that Plaintiffs cannot establish element one (the existence of a protected business relationship) and that the Plaintiff Charities cannot demonstrate element five (damages) of *White Sands II*. Because the first ground is dispositive, the second need not be resolved.

Defendants argue that relationships between Plaintiffs and "future, theoretical, unidentified patrons and customers of a hoped-for business that do[] not yet exist" are not protectible business relationships, within the meaning of *White Sands II*. (Doc. # 459, at 107-08.) Plaintiffs, however, contend that Defendants' interference with the underlying contractual and business relations between Lucky Palace and the Plaintiff Charities has prevented them from forming relationships with patrons and customers of a Lucky Palace

facility, and by implication that Defendants should not be allowed to profit from their own misconduct.  (Doc. # 464, at 20.)

In *White Sands II*, discussing the first element of the tort of wrongful interference with a business relationship, the Supreme Court of Alabama reiterated that, "[i]n Alabama, 'protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking.'" 32 So. 3d at 15 (quoting *Ex parte Ala. Dep't of Transp.*, 764 So. 2d at 1270).  "Indeed, '[i]t is not necessary that the prospective relations be expected to be reduced to a formal, binding contract.'" *Id.* (quoting Restatement § 766B cmt. c).  "'It is the right to do business in a fair setting that is protected.'" *Id.* (quoting *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345, 1353 (Ala. 1991)).  "Thus, the inquiry in this tort is 'which interests along the *continuum* of business dealings are protected.'" *Id.* (citation omitted).  "[I]n other words, . . . when has 'an expectancy . . . matured to the stage that it is deemed worthy of protection from interference.'" *Id.* (citation omitted).

Here, no potential customer has been identified, and it is undisputed that the relationships sought to be protected presently are nonexistent.  Thus, the potential relationships here are unlike the one in *White Sands II*, where there was evidence that the plaintiffs and a third-party seller were involved in "a late-stage negotiation process for the purchase of real estate." 32 So. 3d at 15.  The negotiations had progressed considerably along the continuum.  In contrast, Plaintiffs' relationships with unknown prospective

205

customers of a prospective business arguably are not on the *White Sands II* continuum at all. In other words, the *White Sands II* court was confronted with an actual, as opposed to a nonexistent, prospective business relationship. That is a factual distinction; however, there also appears to be a fundamental legal distinction between the claim in this case and the one in *White Sands II*, a distinction that does not weigh in Plaintiffs' favor.

The specific tort addressed in that case was "wrongful interference with a business relationship," *White Sands II*, 32 So. 3d at 11, not wrongful interference with a *prospective* business relationship.[116] For obvious reasons, Plaintiffs argue that "[i]t is immaterial that specific future patrons cannot be identified" for purposes of proving a protected business relationship. (Doc. # 445, at 63 (citing *Teitel*, 287 F. Supp. 2d at 1281).) For this point, however, their reliance on *Teitel* is misplaced. In *Teitel*, there was a known potential third-party buyer. *See* 287 F. Supp. 2d at 1273, 1279. The language cited from *Teitel* concerned a different element – *i.e.*, the tortfeasor's knowledge of that third party. As to this element,

---

[116] As noted above, *White Sands II* quotes the Restatement (Second) of Torts for the proposition that "'[i]t is not necessary that the *prospective relations* be expected to be reduced to a formal, binding contract.'" *White Sands II*, 32 So. 3d at 15 (quoting Restatement § 766B cmt. c). Section 766B of the Restatement (Second) of Torts is titled, "Intentional Interference with Prospective Contractual Relation," and the phrase "prospective relations" must be read in the context of that topic and the paragraph in which the phrase is found:

> The expression, *prospective contractual relation*, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.

Restatement § 766B cmt. c (emphasis added).

206

the court concluded that there is no requirement that the tortfeasor know the identity of the "specific third person whom its misconduct prevented from entering into a business relation with the plaintiff." *Id.* at 1281. *Ex parte Alabama Department of Transportation*, also relied upon by Plaintiffs, involved a claim for tortious interference with business relations, not prospective business relations.[117]   764 So. 2d at 1270.  The defendants were accused of tortiously interfering with the plaintiff's existing business relations with general contractors. *See id.*  Whether those relations actually existed was not at issue.

Plaintiffs have not cited any Alabama case that has expanded the tort to include future relationships with nameless customers of an unformed, but anticipated, business.  Plaintiffs rely upon *Utah Foam Products*, but it does not bolster their position.  In that case, a roofing contractor (Polytec) brought a claim against a roofing products supplier (Utah Foam), alleging that Utah Foam intentionally interfered with Polytec's business relationship with a third-party (Teledyne) for a construction contract to repair hurricane-damaged roofs on buildings owned by the city of Mobile.  *See* 584 So. 2d at 1345.  Utah Foam argued that the damages element required proof that "but for" the interference Polytec would have obtained

---

[117] At the motion to dismiss stage in this case, *Ex parte Alabama Department of Transportation* was distinguished on a different ground – *i.e.*, that there was not a market for the gravel product at issue in that case, but that Plaintiffs' complaint alleged a healthy market for electronic bingo in Macon County, and, thus, arguably an expectancy that if there were a Lucky Palace casino, customers would patronize that business.  (Doc. # 144, at 24.)  The viability of the cause of action itself, however, was not directly under attack.  There also was no factual development.  Further consideration of Alabama law leads to the conclusion, as discussed *infra*, that on the evidentiary record, Plaintiffs are not entitled to recover on their claim for tortious interference with prospective business relations.  Additionally, in *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443 (Ala. 2004), also cited in the opinion on the motion to dismiss (Doc. # 144, at 24), the Supreme Court of Alabama's analysis assumed, without deciding, that there were existing business relationships between the plaintiff and vending-account customers.  *See id.* at 456.

the contract. The court disagreed: "Proof that a company would have been awarded a particular contract is not the sine qua non of the tort of interference with a contract or a business relationship." *Id.* at 1353. Plaintiffs rely on this discussion of damages to argue that "it is inapposite that [they] have not yet secured entry into the electronic bingo market in Macon County." (Doc. # 445, at 63.) Plaintiffs, however, fail to mention that there was a pre-contractual existing business relationship between Polytec and Teledyne prior to the alleged interference by Utah Foam, and that the existence of a business relationship (the first element of that tort) was not in contention on appeal.

Moreover, the *Utah Foam Products* opinion relied upon by Plaintiffs was but one of four decisions entered in that long-running litigation. In an earlier decision rendered in that litigation, *Polytec, Inc. v. Utah Foam Prods., Inc.*, 439 So. 2d 683 (Ala. 1983), the Supreme Court of Alabama held that Polytec had "stated a claim for wrongful interference with its business." *Id.* at 689. Notably, the court specifically declined to address Polytec's additional theory of "interference with a *prospective* business relationship." *Id.* (emphasis added). The court explained that Polytec's right of recovery under the latter theory "coincide[d] more or less with the right to recover for the alleged tortious interference with Polytec's business" and bore "no precedent in this state." *Id.*

*Bush v. Goldman Sachs & Co.*, 544 So. 2d 873 (Ala. 1989) also undermines Plaintiffs' legal theory. In *Bush*, the plaintiff company had developed a computer model to maximize tax savings in government bond refunding transactions. The plaintiff's computer model was

208

included as a component in an underwriting firm's proposal to the city for restructuring the bond debt of the city. The defendants' proposal, however, was selected, and the plaintiff alleged that his computer model was misappropriated by the city. One of the plaintiff's claims was that the defendants had interfered with his actual or prospective business relations with the city. *See id.* at 874. The court in to-the-point fashion deflated that theory: "There was no direct business relation between the City and [the plaintiff] that could be interfered with; therefore, this claim is baseless." *Id.* at 875. At least one federal district court in Alabama has cited *Bush* for the principle that Alabama "law requires an *existing* contractual or business relation with a third party before there can be interference with that relation." *Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1585 (N.D. Ala. 1996) (emphasis added).

Although a serious question exists as to whether Alabama courts would recognize the general legal theory advanced in Count VI, it need not be decided whether there could ever exist a factual scenario in which Alabama courts would recognize a cause of action for tortious interference with nonexistent prospective customers of a prospective business. The reasoning is as follows. Here, the relationships between Plaintiffs and prospective customers are not only once-removed from the actual and identifiable contractual and business dealings between Lucky Palace and the Plaintiff Charities that form the basis of Count V, but those prospective business relations identified in Count VI actually are an extension of and interwoven with the underlying business and contractual relations between Lucky Palace and

209

the Plaintiff Charities.  Plaintiffs' reliance on *Utah Foam Products*' discussion of damages for a tortious interference with business relations claim further illustrates that Plaintiffs in actuality are seeking to recover in Count VI a potential element of damages in Count V, *i.e.*, the loss of future profits from customer business.[118]  *See* 584 So. 2d at 1353.  Accordingly, for the foregoing reasons, summary judgment is due to be entered in favor of Defendants on Count VI.[119]

### 3.    *Statute of Limitations*

There is a final issue to be addressed.  Defendants argue that the tortious interference claim in Count V is barred by the statute of limitations.  There is no dispute that the statute of limitations for a tortious interference claim is two years under Alabama law.  *See* Ala. Code § 6-2-38(l); (Doc. # 440, at 61.)

"[T]he statute of limitations begins to run in favor of the party liable from the time the cause of action accrues."  *Chaney v. Ala West-AL, LLC*, 22 So. 3d 488, 496 (Ala. Civ. App. 2008) (citation and internal quotation marks omitted).  The date the cause of action accrues turns on the timing of the plaintiff's legal injury:

---

[118] The court's observation should not be interpreted as a finding one way or the other as to whether such damages are, in fact, recoverable on this record.  Damages on Count V have not been briefed.  At trial, Plaintiffs will bear the burden of proving damages on Count V.  Further briefing on recoverable damages also may be required.

[119] Defendants argue that because the Plaintiff Charities' contracts with Lucky Palace provided for fixed semi-annual payments that are "not tied to a percentage of receipts or profits of Lucky Palace's prospective bingo operations," the Plaintiff Charities have "no prospective relationships with patrons and guests [that] could have proximately resulted in pecuniary loss."  (Doc. # 475, at 15; Doc. # 440, at 75.) Hence, Defendants argue that the Plaintiff Charities cannot prove proximate damages on Count VI.  In light of the findings above, the court need not, and declines to, address this contention.

> [I]f the act complained of does not in and of itself constitute a legal injury on the date on which it was performed, the cause of action does not accrue on that date.   It is only when the first legal injury occurs that the cause of action accrues and the limitations period begins to run.

*Ex parte Floyd*, 796 So. 2d 303, 308 (Ala. 2001).   "A legal injury occurs when the plaintiff can first maintain an action." *Id.*; *accord Chaney*, 22 So. 2d at 496.

Moreover, the Supreme Court of Alabama has held that, "'[w]hen a claim accrues, for statute-of-limitations purposes, is a question of law if the facts are undisputed and the evidence warrants but one conclusion.'" *Jim Walter Homes, Inc. v. Kendrick*, 810 So. 2d 645, 650 (Ala. 2001) (quoting *Kindred v. Burlington N. R.R.*, 742 So. 2d 155, 157 (Ala. 1999)).   "'However, when a disputed issue of fact is raised, the determination of the date of accrual of a cause of action for statute-of-limitations purposes is a question of fact to be submitted to and decided by a jury.'" *Id.* (quoting *Kindred*, 742 So. 2d at 157); *see also Fed. Mogul Corp. v. Universal Constr. Co.*, 376 So. 2d 716, 723 (Ala. Civ. App. 1979) ("It is settled that where the facts are disputed on the question of when plaintiff first suffered injury, the issue of whether the statute of limitations bars plaintiff's claim is for the jury.").

Defendants argue that Plaintiffs' tortious interference claim in Count V accrued in mid-January 2005 when "Lucky Palace's application for a bingo [O]perator's [L]icense was denied by Sheriff Warren . . . on the basis that Lucky Palace did not have a qualified facility." (Doc. # 440, at 59, 62; *see also* Doc. # 440, at 64-65.)   Defendants further contend that mid-January 2005 is the date that the Plaintiff Charities' claims accrued "because the denial of Lucky Palace's application [in January 2005] meant the [Plaintiff Charities] immediately lost

any right they may have had to receive licensing fees pursuant to their contracts with Lucky Palace and, thus, [they] could have maintained an action at that time." (Doc. # 440, at 64 (emphasis omitted).) According to Defendants' calculations, the tortious interference claims are time barred because they were not brought until June 2007, when the Third Amended Complaint was filed.[120]  (Doc. # 440, at 63.)

Plaintiffs do not dispute that Sheriff Warren denied Lucky Palace's application for an Operator's License in mid-January 2005.  Rather, they contend that Defendants have "misapprehend[ed] the accrual date." (Doc. # 464, at 6.)  Plaintiffs assert that, because neither Amendment No. 744 nor the Rules provide for an "operator's application," its submission was "improper" and the return of the application by Sheriff Warren in January 2005 cannot trigger the running of the statute of limitations. (Doc. # 464, at 7, 9.)  This is because, according to Plaintiffs, their injury was not "redressable" at that time, and a "redressable injury" is required before a plaintiff can maintain an action. (Doc. # 464, at 8.) Instead, Plaintiffs point out that the Rules require nonprofit organizations to apply for Class B Bingo Licenses, and that their legal injury did not occur until July 25, 2005, when Sheriff Warren refused to accept the Plaintiff Charities' applications for Class B Bingo Licenses. (Doc. # 464, at 6.)  Only then were Plaintiffs "entitled to maintain a cause of action." (Doc.

---

[120] June 29, 2007, is the date the Third Amended Complaint was filed; however, on June 7, 2007, Plaintiffs filed a motion for leave to file the Third Amended Complaint to add the tortious interference claims.  Plaintiffs argue that the date the motion to amend was filed, rather than the date leave to amend was granted, is the pertinent date for purposes of analyzing the statute of limitations defense.  (Doc. # 464, at 7 n.3.)  Because the result would be the same regardless of which date in June 2007 is used, this argument need not be addressed.

# 464, at 9.)  Because their tortious interference claims were brought within two years of that refusal, Plaintiffs argue that their claims are timely.  (Doc. # 464, at 6.)

Having considered the arguments and the evidence, the court finds that the facts do not show, conclusively and without dispute, that Plaintiffs' legal injury occurred in January 2005, as urged by Defendants.  The tortious interference alleged by Plaintiffs is Mr. McGregor's and VictoryLand's influence and involvement in the promulgation of the Original Rules (effective December 2003), the First Amended Rules (effective June 2004), and the Third Amended Rules (effective January 2005).  More specifically, Mr. McGregor and VictoryLand allegedly had a hand in ensuring that certain terms were included in the Rules to secure a "monopoly" for VictoryLand in electronic bingo operations in Macon County.  However, as pointed out in other parts of this opinion, there is no mention of a procedure in the Rules for an owner to obtain an Operator's License to operate electronic bingo on behalf of a nonprofit organization.  The only reference in the Rules is to an "Operator's License Fee" that must be paid by the owner of a Class B qualified location "[s]hould fifteen (15) or more Class B Bingo License holders contract" with the owner.  (2d Am. Rules, § 4).  If there is no term in the Second Amended Rules that relates to an Operator's License application, then it is difficult to envision how the denial of an Operator's License application has anything to do with Mr. McGregor's and VictoryLand's alleged interference such that Plaintiffs could have maintained their cause of action when the Operator's License application was denied.  On the other hand, the Rules specifically require

a nonprofit organization desiring to obtain a Class B Bingo License to "make[] application to the Sheriff on forms prescribed by the Sheriff." (2d Am. Rules § 4(a).) And, Plaintiffs have presented evidence that it was not until July 25, 2005, that the Plaintiff Charities' forms were submitted to Sheriff Warren and denied. This is sufficient evidence from which a reasonable jury could conclude that the causes of action for tortious interference did not accrue until July 25, 2005, within the limitations period.

Accordingly, Defendants' motion for summary judgment on the basis of the statute of limitations is due to be denied.[121] It will be for the jury to decide when the two-year statutory period of limitations accrued.

### 4.    Summary

Summary judgment is due to be granted in favor of Defendants on the claim in Count VI for intentional interference with prospective business relations. However, Count V is appropriate for trial because genuine issues of material fact exist on the merits and as to the statute of limitations defense. Hence, the summary judgment motions filed by both parties on the claim for intentional interference with contractual and business relations in Count V will be denied.

---

[121] In their summary judgment reply brief, Defendants provide an alternative accrual date. (Doc. # 475, at 8.) This argument, however, will not be addressed because it was raised for the first time in the reply brief, and Plaintiffs have not had an opportunity to respond to the argument.

214

## VI.  CONCLUSION

The end result is that Plaintiffs' motion for partial summary judgment will be denied in its entirety and that Defendants are entitled to summary judgment on some, but not all, of the six counts in the Sixth Amended Complaint.  The RICO substantive and conspiracy claims in Counts I and II fail in their entirety against all Defendants.  The RICO bribery theory in Count I fails because there is no evidence that in 2003, the retainer payments and legal fees that Mr. McGregor and VictoryLand have paid to the Gray Law Firm since 1983 and the shareholder dividends Mr. Gray Sr. has received since 1983 became "things of value" conferred upon Mr. Gray Jr. with the intent to corruptly influence his actions in the rule-drafting process.  Nor is there evidence that they were "pecuniary benefits" accepted by Mr. Gray Jr. with the understanding that his actions would be corruptly influenced regarding his role in the formulation of the Rules.  The RICO honest services mail and wire fraud theory in Count I fails because *Skilling* arguably defeats it, and because Plaintiffs do not have standing under § 1964(c); the cause of Plaintiffs' asserted harms (*i.e.*, lost sales and contractual payments) is a series of actions (the denials of licenses) that are "entirely distinct" from the alleged RICO violation (defrauding the citizens of Macon County and Sheriff Warren of honest services).  *Anza*, 547 U.S. at 458.

Because there is no evidence of a substantive RICO violation, the RICO conspiracy claim in Count II necessarily fails.  Defendants, therefore, are entitled to summary judgment on Counts I and II.

The § 1983 equal protection claim in Count III against Sheriff Warren and the § 1983 equal protection conspiracy claim in Count IV against all Defendants are substantially narrowed.  Plaintiffs' equal protection facial challenges to the Second Amended Rules do not survive summary judgment:  The existing facility requirement is rationally related to the legitimate governmental interest of public safety and welfare, and the numerical licensing requirements, which restrict the number of electronic bingo gaming facilities in Macon County, are rationally related to the legitimate governmental interests of ensuring efficacious law enforcement patrol and control of electronic bingo for the public's safety and welfare.  Likewise, Plaintiffs' alternative equal protection theory – that the disparate impact of the facially neutral Second Amended Rules is the result of purposeful discrimination – does not survive summary judgment primarily because Plaintiffs do not fall into a class that historically has been the victim of discrimination.

One equal protection theory, brought by the Plaintiff Charities (not by Lucky Palace), however, survives summary judgment as to all but two of the Plaintiff Charities: the "as applied" claim that Sheriff Warren unequally administered the facially neutral Second Amended Rules.  Material factual disputes abound as to this theory, and Sheriff Warren is not legislatively immune from this claim.  However, the statute of limitations bars Greater White Church and RG Apartments, which were not added as Plaintiffs until the Fifth Amended Complaint, from pursuing this § 1983 equal protection theory, and they further fail to satisfy the requirements of the relation back doctrine.  The § 1983 conspiracy claim in

Count IV that has as its underpinnings the "as applied" equal protection theory also survives summary judgment. As to the state law claims, there are genuine issues of material fact precluding summary judgment on Count V, which alleges intentional interference with contractual or business relations; however, Defendants are entitled to summary judgment on the claim in Count VI for intentional interference with prospective business relations.

The following chart summarizes which claims and which parties did and did not survive Defendants' summary judgment motions:

| Claims | Named Defendant(s) | Summary Judgment Motions filed by Sheriff Warren, Mr. McGregor & VictoryLand |
|---|---|---|
| § 1962(c) RICO (Count I) | Sheriff Warren Mr. McGregor VictoryLand | GRANTED |
| § 1962(d) RICO Conspiracy (Count II) | Sheriff Warren Mr. McGregor VictoryLand | GRANTED |
| § 1983 Equal Protection (Count III) | Sheriff Warren | GRANTED as to facial and disparate impact theories brought by all Plaintiffs; DENIED as to the "as applied" theory brought by thirteen of the Plaintiff Charities[122]; GRANTED as to the "as applied" theory brought by Greater White Church and RG Apartments. |
| § 1983 Conspiracy to Deprive Plaintiffs of Equal Protection (Count IV) | Sheriff Warren Mr. McGregor VictoryLand | GRANTED as to the § 1983 conspiracy claim predicated on facial and disparate impact theories brought by all Plaintiffs; DENIED as to the § 1983 conspiracy claim predicated on the "as applied" theory brought by thirteen of the Plaintiff Charities, *see supra* note 122; GRANTED as to the § 1983 conspiracy claim predicated on the "as applied" theory brought by Greater White Church and RG Apartments. |
| Intentional Interference with Contractual & Business Relations (Count V) | Mr. McGregor VictoryLand | DENIED |
| Tortious Interference with Prospective Relations (Count VI) | Mr. McGregor VictoryLand | GRANTED |

[122] Hope for Families & Community Services, Inc.; Beulah Missionary Baptist Church; E. D. Nixon Apartments, Inc.; McRae Prostate Cancer Awareness Foundation; Milstead Community Center, Inc.; New Elam Missionary Baptist Church; Shorter Community Development, Inc.; Shorter Lodge # 533; Shorter Volunteer Fire Department; Sweet Gum AME Zion Church; Tabernacle Baptist Church; Tubman Gardens, Inc.; and Tuskegee Macon County Community Foundation, Inc.

## VII.  ORDER

For the foregoing reasons, it is ORDERED that

(1)    Defendants Milton McGregor and VictoryLand's motion for summary judgment (Doc. # 421) is GRANTED in part and DENIED in part (Doc. # 421);

(2)    Sheriff David Warren's motions for summary judgment (Docs. # 423, 425, 427, 429, 431, 433) are GRANTED in part and DENIED in part; and

(3)    Plaintiffs' motion for partial summary judgment (Doc. # 445) is DENIED.

DONE this 30th day of June, 2010.

/s/ W.  Keith Watkins
_____
UNITED STATES DISTRICT JUDGE

219